FILED

**CAVIAR MICKENS**
**2309 SANTA MONICA BLVD.**
**SANTA MONICA, CA 90404**
**424.436.1071**
**CAVIARMICKENS36@YAHOO.COM**
**SELF-REPRESENTING**

2021 NOV -9 PM 3: 32

CLERK U.S. DISTRICT COURT
CENTRAL DIST. OF CALIF.
LOS ANGELES

BY: _____

Pro Se

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA
## WESTERN DIVISION OF LOS ANGELES

# LACV21-8826-AB-AFMx

**CAVIAR MICKENS,**

   **Plaintiff,**

**vs.**

**LOS ANGELES COUNTY, HOUSING AUTHORITY OF THE CITY OF LOS ANGELES, LOS ANGELES COUNTY SHERIFF'S DEPARTMENT, LOS ANGELES POLICE DEPARTMENT, DIVSION OF ADULT PAROLE OPERATIONS, PATH, are California businesses,**

   **Defendant(s)**

**COMPLAINT FOR FEDERAL TORT CLAIMS FOR VIOLATION OF:**

**(1) FAIR HOUSING ACT(1999)**
**(2) THE SECTION 8 ACT (1937)**
**(3) TITLE VII CIVIL RIGHTS ACT(1964)**
**(4) TITLE 42 U.S.C. 1983)**
**(5) AMERICANS WITH DISABILITY ACT**

**(Amount Exceeds $75,000.00)**

**TRIAL BY JURY DEMAND: NO**
**DEMANDED REWARD: YES**

## COMPLAINT FOR INJURIES AND DAMAGES
### (Housing Discrimination)

1.  Complaint for injuries and damages under statutory Title VII. of the Civil Rights Act of 1964, the Section 8 Act of 1937, the Fair Housing Act of 1999 and Title 42 of the United States Code Section 1983 for housing discrimination and based on cause of action for (1) "Housing Discrimination" under the Housing Act (1999), (2) "Conspiracy to Deprive

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

Rights" and Interfered with Civil Rights" under <u>Title 42 U.S.C. 1983</u>, <u>Fair Housing Act (1999)</u> and <u>Section 8 Act (1937)</u>, (3) "Negligent Failure to Provide General Assistance" under <u>Title 42 U.S.C. 1983, 42 U.S.C. 1437(a)(A)(B)</u> and Fair Housing Act, (4) "Negligent Failure to Make Reasonable Accommodation and Person with Disability" under the Section 8 Act (1937) and the American with Disability Act, (5) "Discriminated Against Make Reasonable Accommodation" under Title II. of Federal Americans with Disability Act, (6) "Discrimination Against Person with Disability", under the Civil Rights Act (1964) and American with Disability Act.

## A. <u>PARTIES</u>

(Injured and Damaged Plaintiff)

2.  I, CAVIAR MICKENS, as the ("Plaintiff"), and an individually, and citizen of the State of California, and within the territory of the United States is a party to this action. And has been a residence of State of California thereat from 2005 to 20021, whereas had applied for housing assistance with having possessive impeded disability and low source of income and that was adequately at acknowledge to the County of Los Angeles before and after within the state territory whereas plaintiff 's injuries had occurred and is authorize pursuant to *Federal Rules of Civil Procedures Section 4(b)* once the United States District Clerk Office has finish (*Federal Rules of Civil Procedures Section 4(a)*) the completion filed process herein this complaint, plaintiff will served the federal summon and complaint to the defendants.  The defendants had causes damages to housing opportunity based on prejudice.  *Cal. Gov.'t § 12989.2(Lost of housing opportunity)*

(State and Local Government)

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

3.   Housing Authority of the City Los Angeles, as an ("Defendant"), and a local government public entity of the County of Los Angeles and may be a municipal corporation, and may be served with U.S. Marshal process (pursuant to *Federal Rules of Civil Procedures Section 4(c)(e)(i)*)) [at the address 2600 Wilshire Blvd., Los Angeles, CA 90057], and served with a copy of the summon and herein this complaint. *F.R.C. § 4(j)(i)*

4.   The Los Angeles Sheriff's Department whom is a party to the action (*Fed. Rul. Civ. Proc §§ 19(1)(B)-20*) and is an ("Defendant") and is a law enforcement service agency of the County of Los Angeles, and therewithin the State of California whom is authorize by the county and state constitution and may be served with U.S. Marshal process (pursuant to *Federal Rules of Civil Procedures Section 4(c)(e)(i)*)) [at the address 500 W Temple St, Room 383,  Los Angeles, CA 90012], and served with a copy of the summon and herein with this complaint. *F.R.C. § 4(j)(i)*

5.   The Los Angeles Police Department whom is a party, is an ("Defendant") and is a law enforcement service agency: "The Los Angeles Police Department is a protected service organization agency whom provided law enforcement services for the Districts of Los Angeles [*LAMC § 61.07*] and thereat, the time between the year 2005 through 2021 plaintiff had witnessed the agency as a public services of the City of Los Angeles district and had offered referral services to the Housing Authority of the City Los Angeles", and therewithin the County of Los Angeles and State of Californian whom is authorize by *City Council Municipal Code Section 3.13-56.11* of  the City of Los Angeles and state constitution [*Cal. Cons't., Art. 11, Sec. 1 local government agency*] and may be served with U.S. Marshal

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

process (pursuant to *Federal Rules of Civil Procedures Section 4(c)(e)(i)*)) [at the address 100 W 1st Street, Los Angeles, CA 90012], and served with a copy of the summon and herein with this complaint. *F.R.C. § 4(j)(i)*

6.  The Division of Adult Parole Operations is party to the this action and whom is an ("Defendant"), and is a state department agency of the State of California [*California Code of Regulation, 15, Division 3, Chapter 1*] and is a private sector of government supervision (for convicted offenders [*California Code of Regulation, Section 3500*] whom are <u>reentering into the public community</u> and thus department agency providing services or and receiving demands from the people of communities or county or district or any resident neighborhood community therewithin the County of Los Angeles and State of California whom is authorized by the Governor's Office and Department of Corrections), and may be served with U.S. Marshal process (pursuant to *Federal Rules of Civil Procedures Section 4(c)(e)(i)*)) [at the address 2444 South Alameda Street, 2nd Floor, CA 90058], and served with a copy of the summon and herein with this complaint. *F.R.C. § 4(j)(i).*

7.  The Los Angeles County whom is a party to this action (*Fed. Rul. Civ. Proc. §§ 19(1) (B)-20)* and is an ("Defendant") and the County of Los Angeles is person of within the state and is a supervised county of the County of Los Angeles, and therewithin the State of California whom is authorized by state constitution and at the address 500 W Temple St, 10th Floor, Los Angeles, CA 90012], and may be served with U.S. Marshal process pursuant to *Federal Rules of Civil Procedures Section 4(c)(e)(i)*) served with a copy of the summon and herein with this complaint. *F.R.C. § 4(j)(i)*

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

**(Private Organization)**

8.   Path whom is a party to the action and is an ("Defendant") and is organization within

of the City of Los Angeles [*Revenue and Taxation Code Sections 2307; 26 C.F.R. 301.7701-*

*2(b)(3)(business entities and definition)*], located the address of 2346 Cotner Ave, Los

Angeles, CA 90064 and, offer services for the homeless or low-income person and

therewithin the County of Los Angeles and State of Californian whom is authorize by City

Los Angeles to do business. And was contacted on many occasions for housing assistance

and may be served by a private process server pursuant to *Federal Rules of Civil*

*Procedures Section 4(a)(b).*


**B. FEDERAL COURT HAVING JURISDICTION
   OVER SUBJECT-MATTER**

9.   This court has original jurisdiction over this federal lawsuit, that arises under the *Titles*

*VIII of Fair Housing Act(1988),* and *42 U.S.C. §§§ 19, 3601-3604(Public Health and*

*Welfare-discrimination)*; and the *Civil Rights Act(1964).* In 2005 I, plaintiff had moved to

the State of California to only expected its county of providing public welfare assistance for

stable housing and that I moved from the State of Tennessee whereat that plaintiff  having

habitual residency of the Memphis Shelby County, Tennessee.


10.   Plaintiff had been referred by a public county office of the County of Los Angeles

whereat, and thereafter referred to the defendant (Housing Authority of the City of Los

Angeles) for housing assistance whereat I'd applied for section 8 application of housing

assistance at the Section 8 department via telephonically and written administrative form,

injured had occurred,  therefore, this federal court has jurisdiction over subject-matter

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

when the county had an obligation to reflect accordingly to federal regulation [*42 U.S.C. §§3601(Pub. Law. 90 -284, title VII, § 801, Aprt. 11, 1968, 82 stat. 81.)-3604(b)(c)]* to assist a low income person when referred by another public agency that assist homeless person and provide housing placement pursuant to *Title 24  Code of Federal Regulations*(demonstrates that the HACLA must manages its program in a manner that reflects its commitment to improving the quality of housing available to the public).

11.   The defendant (Housing Authority of the City Los Angeles) is an authorized person to operate in the state as a public institution for public housing assistance and such housing vouchers for placement for low income protected class group individuals (see exh. A: Admission Continued and Occupancy Policy, pg. 1-3), and therefore within the territorial jurisdiction of federal district court, the court has jurisdiction over the defendant pursuant to the *Federal Fair Housing Act; Federal Tort Claim Act*.

12.   And I, plaintiff had suffered injuries and damages to life, health, companionship, and emotional distress (sleeping disorder) of the continuance periodically [15 years] amount of deprivation of housing assistance and thereof fifteen years of section 8 housing discrimination by the Department of Housing Authority of the City of Los Angeles and other defendants within [county and its county's agencies] whom all had jointed vicarious concert of housing discrimination. The court my have jurisdiction in the matter that is an issue of housing discrimination under federal law. And whereas, this Court has jurisdiction over this action and may grant the relief sought herein pursuant to 28 U.S.C. §§ 1331, 1491-1443.

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

13.   The court has jurisdiction under the Disability and Employment Act: At the time when applied for Section 8 program from the Housing Authority of City of Los Angeles County I, plaintiff had possessed some disable mental function that had prevented from normal self-care of providence and supporting housing and food in the County of Los Angeles. *Individual With Disability Education Act; 20 USCA §§ 1400-1491*

14.   That I plaintiff in 2005 had possessed a disability and was discriminated based on having some impairment of disability that may have or may not at time or after when applied for Section 8 housing was known to the department of my disability. *Fair Housing Amendments Act of 1988; 42 U.S.C. § 3601 et seq; (see exh. B: LACDA's Policy-Non-Discrimination Policy, pg.2-3; Americans With Disability Act(1990)*

15.   Under the statute title *42 U.S.C. § 3604(a)(b)* it is prohibited for any county within the United States to operate with deliberate interference housing accommodation and that is not accordingly with housing rental assistance as defined under the *Code of Federal Regulation Section 24*(Discriminatory conduct) *and (Section 805(b) of the Fair Housing Act*: It shall be unlawful for any person or other entity whose business includes engaging in residential real estate-related transactions to discriminate against any person in making unavailable): "In 2005 and 2006 plaintiff had applied for Housing Assistance as an individual with low income or and without income sources in the County of Los Angeles, and, whereas plaintiff was under government surveillance investigation for unknown reason that was uniquely had been presented and delivered in technique methods to the plaintiff in a "hybrid-discovery" manner and style and under the "third-degree" police interrogation [see *in re Miranda's Warning Protection, Chpt. 2*(The Third Degree-Police

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

1  Interrogation; see in *The History and Evolution of American Torture and Secrete Prisons*

2  *(1898-2008)*] in 2018 and thereafter had led to the further discovery and the conclusion of

3  housing assistance discrimination potentially closing in factors by telephonically trick or

4  person(s) [county or department or office or state] that had, discriminatory influenced

5  agendas for the Housing Authority of the City Los Angeles not to assist plaintiff", district

6  court is proper pursuant to section *1357 of Title 28(Judiciary and Judicial Procedure*) that

7  plaintiff seek liability of loss of housing opportunity and plaintiff seek the reward in against

8  all jointed and contributed defendants for liable for the loss amount equivalent [to 16 years

9  of housing deprivation] thus and thereof the partial percentage coverage divided among the

10  defendants in any all rental lease for a housing unit or house and liable for all rental

11  application (credit check and letter of guarantee rent payment as designated for scheduled

12  payment by property management or manager of rental unit).

16.   The court has jurisdiction in the justiciability doctrine and Zone-of-Interest: whereas

the question arisen under federal constitution *[28 U.S.C. 1331*] for administrative review of

department's operation of Housing Assistance and the failure of eligibility or ineligibility of

Section 8 notice for the plaintiff as an applicant for 16 years and that the plaintiff's injury

were sustained through the general failure of county to provide housing assistance thus

thereof the failure of 16 years of the nonhousing residence of the County of Los Angeles.

*Administrative Procedure Act; Lexmark Int'l, Inc., v. Static Control Components, Inc., supra,*

*572 US at 129, 134 S. Ct. at 1388; 5 USC § 70(a) person suffering a legal wrong by an*

*agency's action*)

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

17.   As the plaintiff had seek permanent assisted residence or shelter or any housing covenant in the County of Los Angeles and by the County from the years 2005 through 2020 and its designated agency [Housing Authority of the City Los Angeles] and that all times as a homeless resident of or person residing in the county, deprive of rights to obtain or possess or having equal services for housing as it has the attachment of the First Amendment equal protection of state and federal constitution and it is at issue of subject-matter and the district court has jurisdiction when rights was violated as to interference or restriction of federal rights. *[Broadrick v. Oklahoma  (1973) 413 US  601, 612, 93 S. Ct. 2908, 2916]*

18.   The court has jurisdiction when the issue at subject-matter when a public agency has a federal obligation (pursuant to *42 U.S.C. §3601*(to provide housing and thus commenced efforts to homeless person), and that another agency [Los Angeles County Sheriff's Department and other public interested individuals] interfered or obstructed or caused to or influence to cause the housing discrimination or deprivation: Plaintiff alleged full under the *Federal Theory Doctrine Act*; *F.R.E. §§ 301-406,* and based on vicarious circumstance of the discovered awareness of state agencies' satellite surveillance or drones,  a fairy drawing conclusion and speculation of patterns *[F.R.E. §§ 301-302(Presumption- a fact that rise to a presumption without evidence or to rebut]* concluded to act(s) and activities and potential act(s) and activities were use in instrumentality during the periods alleged in housing assistance deprivation while under surveillance investigation.

C. **VENUE**

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

19.   Under *28 U.S.C. §§ 1390(a)-1391(b)(1)(2)(c)(2)(e)* venue is proper, because generally, defendant, Housing Authority of the City of Los Angeles whereas it resides in this district of Los Angeles County. And while, I, plaintiff had made numerous transactional application to Section 8 Department for housing assistance in the past sixteen years and with no correspondence notice of ineligibility or eligibility and housing approval with the defendant, the federal court is proper venue for all issues concerning subject-matter, pursuant to *28 U.S.C. § 1402(b)*; see *Del Raso v. United States (7th Cir. 2001) 244 F. 3d 567, 570, fn(Action under the Federal Tort Claims Act [28 U.S.C. §1346(b), 2671 et seq*(may be prosecuted either where the plaintiff resides or where the act or omission occurred).

20.   Because I plaintiff alleges a serious constitutional violation against Public Health and Welfare, that the public office or institution department had failure its general principles and federal regulations, that this court is a proper special venue pursuant to *42 U.S.C. § 2000e-5(f)(3)*; *Passantino v. Johnson & Johnson Consumer Products, Inc. (9th Cir. 2000) 212 F. 3d 493, 506*-Title VII's venue provision).

21.   This United States District Court is the proper venue thereof because under <u>Public Welfare Title 42 Sections 3607-3608</u> anytime a county has fail providing permanent and stabling housing assistance whether by intended or negligent careless or any circumstance that the failure of housing assistance was or was not related to discrimination or reckless care the venue is proper when a federal question is the subject matter of concern: Plaintiff was confidentially deprive housing assistance by local government of the County of Los Angeles and when under surveillance investigation *Cal. Gov. Code. §§§§ 11180, 25303,*

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

*25212, 26600-26604; 28 U.S.C. § 533* and by other instrumental devices [amplified communication, radio or direct feeds by government agency *Accountability and Transparency Act of 2005; (SB 796 Senate Bill* that was were used for untraceable or for unextractable logging or print or receipt of record or pattern mark or any data recording for review or inspection or any method for generating records that may had led to indicated housing discrimination by conductivity or in near a proxy of vicarious reports. *Fed. Rul. Evid. §§ 106-406*

22.   Plaintiff was accused of a false sexual offense in another state's jurisdiction [Tennessee] and the accused sexual offense as a minor [age (7)] and was protected under federal privacy laws as a minor. The sexual offense record from the State of Tennessee, that was under theirs' protected liability and obligation to protected disseminated confidential information and disregard the accused sex offense record, but the State of California and within its state, County of Los Angeles had obtained such state-to-state confidential record of [sex offense allegation] [*Cal. Pen. Code § 11167.5*(Confidential report; *18 U.S.C. 1905*], this federal district court has original jurisdiction for special protected class members under circumstance involving sexual offenses and the circumstance, involves federal agency [military] of a different state's jurisdiction.

D.  **INTRODUCTION**

23.  I, plaintiff, Caviar Mickens had first register application to the Section 8 Housing Assistance with the Housing Authority of the City of Los Angeles, at the address 2600

Wilshire Blvd., Los Angeles, CA 90057, in the year 2005 by telephonically. (see exh. Q-J, Doc 1: Photo: HACLA building and environment)

24.   Naming as the defendant, Housing Authority of the City Los Angeles, and believes it is the true and accurate name that defendant that uses and do business under the stated entity name. The defendant is a public entity of county of Los Angeles and provides assisted services thereof housing accommodation for person with low income or non-income source or person with disability for the protected class group members of the state of California. (*Cal. Gov.'t Code §§ 12900, 12901(Appointment))-12920(purpose;policy power)*

25.   At between periods of 2005 through 2014, plaintiff had been discriminatory remove from application process or denied without notice or denied application process or interfere with application process. Plaintiff had under reasonable assumption [*F.R.E. §§ 302-401*] in vicarious nexus circumstance in the county's government activity affairs, as the affairs proficiently damaged housing assistance, conclusively determined in the year 2021 and also having determined the housing discrimination may had been the participated of the defendants, Housing Authority of the City of Los Angeles and other outside agendas of a law enforcement agency, of the Los Angeles County Sheriff's Department. (

26.   The defendant, Division of Adult Parole Operations, had to some degree of vicarious circumstance and the influence or direct or cause to direct or contributed to discriminatory chose of housing assistance in the year 2014. The act was in concert of computer hacking of (internet domain name search engine), the directing the availability of housing assistance

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

within the Los Angeles County, whereas plaintiff was directed in the [IDNSE] to a mental housing resident for the purpose of fitting in a past-tense agenda that had reflect to an deceptive reputation or mental status of plaintiff's, and that had cause to some degree of vicarious attribution, and of plaintiff's than 2014 employments, whereas the 'constructive employment discharge of termination' for the purposes resulted in losing permanent housing residency [located at North Hollywood City] and political interests.

27.   Plaintiff had become aware of the past-tense conducting activity for 2014 to be precede as surreal and the electronic [personal cellphone and computer or other public computers [Los Angeles Public Library]] hacking or accessible by certainly a county department during the advanced investigative surveillance (*Cal. Pen. Code § 563*). The discovery had come in unique fashion of investigatory trick [third degree police method] while enduring from the state of comatose recovery and while incarcerated in a county jail.

28.   While incarcerated in Los Angeles Sheriff's County Jail, the department had made its insinuation of the surveillance investigation very vicariously conveyed aggressive, and while incarcerated in the Los Angeles County Sheriff's Department, through the LASD informants and audio and tv signal (HDMI splitter or link connection) to other devices that is use for electronic printed interpretation for predicament of body behavioral patterns or act, whereas thus had becoming self-conscious awareness to the orchestration of discriminatory selecting housing location and among certain residents and the electronic hacking. (*Computer Fraud and Abuse Act.; 18 U.S.C. § 1030*(The phrase "computer hacking" normally refers to illegally using of personal computer or general computer to

make an attempt to access another computer without consent to cause harm or commit fraud or deceit)  Plaintiff was deceive and by deceitful website appearance of a post housing assistance advertisement though a third party website (craig list) [in Plaintiff's partial recollection, of the stated website's lured posted housing information: "if you are just looking for a place to stay-", of a alcohol sober rental living house that was operated by a private own and that was managed by an Los Angeles Federal Bureau of Investigation Informant]. *42 U.S.C. § 12182(b)(2)(A)(ii)(structural communication barrier)*;

29.  Plaintiff had concluded this year of 2021 of the sufficient legality of the past orchestrated activity thus, housing discrimination and discriminatory chose of housing assistance and location and the plaintiff's visually noticed of repeated and change of the website posted rental housing room ad (*42 U.S.C. § 12181(b)(2)(A(iv)*) when plaintiff had search for housing assistance at a library branch of the Los Angeles County Public Library. [*42 U.S.C. § 3604(a)*(housing practice-making unavailable housing); *Woods v. Foster, 884 F. Supp. 1169, 1175 (N.D. Iii. 1995; Cal. Gov. Code § 12927(c)(2)(A); 24 C.F.R. §§ 100.50-100.90*)

30.  The Division of Adult Parole Operations had to some degree to cause influence or had direct cause of action in housing discrimination with and within the County of Los Angeles and had cause the influence or direct cause of act of discriminatory housing assistance with a private organization Path.

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

31.   The defendant (Path) made contact with plaintiff regarding housing assistance at the Los Angeles Union Station Tran Rail [located at 800 N Alameda St, Los Angeles, CA 90012] and sounded the availability of apartment units. (see exh. K, Photos, 1-15: Metro Rail Cameras) And I, plaintiff had return contact for housing assistance to Path but was interfere or denied, that Plaintiff believes it was by the defendants, Division of Adult Parole Operations and defendant's discriminatory agendas, the Los Angeles County Sheriff's Department, Los Angeles Police Department, Los Angeles County, and Path from 2018 through 2021 for political interests and for attempted false-imprisonments by abetting and aiding public nuisance.

E.  STATEMENT OF FACTS

32.  I, Plaintiff had moved from the State of Tennessee, with no stable financial source of income and no arranged permanent housing residence placement of to the County of Los Angeles. Thereby plaintiff was of no permanent residency, threat homeless in the County of Los Angeles. Sometimes in between May 2005 to June 2005 whereat I plaintiff had moved to the county, was offered shelter assistance of a two-week hotel voucher from the Department of Public Social Services.

33.   From threat of services by the Los Angeles County of Department of Public Social Services, I was giving an information form that had contain the information of "applying for section 8 housing assistance", and was verbally instructed to telephonically contact the Section 8 Department for applying for Section 8. I was informed by a case worker of

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

Department of Public Social Services there would be a waited period about 1 to 2 years of Section 8 housing assistance approval from the time I had applied in year 2005. And the following year of 2006 I had redundantly applied again for section 8 housing, and I was at over the age 18 years old and had met all or some administrative criteria for Section 8 application process (see exh A, Doc1, pg 8-14).

34.   When had applied with the department of Section 8 (see exh. J, Photos: HACLA Building and Location Environment) I had conducted a pre-application interview by a female intaker, city operator of the City of Los Angeles, via telephonically [electronically]. The plaintiff information and the necessary background information that was needed for completion of section 8 application and was giving to the female intaker/operator over the telephone communication. I, Plaintiff  was informed by the person whom had completed plaintiff's application "that the waited periods for section 8 approval was 5 or 10 years due to increased volume of section 8 applicants and already approval applicants that are awaited housing in section 8 placement".

35.   From 2005 through 2019 I had approximately applied for section 8 of housing assistance about 4 to 6 times of applications. The department had refused or and made no notice of acknowledgement of application of all eligible application and no approval of section 8 housing assistance within last 16 years of being qualified participant in the section 8 program.

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

36.   Between the years 2006 and 2007 I had personally applied in office of the section 8 department, whereas I filled an application and personally delivered to person at a window of the section 8 line. The application that was handed to the clerk was assumed process for eligibility for Section 8 housing and the waiting list in the year 2006. (*2 Cal. Code Regs § 12120(a)(1)*)

37.   In 2019 I had reapplied for section 8 with the department and was informed that no time of designation of approval of section 8 will be determined and that I would potentially may or may not be eligibility for Section 8 housing program and arranging to 5 to 10 years for approval.

38.   During year 2019 plaintiff was under constant heath complication [irregular heartbeats, malaise (nerve vibration), seizures, etc.) and under satellite surveillance and by also the county as on parole in the County of Los Angeles whereas the retaliation agendas in the county and constructive deprivation of agencies within the county for the meaningful purpose of interfering with and having direct influence to housing discrimination [as to compulsive deceitful offer housing assistance in hostile or criminality or distraught [menace] environment that would goes to an effect of disparage appearance and that would benefit of departments' of the county and a department's (Division of Adult Parole Operations) compliance with regulation and of past-tense alignment of interests and thus unconstitutional agendas [Falsely materials of Bare Bonding of filming productions]].

39.   I, Plaintiff had been had introduced to housing assistance by a private organization at the Los Angeles Union Station (see exh. K, Doc 5-6). I was given a contact information, to

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

contact the individual employee (Maria) for housing assistance from an organization

(Path), located then at 5627 Fernwood Ave., Los Angeles, CA 90028 then 2019 (see exh. O:

Photo: Path Resource Center building), once I meet the requirement and establish some

source of employment and stable financial source of income that would be seemingly

appropriated for requirement of the organization. At the time plaintiff was suffering a

medical disability whereas housing was necessary needed for immediate accommodation in

the year 2019.

40.   Once, plaintiff had obtained employment for a month or two I had contacted the

person (Maria) whom advised me immediately once obtain employment to contact her by

phone via call or text: Made many texts and phone calls were sent to the Path employee

(Maria) whom believes was still an employee of the private organization Path.

41.   At the time I, plaintiff had been under surveillance and phone hacking by Los Angeles

Police Department, Los Angeles County Sheriff's Department, Los Angeles City Attorney's

Officers and Parole Office and of some all agencies' informants. (*2 Cal. Code Regs §*

*12020*(*hostile environment harassment that causes unwelcome conduct sufficiently pervasive*

*to interfere with housing accommodation)* The potential of non- housing assistance from the

organization (Path) unclear determined whom cause the deprivation from housing

assistance in the year 2019 when advised by Path to contact them once obtaining

employment status: I had attempted many communication by text messages and telephone

calling to Maria. But no reply was return. *42 U.S.C. §3604(b)*(*discrimination in term or*

*condition or privilege based on connection)*

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

42.  I, plaintiff had been constant followed and unwanted stalked and cyber stalked by unknown naming group of individuals of the county and believes those individuals involve wee of employees of Path Organization and person of public building offices.

43.  In the year 2014 I, plaintiff had been released from state prison and onto Parole Supervision (Division of Adult Parole Operations Mid-City 3) in the County of Los Angeles, located at 2444 South Alameda, Vernon, Ca 90048.

44.  The parole office then in 2014 had offered some housing assistance in a hostile or criminality or distraught [menace] environment. At the time plaintiff was not aware or having any knowledge or could not have possess knowledge by reasonable due diligence of the concert activity ([psyched treatments]) [causation of housing discrimination, discriminatory chose of housing assistance, and employment termination] in 2014 that was discovered in between 2018 through  2021.

45.  In the year 2014 release from prison I, plaintiff had <u>thought</u> and very often of Section 8 housing assistance and the application filed in 2005 and 2006. Plaintiff had believes had contacted Section 8 for status update and that no status had existed for update.  Plaintiff believes to some degree and thus vicarious circumstance that of state department or agency had discriminated in housing assistance and that among attributive defendant, County of Los Angeles joint in concert in influence of nonhousing assistance [*24 C.F.R. 960.206*]. (see exh A, Doc 1, pg 24: Removal of waiting list)

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

46.  In the year 2014, I, plaintiff was release from state prison, and had seek housing assistance through the <u>internet domain</u> for any housing assistance for low income and convicted felony person for reentry into a peaceful community residence. The agency [Division Adult Parole of Operations] that plaintiff had reported for supervision, the agency had assisted in aggressive orchestration and under government operation of pertinent to housing residency for political reasons that was concluded in the year 2019 through 2021 as the [plaintiff had suffered from injuries and was recovering from state of coma that was cause by an investigation and that had led to the concluded vicarious discovery in 2018 -2020 or and reasonable circumstance of residual hearsay of a deceptive hacking then 2014 of my personal computer and county public computers' internet domain search engine of "housing assistance" and the interference; and further concluded that other local agencies had participant in or influenced the concert act in year 2014.

47.  After sometimes serving on parole for years thereat from January 14, 2014 and asking for the suitable housing plaintiff was refer to lobby board whereas "posted housing information" of inside a parole office lobby, but discovered sometimes a years later that the parole office were concealing and discriminatory selectively housing placement for favored parolees base on pervasive racial motivation and discrimination and investigatory agendas while under duty of the department of correction regulation to assist in housing assistance.

48.  In 2019 plaintiff was not able to find suitable housing placement or sharing housing unit within the County of Los Angeles.

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

**49. In the year 2019 plaintiff was approached in a Los Angeles Union Station [see exh. B: Photo: Union Station], by a private organization (Path-services for the homeless assistance, while plaintiff had waited for metro rail as attended to himself.**

**50. A female employee for Path whom had approached me and presented information regarding housing assistance and all requirement for the housing assistance that Path can offer. The employee or volunteer of the organization had given plaintiff her contact and instructed plaintiff to call or text once had established all requirement for housing assistance.**

**51. I, Plaintiff had discovery that phone hacking and internet domain name generator was redirected or interfered of my personal electronic devices by local agencies and companies. And believes such as the Division Adult Parole of Operations had participated among concert of the county in housing discrimination for the purposes of government's interest (to extend parole supervision). In unrelated to herein this federal complaint, plaintiff had discovered that the parole agency had conspired in extended parole supervision by interfere with parole condition terms (such as employment and rehabilitation programs and meeting all parole condition). As such of parole conditions, is that plaintiff must have permanent residence.**

**52. I, Plaintiff had obtained employment about two months and while under attack of employment discriminatory termination by the defendant, County of Los Angeles, plaintiff**

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

had contacted Path for the housing assistance [apartment] that was offered of services.

53. In 2021 plaintiff had contacted the Los Angeles County Development Authority pertained to public records of the Section 8 Housing Program for low-come individual and with disability. And I had further inquired through the administrated (HACLA ) method request process for the years 2005, 2005, 2007, 20008, 2009 policies for Section 8 program for application and individual with low-income sources and the Housing Authority of the City of Los Angles and had comply after many requests but the department had refuse or deny the information existed in the department's data records  collection for inspection or copying of "Contract Services Agreement of the Amendment 1 of year 2005 with the Los Angeles Sheriff's Department . (see exh. N: emails) Plaintiff discovered that of 2005 application, plaintiff should been approve sometimes between 2007 through 2011 for section 8 housing placement.

F.   **LOS ANGELES COUNTY MANDATORY POLICY FOR OPERATING HOUSING ASSISTANCE PROGRAMS**

   a.  **County and City Housing Operating Policy**

54.  In the year 2005 of the Los Angeles County's Operations Policy for Housing Assistance thereby in accordance to *the California Code of Regulations Sections 6910* and *11099* and, the *Health and Safety Code Section 50700*, in the housing program provision of Program Eligibility and Affordability for Lower Income Household Individual or single person, the Scope and Applicability of policy: Programs must comply with all portions of *Title 25 Section 6910*, and that the county and city was obligated to provide housing

assistance thus accommodation for disabled person for "affordable unit". [pursuant to *Cal. Code Regs. §§ 6910-6928(d)*; *Section 8 of United States Housing Act of 1937* (Section 8 very low-income households)] At the time when plaintiff was an or assumed as an applicant for Section 8 program plaintiff partially did not, possessed full time employment but had possessed several full part-time employments in the County of Los Angeles in between the years 2005 and 2006.

55. The County of Los Angeles was mandated to follow all procedural process for Housing Assistance for a single household family or homeless person with low income without any influence or being influent by another agency or agency under contractual relationship: Of *Title 25, Art. 3, Sec. 6(a)(b)* (Administration and Enforcement: Must be at all times in compliance with ordinance and regulation as the governing body of city or county of its welfare public office, and shall not intended to be enforce ordinance or regulation or and partially enforce ordinance or regulation by or on behalf of another city or county.

56. The County as defendant had being influent by such prejudice [by another state and joint Communication [Memphis, Tennessee (*Brock v. U.S. 570 F. 2d 976 (9th Cir. 1979(concurrent jurisdiction))*] and on its own motive endurance to deny application process and housing assistance in 2005 or and started at 2006 that had prolonging continuation for 16 years of interference and nongovernment assistance. *[Health and Safety Code §§ 17922.2-17921; Cal. Code Regs. §§ 8-17003. 5]*

    b. **Nondiscrimining Housing Assistance**

57. The County of Los Angeles was authorized accordingly to [*Fair Housing Act Title VIII*

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

*of the Civil Rights Act of 1968; Sections 11099-11154 of Title 2 Cal. Code of Regs*

**Discriminatory Practices Applicable to All Persons:** Quoted: "**It is a discriminatory practice for a recipient, in carrying out any program or activity directly, or through contractual, licensing or other arrangements, on the basis of ethnic group identification, religion, age, sex, color or status, or a physical or mental disability: (a) to deny a person the opportunity to participate in, or benefit from an aid, benefit or service; (b) to afford a person the opportunity to participate in or benefit from an aid, benefit or service that is not equal to that afforded others; (c) to provide a person with an aid benefit or service, that is not as effective in affording an equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. in some situations, identical treatment may be discriminatory; (d) to provide different or separate aid, benefits or services to a person, or to any class of persons than is provided to others, or to provide aid, benefits or services at a different time, unless such action is clearly necessary to provide such persons with an equal opportunity to receive as truly effective aid, benefits or services as those provided to others; (e) to aid or perpetuate discrimination by transferring State support to another recipient that discriminates in providing any aid, benefit or service; (f) to exclude a person from participation as a member of a planning or advisory board. Under this requirement, it is a discriminatory practice for a recipient to fail to make reasonable efforts to achieve a representative board. However, such requirement is not deemed to impose adherence to a quota system; (g) to otherwise limit a person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving any aid, benefit or service resulting from the program or activity; (h) to deny a person the opportunity to participate in programs or activities that**

are not separate or different, despite the existence of permissibly separate or different programs or activities; (i) to utilize criteria or methods of administration that: (1) have the purpose or effect of subjecting a person to discrimination on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability; (2) have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program with respect to a person of a particular ethnic group identification, religion, age, sex, color, or with a physical or mental disability; or (3) perpetuate discrimination by another recipient on the basis of ethnic group identification, religion, age, sex, color, or a physical or mental disability. (j) to make or permit selections of sites or locations of facilities: (1) that have the purpose or effect of excluding persons from, denying them the benefits of, or otherwise subjecting them to discrimination under any program or any activity; (2) that have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the program or activity with respect to a person of a particular ethnic group identification, religion, age, sex, color, or with a physical or mental disability"].

58.  Plaintiff had moved county residence from Memphis Shelby County, and the time of moved residence plaintiff then had possessive acute or partially mental impairment [disability] that had impaired from normal functions from obtaining stable housing in the County of Los Angeles whereas plaintiff was entitled to rights of government assistance under any circumstance. [*Americans with Disabilities Act*; *California Fair Employment and Housing Act*; *Section 504 of the Rehabilitation Act of 1973*]

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

59.  In the discovery information and obtain by the Los Angeles County Sheriff's Department, thus whereas informed and indicated that I had been under surveillance for investigation reason that had concluded the potential deprivation of housing assistance whereas plaintiff had lived most of its sleeping in stairways or shelter or roof tops or car. The form of constructive notice and indication that those of the agency(s) and person(s) in supervising position, were the cause of influence or interfering to rights to access or operation process with the Housing Authority of the City of Los Angeles, for the purpose of among agendas [to be in the conditioning state of homelessness]. (Cal. Civ. Code § 51(to incite or aide interference with Civil Rights)

60.  Under the Theory Doctrine Act: whereas the facts or allegation can be made by reasonable beliefs in complex circumstance: That while under investigative surveillance and operation for extended period of years in confidential acts and mis·conductivity of enjoyments (deprived of and unenforced 1st amendment rights of state constitution of California) by government agency(s), and, among also of concluded in others of unconstitutional activities. (*Ragin v. New York Times Co., 923 F. 2d 995, 1002-1003 (2d Cir. 1991)(Fair Housing laws prohibit certain communication with housing transaction and That ois view as a form of speech that lesser a First Amendment Protection Rights*)

61.  And thereof another theory that has concluded sufficiently with the residual hearsay of public controversy and public announcement by the County of Los Angeles and other federal agency's investigative surveillance, thereof the 'study surveillance agendas of "social encounters behaviors [sexual activity]" were factors to discriminatory deprive plaintiff from housing assistance in the County of Los Angeles was

intended to be willful and at initiative will of the county. *28 C.F.R. § 12182(a)(duty to accommodate first before finding direct or involuntary threat)*

## G. MANDATORY OBLIGATION OF PUBLIC OFFICE TO AID ASSISTANCE UNDER FEDERAL LAW OF THE PUBLIC WELFARE AND FOR HEALTH; GENERAL PRINCIPLES

### a. Homeless Peron Entitlement; County Adequately at Knowledge of Condition

62. Under Title 42 of The Public Health and Welfare Sections 1401, 3601-11301: the general term of "homeless person" and "homeless individual" means: 'an individual or family who lack a fixed, regular and adequate nighttime residence. An individual or family with a primary nighttime residence that is a public or private place not designed for or ordinarily used as a regular sleeping accommodation for a human being, including whereas the sleeping condition within a car, park, abandoned building, bus or train station, airport or a camping ground.

63. Before plaintiff had enter state territory of California, the state and its county had been notified [*Tenn. Penal Code §§§10, 33-37; T.C.A. §§§ 33-3-104*(Tenn. Code Title 33-Mental Health and Development Disability] by another state county [Memphis Shelby County] of my "thoughtful" intent to move to Los Angeles County and becoming a resident of the county within the year 2005. [*F.I.S.A.* (Foreign Intelligence Surveillance Act(1978); *50 U.S.C. § 1801*(electronic surveillance]

64. And, I as had moved to the County of Los Angeles in the year 2005 and thereafter reside in homeless condition within under 5 years in the county, the county was at full disclosure of my homeness status. Plaintiff was entitled general assistance, and special

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

accommodation of housing assistance (*EVANS v. UDR, INC., 644 F.Supp.2d 675 (E.D.N.C. 2009)*) that should had been a process by means of constructive effects for general assistance and notice *(Cal. Civ. Code §§ 18-19)* while under government surveillance investigation [*Cal. Gov. Code §§23004-58500*(district investigation)]. And as the law had been in effect of public housing law programs within the United States (see exh. H, doc1, 1-160), I, plaintiff should had been by under circumstance [the County of Los Angeles adequately having knowledge of plaintiff's homeless condition in the year 2006 and the constructive notice of my arrival in the county: The county and City of Los Angeles had cause and had direct negative acts in confidential concert activities over an extend period amount of years while I, plaintiff had arrived 2005 and reside in the county for approximately 16 years thus while the county having participation in deprivation] should had been eligible and approved for housing assistance thereof Section 8 program. (see exh. A-Doc 1, pg. 8, G-H-pg. 1-3, ¶1-3: U.S. Department of Justice: Civil Rights Division: Recital Public Policy Laws [2004]).

    **b. State's Deliberate Failure to Following Federal Laws**

65.  In the discoverable connection or and under then past vicarious circumstance while incarcerated and thereafter released prison of California Department of Correction, the following by subsequence of residual hearsay and public strong indication of concert (pursuant to *42 U.S.C.A. § 3617*: "Interference, coercion, or intimidation: It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

or attempt to be aided or encouraged, any other person in the exercise or enjoyment of, any

right granted or protected by <u>sections 3603</u>, <u>3604</u>, <u>3605</u>, or <u>3606</u> of this title 42") of the

County of Los Angeles, and its' county and city public agency of the Los Angeles County

Sheriff's Department, Los Angeles Police Department, the Housing Authority of the City

Los Angeles that, having access or receiving information that had come into obsessive

interest of the plaintiff and knowledge of plaintiff by agencies sometimes between 2005 or

earlier period distance and that had risen to the reasonable theory of interference with

housing assistance pursuant to the relation of the defendants and pursuant to the contract

services agreement between the entities Housing Authority of the City Los Angeles and the

Los Angeles County Sheriff's Department's contract document (see exh., F: doc 3,

Amendment No.1 (2009))


H.  <u>THE FEDERAL TORT CLAIM ACT SUBJECT COUNTY LIABILITY</u>

66.  Overview of F.T.C.A., states: "The prosecution through a Federal Tort Claim Act, a

county that is operates as government under the United States, and for any acts or omission

it is defined as tortious conduct by an employee for the government and is liable for the

injury or damage or loss.[1]

67.  Presumably attacking under section 402 of the Federal Rules of Evidence the county

thus, Los Angeles County and or the City of Los Angeles District whereat, the district of

Los Angeles within its municipal district areas, law enforcement agencies, all had acted in
congregational act or and the affairs of intradepartment's surveillance conductivity,
had created the engineering concert to cause housing discrimination. The acts of the county
and the city's municipal agencies, no immunity is granted by the United States as
protection against liability of injuries or damages or loss.[2]

68. As I, plaintiff had suffered injuries and damages by the county, for approximately 16
years, plaintiff don't have to endure burdensome of or and frustration of attacking
sovereign immunity of the county or and city for the acts whether in official capacity of
government business.[3]


I.   UNDER COUNTY SURVEILLANCE FOR INVESTIGATIVE INTERESTS;
     PERIODICAL 16 YEARS OF COUNTY SUPERVISION

69. In 2005 plaintiff had been under surveillance from another state jurisdiction
(Tennessee) whereas plaintiff was being taunted by government activity of surveillance
tracking and thereby the conductivity of government surveillance had become to the
plaintiff's awareness sometimes after the discovery of plaintiff had suffered from comatose
and whereas had receive vicarious delivered hearsay statements (as to advanced machine
that can draw or imprint or photo or photo image and that form an interpretation to

---

[1]*United States Supreme Court, Cases, 24 A.L.R. Fed. 2d 329(Construction and
application of Federal Tort Claims Act)*

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

anything to be statement or a statement of hearsay or opinion) pursuant to *F.R.E. § 1001*. (see in re <u>U.S. v. George, 960 F. 2nd 97 (1992)</u>)(Unique exceptional receivable discovery: "Hearsay testimony is barred by confrontation clause in criminal cases unless it has adequate indicia of reliability, which requirement is to be satisfied if statement falls within "firmly rooted" hearsay exception or is supported by "particularized guarantees of trustworthiness." <u>U.S.C.A. Const.Amend. 6.</u>

70.   The unique residual hearsay statement of discoveries was of electronic transmittal sounded conveyance by the Los Angeles County Sheriff's Department housing facility units whereas also plaintiff had in accidental circumstance discovered 'video feeds of plaintiff in a jail cells', 'sexual video contents of witnesses', and 'classified videotaped exploitation of formally spouses' and <u>glanced investigative surveillance video clips of "plaintiff's life activity in the County of Los Angeles</u>" and thereat in the united facility plaintiff suffered prejudiced inflicted injuries to health and damages to housing assistance during the time plaintiff was incarcerated between 2017 to 2018.  In some video clips, plaintiff had witnessed "himself walking near a public shopping mall center', as a focus zooming camera was capturing every motioning movement".

71. The county and thereof its county law enforcement agencies and Los Angeles City Municipal Law Enforcement Agency was equipped with tracking technologies of devices for surveillance from then the periodically years residing in the county of 2005 to 2014. (see exh. Q: tracking surveillance equipment)

---

[2]*Mader v. U.S., 654 F.3d 794(8th Cir. 2011)(FTCA provides a limited waiver of the United States' sovereign immunity, to permit an injured person to sue for*

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

72.  The Los County Sheriff's Department and Los Angeles Police Department had obtained and possessed criticized tracking cellphone equipment devices for hacking or intercepting or redirected outcoming cellular calling.  As both separate jurisdictional law enforcement agencies, the risen theory that leads to many other potential methods of interference with Section 8 housing application process or the housing assistance in the county, is the manipulation usage and anticipatory effects of the law enforcement equipped cellphone hacking device (stingray), potentially no footprint of trace or record act or conduct in cause the created housing discrimination and causing interference with housing from the year 2006 to 2011. (see exhibit R: Illustrated Diagrams, pg. 1-2)

## J.  ARTICULATING ENTIRETY OF CULPABILITIES

### a. Intended Negligence of Public Duty

73.  In the overall portion of the defendant's negligent failure to provided section 8, when unattended to residency thus homeless in the majority living condition while residing in the County of Los Angeles, and thereof submitting repeated section 8 applications, the interference of officers of yet to be discovered officially with the corresponds to the true identity of the officers' employment entity name thereof the investigative officers' influence while under federal or local city or county department surveillance. A reasonable theory [under the federal theory doctrine] can be drawn that the officers whom had surveil plaintiff's life, were under prejudice influence or influence of prejudice of informational material or [background history [e.g. violence or violence against person or domestic

_____

*damages in federal court); Tile 28U.S.C§ 1346(b); and see sections 2671 to 2680*

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

partner, sex crime or sex crime involving rap or molestation, or involuntary threat to public safety or institution] or state-to-state release of information] that would be view as precaution or threat to public safety] such as the intent to cause continuance of homelessness and deprive of section 8 while the officer or officers or departmental agency was under the discriminatory agendas and discriminatory housing assistance. (*28 C.F.R. § 36.208(b)(reasonable mitigated risk- for assessment to accommodation); Montalvo v. Radcliffe, 167 F. 3d 873, 878 (4th Cir. 1999)(balancing factors for determining housing*)

**b. Theory Factors Arisen For Deprivation:**

   1. Factoring Theories of Agendas

74.  The blockage or concealment for entertainment productions as plaintiff were unaware than from 2005 to 2011, had been a subject of product within the County of Los Angeles, as vicarious circumstance, to the county's deliberate demised negligent to not assist with providing housing assistance, thereby defendant, Housing Authority of the City of Los Angeles. The involved circumstance of subject product for entertainment industries, is of another subject-matter jurisdiction realm of propounding facts that are nexus to other prepped federal claims against the County of Los Angeles.

   2. Unknown Periodically Conversion of Investigative Surveils into Production Film Industries and Media

75.  As the plaintiff had moved thereat, the City of Los Angeles, as a dominant film industries of the County of Los Angeles, plaintiff believes with carefully consideration and

---

[3] *Levin v. U.S. 133 S. Ct., 1224, 1228, 185 L. Ed. 2d 343 (2013)( Seeking compensation from the United States, Levin sued under the*

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

scrutiny of all factors related to entertainment industry and the affluent relation with

defendant Los Angeles County and Los Angeles Police Department and Los Angeles

Sheriff's Department and thereof the plaintiff (Caviar Mickens) was of interest during the

period of residency of Los Angeles, plaintiff was being publicly exploited that had

influenced prolonging homeless condition. *Joint Work Act of 1909(workproduct that is*

*created by two or more collaborators in a non-employment relationship and sharing an equal*

*and undivided interest*)

76.  Plaintiff recalls in public place of peculiarity in encountering with celebrities and

person of a film production, and whereas now retrospective to past mirror reflection of

anticipated conductivity of television production shows were the feeding of my awareness

and of some celebrity having affection to meet or to having encounter a social welcoming,

plaintiff's homeless condition may had been effect by a person of film production whom

may having a relation with an law enforcement officer of Los Angeles County.

77.  And, such to statutory rights of entertainment person or production company or

corporation, that includes entertainment laws as the industries laws and regulation

ordinance [e.g. copy rights laws, writer agreement laws, product or subject investigation]

for the professional activity were entitle to privacy activity, and that had vicariously

indirect prejudicing my constitutional rights to housing and to my welfare of life and

federal constitution whereas the privacy conductivity may had contributed to influenced

*Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671-2680,*
*which waives the Government's sovereignty*

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

those whom had supposed to provide housing or assist with housing.

78.  And, by such film production having government and social impact, as distributing for film marketing or credit or publicity it helps sufficiently to narrowly enclosed the theorical circumstance, as to may be a factor reason for potential affluence and reason may or may not be in its entirety of a factor part for the housing discrimination for among of periodic years in the county. But, nevertheless, in case of point of, the truthfulness of fact that another derivate effect (person) had attributed or affluent to housing discrimination.

79.  And that the only remaining substantiated substance to reach to the conclusion, until defendants having the proof of rebuttal (whether by direct or indirect evidence, not limited including to video or audio, written statements or testimonial statements or tangible things) to demonstrate different facts and that contradicts the leading theory of "conspiracy to discriminatory housing assistance" based on having influenced interest to film productions whereat in or after 2005 and before moved to the state of California was concluded in another prepped federal case matter of interests.

80.  The motivation of housing discrimination and thus continual condition in the county (*The Committee Concerning Community Improvement v. City of Modesto, 583 F. 3d 690, 706 (9th Cir. 2009(refusing housing assistance)*)), is assumedly certainly by the defendants Los Angeles County and the Los Angeles County Sheriff's Department, and Division of Adult Parole Operations were affluent by film production industries.

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

81.  Of the defendant, Los Angeles County Sheriff's Department Men Central Jail, has in its facility's possession, in the course of operation of the department's, an Audio and computer digital televise broadcasting console and direct television broadcasting system that covering the Los Angeles County areas: "In the year 2008, I plaintiff had obtained a residential rental apartment and rental lease agreement for one year. As plaintiff obtained the apartment, plaintiff activity whereas private and sanctuary under constitution laws of state and federal, were plaintiff had engaged in promiscuous sexual intimacy and conducted to watching cable television.

82.  As plaintiff had occupy the apartment in 2008, plaintiff had a sexual relation with an acquaintance whom were of <u>Latin</u> descendent female and had engaged in sexual private exploitation inside the privacy of plaintiff's apartment, thus constitutional sanctuary privacy rights. Of between the months January and February 2008, plaintiff recalled watching his' favor cable televised show ("The L Word") through the production broadcast network named "HBO [Home Box Office, Inc.]", had a sexual scene that had reflected reenactment or imitation or curvature gerund of the plaintiff's sexual exploitation of plaintiff's motion with the female acquaintance, that of the acquaintance had engaged with plaintiff. *<u>Dietemann v. Time, Inc. (1971, CA9 Cal.) 449 F2d 245, 248, 1 Media L R 2417</u>* *<u>(privacy rights in California states:</u> no right to precincts of person's home or office by means of electronically trespass*)

83.  At that point when witnessing the quick visually sex scene, inflicted '<u>mental thought</u>' had ecstatic superstitiously, medically interpreted of psychology profession, plaintiff

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

mentally reacted in anomalous in psychological state [paranormal when plaintiff had not

having official acknowledgement of what was occurring in the direct feed or not having the

awareness of the televise production making recognizable reflected identity of the sex scene

that was gerund from sexual encounter of plaintiff's apartment). *Pearson v. Dodd (1969)*

*133 App DC 279, 410 F2d 701, 1 Media L R 1809, cert den 395 US 947, 23 L. Ed 2d 465, 89 S*

*Ct. 2021(Placing a great strain on human weakness by one whom scumble to sexual*

*temptation and in to listens)*

84. And, plaintiff this year had become to self-awareness, and by other circumstance when

watching and thereof had change network channels, the famous entertainment talent film

move actress "Anne Moss" or and may had seem the replica appearance in direct digital

live screen-over, or may had been the artificial face-over or live jittering [jitter software

that can make the appearance of artificially digitized facial of a person and behind digital

effects that conveying deception (*Fair Use in Digital Environment*)]. *Bare Bonding Doctrine*

(Entertainment law of exploitation: causing sexual harassment, harassment, humiliation

through televising broadcasting) Plaintiff may had been subjected to digital art psych

testation (Derivative work of *Title 17 U.S.C.A. § 101*) as mixed with original production

scene artwork. see *re in Durham Indus. v, Tomy Corp., (1980, Ca2) 630 F2d 905, 911(modest*

*degree of televised partially artwork is consider originality*)

85. Nevertheless, as concluded as under surveillance, under county supervision, and the

supervision surveillance investigation, was somehow and by someone of person or

department or agency or whether private or government within the County of Los Angeles,

a conversion was a conjunction (entertainment laws and rights) to the interest of governmental investigation and entertainment industries.

### K. REASONABLE THEORIES OF AVOIDANCE; LIKELIHOOD OF DIFFERENT OUTCOMES

#### a. Reasonable Theory Drawn by Past Conduct Behavioral Acts that Could've Been Avoided and With Certainty as to Proof of Having Past Resident Activity

86.  If, not the county had under prejudice surveillance investigation and engineering cause of effect to constitutional rights to be deprive or not invoked enforced regardless of other circumstance that had tainted mandatory wise or competent decision making under color of law (_42 U.S.C. 1984_), plaintiff with verified certainty of plaintiff's self-awareness of characteristics and behavioral conductivity, of isolation of conductivity of apartment, would had been a gravitated conductivity inside a residency had not than from the housing discrimination and would had been from the contrary conduct to public offenses or immoral acts thereof and therewithin Los Angeles County, if alleged by defendant Los Angeles County.

87.  In the year 2008 I, plaintiff had permanent residency that was not of any government or private organization housing assistance, while plaintiff had conduct himself with isolation or had accompanied with social acquaintance when not obtaining to employment occupancy.

88.  During the permanent residency of 2008, plaintiff had 2 to 3 employment occupancy to covered expenses and rent dues. The county had assisted with food funds or issuance but,

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

did not assistance with housing assistance. The request(s) of any additional available appropriated funds from the county for housing assistance was presumedly made to the county's attention.

89. As, I plaintiff had worked different employment occupancy, no enjoyment time for in-person search for any organization to assist with housing assistance due to physical energy consumed from employments as the county was aware through surveillance.

90. Plaintiff had consumed homeless living conditions [whereas car and stairways] and consumed sleeping in car or stairways or bus or union station, and had consuming temporary housing and sleep of apartments or hotels or resident couch or car.

91. And, providing in the methods of living a quarter or unit or placement whereas plaintiff had made storage of food [e.g. can goods, perishable food, liquid (water)].

92. With certainty, if the county had assisted with housing assistance but thus from housing discrimination, such permanent housing would been for all 16 years of nights within the county, of healthy sleeping condition instead of homeness.

  b.  Theory of Avoiding Public Interests and Public Moral Offensives

93. Plaintiff had in some instance within the County of Los Angeles pursued deceptive relationship for shelter purposes and as subsequently unaware of police investigation and their staged entrapment conductivity.

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

94.  In the absence of housing assistance from the defendant, Housing Authority of the City Los Angeles, that would had been the avoidance of any criminal offenses and probation sentence resulting in the living condition of homeness, housing assistance of a apartment whereas plaintiff would been obligated to pay shared portion of his income for rent services through the Department of 8 Section; if plaintiff would have been assisted (under the Housing Accountability Act) within the county of Los Angeles, high likely probability of 90% to 95% of no public criminal offensive would likely had occurred while plaintiff had resided in the county of 17 years.

95.  Had not the deprivation and interference of housing assistance from 2005 and through the mid effective surveil vacuum course to 2009 and thereafter, plaintiff would had never enter-into-past relationship (that had resulted in domestic violence relationship) based on deceitful intents that was due to vulnerability of the public street of homeless condition.

96.  Plaintiff recollected of the year 2011 Path had contact the plaintiff in a silly harassment manner. *Cal. Code Regs. § 12120(a)(1)* As derisively inquired of a "mental state", humorously, as indicated was presumedly at will, and defendant should, done reasonable care of discretion to private any source or refer for housing if, as how defendant (Path) was led to believe that a mental thus, disability was prominent warn as to the propounding allegation that was delivered or stated or incited or suggested or directed or indirect indicated by the unknown person.

97.  When Path had contacted plaintiff in 2011, Path was warned with indication that plaintiff need a resident when at the time defendant had contacted plaintiff, assumed on

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

behalf on than cohabitant partner pursuant to *Cal. Pen. Code § 13700 (b)* or an agency's
pre-investigation pursuant to *California Government Code Sections 6250 and
6254*(individual rights to disclose information of misconduct).

98.  In the substance of county housing discrimination and not in intended tethering in
inexcusable justification or to make justification or unaccountability or avoiding the
conscious liability of self-acts of offensives of plaintiff, and the circumstance not having a
place of shelter or the circumstance may involve the circumstance of having a residency
that involves offenses upon person and inside a residency, it is fairly assumed that plaintiff
would not had been involve in accountability whether in partial or comparative.

99.  But of the plaintiff's objective opposition to some degree in far distance periodically,
as resided in having residency or homeless condition in County of Los Angeles, that in
some fair partiality of conscionability, if had not the cause of interference of nonhousing
assistance by the county when the county was aware of my homeness, plaintiff would never
submit to vulnerable immoral acts upon a person or would not had encounter any unlawful
offenses within any resident property as to such acquaintance and spousal deceit or
manipulation for the purpose of having a shelter or covenant in the County of Los
Angeles.

100.  Because, of the plaintiff's first spousal relation threat 2011, in deceitful intent to
having residency plaintiff had inflicted illusional psyched characteristic that year, as a
result of plaintiff having increasing distress due to many employment attempts and failure
job application and interviews and having no residency of the year 2011. Plaintiff had
resided homeless condition inside his car for all nights of sleeping and cloth changing and

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

eating. The homeless condition than was a nexus circumstance to a litigation lawsuit that plaintiff was in proceedings and of county's agenda affairs.

101.  As the plaintiff had resided in the county, as living condition of homeness or having permanent residency, and that of executive officers thereof former Los Angeles County Sheriff's Department, Lee Baca was the governing officer among board members. (see exh. P: Photos of former Sheriffs).

102.  The Los Angeles Sheriff's Department had been accused of interference with and housing discrimination in the County of Los Angeles. (see exh. M: News Reporting)

103.  And, at the initiated year 2005 whereas, plaintiff had applied for Section 8 by telephonically, the county thereof its law enforcement agencies having the equip instruments (see exh. Q-R) that such instrument may had course parted in with interference for housing discrimination or influence housing discrimination by the county.


K.  <u>ESTIMATED INJURIES AND DAMAGES</u>

104.  As a direct or indirect cause by Defendants, the County of Los Angeles and within its county all public offices and entity, had cause to the of housing discrimination whereas by the course of action of concert, and the concert of conspiracy to deprive and interfered with civil rights and the deliberate negligent failure under Title 42 U.S.C. 1983 to make or cause reasonable accommodation therefrom than 2005 and now presently having disabled impairments functions under the American Disability Act,

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

105.  Plaintiff having long years of suffering housing discrimination by Los Angeles

County, when its county having full acknowledgement and under investigative surveillance.

*Dept. of Fair Employ & Hous. v. City of Napa (June 4, 1981) No. 81-12 FEHC Precedential*

*Decs. 1981, CEB 24, pp. 28-29, 1981 WL 30855, 19 (Cal. F.E.H.C.)(Damaging resulting from*

*unlawful housing discrimination practice has no cutoff period for damages)*


106.  Further, in long periods of housing discrimination, plaintiff has suffering

disfigurement to body, unhealthy sleep activity, physical pain and hunger: Plaintiff was

stalked by criminals as plaintiff was in homeless condition and sleeping in stairways and, of

one day's morning plaintiff had gone to use a public restroom thereafter plaintiff had

engaged in a deadly stabbing as a result plaintiff stomach was disfigured. Had not the

defendants, Los Angeles County and Housing Authority of the City of Los Angeles

provided housing plaintiff would had use a bathroom of an apartment or housing unit.

*Philips v. Hunter Trails Community Ass'n, 685 F. 2d 184, 190 (7th Cir. 1982(Damage amount*

*for intangible injuries)*)


107.  And as generally, direct or indirect and proximate result of defendant, Los Angeles

County's negligent failure to assist when housing assistance when at adequate knowledge of

another state's false report of sex offenses whether the County had or should had, know the

state reporting was false, county had moral federal statutory duty to provide reasonable

accommodation for permanent housing threat from 2005 when plaintiff had resided

residency in the county. *42 U.S.C.A. § 12182(b)(2)(A)(ii); 36 C.F.R. § 36.302; see in*

*Pennsylvania Protection Advocacy, Inc. v. Pennsylvania Dept. of Public Welfare, 402 F3d*

*374, 16 A.D. Cas. (BNA) 1144 (3d Cir. 2005)(budgetary insufficient to establish*

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

*fundament alteration defense to policy*)

108.  Plaintiff, as resulted from non·housing general assistance based on negligent failure, by the defendants, County of Los Angeles and, its county public agencies thereof the Housing Authority of the City of Los Angeles, whereas the plaintiff's suffered injuries and damages are estimated from no household or housing services from than plaintiff having low income or homeless conditions from 2005 through 2010. *28 U.S.C. § 2674(Liability for injuries as a result of negligence are estimate by proximately caused*

109.  As a direct result from neglect of due care and interference of housing assistance, by the defendants, Los Angeles County, Los Angeles Sheriff's Department, and Los Angeles Police Department threat from 2005 through 2014, whereas the plaintiff's suffer damages is measured estimated by state applicable laws and thereby which that of plaintiff's condition of continuation homeness within the County of Los Angeles, thereof in damaging the plaintiff's health condition and as to improper sleeping and eating digestions. *U.S. v. Kearney, 672 F. 3d 81, 96 (1st Cir. 2012), cert. dismissed, 133 S Ct. 1521 (2013)(Proximate cause in generally*)

L.   SHOWING STATED FACTS HAVING GROUNDS FOR CAUSE OF ACTION

First Cause of Action
(Housing Discrimination)
(Violations of the Fair Housing Act(1999)

110.  Whereat all times alleged in reference number paragraphs 25 through 103, for First Cause of Action for Housing Discrimination under federal law, thereof Housing Act (1999),

good cause is having shown by the factual information alleged against defendants, Los Angeles County, Los Angeles County Sheriff's Department, Los Angeles Police Department, Division of Adult Parole Operations and Path. *Olsen v. U.S. 175 F. 2d 510 (8th Cir. 1949)(Capacity to sue-stating cause of action)*

111.  And, as each paragraph informative (¶25-103) substance alleging a lawfully applicable statutory facts and meeting substantiated showing (*F.R.E. §§§§ 404, 405,406-807*) in the form of making detailing articulated allegations, the information is clear showing for standing-alone grounds for "First Cause of Action" for housing discrimination. *28 U.S. C.A. § 1346(Plaintiff standing to sue); Fed. R. Civ. P. §17*

<center>

**Second Cause of Action**
(Conspiracy to Deprive and Interfere with Civil Rights)
(Violations of the Housing Act(1999) and Title 42 U.S.C. 1984)

</center>

112.  Whereat all times alleged in reference number set paragraphs 25 through 30, 33 through 95, and 99 through 103 for Second Cause of Action to Conspiracy to Deprive and Interfere with Civil rights under federal law, thereof Housing Act (1999), good cause is having shown by factual information alleged against defendants, Los Angeles County, Los Angeles County Sheriff's Department, Los Angeles Police Department, and Division of Adult Parole Operations. *Art Metal-U.S.A., Inc. v. U.S., 753 F. 53,  2d 1151, 32 Cont 1151, 32 Cont. Cas. Fed. (CCH) P. 73391(D.C. Cir. 1985(Suspension of business to person-held by U.S. Supreme court interference))*

113.  And, as each paragraph informative (¶ 25-30, 33-95, 99-103) substance alleging a

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

1   lawfully applicable statutory facts and meeting substantiated showing (*F.R.E. §§§§ 404,*

2   *405,406-807*) in the form of detailing articulated allegations, the information is clear

3   showing for standing-alone grounds for "Second Cause of Action" for conspiracy to

4   deprive and interfere of civil rights to housing and housing assistance. *28 U.S. C.A. §*

5   *1346(Plaintiff standing to sue); Fed. R. Civ. P. §17*

6

7

8

9                                   **Third Cause of Action**
10                        (Negligent Failure to Provide General Assistance)
11             (Violations of the Section 8Act(1937) and Fair Housing Act(1999))

12   114.  Whereat all times alleged in reference number paragraphs 25, 31, and 32 through 42

13   for Third Cause of Action for Negligent Failure Provide General Assistance under federal

14   law, thereof Fair Housing Act (1999) and American with Disability Act, good cause is

15   having shown by factual information alleged against defendants, Los Angeles County,

16   Housing Authority of the City of Los Angeles and Path.

17

18

19   115.  And, as each paragraph informative (¶ 25, 31, 32–42) substance alleging

20   lawfully applicable statutory facts and meeting substantiated showing (*F.R.E. §§§§ 404,*

21   *405,406-807*) in the form making of detailing articulated allegations, the information is

22   clear showing for standing-alone grounds for "Third Cause of Action" alleged against

23   defendants, Los Angeles County, Housing Authority of the City Los Angeles and Path, for

24   negligent failure to provide general assistance for housing accommodation and or

25   permanent housing in generally, when plaintiff had than applied in written application

26   with the Housing Authority of the City of Los Angeles-Section 8 Department and had met

all or some required exceptional standard criteria. *28 U.S. C.A. § 1346(Plaintiff standing to sue); Fed. R. Civ. P. §17*

116.   And Plaintiff, had made reasonable efforts to contacted Path, for housing services and assistance. When Path had expressly sounded "availability of apartment unit" and was under unknown referral managerial housing apartment services relationship within the County of Los Angeles. *(Cal. Gov.'t Code § 12955(k)(discriminatory act under "catchall" based protected class)*

### Fourth Cause of Action
**(Negligent Failure to Make Reasonable Accommodation and Person with Disability)**
**(Violations of the Section 8Act(1937) and American with Disability Act)**

117.   Whereat all times alleged in reference number paragraphs 25, 36, 39-41 and 54 through 66 for Forth Cause of Action for Negligent Failure to Make Reasonable Accommodation and Person with Disability under federal law, thereof Section 8 Act(1937) and American with Disability Act, and thereby good cause is having shown by factual information alleged against defendants, Los Angeles County, Housing Authority of the City of Los Angeles and Path. *Garcia-Catalan v. U.S., 734 F. 3d 100, 86 Fed. R. Serv. 3d 1386 (1st Cir. 2013)(claim must state element for negligence under FTCA for causing dangerous conditions)*

118.   And, as each paragraph informative (¶ 25, 36, 39-41, 54-66) substance alleging a lawfully applicability statutory fact and meeting substantiated showing (*F.R.E. §§§§ 404,*

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

405,406-807*) in the form of making detailing articulated allegation, the information is clear showing for standing-alone grounds for "Fourth Cause of Action" alleged against defendants, Los Angeles County, Housing Authority of the City Los Angeles and Path, for negligent failure to honor policy making thereof public policy (Section 8 Act: see exh. B-1) for housing assistance of homeless person when than having conditional welfare criteria for housing accommodation with person with a disability that had impaired the ability to have normal functions to provide self-care for housing. *28 U.S. C.A. § 1346(standing and capacity question in a FTCA case )*

<div align="center">

**Fifth Cause of Action**
**(Discrimination Against Make Reasonable Accommodation)**
**(Violations of the American with Disability Act)**

</div>

119. Whereat all times alleged in reference number paragraphs 25, 32 through 42 and 51 through 85 for Fifth Cause of Action for Discrimination to Make Reasonable Accommodation under federal law, thereof the American with Disability Act, and thereby good cause is having shown by factual information alleged against defendants, Los Angeles County, and Path.

120. And, as each paragraph informative (¶ 25-32-42, 42-85) substance alleging a lawfully applicable statutory facts and meeting substantiated showing (*F.R.E. §§§§ 404, 405,406-807*) in the form of making detailing articulated allegation, the information is clear showing for standing-alone grounds for "Fifth Cause of Action" for discrimination against make reasonable accommodation of housing. *28 U.S. C.A. § 1346(Plaintiff standing to sue); Fed. R. Civ. P. §17*

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

## Sixth Cause of Action
### (Discrimination Against Person with a Disability)
### (Violations of the American with Disability Act and Civil Rights Act(1964))

121.  Whereat all times alleged in reference number paragraphs 26 through 30, and 57 through 61 for Sixth Cause of Action for Discrimination Against a Person with a Disability under federal law, thereof the American with Disability Act and Civil Rights Act, and thereby good cause is having shown by factual information alleged against defendants, Los Angeles County, Los Angeles County Sheriff's Department, Los Angeles Police Department and Division of Adult Parole Operations.

122.  And, as each paragraph informative (¶ 26-30, 57-61) substance alleging a lawfully applicable statutory facts and meeting substantiated showing (*F.R.E. §§§§ 404, 405,406-807*) in the form of making detailing articulated allegation, the information is clear showing for standing-alone grounds for "Sixth Cause of Action" for discrimination against a disable person or person having unnormal mental functions or impede ability to obtain stable financial source of income for the living housing cost rate of Los Angeles County. *Richard v. U.S., 369 U.S. 1, 82 S. Ct. 585,7 L. Ed. 2d 492(1962)(Cause of action must not fail to state a claim)*

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

1

**M.  Claims for Relief**

2

3  WHEREFORE, I plaintiff, CAVIAR MICKENS now preys, for judgement against

4  defendants and for awarded of the followings:

5

6

7  <u>Good Cause of Action for Relief for Injuries and Damages Should Be Granted</u>
(Common to All Allegations)
(Housing Discrimination, Violation of Fair Housing Act(1999))

8

9  **123.  At all times material (Thereto "Plaintiff" CAVIAR MICKENS), alleged to had reside**

10  in the county of Los Angeles, whereas plaintiff injuries and damages had occurred from

11  year 2005 through 2020, at a total of 15 years of housing deprivation, the grant in

12

13  rewarding plaintiff for injuries and damages should be in favor of plaintiff and based on

14  the facts alleged against defendants that had mad attributed portion or at comparative

15  fault that are entitled to hold liable. *28 U.S.C.A. § 1346(a)(determining liability)*

16

17

18  **124.  At all times material (Thereto "Plaintiff"), alleged to had reside in the county of Los**

19  Angeles, whereas plaintiff made many diligence efforts to obtain housing assistance in the

20  County of Los Angeles from the County of Los Angeles and private organizations

21  therewithin county, and had obtain self-own residential rental apartment and rental

22  agreement lease (whereas in the year 2008, in North Hollywood, of plaintiff's own

23

24  apartment at a monthly rent cost of $950.00), that the county made no effort to assistance

25  plaintiff, while plaintiff was in financial struggling. *Rayonier Inc., v. U.S., 352 U.S. 315, 77*

26  *S. Ct. 374, 1 L. Ed. 2d 354, 1957 A.M.C. 909 (1957)(liability where the act had occurred)*

27

28

_____

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

125.  At all times material (Thereto "Plaintiff"), alleged to had reside in the county of Los Angeles, whereas plaintiff made many diligence efforts to obtain housing assistance in the County of Los Angeles from the County of Los Angeles, while under government investigative surveillance and as a direct or indirect result from the county investigation causing of periodical years and of periodical courses of civil rights violations and housing discrimination, plaintiff should be grant the relief for injuries and damages and be rewarded the available remedy, thereof  rental coverage from holding defendants liable. *Laird v. Nelms, 406 U.S. 797, 92 S. Ct. 1889, 32 L. Ed. 2d 499, 2 Envtl. L. Rep. 20363(1972)(strict liability)*

126.  As Plaintiff had been in vulnerable to partially reliance of government assistance for personal usages (e.g. food, rent, bill, etc.) was never an abuse or self-careless of life's responsibility or relied assistance. When plaintiff had a permanent employment (three jobs for 3 years from 2005 to 2008) plaintiff's initiated, efforts to obtain care of food and permanent residence, the county was aware of the years conditions as having employments and homeless condition in the county of Los Angeles, but yet the county had neglect its due care of duty to housing assistance when plaintiff had made requests, thereby the grant for relief should be granted in favor of the plaintiff and in all evidence that support some or all factual allegation against defendants(s). *Oconomowoc Residential Programs v. City of Milwaukee, 300 F. 3d 775, 783 (7th Cir. 2002)*(burden to show that an accommodation is reasonable on its face)

---

**FEDERAL TORT CLAIMS FOR HOUSING DISCRIMINATION VIOLATIONS**

127. In the average of homeless in the American and the County Los Angeles resulting in are result from drug addiction or abuse, or loss of job or disability [that causes, of careless or vulnerable efforts to compete with a normal person whom not in possess of a disability and can establish financial income resources and function for housing or apartment searching for residence than an disabled or impeded person] or circumstance that causes vulnerability to non·housing residency. Plaintiff's analogic point of fact__ is that, Plaintiff, at all times resided in the County of Los Angeles never wanted to relied or never had awaited, to be aid of government assistance without first attempted the farthest extent of plaintiff's ability and thus ability to self-care without any assistance, but in circumstance in plaintiff's life that were inevitably unavoidable of the county investigative surveillance and, having abnormal functioning self-care of housing assistance and thereby upon proof of evidence and demonstration, the relief sought for remedy should be granted in the plaintiff's favor for liable of housing rental coverage, against all defendant(s) liable for all or some in portion or attributed or comparative at fault, and that the covering calculation is based at an equally divided proportionate percentage or the separate amount percentage covering in housing rental coverage pursuant to California laws-Section 1 of Article XIV.. Cal. Cons't(effective remedy of legislature's authority; *State Farm Mut. Auto. Inc. co. v. Campbell, 538 U.S. 408, 422-423, 123 S. Ct. 1513, 1522-1523, 155 L. Ed. 2d 585, 60 Fed R. Evid. Serv. 1349, 1 A L.R. Fed 2d 739 (2003)*)(conduct having specific nexus to plaintiff's harm)

128. For all  material commonly alleged against said defendants, County of Los Angeles, Housing Authority of the City Los Angeles, Los Angeles County Sheriff's Department, Los

---

Angeles Police, Division of Adult Parole Operations and Path, the demanding for the substitute of monetary awarded settlement for the settlement of percentage coverage of all rent lease agreement in the costed amount for any selective renting unit (one unit) and the amount percentage coverage of 65.70% that is to be divided among the liable defendants for extended period of years (10yrs) of as the equivalent of the consuming force or cause to be force whether directed or indirectly influenced and housing discrimination and nonhousing assistance, or force consuming conditions thereof homeness and living in street environment or habitation, and that the coverage extends to the equal amount of years of deprivation or reasonable negligence (*Texas Dept. of Housing and Community Affairs v. Inclusive Communities Project, Inc., 135 S. Ct. 2507, 2513, 192 L. Ed. 2d 524 (2015)*) from the responsible due care persons [County of Los Angeles and City of Los Angeles].

### First Cause of Action For Relief
(Housing Discrimination: Violations of the Fair Housing Act(1999))

129.   The allegations listed above are incorporated herein by reference paragraphs 25 through 103, relief should be granted, in violation of the federal Fair Housing Act, as under the federal statue law that defines the meaning of discriminatory housing pursuant to *42 U.S.C. § 3602(f)*. (see *Havens Reality Corp. v. Coleman, 455 U.S. 363, 373-370, 102 S. Ct. 1114, 1124-1125, 71 l. Ed. 2d 214 (1982)*)(Entitled recovery damages to the extent proven that discrimination had diverted resources or frustrated housing assistance); (making housing unavailable) *42 U.S.C. §3604(a)(f)(h)*; Woods v. Foster, 884 f. Supp. 1169, 1175 (N.D. I11. 1995)(Congress broaden the meaning of making unavailable housing)

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

130.  And, if granted based on the trier of facts alleged in First Cause of action against said

defendants, County of Los Angeles, Los Angeles County Sheriff's Department, Los Angeles

Police Department, Division of Adult Parole Operations, and Path, in the court's discretion

upon plaintiff's demand that is morally sensible and the demand is not unreasonable

excessive (*Fletcher v. Western National Life Ins. Co., 10 Cal. Ap. 3d 376, 409,*

*89 Cal. Rptr. 78,99, 47 A.L.R. 3d 286 (1970)*) that can make adjustment to increase or

decrease to percentage rental coverage and if defendants are find liable (*State Farm, supra,*

*538 U.S. at 419*) by the district court.


131.  In the granting if, so grant by the federal district court, of enforcement of California

State law for remedy under the Bane Act in re *Venegas v. County of Los Angeles, 32 Cal.*

*4th 820, 843, 11 Cal. Rptr. 3d 692, 87 P. 3d 1 (2004)*(showing of Discrimination intent), that

each defendants serve a proportionate terms and proportionality of attributive fault or

comparative fault or at separate liability of:

      1.  The County of Los Angeles holding at complete fault for housing

          discrimination and nonhousing assistance, of a serving liable tern and civil

          reward for 10 to 15 years of percentage rental housing unit coverage not

          exceed over $2,000. and, to covered Plaintiff's (Caviar Mickens)

          accredited unit or apartment or sub-housing live application for purpose to

          reassure the renter or owner or property management that payment for

          rent is guarantee due upon delivery by the defendants whom will be liable

          for the majority coverage of the rent due to the property management or

          owner or renter and that the reliable input information on application is

cover background credential (noncriminal records) thereby any section of

the application pertaining to:

    a.  employment status and or history.

    b.  any apartment evection.

    c.  current or and past source of income that cover the 3 to 4 times the

        rent due for unit at decided leasing.

that all above if information is required by the renter or owner or

property management, to cover accredit by means of any form of delivered

communication (e.g. written letter, fax, telegram, email and with

attachment (e.g. format file (pfd.))) anywhere within the State California

and the United States.


2. The County of Los Angeles Sheriff's Department holding at complete fault

   of direct or indirect causation or influence of causation for housing

   discrimination and nonhousing assistance, of a serving liable

   tern and civil reward for 10 to 15 years of percentage rental coverage

   not to exceed $2,000. anywhere within the State California and the United

   States.


3. The Los Angeles Police Department holding at complete fault

   of direct or indirect causation or influence of causation for housing

   discrimination and nonhousing assistance, of a serving liable

   tern and civil reward for 10 to 15 years of a divided percentage rental

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

coverage not to exceed 2,000. any resident unit anywhere within the State California and the United States.

4.  The Division of Adult Parole Operations holding at complete fault of direct or indirect causation or influence of causation for housing discrimination and nonhousing assistance, of a serving liable tern and civil reward for 5 years of a lesser divided percentage rental coverage not to exceed $2,000. any resident unit anywhere within the State California and the United States.

5. Path holding at complete fault of direct or indirect causation or influence of causation for housing discrimination and nonhousing assistance, of a serving liable tern and civil reward for 2 years of a lesser divided percentage rental coverage not to exceed $2,000. any resident unit anywhere within the State California and the United States.

<u>Second Cause of Action For Relief</u>
(Conspiracy to Deprive and Interfere with Civil Rights: Violation of the Fair Housing Act(1999) and Title 42 U.S.C. 1984)

132.  The allegations listed above are incorporated herein by reference paragraphs 25 through 30, and 33 through 95, and 99 through 103, relief should be granted, in violation of the federal Fair Housing Act(1999) and Title 42 U.S.C. § 1984(conspiracy of person under color of duty to interfered with civil rights privilege. *Mandelbaum v. United States, 251 F.*

1   *2d 748 (2d Cir. 1958)(presumption of interference under FTCA)*

2

3   133. And, if granted based on the trier of facts alleged in Second Cause of action against

4   said defendants, County of Los Angeles, Los Angeles County Sheriff's Department, Los

5   Angeles Police Department and Division of Adult Parole Operations, in the court's

6   discretion upon plaintiff's demand for recovery for the damages and injuries by the

7   interference that had cause housing discrimination, plaintiff should be rewarded against

8   defendants for rental coverage thereby of a percentage coverage, covering all rental unit

9   cost at an divided percentage among the defendants stated-above for the Second Cause of

10   Action. (*Cal. Gov't Code § 12989.2(Special Damages for lost of housing opportunity)*

11

12

13

14

15

16   <div align="center">**Third Cause of Action For Relief**</div>
<div align="center">Negligent Failure to Provide General Assistance: Violations of the Section 8Act(1937) and Fair Housing Act(1999))</div>

17

18

19   134. The allegations listed above are incorporated herein by reference paragraphs 25, 31,

20   and 32 through 42, relief should be granted, in violation of Section 8 Act (1937) and the

21   federal Fair Housing Act(1999) for negligent failure to provide general housing assistance

22   when the county was adequate knowledge that plaintiff was homeless and had possessed a

23   minor disability (*Title II of Americans with Disability Act; Cal. Civ. Code §§ 51-54- Cail.*

24   *Disable Person Act*), but defendants, Los Angeles County and Housing Authority of the

25   City of Los Angeles had negligent an obligated duty to serving expedited accommodation

26

27   or provided access to await case file approval. *28 U.S.C.A. § 2674(punitive damages and*

28

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

1   *interest*)

2

3   135.  Plaintiff had signed documents indicated the agreement in year 2006 with defendant

4   the Housing Authority of the seeking housing assistance.  Information was release to the

5   defendant as the defendant had requested the release of information to be eligible for

6   Section 8 housing or any housing accommodation within the housing development project

7   or any contractual housing for low-income homes person or household, the defendant did

8

9   not serving any housing assistance, therefore the district court should grant favor of the

10   aggrieved plaintiff in rewarding of proportionated rental unit percentage coverage as the

11   evidence may show against defendant if in the event of trial or hearing. *Auburn Woods I*

12   *Homeowners Ass'n v. Fair Employ& Hous. Comm'n., 121 Cal. App. 4th 1578, 1591, 18 Cal.*

13   *Rptr. 3d 669, 678 (2004)(remedy available under FEHA for afford greater rights*)

14

15

16

17                                   **Fourth Cause of Action For Relief**
18   (Negligent Failure of Reasonable Accommodation and Person with Disability: Violations
                            of the Section 8act(1937) and American with Disability Act)
19

20   136.  The allegations listed above are incorporated herein by reference paragraphs 25 and

21   36 and 39 through 41 and 54 through 66, relief should be granted, in violation of Section 8

22   Act (1937) and the American with Disability Act for negligent failure of reasonable

23   accommodation of a person with disability for housing assistance. When the county was

24   adequate knowledge that plaintiff was homeless and had possessed a minor disability (*Title*

25   *II of Americans with Disability Act; Cal. Civ. Code §§ 51-54- Cail. Disable Person Act*), but

26

27   defendants, Los Angeles County and Housing Authority of the City of Los Angeles had

28

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

1    negligent an obligated duty to serving expedited accommodation or provided access to

2    await case file approval.

3

4    137.  And, Plaintiff was at government county interest thereat 2005, and while under

5    surveillance investigation, as the investigation had made constructive influence that

6    subsequently resulted in civil rights deprivation, as to no excusable avoidance that the

7    county should had provided reasonable accommodation at a constructive effect while still

8    remaining surveil investigation. The County of Los Angeles made effects to

9    unconstitutional act thereby outside their government policy authority of surveillance, had

10   run as a balanced conjunction to public policy obligation and their investigation rights and

11   regulation, therefore it is further said, that grant in favor awarding plaintiff coverage

12   settlement against defendants is justify in the event of showing evidence at trial or hearing

13   and lawfully without prejudice to the defendants. *Fair Housing of Martin v. Combs, 285 F*

14   *3d 899, 905, 52 Fed. R. Serv. 3d 76 (9th Cir.2002)(division of resources damages); Saunders*

15   *v. General Services Corp. 659 F. Supp. 1042, 1060 (E.D. Va. 1987)(Time spent investigating*

16   *and attempted to resolve violation)*

17

18

19

20

21

22                          <u>Fifth Cause of Action For Relief</u>
23        (Discrimination Against Make Reasonable Accommodation: Violations of the American
                                    with Disability Act)

24

25   138.  The allegations listed above are incorporated herein by reference paragraphs 25 and

26   32 through 42 and 51, and that relief is shown having merit in accordance to applicable law

27   (*Bane Act*) and be should be granted, in violation of the American with Disability Act for

28

---

**FEDERAL TORT CLAIMS FOR HOUSING**
**DISCRIMINATION VIOLATIONS**

Discrimination against making reasonable accommodation when, person with disability need housing assistance from Housing Authority of the City of Los Angeles and Los Angeles County. (*Arnold v. United Artists Theatre Circuit, Inc. 866 F. Supp. 433, 438 (N.D. Cal. 1994)*)(*California available statutory damages for incidents of deterrence*)

139.  When the county was adequate knowledge that plaintiff was homeless and had possessed a minor acute disability, of discriminatory interference influence thereby the Los Angeles County Sheriff's Department, Los Angeles Police Department and Path, the plaintiff suffered injurious living condition within the county, therefore the district court should grant the favor of plaintiff's claims and hold all defendants equally to comparability or attributive to liability and rewarding plaintiff in the settlement controversy of renter percentage apartment or unit coverage.

140.  The defendant, Los Angeles County was adequate knowledge of homeless living statistics and advance crime prevention theology, thereby the county had anticipated that the likelihood without providing any permanent housing assistance that had prolong from 2005 to 2020 that crime would had likely occurred at a probability of 85% to 90% whether is the crime or offense of a vulnerable homeless living condition, and of surviving for food or a place to be safe and warm unit that the homeless person is not permitted by some municipal regulation or penal code. Therefore, plaintiff believes with showing of evidence that the plaintiff having substantiated meritorious claims against defendant, and the grant holding defendants, Los Angeles County, Los Angeles Sheriff's Department, Los Angeles Police Department, liable for injuries and damages for provoking to cause homeless conditioning and, without housing accommodation by discrimination and hatred.

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

141.  And, as the reference paragraphs 74 through 85 and whereas the statements tones indicated the demise agendas to further shelter plaintiff in unconditionally of homeness living and from televise broadcasting whereas the epic center of the county's and its' department agency all demised intent to conspired in having plaintiff without housing aid, therefore, by the Fifth Cause, an immediate injunctive relief should be granted in preliminary facts against defendant, Los Angeles County, Los Angeles Sheriff's Department and Los Angeles Police and holding liable for settlement in the percentage rental coverage of housing unit within the State of California and within anywhere of United States.

## Sixth Cause of Action For Relief
(Discrimination Against Person with a Disability: Violations of The American with Disability Act and Civil Rights Act(1964))

142. The allegations listed above are incorporated herein by reference paragraphs 26 through 30 and 57 through 61, are having meritorious claims and that relief should be having merit in accordance be granted, in violation of the American with Disability Act and the Civil Rights Act of (1964) for discrimination against person with disability and of a minor impediment. *42 U.S.C. §§ 2000(c)-12188(remedy for discrimination against a person with a disability)*

143.  The Los Angeles County and Sheriff's Department and Los Angeles Police Department was at adequate knowledge thereat from 2005 and thereafter that plaintiff had possessed some mental impediment while had resided in the county, and while under investigation that had causing unconstitutional employment work environment

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

conductivity, while as the only employment finance source (from than employment status 2005 through 2020) was the essence to support housing or to obtain housing unit as self-sufficient if with or without government aid from the defendant, Los Angeles County or Housing Authority of the City of Los Angeles, therefore the federal district court should grant relief thereof settlement in the housing rental coverage upon showing or proven alleged facts against defendants.

## Conclusion

144.   Plaintiff feels and expressive demand the court honor and enforce the matter of settlement in controversy (percentage rental coverage (65.70%)) to a reasonable terms of liability and holding the liability terms to the fullest of civil justice that base served plaintiff's injuries and damages to the long periodical housing discrimination terms (*Cal. Gov't Code § 12927(c)(1*) and that the amount years deprived (thereof 15 years) within the County of Los Angeles, is equivalent serving the civil liability terms thereof disproportion to each individual's attributed or comparative accountability of housing discrimination.

145.   The purpose that plaintiff had demand this settlement controversy than monetary rewards, is that plaintiff want to secure long housing terms of any rental lease of an housing unit, that plaintiff had not had reasonable opportunity to establish consistent housing history due to the circumstance alleged against said defendants. If the court or upon defendants' request or motion or recommendation that suggests or change settlement venue to monetary offer(s) that is an approximate estimate of ranging from the time (thereof 2005 to 2020) deprive housing, of $130,000 or slightly more that is less than the

1  rental coverage years that is equally to the years of housing deprivation. (*Lehner v. U.S. 685*

2  *F. 2d 1187 (9th 1982)(claims may be limit to its injuries and not excessive demanded*)

3  Defendants will present opposition to the term year than rather they'd settle in a onetime

4

5  payment settlement. Cutting the entitlement to full remedial claims about of a reduced

6  percentage fraction than the equal equivalent values of all claims alleged against

7  defendants for 16 years of housing deprivation.

8

9  146.  And, but additionally, plaintiff is being publicly antagonized in lured indication or ill-

10  controversy psychobabble of an unknown residential community(s) whom may had

11  participated in between the 16 years of housing discrimination within the County Los

12

13  Angeles. Plaintiff is having a frustrated recollection of what had may been seem as

14  orchestrated conductivity thus within the community (Hollywood District) awareness of

15  plaintiff's presence as damaging his' state and federal First Amendment Rights in the years

16

17  between 2005 to 2008, due the anticipated county surveil communication.  Plaintiff having

18  consisted employment income sources whereas plaintiff was able to have salvation in hotel

19  living condition that would provide secure comfort of sleeping and food storage. Plaintiff

20  recollected that once he'd arrived in the Los Angeles County, the next followed day, in

21

22  Hollywood City, plaintiff had entered into a hotel and inquired of weekly cost for a hotel

23  room.  Plaintiff was informed that of 'the hotel did not rent weekly cost for room'.

24  Approximately after 5 years whereas plaintiff had unemployed for amount of years,

25  plaintiff had approached an gentleman whom I had seen on a daily regular basis entering a

26  hotel, of the same hotel plaintiff had inquired for room weekly rental cost. Plaintiff was

27

28

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

1  informed by the civilian 'that he had paid $150.00 a week', as the county tax market was at

2  steady increase.

3

4

5  147. As the circumstance may seem surreal coincidental community's activity but plaintiff

6  is head-aching due to the facts of plaintiff discovered he was under surveillance

7  investigation and the confidential communication within the communities within the Los

8  Angeles County. If these facts that are officially unverified, become verified by the

9  defendants or and by means of federal discovery, plaintiff will seek in court of increase of

10 the amount percentage rental coverage against newly added defendants. Based on the

11 indication that the housing discrimination may had been a diverted course action for

12 liability or a jointed course of action for liability.

13

14

15 148.  And, as an analogic reasonable likelihood of personal responsibility that has no legal

16 basic or study recognition that is not profound in legal merits or having cited in reported

17 cases and if plaintiff is granted relief and rewarded monetary as resulted from venue

18 change of controversy settlement based upon the court's discretion or any opposition

19 motion by the defendants, plaintiff believes that upon his' personal motives that securing

20 the settlement in preservation for "percentage rental housing unit coverage (65.70%)",

21 would be most likely not guarantee secure by plaintiff's own responsibility care, due to

22 compilation of prepped greater costly federal litigation in  local district court and Supreme

23 Court and obtaining cost-efficient expensive retentions of experts' services.

24

25

26

27

28

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

149.  To the extend years terms for percentage rental coverage holding against defendants for intent confidential negligent refusal to provided housing assistance services (*24 C.F.R. § 100.70(d)(4)*), plaintiff, would be satisfy completely of civil punishment of that is equivalent to years and the defendants be responsible for years of a civil punishment for the injuries. *Dep't Fair Employ. & Hous. v. City of Napa (June 4, 1981)(Interest id awarded to make plaintiff whole)* The demand controversy settlement will serve as an exemplary and can be look upon demonstration of justice having being serve therefore the district court has the ultimate discretion to resolute a matter in dispute, the demand is reasonably meritorious righteous and seem fit for hold civil punishment and remedy of each defendants.

Submitting,

10/21/21

BY:  CAVIAR MICKENS
Pro Se Litigant's Name

Signature

Caviar Mickens
2309 Santa Monica
Santa Monica, CA 90404
Email: Caviarmickens36@yahoo.com
Ph.: 424.436/1071
In Pro Se

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

## VERIFIED COMPLAINT FOR FEDERAL TORT CLAIMS FOR VIOLATION OF HOUSING DISCRIMINATION

1.  I, CAVIAR MICKENS, verifies herein: I am the federal "Plaintiff" in to be proceeded in a United States District Court, thereof Southern California, Los Angeles Division, and am bring a federal complaint tort claims action against "Defendant(s)", Los Angeles County, Los Angeles County Sheriff's Department, Los Angeles Police Department, Division of Adult Parole Operations and Path, thereof which each said fore·mentioned defendants are resided of place of business with jurisdiction of the federal court pursuant to American with Disability Act and *Fed Rul. Civ. Proc. §§ 4(e)(i)-82* as well under *Title 28 U.S.C. §§§ 1331, 1343*-1343 and are authorized to be sue under *Title 42 U.S.C. § 1984(a)(b)* and *Fed Rul. Civ. Proc. §§§17(a)(b)(3)(c)(C), 19(a)(B)(i)-20(a),* for any relief or enforce (*re United Heath Care Corp. v. American Trade Ins. Co., Ltd., 88 F. 3d 563, 569, (8th Cir. 1996)*).

2.  But, and under section 19 of Federal Rules of Civil Procedures that nonjoinders to the action and are not stated in the complaint, thereof naming nonjoinders, the Los Angeles County District Attorney's Office, Los Angeles Mayor's Office and KTLA News 5 (fictitious name) based on federal criminal and appeal jurisdictional interest pursuant Title 18 of the U.S. Constitution. *National Licorice Co. v. National Labor Relations Board, 309 U.S. 350, 363, 60 S. Ct. 569, 84 L. Ed. 799(1940)*)(narrow goal of protected public interest)

3. In the complaint for federal tort claims against defendants, the alleged information was read of the foregoing "federal complaint" and the knowing informative contents alleged against defendants, thereof:

---

**FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS**

4.   The First Cause of Action-for Housing Discrimination, under the Fair Housing ACT(1999) thereby such doctrine act, in violation of the provisional act, all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

5.   The Second Cause of Action-for Conspiracy to Deprive and Interfere with Civil Rights, under Fair Housing Act(1999) and Title 42 U.S.C. § 1984 thereby such doctrine act, all allegation therein complaint alleged violation of the provisional Acts, all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

6.  The Third Cause of Action-for Negligent Failure to Provide General Assistance, under Section 8 Act(1937) and Fair Housing Act(1999),  all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

7.  The Fourth Cause of Action for Negligent Failure to Make Reasonable Accommodation and Person with Disability under the Section 8Act(1937) and American with Disability Act, all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

8.  For the Fifth Cause of action for Discrimination Against Make Reasonable Accommodation, under the American with Disability Act, all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

---

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS

9.  The Sixth Cause of action for Discrimination Against Person with a Disability, under American with Disability Act and Civil Rights Act(1964), all allegation therein complaint alleged violation of the provisional Acts is to be verified as true and accurate.

10.  And, thereof: I, Plaintiff believes that the information alleged against pursued defendants are true and accurate, under federal perjury of law. [18 U.S.C. §§1621-1623; 28 U.S. Code § 1746]

11. This federal complaint, and complaint for Federal Tort Claims, has been computer type written by word process and word counted for approximately 17,067 for each words of the prepared complaint and included with verification, is consisted of 68 pages.

Submitting,

10/21/21                              BY:  CAVIAR MICKENS
                                            Pro Se Litigant's Name

                                            Signature

                                            Caviar Mickens
                                            2309 Santa Monica
                                            Santa Monica, CA 90404
                                            Email: Caviarmickens36@yahoo.com
                                            Ph.: 424.436/1071
                                            In Pro Se

FEDERAL TORT CLAIMS FOR HOUSING
DISCRIMINATION VIOLATIONS
                              PAGE 68 OF 68

# EXHIBIT

# A

# DOCUMENT

# 1

# PAGES

# 1-178

**ADMISSIONS AND CONTINUED OCCUPANCY POLICY [2005] FOR THE
CONVENTIONAL PUBLIC HOUSING PROGRAM**



# HOUSING AUTHORITY OF THE COUNTY OF LOS ANGELES

## ADMINISTRATIVE PLAN
### APRIL 5, 2005

# Assisted Housing Division Administrative Plan
## Table of Contents

| Section | Page |
|---|---|

**CHAPTER 1: POLICIES AND OBJECTIVES** ........................................................... 1

1.1    Introduction .............................................................................. 1

1.2    Purpose of the Plan [24 CFR §982.54] ........................................... 1

1.3    Local Objectives [24 CFR §982.1(a)] ............................................. 2

1.4    Jurisdiction [24 CFR §982.51 and 24 CFR §982.4(b)]....................... 2

1.5    Rental Assistance Programs....................................................... 2

     1.5.1   Set-Aside, Targeted and Special Programs........................... 3

1.6    Fair Housing and Equal Opportunity Policy [24 CFR §982.53] .......... 4

1.7    Operating Reserves .................................................................. 4

1.8    Service Policy [24 CFR §8.11] ...................................................... 5

     1.8.1   Requests for Accommodation ............................................ 5

1.9    Family Outreach ....................................................................... 5

1.10   Owner Outreach [24 CFR §982.54(d)(5)]....................................... 6

1.11   Privacy Rights [24 CFR §5.212]................................................... 6

1.12   Monitoring Program Performance [24 CFR §985] ........................... 6

1.13   Terminology [24 CFR §982.4(b)].................................................. 7

**CHAPTER 2: ADMISSION ELIGIBILITY FACTORS AND APPLICANT REQUIREMENTS** ........ 8

2.1    Introduction [24 CFR §982.54(d)]................................................ 8

2.2    Eligibility Factors and Requirements [24 CFR §982.201 and 24 CFR §982.552] ................................................................................ 8

2.3    Family Composition [24 CFR §982.201(c)] .................................... 9

     2.3.1   Stable Relationship ......................................................... 9

     2.3.2   Head of Household [24 CFR §5.504].................................. 10

     2.3.3   Spouse of Head ............................................................ 10

     2.3.4   Live-In Attendants [24 CFR §982.316 and 24 CFR §5.403]................ 10

     2.3.5   Split Households Before Voucher Issuance.......................... 11

     2.3.6   Multiple Families in the Same Household ........................... 11

     2.3.7   Joint Custody of Children ............................................... 11

2.4    Income Limitations [24 CFR §982.201(b)]..................................... 12

     2.4.1   Income Limits for Other Programs.................................... 12

2.5   Citizenship/Eligible Immigration Status [24 CFR §982.201(a) and §982.203(b)(4) and §5.508] ................................................................................12

    2.5.1   Mixed Families [24 CFR §5.504] .........................................................12

    2.5.2   No Eligible Members [24 CFR §982.552(b)(4)].....................................13

2.6   Social Security Number Requirements [24 CFR §5.216(a)] ...........................13

2.7   Screening for Drug Abuse and Other Criminal Activity [24 CFR §982.552 – §982.553]...............................................................................................13

    2.7.1   Drug Abuse and Criminal History Screening Standards [24 CFR §982.552(i) and §982.553(a)].................................................................13

    2.7.2   Criminal Background Checks [24 CFR §982.552 – §982.553, §5.903 – §5.905]...........................................................................................15

    2.7.3   Requests for Criminal Records by Owners of Covered Housing for the Purposes of Screening  [24 CFR §5.903(d)].............................................16

    2.7.4   Request for Criminal Records by Section 8 Project-Based Owners for the Purposes of Lease Enforcement or Eviction.........................................16

    2.7.5   Confidentiality of Criminal Records [24 CFR §5.903(g)] ......................16

    2.7.6   Disclosure of Criminal Records to Family ............................................17

    2.7.7   Explanations and Terms [24 CFR §5.100].............................................17

2.8   Other Criteria for Admission [24 CFR §982.552(c)].........................................17

2.9   Suitability of Family [24 CFR §982.307(a)(2)] ..............................................18

2.10  Denying Admission to Ineligible Families [24 CFR §982.201(f)(1) and §982.552(a)(2)]......................................................................................18

CHAPTER 3: APPLICATIONS PROCESS ...........................................................20

3.1   Introduction [24 CFR §982.54(d)(1)] .............................................................20

3.2   How to Apply ............................................................................................20

    3.2.1   Preliminary Registration Waiting List [24 CFR §982.204(b)] ................20

    3.2.2   Waiting List ......................................................................................20

3.3   Applying for Special Programs and Non-Housing Choice Voucher Programs .21

3.4   Opening and Closing of Waiting List [24 CFR §982.206] ...............................21

    3.4.1   Opening the Waiting List [24 CFR §982.206(a)(2)]..............................21

3.5   Limits on Who May Apply [24 CFR §982.307(b)(1)] ........................................22

3.6   Closing the Waiting List [24 CFR §982.206(c)]...............................................22

3.7   Time of Selection [24 CFR §982.204(d)].........................................................22

3.8   Application Procedures [24 CFR §982.204(c)] ................................................22

3.9   Interview Sessions/Mailings..........................................................................23

    3.9.1   Request for Information via Mail .........................................................23

3.9.2   Application Interview Process..................................................24

3.9.3   Secondary Reviews/Credit Reports [24 CFR §982.551(b)(1)] .............25

3.10   Denial of Assistance [24 CFR §982.204(c)(1) and §982.204(f)(1) §982.552] ..26

3.11   Final Determination and Notification of Eligibility [24 CFR §982.301] ..............26

**CHAPTER 4:  ESTABLISHING PREFERENCES AND MAINTAINING THE WAITING LIST .....27**

4.1   Introduction..................................................................................27

4.2   Application Pool ..........................................................................27

4.3   Local Preferences [24 CFR §982.207] ........................................27

    4.3.1   Verification of Preferences [24 CFR §982.207(b)] ....................28

4.4   Special Admissions [24 CFR §982.203] ......................................29

    4.4.1   Exceptions for Special Admissions.......................................29

    4.4.2   Criminal Background Checks ................................................29

4.5   Change in Circumstances [24 CFR §982.204(b)]..........................30

4.6   Cross-Listing of Public Housing and Section 8 [24 CFR §982.205] ................30

4.7   Final Verification of Preferences [24 CFR §982.207(e)] ..................30

4.8   Preference Denial .......................................................................30

4.9   Removal from Waiting List and Purging [24 CFR §982.204(c)(1) and §982.201(f)(1)] ...........................................................................30

**CHAPTER 5:  SUBSIDY STANDARDS .........................................................32**

5.1   Introduction [24 CFR §982.402(a)]..............................................32

5.2   Determination of Voucher Size [24 CFR §982.402].......................32

    5.2.1   Continuing Assistance ........................................................33

5.3   Occupancy Standards Waiver [24 CFR §982.402(b)(8)] ................33

5.4   Exceptions for Foster Children [24 CFR §982.402(b)(4)] ...............34

5.5   Changes for Participants [24 CFR §982.551(h)(2) and 24 CFR §982.516(c)] .34

5.6   Unit Size Selected .....................................................................35

5.7   Flexibility of Unit Size Actually Selected [24 CFR §982.402(d)]......................35

**CHAPTER 6:  DETERMINING THE TOTAL TENANT PAYMENT AND HACoLA ABSENCE POLICY.........................................................................................36**

6.1   Introduction..................................................................................36

6.2   Income Definitions ......................................................................36

6.3   Income Deductions [24 CFR §5.611(a)].......................................36

    6.3.1   Childcare Expenses [24 CFR §5.603(d) and 24 CFR §5.611(e)] .........37

    6.3.2   Medical Expenses [24 CFR §5.611(d)(1)]................................37

6.4     Income Inclusions and Exclusions ................................................. 38
        6.4.1   Income Inclusions [24 CFR §5.609(b)] ................................ 38
        6.4.2   Income Exclusions [24 CFR §5.609(c)] ................................ 40
6.5     Family Assets [24 CFR §5.603(b)] ................................................ 43
        6.5.1   Lump-Sum Receipts ......................................................... 43
        6.5.2   Attorney Fees ................................................................... 43
        6.5.3   Contributions to Retirement Funds – Assets [24 CFR §5.603(d)] ........ 43
        6.5.4   Assets Disposed of for Less than Fair Market Value [24 CFR §5.603(d)]
                43
6.6     Calculating Income and Family Contribution ................................. 44
        6.6.1   "Minimum Rent" and Minimum Family Contribution [24 CFR
                §5.630(a)(3)] ................................................................... 44
        6.6.2   Minimum Income ............................................................. 44
        6.6.3   Averaging Income [24 CFR §982.516(B)(2) and 24 CFR §5.609(D)] ... 44
        6.6.4   Utility Allowance and Utility Reimbursement Payments [24 CFR
                §982.517] ........................................................................ 44
        6.6.5   Reduction in Benefits ...................................................... 45
6.7     Proration of Assistance for "Mixed" Families ............................... 45
        6.7.1   Applicability [24 CFR §5.520(a)] ....................................... 45
        6.7.2   Prorated Assistance Calculation [24 CFR §5.520(c)] ........... 45
6.8     Absence Policy [24 CFR §982.312(d)] ......................................... 45
        6.8.1   Absence of Entire Family [24 CFR §982.312] ..................... 46
        6.8.2   Absence of Any Member [24 CFR §982.312(a)] .................. 47
        6.8.3   Absence Due to Medical Reasons [24 CFR §982.312(e)(1)] ...... 47
        6.8.4   Absence Due to Incarceration [24 CFR §982.312(e)(1)] ......... 47
        6.8.5   Foster Care and Absences of Children [24 CFR §982.551(h)(4)] ........ 47
        6.8.6   Absence of Adult [24 CFR §982.312(e)] ............................. 48
        6.8.7   Students [24 CFR §982.312(e)] ......................................... 48
        6.8.8   Visitors [24 CFR §982.312(e)] .......................................... 49
6.9     Reporting Changes in Household Composition [24 CFR §982.516(c)] .......... 49
        6.9.1   Reporting Additions to Owner and HACoLA [24 CFR §982.551(h)(2)] . 49
        6.9.2   Reporting Absences to HACoLA [24 CFR §982.551(h)(3) and
                §982.551(i)] ..................................................................... 50

CHAPTER 7: VERIFICATION PROCEDURES .......................................... 51
7.1     Introduction [24 CFR §5.240(c), 24 CFR §5.210, 24 CFR §982.551(b)] ......... 51

| | | | |
|---|---|---|---|
| 7.2 | | Methods of Verification and Time Allowed ................................................ | 51 |
| | 7.2.1 | Up-Front Income Verification (UIV)/Enterprise Income Verification (EIV) 51 | |
| | 7.2.2 | Third-Party Written Verification.............................................................. | 51 |
| | 7.2.3 | Third-Party Oral Verification .................................................................. | 52 |
| | 7.2.4 | Review of Documents ............................................................................ | 52 |
| | 7.2.5 | Self-Certification/Self-Declaration......................................................... | 53 |
| 7.3 | | Release of Information [24 CFR §5.230] ................................................... | 53 |
| 7.4 | | Computer Matching [24 CFR §5.210(a)] ................................................... | 53 |
| 7.5 | | Items to be Verified [24 CFR §982.551(b)]............................................... | 53 |
| 7.6 | | Verification of Income [24 CFR §982.516(a)(2)(i)] .................................... | 54 |
| | 7.6.1 | Employment Income [24 CFR §5.609(b)(1)]........................................... | 54 |
| | 7.6.2 | Social Security, Pensions, Disability, Supplementary Security Income [24 CFR §5.609(b)(4)] ........................................................................... | 54 |
| | 7.6.3 | Unemployment Compensation [24 CFR §5.609(b)(5)].......................... | 55 |
| | 7.6.4 | Welfare Payments or General Assistance [24 CFR §5.609(b)(6)]........ | 55 |
| | 7.6.5 | Alimony or Child Support Payments [24 CFR §5.609(b)(7)]................. | 55 |
| | 7.6.6 | Net Income from a Business [24 CFR §5.609(b)(2)] ............................ | 56 |
| | 7.6.7 | Child Care Business............................................................................... | 56 |
| | 7.6.8 | Recurring Gifts [24 CFR §5.609(b)(7)]................................................. | 56 |
| | 7.6.9 | Zero-Income Status................................................................................ | 57 |
| | 7.6.10 | Full-Time Student Status [24 CFR §5.609(c)(11)]................................ | 57 |
| 7.7 | | Income from Assets .................................................................................. | 57 |
| | 7.7.1 | Savings Account Interest Income and Dividends [24 CFR §5.609(b)(3)] 57 | |
| | 7.7.2 | Interest Income from Mortgages or Similar Arrangements [24 CFR §5.609(b)(7)] ......................................................................................... | 58 |
| | 7.7.3 | Net Rental Income from Property Owned by Family [24 CFR §5.609(b)(3)] ......................................................................................... | 58 |
| 7.8 | | Verification of Assets [24 CFR §982.516(a)(2)(ii)] ................................... | 58 |
| | 7.8.1 | Family Assets......................................................................................... | 58 |
| | 7.8.2 | Assets Disposed of for Less than Fair Market Value (FMV) [24 CFR §5.603(b)(3)] ......................................................................................... | 58 |
| 7.9 | | Verification of Allowable Deductions from Income [24 CFR §5.11].......... | 59 |
| | 7.9.1 | Childcare Expenses [24 CFR §5.611(a)(4)] ......................................... | 59 |
| | 7.9.2 | Medical Expenses [24 CFR §5.611(a)(3)]............................................. | 59 |

7.9.3   Assistance to Persons with Disabilities [24 CFR §5.611(a)(3)(ii)] ........60

7.10   Verifying Non-Financial Factors [24 CFR §982.551(b)(1)]................................61

7.10.1   Verification of Legal Identity ...................................................61

7.10.2   Verification of Marital Status....................................................61

7.10.3   Familial Relationships .........................................................62

7.10.4   Verification of Permanent Absence of Adult Member...........................62

7.10.5   Verification of Change in Family Composition [24 CFR §982.516(c)] ..62

7.10.6   Verification of Disability .......................................................63

7.10.7   Verification of Citizenship/Eligible Immigrant Status [24 CFR §5.508(a)] 63

7.10.8   Verification of Social Security Numbers [24 CFR §5.216(a)]................64

7.10.9   Medical Need for Larger Unit...................................................65

7.10.10   Secondary Review/Credit Checks.............................................65

**CHAPTER 8:   VOUCHER ISSUANCE AND BRIEFINGS .................................................68**

8.1   Introduction.................................................................................68

8.2   Issuance of Housing Choice Vouchers ..........................................................68

8.3   Briefing Types and Required Attendance [24 CFR §982.301(a)]......................68

8.3.1   Initial Applicant Briefing .......................................................68

8.3.2   Briefing Packet [24 CFR §982.301(b)]........................................69

8.3.3   Other Information to be Provided at the Briefing [24 CFR §982.301(a)] 70

8.3.4   Re-Issuance Briefing...........................................................70

8.3.5   Owner Briefing .................................................................71

8.4   Encouraging Participation in Areas Without Low Income or Minority Concentration [24 CFR §982.301(a)(3) ...............................................71

8.5   Security Deposit Requirements [24 CFR §982.313] ..........................................71

8.6   Term of Voucher [24 CFR §982.301(b)(1)].....................................................71

8.6.1   Expirations [24 CFR §982.303(a)] ............................................72

8.6.2   Policy on Suspensions (Tolling) [24 CFR 982.303(c)].........................72

8.6.3   Extensions [24 CFR §982.303(b)] ............................................72

8.6.4   Assistance to Voucher Holders [24 CFR §982.301(b)] .......................72

8.7   Voucher Issuance Determination for Split Households [24 CFR §982.315].....72

8.8   Remaining Member of Family – Retention of Voucher ....................................73

8.9   Family Voluntarily Relinquishes Housing Choice Voucher ..............................73

**CHAPTER 9: THE NEW CONTRACT PROCESS REQUEST FOR TENANCY APPROVAL AND CONTRACT EXECUTION**....................................................................**75**

9.1    Introduction [24 CFR §982.302(b) and 24 CFR §982.353(b)]...........................75

9.2    Request for Tenancy Approval [24 CFR §982.302(c)].....................................75

      9.2.1  Disapproval of RTA [24 CFR §982.302(d)] ............................................75

9.3    Eligible Types of Housing [24 CFR §982.352]..............................................76

      9.3.1  Ineligible Housing Types [24 CFR §982.352(a)] ...................................76

      9.3.2  Restrictions On Renting To Relatives [24 CFR §982.306(d)]................76

9.4    Lease Agreements [24 CFR §982.308 - §982.309] ......................................77

      9.4.1  Separate Agreements [24 CFR §982.510(c)]......................................78

9.5    Initial Inspections ........................................................................................79

9.6    Rent Limitations [24 CFR §982.508] ...........................................................79

9.7    Rent Reasonableness [24 CFR §982.507(a)(1)] ..........................................79

9.8    Information to Owners [24 CFR §982.307(b)] ...............................................79

9.9    Owner Disapproval [24 CFR §982.306(a) - §982.306(c)(4)] .........................80

9.10  Change in Total Tenant Payment (TTP) Prior to HAP Effective Date.............81

9.11  Contract Execution Process [24 CFR §982.305(c)] ......................................81

      9.11.1 Determining the Contract Effective Date.............................................81

      9.11.2 Prorating First Month's Rent ..............................................................82

      9.11.3 Proof Of Ownership............................................................................82

      9.11.4 Establishing Eligibility To Execute HAP Contract And Related Documents...................................................................................................82

      9.11.5 Payment To The Owner [24 CFR §982.311(a)] ...................................82

9.12  Change in Ownership ..................................................................................83

**CHAPTER 10: HOUSING QUALITY STANDARDS AND INSPECTIONS .............................84**

10.1  Introduction..................................................................................................84

10.2  Types of Inspections [24 CFR §982.405] .....................................................84

10.3  Housing Quality Standards (HQS) [24 CFR §982.401]...................................84

      10.3.1 Unit Space and Size [24 CFR §982.401(d)(2)(i)] ................................85

      10.3.2 Living Room / Sleeping Room [24 CFR §982.401(d)(2)(ii)], [24 CFR §982.401(h)(2)(iv)], [24 CFR §982.401(f)] ...........................................85

      10.3.3 Sanitary Facilities (Bathroom) [24 CFR §982.401(b)], [24 CFR §982.401(h)(2)(iii)], [24 CFR §982.401(f)(2)(ii)] .........................................85

      10.3.4 Food Preparation (Kitchen) [24 CFR §982.401(c)], [24 CFR §982.401(f)(2)(ii)] ............................................................................86

      10.3.5 Ceilings, Walls, Floors and Roof [24 CFR §982.401(g)] .....................86

10.3.6 Windows [24 CFR §982.401(f)(1)(ii)], [24 CFR §982.401(d)(2(iii)] .......87

10.3.7 Doors and Unit Access [24 CFR §982.401(d)(2)(iv)], [24 CFR §982.401(k)]..................................................................................87

10.3.8 Thermal Environment [24 CFR §982.401(e)] .......................................87

10.3.9 Smoke Detectors [24 CFR §982.401(n)].............................................87

10.3.10 Site and Sanitation [24 CFR §982.401(l)], [24 CFR §982.401(m)].....88

10.3.11 Additional Housing Quality Standards [24 CFR §982.401(a)(4)(ii)(a)]88

10.3.12 Serious Deficiencies.......................................................................88

10.4 Lead-Based Paint [24 CFR §982.401(j)] .....................................................89

10.4.1 Disclosure  [24 CFR §35(A)]..............................................................90

10.4.2 Lead-Based Paint Visual Assessment [24 CFR §35(M)].....................90

10.4.3 Stabilization and Clearance [24 CFR §35(M)]....................................90

10.4.4 Children with Environmental Intervention Blood Lead Levels (EIBLL) [24 CFR §35.325]....................................................................................91

10.5 Inspections Schedule...............................................................................92

10.6 New Contract Inspections [24 CFR §982.305(b)(2))] ...................................92

10.6.1 When HQS Deficiencies Must Be Corrected.......................................92

10.7 Annual and Interim Inspections [24 CFR §982.405] .....................................93

10.7.1 Annual Inspections..........................................................................93

10.7.2 Interim Inspections .........................................................................93

10.8 Failed Inspections: Determination of Responsibility [24 CFR §982.404(b)] .....93

10.9 Failed Inspections: When Deficiencies Must Be Corrected [24 CFR §982.404(a)(3)].....................................................................................94

10.9.1 Emergency Fail Deficiencies ............................................................94

10.9.2 Non-Emergency Fail Deficiencies......................................................94

10.10 Consequences of Verified Family-Caused Deficiencies [24 CFR §982.552(a)] 95

10.11 Consequences of Verified Owner-Related Deficiencies [24 CFR §982.404(a), 24 CFR §982.452 and 24 CFR §982.453]...............................................95

10.11.1 Abatement [24 CFR §982.453(b) and 24 CFR §982.404(a)(3)] .........95

10.11.2 Termination of Contract [24 CFR §982.453(b)]...........................97

10.12 Quality Control Inspections [24 CFR §982.405(b)] .........................................97

CHAPTER 11: SETTING PAYMENT STANDARDS AND DETERMINING RENT REASONABLENESS.....................................................................................98

11.1 Introduction [24 CFR §982.503] .................................................................98

11.2 Payment Standards for the Voucher Program [24 CFR §982.503(b)(1)] .........98

11.2.1 Assisted Families' Rent Burdens ........................................................ 98

11.2.2 Success Rate of Voucher Holders...................................................... 98

11.2.3 Rent Reasonableness Database......................................................... 99

11.2.4 Quality of Units Selected .................................................................. 99

11.2.5 File Documentation .......................................................................... 99

11.3   Rent Reasonableness Determinations [24 CFR §982.507] ........................... 99

11.3.1 Management and Maintenance Services........................................... 100

11.3.2 Appealing a Rent Reasonableness Determination ........................... 100

11.3.3 Rent Increases [24 CFR §982.519] ................................................. 101

CHAPTER 12: RE-EXAMINATION.................................................................... 102

12.1   Introduction [24 CFR §982.516(a)].............................................................. 102

12.1.1 Procedure ....................................................................................... 102

12.2   Re-Examination Notification to the Family................................................... 102

12.2.1 Persons with Disabilities [24 CFR §8.24(a)] .................................... 102

12.2.2 Requirements to Attend.................................................................... 102

12.2.3 Failure to Respond........................................................................... 102

12.2.4 Documents Required from the Family .............................................. 103

12.2.5 Tenant Rent Increases ..................................................................... 103

12.2.6 Tenant Rent Decreases ................................................................... 103

12.3   Interim Re-examination  [24 CFR §982.516(b)(3)] ....................................... 104

12.3.1 Increases or Decreases in Income ................................................... 104

12.4   Special Adjustments .................................................................................. 104

12.5   Changes in Family Composition [24 CFR §982.516(c)]................................ 105

12.5.1 Increases in Family Size [24 CFR §982.551(h)(2)] ........................... 105

12.5.2 Decreases in Family Size................................................................. 105

12.6   Continuation of Assistance for "Mixed" Families [24 CFR §5.504(b)] ............ 105

CHAPTER 13: ALLOWABLE MOVES/PORTABILITY ..................................... 107

13.1   Introduction............................................................................................... 107

13.2   Allowable Moves and Restrictions............................................................... 107

13.2.1 Restrictions on Moves ..................................................................... 107

13.2.2 Allowable Moves for New Applicants [24 CFR §982.353] ................. 107

13.2.3 Allowable Moves for Current Participants [24 CFR §982.314] .......... 108

13.2.4 Restrictions on Moves During the Initial Lease [24 CFR §982.314(c) and
       §982.314(e)] .................................................................................... 109

13.3   Procedures for Moves for Current Participants [24 CFR §982.314(d)] .......... 109

13.4   Outgoing Portability Procedures [24 CFR §982.355(c)] ................................. 110

    13.4.1  Briefing for Families Wishing to Exercise Portability .......................... 110

    13.4.2  Payment to the Receiving Housing Authority [24 CFR §982.355(d) and §982.355(e)] ................................................................................. 110

13.5   Incoming Portability Procedures [24 CFR §982.355] .................................... 110

    13.5.1  Policies on Absorption and Administration [24 CFR §982.355(d) and §982.355(e)] ................................................................................ 111

    13.5.2  Income and Total Tenant Payment Review [24 CFR §982.355(c)] .... 111

    13.5.3  Terminations .................................................................................... 112

    13.5.4  Informal Hearings/Reviews [24 CFR §982.555] ................................ 112

CHAPTER 14: CONTRACT TERMINATIONS ................................................................ 113

14.1   Introduction .................................................................................................. 113

14.2   Description of Documents ............................................................................ 113

14.3   Termination of the Lease by the Family: Moves [24 CFR §982.309(c)] ......... 113

14.4   Termination of the Lease by the Owner ....................................................... 113

    14.4.1  Terminating the Lease During the Initial Term of the Lease [24 CFR §982.310(a)] ................................................................................... 113

    14.4.2  Terminating the Lease After the Initial Term of the Lease ................. 114

    14.4.3  Requests for Criminal Records by Project-Based Section 8 Owners [24 CFR §5.903(d)] ......................................................................... 114

14.5   Mutual Termination of the Lease ................................................................. 115

14.6   Termination of the HAP Contract by HACoLA [24 CFR §982.453] ............... 115

14.7   HAP Payments and Contract Terminations [24 CFR §982.311] .................... 116

CHAPTER 15: FAMILY OBLIGATIONS ....................................................................... 117

15.1   Introduction [24 CFR §982.552(a)] ............................................................... 117

15.2   Grounds for Denial/Termination [24 CFR §982.552(c)(2)(ii)] ......................... 117

    15.2.1  Form of Termination ........................................................................ 117

    15.2.2  Mandatory Termination ................................................................... 117

    15.2.3  Grounds for Termination of Assistance [24 CFR §982.552(c)(1)] ...... 117

    15.2.4  Welfare to Work Program [24 CFR §982.552(c)(1)(x)] ....................... 118

    15.2.5  Registered Sex Offenders ............................................................... 118

15.3   Family Obligations [24 CFR §982.551] ......................................................... 119

    15.3.1  Housing Authority Discretion [24 CFR §982.552(c)(2)] ..................... 120

    15.3.2  Enforcing Family Obligations ........................................................... 121

15.3.3 Drug Related Criminal Activity [24 CFR §982.553(a) and (b)(1) and (2)] 122

15.3.4 Violent Criminal Activity [24 CFR §982.553(a) and (b)(1) and (2)] ..... 122

15.3.5 Required Evidence [24 CFR §982.553(c)] ........................................ 123

15.3.6 Confidentiality of Criminal Records [24 CFR §5.903(g)] ................... 123

15.3.7 Disclosure of Criminal Records to Family [24 CFR §5.903(f) and §982.553(d)] ............................................................................... 123

15.4   Notice of Termination of Assistance ............................................. 123

15.5   Procedures for Non-Citizens [24 CFR §982.552(b)(4) and 24 CFR §5.514] .. 124

15.5.1 False or Incomplete Information (No Eligible Members) ................... 124

15.6   $0 Assistance Tenants (End of Participation) [24 CFR §982.455] ............. 125

15.7   Option Not to Terminate for Misrepresentation of Income ..................... 125

15.8   Misrepresentation in Collusion with Owner ...................................... 125

15.9   Missed Appointments and Deadlines [24 CFR §982.551] ...................... 125

CHAPTER 16: INFORMAL HEARINGS AND COMPLAINTS ........................................ 127

16.1   Introduction ............................................................................ 127

16.2   Applicants – Preference Denials [24 CFR §982.554] ........................... 127

16.3   Informal Review Procedures for Applicants [24 CFR §982.554(a)] ............ 127

16.3.1 When an Informal Review is Not Required [24 CFR §982.554(c)] ..... 128

16.3.2 Procedure for Review [24 CFR §982.554(b)] ............................... 128

16.4   Informal Hearing for Participants [24 CFR §982.555] ........................... 129

16.4.1 When an Informal Hearing May Be Requested [24 CFR §982.555(a)(1)] 129

16.4.2 Notification [24 CFR §982.555(c)] .......................................... 129

16.4.3 Prior to Hearing [24 CFR §982.555(e)(2)] .................................. 130

16.4.4 Hearing Process [24 CFR §982.555(d)] .................................... 131

16.4.5 Hearing Officer [24 CFR §982.555(e)(4)] .................................. 131

16.4.6 Opening ........................................................................... 131

16.4.7 Presentations ..................................................................... 131

16.4.8 Rebuttals .......................................................................... 131

16.4.9 Final Summary ................................................................... 131

16.4.10 Conclusion of Hearing ........................................................ 132

16.5   When an Informal Hearing Is Not Required [24 CFR §982.555(b)] ............ 132

CHAPTER 17: OWNER OR FAMILY DEBTS TO HACoLA .......................................... 133

17.1   Introduction [24 CFR §982.163 and §792] ...................................... 133

17.2   Repayment Agreement for Families [24 CFR §792.103] ............................... 133

    17.2.1  Late Payments ..................................................................... 133

    17.2.2  Requests To Move .............................................................. 134

    17.2.3  Guidelines for Repayment Agreements ............................. 134

17.3   Family Debts Owed for Claims........................................................ 135

17.4   Family Debts Due to Fraud/Non-Reporting of Information [24 CFR §792.103] ................................................................................................ 135

    17.4.1  Family Error/Late Reporting ............................................... 135

    17.4.2  Program Fraud .................................................................... 135

17.5   Family Debts Paid in Full ................................................................ 135

17.6   Owner Debts to HACoLA ................................................................ 136

17.7   Writing Off Debts ............................................................................ 136

**CHAPTER 18: CLAIMS, MOVE-OUT AND CLOSE-OUT INSPECTIONS ........................ 137**

18.1   Introduction .................................................................................... 137

18.2   Owner Claims ................................................................................. 137

18.3   Unpaid Rent.................................................................................... 137

18.4   Vacancy Loss in the Certificate Program ...................................... 137

18.5   Damage Claims .............................................................................. 138

18.6   Move-Out and Close-Out Inspections ........................................... 139

18.7   Processing Claims .......................................................................... 139

    18.7.1  Other Requirements for Claims Processing......................... 140

**CHAPTER 19: OWNER DISAPPROVAL AND RESTRICTION ......................................... 141**

19.1   Introduction [24 CFR §982.306] .................................................... 141

19.2   Disapproval of Owner .................................................................... 141

19.3   Other Remedies for Owner Violations............................................ 142

    19.3.1  Abatement [24 CFR §982.404(a)(3)] ................................. 142

    19.3.2  Overpayments [24 CFR §792.101] .................................... 142

**CHAPTER 20: SPECIAL PROGRAMS ...................................................................... 143**

20.1   Introduction.................................................................................... 143

20.2   Housing Assistance Programs........................................................ 143

    20.2.1  Housing Choice Voucher Programs ................................... 143

    20.2.2  Voluntary Set-Aside Programs For Homeless Families .................... 143

    20.2.3  Non-Housing Choice Voucher Special Programs ............................. 144

20.3   Housing Assistance Program Procedures....................................... 144

20.3.1  Referral Process/Waiting List ................................................ 144

20.3.2  Eligibility ................................................................................ 145

20.3.3  Verification Procedures .......................................................... 145

20.3.4  Denial of Participation ............................................................ 145

20.3.5  Criminal Background ............................................................. 145

20.3.6  Briefing Sessions .................................................................. 145

20.3.7  Contracts/Tenant Payments ................................................. 146

20.3.8  Re-examinations ................................................................... 146

20.3.9  Terminations ......................................................................... 146

20.3.10  Portability ........................................................................... 147

20.4  Family Self-Sufficiency Program [24 CFR §984.101(a)] ................. 147

20.5  FSS Application Process ............................................................... 147

20.5.1  FSS Eligible Families [24 CFR §984.203].............................. 148

20.5.2  Denial of Participation [24 CFR §984.302]............................. 148

20.6  FSS Contract of Participation (COP) [24 CFR §984.303] ................ 148

20.6.1  Compliance With The Lease [24 CFR §984.303(b)(3)] .......... 149

20.7  Individual Training and Service Plan (ITSP) [24 CFR §984.303(b)(2)] .......... 150

20.7.1  Needs Assessment ............................................................... 150

20.7.2  The Individual Training and Services Plan (ITSP) [24 CFR §984.303] 150

20.8  Escrow Accounts [24 CFR §984.305] ........................................... 151

20.8.1  Forfeiting the FSS Escrow Account [24 CFR §984.305(f)]] ................ 152

20.9  Change in Family Composition ..................................................... 152

20.10  FSS Termination/Cancellation/Portability [24 CFR §984.303(h)] .................. 152

20.10.1  FSS Termination Due To Portability [24 CFR §984.306(f)] .............. 153

CHAPTER 21:  PRE-PAY/PRESERVATION PROGRAM [24 CFR §886] ...................... 154

21.1  Introduction .................................................................................. 154

21.2  Terms/Provisions ......................................................................... 154

CHAPTER 22:  MODERATE REHABILITATION PROGRAM [24 CFR §882] ................ 156

22.1  INTRODUCTION ........................................................................... 156

22.2  The Expired 15-Year Contracts ..................................................... 156

22.3  Requesting An Extension.............................................................. 156

22.4  Annual Increase For the Expired 15-Year Contracts ....................... 157

22.5  Non-Expired Mod Rehab Contracts .............................................. 157

22.6   Request To Move ........................................................................... 158

22.7   Referrals......................................................................................... 158

22.8   New Lease Process......................................................................... 159

22.9   Claims, Move-Out and Close-Out Inspections ............................... 159

## CHAPTER 1:
## POLICIES AND OBJECTIVES

**1.1    INTRODUCTION**

The Los Angeles County Community Development Commission (CDC) was created in 1982 by the County's Board of Supervisors.  The CDC aims to build better lives and better neighborhoods, by providing services to improve the quality of life in low- and moderate-income neighborhoods.  The CDC manages programs in public and assisted housing, community development, economic development, and housing development and preservation.

The Housing Authority of the County of Los Angeles (HACoLA) was created in 1938 to manage and develop affordable housing.  Since 1938, HACoLA has administered federally funded public housing, rental assistance programs, and services and special programs for residents of public and assisted housing.

In an effort to streamline Los Angeles County's housing and community development programs and services, the County Board of Supervisors combined HACoLA with the CDC in 1982.  HACoLA is comprised of two divisions of the CDC.  The Housing Management Division manages public housing and related programs and services.   The Assisted Housing Division administers rental assistance programs.

**1.2    PURPOSE OF THE PLAN**
     **[24 CFR §982.54]**

The purpose of the Administrative Plan is to clearly outline the policies and procedures that govern HACoLA's administration of rental assistance programs. The plan includes program requirements established by the U.S. Department of Housing and Urban Development (HUD), as well as the discretionary policies established by HACoLA.

The policies and procedures in this Administrative Plan comply with applicable local, State, and HUD and other Federal regulations, relevant memos, notices and guidelines, including fair housing and equal opportunity requirements.  If applicable regulatory changes conflict with this plan, regulations will have precedence.

HACoLA adheres to the Administrative Plan in administering all rental assistance programs.  The original plan and any changes must be approved by the Board of Commissioners of the agency (the Los Angeles County Board of Supervisors), and a copy of the plan must be provided to HUD.

As much as possible, revisions and additions are published to coincide with published changes in HACoLA's Agency Plan.  Interim changes, including Board mandates and administrative updates reflecting changes in law or regulatory requirements, will be made effective by memo from the Executive Director or designee.

Housing Authority of the County of Los Angeles

## 1.3   LOCAL OBJECTIVES
### [24 CFR §982.1(a)]

HACoLA rental assistance programs are designed to achieve three major objectives:

1. To provide improved living conditions and decent, safe, and sanitary housing for very low-income families while maintaining their rent payments at an affordable level;

2. To provide an incentive to private property owners to rent to lower income families by offering timely assistance payments; and

3. To promote freedom of housing choice and spatial deconcentration of lower income and minority families.

Additionally, HACoLA has adopted the following mission statement:

➤ To promote adequate and affordable housing, economic opportunity and a suitable living environment free from discrimination.

## 1.4   JURISDICTION
### [24 CFR §982.51 AND 24 CFR §982.4(B)]

HUD has authorized HACoLA to administer rental assistance programs within the corporate boundaries of Los Angeles County.  HACoLA's jurisdiction includes:

1. The unincorporated areas of the County, and

2. Participating cities within the County.  Participating small cities are defined as cities in the Los Angeles County area that have authorized HACoLA to administer rental assistance programs within their city limits.

## 1.5   RENTAL ASSISTANCE PROGRAMS

Section 8 of the Housing and Community Development Act of 1974 established the "Section 8 Program," the first permanent Federal program for rental assistance.  The program authorized a basic certificate program, as well as targeted subprograms.  As rental assistance programs developed, Congress authorized additional Section 8 programs, including a voucher program in 1987.

In 1998, the Quality Housing and Work Responsibility Act (QHWRA) required housing authorities to convert their certificates into vouchers and establish the Housing Choice Voucher Program as the primary rental assistance program.  As a result of this conversion, the Housing Choice Voucher Program now encompasses all HACoLA rental assistance except for existing certificates under the previously offered Moderate Rehabilitation Program.

➤ **Moderate Rehabilitation Program**: A certificate-based rental assistance program incorporating financial options for owners doing moderate levels of rehab and upkeep to affordable housing rental units.  Administration involves closing or extending expiring contracts.  Chapter 22 (Moderate Rehabilitation Program) covers the details of this program.

> **Section 8 Pre-Pay/Preservation Program**: A voucher-based rental assistance program that enables existing participants, living in units in which owners have prepaid a HUD-insured mortgage loan, to remain in affordable housing. Chapter 21 (Pre-Pay/Preservation Program) covers the details of this program.

> **Project-Based Voucher Program**: The Housing Authority will utilize Project-Based vouchers to prevent the displacement of families and preserve affordable rents in the case of an unforeseen event.

> **Housing Choice Voucher Program**: The major rental assistance program administered by HACoLA.

   • **Note**: *Unless otherwise noted, the procedures in this Administrative Plan are for the general Housing Choice Voucher Program.*

As required by HUD regulations, HACoLA administers the Family Self-Sufficiency Program as a special program option for participants in the Housing Choice Voucher Program. See Chapter 20 (Special Programs) for details.

### 1.5.1  Set-Aside, Targeted and Special Programs

HACoLA may use the Housing Choice Voucher Program budget to fund set-aside programs, which are detailed in Chapter 20 (Special Programs). All set-aside programs are subject to the availability of funding. The Executive Director has the discretion to approve allocations beyond the existing program size for all set-aside programs.

> **Housing Choice Voucher Homeless Program**: This program targets families throughout Los Angeles County. All eligible families are referred to HACoLA by pre-selected service providers.

> **Housing Choice Voucher Long-Term Family Self-Sufficiency Homeless Program**: This program targets homeless families who are eligible for CalWORKs and are employed or have an offer of employment (either subsidized or unsubsidized).

> **Housing Choice Voucher Family Unification Set-Aside Program**: This program provides assistance to families who are in imminent danger of losing or who cannot regain custody of their minor children due to lack of adequate housing.

Periodically, HACoLA applies for special funding from HUD to administer vouchers to targeted populations, within the Housing Choice Voucher Program. HACoLA administers vouchers through the following targeted programs:

> **Housing Choice Voucher Welfare to Work Program**: This program provides assistance to families who are eligible for CalWORKs benefits, are in good standing with the employment/job training program offered by the Los Angeles County Department of Public and Social Services (DPSS) and are in need of housing in order to obtain or retain employment. See Chapter 20 (Special Programs) for details.

   **Housing Choice Voucher Mainstream Program**: This program assists very-low income, disabled families who need rental assistance. As authorized by HUD regulations, HACoLA administers this program

Housing Authority of the County of Los Angeles

independently and does not rely on joint ventures with community partners. Eligible families are identified from the regular housing choice voucher waiting list and are admitted on a first come, first served basis.

Families admitted into a targeted program must meet all regular admission requirements with the exception of the residency requirement. Since HACoLA is required to work closely with other County departments that provide services through all of Los Angeles County, families residing outside of HACoLA's jurisdiction are allowed to participate in targeted programs. However, families may be required to move within HACoLA's jurisdiction for at least one year.

HACoLA also receives non-Housing Choice Voucher Program funding to administer the following special programs. See Chapter 20 (Special Programs) for details:

➢ **Shelter Plus Care Program**

➢ **Housing Opportunities for Persons with AIDS (HOPWA) Program**

### 1.6   FAIR HOUSING AND EQUAL OPPORTUNITY POLICY [24 CFR §982.53]

It is the policy of HACoLA to comply fully with all Federal, State and local nondiscrimination laws and with the rules and regulations governing fair housing and equal opportunity in housing and employment.

HACoLA shall not deny any family or individual the opportunity to apply for or receive assistance under HACoLA rental assistance programs on the basis of race, color, sex, religion, creed, national or ethnic origin, age, family status, handicap or disability.

HACoLA will provide Federal, State, and local information to voucher holders regarding discrimination, and the recourse available to them if they are victims of discrimination. Such information will be made available during the family briefing session, and all fair housing information and discriminatory complaint forms will be included in the voucher holder's briefing packet.

Except as otherwise provided in 24 CFR §8.21(c)(1), §8.24(a), §8.25 and §8.31, no individual with disabilities shall be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination because HACoLA's facilities are inaccessible to or unusable by persons with disabilities.

### 1.7   OPERATING RESERVES

The Board of Commissioners shall establish the permitted uses of earned administrative fees at the time of the Annual Consolidated Operating Budget approval. The approval shall consist of the use of administrative fees for the Housing Choice Voucher Program (Section 8) administration.

The Board of Commissioners must approve the expenditure of Section 8 operating reserves in excess of $50,000. The Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $49,999. The

Assistant Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $30,000.

**1.8**   **SERVICE POLICY**
        **[24 CFR §8.11]**

This policy is applicable to all situations described in this Administrative Plan when a family initiates contact with HACoLA, when HACoLA initiates contact with a family including when a family applies, and when HACoLA schedules or reschedules any kind of appointments.

It is the policy of HACoLA to be service-directed in the administration of HACoLA rental assistance programs, and to exercise and demonstrate a high level of professionalism while providing housing services to all families.

HACoLA's policies and practices are designed to provide assurances that all persons with disabilities will be provided reasonable accommodation so that they may fully access and utilize the housing program and related services. The availability of specific accommodations will be made known by including notices on HACoLA forms and letters to all families.

**1.8.1   Requests for Accommodation**

All requests for accommodation or modification will be verified with a reliable, knowledgeable professional so that HACoLA can properly accommodate the need presented by the disability.

Requests for reasonable accommodation from persons with disabilities will be granted upon verification that they meet the need presented by the disability.

Reasonable accommodation will be made for persons with disabilities that require an advocate or accessible offices. A designee will be allowed to provide information as needed, but only with the permission of the person with the disability.

**1.9**   **FAMILY OUTREACH**

Each time HACoLA enters into an Annual Contributions Contract (ACC) with HUD for new Section 8 existing units, it will be publicized in accordance with the specification in the criteria of the Equal Opportunity Housing Plan. HACoLA's waiting list will remain open on a continuous basis for the foreseeable future.

HACoLA will communicate the status of housing availability to other service providers in the community, advise them of housing eligibility factors and guidelines in order that they can make proper referrals for housing assistance.

Information regarding the program directed at prospective applicants/tenants will be disseminated in accordance with Equal Opportunity Housing Plan and HUD guidelines for fair housing.

Housing Authority of the County of Los Angeles

1.10   **OWNER OUTREACH**
      **[24 CFR §982.54(d)(5)]**

HACoLA encourages owners of decent, safe and sanitary housing units to lease to families participating in HACoLA rental assistance programs.   HACoLA maintains and regularly updates a list of interested landlords and available units for HACoLA rental assistance programs.   When listings from owners are received, they are compiled by HACoLA staff and made available through the phone hotline, by mail, or by Internet at www.hacola.org.

Ongoing marketing efforts to recruit suburban owners for participation include, but are not limited to:

1. Brochures for owners;

2. Realty Board presentations;

3. Apartment Owner Association presentations;

4. Community Center presentations; and

5. Presentation to organizations serving the disabled and other similar organizations.

HACoLA periodically evaluates the distribution of assisted families to identify areas within the jurisdiction where owner outreach should be targeted.   Special outreach efforts will be used in order to encourage participation of those groups who would not normally apply or participate.

1.11   **PRIVACY RIGHTS**
      **[24 CFR §5.212]**

Applicants and participants, including all adults in each household, are required to sign the HUD-9886 Form (Authorization for the Release of Information).   This document incorporates the Federal Privacy Act Statement and describes the conditions under which HUD will release family information.

A statement of HACoLA's policy on release of information to prospective landlords will be included in the briefing packet that is provided to the family.

HACoLA's practices and procedures are designed to safeguard the privacy of applicants and program participants.   All applicant and participant files are stored in a secure location that is only to be accessed by authorized staff.

HACoLA staff will not discuss family information contained in files unless there is a business or legal reason to do so.   Inappropriate discussion of family information or improper disclosure of family information by will result in disciplinary action.

1.12   **MONITORING PROGRAM PERFORMANCE**
      **[24 CFR §985]**

In order to ensure quality control, supervisory staff will review the following functions:

1.  10 percent of new applicants/contracts, and
2.  100 percent of work completed by new staff for a minimum of 30 calendar days.

HACoLA's Quality Assurance Unit conducts audits of:

1.  5 percent of annual re-examinations/interim re-examinations, and
2.  Minimum HQS quality control inspections as dictated by Section Eight Management Assessment Program (SEMAP) Indicator #5.

HACoLA's Program Integrity/Fraud Prevention Team will use credit checks, and other similar tools to confirm eligibility for:

1.  20 percent of all new applicants, and
2.  A random sample of program participants. It is anticipated that approximately 1,500 will be selected annually for a random review.

## 1.13   TERMINOLOGY
### [24 CFR §982.4(b)]

The Housing Authority of the County of Los Angeles is referred to as "HACoLA," "PHA," or "HA" throughout this document.

"Family" is used interchangeably with "applicant" or "participant" and can refer to a single person family. "Tenant" refers to participants in terms of their relation to landlords.

"Landlord" and "owner" are used interchangeably.

"Disability" is used where "handicap" was formerly used.

"Non-Citizen Rule" refers to the regulation effective on June 19, 1995 restricting assistance to U.S. citizens and eligible immigrants.

"HQS" means the Housing Quality Standards required by regulations as enhanced by HACoLA.

Housing Authority of the County of Los Angeles

## CHAPTER 2:
## ADMISSION ELIGIBILITY FACTORS AND APPLICANT REQUIREMENTS

**2.1** **INTRODUCTION**
**[24 CFR §982.54(d)]**

This chapter defines the criteria used by HACoLA to determine program eligibility, and the requirements that families and family members must meet in order to receive assistance under the program.  This chapter also clarifies the circumstances that may lead to a denial of admission, and the process for notifying families if they are denied admission.

Family members being added to households that are currently receiving assistance are considered new applicants and are subject to HACoLA's admission and eligibility requirements.

The intent of these policies is to maintain consistency and objectivity in evaluating the eligibility of families who apply for the programs.  The criteria listed in this chapter are the only factors used to review eligibility, to minimize the possibility of bias or discrimination.  Selection shall be made without regard to race, color, creed, religion, sex, national origin, familial status, source of income, or disability/handicap.

**2.2** **ELIGIBILITY FACTORS AND REQUIREMENTS**
**[24 CFR §982.201 AND 24 CFR §982.552]**

In accordance with HUD regulations, HACoLA has established the following eligibility criteria, which are detailed throughout this chapter.  To be eligible for admission, an applicant family must:

1. Meet the definition of a "family;"

2. Be within the appropriate income limits;

3. Be a citizen, or a non-citizen with eligible immigration status [24 CFR §5.508]; and

4. Furnish and verify valid Social Security numbers for all family members age 6 and over [24 CFR §5.216].

HACoLA will also deny admission as follows:

1. If applicant fails to meet specified criteria regarding drug abuse and other criminal activity;

2. If applicant fails to submit required consent forms, or any other HACoLA-required information to verify family eligibility, composition, or income (including birth certificates and valid state identification);

3. If applicant is in violation of other criteria listed in Section 2.7 of this chapter; or

4. If the applicant is a member, officer or employee of HACoLA who formulates policy or influences decisions with respect to federally funded rental assistance programs or a public official or a member of the local governing body or member of Congress.

HACoLA's procedures regarding notification and informal reviews for applicants who are denied assistance can be found at the end of this chapter.

## 2.3   FAMILY COMPOSITION
### [24 CFR §982.201(c)]

The applicant must qualify as a family. HACoLA defines a family as a single person or a group of persons as follows.

1. **An elderly family**: A family whose head, spouse, or sole member is a person who is at least 62 years of age. It may include two or more persons who are at least 62 years of age living together, or one or more persons who are at least 62 years of age living with one or more live-in aides.

2. **A disabled family**: A family whose head, spouse, or sole member is a person with disabilities. It may include two or more persons with disabilities living together, or one or more persons with disabilities living with one or more live-in aides.

3. **The remaining member of a tenant family**: Includes a pregnant person whose pregnancy was terminated after admission to the program. However, if the pregnancy is terminated before admission to the program, the individual will no longer constitute a family. The remaining member of a tenant family will be reassigned another bedroom size voucher, provided there is funding available. The remaining member of a tenant family does not include a live-in attendant of the former family whose service was necessary to care for the well being of an elderly, disabled or handicapped head of household, or spouse and whose income was not included for eligibility purposes.

4. **A group of persons**: Two or more persons sharing residency, who are not categorized as an elderly or disabled family, whose income and resources are available to meet family needs. There must be a relation by blood, marriage or operation of law, or the group must provide evidence of a significant relationship determined to be stable by HACoLA. The following is to be considered as relation by blood: mother, father, children, cousin, niece, nephew, aunt, uncle, grandfather and grandmother. A group of two could also be a single person who is pregnant or in the process of adopting or securing legal custody of any individual under the age of 18.

5. **A single person**: A person who lives alone, or intends to live alone, who is not categorized as elderly, disabled, or the remaining member of a tenant family.

A child who is temporarily away from home due to placement in foster care is considered a member of the family.

### 2.3.1   Stable Relationship

When the applicant group is not related by blood, marriage, or operation of law, HACoLA will require that the applicant group provide evidence of a stable relationship.

Housing Authority of the County of Los Angeles

HACoLA defines a stable relationship as:

1. A relationship that has been in existence for a minimum of 6 months, and
2. The parties provide financial support for each other.

Acceptable documentation of a stable relationship includes lease agreements indicating that the parties have lived together for at least 6 months, utility bills, other joint bills and/or bank account(s) (need to provide for a 6-month period), and, on a case-by-case basis, letters from a social service provider or religious organization confirming the relationship.

**2.3.2  Head of Household**
**[24 CFR §5.504]**

The head of household is considered to be the adult designated by the family or HACoLA to sign program-related documents. However, since rental assistance is provided to the entire family, it is expected that every family member will uphold HACoLA's rules and regulations. Emancipated minors who qualify under State law will be recognized as head of household.

**2.3.3  Spouse of Head**

Spouse means the husband or wife of the head of household. The marriage partner who, in order to dissolve the relationship, would have to be divorced. This includes the partner in a common-law marriage.

**2.3.4  Live-In Attendants**
**[24 CFR §982.316 and 24 CFR §5.403]**

A family may include a live-in attendant if the live-in attendant meets the following stipulations. The live-in attendant:

1. Is determined by HACoLA to be essential to the care and well being of an elderly person or a person with a disability;
2. Is not obligated for the support of the person(s);
3. Would not be living in the unit except to provide care for the person(s); and
4. Must submit a signed Criminal Background Consent Form.

A live-in attendant is different from a family member in the following:

1. An attendant's income will not be used to determine eligibility of family;
2. An attendant is not subject to the Non-Citizen Rule requirements;
3. An attendant is not considered a remaining member of the tenant family, which means that they are not entitled to retain the voucher if the eligible family member(s) voluntarily leave the program, are terminated from the program, or have a voucher that expires.

Relatives are not automatically excluded from being live-in attendants, but they must meet all the stipulations in the live-in attendant definition described above to qualify for the income exclusion as a live-in attendant. A relative who does not qualify for an income exclusion as a live-in attendant may qualify for other exclusions, including if a family receives income from a state agency to offset the

cost of services and equipment needed to keep a developmentally disabled family member at home.   For a complete list of income exclusions, refer to Chapter 7.

A live-in attendant may only reside in the unit with the approval of HACoLA. HACoLA will require written verification from a reliable, knowledgeable professional, such as a doctor, social worker, or caseworker.  The verification provider must certify that a live-in attendant is needed for the care of the family member who is elderly, and/or disabled.  The verification must include the hours of care that will be provided.

The live-in attendant will be subject to a criminal background check and must meet the same standard as an applicant.  Please see Section 2.6.1 (Applicant Screening Standards) of this chapter for more information.

With authorization from the assisted family, the landlord and HACoLA, a live-in attendant may have a family member live in the assisted unit as long as it does not create overcrowding in the unit.  HACoLA will not increase the family's subsidy to accommodate the family of a live-in attendant.

### 2.3.5   Split Households Before Voucher Issuance

When a family breakup occurs while a family is on the waiting list due to divorce or legal separation, it is the responsibility of the two families to decide which will take the placement on the waiting list.  If no decision or court determination is made, HACoLA will make the decision, taking into consideration the following:

1. Which family member applied as head of household;
2. Which family member retains the children or any disabled or elderly members;
3. Any restrictions that were in place at the time the family applied;
4. Role of domestic violence or any other infraction; and
5. Recommendation of social service agencies or qualified professionals.

### 2.3.6   Multiple Families in the Same Household

When families consisting of two families living together, (such as a mother and father, and a daughter with her own husband or children), apply together as a family, they will be treated as one-family unit.

### 2.3.7   Joint Custody of Children

Children who are subject to a joint custody agreement but live with one parent at least 51 percent of the time will be considered members of that household.  If both parents on the waiting list are trying to claim the child, the parent whose address is listed in the school records will be allowed to claim the school-age child as a dependent.

Where court orders exist and provide guidance on custody issues, HACoLA will follow the directives outline in the court documents.

Housing Authority of the County of Los Angeles

**2.4** **INCOME LIMITATIONS**
**[24 CFR §982.201(b)]**

In order to be eligible for assistance, an applicant must be:

1. An extremely low-income family (i.e.; the family's gross income may not exceed 30 percent of the Average Median Income [AMI] for Los Angeles County, as established by HUD); **or**

2. A low-income family whose gross income does not exceed more than 80 percent of the average median income for Los Angeles County.

In order to meet the income targeting requirements established by QHWRA, 75 percent of all new admissions will be required to meet the definition of an extremely low-income family. To achieve the required balance, it may be necessary to skip over otherwise eligible family. If this occurs, families that have been skipped over will retain the time and date of application and will be admitted as soon as an appropriate opening becomes available [24 CFR §982.201(b)(2)(i)].
HACoLA will admit eligible low-income families, whose incomes do not exceed 80 percent of the AMI, on a first-come, first-serve basis, according to their local preference ranking [24 CFR §982.207(e)(1) and 24 CFR §982.207(a)].

Families whose annual incomes exceed the income limit will be denied admission and offered an informal review.

**2.4.1** **Income Limits for Other Programs**

Periodically, HUD has provided funding to HACoLA for projects involving preservation opt-outs and/or the expiration of a project based Section 8 contract. HUD provides the income limits applicable to those projects through specific regulation. HACoLA will follow HUD directives in determining admissions for such programs.

**2.5** **CITIZENSHIP/ELIGIBLE IMMIGRATION STATUS**
**[24 CFR §982.201(a) and §982.203(b)(4) and §5.508]**

Eligibility for assistance is contingent upon a family's submission of evidence of citizenship or eligible immigration status. In order to receive assistance, a family member must be a U.S. citizen or eligible immigrant. Each family member, regardless of age, must submit a signed declaration of U.S. citizenship or eligible immigration status. HACoLA may request verification of the declaration by requiring presentation of alien resident card, birth certificate, social security card, naturalization document, or other appropriate documentation.

The citizenship/eligible immigration status of each member of the family is considered individually before the family's status is defined.

**2.5.1** **Mixed Families**
**[24 CFR §5.504]**

An applicant family is eligible for assistance as long as at least one member is a citizen or eligible immigrant. A family that includes eligible and ineligible individuals is called a "mixed family." Mixed family applicants will be given notice

that their assistance will be prorated and that they may request a hearing if they contest this determination.

### 2.5.2   No Eligible Members
### [24 CFR §982.552(b)(4)]

HACoLA is required to deny admission if no member of the family is a U.S. citizen or eligible immigrant. Families will be provided the opportunity to appeal the decision in an informal review.

### 2.6   SOCIAL SECURITY NUMBER REQUIREMENTS
### [24 CFR §5.216(a)]

Applicant families are required to provide verification of Social Security numbers for all family members prior to admission, if they have been issued a number by the Social Security Administration. This requirement also applies to persons joining the family after the admission to the program. Children age 5 and under, who have not been assigned a number, are exempt from this requirement.

Failure to furnish verification of Social Security numbers is grounds for denial of admission.

### 2.7   SCREENING FOR DRUG ABUSE AND OTHER CRIMINAL ACTIVITY
### [24 CFR §982.552 – §982.553]

This section describes the guidelines HACoLA has established for screening applicants for drug abuse and other criminal activity. The section includes HUD-required screening standards, as well as HACoLA discretionary standards allowed by HUD. HACoLA will deny program admission if there is reasonable cause to believe that an applicant family has engaged in activity prohibited by these guidelines.

These guidelines apply to applicant families, and any new members being added to the household of a family currently participating in a HACoLA-administered rental assistance program. HACoLA also screens families transferring into HACoLA's jurisdiction from other housing authorities, as authorized at 24 CFR §982.355(c)(9) and §982.355(c)(10).

### 2.7.1   Drug Abuse and Criminal History Screening Standards
### [24 CFR §982.552(i) and §982.553(a)]

HACoLA will prohibit program admission to households if any household member is found to have engaged in activities listed in this screening standards section. Applicants convicted of an act listed in this section are ineligible to receive assistance. However, HACoLA will consider the household eligible for rental assistance if the household member who committed the criminal act will not be a part of the assisted household; as long as all other admission requirements are met. The family may be required to submit written certification that the ineligible family member(s) will not reside in and/or visit the household.

1. **Applicant(s) previously evicted from federally assisted housing for drug-related criminal activity.**

Housing Authority of the County of Los Angeles

HACoLA is required to deny admission to the applicant or any household member evicted from public housing, Indian housing, Section 23, or any federally assisted housing program because of a drug-related criminal activity for a 3-year period beginning on the date of such eviction. However, HACoLA may waive the 3-year probation period if the person who committed the drug-related crime has successfully completed an approved supervised drug rehabilitation program after the date of the eviction or if the circumstances leading to the eviction no longer exist (i.e. the individual responsible for the original eviction is imprisoned or is deceased).

2. **Applicant(s) convicted for the manufacture of methamphetamine on the premises of federally assisted housing.**

   HACoLA is required to deny admission if the applicant or any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

3. **Applicant(s) currently engaging in the illegal use of a drug.**

   HACoLA is required to deny admission to an applicant or any household member who HACoLA determines is currently engaging in illegal use of a drug.

   HACoLA is required to deny admission if HACoLA has reasonable cause to believe that there is a pattern of illegal use of a drug by the applicant or any household member and that this pattern may threaten the health, safety, or right to peaceful enjoyment of the premises by others, regardless of whether the household member has been arrested or convicted.

   HACoLA may approve admission if the person provides sufficient evidence that they are no longer engaging in illegal drug use and have successfully completed a supervised drug rehabilitation program.

4. **Applicant(s) subject to a lifetime sex offender registration requirement.**

   HACoLA is required to deny admission if the applicant or any household member is subject to lifetime registration as a sex offender under a state registration program, regardless of longevity of conviction or completion of any rehabilitative program.

5. **Applicant(s) with a pattern of alcohol abuse.**

   HACoLA is required to deny admission if HACoLA has reasonable cause to believe that there is a pattern of abuse of alcohol by the applicant or any household member and this pattern may threaten the health, safety, or peaceful enjoyment of the premises.

   HACoLA may approve admission if the person provides sufficient evidence that they are no longer engaging in the abuse of alcohol and has successfully completed a supervised alcohol rehabilitation program.

6. **Applicant(s) currently engaging in, or who have engaged in criminal activities.**

HACoLA shall deny admission if the applicant or any household member has been convicted for **any** of the following activities, for a period of 3 years following the end of a conviction or incarceration (which ever is later), with no further arrest or convictions other than minor traffic violations:

- Drug-related criminal activity;

- Violent criminal activity (convicted perpetrators only);

- Other criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity; and

- Other criminal activity which may threaten the health or safety of the owner or HACoLA staff, contractor or subcontractors or vendors.

- HACoLA may waive the 3-year period for drug-related criminal activity if the person provides sufficient evidence that they are no longer engaging in the illegal use of a controlled substance and have successfully completed a supervised drug rehabilitation program.

7. **Applicant(s) engaging in fraud or bribery associated with any federal housing program.**

    HACoLA shall deny admission if the applicant or any household member has committed fraud, bribery, or any other corrupt or criminal act in connection with any Federal housing program. HACoLA may make an exception in determining admission if the family member(s) who participated or were culpable for the action do not reside in the assisted unit.

8. **Applicant(s) have not completed parole or probation.**

    HACoLA shall deny admission if the applicant or any household member has not completed parole or probation, including summary probation.

## 2.7.2   Criminal Background Checks
[24 CFR §982.552 – §982.553, §5.903 – §5.905]

HACoLA requests a criminal background check for all applicant household members (including live-in aides) 18 years of age and older. The criminal background check is used as a factor in screening applicants for criminal activities that would prohibit admission to HACoLA's Section 8 rental assistance programs.

All adult members of the applicant household must submit a signed Criminal Background Consent Form [24 CFR §5.903(b)], authorizing the release of criminal conviction records from law enforcement agencies. Failure to sign the consent form will result in the denial of assistance.

A criminal conviction alone may or may not result in the denial of assistance. Factors such as disclosure, completion of a drug or alcohol rehabilitative treatment program, type and longevity of the conviction may also be taken into consideration.

HACoLA is additionally authorized by HUD to obtain access to sex offender registration information, in order to prevent program admission to any household

Housing Authority of the County of Los Angeles

member (including live-in aides and minors) subject to a lifetime sex offender registration under a State sex offender registration program.

**2.7.3** **Requests for Criminal Records by Owners of Covered Housing for the Purposes of Screening**
**[24 CFR §5.903(d)]**

Owners of covered housing may request that HACoLA obtain criminal records, on their behalf, for the purpose of screening applicants. HACoLA will charge a fee in order to cover costs associated with the review of criminal records. These costs could include fees charged HACoLA by the law enforcement agency and HACoLA's own related staff and administrative cost.

Owners must submit the following items in order for HACoLA to process criminal records. Owner requests must include:

1. A copy of a signed consent form from each adult household members, age 18 years and older. Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social Security number. This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2. An owner's criteria or standards for prohibiting admission of drug criminals in accordance with HUD regulations (§ 5.854 of 24 CFR Parts 5 et al.), and for prohibiting admission of other criminals (§ 5.855 of 24 CFR Parts 5 et al.).

Once HACoLA obtains criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used as a basis for applicant screening. HACoLA will base its determination in accordance with HUD regulations and the owner criteria. If the owner's criteria conflicts with HUD regulations, the regulations will have precedence.

It is important to note that HACoLA will not disclose the applicant's criminal conviction record or the content of that record to the owner.

**2.7.4** **Request for Criminal Records by Section 8 Project-Based Owners for the Purposes of Lease Enforcement or Eviction**

Section 8 project-based owners may request that the PHA in the location of the project obtain criminal conviction records of a household member on behalf of the owner for the purpose of lease enforcement or eviction. Owner's request must the following:

1. A copy of the consent form, signed by the household member.

2. Owner's standards for lease enforcement and evicting due to criminal activity by members of a household.

**2.7.5** **Confidentiality of Criminal Records**
**[24 CFR §5.903(g)]**

Criminal records received by HACoLA are maintained confidentially, not misused, nor improperly disseminated and kept locked during non-business hours. All criminal records will be destroyed no later than 30 calendar days after a final determination is made.

**2.7.6   Disclosure of Criminal Records to Family**

The applicant or family member requesting to be added to the household will be provided with a copy of the criminal record upon request and an opportunity to dispute the record.  Applicants will be provided an opportunity to dispute the record at an informal review.  Participants may contest such records at an informal hearing [24 CFR §982.553(d)].

**2.7.7   Explanations and Terms**
**[24 CFR §5.100]**

The following terms are used to determine eligibility when an applicant or a family member is added to an already assisted household and is undergoing a criminal background check.

❑   "Covered housing" includes public housing, project-based assistance under Section 8 (including new construction and substantial rehabilitation projects), and tenant-based assistance under Section 8.

❑   "Drug" means a controlled substance as defined in Section 102 of the Controlled Substance Act (21 U.S.C. 802).

❑   "Drug-related criminal activity" means the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with the intent to manufacture, sell, distribute or use the drug.

❑   "Pattern" is defined as the use of a controlled substance or alcohol if there is more than one incident during the previous 12 months.  "Incident" includes but is not limited to arrests, convictions, no contest pleas, fines, and city ordinance violations.

❑   "Premises" is the building or complex or development in which the public or assisted housing dwelling unit is located, including common areas and grounds.

❑   "Sufficient evidence" may include all or a number of personal certification along with supporting documentation from the following sources 1) probation officer; 2) landlord; 3) neighbors; 4) social service workers; 5) review of verified criminal records.

❑   "Violent criminal activity" means any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage.  Violent criminal activity also includes activity within the family, such as during domestic disputes.

**2.8   OTHER CRITERIA FOR ADMISSION**
**[24 CFR §982.552(c)]**

HACoLA is authorized to apply the following criteria, in addition to the HUD eligibility criteria, as grounds for denial of admission to the program.

1.   The family, or any household member, must not have violated any family obligations during a previous participation in a federally assisted housing program.  HACoLA will review situations, on a case-by-case basis, for violations that are more than 5 years old.

Housing Authority of the County of Los Angeles

2.  The family, or any household member, must not have engaged in serious lease violations while a resident of federally assisted housing or within the past five years been evicted from a federally assisted housing program.

3.  The family, or any household member, must not be a past participant of any Section 8 or public housing program who has failed to satisfy liability for rent, damages or other amounts to HACoLA or another housing agency, including amounts paid under a HAP contract to an owner for rent, damages, or other amounts owed by the family under the lease.

    •  On a case-by-case basis, HACoLA may provide the applicant the opportunity to repay any such debt in full as a condition of admissions. HACoLA will not enter into a repayment agreement for this purpose.

4.  No family household member may have engaged in or threaten abusive or violent behavior toward HACoLA personnel.

    •  "Abusive or violent behavior" includes verbal as well as physical abuse or violence.  Use of expletives that are generally considered insulting, racial epithets, or other language, written or oral, that is customarily used to insult or intimidate, may be cause for denial of admission.

    •  "Threatening" refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

    •  Actual physical abuse or violence will always be cause for denial.

5.  The family, or any household member, must not supply false, inaccurate or incomplete information on any application for federal housing programs, including public housing and Section 8.  The family may be denied for a period not to exceed two years from the date of such a determination by HACoLA that information which was provided was false, inaccurate or incomplete, provided that no further cause for denial exists [24 CFR §982.552(c)(2)(i)].

## 2.9  SUITABILITY OF FAMILY
### [24 CFR §982.307(a)(2)]

HACoLA may take into consideration any admission criteria listed in this chapter in order to screen applicants for program eligibility; however, it is the owner's responsibility to screen applicants for family behavior and suitability for tenancy.

HACoLA will assist and advise applicants on how to file a compliant if they have been discriminated against by an owner.

## 2.10  DENYING ADMISSION TO INELIGIBLE FAMILIES
### [24 CFR §982.201(f)(1) and §982.552(a)(2)]

Denial of assistance for an applicant family may include denying placement on the waiting list; denying or withdrawing a voucher; refusing to enter into a HAP contract or approve a lease; and refusing to process or provide assistance under portability procedures.

Families from the HACoLA waiting list who are determined to be ineligible will be notified in writing of the reason for denial and given an opportunity to request an informal review if they do not agree with the decision.  This policy also applies to incoming families from other housing authorities that have not yet received assistance in HACoLA's jurisdiction.   Please refer to Chapter 16 for more information on the informal review process.

Housing Authority of the County of Los Angeles

## CHAPTER 3:
## APPLICATIONS PROCESS

**3.1**    **INTRODUCTION**
         **[24 CFR §982.54(d)(1)]**

This chapter describes the policies and procedures that govern the initial application, placement and denial of placement on HACoLA's waiting list, as well as limitations on whom may apply.  The policies outlined in this chapter are intended to ensure that all families who express an interest in housing assistance are given an equal opportunity to apply.  The primary purpose of the intake function is to gather information about the family so that an accurate, fair, and timely decision relative to the family's eligibility may be made.  As such, applicants are placed on the waiting list in accordance with this plan.

**3.2**    **HOW TO APPLY**

Interested persons may apply online at www.hacola.org, or by calling HACoLA's special application telephone number.  Families who wish to apply for any of HACoLA's programs must complete a written application form.  Applications will be made available in an accessible format to persons with disabilities upon their request.

The application process is composed of two phases.

**3.2.1**    **Preliminary Registration Waiting List**
           **[24 CFR §982.204(b)]**

All families wishing to receive rental assistance through a HACoLA rental assistance program are initially placed on the Preliminary Registration Waiting List.  This is essentially an interest list.  Families are placed on Preliminary Registration Waiting List according to the date and time of their call.  Preliminary information regarding the family's address, income, family composition, and disability status is collected.  However, this information is not verified until the family is placed on the active waiting list.  Applicants receive a postcard to confirm that their name has been placed on the Preliminary Registration Waiting List.

**3.2.2**    **Waiting List**

When HACoLA determines that there is sufficient funding to issue additional vouchers, a pool of potential new applicants is drawn from the Preliminary Registration Waiting List.  Families move onto the active waiting list according to the date and time of their initial call.  Once a family has been placed on the active waiting list, they will be asked to complete a program application and provide all the necessary income forms.  At this point, all information will be confirmed through a third party.  Families must meet all admissions requirements to be issued a voucher.

**3.3** **APPLYING FOR SPECIAL PROGRAMS AND NON-HOUSING CHOICE VOUCHER PROGRAMS**

To see a list of special programs, other non-Housing Choice Voucher Programs and the eligibility process, please refer to Chapter 4, Section 4.4.2 (Targeted Funding). Detailed information on special programs can also be found in Chapter 20 (Special Programs).

**3.4** **OPENING AND CLOSING OF WAITING LIST [24 CFR §982.206]**

HACoLA has maintained a continuously open waiting list for over 10 years. For the foreseeable future, HACoLA plans to continue this process indefinitely. However, should it become necessary to close and then reopen the waiting list, HACoLA will comply with the policies outlined in this chapter.

**3.4.1** **Opening the Waiting List [24 CFR §982.206(a)(2)]**

When HACoLA opens the waiting list, it will advertise through public notice in the following newspapers, minority publications, and media entities.

- ➢ Los Angeles Times
- ➢ La Opinion
- ➢ The Daily News
- ➢ International Daily News
- ➢ L.A. Sentinel
- ➢ Long Beach Press Telegram
- ➢ Eastern Group Publications
- ➢ The Wave
- ➢ The Daily Breeze

HACoLA's public notification will contain:

- ➢ The dates, times, and locations where families may apply.
- ➢ The programs for which applications will be taken.
- ➢ A brief description of the program(s).
- ➢ A statement that public housing residents must submit a separate application if they want to apply to a rental assistance program.
- ➢ Any limitations on who may apply [24 CFR §982.206(a)(3)].
- ➢ The Fair Housing Logo.

The notices will be made in an accessible format to persons with disabilities if requested. The notices will provide potential applicants with information that includes HACoLA's telephone number and address, how to submit an application, information on eligibility requirements, and the availability of local preferences, if applicable.

Housing Authority of the County of Los Angeles

Additional time for submission of an application after the stated deadline will be given as a reasonable accommodation at the request of a person with a disability.

## 3.5   LIMITS ON WHO MAY APPLY
### [24 CFR §982.307(b)(1)]

Upon opening the waiting list, HACoLA will disclose the criteria defining what families may apply for assistance under a public notice.

If there are sufficient applications from elderly families, disabled families, and displaced singles, applications will not be accepted from other singles.

## 3.6   CLOSING THE WAITING LIST
### [24 CFR §982.206(c)]

Should it become necessary to close the waiting list, HACoLA will use the same advertising methods described above.

Notification of impending closure will be provided to the public for a minimum of 30 calendar days.

## 3.7   TIME OF SELECTION
### [24 CFR §982.204(d)]

When funding is available, families will be selected from the waiting list in their preference-determined sequence, regardless of family size.

If there is ever insufficient funding to subsidize the unit size of the family at the top of the waiting list, HACoLA will not admit any other applicant until funding is available for the first applicant.

Families may be skipped over to meet the income targeting requirements mandated in QHWRA.

## 3.8   APPLICATION PROCEDURES
### [24 CFR §982.204(c)]

Once the applicant is transferred from the Preliminary Registration Waiting List to the Active Waiting List, an application will be mailed to the applicant.   The application is due back within 10 calendar days from the date it was mailed.   If the application is returned undeliverable, the applicant will be cancelled from the waiting list.

Periodically, registrants will call to check their status on the waiting list and learn that they have been cancelled because mail was returned undeliverable.   In extenuating circumstances, such as a long-term illness, or other family emergency, the registrant may be reinstated.   However, the registrant must be able to provide documentation of the circumstances.   Such requests will be reviewed and approved (or denied) on a case-by-case basis by the Applications and Eligibility Unit Supervisor.

Once an application is returned, the information provided by the applicant will be used to determine if the applicant is eligible for a tenant selection preference, and used to help HACoLA determine which income forms the applicant must complete.

If an applicant is ineligible based on the information provided on the application, or because they fail to return the documents by the due date, the applicant will be provided written notice of the reason for their disqualification and their right to request an informal appeal hearing.

The application may capture the following information:

> Name of adult members and age of all members;
> Sex and relationship of all members;
> Street address and phone number;
> Mailing address;
> Amount(s) and source(s) of income received by household members;
> Information regarding disabilities relating to program requirements;
> Information related to qualification for preference(s);
> Social Security numbers;
> Race/ethnicity;
> Citizenship/eligible immigration status;
> Convictions for drug-related or violent criminal activity;
> Request for specific accommodation(s) needed to fully utilize program and services;
> Previous address;
> Current and previous landlords' names and addresses;
> Emergency contact person and address; and
> Program integrity questions regarding previous participation in HUD programs.

Applicants are required to inform HACoLA in writing within 30 calendar days of effective date of any changes in family composition, income, and address, as well as any changes in their preference status.  Applicants must also comply with requests from HACoLA to update information.  For information on preferences, see Chapter 4 (Establishing Preferences and Maintaining the Waiting List).

## 3.9    INTERVIEW SESSIONS/MAILINGS

HACoLA will use both mailing and interview sessions to obtain income, asset and family composition information from applicants.

### 3.9.1   Request for Information via Mail

During times of high activity, HACoLA will mail income and asset forms to applicants. Applicants will be given 10 calendar days to complete and return all

Housing Authority of the County of Los Angeles

required forms. If forms are not returned in a timely manner, the applicant will receive a final notice. The final notice will provide an additional five-day grace period. If the required forms are not returned, as specified, the application will be cancelled. HACoLA will provide additional time, with appropriate documentation, as a reasonable accommodation and in special circumstances such as an illness and/or death in the family.

**3.9.2   Application Interview Process**

During times for regular activity (average volume), HACoLA utilizes a full application interview to discuss the family's circumstances in greater detail, to clarify information that has been provided by the applicant, and to ensure that the information is complete.

Applicants are given two opportunities to attend an interview session. If the applicant does not respond to the second invitation, the application is cancelled. HACoLA will allow for a third interview appointment as a reasonable accommodation and in special circumstances such as illness. An applicant may also request that the Applications and Eligibility Unit assign someone to conduct the interview at the applicant's home, as a reasonable accommodation.

All applicants must complete the following requirements [24 CFR §982.551(b)(1)(iii)].

1. At minimum, the <u>head of household must attend the interview</u>. HACoLA requests that all adult members of the applicant family attend when possible. This assures that all members receive information regarding their obligations and allows HACoLA to obtain signatures on critical documents quicker.

2. All adult members of the applicant family must sign the HUD-9886 Form (Authorization for the Release of Information), and all supplemental forms required by HACoLA.

3. Citizen declaration forms must be completed for all applicant family members, regardless of age.

4. All adult members of the applicant family must complete and sign a Criminal Background Consent Form.

5. Identification information for all members of the applicant family such as birth certificates, driver's licenses or California ID cards, whichever is applicable based on the age of the family member, must be submitted for all members of the household regardless of age.

Information provided by the applicant will be verified, including citizenship status, full time student status and other factors related to preferences, eligibility and rent calculation. Verifications must not be older than 60 calendar days old at the time of issuance.

If they are requested, exceptions for any of the above listed items will be reviewed on a case-by-case basis. Exceptions will be granted based upon hardship. Reasonable accommodations will be made for persons with disabilities. In these cases, a designee will be allowed to provide some information, but only with permission of the person with a disability.

Under both processes, all local preferences claimed on the application while the family is on the waiting list will be verified.  Preference is based on current status, so the qualifications for preference must exist at the time the preference is verified, regardless of the length of time an applicant has been on the waiting list.  For information on preferences, see Chapter 4 (Establishing Preferences and Maintaining the Waiting List).

### 3.9.3 Secondary Reviews/Credit Reports
[24 CFR §982.551(b)(1)]

Before issuing vouchers to applicant families, HACoLA will request a credit report for 20 percent of all new applicant families.  Of the randomly selected families, all adults (persons 18 years of age and older) who will reside in the assisted household will have their credit report reviewed by HACoLA staff.  Applicants claiming that they have zero income will automatically undergo a credit review and will be included as part of the 20 percent of households undergoing credit reviews.

The information contained in the credit report will be used to confirm the information provided by the family.  Specifically, the credit report will be used to confirm:

❑ **Employment**: A credit report will list any employers that the applicant has listed in any recent credit applications.  If the credit report reveals employment, for any adult household member, within the last 12 months that was not disclosed, the family will be asked to provide additional documents to clear up the discrepancy.  Failure to disclose current employment may result in cancellation of the family's application.

❑ **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit.  Common reasons for use of other names include a recent marriage or a divorce.  If an alias has not been disclosed to HACoLA, the family will be asked to provide additional evidence of the legal identity of adult family members.

❑ **Current and previous addresses**: A credit report can provide a history of where the family has lived.  This is particularly important because HACoLA provides a residency preference.  If the family has provided one address to HACoLA and the credit report indicates a different address, the family will be asked to provide additional proof of residency.  This may include a history of utility bills, bank statements, school enrollment records for children, credit card statements or other relevant documents.  Failure to provide adequate proof will result in the denial of a residency preference.

❑ **Credit card and loan payments**: A credit report will usually include a list of the family's financial obligations.  Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments.  HACoLA will review this information to confirm the income and asset information provided by the family.  If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, HACoLA will ask the family to disclose how they are currently meeting their financial obligations.  Accounts that have been charged off or significantly delinquent are not included in this calculation.

Housing Authority of the County of Los Angeles

Failure to provide adequate proof of income will result in termination of the application.

❑ **Multiple Social Security numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit. If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

A family will not be issued a voucher until all discrepancies between the information provided by the applicant family, and the information contained in the credit report have been cleared by the applicant family.

When discrepancies are found, the family will be contacted by telephone or by mail. In most cases, the family will be allowed a maximum of 10 calendar days to provide the additional documentation. On a case-by-case basis, as a reasonable accommodation, the family may be granted additional time. If additional time is granted, the family will receive a letter confirming the new deadline. No additional extension will be granted thereafter.

When the credit report reveals multiple discrepancies that are not easily communicated over the telephone, HACoLA will set up a face-to-face interview with the applicant. HACoLA will schedule up to two interview appointments. An additional interview may be scheduled as a reasonable accommodation. Failure to appear at the interview session will result in cancellation of the application.

Additionally, failure to provide the necessary information will result in cancellation of the application.

### 3.10   DENIAL OF ASSISTANCE
### [24 CFR §982.204(c)(1) and §982.204(f)(1) §982.552]

If an application is denied due to failure to attend an interview (initial or secondary), or for failure to provide eligibility related information, the applicant family will be notified in writing and offered an opportunity to request an informal review. It is the applicant's responsibility to reschedule the interview if they miss the appointment. If the applicant does not reschedule or misses two scheduled meetings, HACoLA will reject the application and remove the applicant's name from the waiting list.

HACoLA may at any time deny program assistance to an applicant family because of actions or failure to act by members of the family such as any member of the family to sign and submit consent forms for obtaining information.

### 3.11   FINAL DETERMINATION AND NOTIFICATION OF ELIGIBILITY
### [24 CFR §982.301]

If the applicant family is determined to be eligible after all applicable paperwork has been reviewed, they will be invited to attend a briefing session at which time they will receive information regarding their rights and responsibilities and they will be issued a voucher.

## CHAPTER 4:
## ESTABLISHING PREFERENCES AND MAINTAINING THE WAITING LIST

### 4.1    INTRODUCTION

It is HACoLA's objective to ensure that the families are placed on the waiting list in the proper order so that an offer of assistance is not delayed to any family, or made to any family prematurely.

By maintaining an accurate waiting list, HACoLA will be able to perform the activities which ensure that an adequate pool of qualified applicants will be available so that program funds are used in a timely manner.

### 4.2    APPLICATION POOL

The waiting list will be maintained in accordance with the following guidelines:

1. The application will be a permanent file;

2. Applications equal in preference will be maintained by date and time; and

3. All applicants must meet income requirements outlined in Chapter 2 (Admission Eligibility Factors).

### 4.3    LOCAL PREFERENCES
### [24 CFR §982.207]

HACoLA will apply a system of local preferences in determining admissions for the program. All preferences will be subject to the availability of funds and all applicants will be required to meet all eligibility requirements. Local preferences are weighted highest to lowest, in the following order:

1. **Set-Aside, Targeted, and Special Programs :** Families who qualify for Set-Aside, Targeted, or Special Programs administered by HACoLA will be admitted before all other eligible registrants or applicants on the waiting list. Referral may be made by County agencies with a contract or Memorandum of Understanding in place, or by contracted CBO's up to and not to exceed the number of vouchers specified in the contract.

2. **Jurisdictional Preference**: Families who live and/or work in HACoLA's jurisdiction will be admitted before families outside of HACoLA's jurisdiction.

3. These preferences are subject to the approval of the Executive Director:

    • **Victims of Declared Disasters**: An admissions preference may be given to bona fide victims of declared disasters, whether due to natural calamity (e.g. earthquake), civil disturbance, or other causes recognized by the federal government. Victims must provide documentation to receive an admissions preference. Admissions preference may only be given within the allotted timeframe established by the federal government. If HUD provides specific funding, the Housing Authority will not exceed the allocated amount.

Housing Authority of the County of Los Angeles

- **Displacement Due to Government Actions:** Families or individuals who are certified as displaced due to the action of a federal government agency or local government agencies may be given an admissions preference.
- **Referrals from law enforcement agencies:** HACoLA may distribute application forms and may issue a voucher to families or single persons that are referred by law enforcement agencies. The following are examples of the types of referrals that will be considered but will not be limited to:
  - Victims of domestic violence,
  - Involuntarily displaced to avoid reprisals or
  - Displaced due to being a victim of a hate crime.

  Law enforcement referrals must be made in writing, on law enforcement agency letterhead, and signed by the requesting officer and his or her immediate supervisor. Eligibility, including background checks will be confirmed for all members.

4. **Date and Time of Registration:** When the family placed their name on the Section 8 Preliminary Waiting List.

5. **Other preferences:** The following preferences will be weighted equally:
   - Veterans: State law requires HACoLA to give preference to veterans.
   - Elderly and permanently disabled singles or families that have elderly or permanently disabled members.

**Treatment of Single Applicants:** All families with children, elderly families, and disabled families will have an admission preference over "Other Singles."

**4.3.1   Verification of Preferences
[24 CFR §982.207(b)]**

**Residency Preference:** For families who are residing in, or have at least one adult member who works or has been hired to work, or is a full-time participant in an educational or training program in the jurisdiction of HACoLA, and who are not currently nor have been living in subsidized or low income housing during the previous 6 months.

➢ In order to verify that an applicant is a resident, HACoLA will require a minimum of 3 months residency as shown by the following documents: current rent receipts, leases, utility bills, employer or agency records, school records, drivers licenses or credit reports.

➢ In cases where the family's head of household or spouse works or has been offered a job in the jurisdiction of HACoLA, a statement from the employer will be required.

➢ For families whose adult household member is a full-time participant in an educational or training program in the jurisdiction of HACoLA, a statement from the program officials will be required.

> ➤ For families previously living in subsidized or low-income housing, a statement from the agency's official verifying the date of termination of participation/residence will be required.

**Veteran's Preference**: Acceptable documentation regarding veteran's status will include a DD-214 (discharge documents), proof of receipt of veteran's benefits, or documentation from the Veteran's Administration.

## 4.4   SPECIAL ADMISSIONS
## [24 CFR §982.203]

Applicants admitted under special admissions, rather than from the waiting list, are identified by codes in the automated system and are not maintained on separate lists.

Applicants who are admitted under targeted funding which are not identified as a Special Admission are identified by codes in the automated system and are not maintained on separate waiting lists.

### 4.4.1   Exceptions for Special Admissions

If HUD awards HACoLA program funding that is targeted for specifically named families, HACoLA will admit these families under a special admission procedure. Special admissions families will be admitted outside of the regular waiting list process. They do not have to qualify for any preferences, nor are they required to be on the program waiting list. They are not counted in the limit on non-Federal preference admissions. HACoLA maintains separate records of these admissions. The following are examples of types of program funding that may be designated by HUD for families living in a specified unit:

1. A family displaced because of demolition or disposition of a public or Indian housing project;

2. A family residing in a multifamily rental housing project when HUD sells forecloses or demolishes the project;

3. For housing covered by the Low Income Housing Preservation and Resident Homeownership Act of 1990;

4. A family residing in a project covered by a project-based Section 8 HAP contract at or near the end of the contract term; and

5. A non-purchasing family residing in a HOPE 1 or HOPE 2 project.

### 4.4.2   Criminal Background Checks

Program applicants for all voluntary set-aside programs will require criminal background checks.  Applicants for the Shelter Plus Care program will not be required to undergo criminal background checks. For more specific information on the applicant screening standards used by HACoLA when reviewing criminal records, please refer to Chapter 2, Section 2.6 (Criminal Background Checks).

Housing Authority of the County of Los Angeles

**4.5** **CHANGE IN CIRCUMSTANCES**
**[24 CFR §982.204(b)]**

Changes in an applicant's circumstances while on the waiting list may affect the family's entitlement to a preference. Applicants are required to notify HACoLA in writing, within 30 calendar days, when their circumstances change, including any change of address, income or family composition.

**4.6** **CROSS-LISTING OF PUBLIC HOUSING AND SECTION 8**
**[24 CFR §982.205]**

HACoLA will not merge the waiting lists for public housing and Section 8. However, if the Section 8 waiting list is open when the applicant is placed on the public housing list, HACoLA must offer to place the family on both lists. If the public housing waiting list is open at the time an applicant applies for rental assistance, HACoLA must offer to place the family on the public housing waiting list.

**4.7** **FINAL VERIFICATION OF PREFERENCES**
**[24 CFR §982.207(e)]**

Preference information on applications will be updated as applicants are selected from the waiting list. At that time, HACoLA will obtain necessary verifications of preference at the interview and by third party verification.

**4.8** **PREFERENCE DENIAL**

If HACoLA denies a preference, HACoLA will notify the applicant in writing of the reasons why the preference was denied and offer the applicant an opportunity for a review. If the preference denial is upheld as a result of the review, the applicant will be placed on the waiting list without benefit of the preference. Applicants may exercise other rights if they believe they have been discriminated against.

If the applicant falsifies documents or makes false statements in order to qualify for any preference, or for any other reason, they will be removed from the waiting list.

**4.9** **REMOVAL FROM WAITING LIST AND PURGING**
**[24 CFR §982.204(c)(1) and §982.201(f)(1)]**

If an applicant fails to respond to a mailing from HACoLA within the time frame indicated, they will be removed from the waiting list. An extension may be considered an accommodation if requested in advance by a person with a disability. If a letter is returned by the Post Office, the applicant will be removed without further notice and the envelope and letter will be maintained in the file.

If an applicant is removed from the waiting list for failure to respond, they will not be entitled to reinstatement unless HACoLA verifies family/health/work emergency.

The waiting list will be purged by a mailing to all applicants to ensure that the waiting list is current and accurate.  The mailing will ask for current information and confirmation of continued interest.

The same guidelines will be used for failure to respond to this mailing. Notices will be made available in accessible format upon the request of a person with a disability.

Housing Authority of the County of Los Angeles

## CHAPTER 5:
## SUBSIDY STANDARDS

**5.1    INTRODUCTION**
**[24 CFR §982.402(a)]**

Program regulations require that HACoLA establish subsidy standards that determine the number of bedrooms needed for families of different sizes and compositions. Such standards must provide for a minimum commitment of subsidy while avoiding overcrowding. The standards in determining the voucher size must be within the minimum unit size requirements of HUD's Housing Quality Standards (HQS).

This chapter lays out the factors used in determining the voucher size issued to a family initially and when there is a move to a new unit, as well as HACoLA's procedures for handling changes in family size, selection of unit size that are different from the voucher size and requests for waivers.

**5.2    DETERMINATION OF VOUCHER SIZE**
**[24 CFR §982.402]**

Subsidy standards and determination of voucher bedroom size are based upon the number of family members who will reside in the assisted dwelling unit.  All standards in this section relate to the number of bedrooms on the voucher, not the family's actual living arrangements.

The unit size on the voucher remains the same as long as the family composition remains the same.

As required by HUD, HACoLA's subsidy standards for determining voucher size shall provide for the smallest number of bedrooms needed to house a family without overcrowding.  They will be applied consistently for all families of like size and composition, in a manner consistent with fair housing guidelines and HQS.

In accordance with HUD regulations, the unit size designated on the voucher should be assigned using the following HACoLA standards:

1.  Subsidy standards are based on two persons per bedroom, for all new contracts including moves effective January 4, 2005, and effective at annual re-examinations beginning February 2005.

| Number of Household Members | Number of Bedrooms |
|:---:|:---:|
| 1-2 | 1- bedroom |
| 3-4 | 2- bedroom |
| 5-6 | 3- bedroom |
| 7-8 | 4- bedroom |
| 9-10 | 5- bedroom |
| 11-12 | 6- bedroom |

2. At issuance, the bedroom size assigned should not require more than two persons to occupy the same bedroom.  The family may choose and live within a suitable unit in any grouping that is acceptable to the family, including using the living room for sleeping purposes.

3. Every family member is to be counted as a person in determining the family unit size. Under this definition, family members include the unborn child of a pregnant woman, any live-in attendants (approved by HACoLA to reside in the unit to care for a family member who is disabled or is at least 50 years of age), and a child who is temporarily away from the home because of placement in foster care.  A family that consists of a pregnant woman (with no other persons) must be treated as a two-person family. [24 CFR §982.402(a)(4) - §982.402(a)(6)].

4. A one-bedroom unit will be issued to a single-person family.

5. An additional bedroom may be assigned if a family member must use a separate bedroom due to medical reasons, if approved under a waiver by HACoLA (see below).

6. If the family decides to move, HACoLA will issue a voucher based on the family's current composition.

### 5.2.1   Continuing Assistance

Continuing assistance refers to cases where an additional person(s) joins the family and the family will continue to occupy the same rental unit, i.e. no move is involved.

HACoLA may require the family to use the living room for sleeping purposes for no more than one person provided that the unit meets other HQS.  The family may be required to move into a larger size dwelling unit if HACoLA determines that the family is overcrowded.

Acceptable living situations for continued assistance include:

| Number of Bedrooms | Number of Household Members |
|---|---|
| 1- bedroom | 3 |
| 2- bedroom | 5 |
| 3- bedroom | 7 |
| 4- bedroom | 9 |
| 5- bedroom | 11 |
| 6- bedroom | 13 |

### 5.3   OCCUPANCY STANDARDS WAIVER
### [24 CFR §982.402(b)(8)]

The standards discussed above should apply to the vast majority of assisted families. However, in some cases, the health or disability of one or more family

Housing Authority of the County of Los Angeles

members may warrant the assignment of a larger or smaller unit size than the unit size that would result from a strict application of the standards. A departure from the standards is permissible to the extent that it is based on the health or disability of the family member(s).

Examples of possible exceptions include but are not limited to:

1. Persons who cannot occupy the same bedroom because of a verified medical or health reason.
2. Elderly persons or persons with disabilities who may require a live-in attendant.

Requests based on health related reasons must be verified, in writing, by a doctor or other medical professional.  The request must specify the reason for the request and how providing a larger bedroom would improve or accommodate the medical condition.

A Unit Supervisor who has not been involved in the initial determination will review the request, any prior determination and make a decision based on the specifics of the individual case (on a case-by-case basis). After the decision is made, a letter notifying the applicant or participant of the decision regarding the waiver will be sent by the reviewing supervisor.

### 5.4 EXCEPTIONS FOR FOSTER CHILDREN
[24 CFR §982.402(b)(4)]

Exceptions will be made to accommodate foster children.  The Los Angeles County Department of Family and Children Services (DCFS) has very specific housing guidelines that must be meet by foster families. In order to assure that foster children are able to remain with designated Section 8 foster families, HACoLA will utilize the guidelines published by the Los Angeles County DCFS, or specified in a court order, in situations involving foster children.

### 5.5 CHANGES FOR PARTICIPANTS
[24 CFR §982.551(h)(2) AND 24 CFR §982.516(c)]

Under program regulations, HACoLA has the right and responsibility to approve whom can and cannot be a part of the assisted household.  The family must obtain approval of any additional family member before that person occupies the unit.  Exceptions to this rule include additions by birth, adoption, or court-awarded custody. In these cases, the family must inform HACoLA of the changes within 30 calendar days.  The family should provide written notification to the owner or management of the property.

The family may request a larger voucher size than indicated by HACoLA's subsidy standards. This request must be made in writing within 15 calendar days of HACoLA's determination of bedroom size.  The request must explain the need or justification for a larger bedroom size.

HACoLA will not increase the family's voucher size due to additions unless the addition creates an overcrowding situation for the family.

All new household members who are 18 years of age and older will go through a credit and criminal background check before receiving approval to join the assisted household. Criminal records will only be used to screen new household members. They will not be used for lease enforcement or eviction of residents already receiving tenant-based rental assistance.

**5.6   UNIT SIZE SELECTED**

The family may select a different size dwelling than that listed on the voucher. There are three criteria to consider in this situation:

> HACoLA uses the **payment standard** for the voucher size or the unit size selected by the family, whichever is less [24 CFR §982.402(c)(3)].

> **Utility Allowance**: The utility allowance used to calculate the gross rent is based on the actual size of the unit the family selects, regardless of the size authorized on the family's voucher.

> **Housing Quality Standards**: The standards allow two persons per living/sleeping room and permit maximum occupancy levels (assuming a living room is used as a living/sleeping area).

**5.7   FLEXIBILITY OF UNIT SIZE ACTUALLY SELECTED
[24 CFR §982.402(d)]**

In accordance with regulations, a family may rent a larger dwelling unit than designated, provided that the rent for the unit is comparable and the family's total rent contribution (rent to the owner plus any applicable utility costs) does not exceed 40 percent of the family's adjusted monthly income (applies only if the gross rent for the unit exceeds the payment standard). Regardless of the number of bedrooms stated on the voucher, HACoLA shall not prohibit a family from renting an otherwise acceptable unit because it is too large for the family.

The family may also rent smaller units, if the unit meets other HQS and the unit is appropriate for the family size. HACoLA recognized that it is particularly hard for larger families to located appropriate housing given local market conditions. Therefore, HACoLA will allow families to request a waiver to move into a smaller unit as long as the unit complies with all HQS requirements, including space requirements.

Housing Authority of the County of Los Angeles

## CHAPTER 6:
## DETERMINING THE TOTAL TENANT PAYMENT AND HACOLA ABSENCE POLICY

**6.1    INTRODUCTION**

This chapter explains how the Total Tenant Payment (TTP) is calculated at admission and during annual re-examinations. It covers HACoLA and HUD standards used to calculate income inclusions and deductions.

This chapter also provides the HACoLA definition of absence of household members and explains how the presence or absence of household members can affect the TTP.

The policies outlined in this chapter address those areas, which allow HACoLA discretion to define terms and to develop standards in order to assure consistent application of the various factors that relate to the determination of TTP.

**6.2    INCOME DEFINITIONS**

❑ **Total Tenant Payment (TTP)**: TTP is calculated for each household based on family income. It is used to determine the tenant contribution toward rent. The TTP is affected by who is included in the family composition. Accurate calculation of annual income and adjusted income ensures that families do not pay more or less for rent than obligated and required by the regulations.

❑ **Income**: HACoLA will include income from all sources, unless otherwise specifically exempted [24 CFR §5.609(c)] through program regulations, for the purposes of calculating the TTP. In accordance with this definition, income from all sources of each member of the household is counted.

❑ **Annual Income [24 CFR §5.609(a)]**: The gross amount of income anticipated to be received by the family during the 12 months after certification or re-examination. Gross income is the amount of income prior to any HUD allowable expenses or deductions, and does not include income that has been excluded by HUD. Annual income is used to determine whether or not applicants are within the applicable income limits.

❑ **Adjusted Income [24 CFR §5.611]**: The annual income minus any HUD allowable deductions.

**6.3    INCOME DEDUCTIONS
[24 CFR §5.611(a)]**

The following deductions will be applied in the TTP calculation:

➢ **Dependent Allowance**: $480 each for family members (other than the head or spouse), who are minors, and for family members who are 18 and older who are full-time students or who are disabled. This allowance does not apply to foster children.

➢ **Elderly Family or Disabled Family Allowance**: $400 for families whose head or spouse is 62 or over or disabled.

> ➤ **Childcare Expenses**: Deducted for children under 13, including foster children, when childcare is necessary to allow an adult member to work, search for work, or attend school (see below for details).

> ➤ **Allowable Medical Expenses**: Deducted for unreimbursed medical expenses for members of any elderly family or disabled family.

> ➤ **Attendant Care and Auxiliary Apparatus Expenses**: Deducted for persons with disabilities if needed to enable the individual or an adult family member to work.

### 6.3.1   Childcare Expenses
### [24 CFR §5.603(d) and 24 CFR §5.611(e)]

Childcare expenses for children under 13 years of age may be deducted from annual income if they enable an adult to work, search for work, or attend school full time.

In the case of a child attending school, only care during non-school hours can be counted as childcare expenses.

Families will be given a childcare allowance based on the following guidelines:

❑ **Childcare to Work**: The maximum childcare expense allowed must be less than the amount earned by the person enabled to work. The "person enabled to work" will be the adult member of the household who earns the least amount of income from working.

❑ **Childcare to Search for Work**: Childcare expenses cannot exceed the current amount of income received.

❑ **Childcare for School**: The number of hours claimed for childcare may not exceed the number of hours the family member is attending school (including one hour travel time to and from school).

❑ **Amount of Expense**: HACoLA will determine local average costs as a guideline. If the hourly rate materially exceeds the guideline, HACoLA may calculate the allowance using the guideline.

### 6.3.2   Medical Expenses
### [24 CFR §5.611(d)(1)]

When it is unclear in the HUD rules as to whether or not to allow an item as a medical expense, IRS Publication 502 will be used as a guide.

HACoLA will allow as medical expense the actual out-of-pocket amounts which are owed and anticipated to be paid by the family during the re-examination period.  Expenses from the previous year may be analyzed to determine the amount to anticipate when other verification is not available.

Nonprescription medicines will be counted toward medical expenses for families who qualify if the family furnishes legible receipts.

Acupressure, acupuncture and related herbal medicines, and chiropractic services will be considered allowable medical expenses.

Housing Authority of the County of Los Angeles

**6.4    INCOME INCLUSIONS AND EXCLUSIONS**

**6.4.1    Income Inclusions**
**[24 CFR §5.609(b)]**

HACoLA considers the following to be included in the family's annual income, as required by HUD:

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in No. 2 of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic payments received from Social Security, annuities, insurance policies, retirement funds, pensions, lotteries, disability or death benefits, and other similar types of periodic receipts, including a lump-sum payment for the delayed start of a periodic payment (but see No. 13 under Income Exclusions);

(5) Payments in lieu of earnings, such as unemployment, worker's compensation, and severance pay (but see No. 3 under Income Exclusions);

(6) Welfare Assistance.

   a.   Welfare assistance received by the household.

   b.   The amount of reduced welfare income that is disregarded specifically because the family engaged in fraud or failed to comply with an economic self-sufficiency or work activities requirement.

   c.   If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustments by the welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare income to be included as income shall consist of:

    (i) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

    (ii) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage;

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from persons not residing in the dwelling;

---

Regular Contributions and Gifts [24 CFR §5.609(b)(7)]

Any contribution or gift received every 3 months or more frequently will be considered a "regular" contribution or gift. This includes payments made on behalf of the family such as payments for a car, credit card bills, rent and/or utility bills and other cash or non-cash contributions provided on a regular basis. It does not include casual contributions or sporadic gifts.

If the family's expenses exceed its known income, HACoLA will question the family about contributions and gifts. If the family indicated that it is able to meet the extra expenses due to gifts or contributions from persons outside the household, the amount provided will be included in the family's TTP.

---

Alimony and Child Support [24 CFR §5.609(b)(7)]

If the amount of child support or alimony received is less than the amount awarded by the court, HACoLA must use the amount awarded by the court unless the family can verify that they are not receiving the full amount. Acceptable verification in such cases may include:

1. Verification from the agency responsible for enforcement or collection, and

2. Documentation of child support or alimony collection action filed through a child support enforcement/collection agency, or has filed an enforcement or collection action through an attorney.

It is the family's responsibility to supply a certified copy of the divorce decree.

Effective January 4, 2005, families are required to register with the Los Angeles County Child Support Services Department to facilitate child support income for dependent children.

---

(8) All regular pay, special pay, and allowances of a member of the Armed Forces (whether or not living in the dwelling) who is head of the family, spouse, or other person whose dependents are residing in the unit (but see paragraph (7) under Income Exclusions).

Housing Authority of the County of Los Angeles

**6.4.2** <u>**Income Exclusions**</u>
<u>**[24 CFR §5.609(c)]**</u>

HACoLA considers the following to be excluded from the family's annual income, as required by HUD:

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually individuals with disabilities, unrelated to the tenant family, who are unable to live alone);

> Benefits received through the Kin GAP program, a California program designed specifically for foster children who have been place in the home of a relative are considered foster care and should be excluded.

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses (but see No. 5 under Income Inclusions);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide (as defined by regulation);

(6) The full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8) (a) Amounts received under training programs funded by HUD;

> (b) Amounts received by a person with disabilities that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

> (c) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to allow participation in a specific program;

> (d) A resident service stipend. This is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the owner, on a part-time basis, that enhances the quality of life in the development. This may include, but is not limited to fire patrol, hall monitoring, lawn maintenance, and resident initiatives coordination and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time; or

> (e) Incremental earnings and benefits resulting to any family member from participation in qualifying state or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts

excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program.

(9) Temporary, nonrecurring, or sporadic income (including gifts). For example, amounts earned by temporary census employees whose terms of employment do not exceed 180 days (Notice PIH 2000-1).

(10) Reparations payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years or older (excluding the head of household and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) Deferred periodic payments of supplemental security income and social security benefits that are received in a lump-sum payment or in prospective monthly payments;

(14) Amounts received by the family in the form of refunds or rebates under state or local law for property taxes paid on the dwelling unit;

(15) Amounts paid by a state agency to a family with a developmentally disabled family member living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; and

(16) Amounts specifically excluded by any other federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under the 1937 Act. A notice will be published in the Federal Register and distributed to PHAs identifying the benefits that qualify for this exclusion. Updates will be distributed when necessary. The following is a list of income sources that qualify for that exclusion:

a) The value of the allotment provided to an eligible household under the Food Stamp Act of 1977 (7 U.S.C. 2017 (b));

b) Payments to Volunteers under the Domestic Volunteer Services Act of 1973 (42 U.S.C. 5044(g), 5058);

c) Payments received under the Alaska Native Claims Settlement Act (43 U.S.C. 1626(c));

d) Income derived from certain submarginal land of the United States that is held in trust for certain Indian tribes (25 U.S.C. 459e);

e) Payments or allowances made under the Department of Health and Human Services' Low-Income Home Energy Assistance Program (42 U.S.C. 8624(f));

f) Payments received under programs funded in whole or in part under the Job Training Partnership Act (29 U.S.C. 1552(b); (effective July 1, 2000, references to Job Training Partnership Act shall be deemed to refer to

Housing Authority of the County of Los Angeles

the corresponding provision of the Workforce Investment Act of 1998 (29 U.S.C. 2931);

g) Income derived from the disposition of funds to the Grand River Band of Ottawa Indians (Pub.L- 94-540, 90 Stat. 2503-04);

h) The first $2000 of per capita shares received from judgment funds awarded by the Indian Claims Commission or the U. S. Claims Court, the interests of individual Indians in trust or restricted lands, including the first $2000 per year of income received by individual Indians from funds derived from interests held in such trust or restricted lands (25 U.S.C. 1407-1408);

i) Amounts of scholarships funded under title IV of the Higher Education Act of 1965, including awards under federal work-study program or under the Bureau of Indian Affairs student assistance programs (20 U.S.C. 1087uu);

j) Payments received from programs funded under Title V of the Older Americans Act of 1985 (42 U.S.C. 3056(f));

k) Payments received on or after January 1, 1989, from the Agent Orange Settlement Fund or any other fund established pursuant to the settlement in *In Re Agent*-product liability litigation, M.D.L. No. 381 (E.D.N.Y.);

l) Payments received under the Maine Indian Claims Settlement Act of 1980 (25 U.S.C. 1721);

m) The value of any child care provided or arranged (or any amount received as payment for such care or reimbursement for costs incurred for such care) under the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858q);

n) Earned income tax credit (EITC) refund payments received on or after January 1, 1991 (26 U.S.C. 32(j));

o) Payments by the Indian Claims Commission to the Confederated Tribes and Bands of Yakima Indian Nation or the Apache Tribe of Mescalero Reservation (Pub. L. 95-433);

p) Allowances, earnings and payments to AmeriCorps participants under the National and Community Service Act of 1990 (42 U.S.C. 12637(d));

q) Any allowance paid under the provisions of 38 U.S.C. 1805 to a child suffering from spina bifida who is the child of a Vietnam veteran (38 U.S.C. 1805);

r) Any amount of crime victim compensation (under the Victims of Crime Act) received through crime victim assistance (or payment or reimbursement of the cost of such assistance) as determined under the Victims of Crime Act because of the commission of a crime against the applicant under the Victims of Crime Act (42 U.S.C. 10602); and

s) Allowances, earnings and payments to individuals participating in programs under the Workforce Investment Act of 1998 (29 U.S.C. 2931).

(17)  Earned Income Disallowance for persons with disabilities [24CFR5.617]

    (a) Initial Twelve Month Exclusion [24CFR5.617(C)(1)]

    (b) Second Twelve Month Exclusion and Phase-In [24CFR5.617(C)2)

    (c) Maximum Four Year Disallowance [24 CFR 5.617(c)(3)]

## 6.5  FAMILY ASSETS
## [24 CFR §5.603(b)]

### 6.5.1  Lump-Sum Receipts

Lump-sum additions to family assets, such as inheritances, insurance payments (including lump-sum payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses, are not included as income but may be included in assets.

Lump-sum payments caused by delays in processing periodic payments (unemployment or welfare assistance) are counted as income.  Lump sum payments from Social Security or SSI are excluded from income, but any amount remaining will be considered an asset.  Deferred periodic payments which have accumulated due to a dispute will be treated the same as periodic payments which are deferred due to delays in processing.

### 6.5.2  Attorney Fees

The family's attorney fees may be deducted from lump-sum payments when computing annual income if the attorney's efforts have recovered a lump-sum compensation, and the recovery paid to the family does not include an additional amount in full satisfaction of the attorney fees.

### 6.5.3  Contributions to Retirement Funds – Assets
### [24 CFR §5.603(d)]

Contributions to company retirement/pension funds are handled as follows:

1. While an individual is employed, include as assets only amounts the family can withdraw without retiring or terminating employment.

2. After retirement or termination of employment, include any amount the individual elects to receive as a lump sum.

### 6.5.4  Assets Disposed of for Less than Fair Market Value
### [24 CFR §5.603(d)]

HACoLA must count assets disposed of for less than fair market value during the two years preceding certification or re-examination. HACoLA will count the difference between the market value and the actual payment received in calculating total assets.

Assets disposed of as a result of foreclosure or bankruptcy, separation or divorce are not considered to be assets disposed of for less than fair market value.

HACoLA's minimum threshold for counting assets disposed of for less than Fair Market Value is $5,000.  If the total value of assets disposed of within a one-year period is less than $5,000, they will not be considered an asset.

Housing Authority of the County of Los Angeles

**6.6    CALCULATING INCOME AND FAMILY CONTRIBUTION**

**6.6.1   "Minimum Rent" and Minimum Family Contribution
[24 CFR §5.630(a)(3)]**

Minimum family contribution in HACoLA rental assistance programs is $50, for all new contracts including moves effective April 5, 2005, and effective at annual re-examinations beginning May 2005.

HACoLA will waive the minimum rent requirement in cases where the family documents that they do not currently have any source of income such as in the case of some homeless families.  In such cases, the family will be re-evaluated in 6 months.   All families are required to report changes in income within 30 calendar days.

**6.6.2   Minimum Income**

There is no minimum income requirement.  Families who report zero income may be required to attend an interim re-examination periodically, up to once a quarter, at HACoLA's discretion.   A credit review will automatically be requested for families claiming zero income.

**6.6.3   Averaging Income
[24 CFR §982.516(B)(2) and 24 CFR §5.609(D)]**

When annual income cannot be anticipated for a full 12 months, HACoLA may annualize current income and conduct an interim re-examination if income changes.

If there are bonuses or overtime which the employer cannot anticipate for the next 12 months, bonuses and overtime received the previous year may be used.

Income from the previous year may be analyzed to determine the amount to anticipate when third-party or check-stub verification is not available.

If by averaging, an estimate can be made for those families whose income fluctuates from month to month, this estimate will be used so that the housing payment will not change from month to month.

The method used depends on the regularity, source and type of income.

**6.6.4   Utility Allowance and Utility Reimbursement Payments
[24 CFR §982.517]**

The utility allowance is intended to help defray the cost of utilities not included in the rent and is subtracted from TTP to establish the family's rent to the owner. The allowances are based on rates and average consumption studies, not on a family's actual consumption. HACoLA will review the Utility Allowance Schedule on an annual basis and revise it if needed (10 percent increase or decrease).

The approved utility allowance schedule is given to families along with the voucher.  The utility allowance is based on the actual unit size selected.

Where families provide their own range and refrigerator, HACoLA will establish an allowance adequate for the family to purchase or rent a range or refrigerator, even if the family already owns either appliance.  Allowances for ranges and

refrigerators will be based on the lesser of the cost of leasing or purchasing the appropriate appliance over a 12-month period.

If the utility allowance exceeds the family's TTP, HACoLA will provide a utility reimbursement payment for the family each month. The check will be made out directly to the family's head of household on record.

**6.6.5   Reduction in Benefits**

If the family's benefits, such as Social Security, Social Supplemental Insurance or CalWORKs grant, are reduced through no fault of the family, HACoLA will use the net amount of the benefit.

In certain very specific instances families may have welfare benefits reduced and still not be eligible for a rent reduction. Families affected include those that receive welfare assistance or other public assistance benefits (e.g. transportation or child care) under a governmental program that requires the family to participate in an economic self-sufficiency program as a condition for such assistance.

The amount that the welfare benefit has been reduced because of fraud or a sanction for noncompliance with requirements to participate in an economic self-sufficiency program is identified as the "imputed welfare income." The family's annual income includes the amount of the imputed welfare income plus the total amount of other annual income.

**6.7   PRORATION OF ASSISTANCE FOR "MIXED" FAMILIES**

**6.7.1   Applicability**
**[24 CFR §5.520(a)]**

Proration of assistance must be offered to any "mixed" applicant or participant family. A "mixed" family is one that includes at least one U.S. citizen or eligible immigrant and any number of ineligible members.

"Mixed" families that were participants on June 19, 1995, and that do not qualify for continued assistance must be offered prorated assistance. Mixed family applicants are entitled to prorated assistance. Families that become mixed after June 19, 1995 by addition of an ineligible member are entitled to prorated assistance.

**6.7.2   Prorated Assistance Calculation**
**[24 CFR §5.520(c)]**

Prorated assistance is calculated by determining the amount of assistance payable if all family members were eligible and multiplying by the percent of the family members who actually are eligible. TTP is the gross rent minus the prorated assistance.

**6.8   ABSENCE POLICY**
**[24 CFR §982.312(d)]**

HACoLA must compute all applicable income of every family member who is on the lease, including those who are temporarily absent. In addition, HACoLA must

Housing Authority of the County of Los Angeles

count the income of the spouse or the head of household if that person is temporarily absent, even if that person is not on the lease.

Income of persons permanently absent will not be counted. If the spouse is temporarily absent and in the military, all military pay and allowances (except hazardous duty pay when exposed to hostile fire and any other exceptions to military pay HUD may define) is counted as income.

It is the responsibility of the household to report absences and changes in family composition. HACoLA will evaluate absences from the unit using this policy [24 CFR §982.551(i)].

**6.8.1**   **Absence of Entire Family**
**[24 CFR §982.312]**

These policy guidelines address situations when the family is absent from the unit, but has not moved out of the unit. In cases where the family has moved out of the unit, HACoLA will terminate assistance in accordance with appropriate termination procedures contained in this plan.

Families are required both to notify HACoLA before they move out of a unit and to give HACoLA information about any family absence from the unit.

Families must notify HACoLA if they are going to be absent from the unit for more than 30 consecutive calendar days.

If the family fails to notify HACoLA of an absence of longer than 30 consecutive calendar days, or if the entire family is absent from the unit for more than 60 consecutive calendar days, the unit will be considered to be vacated and the assistance will be terminated. HACoLA at all times shall reserve the right to exercise its judgment regarding extensions on family absence from the unit on a case-by-case basis. However, HUD regulations require HACoLA to terminate assistance if the entire family is absent from the unit for a period of more than 180 consecutive calendar days.

"Absence" means that no family member is residing in the unit, and the unit has not been vacated. In order to determine if the family is absent from the unit, HACoLA may:

- ➢ Write letters to the family at the unit
- ➢ Telephone the family at the unit
- ➢ Interview the owner
- ➢ Interview neighbors
- ➢ Verify if utilities are in service
- ➢ Conduct an interim HQS Inspection

If the absence which resulted in termination of assistance was due to a person's disability, and HACoLA can verify that the person was unable to notify HACoLA in accordance with the family's responsibilities, and if funding is available, HACoLA may reinstate the family as an accommodation if requested by the family.

**6.8.2   Absence of Any Member**
**[24 CFR §982.312(a)]**

Any member of the household will be considered permanently absent if s/he is away from the unit for 180 consecutive calendar days except as otherwise provided in this chapter.

**6.8.3   Absence Due to Medical Reasons**
**[24 CFR §982.312(e)(1)]**

If any family member leaves the household to enter a facility such as a hospital, nursing home, or rehabilitation center, HACoLA will seek advice from a reliable qualified source as to the likelihood and timing of their return.  If the verification indicates that the family member will return in less than 180 calendar days, the family member will not be considered permanently absent.

If the verification indicates that the family member will be permanently confined to a nursing home, the family member will be considered to be permanently absent – out of the home and removed from the family composition.

If the person who is determined to be permanently absent is the sole member of the household, assistance will be terminated in accordance with HACoLA's "Absence of Entire Family" policy.

**6.8.4   Absence Due to Incarceration**
**[24 CFR §982.312(e)(1)]**

If the sole member of the household is incarcerated for more than 30 calendar days, s/he will be considered permanently absent and HACoLA will initiate proposed termination procedures to terminate assistance.

Any member of the household, other than the sole member, will be considered permanently absent if s/he is incarcerated for 60 calendar days. Once a family member is removed from the family composition, the family must seek HACoLA approval prior to allowing the family member to re-join the assisted household. Failure to adhere to this policy can result in termination of assistance.

HACoLA will determine if the reason for any family member's incarceration is for drug-related or violent criminal activity and, if appropriate, will pursue termination of assistance for the family if deemed appropriate.

**6.8.5   Foster Care and Absences of Children**
**[24 CFR §982.551(h)(4)]**

If the family includes a child or children temporarily absent from the home due to placement in foster care, HACoLA will request information from the appropriate agency to determine when the child/children will be returned to the home.

If the time period is to be greater than 180 calendar days from the date of removal of the child/children, the voucher size may be temporarily reduced. If children are removed from the home permanently, the voucher size will permanently reduced in accordance with HACoLA's subsidy standards.

Housing Authority of the County of Los Angeles

### 6.8.6 Absence of Adult
#### [24 CFR §982.312(e)]

If neither parent remains in the household and the appropriate agency has determined that another adult is to be brought into the assisted unit to care for the children for an indefinite period, HACoLA will treat that adult as a visitor for up to the first 180 calendar days.

If during or by the end of that period, court-awarded custody or legal guardianship has been awarded to the caretaker, the voucher will then be transferred to the caretaker.

If custody or legal guardianship has not been awarded by the court, but the action is in process, HACoLA will secure verification from social services staff or the attorney as to the status.

If the appropriate agency cannot confirm the guardianship status of the caretaker, HACoLA will review the status at 120-day intervals.

The caretaker will be allowed to remain in the unit, as a visitor, until a determination of custody is made or up to 12 months total.

HACoLA will transfer the voucher to the caretaker, in the absence of a court order, if the caretaker has been in the unit for more than 12 months and it is reasonable to expect that custody will be granted.

When HACoLA approves a person to reside in the unit as caretaker for the children, this person's income will be counted in the TTP for the family pending a final disposition. HACoLA will work with the appropriate service agencies and the owner to provide a smooth transition in these cases.

If a member of the household is subject to a court order that restricts him/her from the home for more than 180 calendar days, the person will be considered permanently absent.

If an adult family member leaves the household for any reason, the family must report the change in family composition to HACoLA within 30 calendar days.

The family will be required to notify HACoLA in writing within 30 calendar days when a family member leaves the household for any reason or moves out. The notice must contain a certification by the family as to whether the member is temporarily or permanently absent. The family member will be determined permanently absent if verification is provided.

If an adult child goes into the military and leaves the household, they will be considered permanently absent.

Time extensions may be granted as an accommodation upon request by a person with a disability.

### 6.8.7 Students
#### [24 CFR §982.312(e)]

Full time students who attend school away from the home and live with the family during school recess will be considered temporarily absent from the household. These family members will continue to be counted for the purpose of determining the family's appropriate voucher size.

**6.8.8** **Visitors**
**[24 CFR §982.312(e)]**

Any person not included on the HUD-50058 who has been in the unit more than 30 calendar days, or a total of 60 calendar days in a 12-month period, will be considered to be living in the unit as an unauthorized household member.

Absence of evidence of any other address will be considered verification that the visitor is a family member.

Statements from neighbors and/or the owner will be considered in making the determination.

Use of the unit address as the visitor's current residence for any purpose that is not explicitly temporary shall be construed as permanent residence.

The burden of proof that the individual is a visitor rests on the family. In the absence of such proof, the individual will be considered an unauthorized member of the family and HACoLA will terminate assistance since prior approval was not requested for the addition.

In a joint custody arrangement, if the minor is in the household less than 180 calendar days per year, the minor will be considered to be an eligible visitor and not a family member.

**6.9** **REPORTING CHANGES IN HOUSEHOLD COMPOSITION**
**[24 CFR §982.516(c)]**

Reporting changes in household composition is both a HUD and HACoLA requirement.

**6.9.1** **Reporting Additions to Owner and HACoLA**
**[24 CFR §982.551(h)(2)]**

The family obligations require the family to receive advance HACoLA approval to add any other family member as an occupant of the unit. HACoLA shall notify the family of its determination (approve or deny addition) in writing. No persons should move in to the unit until approval from HACoLA has been received. If the family does not obtain prior written approval from HACoLA, any person the family has permitted to move in will be considered an unauthorized household member.

Families are required to report any additions to the household resulting from the birth, adoption or court-awarded custody of a child in writing to HACoLA within 30 calendar days of the move-in date.

An interim re-examination will be conducted for any additions to the household.

In addition, the lease may require the family to obtain prior written approval from the owner when there are changes in family composition.

HACoLA will conduct a credit and criminal background check on all new potential family members, 18 years of age and older, as part of the approval process.

Housing Authority of the County of Los Angeles

**6.9.2    Reporting Absences to HACoLA**
**[24 CFR §982.551(h)(3) and §982.551(i)]**

If a family member leaves the household, the family must report this change to HACoLA, in writing, within 30 calendar days of the change and certify as to whether the member is temporarily absent or permanently absent.   When available to do so, an adult family member who is leaving the household should remove him/herself in writing from the lease and voucher family composition.

HACoLA will conduct an interim evaluation for changes, which affect the TTP in accordance with the interim policy.

## CHAPTER 7:
## VERIFICATION PROCEDURES

**7.1**    **INTRODUCTION**
         **[24 CFR §5.240(c), 24 CFR §5.210, 24 CFR §982.551(b)]**

HUD regulations require that the factors of eligibility be verified by HACoLA. Applicants and program participants must furnish proof of their statements whenever required by HACoLA, and the information they provide must be true and complete. HACoLA's verification requirements are designed to maintain program integrity. This chapter explains HACoLA's procedures and standards for verification of preferences, income, assets, allowable deductions, family status, and when there are changes in family members. HACoLA will ensure that proper authorization from the family is always obtained before making verification inquiries.

**7.2**    **METHODS OF VERIFICATION AND TIME ALLOWED**

HACoLA will verify information through the five methods of verification acceptable to HUD in the following order:

1.   Up-Front Income Verification (UIV)/ Enterprise Income Verification (EIV) will be used first, when available.

2.   Third-party written verification will be used when UIV/EIV is not available.

3.   Third-party oral verification will be used when written verification is delayed or not possible.

4.   Review of documents will be used if third-party written or oral is unavailable, or the information has not been verified by the third-party within two weeks.

5.   Certification/self-declaration will be used if third-party verification or review of documents cannot be made.

HACoLA will allow two weeks for return of third-party verifications and two weeks to obtain other types of verifications before going to the next method.

For applicants, verifications may not be more than 60 calendar days old at the time of voucher issuance [24 CFR §982.201(e)].  For participants, income forms are valid for 120 calendar days from date of receipt.

**7.2.1**   **Up-Front Income Verification (UIV)/Enterprise Income Verification (EIV)**

HACoLA will utilize up-front income verification and enterprise income verification tools, including TASS and LEADER, whenever possible.  When HUD announces the availability of a UIV/EIV system for HACoLA, additional UIV/EIV tools will be utilized.

**7.2.2**   **Third-Party Written Verification**

Third-party written verification will be used when up-front income verification is not availability.  Third-party written verification forms will be sent and returned via

Housing Authority of the County of Los Angeles

first class mail. The family will be required to sign an authorization for the information source to release the specified information.

Verifications received electronically directly from the source are considered third party written verifications.

HACoLA will not accept verifications delivered by the family except computerized printouts from the following agencies:

- ➤ Social Security Administration
- ➤ Veterans Administration
- ➤ Welfare Assistance
- ➤ Unemployment Compensation Board
- ➤ City or County Courts
- ➤ Child Support Enforcement Agencies

### 7.2.3   Third-Party Oral Verification

Oral third-party verification will be used when written third-party verification is delayed or not possible.  When third-party oral verification is used, staff will be required to document both the paper and computer file, noting with whom they spoke, the date of the conversation, and the facts provided. If oral third party verification is not available, HACoLA will compare the information to any documents provided by the family. If provided by telephone, HACoLA must originate the call.

### 7.2.4   Review of Documents

In the event that, third-party written or oral verification is unavailable, or the information has not been verified by the third party within two weeks, HACoLA will annotate the file accordingly and utilize documents provided by the family as the primary source if the documents provide complete information.

All such documents, excluding government checks, will be photocopied and retained in the applicant file. In cases where documents are viewed which cannot be photocopied, staff viewing the document(s) will complete a Certification of Document Viewed or Person Contacted form.

HACoLA will accept the following documents from the family provided that the document is such that tampering would be easily noted:

- ➤ Printed wage stubs
- ➤ Computer print-outs from the employer
- ➤ Signed letters (provided that the information is confirmed by phone)
- ➤ Other documents noted in this chapter as acceptable verification

HACoLA will accept faxed documents, however a hard copy must also be provided.

HACoLA will accept photocopies, however original documents may be requested for verification.

If third-party verification is received after documents have been accepted as provisional verification, and there is a discrepancy, HACoLA will utilize the third party verification.

### 7.2.5 Self-Certification/Self-Declaration

When verification cannot be made by third-party verification or review of documents, families will be required to submit a self-certification.

Self-certification means a notarized statement/affidavit/certification/statement under penalty of perjury and must be witnessed.

### 7.3 RELEASE OF INFORMATION
### [24 CFR §5.230]

The family will be required to sign specific authorization forms when information is needed that is not covered by the HUD-9886 Form (Authorization for the Release of Information).

Each member requested to consent to the release of information will be provided with a copy of the appropriate forms for their review and signature.

Family refusal to cooperate with the HUD prescribed verification system will result in denial of admission or termination of assistance because it is a family obligation to supply any information requested by HACoLA or HUD.

### 7.4 COMPUTER MATCHING
### [24 CFR §5.210(a)]

Where allowed by HUD and/or other State or local agencies, computer matching will be done.

### 7.5 ITEMS TO BE VERIFIED
### [24 CFR §982.551(b)]

❑ All income not specifically excluded by the regulations.

❑ Zero-income status of household.

❑ Full-time student status including high school students who are age 18 or over.

❑ Current assets including assets disposed of for less than fair market value in preceding two years.

❑ Childcare expense where it allows an adult family member to be employed or to further his/her education.

❑ Total medical expenses of all family members in households whose head or spouse is elderly or disabled.

❑ Disability assistance expenses to include only those costs associated with attendant care or auxiliary apparatus, which allow an adult family member to be employed.

❑ Identity.

Housing Authority of the County of Los Angeles

❑  U.S. citizenship/eligible immigrant status.

❑  Social Security Numbers for all family members 6 years of age or older.

❑  Preference status, based upon local preferences.

❑  Displacement status of single applicants who are involuntarily displaced through no fault of their own.

❑  Familial/marital status when needed for head or spouse definition.

❑  Disability for determination of preferences, allowances or deductions.

**7.6    VERIFICATION OF INCOME**
**[24 CFR §982.516(a)(2)(i)]**

This section defines the methods HACoLA will use to verify various types of income.

**7.6.1    Employment Income**
**[24 CFR §5.609(b)(1)]**

Verification forms request the employer to specify the:

➢  Dates of employment

➢  Amount and frequency of pay

➢  Date of the last pay increase

➢  Likelihood of change of employment status and effective date of any known salary increase during the next 12 months

➢  Year-to-date earnings

➢  Estimated income from overtime, tips, bonus pay expected during next 12 months

Acceptable methods of verification include, in this order:

1.  Employment verification form completed by the employer.

2.  Check stubs or earning statements which indicate the employee's gross pay, frequency of pay or year-to-date earnings.

3.  W-2 forms plus income tax return forms.

4.  Income tax returns signed by the family may be used for verifying self-employment income, or income from tips and other gratuities.

In cases where there are questions about the validity of information provided by the family, HACoLA will require the most recent federal income tax statements.

**7.6.2    Social Security, Pensions, Disability, Supplementary Security Income**
**[24 CFR §5.609(b)(4)]**

Acceptable methods of verification include, in this order:

1.  Benefit verification form completed by agency providing the benefits.

2. Award or benefit notification letters prepared and signed by the providing agency.

3. Computer report electronically obtained or in hard copy.

**7.6.3   Unemployment Compensation
[24 CFR §5.609(b)(5)]**

Acceptable methods of verification include, in this order:

1. Verification form completed by the unemployment compensation agency.

2. Computer printouts from unemployment office stating payment dates and amounts.

3. Payment stubs.

**7.6.4   Welfare Payments or General Assistance
[24 CFR §5.609(b)(6)]**

Acceptable methods of verification include, in this order:

1. HACoLA verification form completed by payment provider.

2. Written statement from payment provider indicating the amount of grant/payment, start date of payments, and anticipated changes in payment in the next 12 months.

3. Computer-generated Notice of Action.

4. HACoLA may also verify this information by accessing the Los Angeles County Department of Public Social Services (DPSS) computer system.

**7.6.5   Alimony or Child Support Payments
[24 CFR §5.609(b)(7)]**

Acceptable methods of verification include, in this order:

1. Copy of a separation or settlement agreement or a divorce decree stating amount and type of support and payment schedules.

2. Computerized official printout of payments made if through a state agency.

3. A notarized letter from the person paying the support.

4. Copy of latest check and/or payment stubs from Court Trustee. HACoLA must record the date, amount, and number of the check.

5. Family's self-certification of amount received and of the likelihood of support payments being received in the future, or that support payments are not being received.

6. If payments are irregular, the family must provide:

   • A copy of the separation or settlement agreement, or a divorce decree stating the amount and type of support and payment schedules.

   • A statement from the agency responsible for enforcing payments to show that the family has filed for enforcement.

Housing Authority of the County of Los Angeles

- A welfare notice of action showing amounts received by the welfare agency for child support.
- A written statement from the District Attorney's office or other appropriate agency certifying that a collection or enforcement action has been filed.

**7.6.6   Net Income from a Business
[24 CFR §5.609(b)(2)]**

In order to verify the net income from a business, HACoLA will view IRS and financial documents from prior years and use this information to anticipate the income and expenses for the next 12 months.

Acceptable methods of verification include:

1. IRS Form 1040, including:
   - Schedule C (Small Business)
   - Schedule E (Rental Property Income)
   - Schedule F (Farm Income)
2. If accelerated depreciation was used on the tax return or financial statement, an accountant's calculation of depreciation expense, computed using straight-line depreciation rules.
3. Audited or unaudited financial statement(s) of the business.
4. Third party verification forms for each customer/contract indicating the amounts of income received in a specified time period.

Expenses for rent and utilities will not be allowed for operations or businesses based in the subsidized unit, as these expenses are a required family contribution in the Housing Choice Voucher Program and are calculated based upon the family's income.

**7.6.7   Child Care Business**

If an applicant/participant is operating a licensed day care business, income and expenses will be verified as with any other business.

If the applicant/participant is operating a cash and carry operation (which may or may not be licensed), HACoLA will require that the applicant/participant complete a form for each customer which indicates: name of person(s) whose child/children is/are being cared for, phone number, number of hours child is being cared for, method of payment (check/cash), amount paid, and signature of person.

If childcare services were terminated, a third-party verification will be sent to the parent whose child was receiving childcare.

**7.6.8   Recurring Gifts
[24 CFR §5.609(b)(7)]**

The family must furnish a self-certification containing the following information:

➢ The person who provides the gifts

> ➤ The value of the gifts
>
> ➤ The regularity (dates) of the gifts
>
> ➤ The purpose of the gifts

### 7.6.9  Zero-Income Status

Families claiming to have no income will automatically undergo a credit review. The information contained in the credit report will be used to confirm the information provided by the family.  HACoLA will also utilize records provided by the Department of Public Social Services (DPSS).

Moreover, HACoLA may check records of other departments in the jurisdiction that have information about income sources of customers.

### 7.6.10  Full-Time Student Status
### [24 CFR §5.609(c)(11)]

Only the first $480 of the earned income of full time students 18 years or older (including those who are temporarily absent), other than head or spouse, will be counted towards family income.

Financial aid, scholarships and grants received by full time students are not counted towards family income.

Verification of full time student status includes:

1.  Written verification from the registrar's office or other school official,

2.  School records indicating enrollment for sufficient number of credits to be considered a full-time student by the educational institution, and

3.  A copy of final grades.

### 7.7   INCOME FROM ASSETS

Acceptable methods of verification include, in this order:

### 7.7.1  Savings Account Interest Income and Dividends
### [24 CFR §5.609(b)(3)]

Will be verified by:

1.  Account statements, passbooks, certificates of deposit, or HACoLA verification forms completed by the financial institution.

2.  Broker's statements showing value of stocks or bonds and the earnings credited the family. Earnings can be obtained from current newspaper quotations or oral broker's verification.

3.  IRS Form 1099 from the financial institution, provided that HACoLA must adjust the information to project earnings expected for the next 12 months.

Housing Authority of the County of Los Angeles

**7.7.2   Interest Income from Mortgages or Similar Arrangements [24 CFR §5.609(b)(7)]**

1. A letter from an accountant, attorney, real estate broker, the buyer, or a financial institution stating interest due for next 12 months. (A copy of the check paid by the buyer to the family is not sufficient unless a breakdown of interest and principal is shown.)

2. Amortization schedule showing interest for the 12 months following the effective date of the certification or re-examination.

**7.7.3   Net Rental Income from Property Owned by Family [24 CFR §5.609(b)(3)]**

1. IRS Form 1040 with Schedule E (Rental Income).

2. Copies of latest rent receipts, leases, or other documentation of rent amounts.

3. Documentation of allowable operating expenses of the property: tax statements, insurance invoices, bills for reasonable maintenance and utilities, and bank statements or amortization schedules showing monthly interest expense.

**7.8   VERIFICATION OF ASSETS [24 CFR §982.516(a)(2)(ii)]**

**7.8.1   Family Assets**

HACoLA will require the necessary information to determine the current cash value, (the net amount the family would receive if the asset were converted to cash).

1. Verification forms, letters, or documents from a financial institution or broker.

2. Passbooks, checking account statements, certificates of deposit, bonds, or financial statements completed by a financial institution or broker.

3. Quotes from a stockbroker or realty agent as to net amount family would receive if they liquidated securities or real estate.

4. Real estate tax statements if the approximate current market value can be deduced from assessment.

5. Financial statements for business assets.

6. Copies of closing documents showing the selling price and the distribution of the sales proceeds.

7. Appraisals of personal property held as an investment.

**7.8.2   Assets Disposed of for Less than Fair Market Value (FMV) [24 CFR §5.603(b)(3)]**

This includes assets disposed of during two years preceding effective date of certification or re-examination:

1. For all certifications and re-examinations, HACoLA will obtain the family's certification as to whether any member has disposed of assets for less than fair market value during the two years preceding the effective date of the certification or re-examination.

2. If the family certifies that they have disposed of assets for less than fair market value, verification [or certification] is required that shows:

   • All assets disposed of for less than FMV;

   • The date they were disposed of;

   • The amount the family received; and

   • The market value of the assets at the time of disposition. Third party verification will be obtained wherever possible.

## 7.9   VERIFICATION OF ALLOWABLE DEDUCTIONS FROM INCOME [24 CFR §5.11]

### 7.9.1   Childcare Expenses [24 CFR §5.611(a)(4)]

1. Written verification from the person who receives the payments is required. If the childcare provider is an individual, s/he must provide a statement of the amount they are charging the family for their services and whether any of the amounts owed have been or will be paid by sources outside the family.

2. Verifications must specify the child care provider's name, address, telephone number, the names of the children cared for, the number of hours the child care occurs, the rate of pay, and the typical yearly amount paid, including school and vacation periods.

3. Family's certification as to whether any of those payments have been or will be paid or reimbursed by outside sources.

### 7.9.2   Medical Expenses [24 CFR §5.611(a)(3)]

Families who claim medical expenses or expenses to assist a person(s) with a disability will be required to submit a certification as to whether or not any expense payments have been, or will be, reimbursed by an outside source. All expense claims will be verified by one or more of the methods listed below:

1. Written verification by a doctor, hospital or clinic personnel, dentist, pharmacist, of

   • The anticipated medical costs to be incurred by the family and regular payments due on medical bills, and

   • Extent to which those expenses will be reimbursed by insurance or a government agency.

2. Written confirmation by the insurance company or employer of health insurance premiums to be paid by the family.

Housing Authority of the County of Los Angeles

3. Written confirmation from the Social Security Administration's written of Medicare premiums to be paid by the family over the next 12 months. A computer printout will be accepted.

4. For attendant care:

   • A reliable, knowledgeable professional's certification that the assistance of an attendant is necessary as a medical expense and a projection of the number of hours the care is needed for calculation purposes.

   • Attendant's written confirmation of hours of care provided and amount and frequency of payments received from the family or agency (or copies of canceled checks the family used to make those payments) or stubs from the agency providing the services.

5. Receipts, canceled checks, or pay stubs that verify medical costs and insurance expenses likely to be incurred in the next 12 months.

6. Copies of payment agreements or most recent invoice that verify payments made on outstanding medical bills that will continue over all or part of the next 12 months.

7. Receipts or other record of medical expenses incurred during the past 12 months that can be used to anticipate future medical expenses. HACoLA may use this approach for general medical expenses such as non-prescription drugs and regular visits to doctors or dentists, but not for one-time, nonrecurring expenses from the previous year.

8. HACoLA will use mileage at the IRS rate, or cab, bus fare, or other public transportation cost for verification of the cost of transportation directly related to medical treatment.

**7.9.3   Assistance to Persons with Disabilities [24 CFR §5.611(a)(3)(ii)]**

1. In all cases:

   • Written certification from a reliable, knowledgeable professional that the person with disabilities requires the services of an attendant and/or the use of auxiliary apparatus to permit him/her to be employed or to function sufficiently independently to enable another family member to be employed.

   • Family's certification as to whether they receive reimbursement for any of the expenses of disability assistance and the amount of any reimbursement received.

2. Attendant Care:

   • Attendant's written certification of amount received from the family, frequency of receipt, and hours of care provided.

   • Certification of family and attendant and/or copies of canceled checks family used to make payments.

3. Auxiliary Apparatus:

- Receipts for purchases or proof of monthly payments and maintenance expenses for auxiliary apparatus.
- In the case where the person with disabilities is employed, a statement from the employer that the auxiliary apparatus is necessary for employment.

## 7.10   VERIFYING NON-FINANCIAL FACTORS [24 CFR §982.551(b)(1)]

### 7.10.1  Verification of Legal Identity

In order to prevent program abuse, HACoLA will require applicants to furnish verification of legal identity for all family members.

The documents listed below will be considered acceptable verification of legal identity for adults. If a document submitted by a family is invalid or otherwise questionable, more than one of these documents may be required.

- ➢ Certificate of Birth, naturalization papers
- ➢ Church issued baptismal certificate
- ➢ Current, valid Driver's license
- ➢ U.S. military discharge (DD 214)
- ➢ U.S. passport
- ➢ Board approved Consulate General identification cards, which are currently Mexico's and Argentina's "Matricula Consular" identification cards
- ➢ Company/agency Identification Card
- ➢ Department of Motor Vehicles Identification Card
- ➢ Hospital records

Documents considered acceptable for the verification of legal identity for minors may be one or more of the following:

- ➢ Certificate of Birth
- ➢ Adoption papers
- ➢ Custody agreement
- ➢ Health and Human Services ID

### 7.10.2  Verification of Marital Status

- ❏ Verification of divorce status will be a certified copy of the divorce decree, signed by a Court Officer.
- ❏ Verification of a separation may be a copy of court-ordered maintenance or other records.
- ❏ Verification of marriage status is a marriage certificate.

Housing Authority of the County of Los Angeles

### 7.10.3 Familial Relationships

The following verifications may be required if applicable:

➢ Verification of relationship:
- Official identification showing names
- Birth Certificates
- Baptismal certificates

➢ Verification of guardianship:
- Court-ordered assignment

➢ Verification from social services agency

➢ School records
- Affidavit of parent

➢ Evidence of a stable family relationship:
- Joint bank accounts or other shared financial transactions
- Leases or other evidence of prior cohabitation
- Credit reports showing relationship

### 7.10.4 Verification of Permanent Absence of Adult Member

If an adult member who was formerly a member of the household is reported permanently absent by the family, HACoLA may require one or more of the following as verification:

1. Husband or wife institutes divorce action.
2. Husband or wife institutes legal separation.
3. Order of protection/restraining order obtained by one family member against another.
4. Proof of another home address, such as utility bills, canceled checks for rent, drivers license, or lease or rental agreement, if available.
5. Statements from other agencies such as social services or a written statement from the owner or manager that the adult family member is no longer living at that location.
6. If the adult family member is incarcerated, a document from the Court or prison should be obtained stating how long they will be incarcerated.
7. A notarized statement by the adult member of the household removing him/herself from the lease and voucher household and providing a forwarding address and effective date of the move.

### 7.10.5 Verification of Change in Family Composition
### [24 CFR §982.516(c)]

HACoLA may verify changes in family composition (either reported or unreported) through letters, telephone calls, utility records, inspections, owners, neighbors, credit data, school or DMV records, and other sources.

**7.10.6 Verification of Disability**

Verification of disability must be receipt of SSI or SSA disability payments under Section 223 of the Social Security Act or 102(7) of the Developmental Disabilities Assistance and Bill of Rights Act (42 U.S.C. 6001(7) or verified by appropriate diagnostician such as physician, psychiatrist, psychologist, therapist, rehabilitation specialist, or licensed social worker, using the HUD language as the verification format.

**7.10.7 Verification of Citizenship/Eligible Immigrant Status [24 CFR §5.508(a)]**

To be eligible for assistance, individuals must be U.S. citizens or eligible immigrants. Individuals who are neither may elect not to contend their status. Eligible immigrants must fall into one of the categories specified by the regulations and must have their status verified by Immigration and Naturalization Service (INS). Each family member must declare their status once. Assistance cannot be delayed, denied, or terminated while verification of status is pending except that assistance to applicants may be delayed while HACoLA hearing is pending.

1. Citizens or nationals of the United States are required to sign a declaration under penalty of perjury [24 CFR §5.608(b)(1)].

2. Eligible immigrants who were participants and 62 or over on June 19, 1995, are required to sign a declaration of eligible immigration status and provide proof of age [24 CFR §5.608(b)(2)].

3. Noncitizens with eligible immigration status must sign a declaration of status and verification consent form and provide their original immigration documents which are copied front and back and returned to the family [24 CFR §5.508(d)(1)]. HACoLA verifies the status through the INS SAVE system. If this primary verification fails to verify status, HACoLA must request within 10 calendar days that the INS conduct a manual search [24 CFR §5.512(c)].

4. Ineligible family members who do not claim to be citizens or eligible immigrants must be listed on a statement of ineligible family members signed by the head of household or spouse [24 CFR §5.508(e)].

5. Noncitizen students on student visas are ineligible members even though they are in the country lawfully. They must provide their student visa but their status will not be verified and they do not sign a declaration but are listed on the statement of ineligible members [24 CFR §5.522].

❑ **Failure to Provide**: If an applicant or participant family member fails to sign required declarations and consent forms or provide documents, as required, they must be listed as an ineligible member. If the entire family fails to provide and sign as required, the family may be denied or terminated for failure to provide required information [24 CFR §5.508(i)].

❑ **Time of Verification**: For applicants, verification of U.S. citizenship/eligible immigrant status occurs at the same time as verification of other factors of eligibility for final eligibility determination. For participants, it is done at the first regular re-examination after June 19, 1995. For family members added

Housing Authority of the County of Los Angeles

after other members have been verified, the verification occurs at the first re-examination after the new member moves in. Once verification has been completed for any covered program, it need not be repeated except that, in the case of port-in families, if the initial HA does not supply the documents, HACoLA must conduct the determination [24 CFR §5.508(g)].

❏ **Extensions of Time to Provide Documents**: Extensions must be given for persons who declare their eligible immigration status but need time to obtain the required documents. The length of the extension shall be based on individual circumstances. HACoLA will generally allow up to 30 calendar days to provide the document or a receipt issued by the INS for issuance of replacement documents [24 CFR §5.508(h)].

❏ **Acceptable Documents of Eligible Immigration**: The regulations stipulate that only the following documents are acceptable unless changes are published in the Federal Register [24 CFR §5.508(b) and 24 CFR §5.510(b)].

- Resident Alien Card (I-551)
- Alien Registration Receipt Card (I-151)
- Arrival-Departure Record (I-94)
- Temporary Resident Card (I-688)
- Employment Authorization Card (I-688B)
- Receipt issued by the INS for issuance of replacement of any of the above documents that shows individual's entitlement has been verified

➢ A birth certificate is not acceptable verification of status. All documents in connection with U.S. citizenship/eligible immigrant status must be kept five years.

❏ **Determination of Ineligibility**: After HACoLA has made a determination of ineligibility, the family will be notified of the determination and the reasons and informed of the option for prorated assistance (if applicable).

**7.10.8 Verification of Social Security Numbers [24 CFR §5.216(a)]**

Social Security numbers must be provided as a condition of eligibility for all family members, except for children age 5 and under, who have not been assigned a number, and family members who are not eligible to obtain a Social Security number. Social Security numbers will be verified through a Social Security card issued by the Social Security Administration. If a family member cannot produce a Social Security card, only the documents listed below showing his or her Social Security number may be used for verification. The family is also required to certify in writing that the document(s) submitted in lieu of the Social Security card information provided is/are complete and accurate [24 CFR §5.216(f)]:

➢ A driver's license
➢ Identification card issued by a Federal, state or local agency
➢ Identification card issued by a medical insurance company or provider (including Medicare and Medicaid)

> An identification card issued by an employer or trade union

> An identification card issued by a medical insurance company

> Earnings statements or payroll stubs

> Bank statements

> IRS Form 1099

> Benefit award letters from government agencies

> Retirement benefit letter

> Life insurance policies

> Court records such as real estate, tax notices, marriage and divorce, judgment or bankruptcy records

> Verification of benefits or Social Security Number from Social Security Administration

All new family members, except children age 5 and under, who have not been assigned a number, will be required to produce their Social Security card or provide the substitute documentation described above together with their certification that the substitute information provided is complete and accurate. This information is to be provided at the time the change in family composition is reported to HACoLA [24 CFR §5.216(a)].

If an applicant or participant is able to disclose the Social Security number but cannot meet the documentation requirements, the applicant or participant must sign a certification to that effect provided by HACoLA.  The applicant/participant or family member will have an additional 60 calendar days to provide proof of the Social Security number.  If they fail to provide this documentation, the family's assistance will be terminated [24 CFR §5.216(g)].

If the family member states they have not been issued a number, the family member will be required to sign a certification to this effect.

### 7.10.9 Medical Need for Larger Unit

A written certification that a larger unit is medically necessary must be obtained from a reliable, knowledgeable medical professional.

### 7.10.10 Secondary Review/Credit Checks

HACoLA uses credit reports obtained from reliable sources to conduct secondary verifications of applicants and participants.  Starting in January 2001, HACoLA obtains credit reports for 20 percent of randomly selected new families, and a randomly selected portion of ongoing program participants.

The methodology used to evaluate the information obtained from the credit report in relation to new applicants is outlined in Chapter 3 (Applications Process).

For continuously assisted families, HACoLA will routinely select, at random, a pre-identified number of families to undergo a secondary verification. Approximately 1,500 – 2,000 families will be reviewed annually.  The secondary review includes a comparison between the information contained in

Housing Authority of the County of Los Angeles

the credit report, for each adult household member, and the information provided by the family to HACoLA for eligibility purposes. Specifically, HACoLA reviews the credit report to verify:

➤ **Employment**: If the credit report reveals employment during the subsidized period that was not disclosed to HACoLA, the family will be required to provide documentation that the employment did not occur or provide information regarding the amount of earnings received during the employment period.

If the family contends that the employment was made up for the purposes of obtaining credit or was erroneously placed on the credit report, the family must supply a letter from the employers listed confirming such information. On a case-by-case basis, HACoLA may accept a certified statement from the family.

If the family failed to disclose employment for a period longer than 6 months, HACoLA will propose termination of the family's assistance and seek repayment of any overpayment.

If the family failed to disclose employment for less than 6 months, the family will be required to attend a counseling interview and re-sign all program documents re-enforcing the family's obligations. The family will also be required to repay any overpayment amount. A second violation of this nature will result in a proposed termination.

➤ **Assets**: The credit report information will be used to verify assets, particularly, large items such as real estate property. If the credit report reveals that the family owns property, the family will be required to provide the appropriate documentation regarding the property.

If all documentation confirms that the family (any family member) owns real estate property that was purposely concealed, HACoLA will propose termination of assistance and seek repayment of any overpayment amount.

➤ **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit. Common reasons for use of other names include a recent marriage or a divorce. If an alias has not been disclosed to HACoLA, the family will be asked to provide additional evidence of the legal identity of adult family members.

➤ **Current and Previous Addresses**: For a continuously assisted family, it is assumed that the family's primary residence is the assisted address. If the credit report indicates the continuous use of an address, other than that of the assisted unit during the subsidized period, the family will be asked to provide documentation that the assisted address is being used as the family's primary residence. This may include a history of utility bills, bank statements, school enrollment record for children, credit card statements or other relevant documents. Failure to provide adequate proof may result in termination of assistance.

If the family is not using the subsidized unit as their primary residency and/or is subletting the assisted unit, the file will be referred for proposed

termination and HACoLA will seek full repayment of any overpayment amount.

➢ **Credit Card and Loan Payments**: A credit report will usually include a list of the family's financial obligations. Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments. HACoLA will review this information to confirm the income and asset information provided by the family. If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, HACoLA will ask the family to disclose how they are currently meeting their financial obligations. Accounts that have been charged off or significantly delinquent are not included in this calculation. Failure to provide adequate proof of income will result in the file being referred for proposed termination. Additionally, HACoLA will seek full repayment of any overpayment amount.

➢ **Multiple Social Security Numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit. If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

Whenever a violation results in a proposed termination, the family is entitled to request an informal hearing. Procedures governing the informal hearing process are outlined in Chapter 16 (Informal Hearings and Complaints).

Housing Authority of the County of Los Angeles

## CHAPTER 8:
## VOUCHER ISSUANCE AND BRIEFINGS

### 8.1     INTRODUCTION

HACoLA's objectives are to assure that families selected to participate are successful in obtaining an acceptable housing unit, and that they have sufficient knowledge to derive maximum benefit from the program and to comply with program requirements. When families have been determined to be eligible, HACoLA will conduct a mandatory briefing to ensure that families know how the program works.  The briefing will provide a broad description of owner and family responsibilities, HACoLA procedures, and how to lease a unit.  The family will also receive a briefing packet that provides more detailed information about the program. This chapter describes how briefings will be conducted, the information that will be provided to families, and the policies for how changes in the family composition will be handled.

### 8.2     ISSUANCE OF HOUSING CHOICE VOUCHERS

When funding is available, HACoLA will issue vouchers to applicants whose eligibility has been determined.

The number of vouchers issued must ensure that HACoLA stays as close as possible to 100 percent lease-up.  HACoLA performs a calculation to determine whether applications can be processed, the number of vouchers that can be issued, and to what extent HACoLA can over-issue.

HACoLA may over-issue vouchers only to the extent necessary to meet leasing goals.  All vouchers that are over-issued must be honored.  If HACoLA finds it is over-leased, it must adjust future issuance of vouchers in order not to exceed the ACC budget limitations for the fiscal year.

### 8.3     BRIEFING TYPES AND REQUIRED ATTENDANCE
### [24 CFR §982.301(a)]

#### 8.3.1     Initial Applicant Briefing

A full HUD-required briefing will be conducted for applicant families who are determined to be eligible for assistance.  The briefings will be conducted in groups or individual meetings.  Families who attend group briefings and still have the need for individual assistance will be referred to the appropriate staff person.

Briefings will be conducted in English.

The purpose of the briefing is to explain the documents in the voucher holder's packet to families so that they are fully informed about the program.  This will enable them to utilize the program to their advantage, and it will prepare them to discuss it with potential owners and property managers.

HACoLA will not issue a voucher to a family unless the household representative has attended a briefing and signed the voucher.  Applicants who provide prior notice of inability to attend a briefing will automatically be scheduled for the next briefing.    Applicants who fail to attend scheduled briefings, without prior

notification and approval of HACoLA, may be denied admission based on failure to supply information needed for certification. HACoLA will conduct individual briefings for families with disabilities at their home, upon request by the family, if required for reasonable accommodation.

**8.3.2**   **Briefing Packet**
         **[24 CFR §982.301(b)]**

HACoLA will provide the family with a briefing packet of materials. The packet includes forms and information required by HUD, as well as additional resources, as follows:

1. **Voucher instructions** that explain the term of the voucher, and policies on extensions and suspensions.

2. **Payment Standards** for Los Angeles County and Small Cities: Provides the calculated payment standards for HACoLA's jurisdiction by unit size (number of bedrooms).

3. **Estimated Rent Calculation/Subsidy Profile**: A worksheet on rent calculations, including a description of the method used to calculate the assistance payment, how the minimum and maximum allowable rent is determined, payment standard determination, and an estimated calculation of the maximum rent to suit the tenant's budget.

4. **Information on where the family can lease a unit**, including portability procedures for tenants looking to relocate, a list of local and nationwide housing authorities, and a form for participants who are requesting to transfer.

5. The HUD-required "tenancy addendum" (**HUD-53641**) that must be included in the lease.

6. The **Request for Tenancy Approval (RTA)** form, which the family uses to request PHA approval of the assisted tenancy. This document explains the new contracts process, including how to request approval.

7. **Information on Subsidy and Requests for Waivers**: Explains how the number of bedrooms allowed (unit size) relates to family composition, and when and how exceptions are made in regards to requests for additional bedrooms.

8. The HUD brochure, **A Good Place to Live,** on how to select a unit that complies with HQS.

9. Information on federal, State and local **equal opportunity laws**, and a copy of **HUD-906-3**, the housing discrimination complaint form.

10. A list of **properties available for rent**. Owners or other parties willing to lease to assisted families submit unit listings which HACoLA compiles and distributes. The list includes any available information on units that are accessible to persons with disabilities.

11. Guidance on **searching for a rental home** and submitting a successful rental application.

Housing Authority of the County of Los Angeles

12. A **statement of the family obligations** under the program, and consequences including termination of assistance if the family fails to comply.

13. Information on HACoLA's **informal hearing procedures**, including explanations of when participant families have the opportunity for an informal hearing, and how to request a hearing.

14. The **Utility Allowance Schedule**, which provides utility allowance amounts for rental units, by unit size and utility type, for cities and unincorporated areas within HACoLA's jurisdiction.

15. **Protect Your Family From Lead In Your Home**, a brochure on the hazards of lead-based paint and resources for additional information.

16. HACoLA's policy on conducting **credit and background checks**.

The packet may also include the following materials:

❑ **Fact sheet** or information on the Section 8 Program.

❑ A Section 8 **program overview** for owners.

❑ Owner forms, such as:

- **IRS Form W-9** (Request for Taxpayer Identification Number and Certification).

- **Letter of Authorization**.

- Authorization Agreement for **Automatic Deposit Form**.

**8.3.3    Other Information to be Provided at the Briefing [24 CFR §982.301(a)]**

The person conducting the briefing will also describe how the program works and the relationship between the family and the owner, the family and HACoLA, and HACoLA and the owner.

The briefing presentation emphasizes:

➢ Family and owner responsibilities;

➢ Where a family may lease a unit inside and outside HACoLA jurisdiction;

➢ How portability works for families eligible to exercise portability;

➢ Advantages to moving to areas with low concentration of poor families if family is living in a high poverty census tract in HACoLA jurisdiction;

➢ The Family Self-Sufficiency program and its advantages; and

➢ If the family includes a person with disabilities, HACoLA will ensure compliance with 24 CFR §8.6 to ensure effective communication.

**8.3.4    Re-Issuance Briefing**

A briefing will be held for participants who will be re-issued vouchers to move, if they have been re-certified within the last 60 calendar days, and have given proper notice of intent to vacate to their owner.   This briefing may include

incoming and outgoing portable families.   Families whose re-examinations are older than 60 calendar days must be re-certified in order to be briefed to move.

Families failing to attend a scheduled briefing twice will be denied a new voucher based on failure to provide required information.

### 8.3.5   Owner Briefing

Briefings are held for owners at least annually.   All owners receive a mailed invitation.  Prospective owners are also welcome.  The purpose of the briefing is to assure successful owner participation in the program.

### 8.4   ENCOURAGING PARTICIPATION IN AREAS WITHOUT LOW INCOME OR MINORITY CONCENTRATION [24 CFR §982.301(a)(3)

At the briefing, families are encouraged to search for housing in non-impacted areas and HACoLA will provide assistance to families who wish to do so.

The assistance provided to such families includes:

- ➢ Direct contact with owners;
- ➢ Counseling with the family;
- ➢ Providing information about services in various non-impacted areas;
- ➢ Meeting with neighborhood groups to promote understanding;
- ➢ Formal or informal discussions with owner groups;
- ➢ Formal or informal discussions with social service agencies;
- ➢ Meeting with rental referral companies or agencies; and
- ➢ Meeting with fair housing groups or agencies.

HACoLA will maintain a database of available housing submitted by owners in all neighborhoods within its jurisdiction to ensure greater mobility and housing choice to very low-income households. The Marketing List will be made available to voucher holders who are actually seeking housing.

### 8.5   SECURITY DEPOSIT REQUIREMENTS
[24 CFR §982.313]

Security deposits charged by owners may not exceed those charged to unassisted families (nor the maximum prescribed by State or local law.)

For lease-in-place families, responsibility for first and last month's rent is not considered a security deposit issue. In these cases, the owner should settle the issue with the family prior to the beginning of assistance.

### 8.6   TERM OF VOUCHER
[24 CFR §982.301(b)(1)]

During the briefing session, each household will be issued a voucher which represents a contractual agreement between HACoLA and the family, specifying

Housing Authority of the County of Los Angeles

the rights and responsibilities of each party. It does not constitute admission to the program, which occurs when the lease and contract become effective.

### 8.6.1 Expirations
#### [24 CFR §982.303(a)]

The voucher is valid for a period of 60 calendar days from the date of issuance. The family must submit a Request for Tenancy Approval and Lease within the 60 calendar day period unless an extension has been granted by HACoLA.

If the voucher has expired, and has not been extended by HACoLA or expires after an extension, the family will be denied assistance. The family will not be entitled to a review or hearing. If the family is currently assisted, they may remain as a participant in their unit if there is an assisted lease/contract in effect.

### 8.6.2 Policy on Suspensions (Tolling)
#### [24 CFR 982.303(c)]

When a Request for Tenancy Approval is received, HACoLA will not deduct the number of calendar days required to process the request from the term of the voucher.

### 8.6.3 Extensions
#### [24 CFR §982.303(b)]

HACoLA may grant extensions to vouchers.

A family may request an extension of the voucher time period. All requests for extensions must be received prior to the expiration date of the voucher.

Extensions may be granted in 30, 60, or 120-day increments, up to a maximum term of 180 calendar days, if necessary for the tenant to locate a unit.

Housing Supervisors may authorize extensions up to a maximum term of 270 calendar days for extenuating circumstances or as a reasonable accommodation. Such matters will be considered on an individual basis and must be supported by verifiable third party documentation.

### 8.6.4 Assistance to Voucher Holders
#### [24 CFR §982.301(b)]

Families who require additional assistance during their search may call the Marketing List for a listing of available units. Information regarding the Marketing List will be presented at the briefing session.

HACoLA will assist families with negotiations with owners and provide other assistance related to the families' search for housing.

### 8.7 VOUCHER ISSUANCE DETERMINATION FOR SPLIT HOUSEHOLDS
#### [24 CFR §982.315]

In those instances when a family assisted under the Housing Choice Voucher Program becomes divided into two otherwise eligible families due to divorce, legal separation, or the division of the family, and the new families cannot agree as to which new family unit should continue to receive the assistance, and there

is no determination by a court, HACoLA shall consider the following factors to determine which of the families will continue to be assisted:

1. Which of the two new family units has custody of dependent children.

2. Which family member was the head of household when the voucher was initially issued (listed on the initial application).

3. The composition of the new family units, and which unit contains elderly or disabled members.

4. Whether domestic violence was involved in the breakup.

5. Which family members remain in the unit.

6. Recommendations of social service professionals.

Documentation of these factors will be the responsibility of the requesting parties.

If documentation is not provided, HACoLA will terminate assistance on the basis of failure to provide information necessary to complete the annual re-examination.

Where the breakup of the family also results in a reduction of the size of the voucher, the family will be required to move to a smaller unit if the current owner is unwilling to accept the rent level of the smaller sized certificate.

## 8.8   REMAINING MEMBER OF FAMILY – RETENTION OF VOUCHER

To be considered the remaining member of the family, the person must have been previously approved by HACoLA to be living in the unit.

A live-in attendant, by definition, is not a member of the family and will not be considered a remaining member of the Family.

In order for a minor child to continue to receive assistance as a remaining family member:

1. The court has to have awarded emancipated minor status to the minor, or

2. HACoLA has to have verified that social services and/or the Juvenile Court has arranged for another adult to be brought into the assisted unit to care for the child/children for an indefinite period.

A reduction in family size may require a reduction in the voucher size.

## 8.9   FAMILY VOLUNTARILY RELINQUISHES HOUSING CHOICE VOUCHER

The family may voluntarily relinquish their voucher at any time.  In such cases, HACoLA will provide the owner of the property with a 30 calendar days notice indicating that rental assistance will terminate based on the family's request. The family will become fully liable for the contract rent after 30 calendar days.

Generally, HACoLA will not re-instate a family once a request for voluntary termination has been received.  However, as a reasonable accommodation, HACoLA will review requests for reinstatements received within 6 months and make a determination on a case-by-case basis.

Housing Authority of the County of Los Angeles

If a family voluntarily relinquishes their voucher in lieu of facing termination, HACoLA will continue to seek to recover any monies that may be due HACoLA as a result of misrepresentation or other breach of program regulations.

# CHAPTER 9:
## THE NEW CONTRACT PROCESS REQUEST FOR TENANCY APPROVAL AND CONTRACT EXECUTION

**9.1   INTRODUCTION**
**[24 CFR §982.302(b) and 24 CFR §982.353(b)]**

After families are issued a voucher, they may search for a unit anywhere within HACoLA's jurisdiction, or outside of HACoLA's jurisdiction if they qualify for portability. The family must find an eligible unit under the program rules, with an owner who is willing to enter into a Housing Assistance Payments (HAP) contract with HACoLA. This chapter defines the types of eligible housing, HACoLA's policies which pertain to lease requirements, owner disapproval, and the processing of Requests for Tenancy Approval (RTA).

**9.2   REQUEST FOR TENANCY APPROVAL**
**[24 CFR §982.302(c)]**

The family must submit the RTA and a copy of the proposed lease during the term of the voucher. Both the owner and the voucher holder must sign the RTA.

HACoLA will not permit the family to submit more than one RTA at a time.

The RTA will be approved if [24 CFR §982.302(d)]:

1.  The unit is an eligible type of housing;
2.  The unit passes an inspection (based on HUD's Housing Quality Standards and HACoLA's requirements, detailed in Chapter 10);
3.  The rent is reasonable;
4.  The security deposit amount is approvable;
5.  The proposed lease complies with HUD and HACoLA requirements, and State and local law;
6.  The owner is approvable, and there are no conflicts of interest; and
7.  All applicable lead-based paint disclosure requirements have been met. See Chapter 10, Section 10.4.1 for more information on lead-based paint.

**9.2.1   Disapproval of RTA**
**[24 CFR §982.302(d)]**

If HACoLA determines that the RTA cannot be approved for any reason, the owner and the family will be notified in writing. HACoLA will instruct the owner and family of the steps that are necessary to approve the Request.

The owner will be given five calendar days to submit an approvable RTA from the date of disapproval unless the reason for the disapproval is the result of multiple failed inspections (three or more failed HQS inspections).

When, for any reason, an RTA is not approved, HACoLA will furnish another RTA form to the family along with the notice of disapproval so that the family can continue to search for eligible housing.

Housing Authority of the County of Los Angeles

HACoLA will suspend the term of the voucher while the RTA is being processed. Therefore, the length of time allotted to a family for the purpose of locating another unit will be based on the number of days left on the term of the voucher at the time the RTA was submitted to HACoLA [24 CFR §982.303(b)].

**9.3    ELIGIBLE TYPES OF HOUSING
        [24 CFR §982.352]**

HACoLA will approve the following types of housing in the voucher program:

- ➤ Single-family dwellings, including condos and townhouses.
- ➤ Manufactured homes where the family leases the mobile home and the pad [24 CFR §982.620(a)(2)].
- ➤ Manufactured homes where the family owns the mobile home and leases the pad [24 CFR §982.620(a)(3)].
- ➤ Multifamily dwellings (apartment buildings).
- ➤ Units owned but not subsidized by HACoLA (HUD-prescribed requirement).

A family can own a rental unit but cannot reside in it while being assisted, except in the cases involving manufactured homes when the family owns the mobile home and leases the pad. A family may lease in and have an interest in a cooperative housing development.

HACoLA may not permit a voucher holder to lease a unit which is receiving project-based Section 8 assistance or any duplicative rental subsidies.

**9.3.1   Ineligible Housing Types
         [24 CFR §982.352(a)]**

HACoLA will not approve:

- ➤ A unit occupied by the owner or by any person with an interest in the unit, other than manufactured homes described above.
- ➤ Nursing homes or other institutions that provide care.
- ➤ School dormitories and institutional housing.
- ➤ Structures that have not been properly converted. Owners will be required to provide finalized permits for all conversion work when the integrity and/or soundness of a structure is in question.
- ➤ Converted garages or other structures not intended to be living areas.
- ➤ Any other types of housing prohibited by HUD.

**9.3.2   Restrictions On Renting To Relatives
         [24 CFR §982.306(d)]**

In accordance with HUD policy, the family may not rent a unit from an owner (including a principal or other interested party) who is the parent, child, grandparent, grandchild, sister or brother of any member of the family. This restriction applies to all new contracts entered into after June 16, 1998.

Exceptions may be made to this policy as a reasonable accommodation for persons with a disability.  HACoLA will review all such requests on a case-by-case basis.  The family will be required to provide documentation of disability and how the particular unit, owned by the relative, could benefit the disabled person. Owners must provide the current address of their residence (not a Post Office box).  If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification.   In addition, HACoLA may request a copy of the owner's current utility bills and bank statement.

Failure to provide adequate documentation, within the specified time period (two weeks), will be grounds for denial of such request.

In all cases, the owner of the assisted unit may not reside in the unit with the assisted household, at any time during the term of the Housing Assistance Payment (HAP) Contract between HACoLA and the owner.

**9.4**   **LEASE AGREEMENTS**
**[24 CFR §982.308 - §982.309]**

The tenant and the owner must enter a written lease for the unit.  If the owner uses a standard lease form for rental to unassisted tenants in the locality or the premises, the lease must be in such standard form, plus the required HUD Tenancy Addendum, which HACoLA will provide to the owner.

HACoLA will review the lease for compliance with regulations.  At minimum, the lease must specify the following information:

❑  The names of the owner and tenant;

❑  The address of the unit rented;

❑  The term of the lease including the initial term and any provisions for renewal;

❑  The amount of the monthly rent to owner; and

❑  A specification of which utilities and appliances will be supplied by the owner, and which by the family.

The lease must provide the following are grounds for the owner to terminate tenancy [24 CFR §982.310(c)]:

❑  Drug- related criminal activity engaged in, on or near the premises by any tenant, household member, or guest, or such activity engaged in on the premises by any other person under the tenant's control. In addition, the lease must provide that the owner may evict a family when the owner determines that a household member is illegally using a drug or when the owner determines that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

❑  Any of the following types of criminal activity by a covered person:

Housing Authority of the County of Los Angeles

> Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);

> Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; or

> Any violent criminal activity on or near the premises by a tenant, household member, or guest, or any such activity on the premises by any other person under the tenant's control.

❑ If a tenant is:

> Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or

> Violating a condition of probation or parole imposed under Federal or State law.

If the owner does not have a standard lease form, the owner may request a sample lease.

When needed, HACoLA may require the owner and family to execute a lease rider that changes the rent amount and/or effective date on the owner's original lease.

The effective date of the lease and the HAP contract will be based on the date the unit passed inspection or the family took possession of the unit, whichever is later.  For this purpose, the family is considered to be in possession of the unit when the family has a key to the unit and the unit is fully available for the family's exclusive use [24 CFR §982.305(b)].

**9.4.1   Separate Agreements [24 CFR §982.510(c)]**

Separate agreements are not necessarily prohibited.  Families and owners will be advised of the prohibition of illegal side payments for additional rent, or for items normally included in the rent of unassisted families, or for items not shown on the approved lease.

Owners and families may execute separate agreements for services (parking space), appliances (other than range and refrigerator) and other items that are not included in the lease if the agreement is in writing and approved by HACoLA.

Any appliances, services or other items which are routinely provided to unassisted families as part of the lease (such as air conditioning, dishwasher or garage) or are permanently installed in the unit, cannot be put under separate agreement and must be included in the lease.  For there to be a separate agreement, the family must have the option of not utilizing the service, appliance or other item.

HACoLA is not liable for unpaid charges for items covered by separate agreements and nonpayment of these agreements cannot be cause for eviction.

If the family and owner have come to a written agreement on the amount of allowable charges for a specific item, so long as those charges are reasonable and not a substitute for higher rent, they will be allowed.

All agreements for special items or services must be attached to the lease approved by HACoLA. If agreements are entered into at a later date, they must be approved by HACoLA and attached to the lease.

**9.5     INITIAL INSPECTIONS**

See Chapter 10 (Housing Quality Standards and Inspections).

**9.6     RENT LIMITATIONS**
         **[24 CFR §982.508]**

In accordance with HUD regulations, at the time the family initially receives assistance for a new unit, the family's share of the rent for the unit (includes utilities and the rent to the owner) may not exceed more than 40 percent of the family's adjusted monthly income if the gross rent for the unit exceeds the payment standard.

If the gross rent (rent plus utilities) does not exceed the payment standard, the family may contribute more than 40 percent of their monthly income towards rent.

Although HUD does not place limits on the amount that a family may contribute towards rent (if the family is a continuing family or the gross rent for an initial lease does not exceed the payment standard), HACoLA is concerned about affordability. Therefore, whenever a family is contributing more than 60 percent of their adjusted family income towards rent, the family will be required to attend an affordability counseling session at HACoLA. Trained staff will review the family's financial situation and review the family's ability to meet their rental obligation. If the family discloses that they are concerned about their ability to meet their rental obligation, HACoLA will work with the family to help them locate another affordable unit. If the family indicates that they are able to meet all of their current financial obligations, the family will be allowed to proceed with their request to move into the unit. A notation will be made in the family's file.

**9.7     RENT REASONABLENESS**
         **[24 CFR §982.507(a)(1)]**

A rent reasonable test will be used to determine if the rent amount request by the owner can be approved. HACoLA's rent reasonableness policy, including appeals process, is covered in Chapter 11 (Setting Payment Standards and Determining Rent Reasonableness).

**9.8     INFORMATION TO OWNERS**
         **[24 CFR §982.307(b)]**

HACoLA is required to provide prospective owners with the address of the applicant and the names and addresses of the current and previous owner if known. HACoLA will make an exception to this requirement if the family's

Housing Authority of the County of Los Angeles

whereabouts must be protected due to domestic abuse or witness protection. HACoLA will not release any other information regarding the family.

HACoLA will inform owners that it is the responsibility of the owner to determine the suitability of prospective tenants.  Owners will be encouraged to screen applicants for rent payment history, eviction history, damage to units, and other factors related to the family's suitability as a tenant [24 CFR §982.307(a)].

Information regarding HACoLA's policy on this subject is included in the briefing packet and as an attachment to the Request for Tenancy Approval.  This policy will apply uniformly to all families and owners.

In addition to the information listed above, HACoLA provides owner workshops at least twice a year.  At the workshops, current and prospective owners are given an overview of the program and information about any significant program changes.  There is also ample time for a question and answer session.

**9.9**   **OWNER DISAPPROVAL**
**[24 CFR §982.306(a) - §982.306(c)(4)]**

For purposes of this section, "owner" includes a principal or other interested party.

HACoLA is required to disapprove an owner for the following reasons:

> ➢ HUD has informed HACoLA that the owner has been disbarred, suspended, or subject to a limited denial of participation under 24 CFR Part 24.

> ➢ HUD has informed HACoLA that the federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other federal equal opportunity requirements and such action is pending.

> ➢ HUD has informed HACoLA that a court or administrative agency has determined that the owner violated the Fair Housing Act or other Federal equal opportunity requirements.

HACoLA also maintains the discretion to disapprove an owner for the following reasons:

> ➢ The owner has violated obligations under a housing assistance payments contract under Section 8 of the 1937 Act (42 U.S.C. 1437f).

> ➢ The owner has committed fraud, bribery or any other corrupt act in connection with any Federal housing program.

> ➢ The owner has engaged in drug trafficking.

> ➢ The owner has a history or practice of non-compliance with the HQS for units leased under the tenant-based programs or with applicable housing standards for units leased with project-based Section 8 assistance or leased under any other Federal housing program.

Additionally, in accordance with the policy outlined in Section 9.3.2 (Renting to Relatives), HACoLA will not approve an owner who is the parent, child, grandparent, grandchild, sister or brother of any member of the assisted family.

**9.10    CHANGE IN TOTAL TENANT PAYMENT (TTP) PRIOR TO HAP EFFECTIVE DATE**

When the family reports changes in factors that will affect the Total Tenant Payment (TTP) prior to the effective date of the HAP contract, the information will be verified and the TTP will be recalculated. If the family does not report any change, HACoLA need not obtain new verifications before signing the HAP contract, even if verifications are more than 60 calendar days old.

**9.11    CONTRACT EXECUTION PROCESS
[24 CFR §982.305(c)]**

Provided that the unit passes inspection, HACoLA will prepare the HAP contract for execution. The family and the owner will execute the lease agreement, and the owner and HACoLA will execute the HAP contract. Copies of the documents will be furnished to the parties who signed the respective documents.

HACoLA makes every effort to execute the HAP contract before the commencement of the lease term. The HAP contract may not be executed more than 60 calendar days after commencement of the lease term and no payments will be made until the contract is executed.

The following HACoLA representatives are authorized to execute a contract on behalf of HACoLA: Assisted Housing's Division Director, Assistant Director, Assistant Managers and Housing Supervisors.

Owners must provide the current address of their residence (not a Post Office box). If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification.

**9.11.1    Determining the Contract Effective Date**

The effective date and the amount of the rental payment is communicated in writing to both the owner and family.

If the owner and the family have entered into a lease and provide a copy of the lease with the RTA, the effective date of the contract will be either:

1. The date the unit passed inspection (for families residing in the unit prior to the inspection date), or

2. The date that HACoLA authorized the owner to allow the family to take possession of the unit.

The contract effective date will be based on the later of these two dates. If the owner and the family have not executed a lease prior to the HAP contract negotiation process, then the HAP contract will become effective once the lease has been properly executed by both parties.

Housing Authority of the County of Los Angeles

### 9.11.2 Prorating First Month's Rent

When the effective date of a new contract begins on a day other than the first of the month, HACoLA will determine a prorated contract rent amount. For consistency with rental industry standards, prorated amounts will be calculated by using 30 days to establish a daily rate. Please refer to memo dated 3/3/05.

### 9.11.3 Proof Of Ownership

In addition to the items listed above, HACoLA also requires owners to provide proof of ownership of the assisted unit. Acceptable documents include a recorded grant deed, a property tax bill, property insurance documentation and/or if the property was recently acquired, copies of closing escrow documents.

HACoLA also uses property profile information obtained from a private vendor to confirm ownership.

Generally, HACoLA will only require one form of proof of ownership. However, if ownership is questionable, additional documentation will be requested and must be provided prior to executing a HAP contract. Failure to provide the requested information within a reasonable period of time, generally not more than 30 calendar days, will result in a cancellation of the RTA.

### 9.11.4 Establishing Eligibility To Execute HAP Contract And Related Documents

In cases involving multiple owners, HACoLA will accept the signature of a designee on all contracts and related paperwork if all the legal owners have jointly agreed on the person/persons who may act on their behalf.

To establish signature and/or payment authority, HACoLA requires that all persons who have interest in the property sign a letter of authorization giving one or more parties the right to sign contracts, other program documents and/or receive payments on behalf of the owners.

In cases involving a partnership, HACoLA may request the partnership agreement or incorporation documents to determine who is designated to act on the group's behalf.

HACoLA will not execute a HAP Contract until all the proper authorization, from all the appropriate parties, has been provided. Failure to provide information needed to establish authority to execute the HAP contract within a reasonable time, generally 30 calendar days, may result in a cancellation of the RTA.

Once HACoLA has established proper authorization, the letter of authorization will remain in effect until superceded by another authorization or the HAP contract is terminated. All changes or modification to the instructions provided in the current letter of authorization must be provided in writing.

### 9.11.5 Payment To The Owner
### [24 CFR §982.311(a)]

Once the HAP Contract is executed, HACoLA begins processing payments to the owner. Because HACoLA's sole method of payment to owners is direct deposit, new and existing owners must provide the necessary information for enrollment in HACoLA's direct deposit program. Payments will be made via direct deposit by the first of each month. Owners must notify HACoLA of any missing

payments as soon as possible.  HACoLA will accept report of missing payment both via a telephone call and/or in writing.

**9.12**   **CHANGE IN OWNERSHIP**

A change in ownership does not require execution of a new contract.

HACoLA will process a change of ownership only upon the written request of the previous or new owner and only if accompanied by a copy of the escrow statement or other document showing the transfer of title and the Employee Identification Number or Social Security number of the new owner.

In order to complete a change of ownership, the new owner must complete an Assumptions of Obligations and Benefits contract.  This form obligates the new owner to the HAP contract.  HACoLA will provide this document once a written request for a change is received.

When the assumption contract has been executed, HACoLA will send a copy of it, along with a copy of the original HAP contract and lease, to the new owner.

New owners are subject to HACoLA's owner disapproval policy as outlines in Section 9.9 of this chapter.

Housing Authority of the County of Los Angeles

## CHAPTER 10:
## HOUSING QUALITY STANDARDS AND INSPECTIONS

**10.1   INTRODUCTION**

This chapter describes HACoLA's procedures for implementing Housing Quality Standards (HQS), conducting different inspections, and setting standards for the timeliness of repairs.  It also explains the responsibilities of the owner and family, and the consequences for noncompliance with HQS by the owner and family.

**10.2   TYPES OF INSPECTIONS**
**[24 CFR §982.405]**

HACoLA conducts the following inspections, which will be explained in greater detail throughout the chapter:

❑   **New Contracts Inspection**: A unit must pass this HQS inspection before HACoLA enters into a HAP Contract with the owner.

❑   **Inspections at Other Times as Needed**:

  ➢   Interim Inspection: HQS inspection conducted upon request of the owner, family or agency.

  ➢   Emergency Inspection: HQS inspection conducted for life-threatening violations.

❑   **Annual Inspection**: A unit must pass its annual HQS inspection.

❑   **Quality Control Inspection**: HACoLA is required to conduct supervisor quality control HQS inspections.

❑   **Move-Out Inspection**: For contracts effective before October 2, 1995, HACoLA may conduct a move-out inspection, at an owner's request, if a damage claim is to be submitted (Moderate Rehabilitation Program only).

**10.3   HOUSING QUALITY STANDARDS (HQS)**
**[24 CFR §982.401]**

HQS is the minimum quality standards set forth by HUD for tenant-based programs.  These standards are in place to ensure that assisted housing is decent, safe and sanitary.  All program housing must meet the HQS performance requirements both at commencement of assisted occupancy, and throughout the assisted tenancy.

Efforts will be made at all times to encourage owners to provide housing above the HQS minimum standards.

HQS applies to the building and premises, as well as the unit.  In order for a unit to pass an HQS inspection, the following standards must be met.

**10.3.1** <u>Unit Space and Size</u>
<u>[24 CFR §982.401(d)(2)(i)]</u>

At minimum, a living room, kitchen area, and bathroom must be located in the unit.

**10.3.2** <u>Living Room / Sleeping Room</u>
<u>[24 CFR §982.401(d)(2)(ii)], [24 CFR §982.401(h)(2)(iv)], [24 CFR §982.401(f)]</u>

❑ The dwelling unit must have at least one bedroom or living/sleeping room for each two persons. Children of opposite sex, other than very young children, may not be required to occupy the same bedroom or living/sleeping room.

❑ There must be at least one window in the living room and in each sleeping room. If the window is designed to be openable, the window must open and close properly, and be large enough to provide emergency egress.

❑ The living room and each bedroom must have at least two electrical outlets in proper operating condition. Permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets.

❑ Bedrooms must also have a built-in closet or wardrobe, be located within the unit (e.g., no garages), and be private (have a closing door separating it from the rest of the unit). Bedrooms should also be finished in a quality similar to other bedrooms in the home.

❑ In cases where an owner has modified the rental unit without obtaining the proper city and/or County building permits, HACoLA may rely on the legal property description for the purposes of negotiating the rent and determining how many actual sleeping rooms are in the rental unit.

**10.3.3** <u>Sanitary Facilities (Bathroom)</u>
<u>[24 CFR §982.401(b)], [24 CFR §982.401(h)(2)(iii)], [24 CFR §982.401(f)(2)(ii)]</u>

❑ The bathroom must be located in a separate private room and contain a working flush toilet.

❑ Bathroom areas must have one openable window or other adequate exhaust ventilation.

❑ The unit must have a sink, and shower or tub in proper operating condition, with hot and cold running water.

❑ All walls in a tub or shower area must be covered with ceramic tile or other material that is impervious to water to prevent water damage and deterioration.

❑ Sinks and commode water lines must have shut off valves, unless faucets are wall-mounted. All sinks in the unit must have functioning stoppers.

❑ The bathroom must have a permanent ceiling or wall light fixture in proper operating condition.

❑ All bathrooms in the unit must be in proper operating condition.

Housing Authority of the County of Los Angeles

**10.3.4** **Food Preparation (Kitchen)**
**[24 CFR §982.401(c)], [24 CFR §982.401(f)(2)(ii)]**

❑ The dwelling unit must have suitable space and equipment to store, prepare, and serve foods in a sanitary manner (i.e., kitchen).

❑ The dwelling unit must have an oven, and a stove or range, and a refrigerator of appropriate size for the family. All of the equipment must be in proper operating condition. The equipment may be supplied by either the owner or the family.

❑ If the tenant is providing the stove and/or refrigerator, those appliances do not need to be present during the new contract inspection in order to pass; however, they must be in place and operable when the tenant moves in. If the owner is providing the appliances, they must be in place and operable during the new contract inspection in order to pass.

❑ A microwave oven may be substituted for a tenant-supplied oven and stove or range. A microwave oven may be substituted for an owner-supplied oven and stove or range if the tenant agrees and microwave ovens are furnished instead of an oven and stove or range to both subsidized and unsubsidized tenants in the building or premises.

❑ The kitchen area must have a permanent ceiling or wall light fixture in proper operating condition, and at least one electrical outlet in proper operating condition.

❑ The dwelling unit must have a kitchen sink in proper operating condition, with a sink trap and hot and cold running water. The sink must have a shut off valve, unless faucets are wall-mounted, and must drain into an approvable public or private system. All sinks in the unit must have functioning stoppers.

❑ There must be facilities and services for the sanitary disposal of food waste and refuse, including temporary storage facilities where necessary (e.g., garbage cans).

**10.3.5** **Ceilings, Walls, Floors and Roof**
**[24 CFR §982.401(g)]**

The unit must be structurally sound. The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment.

Ceilings, walls, floors and fences must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage.

❑ Wood floors must be sanded to a smooth surface and sealed. Any loose or warped boards must be re-secured and made level. If the boards cannot be leveled, they must be replaced.

❑ The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation.

❑ In areas where plaster or drywall is sagging, severely cracked, or otherwise damaged, it must be repaired or replaced.

❏ The condition and equipment of interior and exterior stairs, halls, porches, walkways, etc., must not present a danger of tripping and falling. For example, broken or missing steps or loose boards are unacceptable.

❏ The roof must be structurally sound and weather tight.

### 10.3.6 Windows
### [24 CFR §982.401(f)(1)(ii)], [24 CFR §982.401(d)(2(iii)]

All window sashes must be in good condition, solid, intact, and fit properly in the window frame.  Damaged or deteriorated sashes must be replaced.

Windows must be weather-stripped as needed to ensure a weather tight seal.

If window security bars or security screens are present on emergency exit windows, they must be equipped with a quick release system.  The owner is responsible for ensuring that the family is instructed on the use of the system.

Dwelling unit windows that are accessible from the outside, such as basement, first floor, and fire escape windows, must be lockable (such as window units with sash pins or sash locks, and combination windows with latches).

Windows that are nailed shut are acceptable only if these windows are not needed for ventilation or as an alternate exit in case of fire.

### 10.3.7 Doors and Unit Access
### [24 CFR §982.401(d)(2)(iv)], [24 CFR §982.401(k)]

All exterior doors must be solid core and weather tight to avoid any air or water infiltration, have no holes, and have all trim intact.

All interior doors must have no holes, have all trim intact, and be openable without the use of a key.

All exterior doors must have dead bolt locks.

The unit must be able to be used and maintained without unauthorized use of other private properties. The building must provide an alternate means of exit in case of fire (such as fire stairs or egress through windows).

### 10.3.8 Thermal Environment
### [24 CFR §982.401(e)]

There must be a safe system for heating the unit, in proper operating condition. The heating unit must be affixed to the unit and be able to provide adequate heat, either directly or indirectly, to each room.   The dwelling unit must not contain unvented room heaters that burn gas, oil, or kerosene. Electric heaters are acceptable.  Portable heaters are not acceptable.

### 10.3.9 Smoke Detectors
### [24 CFR §982.401(n)]

Each assisted unit must be equipped with at least one properly working battery-operated or hard-wired smoke detector on each level of the unit.

Whenever possible, smoke detectors should be installed in a hallway adjacent to a bedroom.

If an assisted unit is occupied by a household with hearing-impaired persons, a permanently installed smoke detector designed for people with hearing-impairments must be located in each bedroom that is occupied by a hearing-impaired person.

### 10.3.10 Site and Sanitation
### [24 CFR §982.401(l)], [24 CFR §982.401(m)]

The site and neighborhood may not be subject to serious adverse environmental conditions, natural or manmade. These can include dangerous walks or steps; instability; flooding, poor drainage, septic tank back-ups or sewage hazards; mudslides; abnormal air pollution, smoke or dust; excessive noise, vibration or vehicular traffic; excessive accumulations of trash; vermin or rodent infestation; or fire hazards.

The unit and its equipment must be in sanitary condition, and free from vermin and rodent infestation.

### 10.3.11 Additional Housing Quality Standards
### [24 CFR §982.401(a)(4)(ii)(a)]

HACoLA is authorized to enhance HQS, provided that by doing so HACoLA does not overly restrict the number of units available for leasing. The enhancements adopted by HACoLA are meant to ensure that assisted units are safe in relation to other units rented throughout Los Angeles County.

HUD has identified the items listed above. In addition to these items, all assisted units must also be in compliance with the following local building code regulations in order to pass an HQS inspection.

❑ **Double Cylinder Locks**: Under the Building Code Regulations for Los Angeles County, double-keyed deadbolts, or any other lock requiring special knowledge or a tool to open, are prohibited in a residential unit. All doors that provide an exit from the residence must be openable from the inside without the need of a key or any other special knowledge, effort or tool.

❑ **Swimming Pools**: Under the Building Code Regulations for Los Angeles County, all swimming pools must be enclosed by a gate from 48 inches to 60 inches tall. The gate must be self-closing with a self-closing latch and a protected panel must surround the latch. HACoLA will enforce this ordinance in multifamily structures.

❑ **Hot Water Heater**: Hot water heater, TPR and drainpipe 6 inches above the floor must be present. PVC type drainpipes are not acceptable.

❑ **Earthquake Straps for Water Heaters**: Under the Building Code regulations for Los Angeles County, all water heaters must be strapped at 1/3 intervals from the top to the bottom of the heater, for seismic stability.

❑ **Garages**: Garages, whether attached or detached, must be accessible. Garages are not to be used as a living space.

### 10.3.12 Serious Deficiencies

Assisted units must meet all HQS performance requirements in order to pass an inspection. HACoLA has compiled the following list of specific conditions that are

considered serious deficiencies that may cause a unit to fail an inspection. This list assists inspectors in making a determination regarding the condition of an assisted unit; however, deficiencies are not limited to this list:

1. No TPR/Drainpipe on water heater
2. Clogged toilets/sinks/wash basins/bathtubs
3. Torn carpet or linoleum flooring posing a tripping hazard
4. Stretched carpet when a potential hazard exists
5. Broken mirrors, cabinets, etc.
6. Missing smoke detectors
7. Vermin infestation (fleas, roaches, termites, mice, and rats)
8. Double cylinder locks
9. Exterior/common grounds rubbish/debris/overgrown grass/weeds
10. Large holes/cracks/uneven concrete in walkway
11. Building with major peeling of wood trim/paint (directly affecting family's unit)
12. Large porcelain chips or peeling paint in bathtubs/sinks/wash basin exposing black surfaces/rust
13. Burner knobs missing on stove
14. Inoperable stove/refrigerator
15. Bathrooms where no windows are present and exhaust fans are missing/inoperable
16. Flammable products stored near water heaters
17. Signs of leaking/water damage on ceiling/roof
18. Broken windows and larger cracks which pose a potential hazard
19. Algae/debris in swimming pool
20. Loose hand rails/guard rails
21. Missing/cracked switch cover plates
22. Closet doors off track
23. Bedroom window security bar release mechanism is inoperable
24. Inoperable window locks

## 10.4   LEAD-BASED PAINT
### [24 CFR §982.401(j)]

HACoLA's rental assistance programs are subject to the requirements of the Lead-Based Paint Poisoning Prevention Act and the Residential Lead-Based Paint Hazard Reduction Act of 1992. Applicable regulations are detailed in 24 CFR §35.

HACoLA will be responsible for the collection of LBP disclosure information; conducting Visual Assessment inspections; assuring that Clearance

Housing Authority of the County of Los Angeles

Examinations are conducted; collect data regarding Elevated Intervention Blood Lead Level (EIBLL) cases, and informing owners of their responsibilities.

**10.4.1** <u>Disclosure</u>
<u>[24 CFR §35(A)]</u>

Owners of units built before 1978 are required to disclose to lessees all available information about the presence of lead-based paint or lead-based paint hazards and provide any available record or reports pertaining to the presence of lead-based paint or lead-based paint hazards, before the lease is enacted.

Lessees must also receive a copy of the lead hazard information pamphlet, "Protect Your Family From Lead in Your Home."

For all new contracts, HACoLA will require owners to certify on the RTA that they have met all applicable lead-based paint disclosure requirements. If applicable, HACoLA will require owners to submit a copy of the lead-based paint disclosure statement, and any inspection reports.

HACoLA will include a sample lead-based paint disclosure form and a lead hazard information pamphlet in voucher issuance packets for participants. Materials will be made available directly to owners upon request.

For units built before 1978, HACoLA will not approve an owner lease without receiving all applicable lead-based paint disclosure information.

**10.4.2** <u>Lead-Based Paint Visual Assessment</u>
<u>[24 CFR §35(M)]</u>

HACoLA is required to conduct lead-based paint visual assessments for all units built prior to 1978 that house or will house a child or children under 6 years of age, at the time of the new contract inspection and at annual inspections.

HACoLA inspectors conducting lead-based paint visual assessments will be trained according to HUD requirements.

The purpose of the visual assessment is to identify any deteriorated paint. Deteriorated paint is paint that is peeling, chipping, chalking or cracking, or any paint or coating located on an interior or exterior surface or fixture that is otherwise damaged or separated from the substrate. Inspectors will check the condition of painted surfaces. If deteriorated paint exceeds the de minimis thresholds as defined by HUD, the unit will fail the lead-based paint visual assessment. The de minimis thresholds are defined as 20 sq. ft. (2 sq. meters) on exterior surfaces; 2 sq. ft. (0.2 sq. meters) in any one interior room or space; or 10% of the total surface area on an interior or exterior type of component with a small surface area (such as window sills, baseboards, and trim).

**10.4.3** <u>Stabilization and Clearance</u>
<u>[24 CFR §35(M)]</u>

Owners of units that fail the lead-based paint visual assessment will be required to stabilize deteriorated paint in order for the unit to pass.

HACoLA will send a letter to owners of failed units that provides guidance on stabilizing paint and other required activities. Owners will have 30 calendar days from the letter date to complete the following:

❑ **Repair the deteriorated paint**.  Work must be performed by certified lead workers using lead-safe work practices.  HACoLA will provide owners with resources and information on meeting these guidelines.

❑ **Obtain a Clearance Report**.  A contractor certified by the Environmental Protection Agency (EPA) must inspect the unit and prepare a Clearance Report summarizing the work completed and the inspection results.

❑ **Complete HACoLA's Lead-Based Paint Owner Certification form**.  The owner must certify that all applicable requirements have been met.

❑ **Submit Clearance Report and Certification to HACoLA**.  HACoLA will accept paperwork by mail, fax, and hand delivery.

The owner is responsible for informing tenants of all lead hazard reduction work and evaluations, in a manner consistent with HUD regulations.

If the unit has been previously certified free of lead-based paint by a certified inspector, the owner may submit a copy of the inspector's report, along with the certification form, to HACoLA.

HACoLA will review the Clearance Report and certification form for completeness.  The Clearance Report must contain all information required by HUD.  If the Clearance Report passes, the unit will receive a pass on the visual assessment; no further inspection visit is required.

On new contracts inspections, the passing Clearance Report and valid certification form must be received by HACoLA before HACoLA can enter into a HAP Contract with the owner.  If this does not take place within 30 calendar days, HACoLA will cancel the RTA.

For annual inspections, if the owner fails to submit the passing Clearance Report and valid certification form within 30 calendar days, the Housing Assistance Payments (HAP) will be placed on hold (abated) for the unit and the participant will be issued a voucher.  The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated.  See Section 10.11.1 for more information on abatement.

HACoLA's Director of Assisted Housing will review reasonable cause requests for extension.  Extension requests must be submitted in writing within the first 30 calendar days of the failed lead-based paint visual assessment.  An extension shall not extend beyond 90 days after the date of notification to the owner of the results of the visual assessment.  If an extension is approved, the HAP will not be abated during this extension period.  Reasonable cause circumstances include prohibitive weather conditions, financial hardship, and rehabilitation in progress.

### 10.4.4 Children with Environmental Intervention Blood Lead Levels (EIBLL) [24 CFR §35.325]

On a quarterly basis, the Division will send the Los Angeles County Department of Health Services Childhood Lead Poisoning Prevention (CLPP) Program the addresses of assisted families with children under the age of 6.  CLPP Program staff will check the addresses for matches with identified EIBLL cases.  If a match is found, CLPP Program staff will conduct a Risk Assessment of the occupied unit and forward a report to the Division.  A Risk Assessment is a comprehensive evaluation for LBP hazards that goes beyond the Visual Assessment component

Housing Authority of the County of Los Angeles

including paint testing, and dust and soil sampling.  The Risk Assessment Report identifies lead hazards and appropriate lead hazard reduction methods.

A copy of the Risk Assessment Report must immediately be forwarded to the participating owner once received by the Division.  The owner must post a Notice of Lead Hazard Evaluation within 15 calendar days and complete lead hazard reduction and clearance activities as advised in the Report within 30 calendar days.  The Housing Authority is not allowed to assist *any* other participant in the unit until the owner complies with the Report.

If informed about an EIBLL case from a source other than the CLPP Program, the Division must submit the information to the CLPP Program within five calendar days.  The CLPP Program will conduct a Risk Assessment of the occupied unit if required.

**10.5    INSPECTIONS SCHEDULE**

Inspections are conducted on business days between the hours of 7:00 a.m. and 5:00 p.m.  An individual over 18 years of age must be present to allow entry for the inspector.

**10.6    NEW CONTRACT INSPECTIONS
[24 CFR §982.305(B)(2)]**

Under normal circumstances, new contract (initial) inspections are conducted 7 to 10 calendar days following the receipt of a Request for Tenancy Approval.  The new contract inspection is conducted in order to:

1. Determine if the unit, including common areas, meets housing quality standards.

2. Document the current condition of the unit.  This will serve as the basis to evaluate the future condition of the unit, i.e. excessive wear and tear.

**10.6.1  When HQS Deficiencies Must Be Corrected**

If the unit fails the initial inspection, the unit will be scheduled for a follow-up inspection within 10 calendar days.  The owner will be given 30 calendar days to correct the deficiencies.  The owner can request an inspection sooner if repairs have been made prior to the scheduled follow-up inspection date.

If the time period given by HACoLA to correct the deficiencies has lapsed, or the maximum of three failed inspections has occurred, the family must select another unit.

HACoLA will not enter into a HAP Contract with the owner until the unit passes the inspection.  However, the family may already be in the unit when the new contract inspection is conducted.  If the family lives in the unit at the time of the new contract inspection, they are responsible for meeting their HQS obligations.  See Section 10.8 for details of the family's HQS obligations.

**10.7    ANNUAL AND INTERIM INSPECTIONS
         [24 CFR §982.405]**

**10.7.1  Annual Inspections**

In order to assure that units meet housing quality standards throughout the assisted tenancy, HACoLA conducts inspections at least annually.

As stated in the family obligations, the family must allow HACoLA to inspect the unit at reasonable times and after reasonable notice.  HACoLA will notify the family and/or owner of the date and time of the scheduled inspection appointment in writing at least 10 calendar days prior to the inspection.

**Appointments may be rescheduled for emergency situations.**  If the family fails to contact HACoLA to reschedule the inspection, or if the family misses two inspection appointments, HACoLA will consider the family to be in violation of the Certified Statement of Family Obligation agreement and will initiate termination procedures in accordance with HACoLA's policy for proposed termination.

**10.7.2  Interim Inspections**

Interim inspections are conducted at the request of the owner, family, or agency (usually as a result of a violation of HQS or violation of the lease).  Interim inspections may be scheduled and conducted at any time of the year.

**10.8    FAILED INSPECTIONS: DETERMINATION OF RESPONSIBILITY
         [24 CFR §982.404(b)]**

If deficiencies cause an assisted unit to fail an inspection, HACoLA's inspectors will determine who is responsible at the time of inspection.

In accordance with family obligations, the following deficiencies are considered the responsibility of the family:

  ➢ Family-paid utilities not in service;

  ➢ Failure to provide or maintain family-supplied appliances; and

  ➢ Damages to the unit or premises caused by a household member or guest beyond normal wear and tear.

  • "Normal wear and tear" is defined as items that could be charged against the family's security deposit under state law or court practice.

The owner is responsible for all other HQS violations.  In cases such as vermin infestation, where burden of responsibility is not immediately clear, HACoLA's inspector will determine the responsible party.

HQS deficiencies that cause a unit to fail must be corrected by the owner, unless the family is responsible for the deficiencies.

Housing Authority of the County of Los Angeles

**10.9    FAILED INSPECTIONS: WHEN DEFICIENCIES MUST BE CORRECTED [24 CFR §982.404(A)(3)]**

**10.9.1  Emergency Fail Deficiencies**

Items that endanger the family's health or safety are considered emergency fails. These deficiencies must be corrected within 24 hours of inspection or verbal/written notification but no longer than 48 hours total from the time of inspection.

In cases where the owner or responsible party cannot be notified verbally, i.e. weekends, HACoLA will have a written notification mailed the day of the inspection.

The following deficiencies are considered life-threatening, emergency fails, and will cause a unit to be labeled uninhabitable:

> ➢ Gas leaks
> ➢ Major plumbing problems
> ➢ Utilities not in service
> ➢ No running water
> ➢ No functioning toilet
> ➢ Unstable roof/structure

In cases where the unit is deemed uninhabitable, the family will be issued a voucher within 24 hours so that they can make arrangements to secure another residence if necessary.

If an emergency fail deficiency is not corrected in the time period required by HACoLA, and the owner is responsible, the housing assistance payment will be abated immediately and the contract will be terminated.

If repairs are completed and the family wishes to move back into the unit, a new RTA will need to be submitted for that unit and the New Contract Process will need to be completed again.

If the emergency fail deficiency is not corrected in the time period required by HACoLA, and the family is responsible, HACoLA will terminate the family's assistance for violating family obligations (see Chapter 15: Family Obligations), but will not abate the payment to owner for that month.

**10.9.2  Non-Emergency Fail Deficiencies**

Non-emergency deficiencies that cause a unit to fail the inspection must be corrected within a 30 calendar-day cycle. The family and owner will be notified of the failed items in writing. Within the 30 calendar days from the notification letter, the owner and family must make the appropriate corrections and notify HACoLA so that a follow-up inspection can be scheduled.

If the necessary repairs have been completed prior to the next scheduled inspection, the owner or tenant may request an earlier inspection date. Requests for earlier repair dates will be reviewed and accommodated in a case-by-case basis.

For major repairs, the Inspections Housing Unit Supervisor or Housing Supervisor may approve an extension beyond 30 calendar days. However, this extension cannot exceed 60 calendar days.

If the family is not at home for the follow-up inspection appointment, a card will be left at the unit with instructions. A second follow-up inspection will be scheduled automatically and the owner and family will be notified by mail.

If owner-caused deficiencies are not corrected in the time period required by HACoLA, housing assistance payments will be abated and the contract may be terminated. If family-caused deficiencies are not corrected in the time period required by HACoLA, housing assistance may be terminated. See Sections 10.10 and 10.11 for more information.

## 10.10   CONSEQUENCES OF VERIFIED FAMILY-CAUSED DEFICIENCIES [24 CFR §982.552(a)]

The family has a responsibility to maintain the assisted unit in good condition and to notify the owner of needed repairs. If non-emergency violations of HQS are determined to be the responsibility of the family, HACoLA will require the family to make any repair(s) or corrections within the 30 calendar-day cycle. Housing assistance will be terminated if an assisted unit continues to fail housing inspections for family-caused deficiencies or the family fails to keep scheduled appointment(s). See Chapter 15 (Family Obligations) for more information.

Extensions will be granted on a case-by-case basis and must be approved by the Unit Supervisor.

If it has been concluded that all deficiencies are family-caused, the owner's rent will not be abated for such items.

## 10.11   CONSEQUENCES OF VERIFIED OWNER-RELATED DEFICIENCIES [24 CFR §982.404(a), 24 CFR §982.452 and 24 CFR §982.453]

The owner is responsible for maintaining the unit in accordance with HQS. When it has been determined that an assisted unit fails to meet HQS, the owner of that unit is responsible for completing the necessary repair(s) in the time period specified by HACoLA. If the owner fails to correct deficiencies within the specified time period, HACoLA is obligated to withhold (abate) housing assistance payments.

### 10.11.1   Abatement [24 CFR §982.453(b) and 24 CFR §982.404(a)(3)]

Abatement is defined as withholding Housing Assistance Payments (HAP) to the owner for the period of time the unit is out of compliance with HQS requirements.

HAP will be abated if:

1. **The assisted unit fails the first and second housing inspections due to owner-related deficiencies.**

Housing Authority of the County of Los Angeles

If a unit fails the first inspection due to owner-related deficiencies, the notice sent to the owner stating the deficiencies, repairs that need to be made, and the date of the next inspection will also serve as notice that HAP will be abated if the unit fails a second inspection due to owner-related deficiencies.

If, after the 30-day correction period, the unit then fails the second inspection due to owner-related deficiencies, HACoLA will stop payment on the first day of the month following the expiration of the 30-day correction period.

The owner will be notified of the date of a final inspection.  Under normal circumstances, HACoLA will inspect an abated unit 30 calendar days after the abatement notification has been issued.

If the owner makes repairs during the abatement period, HAP payments will resume on the day HACoLA's inspector has verified the corrections and the unit passes inspection.

A 30-day calculation standard will be used to reconcile abatement payments.  Please refer to memo dated 3/3/05.

No retroactive payments will be made to the owner for the period of time the rent was abated and the unit did not comply with HQS.  The notice of abatement states that the family is not responsible for HACoLA's portion of rent that is abated.  However, the family is responsible to pay its portion of the rent while abatement is in effect.

If an assisted unit fails the third and final housing inspection for owner-caused deficiencies, HACoLA will terminate the HAP Contract. HACoLA will notify the owner of the termination in writing 30 calendar days before it becomes effective. Abatement will remain in effect until the effective date of the termination.

HACoLA is prohibited from implementing rent abatement for family-caused deficiencies.  However, abatement will apply if family-caused and owner-related deficiencies exist together.

2. **HACoLA has verified that the assisted unit has emergency fail deficiencies, and the owner did not complete the necessary repairs within the required timeframe.**

3. **A unit built before 1978 that houses or will house a child under 6 years of age fails the lead-based paint visual assessment, and the owner fails to submit a complete, passing clearance report and certification within 30 calendar days.** Owners will receive notice by mail if a unit fails the lead-based paint visual assessment.  They will have 30 calendar days from the date of the notice to perform clearance and submit passing paperwork.  If the owner fails to meet these requirements (see Section 10.4 for more information on lead-based paint), HAP will be abated and HACoLA will stop payment on the first day of the month following. The participant will be issued a voucher. The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated.

Families that reside in units that have been abated will be issued a voucher and will have the option to move even if the assisted unit passes inspection at the third and final inspection (this excludes participants of the Moderate Rehabilitation Program).

**10.11.2   Termination of Contract
[24 CFR §982.453(b)]**

When the HAP Contract has been terminated, the family will be required to move in order to continue receiving rental assistance.

RTA submitted for units that have been terminated due to abatement will be reviewed on a case-by-case basis.  In cases where the RTA is accepted, the family will be brought in for counseling on their situation.

**10.12   QUALITY CONTROL INSPECTIONS
[24 CFR §982.405(B)]**

To ensure efficient program operations, it is essential for management to apply sound quality control practices. The purpose of quality control inspections is to objectively ascertain that each inspector is conducting accurate and complete inspections, and to ensure that there is consistency among inspectors in application of HQS.

Quality control inspections will be performed by a Quality Assurance Representative according to SEMAP Indicator #5 which meets the minimum quality control sample size for the number of units under HAP contract during the last completed HACoLA fiscal year for SEMAP.

Housing Authority of the County of Los Angeles

## CHAPTER 11:
## SETTING PAYMENT STANDARDS AND DETERMINING RENT REASONABLENESS

**11.1** **INTRODUCTION**
**[24 CFR §982.503]**

HACoLA is responsible for ensuring that the rents charged by owners are reasonable based upon objective comparables in the rental market. When HACoLA has determined that the unit meets the minimum HQS, that the lease is approvable, and that the rent is reasonable, it will make timely payments to the owner and notify the owner of the procedures for rent adjustments in the rental assistance programs. This chapter explains HACoLA's procedures for setting and adjusting the payment standards and conducting rent reasonableness surveys.

**11.2** **PAYMENT STANDARDS FOR THE VOUCHER PROGRAM**
**[24 CFR §982.503(b)(1)]**

HUD regulations allow HACoLA to set Payment Standards at a level that is between 90 percent to 110 percent of the Fair Market Rent for Los Angeles County. HACoLA must set the payment standard at a level that is high enough to ensure that families are able to afford quality housing while also balancing the need to provide assistance to as many families on the waiting list as possible.

HACoLA will review the payment standards at least annually to determine whether an adjustment should be made for some or all unit sizes. The following provides a list of the factors that will be used to evaluate the adequacy of the payment standard and/or be used to make a determination to adjust standards, as appropriate.

**11.2.1** **Assisted Families' Rent Burdens**

HACoLA will review reports showing the percent of income used for rent by Voucher families to determine the extent to which the rent burden is more than 50 percent of income.

If more than 40 percent of program families in the overall program, or for a specific unit size, are contributing in excess of 50 percent of their adjusted monthly income towards rent, HACoLA will consider increasing the voucher payment standards. The payment standard will not be raised if:

> ➢ The payment is already at the maximum level HUD will allow (110%).

> ➢ HACoLA would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase.

**11.2.2** **Success Rate of Voucher Holders**

HACoLA will periodically review the success rate of voucher holders. If 25 percent or more of new admissions and/or families wishing to move are unable to use the vouchers due to current rental rates in Los Angeles County, HACoLA will consider increasing the payment standard for particular unit sizes and/or the entire program, as appropriate.

The payment standard will not be increased if:

> ➢ The payment is already at the maximum HUD will allow (110%)
> ➢ HACoLA would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase

### 11.2.3 Rent Reasonableness Database

HACoLA will review the rent information in the rent reasonableness data bank and compare it to the payment standards established for the Housing Choice Voucher Program. If the rent reasonableness review indicated that the payment standards are higher than the average rental unit in Los Angeles County, the payment standard for the specific unit size, or all payment standards, will be lowered to reflect the current market rents.

### 11.2.4 Quality of Units Selected

HACoLA will review the quality of units selected by participant families before determining any change to the Payment Standard to ensure that Payment Standard increases are only made when needed to reach the mid-range of the market.

### 11.2.5 File Documentation

A file will be retained in HACoLA Administrative Support Unit for at least 3 years to document the analysis and findings to justify whether or not the Payment Standard was changed.

### 11.3 RENT REASONABLENESS DETERMINATIONS [24 CFR §982.507]

Rent reasonableness determinations are made when units are placed under HAP contract for the first time and when an owner requests a rent increase.  HACoLA will determine and document on a case-by-case basis that the approved rent [24 CFR §982.507(b) and §982.507 (c)]:

1. Does not exceed rents currently charged on new leases by the same owner for an equivalent assisted or unassisted unit in the same building or complex, and

2. Is reasonable in relation to rents currently charged by other owners for comparable units in the unassisted market.

An average of at least three comparable units will be used for each rent determination. Of these, one may be from the first category, and the remaining two should be from the second category. In cases where three comparable units are not available, due either to the unit's location, age or other special features, two comparables may be used to determine the appropriate rent, one from each category identified above.

All comparables must be based on the rent that the unit would command if leased in the current market. Leased in the current market means that the unit has been leased within the last 12 months.

Housing Authority of the County of Los Angeles

The data for other unassisted units will be gathered from newspapers, realtors, professional associations, inquiries of owners, market surveys, and other available sources.

HACoLA will consider the census tract in which the unit is located to be the market area for the purposes of obtaining rent comparables. If a unit is located in a census tract that is primarily industry, or where no comparable units can be found, HACoLA will seek rent comparables in neighboring census tracts. In such cases, may require an inspector to go out to do a visual check of the two neighborhoods to ensure comparability.

The following items will be used for rent reasonableness documentation:

➢ Number of Bedrooms (see Chapter 10 for definition of bedroom)
➢ Facilities
➢ Location
➢ Quality
➢ Amenities
➢ Date Built
➢ Unit Type

### 11.3.1  Management and Maintenance Services

HACoLA maintains a computer database which includes data on unassisted units for use by staff in making rent reasonableness determinations. The data is updated on an ongoing basis and purged when it is more than 12 months old.

In order for a unit to be considered comparable to another, the units must:

➢ Be located in the same census tract;
➢ Have been built within 10 years of each other;
➢ Have three or more similar services and/or amenities;
➢ Have the same number of bedrooms; and
➢ Be the same unit type. Single-family structures will generally not be compared to multifamily structures. However, HACoLA may make an exception in unique cases where no other selection of rental units exists in the area.

### 11.3.2  Appealing a Rent Reasonableness Determination

If the owner of the property disagrees with the rent reasonable determination, the owner may appeal the decision in writing by submitting an appeal that includes a list of comparable rental units that the owner has found to justify their requested rent amount.

Before using a list of rental units submitted by the owner, HACoLA would confirm that the units are indeed comparable using the criteria outlined above. If the units are not comparable, HACoLA will not use these units in the rent comparability survey and the owner will be notified of the decision.

At the owner's request, HACoLA will release information on the unit addresses used in the rent comparability survey. If the owner finds that the information used by HACoLA is incorrect, HACoLA will re-verify the rental comps used and re-determine the rent comparability for the unit.

### 11.3.3 Rent Increases
### [24 CFR §982.519]

HACoLA will use the same criteria defined above to determine if a request for a rent increase meets the rent comparability requirement. If the new rent is not rent comparable HACoLA will advise both the owner and the family that the increase cannot be approved.  If a partial rent increase can be approved, HACoLA will notify the owner, and process the partial increase upon owner approval.  The approval amount for rent increases is the lesser of reasonable rent, the amount determined by the annual adjustment factor, or the amount requested by the owner.

If the owner disagrees with the determination, s/he may then exercise any of the following options:

> Appeal the rent comparability determination using the steps outlined above.

> Adjust his/her request for a rent increase.

> Serve the family with a proper termination notice.

Housing Authority of the County of Los Angeles

# CHAPTER 12:
# RE-EXAMINATION

## 12.1  INTRODUCTION
## [24 CFR §982.516(a)]

To assure that tenancy is restricted to participants meeting the eligibility requirements for continued occupancy and are charged appropriate rents; the eligibility status of each participant is re-examined on an annual basis per HUD requirements.

At the initial, first interim or annual re-examination on or after June 19, 1995, participants must report and verify their U.S citizenship/eligible immigration status by signing and submitting a declaration of eligibility, verification of consent form (if necessary), and appropriate immigration documentation (resident alien card, naturalization, etc.).

When families move to another dwelling unit, a re-examination is completed and the anniversary date changed.

### 12.1.1  Procedure

To maintain program efficiency and integrity, HACoLA at its own discretion may conduct re-examination interviews by mail or in-person.  HACoLA will attempt to conduct all annual re-examinations interviews through the mail. Annual re-examinations not completed through the mail process will be conducted in person.

## 12.2  RE-EXAMINATION NOTIFICATION TO THE FAMILY

Participating families are advised of the annual re-examination requirement and the importance of reporting income and family composition changes as they occur during the initial re-examination.

### 12.2.1  Persons with Disabilities
### [24 CFR §8.24(a)]

Persons with disabilities who are unable to come in to HACoLA's office will be granted an accommodation of conducting the interview at the person's home or by mail, upon verification (physician or medical documentation) that the accommodation requested meets the need presented by the disability.

### 12.2.2  Requirements to Attend

If it is determined that a participant (family) will need to come to HACoLA's office then all adult household members 18 years and older will be required to attend the re-examination interview.

### 12.2.3  Failure to Respond

If a family fails to complete or return the required re-examination documents within the specified timeframe, HACoLA will schedule the family for a mandatory appointment. The appointment letter will provide the date and time of the appointment and a list of items that family will need to bring.  Additionally, the

appointment letter will service as a proposed termination notice and will contain the date of termination as well as a specified timeframe to request an informal hearing.

If the family fails to attend the appointment or fails to bring all the required information and has not requested an informal hearing, Housing Assistance Payments will be stopped.

If the family is able to provide documentation of an emergency situation that prevented them from completing the required re-examination documents or attending the mandatory appointment, the Unit Supervisor at his/her own discretion may, on a case-by-case basis reschedule the appointment.

### 12.2.4  Documents Required from the Family

The re-examination documents will include instructions and appropriate forms that need to be submitted to complete the re-examination. The required forms and documentation are the following:

1. Documentation of income for all family members;
2. Documentation of assets;
3. Documentation of medical or child care expenses;
4. Certified statement of family obligations; and
5. Consent for Release of Information (signed by all household members over 18 years of age).

Verification of these documents will be conducted in accordance with HACoLA procedures and guidelines described in this plan.

### 12.2.5  Tenant Rent Increases

If the tenant rent increases, a 30-day notice of increase in rent is mailed to the family before the anniversary date.

If less than 30 calendar days are remaining before the anniversary date, the new tenant rent will be effective on the first of the month following the 30-day notice. If HACoLA was unable to process the re-examination on a timely basis due to the family's failure to provide re-examination documents, then the rent increase will be effective retroactive to the appropriate anniversary date.

If the family causes a delay in the re-examination processing, there will be a retroactive increase in rent to the anniversary date.  In this particular case, the owner will receive a retroactive HAP payment and every effort will be made to recover lost rent from the tenant.

### 12.2.6  Tenant Rent Decreases

If the tenant rent decreases, it will be effective on the anniversary date.

If the family causes a delay so the processing of the re-examination is not completed by the anniversary date, the rent change will be effective on the first day of the month following the completion of the re-examination processing.

Housing Authority of the County of Los Angeles

**12.3    INTERIM RE-EXAMINATION**
**[24 CFR §982.516(b)(3)]**

No TTP adjustments will be affected between dates of periodic re-examination or pre-scheduled re-examinations except as noted below:

Tenants are required to submit information affecting eligibility income at all re-examinations. Additionally, tenants are required to report the following changes in family circumstances:

1.  Changes in family composition, including loss or addition of one or more family members through death, divorce, birth, or adoption [24 CFR §982.516(c)], and

2.  Changes in family income including increases and decreases for income received by the family.

A family is required to report these changes to HACoLA within 30 calendar days after the change has occurred.  Once notified, the changes that affect the eligibility income will be verified.

The U.S. citizenship/eligible immigrant status of additional family members must be declared and verified as required at the first interim or regular re-examination after moving into the unit.

**12.3.1  Increases or Decreases in Income**

If the information provided results in a decrease in tenant rent, a modification to the HAP Contract is executed to be effective the first of the month following the month in which the required documentation is supplied by the participant.

Effective January 4, 2005, HACoLA conducts interim re-examinations immediately upon notice of a tenant income increase. (Previously, HACoLA did not conduct an interim for increases and instead waited until the annual.)  If the information provided results in an increase in tenant rent, a modification to the HAP Contract will be executed, and the tenant will be notified in writing at least 30 calendar days in advance of an increase.

**12.4    SPECIAL ADJUSTMENTS**

If, at the time of re-examination, a family is clearly of low-income, and it is not possible to make an estimate of the family's income for the next 12-month period; A special re-examination will be scheduled to accommodate the family's circumstances.  This includes cases where:

1.  A tenant is unemployed and there are no anticipated prospects of employment, or

2.  The conditions of employment and/or receipt of income are too unstable to validate usual and normal standards for determination. An interim re-examination will be scheduled for families with zero or unstable income every 3 months.

Families whose past employment has been sporadic or who are on welfare, become employed, then are unemployed, or are self-employed, will not be given special re-examination.  If such an income pattern has been established and is

expected to continue, then a reasonable 12-month estimate of the income may be based upon past income and present rate of income.

Furthermore, special re-examinations must be clearly set for a definite time to assure compliance.

## 12.5   CHANGES IN FAMILY COMPOSITION
### [24 CFR §982.516(c)]

The family must report all changes in family composition to HACoLA within 30 calendar days of the occurrence.

### 12.5.1 Increases in Family Size
### [24 CFR §982.551(h)(2)]

Increases other than by birth, adoption or court awarded custody must have prior approval of the owner and HACoLA.

If an addition would result in overcrowding in the unit according to HQS maximum occupancy standards HACoLA will issue a larger voucher (if needed under the subsidy standards) for additions to the family in the following cases:

1. Addition of marriage/or marital type relation;
2. Addition of a minor who is member of the nuclear family who had been living elsewhere;
3. Addition of HACoLA-approved live-in attendant; or
4. Addition due to birth, adoption or court awarded custody.

If an approved change requires a larger size unit due to overcrowding, the change in voucher size will be made effective immediately. HACoLA will determine the assistance, based on funding availability.

### 12.5.2 Decreases in Family Size

If a change in family composition results in a decrease of the voucher size, HACoLA may exercise the option to downsize the family's voucher size and require the family to move.

Generally, families will be asked to move if the unit is two bedrooms or larger than the family is eligible to rent. When this is necessary, the family will be granted 120 calendar days to locate another suitable unit. Extensions will be granted in accordance with the policy outlined in Chapter 8 (Voucher Issuance and Briefings).

However, if the families Total Tenant Payment unit does not exceed more than 50 percent of the family's monthly-adjusted income, the family will be allowed to remain in the unit.

## 12.6   CONTINUATION OF ASSISTANCE FOR "MIXED" FAMILIES
### [24 CFR §5.504(b)]

Under the non-citizen rule, "mixed" families are families that include at least one citizen or eligible immigrant and any number of ineligible members.

Housing Authority of the County of Los Angeles

"Mixed" families that were participants on or before June 19, 1995, shall continue full assistance if they meet the following criteria:

1. The head of household or spouse is a U.S. citizen or has eligible immigrant status, **and**

2. All members of the family other than head, spouse, parents of head, parents of spouse, children of head or spouse are citizens or eligible immigrants. The family may change the head of household designation to another adult member of the family to qualify under this provision.

If they do not qualify for continued assistance, the member(s) that cause the family to be ineligible for continued assistance may move, or the family may choose prorated assistance.

## CHAPTER 13:
## ALLOWABLE MOVES/PORTABILITY

**13.1   INTRODUCTION**

This chapter defines the procedures, restrictions and limitations for moving, for new applicants and current participants.

As stated in HUD regulations, eligible families participating in the Housing Choice Voucher Program have the right to receive tenant-based voucher assistance anywhere in the United States, in the jurisdiction of a housing authority administering a Housing Choice Voucher program.   This program feature is called "portability."    This chapter includes HACoLA's procedures for new applicants and current participants that "port out" of HACoLA's jurisdiction.

Additionally, this chapter specifies HACoLA's policies for receiving "incoming ports" from other housing authorities.

The option of portability does not apply to families assisted under the Moderate Rehabilitation Program.

**13.2   ALLOWABLE MOVES AND RESTRICTIONS**

**13.2.1  Restrictions on Moves**

HACoLA may deny families permission to move if:

> ➢  There is insufficient funding for continued assistance;
>
> ➢  The family has violated a family obligation;
>
> ➢  The family is in the initial term of the lease (see 13.2.4 for exceptions); or
>
> ➢  The family owes money to HACoLA or another housing authority.  See Chapter 17, Section 17.2, for more information on allowable moves for families with repayment agreements.

In the event of insufficient funding, HACoLA is approved to deny new and assisted families permission to move if the family chooses to move to a higher cost area.   New or assisted families will not permitted to move to a different housing authority's jurisdiction if the new HAP is higher than the current HAP subsidy for a participant, or the estimated HAP for an applicant, unless the receiving housing authority chooses to absorb the new or assisted family into their Section 8 program.

**13.2.2  Allowable Moves for New Applicants**
**[24 CFR §982.353]**

A family who lives and/or works in HACoLA's jurisdiction at the time they are admitted to the Housing Choice Voucher Program may choose, as their initial housing:

> ➢  To remain in their current unit (this is referred to as leasing-in-place);
>
> ➢  A unit anywhere within HACoLA's jurisdiction; or

> A unit outside of HACoLA's jurisdiction. For more information, see the Outgoing Portability section of this chapter.

A family who does not live or work in HACoLA's jurisdiction at the time they are admitted to the Housing Choice Voucher Program must initially locate a unit within HACoLA's jurisdiction in order to receive assistance. The family does not have any right to portability until they have resided in HACoLA's jurisdiction for at least 12 months [24 CFR §982.353(c)].

> Under limited conditions, HACoLA may waive this requirement. Examples of situations that may warrant an exception to this rule include life-threatening situations or as a reasonable accommodation. However, in all cases both HACoLA and the receiving jurisdiction must agree to allow the move. If the receiving housing authority does not agree, HACoLA will not approve a transfer [24 CFR §982.353(c)(3)].

### 13.2.3 Allowable Moves for Current Participants [24 CFR §982.314]

A family that initially receives assistance for a unit leased in HACoLA's jurisdiction may request to move to another unit and receive continued assistance. Families in good standing may move with continued assistance if:

1. The assisted lease for the old unit has ended because HACoLA has terminated the HAP contract for owner breach [24 CFR §982.314(b)(1)(i)];

2. The lease was terminated by mutual agreement of the owner and the family [24 CFR §982.314(b)(1)(ii)]. HACoLA must receive a copy of this notice;

3. The owner has given the family a notice to vacate for reasons other than a lease violation [24 CFR §982.314(b)(2)]. HACoLA must receive a copy of this notice; or

4. The family has given proper written notice of lease termination after the initial lease term and in accordance with State law. This generally requires a 30-day notice; however, HACoLA recommends that families provide a 60-day notice in order to ensure a smooth transition to the new unit [24 CFR §982.314(b)(3)]. HACoLA must receive a copy of this notice.

A family is considered to be in good standing if they have not violated the terms of the lease, any program regulations and do not owe any money to HACoLA or another housing authority.

Families that are eligible to move with continued assistance may choose to move to a unit that is:

> **Within HACoLA's jurisdiction.** This type of a move is called a "reserve vacate." This means that the family is moving from a unit, which could result in a temporary vacancy in the program until another unit is secured; however, the slot remains reserved for the family until the time they lease another unit.

> **Outside HACoLA's jurisdiction.** See the Outgoing Portability section of this chapter for more information.

**13.2.4**  **Restrictions on Moves During the Initial Lease**
         **[24 CFR §982.314(c) and §982.314(e)]**

Generally, families will not be permitted to move during the initial lease (12 months), or more than once in any 12-month period except as noted below:

1. **Life-Threatening Situations** (witness to or victim of a crime, HQS emergency items, natural disaster, unsafe environment, etc.)

2. **Reasonable Accommodation:** A family may request to move to accommodate a disability.  HACoLA may approve the move as a reasonable accommodation and grant the request to move.  However, the owner of the property must agree to release the tenant from the lease.

3. **Mutual Termination:** The family and the owner agree to mutually terminate the contract. If a family requests to terminate a HAP contract based on a mutual termination more than once in a 12-month period, HACoLA may review the reason for the mutual termination. If the owner is requesting a mutual termination in lieu of enforcing tenant obligations under the lease, and there is evidence that the family has committed violations of the lease, HACoLA may terminate the family for non-compliance with family obligations.

**13.3**   **PROCEDURES FOR MOVES FOR CURRENT PARTICIPANTS**
         **[24 CFR §982.314(d)]**

Eligible families who wish to move must first provide HACoLA and the property owner with proper written notice.  Once HACoLA has received the notice, the family may be required to provide current income information, if income verification is more than 60 calendar days old.  This information is needed in order for the family to be issued a new voucher.

At the same time the voucher is issued, the family will receive a Request for Tenancy Approval (RTA). The family should begin looking for housing immediately in order to ensure a smooth transition to the new unit.

➢ Requests to move for families wishing to port to another jurisdiction must be submitted in writing.

Families in HACoLA's jurisdiction that are unable to locate a new unit by the time they are supposed to vacate the old unit are responsible for contacting the owner and negotiating to stay in the current unit longer.  In order for an extension to be approved by HACoLA, both parties must sign and complete the required contract extension form, indicating the revised effective expiration date, and submit it to HACoLA before the contract is set to expire.   Once the request has been received, HACoLA will release payments to the owner as appropriate.  If the owner does not agree to extend the notice, the family may be required to seek alternative housing, at their own expense, in the interim.

Housing Authority of the County of Los Angeles

**13.4    OUTGOING PORTABILITY PROCEDURES**
**[24 CFR §982.355(c)]**

Both new applicants and current participant families must first identify the new jurisdiction where they will be moving. Once HACoLA has received this information, HACoLA will:

1.  Notify the receiving housing authority that the family wishes to relocate into its jurisdiction [24 CFR §982.355(c)(3)];

2.  Advise the family how to contact and request assistance from the receiving housing authority [24 CFR §982.355(c)(2)]; and

3.  Provide the following documents and information to the receiving housing authority [24 CFR §982.355(c)(4)]:

    •   A copy of the family's voucher, with issue and expiration dates, formally acknowledging the family's ability to move under portability.

    •   The most recent HUD 50058 form and verifications.

    •   The Family Portability form (HUD-52665).

New applicant families will be subject to the income eligibility requirements of the jurisdiction in which they will be <u>receiving</u> assistance [24 CFR §982.353(d)].

**13.4.1  Briefing for Families Wishing to Exercise Portability**

Since families wishing to move to another jurisdiction must understand that the policies and procedures of the receiving housing authority prevail, HACoLA will provide counseling for those families who express an interest in portability. This will include a discussion of difference in payment standards, subsidy standards, and income limits, if applicable.

**13.4.2  Payment to the Receiving Housing Authority**
**[24 CFR §982.355(d) and §982.355(e)]**

If the receiving housing authority chooses to administer and bill assistance on HACoLA's behalf, HACoLA will reimburse the receiving housing authority for costs associated with administering the voucher, as specified in HUD regulations.

The receiving housing authority must submit to HACoLA the initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract.

HACoLA will ensure that the receiving PHA receives all subsequent monthly payments no later than the fifth working day of each month.

**13.5    INCOMING PORTABILITY PROCEDURES**
**[24 CFR §982.355]**

Eligible participants in the Housing Choice Voucher Program in other housing authorities may be assisted in HACoLA's jurisdiction.

For a family to port in to HACoLA's jurisdiction, HACoLA must receive, from the initial housing authority:

> The Family Portability form (HUD-52665) with Part I completed.
> A copy of the family's voucher with a valid expiration date.
> The most recent HUD 50058 form and required income verifications supporting the form.

### 13.5.1 Policies on Absorption and Administration [24 CFR §982.355(d) and §982.355(e)]

For incoming ports, HACoLA may, if funding permits, accept a family with a valid voucher from another jurisdiction and absorb the voucher. HACoLA may also exercise the option to administer the initial housing authority's voucher and bill the initial housing authority as authorized in the regulations.

If HACoLA chooses to administer, it will submit to the initial PHA an initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract to ensure timely receipt of payment.

All subsequent monthly billing payments are to be received by HACoLA no later than the fifth working day of each month.

### 13.5.2 Income and Total Tenant Payment Review [24 CFR §982.355(c)]

HACoLA will conduct an initial review of all incoming port families. HACoLA will:

> Conduct criminal background and registered sex offender registration checks of family members, as authorized by 24 CFR §982.355(c)(9) and 24 CFR §982.355(c)(10) (refer to Chapter 2 for additional information).
> Verify identifying documents, family income and composition.
> As necessary, HACoLA will change the bedroom size of a family's voucher to comply with HACoLA's subsidy standards. If this occurs, the family will be notified in writing of the change.
> If family income documents are missing or there has been a change in the family's circumstances, HACoLA may re-determine the family's TTP.
> For incoming port families who have not yet leased a unit under the Housing Choice Voucher Program (initial applicants), HACoLA must verify that the family meets HACoLA's income limits.

If a re-determination is necessary, HACoLA will not delay issuing the family a voucher or otherwise delay approval of a unit unless the re-determination reveals that the family is not eligible for assistance in HACoLA's jurisdiction. In such cases, the family will be referred to the initial housing authority for further assistance [24 CFR §982.355(c)(4)].

In general, all families porting into HACoLA's jurisdiction will be issued a HACoLA voucher. The term of the voucher may not expire before the expiration date noted on the voucher issued by the initial housing authority. HACoLA will determine whether to extend the voucher term, if necessary, based on HACoLA's policy for extension. HACoLA will notify the initial housing authority if such an extension is granted [24 CFR §982.355(c)(6)].

Housing Authority of the County of Los Angeles

If a family that has ported into HACoLA's jurisdiction is unable to locate a unit within the allotted time authorized on the voucher, HACoLA will notify the issuing housing authority that the voucher did not result in a HAP contract.

Approval of any unit is subject to rent reasonableness and a passed inspection [24 CFR §982.401(a)(3)].

### 13.5.3  Terminations

In cases where HACoLA is administering a contract on behalf of another housing authority, HACoLA will notify the initial housing authority in writing of any termination of assistance within 30 calendar days of the termination.

### 13.5.4  Informal Hearings/Reviews
### [24 CFR §982.555]

If an informal hearing is required and requested by the family, HACoLA will conduct the hearing only if the participant has been assisted within HACoLA's jurisdiction.   Such hearings will be conducted using the regular hearing procedures included in this plan.   Families who have not yet received assistance in HACoLA's jurisdiction are eligible for informal reviews, as detailed elsewhere in this administrative plan.

The initial housing authority will be responsible for collecting amounts owed to that housing authority by the family for claims paid and for monitoring repayment. If the initial housing authority notifies HACoLA that the family is in arrears or the family has refused to sign a Repayment Agreement, HACoLA will terminate assistance to the family.

## CHAPTER 14:
## CONTRACT TERMINATIONS

### 14.1   INTRODUCTION

The chapter identifies the key documents/contracts that set forth the responsibilities of each party involved in the rental assistance relationship and outlines the policies and procedures under which these contracts can be terminated.

### 14.2   DESCRIPTION OF DOCUMENTS

There are three parties involved in the rental relationship: the assisted family, the owner and HACoLA.

The rights and responsibilities of the assisted family are defined in the voucher or certificate and the Certified Statement of Family Obligations. A copy of the voucher or certificate is provided to the family at admission and each time a new voucher or certificate is issued. The family signs the Certified Statement of Family Obligations annually.

The relationship between the family and the owner is outlined in the rental lease. Generally, the term of the lease is for one year and then turns into a month-to-month tenancy. Although HACoLA is not a part of the lease, HUD regulations allow housing authorities to act against the family for serious or repeated violations of the lease.

The terms of the relationship between the owner and HACoLA are outlined in the Housing Assistance Payments (HAP) Contract. The term of the HAP contract is the same as the term of the lease.

### 14.3   TERMINATION OF THE LEASE BY THE FAMILY: MOVES
### [24 CFR §982.309(c)]

For continued tenant assistance, the family cannot terminate the lease until after the initial term of the lease except for material breach of the lease by the owner. The lease determines the notice period for termination to the owner. Most leases require, at minimum, a 30-day notification. However, HACoLA recommends that families provide a minimum of a 60-day notice in order to allow enough time for a smooth transition of assistance from the old unit to the new unit. To initiate the lease termination, the family must send a written notice to the owner and HACoLA no less than 30 calendar days before the vacate date.

### 14.4   TERMINATION OF THE LEASE BY THE OWNER

#### 14.4.1   Terminating the Lease During the Initial Term of the Lease
#### [24 CFR §982.310(a)]

During the term of the lease, the owner may not terminate the tenancy except for good cause which includes serious or repeated violations of the lease and/or violations of federal, state or local law that imposes obligations on the family in connection with the use of the unit.

Housing Authority of the County of Los Angeles

Under such conditions, the owner must provide both the family and HACoLA with a copy of any notice to move or eviction action. An eviction action is defined as a notice to vacate, or a complaint, or other initial pleading used under State or local law to commence an eviction action. Any eviction notice served to a family must specify the grounds for the termination of the tenancy.

An owner may commence termination of a tenancy for good cause by serving a legal notice of termination on the family for the following reasons:

1. Serious or repeated violation of the terms and conditions of the lease [24 CFR §982.310(a)(1)];

2. Violation of Federal, State or local law that imposes obligations on the tenant in connection with the occupancy or use of the premises [24 CFR §982.310(a)(2)]; and

3. Other good cause, [24 CFR §982.310(a)(3)] including:

   - Criminal activity by the tenant, any member of the household, a guest or another person under the tenant's control that threatens the health, safety or right to peaceful enjoyment of the premises by the other residents, or persons residing in the immediate vicinity of the premises [24 CFR §982.310(d)];

   - Any drug-related criminal activity on or near the premises; or

   - Tenant disturbance of neighbors, destruction of property, or behavior resulting in damage to the premises.

### 14.4.2 Terminating the Lease After the Initial Term of the Lease

After the initial term of the lease, the owner may terminate the lease for other good cause. Examples of other good cause include:

➤ Business or economic reason for regaining possession of the unit;

➤ Owner's desire to repossess the unit for personal or family use or for a purpose other than residential property;

When terminating the lease for business or economic reasons, the owner is required to provide a 90-day notice to both the family and HACoLA.

### 14.4.3 Requests for Criminal Records by Project-Based Section 8 Owners [24 CFR §5.903(d)]

Project-based Section 8 owners (excludes housing choice voucher owners), that have contracts with HACoLA, may request that HACoLA obtain criminal records, on their behalf, for the purpose of eviction or lease enforcement. HACoLA will, however, charge a fee in order to cover costs associated with the review of criminal records.

Project-based owners must submit the following items in order for HACoLA to process criminal records.  Owner requests must include:

1. A copy of a signed consent form from each adult household members, age 18 years and older.  Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social

Security number. This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2. An owner's criteria or standards for evicting drug criminals in accordance with HUD regulations (§ 5.857 of 24 CFR Parts 5 et al.); or criteria for evicting other criminals (§ 5.858 of 24 CFR Parts 5 et al.); or criteria for lease enforcement.

Once HACoLA obtains the criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used as a basis for eviction or lease enforcement. HACoLA will base its determination in accordance with HUD regulations and the owner criteria.

It is important to note that HACoLA will not disclose the participant's criminal conviction record nor the content of that record to the owner unless the owner is proceeding with a judicial eviction process. In the case of a judicial eviction, the owner must provide HACoLA with a certification that the criminal records are necessary to proceed with the eviction.

## 14.5   MUTUAL TERMINATION OF THE LEASE

In cases where the owner and the family agree to terminate the lease, both parties have an obligation to notify HACoLA in writing at least 30 calendar days in advance of the vacate date in order that HACoLA may avoid overpayment to the owner. If the family has properly notified HACoLA and is in good standing, they will be scheduled for an issuance session where they will receive a voucher and all the necessary documents to search for a new unit.

## 14.6   TERMINATION OF THE HAP CONTRACT BY HACOLA
## [24 CFR §982.453]

HACoLA will terminate the HAP contract as follows:

1. When HACoLA terminates program assistance for the family.

2. When the owner has breached the HAP contract.  Any of the following actions will be considered a breach of the HAP contract by the owner:

   ➢ The owner has violated any obligation under the HAP contract for the dwelling unit, including the owner's obligation to maintain the unit according to housing quality standards, including any standards HACoLA has adopted in this policy [24 CFR §982.453(a)(1)].

   ➢ The owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.453(a)(2)].

   ➢ The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program [24 CFR §982.453(a)(3)].

   ➢ The owner has failed to comply with regulations, the mortgage or note, or the regulatory agreement for projects with mortgages insured by HUD or loans made by HUD [24 CFR §982.453(a)(4)].

   ➢ The owner has engaged in drug trafficking [24 CFR §982.453(a)(5)].

Housing Authority of the County of Los Angeles

3. If the family is required to move from a unit which is overcrowded based on HACoLA's current subsidy standards [24 CFR §982.403(a)].

HACoLA may also terminate the HAP contract if funding is no longer available under the ACC [24 CFR §982.454].

## 14.7  HAP PAYMENTS AND CONTRACT TERMINATIONS [24 CFR §982.311]

When a HAP contract terminates, HACoLA will make payments in accordance with the HAP contract and depending on the reason for the contract termination.

In cases involving a tenant notice to move or a mutual termination, not involving an eviction action, HACoLA will pay the owner for the entire last month that the family was in the unit regardless of the actual day of the month that the family moved out. HACoLA may also pay a HAP on behalf of the family for the new unit in the same month. However, while HACoLA can pay a subsidy for two units in a given month under these conditions, the family may only have physical possession of one unit at a time. A family will be considered to have physical possession of a unit if they still have belongings in the unit and the key to the unit.  Under such cases, the family will be required to pay the full rent for one of the units in its possession and the family's portion for the other unit [24 CFR §982.311(d)].

In cases involving evictions, HACoLA will continue to pay the HAP until the day the family moves out or is evicted [24 CFR §982.311(b)].

In cases involving termination of assistance, HACoLA will provide the owner and the family of the proposed termination date. If the family does not request a hearing or the hearing is decided in HACoLA's favor, the HAP payments will terminate in accordance with the notification. If a family continues to occupy the unit after assistance is terminated, the family is responsible for the total amount of rent due to the owner.

If HAP payments are released to the owner for periods of time beyond the dates set forth above, the owner will be required to return all monies to HACoLA within 30 calendar days or within the time specified in any approved repayment agreement. HACoLA also reserves the right to deduct any monies from other HAP payments being made to the owner by HACoLA. If the owner fails to repay the HAP, the account will be forwarded for further action.

## CHAPTER 15:
## FAMILY OBLIGATIONS

**15.1**  **INTRODUCTION**
        **[24 CFR §982.552(a)]**

HACOLA may terminate assistance for a family because of the family's action or failure to act. HACoLA will provide families with a written description of the family obligations under the program, the grounds under which HACoLA can terminate assistance, and HACoLA's informal hearing procedures. This chapter describes when HACoLA is required to terminate assistance, and HACoLA's policies for the termination of assistance.

**15.2**  **GROUNDS FOR DENIAL/TERMINATION**
        **[24 CFR §982.552(c)(2)(ii)]**

If termination is based upon behavior resulting from a disability, HACoLA will delay the termination in order to determine if there is a reasonable accommodation, pursuant to law, that would cure the grounds for the termination.

**15.2.1**  **Form of Termination**

Termination of assistance for a participant may include any or all of the following [24 CFR §982.552(a)(3)]:

1.  Refusal to enter into a HAP contract or approve a lease

2.  Termination of HAP under an outstanding HAP contract

3.  Refusal to process or provide assistance under portability procedures

**15.2.2**  **Mandatory Termination**

HACoLA must terminate assistance for participants under the following conditions:

1.  If any member of the family fails to sign and submit to HUD or HACoLA required consent forms for obtaining information [24 CFR §982.552(b)(3)].

2.  If no member of the family is an U.S. citizen or eligible immigrant [24 CFR §982.552(b)(4)].

3.  If 180 calendar days have elapsed since HACoLA's last housing assistance payment was made.

**15.2.3**  **Grounds for Termination of Assistance**
        **[24 CFR §982.552(c)(1)]**

HACoLA may at any time terminate program assistance to a participant, for any of the following reasons:

1.  The family violates any family obligation under the program as listed in 24 CFR 982.551 [24 CFR §982.552(c)(1)(i)].

2.  Any member of the family has ever engaged in serious lease violations while a resident of federally assisted housing or within the past five years

Housing Authority of the County of Los Angeles

has been evicted from a federally assisted housing program [24 CFR §982.552(c)(1)(ii)].

3. Any family member engages in drug-related or violent criminal activity [24 CFR §982.553(a) and §982.551(k)-(l)].

4. The family currently owes rent or other amounts to HACoLA or to another housing agency in connection with Section 8 or public housing assistance under the 1937 Act [24 CFR §982.552(c)(1)(v)].

5. The family has not reimbursed HACoLA or any housing agency for amounts paid under a HAP contract to an owner for rent, damages to the unit, or other amounts owed by the family under the lease [24 CFR §982.552(c)(1)(vi)].

6. The family breaches an agreement with any housing agency to pay amounts owed to any housing agency, or amounts paid to an owner by any housing agency [24 CFR §982.552(c)(1)(vii)].

7. A family participating in the family self-sufficiency (FSS) program fails to comply, without good cause, with the family's FSS contract of participation (COP) [24 CFR §982.552(c)(1)(viii)].

8. The family has engaged in or threatened abusive or violent behavior toward HACoLA personnel [24 CFR §982.552(c)(1)(ix)].

   - "Abusive or violent behavior" includes verbal as well as physical abuse or violence. Use of expletives that are generally considered insulting, racial epithets, or other language, written or oral, that is customarily used to insult or intimidate, may be cause for termination.

   - "Threatening" refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

   - Actual physical abuse or violence will always be cause for termination.

### 15.2.4  Welfare to Work Program
### [24 CFR §982.552(c)(1)(x)]

Failure to fulfill the obligations and conditions of the Welfare to Work program is grounds for termination of assistance.

Specifically, HACoLA will terminate assistance for Welfare-to-Work families if the family fails to comply with GAIN requirements, the FSS Contract of Participation (CoP) and/or other required Family Self-Sufficiency requirements without good cause.

### 15.2.5  Registered Sex Offenders

If it is brought to the attention of the Housing Authority that a current program participant is on the sex offender registration list, HACoLA will review on a case-by-case basis.  HACoLA will consult with law enforcement and legal counsel and take appropriate actions based on findings.

15.3   **FAMILY OBLIGATIONS**
       **[24 CFR §982.551]**

1.  The family must supply any information that HACoLA or HUD determines
    is necessary in the administration of the program [24 CFR §982.551(b)].
    Information includes any requested certification, release or other
    documentation.  Requirements include:

    • Submission of required evidence of citizenship or eligible immigration
      status (as provided by 24 CFR part 5);

    • Disclosure and verification of social security numbers (as provided by
      24 CFR part 5);

    • Providing any information requested by HACoLA or HUD for use in a
      regularly scheduled or interim determination of family income and
      composition, including income, assets, and accurate family
      composition.

2.  The family must report all changes in family income and composition in
    writing immediately as they occur.  The owner of the unit and HACoLA
    must approve changes in composition of the assisted family [24 CFR
    §982.551(b) and §982.551(h)(2)].  The family must:

    • Report the birth, adoption or court-awarded custody of a child;

    • Request HACoLA approval to add any other family member;

    • Notify HACoLA when a family member no longer lives in the unit.

    If HACoLA gives approval, a live-in attendant or a foster child may live in
    the unit.  Failure to report changes, making false reports and/or allowing
    unauthorized people in the unit is cause for termination from the program.

3.  All information supplied by the family must be true and complete [24 CFR
    §982.551(b)].

4.  Maintain the rental unit [24 CFR §982.551(c)].  The family is responsible
    for any violation of Housing Quality Standards resulting from:

    • Failure to pay for tenant-paid utilities;

    • Failure to furnish required stove and or refrigerator if to be provided by
      family; or

    • Damage to the unit or grounds by the family or its guests beyond
      normal wear and tear.

5.  The family must allow HACoLA to inspect the unit at reasonable times
    and after reasonable notice [24 CFR §982.551(d)].

6.  The family may not commit any serious or repeated violation of the lease
    [24 CFR §982.551(e)].

7.  The family must notify the owner and, at the same time, notify HACoLA
    before the family moves out of the unit or terminates the lease on notice
    to the owner.  The family must promptly give HACoLA a copy of any
    owner eviction notice [24 CFR §982.551(f) – (g)].

8. The family must use the assisted unit for residence by the family. The unit must be the family's only residence. The family must not sublease or let the unit [24 CFR §982.551(h)(1), (6)].

9. The family must not assign the lease or transfer the unit. In cases where there is a change in the head of household, the lease may be transferred to the new Head but only with the consent of the owner of the property and HACoLA [24 CFR §982.551(h)(7)].

10. Members of the household may engage in legal profit-making activities in the unit, but only if such activities are incidental to primary use of the unit as a residence by members of the family [24 CFR §982.551(h)(5)].

11. The family must supply any information or certification requested by HACoLA to verify that the family is living in the unit, or relating to family absence from the unit, including any HA-requested information or certification on the purposes of family absences. The family must cooperate with HACoLA for this purpose. The family must promptly notify HACoLA of absence from the unit [24 CFR §982.551(i)].

12. The family must not own or have any interest in the unit [24 CFR §982.551(j)].

13. The members of the family must not commit fraud, bribery or any other corrupt or criminal act in connection with the programs [24 CFR §982.551(k)].

14. The members of the family may not engage in drug-related criminal activity or violent criminal activity.

15. An assisted family, or members of the family, may not receive Section 8 tenant-based assistance while receiving another housing subsidy, for the same unit or for a different unit, under any duplicative (as determined by HUD or in accordance with HUD requirements) federal, State or local housing assistance program [24 CFR §982.551(l)].

16. The family must pay only the amount authorized by HACoLA on the approved lease. Any amount paid by the family other than the authorized amount is considered an illegal side payment and is cause for termination of the housing assistance subsidy. HACoLA may authorize additional payments for other amenities [24 CFR §982.451(b)(4)(ii)].

### 15.3.1 Housing Authority Discretion
### [24 CFR §982.552(c)(2)]

In deciding whether to terminate assistance because of action or failure to act by members of the family, HACoLA has discretion to consider all of the circumstances in each case, including:

➢ The seriousness of the case,

➢ The extent of participation or culpability of individual family members, and

➢ The length of time since the violation occurred and more recent record of compliance, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure to act.

HACoLA may impose, as a condition of continued assistance for other family members, a requirement that family members who participated in or were culpable for the action or failure will not reside and/or visit in the unit. HACoLA may permit the other members of a family to continue in the program.

**15.3.2** **Enforcing Family Obligations**

**Explanations and Terms**

❑ **HQS Breach**: The inspector will determine if an HQS breach as identified in 24 CFR §982.404(b) is the responsibility of the family. Families may be given extensions to correct HQS breaches as explained in Chapter 10.

❑ **Lease Violations**: The following criteria will be used to decide if a serious or repeated violation of the lease will cause a termination of assistance [24 CFR §982.310]:

- If the owner terminates tenancy through court action for serious or repeated violation of the lease.

- If the owner notifies the family of intention to terminate tenancy for serious or repeated lease violations, and the family moves from the unit prior to the completion of court action, and HACoLA determines that the cause is a serious or repeated violation of the lease based on available evidence.

- If there are police reports, neighborhood complaints or other third party information, and HACoLA has verified the information. Lack of receipts or other proof of rent payments by the family may also be considered verification of lease violations.

❑ **Family Member Moves Out**: Families are required to notify HACoLA within 30 calendar days if any family member leaves the assisted household [24 CFR §982.551(h)(3)]. When the family notifies HACoLA, they must furnish the following information:

- The date the family member moved out.

- The new address, if known, of the family member.

- A statement as to whether the family member is temporarily or permanently absent.

- Related income, asset or deduction changes resulting from the member moving.

❑ **Limitation on Profit-making Activity in Unit [24 CFR §982.551(h)(5)]**: If the business activity area results in the inability of the family to use any of the critical living areas, such as a bedroom utilized for a business which is not available for sleeping, it will be considered a violation.

If HACoLA determines that the use of the unit as a business is not incidental to its use as a dwelling unit, it will be considered a violation of family obligations.

❑ **Interest in Unit [24 CFR §982.551(j)]**: The owner may not reside in the assisted unit, under any circumstances, including as a live-in aide, regardless of whether the owner is a member of the assisted family, unless assistance is

Housing Authority of the County of Los Angeles

being provided for a mobile home and the family owns the mobile home and rents the pad under the Certificate or Housing Choice Voucher Program.

❑ **Fraud [24 CFR §982.551(k)]**: In each case, HACoLA will consider which family members were involved, the circumstances, and any hardship that might be caused to innocent members.

### 15.3.3  Drug Related Criminal Activity
### [24 CFR §982.553(a) and (b)(1) and (2)]

Drug-related criminal activity refers to the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell, distribute or use a controlled substance [24 CFR §5.100].

Drug-related criminal activity does not include the prior use or possession of a controlled substance if the family member had an addiction to the substance and has recovered, or is recovering from the addiction and does not currently use or possess the substance and has demonstrated successful completion of a rehabilitation program [24 CFR §982.553(b)].

➢ HACoLA may propose termination against the family for drug-related criminal activity within 1000 feet of the assisted unit. An arrest or conviction is not required to deny or terminate assistance.

➢ Participants may be terminated if they have been arrested, convicted or whose tenancy is being terminated due to drug-related criminal activity or whose activities have created a disturbance in the building or neighborhood.

➢ If the family violates the lease for drug-related criminal activity, HACoLA will terminate assistance.

In appropriate cases, HACoLA may permit the family to continue receiving assistance provided that family members determined to have engaged in the prescribed activities will not reside and/or visit in the unit. If the violating member is a minor, HACoLA may consider individual circumstances with the advice of Juvenile Court officials.

### 15.3.4  Violent Criminal Activity
### [24 CFR §982.553(a) and (b)(1) and (2)]

Violent criminal activity includes any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force against a person or property, and the activity is being engaged in by any family member. Violent criminal activity also includes activity which occurs within the family, such as during domestic disputes.

➢ Participants may be terminated if they have been arrested, convicted or whose tenancy is being terminated due to violent criminal activity or whose activities have created a disturbance in the building or neighborhood.

➢ If the family violates the lease for violent criminal activity, HACoLA will terminate assistance.

In appropriate cases, HACoLA may permit the family to continue receiving assistance provided that family members determined to have engaged in the prescribed activities will not reside and/or visit in the unit. If the violating member is a minor, HACoLA may consider individual circumstances with the advice of Juvenile Court officials.

### 15.3.5 Required Evidence
### [24 CFR §982.553(c)]

In determining whether to terminate assistance based on criminal activity, HACoLA may terminate assistance if the preponderance of evidence indicates that a family member has engaged in such activity, regardless of whether the family member has been arrested or convicted.

HACoLA may consider arrests, convictions, no contest pleas, fines, city ordinance violations or other credible preponderance of evidence in determining if a violation has occurred.

**Preponderance of evidence**: evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. The intent is not to prove criminal liability, but to establish that the act(s) occurred. Preponderance of evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

### 15.3.6 Confidentiality of Criminal Records
### [24 CFR §5.903(g)]

Criminal records received by HACoLA shall be maintained confidential, not misused, nor improperly disseminated and kept locked during non-business hours. Also, all criminal records will be destroyed no later than 30 calendar days after a final determination is made.

### 15.3.7 Disclosure of Criminal Records to Family
### [24 CFR §5.903(f) and §982.553(d)]

The applicant or household member requesting to be added to the lease will be provided with a copy of the criminal record upon request and an opportunity to dispute the record. Applicants will be provided with the opportunity to dispute the record at an informal review. Participants may contest such records at an informal hearing.

### 15.4   NOTICE OF TERMINATION OF ASSISTANCE

In any instance where HACoLA decides to terminate assistance to the family, HACoLA must give the family a written notice that includes:

1. The reason(s) for the proposed termination;

2. The effective date of the proposed termination;

3. Information regarding the family's right to request an Informal Hearing to be held before termination of assistance; and

Housing Authority of the County of Los Angeles

4.  The date by which a request for an informal hearing must be received by HACoLA.

A final notice of determination and date of termination will then be sent to the participant if no hearing is requested within the allowable time or if the Informal Hearing confirms the termination.

HACoLA will simultaneously provide written notice of the contract termination to the owner so that it will coincide with the termination of assistance. The notice to the owner will not include any details regarding the reason for termination of assistance.

**15.5   PROCEDURES FOR NON-CITIZENS
[24 CFR §982.552(b)(4) and 24 CFR §5.514]**

HACoLA is required to terminate assistance for participant families in which no members are U.S. citizens or eligible immigrants.  If a family member does not establish citizenship or eligible immigration status as required, HACoLA will prorate the assistance, or if there are no eligible family members remaining, HACoLA will propose program termination and provide the opportunity for an informal hearing, as explained in Chapter 16.

**15.5.1  False or Incomplete Information (No Eligible Members)**

Families are required to submit evidence and sign declarations of their citizenship or eligible immigration status.   If HACoLA obtains substantive documentation (such as a permanent resident card or information from another agency) that contradicts a family member's declaration of citizenship, an investigation will be conducted and the individual given an opportunity to present relevant information.

➢  If the family (or any member) claimed eligible immigrant status and the INS primary and secondary verifications failed to document the status, the family may make an appeal to the INS and request a hearing with HACoLA either after the INS appeal or in lieu of the INS appeal.

➢  If the family member is unable to verify their citizenship, HACoLA may give the individual an opportunity to provide a new declaration as an eligible immigrant or to elect not to contend their status. HACoLA will then verify eligible status, and terminate, or prorate as applicable.

➢  Assistance may not be terminated while verification of the participant family's eligible immigration status is pending.

After HACoLA has made a determination of ineligibility, the family will be notified of the determination and the reasons, and informed of the option for prorated assistance (if applicable) or the proposed termination.

HACoLA will terminate assistance for misrepresentations or submission of false information.

**15.6**   **$0 ASSISTANCE TENANTS (END OF PARTICIPATION)**
**[24 CFR §982.455]**

HACoLA is required to automatically terminate the HAP contract 180 calendar days after the last housing assistance payment is made to the owner. A family receiving no ($0) assistance may remain in the unit for up to 180 calendar days after the last HAP payment. If the family is still in the unit after 180 calendar days, assistance is terminated. If within the 180-day period, an owner rent increase or a decrease in the TTP causes the family to be eligible for a housing assistance payment, HACoLA will resume assistance payments for the family.

In order for a family to move to another unit during the 180 calendar days, the rent for the new unit would have to be high enough to necessitate a housing assistance payment.

**15.7**   **OPTION NOT TO TERMINATE FOR MISREPRESENTATION OF INCOME**

If the family has misrepresented any facts that caused HACoLA to overpay assistance, HACoLA may choose not to terminate and may offer to continue assistance provided that the family agrees to pay HACoLA the amount owed and either pays HACoLA in full or executes a Repayment Agreement and makes payments in accordance with the agreement.

**15.8**   **MISREPRESENTATION IN COLLUSION WITH OWNER**

If the family willingly and knowingly commits fraud or is involved in any other illegal scheme with the owner, HACoLA will deny or terminate assistance.

**15.9**   **MISSED APPOINTMENTS AND DEADLINES**
**[24 CFR §982.551]**

It is a family obligation to supply information, documentation, and certifications as needed for HACoLA to complete required processes. HACoLA schedules appointments and sets deadlines in order to obtain the required information. Failure to supply requested information can result in termination of assistance. Examples of failing to supply requested information can include: failing to sign necessary documents, failing to return documents or returning incomplete or altered documents, failing to complete all information requested on documents, etc.

The obligations also require that the family keep all appointments and allow HACoLA to inspect the assisted unit. All scheduled inspections are considered "appointments."

The family will receive information about the requirement to keep appointments, and the number of times that appointments are rescheduled as specified below. Appointments are scheduled and time requirements imposed for the following events and circumstances:

1.   Eligibility for Admissions;

2.   Verification Procedures;

Housing Authority of the County of Los Angeles

    3.  Voucher Issuance and Briefings;

    4.  HQS Inspections;

    5.  Re-examinations; and

    6.  Appeals (Informal Hearing/Reviews).

Examples of good cause for missing appointments or failing to provide information by deadlines are medical and/or family emergencies. In such cases, the family may be requested to provide verification of such circumstances.

An applicant or participant who fails to keep appointments, or to supply information required by a deadline without notifying HACoLA may be sent a notice of termination of assistance for failure to comply with program regulations.

The family may be granted up to two opportunities before they receive a notice of denial or termination for breach of a family obligation. After issuance of the denial or termination notice, if the family offers to correct the breach within the time allowed to request a review or hearing, the notice may be rescinded after the family corrects the breach, if the family does not have a history of non-compliance. For families with a history of non-compliance, HACoLA may elect to hold the review or hearing.

## CHAPTER 16:
## INFORMAL HEARINGS AND COMPLAINTS

### 16.1   INTRODUCTION

This chapter will cover HACoLA's policy and procedures for informal reviews and informal hearings.  This chapter defines HACoLA's responsibilities to applicants and participants.

### 16.2   APPLICANTS – PREFERENCE DENIALS
### [24 CFR §982.554]

If HACoLA determines that an applicant is not eligible for a preference, the applicant will be informed of the decision in writing.  Although such a determination does not render the applicant ineligible to receive assistance, the applicant's file is considered low priority.

If the applicant disagrees with the decision, the applicant must in writing request to review the decision to the Applications and Eligibility Unit Supervisor within 10 calendar days of the date of the notification. The request should also provide all information and documents supporting the applicant's request. The supervisor will review the file and determine if the decision was proper or if new information provided by the family warrants a change in the original determination.  The Unit Supervisor will notify the applicant of their decision.

If the determination was properly made, the applicant's file will remain low priority until the family notifies HACoLA of a change in circumstance that qualifies the family for a preference.

### 16.3   INFORMAL REVIEW PROCEDURES FOR APPLICANTS
### [24 CFR §982.554(a)]

Under certain circumstances, HACoLA offers informal reviews for applicants. Applicants are defined as families who are on the Section 8 waiting list and are awaiting the issuance of a voucher or families who have been issued a voucher but have not yet been assisted under a Housing Assistance Payment (HAP) Contract.

When HACoLA denies assistance to an applicant, the family is notified in writing. The notice contains:

> ➢ The reason(s) for the decision;
> ➢ The procedure for requesting an informal review if the applicant does not agree with the decision; and
> ➢ The time limit for requesting a review.

HACoLA must provide applicants with the opportunity for an Informal Review of Decisions denying issuance of a voucher or participation in the program.

Applicants who are denied assistance based on ineligible immigration status are entitled to an informal hearing (rather than an informal review).

Housing Authority of the County of Los Angeles

### 16.3.1  When an Informal Review is Not Required
### [24 CFR §982.554(c)]

Informal reviews are not required for established policies, procedures, and HACoLA determinations such as:

1. Discretionary administrative determinations by HACoLA;

2. General policy issues or class grievances;

3. A determination of the family unit size under the HACoLA subsidy standards;

4. Refusal to extend or suspend a certificate or voucher;

5. Disapproval of lease;

6. Determination that the unit is not in compliance with HQS; or

7. Determination that the unit is not in accordance with HQS due to family size or composition.

### 16.3.2  Procedure for Review
### [24 CFR §982.554(b)]

A request for an informal review must be received in writing by the close of the business day, no later than 10 calendar days from the date of HACoLA's notification of denial of assistance. The informal review will be scheduled within 30 calendar days from the date the request is received.

The informal review will not be conducted by the person who made or approved the decision under review, nor a subordinate of such person. The review may be conducted by:

➢ A staff person who is not the person who made the decision or his/her subordinate, or

➢ An individual from outside HACoLA.

If the applicant fails to appear for the informal review and has not contacted HACoLA in advance to reschedule, HACoLA's proposed disposition of the grievance will become final. HACoLA may reschedule the review but only if the family can show good cause for the failure to appear.

At the informal review, the applicant may present oral or written objections to the decision. Both HACoLA and the family may present evidence and witnesses. The family may use an attorney or other representative to assist them at their own expense.

A Notice of the Review decision will be provided in writing to the applicant within 30 calendar days after the review. It shall include the decision of the review officer, and an explanation of the reasons for the decision.

All requests for a review, supporting documentation, and a copy of the final decision will be retained in the applicant's file.

**16.4     INFORMAL HEARING FOR PARTICIPANTS**
         **[24 CFR §982.555]**

**16.4.1  When an Informal Hearing May Be Requested**
         **[24 CFR §982.555(a)(1)]**

A participant family must be given an opportunity for an informal hearing to consider whether certain HACoLA decisions are in accordance with the law, HUD regulations and HACoLA policies.

In the following cases, HACoLA must give the participant an opportunity for an informal hearing before HACoLA terminates HAP for the family under an existing HAP contract.

1.  A determination of the family's annual or adjusted income, and the use of the income to compute the housing assistance payment.

2.  A determination of the appropriate utility allowance (if any) for tenant-paid utilities from HACoLA utility allowance schedule.

3.  A determination of the family unit size under HACoLA subsidy standards.

4.  A determination that a certificate program family is residing in a unit with a larger number of bedrooms than appropriate for the family unit size under HACoLA subsidy standards, or HACoLA determination to deny the family request for a waiver from the standards.

5.  A determination to terminate assistance for a participant family because of the family's action or failure to act.

6.  A determination to terminate assistance because the participant family has been absent from the assisted unit for longer than the maximum period permitted under HACoLA policy and HUD rules.

7.  A decision to deny a voucher re-issuance, to refuse to agree to a new Contract with the participant, or to terminate assistance on behalf of the participant.  **Exception**: No further hearing is required prior to denial of assistance if:

    •   The ground for denial of re-issuance is the tenant's failure to pay an owner's claim for damages, vacancy loss or unpaid rent, and

    •   A prior informal hearing on the validity and amount of that claim has been held (or was not requested by the participant).

    •   However, the participant must be afforded a reasonable opportunity to supply proof of payment of such owner's claim.

**16.4.2  Notification**
         **[24 CFR §982.555(c)]**

❑  When the matter in question is:

1.  The determination of the family's annual or adjusted income or computation of the housing assistance payment;

2.  Appropriate utility allowance (if any) for tenant-paid utilities; or

3.  Family unit size,

HACoLA must notify the family that they may ask for an explanation of the basis of HACoLA determination. The family must also be notified that if the family does not agree with the explanation, the family may request in writing an informal hearing on the decision.

❑ When the matter in question is:

1. Certificate family residing in too large a unit, or HACoLA's refusal to issue a waiver to subsidy standards;

2. Termination due to the family's action or failure to act; or

3. Absence from the assisted unit for longer than the maximum period permitted,

HACoLA must give the family prompt written notice that the family may request in writing an informal hearing on the decision.

❑ When HACoLA has made a decision to:

1. Terminate HAP on behalf of a participant under an active Contract;

2. Refuse to re-issue a voucher; or

3. Refuse to execute a new contract with a program participant,

The family must be given written notice of the opportunity for an informal hearing before the termination of Housing Assistance Payments.

❑ The notice must:

• Contain a brief statement of reasons for the decision;

• Inform the participant regarding his/her right to an informal hearing;

• Advise the participant that a request for an informal hearing must be in writing;

• Advise the participant that HACoLA must receive the request within 10 calendar days of the date of the letter; and

• Explain the basic elements of the informal hearing, i.e., right of the participant to present evidence, question witnesses, to have representation, HACoLA designated impartial hearing officer a written decision.

### 16.4.3 Prior to Hearing
### [24 CFR §982.555(e)(2)]

Before the informal hearing, the family may request an appointment to examine any documents in the family's portion of the file that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If HACoLA does not make the document available for examination on request of the family, HACoLA may not use the document at the hearing.

HACoLA requires that the family submit any documents that are directly relevant to the hearing either before or at the time of the hearing. HACoLA must be allowed to copy any such documents at HACoLA's expense. If the family does not make the document available for examination on request of HACoLA, the family may not rely on the document at the hearing.

During the course of the hearing, if the family offers to submit evidence, the Hearing Officer is not required to, but may exercise the discretion to allow the family to submit a document within a specified period.

### 16.4.4 Hearing Process
### [24 CFR §982.555(d)]

When a participant family has timely requested a hearing, HACoLA will proceed within 15 calendar days of receipt of the request to notify the participant of the date, time and location of the hearing.  There may be one postponement of the hearing date by the participant. A request to reschedule must be requested before the scheduled date and may not extend beyond the proposed termination date.  Any additional postponements may only be for good cause such as, but not limited to hospitalization, illness or injury.  Second postponement requests must be supported by verification of the cause.

### 16.4.5 Hearing Officer
### [24 CFR §982.555(e)(4)]

The Hearing Officer may be either an HACoLA employee or an outside third party contracted by HACoLA. The Hearing Officer must not have made or approved the decision under review nor be a subordinate of the person who made the decision. The Hearing Officer will audio record the hearing and follow the format set forth below.

### 16.4.6 Opening

The Hearing Officer will convene the informal hearing with both parties and their representatives present.  (If the participant is represented, the participant will have provided HACoLA written authorization for the representative to do so.)

The Hearing Officer will explain the informal hearing procedures, state the purpose of the hearing, and inform the participant that the hearing will be recorded.  The Hearing Officer may request clarification or ask questions of either side or witnesses at anytime during the Informal Hearing.  Each person present will introduce himself or herself.

### 16.4.7 Presentations

Each side will have an opportunity to present its case and be allowed to present witnesses and submit relevant evidence as determined by the Informal Hearing Officer. (Witnesses may be cross-examined at this time.)  HACoLA begins the hearing by presenting the Notice of Hearing. HACoLA will then present a copy of the original notification to the participant regarding the matter, followed by the evidence, including testimony of witnesses, which supports the allegations in the notification.

### 16.4.8 Rebuttals

Each side will have an opportunity to present rebuttal to the evidence presented.

### 16.4.9 Final Summary

Each side is then allowed to summarize its arguments.

Housing Authority of the County of Los Angeles

**16.4.10  Conclusion of Hearing**

The Hearing Officer may continue a hearing if additional information from either party is requested. Otherwise, the Hearing Officer will advise each side that the testimony and evidence will be reviewed, a final decision made and a determination letter issued stating the decision and the reasons for the decision within 10 calendar days.  The decision of the Hearing Officer is final.

The Hearing Officer will use the following principles for the Informal Hearings and decisions:

1. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

2. Determinations on the matter being reviewed shall be based on the evidence presented at the hearing.

3. If the issues and differences can properly be resolved at the hearing, the Hearing Officer should attempt to resolve them through mutual consent as long as the resolution is not contrary to applicable law, HUD regulations and/or HACoLA's policies.

4. The purpose of the hearing is to determine if the original decision made in the case is in accordance with the law, HUD regulations and HACoLA's policies.

5. The Hearing Officer may not make a finding contrary to HUD regulations or requirements, contrary to federal, state or local law or exceeding the authority of the Hearing Officer.

**16.5  WHEN AN INFORMAL HEARING IS NOT REQUIRED [24 CFR §982.555(b)]**

HACoLA is not required to provide a participant family an opportunity for an informal hearing for the following:

1. To review discretionary administrative determinations by HACoLA, or to consider general policy issues or class grievances;

2. To review HACoLA's determination that a unit does not comply with HQS, **except** when the breach of HQS was determined to be tenant-caused;

3. To review decision by HACoLA to exercise or not exercise any remedy against the owner under an outstanding Contract, including the termination of HAP to the owner;

4. To review HACoLA's decision not to approve a Family's request for an extension or suspension of the term of the voucher;

5. Determination that the unit is not accordance with HQS due to family size;

6. Establishment of HACoLA's schedule of utility allowances for families in the program; or

7. HACoLA determination not to approve a unit or lease.

## CHAPTER 17:
## OWNER OR FAMILY DEBTS TO HACOLA

**17.1    INTRODUCTION**
**[24 CFR §982.163 and §792]**

This chapter describes HACoLA's policies and guidelines for the recovery of debts and the use of repayment agreements. Before a debt is assessed against a family or owner, the file must contain documentation to support HACoLA's claim that the debt is owed. The file must further contain written documentation of the method of calculation, in a clear format for review by the owner or the family, as appropriate.

When families or owners owe money to HACoLA, every effort will be made to collect the debt.   A variety of collection tools to recover debts may be used including, but not limited to:

➢  Requests for lump sum payments

➢  Repayment agreements

➢  Abatements

➢  Deductions

➢  Collection agencies

➢  Credit bureaus

➢  Civil suits

**17.2    REPAYMENT AGREEMENT FOR FAMILIES**
**[24 CFR §792.103]**

A Repayment Agreement as used in this plan is a document entered into between HACoLA and the person who owes a debt to HACoLA. The Repayment Agreement contains an acknowledgment by the person of the debt in a specific amount, the terms of repayment, any special provisions of the agreement, and the remedies available to HACoLA upon default of the agreement.

If a repayment agreement is to be entered into, HACoLA will usually require that the family pay an initial lump sum (in an amount determined by HACoLA) with the remaining balance to be paid in equal payments over a period of time not to exceed 12 months for amounts under $2,400 or 24 months for any amount in excess of $2,400.

In determining the initial lump sum, HACoLA will consider the total amount owed, the ability of the person to make the remaining payments and the percentage of the total sum owed. In most cases, HACoLA will require a significant initial lump sum as part of entering into a Repayment Agreement to help ensure full payment to HACoLA and to reduce the monthly payment.

**17.2.1  Late Payments**

A payment will be considered to be in arrears if the payment has not been received by the close of the business day on which the payment was due.

> ➤ If the due date is on a weekend or holiday, the due date will be at the close of the next business day.

If the family's repayment agreement is in arrears, HACoLA may do one or more of the following:

> ➤ Require the family to pay the entire arrearage plus current month's payment in order avoid loss of assistance;

> ➤ Require the family to pay the balance in full in order to avoid losing assistance;

> ➤ Pursue civil collection of the balance due; or

> ➤ Terminate the housing assistance.

### 17.2.2 Requests To Move

If the family requests a move to another unit and has a repayment agreement in place and the repayment agreement is not in arrears, the family will be required to pay the balance in full prior to the issuance of a voucher.

If the family requests a move to another unit and is in arrears on a repayment agreement unless, they pay the balance in full, the request will be denied.

Under special circumstances, HACoLA may make an exception and allow a family to move without paying the entire balance of the debt if the family is current with its payments. HACoLA may also allow a family who is in arrears to become current in order to process a move if the move is for one of the following reasons:

> ➤ HAP contract is terminated due to owner non-compliance

> ➤ A natural disaster

> ➤ The unit is uninhabitable or has major HQS deficiencies that are not the result of a family action or inaction.

> ➤ A life-threatening situation such as the family is a witness to or a victim of a crime and must move for safety reasons. The family will be required to provide proof in such cases.

HACoLA may not agree to a repayment agreement if the family already has a Repayment Agreement in place, or if the family has breached previous Repayment Agreements.

### 17.2.3 Guidelines for Repayment Agreements

HACoLA, at its sole discretion, will determine on a case-by-case basis whether or not to offer a family a repayment agreement for monies owed to HACoLA.

Repayment Agreements will be executed between HACoLA and the head of household or other adult family member.

Monthly payments may be decreased in cases of hardship with the prior notice of the family, verification of hardship, and the approval of a HACoLA Housing Supervisor.

❑ **Additional Debt Incurred**: If the family has a Repayment Agreement in place and incurs an additional debt to HACoLA:

- HACoLA may choose, at its discretion, to agree to more than one Repayment Agreement at a time with the same family.
- If a Repayment Agreement is in arrears more than 30 calendar days, any new debts must be paid in full.

## 17.3   FAMILY DEBTS OWED FOR CLAIMS

If a family owes money to HACoLA for claims paid to an owner:

➢ HACoLA may require the family to repay the amount in full.

➢ HACoLA may agree to a Repayment Agreement.

## 17.4   FAMILY DEBTS DUE TO FRAUD/NON-REPORTING OF INFORMATION [24 CFR §792.103]

**HUD's Definition of Program Fraud and Abuse**: A single act or pattern of actions that constitutes false statement, omission, or concealment of a substantive fact, made with intent to deceive or mislead, and that results in payment of Housing Choice Voucher Program funds in violation of Housing Choice Voucher Program requirements.

### 17.4.1   Family Error/Late Reporting

Families who owe money to HACoLA due to the family's failure to report increases in income or change in allowances or deductions will be required to repay in accordance with the guidelines set forth in Section 17.2 (Repayment Agreement for Families) of this chapter.

### 17.4.2   Program Fraud

At HACoLA's discretion, families who owe money to HACoLA due to program fraud may be required to repay in accordance with the guidelines set forth in Section 17.2 (Repayment Agreement for Families) of this chapter.

In addition, the case may be referred to the Inspector General and/or HACoLA may refer the case for criminal prosecution.

## 17.5   FAMILY DEBTS PAID IN FULL

If HACoLA determines not to enter into a repayment agreement, or if the repayment agreement is breached and HACoLA demands payment of the balance in full, the family must pay the full amount due and owing in one lump sum. If the family fails to pay, HACoLA may pursue collection through a collection agency or a civil action and may notify credit agencies of the debt. Whether or not the amount is paid, HACoLA does not waive its right to take other action including termination of assistance or referral for criminal prosecution in appropriate cases.

Housing Authority of the County of Los Angeles

**17.6** **OWNER DEBTS TO HACOLA**

If HACoLA determines that the owner has retained Housing Assistance or Claim Payments the owner is not entitled to, HACoLA may deduct the amounts owed from future Housing Assistance or Claim Payments owed the owner for any units under contract.

If future Housing Assistance or Claim Payments are insufficient to reclaim the amounts owed, HACoLA may do one or more of the following:

> ➢ Require the owner to pay the amount in full within 30 calendar days;
> ➢ Agree to a repayment agreement with the owner for the amount owed. Repayment period may not exceed 12 months;
> ➢ Pursue collections through the local court system;
> ➢ Pursue collections through a collection agency; or
> ➢ Restrict the owner from future participation.

**17.7** **WRITING OFF DEBTS**

Debts may be written off if:

> ➢ The debtor's whereabouts are unknown and the debt is more than 3 years old.
> ➢ A determination is made that the debtor is judgment proof.
> ➢ The debtor is deceased and has an insufficient estate.
> ➢ The debtor is confined to an institution indefinitely or for more than 3 years.
> ➢ The amount is less than $100 and the debtor cannot be located.

## CHAPTER 18:
## CLAIMS, MOVE-OUT AND CLOSE-OUT INSPECTIONS
### (For Contracts Effective Before October 2, 1995)

**18.1** **INTRODUCTION**

This chapter describes HACoLA's policies, procedures and standards for servicing contracts that were effective before October 2, 1995. Certificate and voucher contracts in this category have provisions for HACoLA's liability to owners when families move out. Vouchers and certificates have a provision for damages, and certificates, in addition, have a provision for vacancy loss.

**18.2** **OWNER CLAIMS**

Under HAP Contracts effective prior to October 2, 1995, owners may make a special claim for damages, unpaid rent, and vacancy loss (vacancy loss cannot be claimed in the Housing Choice Voucher Program) after the tenant has vacated the unit.

Owner claims for payment for unpaid rent, damages, or vacancy loss will be reviewed for accuracy and completeness and compared with records in the file. HACoLA establishes standards by which to evaluate claims, but the burden of proof rests with the owner.

If vacancy loss is claimed, HACoLA will ascertain whether the family gave proper notice of its intent to move. The file will also be reviewed to verify owner compliance at the time the contract was terminated.

HACoLA will pay properly filed claims to the owner as a function of the contract, but the tenant is ultimately responsible to reimburse HACoLA for claims paid to the owner.

**18.3** **UNPAID RENT**

Unpaid rent only applies to the tenant's portion of rent while the tenant is in residence under the assisted lease and only until the termination date of the HAP contract.

Separate agreements are not considered a tenant obligation under the lease and HACoLA will not reimburse the owner for any claims under these agreements.

**18.4** **VACANCY LOSS IN THE CERTIFICATE PROGRAM**

Vacancy loss is applicable to the Certificate Program only. Vacancy loss is paid if the move was in violation of the notice requirements in the lease, or the result of an eviction.

In order to claim vacancy loss, the unit must be available for lease and the landlord must:

    1.  Notify HACoLA within 72 hours upon learning of the vacancy, or prospective vacancy, and

    2.  Pursue all possible activities to fill the vacancy, including, but not limited to:

- Contacting applicants on the owner's waiting list, if any;
- Seeking eligible applicants by listing the unit with HACoLA;
- Advertising the availability of the unit; and
- Not rejecting potentially eligible applicants except for good cause.

In the event that a unit becomes vacant because of death, HACoLA will permit the owner to keep the HAP for the month in which the tenant died, but may pay no further HAP.

If the tenant moves after the date given on their notice of intent to vacate, the landlord may claim vacancy loss by providing acceptable documentation that there was a bona fide prospective tenant to whom the unit could have been rented.

## 18.5   DAMAGE CLAIMS

To ensure valid claim processing, HACoLA should conduct a thorough move-in inspection noting conditions as well as HQS deficiencies, take pictures of questionable items, and send a report of all items to the owner and tenant.

The owner must be present during the move-out inspection and only damages claimed by the owner are reimbursable.

All claims for damages must be supported by the actual bills for materials and labor and a copy of the canceled checks or other receipts documenting payment. Estimates are accepted at the discretion of HACoLA depending upon the nature of the work to be done.

Bills from individuals providing labor must include their name, Social Security number, address and phone number.  The owner may not bill himself/herself for labor since that is not considered by HACoLA to be an "actual cost".  However, the actual cost of the owner's employees' labor, such as the resident manager, to make repairs may be included.

Persons making repairs or replacements must be licensed to do business in Los Angeles County.

Reasonableness of costs will be based on the Means Cost Estimating Guide. Reimbursement for replacement of items such as carpets, drapes, or appliances, are based on depreciation schedules in general use by HACoLA.

HACoLA may require verification of purchase date, quality, and price of replaced items in order to calculate depreciation.

Claims for unpaid utility bills cannot be approved as part of a claim.

Claims for normal wear and tear, previously existing conditions, routine turnover preparation, and cyclical interior painting are not paid.

HACoLA will inspect the unit to verify that repairs were made.

**18.6    MOVE-OUT AND CLOSE-OUT INSPECTIONS**

Move-out (vacate) inspections are performed after the tenant has vacated the unit.   These inspections are performed by Program Specialists/Inspectors to assess the condition of the unit, not to evaluate the HQS.

There will be no move-out inspections of units with contracts effective on or after October 2, 1995.

The owner must notify HACoLA of the move-out and request an inspection within five calendar days of learning of the move-out, or contract termination, whichever is first, in order to submit a claim for damages.

If the contract was terminated due to owner breach, or the owner was in violation of the contract at the time that it was terminated, there will be no entitlement to claims and therefore no inspection.

The owner and tenant will be notified of the date and time of the inspection. If the owner is not present, the move-out inspection will not be rescheduled.

HACoLA will conduct a move-out inspection on the tenant's request.

In the event that HACoLA is unable to inspect within 10 calendar days, the owner will be permitted to use date-stamped photographs to substantiate the claim.

**18.7    PROCESSING CLAIMS**

Any amount owed by the tenant to the owner for unpaid rent or damages will first be deducted from the maximum security deposit that the owner could have collected under the program rules. If the maximum allowable security deposit is insufficient to reimburse the owner for the unpaid tenant rent or other amounts which the family owes under the lease, the owner may request reimbursement from HACoLA up to the limits for each program.

If the owner claims vacancy loss, the security deposit that s/he collected or could have collected will be deducted from the vacancy loss claim.

HACoLA reviews claims for unpaid rent, damages, or vacancy loss and makes a preliminary determination of amount payable. The family is informed that a claim is pending (notice sent to last known address). The notification will state the preliminarily determined amount, the type of claim, and describe the procedure for contesting the claim.

1.   HACoLA will offer the family 10 calendar days to contest the claim. If the family disputes the claim, HACoLA will schedule an informal meeting/claim review with the owner and tenant in order to resolve the differences.

2.   If the tenant fails to attend the meeting, HACoLA will proceed with its original determination; the meeting will not be rescheduled unless there are extenuating circumstances.

3.   At the Claim Review, the amount and type of claim will be discussed with the family. If the family agrees with the amount and type of claim, the family may be offered a Repayment Agreement. If the family does not

Housing Authority of the County of Los Angeles

agree to sign a Repayment Agreement, HACoLA will process the account for collection.

4. If the family demonstrates that the claim, or parts of it, is invalid, HACoLA will adjust the amount. HACoLA may offer the tenant an opportunity for an Informal Hearing regarding the claim if disputes cannot be resolved.

After a determination has been made, HACoLA will notify the family in writing of the decision. If it has been determined that the family owes money, HACoLA will pursue collection to repay either in a lump sum or through a payment agreement. The notice will warn the family that their assistance may be terminated and they may be denied future participation in the program if they do not reimburse HACoLA as required.

### 18.7.1 Other Requirements for Claims Processing

❑ HACoLA will require proof that the owner has complied with State and local laws applicable to security deposits before making payment on any claim.

❑ All notices to tenants during the processing of a claim must include proof of mailing or of personal delivery.

❑ Costs of filing eviction to remove the tenant or any other legal fees, shall not be reimbursed.

❑ No claims will be paid for a unit that is vacant as the result of the landlord voluntarily moving a family to another unit owned by the same landlord or as a result of a mutual rescission between the landlord and tenant family.

All unpaid rent, damage, and vacancy loss claim forms must be fully complete when they are submitted, and they must be submitted within 30 calendar days of the date the owner learned of the move-out.

**CHAPTER 19:**
**OWNER DISAPPROVAL AND RESTRICTION**

**19.1** **INTRODUCTION**
**[24 CFR §982.306]**

In order to ensure the viability of the Housing Choice Voucher Program, HACoLA continuously strives to adopt policies that will encourage new and existing owners to participate in the program and to provide owners with prompt and professional service in order to maintain an adequate supply of available housing throughout the entire jurisdiction. However, in cases of owner non-compliance, HACoLA must act accordingly in order to protect families and the program. The regulations herein contained define when HACoLA must disallow an owner participation in the program, and when HACoLA will exercise its discretion to disapprove or otherwise restrict the participation of owners in certain categories.

**19.2** **DISAPPROVAL OF OWNER**

The owner does not have a right to participate in the program [24 CFR §982.306(e)]. For purposes of this section, "owner" includes a principal or other interested party.

HACoLA shall disapprove the owner for the following reasons:

➢ HUD or other agency directly related has informed HACoLA that the owner has been disbarred, suspended, or subject to a limited denial of participation under 24 CFR part 24 [24 CFR §982.306(a)].

➢ HUD has informed HACoLA that the federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other federal equal opportunity requirements and such action are pending [24 CFR §982.306(b)(1)].

➢ HUD has informed HACoLA that a court or administrative agency has determined that the owner has violated the Fair Housing Act or other Federal Equal Opportunity Requirements [24 CFR §982.306(b)(2)].

HACoLA may disapprove an owner for the following reason:

➢ The owner has violated obligations under a housing assistance payments contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.306(c)(1)].

➢ The owner has committed fraud, bribery or any other corrupt act in connection with any Federal housing program [24 CFR §982.306(c)(2)].

➢ The owner has engaged in any drug-related criminal activity or any violent criminal activity [24 CFR §982.306(c)(3)].

➢ The owner has a history or practice of non-compliance with the HQS for units leased under the tenant-based programs or with applicable housing standards for units leased with project-based Section 8 assistance or leased under any other federal housing program [24 CFR §982.306(c)(4)].

Housing Authority of the County of Los Angeles

> ➤ The owner has a history or practice of renting units that fail to meet State or local housing codes [24 CFR §982.306(c)(6)].

> ➤ The owner has not paid State or local real estate taxes, fines or assessments [24 CFR §982.306(c)(7)].

## 19.3   OTHER REMEDIES FOR OWNER VIOLATIONS

### 19.3.1 Abatement
### [24 CFR §982.404(a)(3)]

For non-compliance with HQS, HACoLA may abate rental payments if the assisted unit remains out of compliance for more than 30 calendar days.

In cases involving serious health and/or safety violations, HACoLA may begin abating rental payments if the violation is not cured within 24 hours.

### 19.3.2 Overpayments
### [24 CFR §792.101]

If the landlord has been overpaid because of fraud, misrepresentation or violation of the contract, HACoLA may terminate the contract and arrange for restitution to HACoLA and/or family as appropriate.

HACoLA will make every effort to recover any overpayments made as a result of landlord fraud or abuse. Possible remedies available to HACoLA include: recovering monies owed from payments otherwise due to the owner, setting up a repayment agreement, referring the debt to a collection agency, or pursuing the matter in a civil court. A determination on the course of action to be taken will be based on the nature of the violation and the amount of the money owed. Generally, if the owner is cooperative, is willing to pay back all monies owed, and all monies will be repaid within 12 months, HACoLA will offer the owner a chance to enter into a repayment agreement. However, in cases where the owner knowingly and willfully violated program rules, HACoLA may seek full repayment in one lump sum.

## CHAPTER 20:
## SPECIAL PROGRAMS

### 20.1   INTRODUCTION

HACoLA periodically has the opportunity to apply for targeted funding for special populations.   HACoLA often enters into collaborative agreements with other agencies or County departments to qualify for and/or administer these funds.

Currently, HACoLA's Special Programs Unit administers the following targeted programs:

> ➢ Family Unification Set-Aside Program (Family UP);
> ➢ Welfare-to-Work Program (WtW);
> ➢ Homeless Set-Aside Program;
> ➢ Shelter Plus Care Program (S+C);
> ➢ Housing Opportunities for Persons with AIDS Program (HOPWA); and
> ➢ The Family Self-Sufficiency Program (FSS).

This chapter provides details on the special programs currently administered by HACoLA.  This section is divided into two main parts:

> ➢ Housing Assistance Programs, and
> ➢ Family Self-Sufficiency Program.

### 20.2   HOUSING ASSISTANCE PROGRAMS

#### 20.2.1  Housing Choice Voucher Programs

❏ **Housing Choice Voucher Welfare-to-Work Program (WtW) Program**: This program provides assistance to families who are eligible for CalWORKs benefits, are in good standing with the employment/job training program offered by the Los Angeles County Department of Public and Social Services (DPSS) and are in need of housing in order to obtain or retain employment. Eligible families are identified by DPSS and referred to HACoLA for rental assistance.   HACoLA may also refer eligible families from the HACoLA waiting list to DPSS for assistance.

#### 20.2.2  Voluntary Set-Aside Programs For Homeless Families

❏ **Housing Choice Voucher Homeless Set-Aside Program**: This program targets families throughout Los Angeles County.  All eligible families are referred to HACoLA by pre-selected service providers.

❏ **Housing Choice Voucher Long Term Family Self-Sufficiency Homeless Program**: This program targets homeless families who are eligible for CalWORKs and are employed or have an offer of employment (either subsidized or unsubsidized).  Families assisted under this program will have access to a $1,500 Relocation grant to help meet the cost of moving expenses and have access to Housing Counseling Services.  Relocation and Housing Counseling Services are funded by the Los Angeles County

Housing Authority of the County of Los Angeles

Department of Public and Social Services (DPSS). This program is currently inactive until funding from the DPSS is secured.

❑ **Housing Choice Voucher Family Unification (Family UP) Set-Aside Program**: This program provides assistance to families who are in imminent danger of losing or who cannot regain custody of their minor children due to lack of adequate housing. This program is a collaborative effort between HACoLA and the Los Angeles Department of Children and Family Services (DCFS). Eligible families are identified by DCFS through their Family Preservation Unit and referred to HACoLA for rental assistance. HACoLA may also refer eligible families from the HACoLA waiting list to DCFS.

These programs are funded from HACoLA's regular turnover, i.e. vouchers that are vacated throughout the year because families are terminated from the program or voluntarily leave are used to provide assistance to special needs families.

For each set-aside program, HACoLA works with pre-selected supportive services providers who will certify that the family meets the specific criteria for the set-aside program and commits to providing on-going supportive services for a minimum of 6 months in order to ensure that the family is able to live independently.

All families admitted into a set-aside program must be referred by an approved supportive service provider and meet all regular admission requirements with the exception of the residency requirement. For the purpose of the set-aside programs, HACoLA will not require that a family qualify for a residential preference since most families are homeless and are unable to provide information about their last known permanent address. However, families must agree to reside in HACoLA's jurisdiction for the first year of assistance.

### 20.2.3 Non-Housing Choice Voucher Special Programs

❑ **Shelter Plus Care (S+C) Program**: This program is designed to link rental assistance to supportive services for homeless individuals with disabilities and/or their families. This program primarily provides assistance to those who have been diagnosed with mental illness, chronic substance abuse problems, or AIDS. Assistance is provided for a term of five years or for as long as there is a continuum of funding available for this program.

❑ **Housing Opportunities for Persons with AIDS (HOPWA)**: This program specifically targets individuals and families afflicted by HIV/AIDS. Assistance under this program is provided for one year. After the one-year term, all HOPWA participants in good standing are allowed to transition to the regular Housing Choice Voucher Program. This program is also administered by HACoLA in other cities in addition to the cities currently within HACoLA's jurisdiction.

### 20.3   HOUSING ASSISTANCE PROGRAM PROCEDURES

### 20.3.1 Referral Process/Waiting List

HACoLA does not maintain a waiting list for the Housing Choice Voucher Special Programs, Housing Choice Voucher Homeless Set-aside Programs, or Non-

Housing Choice Voucher Special Programs.  Eligible families are identified to apply for these programs by pre-selected service providers, other agencies or County departments are referred to HACoLA.

### 20.3.2 Eligibility

Applicants must meet HUD's eligibility requirements for that specific program to qualify for rental assistance.  In order to determine final eligibility, HACoLA may verify all information submitted by applicants.

For more specific information on eligibility requirements, please see Chapter 2 (Admission Eligibility Factors).

### 20.3.3 Verification Procedures

Since HUD requires that factors of eligibility must be verified, applicants and program participants are required to provide proof of their statements whenever required by HACoLA.  Some Special Programs may require additional documents when verifying program eligibility.  For example:

> **Homeless Condition Form**: Must be provided for all individuals/families referred through the Shelter Plus Care Program, Homeless Set-Aside Program, Homeless with AIDS program, and HOPWA program.

> **Verification of Disability and/or Diagnosis Form**: Must be provided for all individuals claiming a disability, especially a disability that is cited as a qualifying factor for a particular program (i.e. S+C, HOPWA).  Written determinations must be made by a psychiatric or medical professional trained to make such determination.

### 20.3.4 Denial of Participation

If a family previously participated in any special program and violated a family obligation and was terminated, the family may be denied future participation.

Families may be denied participation in the program if they owe HACoLA or another housing authority money in connection with the Housing Choice Voucher Program or Public Housing assistance.

Families referred by contracted Community-Based Organizations (CBO's), will be sent a denial letter and referred to the CBO if there are any further questions.

### 20.3.5 Criminal Background

Program applicants for all voluntary set-aside programs and Housing Choice Voucher Special Programs will require criminal background checks.  Shelter Plus Care applicants will not be required to undergo the criminal background check.

For more specific information on the applicant screening standards used by HACoLA when reviewing criminal records, please see Chapter 2 (Admission Eligibility Factors), Section 2.6 (Criminal Background Checks).

### 20.3.6 Briefing Sessions

Briefing sessions are conducted for all special programs.  Families are issued accordingly:

Housing Authority of the County of Los Angeles

> ➢ Housing Choice Voucher Special Programs and Homeless Set-aside Programs are issued a Housing Choice Voucher.

> ➢ Shelter Plus Care applicants are issued a participation agreement. This participation agreement allows for termination of assistance if any member of the family violates the terms set forth in the participation agreement.

> ➢ HOPWA applicants are issued certificates.

For more specific information on voucher issuance and briefings, please see Chapter 8 (Voucher Issuance and Briefing).

### 20.3.7  Contracts/Tenant Payments

Housing Choice Voucher Special Programs and Homeless Set-Aside Programs are contracted based on the Payment Standards and participants may pay up to 40% of their adjusted monthly income.

Non-Housing Choice Voucher Special Programs are contracted based on the Fair Market Rents published by HUD and tenant rental portions are limited to 30% of the participant's adjusted monthly income.

For more specific information on determining total tenant payment, please refer to Chapter 6 (Determining the Total Tenant Payment and HACoLA Absence Policy). For more specific information on the new contract process, request for tenancy approval and contract execution, please refer to Chapter 9 (New Contract Process RTA and Contract Execution.

### 20.3.8  Re-examinations

HACoLA is required to process annual re-examinations. In cases where a family experiences a change in household composition and/or income between annual re-examinations, HACoLA will process an interim re-examination. The family is required to report all changes in household composition and/or income to HACoLA within 30 calendar days of occurrence.

For more specific information regarding causes for processing annual/interim re-examinations and the requirements for completing an annual/interim re-examinations, please refer to Chapter 12 (Re-Examination).

### 20.3.9  Terminations

❑ **Proposed Terminations**: Community Based Organizations and/or other government units or departments currently contracted by HACoLA to provide supportive services may request termination of housing assistance for a program participant who is in violation of program requirements and/or conditions of occupancy.

❑ **Terminations**: Housing assistance may be terminated if a family violates specific program requirements and/or the family obligation. For more specific information on family obligations, please see Chapter 15 (Family Obligations).

20.3.10        **Portability**

All special programs have different requirements for portability.  They are listed as follows:

- Housing Choice Voucher Special Programs and Housing Choice Voucher Set-aside Programs must live within HACoLA's jurisdiction for at least one year before becoming eligible to port out to another housing authority's jurisdiction.

- Shelter Plus Care Program participants have **no portability rights**. They must continue to live within HACoLA's jurisdiction for as long as they continue to participate in this program.

- HOPWA Program participants have no portability rights as long as they continue being assisted under this program.  However, after one year of HOPWA assistance, eligible participants are converted to the regular Housing Choice Voucher program and become eligible to port out to another housing authority's jurisdiction.

For more specific information on allowable moves and eligibility for portability, please refer to Chapter 13 (Allowable Moves/ Portability).

20.4    **FAMILY SELF-SUFFICIENCY PROGRAM [24 CFR §984.101(a)]**

Family Self-Sufficiency promotes the development of local strategies to enable families to achieve economic independence and self-sufficiency.  The program is designed to provide supportive services for families who are residents within HACoLA's jurisdiction.   Supportive services include but are not limited to childcare, education, transportation, counseling, job preparation, vocational training and home ownership workshops.

Upon becoming employed, FSS participants continue to pay rent in accordance with HACoLA's housing choice voucher procedures. Whenever the participants rent increases, HACoLA establishes an interest bearing Escrow Account in their name. If the family successfully completes the contract obligations within 5 years, the family can apply to graduate from the program and receive the accrued portion of their escrow account.

Effective January 4, 2005, the Housing Authority has suspended all new admissions to the Family Self-Sufficiency program.

20.5    **FSS APPLICATION PROCESS**

An application is mailed to the applicant and is due back within 10 calendar days from the date it was mailed. If the application is returned undeliverable, HACoLA will make one more attempt to contact the applicant by mail.  If the second application is returned undeliverable, the file will be documented as such. Tenants will not be penalized for not participating in the FSS Program since it is a voluntary program for voucher holders with the exception of the Welfare-To-Work (WTW) participants.

The FSS application process for WTW participants is handled in the same manner as stated in the preceding paragraph, however if the participant fails to

Housing Authority of the County of Los Angeles

return the application, HACoLA would propose termination on the grounds of non-compliance with program mandate.

Once an application is returned to the FSS office, eligibility is determined. If accepted, a Contract of Participation (CoP) is developed and an Individual Training and Services Plan (ITSP) is created. Following the CoP and ITSP being executed, participants are referred to an FSS case manager or to a contracted Community-Based Organization (CBO) to administer the case. If the application is not accepted, the tenant will be notified in writing within 5 calendar days. This applies to housing choice voucher applications only. All Welfare-To-Work applications are accepted.

### 20.5.1 FSS Eligible Families
### [24 CFR §984.203]

FSS eligible families are housing choice voucher holders and/or residents of County Public Housing.

❑ "FSS family" or "participating family" means a family that receives assistance under Public Housing or the Housing Choice Voucher Program and elects to participate in the FSS Program and whose designated head of FSS family has signed the Contract of Participation.

❑ "Head of the FSS family" means the adult member of the FSS family who is the head of household for purposes of determining income eligibility and rent.

### 20.5.2 Denial of Participation
### [24 CFR §984.302]

If a family previously participated in the FSS Program but did not meet its obligations and was terminated, the family may be denied future participation.

Families may be denied participation in the program if they owe HACoLA or another housing authority money in connection with the Housing Choice Voucher Program or Public Housing assistance.

### 20.6    FSS CONTRACT OF PARTICIPATION (COP)
### [24 CFR §984.303]

Upon receipt of the application HACoLA will prepare a Contract of Participation within 5 to 10 calendar days. The contract will contain the effective date as well as the expiration date. It will execute the resources and supportive service and outline the starting base for determining the escrow account. In addition, the contract will outline the guidelines for administering and disbursing the escrow funds [24 CFR §984.303(b)(1)].

Each family participating in FSS must execute a Contract of Participation with HACoLA. The effective date of the contract will be the first of the month after the contract is executed. The limited term is five years. The contract may be extended in writing and at the family's request, for up to two year for good cause [24 CFR §984.303(c)].

HACoLA will only grant an extension in rare circumstances that are beyond the control of the family, and which prevent completion of the training and services plan [24 CFR §984.304(d)].

Termination of employment for nonperformance by the FSS head is not justification for a contract extension.

HACoLA may extend the CoP to allow families to meet the interim goal of being welfare-free at least 12 consecutive months prior to the expiration of the contract.

During an extension to the contract, the family continues to have FSS amounts credited to the escrow account.

HACoLA may set milestones for employment and other activities leading to self-sufficiency early in the five-year contract term in accordance with the family's abilities.

The family's obligations may terminate before the end of the five-year contract term, and the family's participation in FSS and entitlement to the escrow may be less than five years.

Three items of information must be entered into the contract to be valid:

  ➢ Gross Annual Income

  ➢ The amount of earned income in the gross annual income

  ➢ Family Rent (TTP or 30 percent of Monthly Adjusted Income for vouchers)

The CoP establishes an agreement between the family and HACoLA as to the responsibilities of each party.  The contract is to be signed by the head of the FSS family, which is the head of household for purposes of determining eligibility. Copies of the documents will be furnished to the head of household.

The CoP may be modified in the following areas, if HACoLA and the family mutually agree [24 CFR §984.303(f)]:

  ➢ Individual Training and Services Plan

  ➢ The contract term (extension)

  ➢ Designation of the FSS head of the family in cases where the FSS head is deceased or becomes unassisted

A change in the designated FSS head must be included as an attachment to the Contract.  It must contain the following:

  ➢ Name of new designated FSS head

  ➢ The signatures of the new FSS head and a HACoLA representative

  ➢ The date signed

## 20.6.1 Compliance With The Lease
## [24 CFR §984.303(b)(3)]

The Contract provides that the family must comply with the assisted lease. Therefore, noncompliance with County Housing Development lease, or the lease with the owner in the Housing Choice Voucher Program, is grounds for termination of the FSS Contract of Participation.

In the Housing Choice Voucher Program, if the violation of the lease is "serious or repeated," the housing authority may also terminate program assistance.

Housing Authority of the County of Los Angeles

The following representative(s) is/are authorized to execute a contract on behalf of HACoLA: Special Programs Administrator, FSS Coordinator, and FSS Program Specialist.

**20.7    INDIVIDUAL TRAINING AND SERVICE PLAN (ITSP)**
**[24 CFR §984.303(b)(2)]**

The contract must contain an ITSP for the FSS head of household. Other adult family members who wish to receive services must also have an individual training and services plan to participate in the FSS program. The resources and services to be provided must be contained in the plan. It must contain the milestones, interim goals and final goal for suitable employment.

**20.7.1  Needs Assessment**

HACoLA will perform a needs assessment with the family using various needs assessment tools. Upon completion of the assessment, FSS will be able to establish the milestones, and short- and long-term goals designated for the head of household on the ITSP and any other participating family members with an executed ITSP.

**20.7.2  The Individual Training and Services Plan (ITSP)**
**[24 CFR §984.303]**

Each individual FSS contract must contain an ITSP for the FSS head of household and any participating family member.  The items included on the ITSP will include:

> The resources and services to be provided by HACoLA and contracted supportive services provider;

> The individual milestones, interim goals and final goal for suitable employment;

> Completion dates for each individual interim goals will be included on or before the contract expiration date;

> A mandatory interim goal for families receiving welfare is that all family members must be free of welfare assistance for 12 consecutive months prior to the expiration of the contract (including extensions) [24 CFR §982.306(b)(2)];

> The requirement for the head of the FSS family to seek and maintain suitable employment throughout the term of the contract; and

> Each ITSP plan must be signed by the participant and a HACoLA representative.

Any changes to the ITSP must be included as a revision to the original plan. The revision may be based on the following reasons: factors keeping the client from effectively becoming suitably employed, lack of supportive services, and unforeseen circumstances/barriers. The revision must include:

> The item changed;

> Signature of the participant and a HACoLA representative; and

     ➢  The date signed.

**20.8   ESCROW ACCOUNTS**
       **[24 CFR §984.305]**

The general concept of the escrow account is that FSS families continue to pay rent in accordance with their incomes (even as their incomes increase due to employment income).  As a rule, the amount of the increase in earned income is escrowed.  Because there are other factors that affect the family rent, it will not necessarily be dollar for dollar.  The amount escrowed for the family will depend on whether the family is considered a very low- or low-income family.

❑ **Disbursing the FSS Escrow Account**: The amount in an FSS account, in excess of any amount owed to HACoLA by the FSS family, is paid to the head or designated remaining family member of the FSS family [24 CFR §984.305(c)(1)]:

     ●  When the contract of participation has been completed; and

     ●  When, at contract completion, the head of the family certifies that family member receives Federal or state welfare assistance.

❑ **Interim Disbursement**: HACoLA may, at its sole option, disburse a portion of the funds from the family's escrow account during the contract period for contract-related expenses if the family has fulfilled certain interim goals and needs a portion of the FSS account funds for purposes consistent with contract such as [24 CFR §984.305(c)(2)]:

     ●  School tuition;

     ●  Business start-up expenses;

     ●  Car when public transportation is unavailable or inaccessible to the family; or

     ●  Job training expenses.

The family may use the final disbursement of escrow account funds without restriction.

HACoLA cannot restrict a family's use of FSS escrow account funds withdrawn by the family unless the funds are withdrawn to aid in the completion of an interim goal.

     ➢  If a family receives an advance payment from their escrow account prior to completing the Contract, the advance payment does not have to be repaid to HACoLA if the family drops out of the FSS program, unless the payment was due to fraud or misinformation by the family.

If the family moves outside of HACoLA's jurisdiction under the Housing Choice Voucher Program portability procedures, HACoLA may transfer the balance of the family's FSS escrow account to another housing authority [24 CFR §984.306(e)].

Housing Authority of the County of Los Angeles

### 20.8.1 Forfeiting the FSS Escrow Account
### [24 CFR §984.305(f)]]

Amounts in the FSS escrow account will be forfeited if:

➢ The Contract of Participation is terminated;

➢ The Contract of Participation is completed but the family is receiving welfare assistance when the contract expires, including extensions; or

➢ The head of the family dies and the remaining members of the family choose not to continue participating in the program, and the contract obligations have not been met.

If families do not pay their rent to the owner, the funds may be forfeited because:

➢ Compliance with the applicable housing choice voucher or Public Housing lease is a family obligation under the Contract, and

➢ Nonpayment of rent is grounds for terminating a family's FSS participation and forfeiture of the escrow.

In the housing choice voucher program, FSS account funds forfeited by the family will be treated as program receipts for payment of program expenses under HACoLA's Housing Choice Voucher Program budget. Escrow funds may be used by HACoLA for HUD-approved expenses; such expenses may include rental assistance payments.

In Public Housing, the forfeited account will be credited to the Housing Authority's operating reserves and counted as other income in the calculation of the PFS operating subsidy eligibility for the next budget year. The escrow funds may be used by the Housing Authority for HUD-approved expenses such as Public Housing maintenance costs.

## 20.9   CHANGE IN FAMILY COMPOSITION

If the head of the FSS family no longer resides with other family members in the assisted unit, the remaining family members of the family will have the right to designate another family member to receive the funds. HACoLA must be consulted and must approve this change.

If a family with two adults splits up, HACoLA will determine if the escrow should be paid. The family may be paid if the family member that continues to reside in a Housing Development and/or retains the rental assistance through the Housing Choice Voucher Program:

➢ Is already head of the FSS family, or

➢ Was not designated as head of the FSS family but now designate himself or herself to receive the escrow account.

## 20.10   FSS TERMINATION/CANCELLATION/PORTABILITY
## [24 CFR §984.303(h)]

HACoLA is responsible for determining whether the family has violated the FSS contract and whether the family's rental assistance should be terminated.

**20.10.1**      **FSS Termination Due To Portability**
              **[24 CFR §984.306(f)]**

Where the family is relocating and is not absorbed by the receiving housing authority under the portability regulations, and is participating in the receiving housing authority's FSS Program, HACoLA must abide by the termination decision of the receiving housing authority.

If a relocating FSS family is unable to fulfill its obligation under the FSS contract, HACoLA or the receiving housing authority, whoever is party to the FSS Contract of Participation may:

- Terminate the family from the FSS Program and the family's FSS account will be forfeited, and

- Terminate the family's rental assistance since the family failed to meet its obligations under the FSS contract. This is applicable to Welfare-to-Work participants only.

If the family's FSS account is forfeited, the funds in the account will revert to the housing authority maintaining the FSS account for the family and will be treated as program receipts.

Housing Authority of the County of Los Angeles

<div align="center">

**CHAPTER 21:**
**PRE-PAY/PRESERVATION PROGRAM**
**[24 CFR §886]**

</div>

**21.1**    **INTRODUCTION**

The Section 8 Pre-Pay/Preservation Program is a transition program designed to preserve the level of affordable housing and avoid the potential displacement of low and moderate-income families when owners of eligible properties pre-pay their HUD-insured mortgage loan or voluntarily terminate their mortgage insured contract.  Families determined eligible for this program are assisted with special Section 8 Vouchers.  **The Preservation Program policies and procedures are the same as that of the Housing Choice Voucher except as otherwise noted.**

**21.2**    **TERMS/PROVISIONS**

There are two types of housing conversion actions that the property owners can choose: pre-pay or opt-out.

1.  Pre-pay date is the date the owner officially "pays off" their HUD-insured mortgage.   The property is no longer considered a Project-Based or Affordable Development, and the owner is free to increase rents to market levels.  As early as 60 days after this "pre-payment date," the residents are no longer protected by the subsidy or affordable rents.

    The residents on the Project-Based program under the HUD Section 8 Contract are eligible to receive an Enhance Housing Choice Voucher if the participant eligibility screening is approved, including the criminal background check requirement.

    The participant has the right to stay in the unit if they so desire, however, the families who choose to stay are required to contribute a minimum rent requirement for as long as they are eligible to receive this assistance and must remain in the unit for at least for one year.

    Families assisted with enhance housing choice voucher assistance have a special statutory minimum rent requirement (read above statement).  The law requires that a family receiving enhance voucher assistance must pay for rent no less than the rent the family was paying on the date of the pre-pay date of the Section 8 housing contract or the expiration date of the expiring project-based contract in case of owner opt-outs.

    **The enhance voucher minimum rent only applies if the family remains in the project.  The enhance voucher minimum rent does not apply if the family moves.**

    Families who choose to vacate, the enhance voucher becomes regular housing choice voucher and the eligibility requirements policy is the same as for screening regular admissions for the Housing Choice Voucher Program.  Families are also eligible for portability and the minimum rent requirement is no longer applicable.

2.  Opt-out is where owners elect to discontinue the existing contract with HUD and no longer desire to participate in any subsidy program.  In cases when owners pre-pay either their mortgage loan or opt-out of the Section 8 Housing Assistance, federal law requires that owners provide the tenants with a one year notification before the expiration of the Section 8 Contract.  The owners are required to give proper notice of intent to pre-pay or opt-out to HUD, a notice of intent to pre-pay loan to California Housing Partnership Office, the Participant City, the local Housing Authority, and the Legal Aid Foundation. These notifications must be sent at least one year in advance, along with the notice of intent to increase the rent with a minimum of 60-day notice to the tenants of such a rent increase.

Housing Authority of the County of Los Angeles

## CHAPTER 22:
## MODERATE REHABILITATION PROGRAM [24 CFR §882]

### 22.1   INTRODUCTION

The Moderate Rehabilitation (Mod Rehab) Program was designed in 1978 to be an expansion of the rental certificate program.  The rental certificate program was initially amended to permit moderate levels of rehabilitation to upgrade and preserve the housing stock.  The rental certificate program required a minimum expenditure of $1,500.00 in repairs to meet the program housing quality standards.

After the work was completed, owners entered into a 15-year Housing Assistance Contract with the local housing authority. Using this 15-year rental certificate contract, the housing authority helped the owner repay the loan by subsidizing the rents of low-income participants at a higher-than-fair market rate. The contract tied rental subsides to the building not the participant. Although funding is no longer available for new participants, the Assisted Housing Division continues to administer existing contracts under this program. **Mod Rehab policies and procedures are the same as that of the Housing Choice Voucher program except as otherwise noted.**

### 22.2   THE EXPIRED 15-YEAR CONTRACTS

To date, many of the 15-year contracts have now expired.  HUD has authorized housing authorities to extend expiring Moderate Rehabilitation Contracts under certain conditions.  These conditions are as follows:

  ➢  The project must have five or more units.  If a building has five or more units, but only one of the units is under Moderate Rehabilitation Program then the unit is cover under the contract.  The building still qualifies for an extension because the requirement is tied to the project not the contract.

  ➢  The owner must be in good standing with the current contract. Examples of non-compliance: on-going non-compliance with the Housing Quality Standard inspections.

### 22.3   REQUESTING AN EXTENSION

HACoLA closely monitors the expiration dates for all Moderate Rehabilitation contracts and mails the owners a letter asking owners if they would like to request an extension.  Owners need to reply immediately to this letter if they wish to extend another year.  The extension of the contract is a one-year extension. HUD has allowed HACoLA to continue to extend the "extension" contract for another year. This has been the practice since 1996.  However, there is no guarantee that the contracts will continue to be extended in the future.

If an owner does not wish to extend the Mod Rehab Contract for their building, they are under no obligation to extend the contract.   Rules governing the Moderate Rehabilitation program require that the owners advise their tenants one-year notice in advance of the expiration of the contract and their intent to opt-out of the program.  The families will receive enhanced vouchers and have

the right to remain in your units as long as the units are used for rental housing. If the family chooses to vacate the Mod Rehab unit, then the family will be given a Housing Choice Voucher.

If an owner does not provide a family with the required notice, the family is protected as if they were under an assisted tenancy until one year from the time the owner actually provides the notice. This means that if the owner elects not to renew the contract and the family chooses to remain in the unit as an unassisted tenant, the owner will be required to accept the family portion of the rent as full payment until he/she has complied with the notification requirement.

## 22.4   ANNUAL INCREASE FOR THE EXPIRED 15-YEAR CONTRACTS

HACoLA will mail the owner a letter regarding their upcoming expiration date and advise them of their annual increase that may be granted to them providing that they choose to extend their contract. The owner must respond immediately for an extension so that HACoLA can expedite the process to secure funding for the new coming year.

The methodology used to calculate the rent that an owner may be eligible to receive under the renewal contract is different. To determine the rent under the extension contract the Housing Authority must compare the following three rent analyses:

> Existing contract rents multiplied by the Operating Cost Adjustment Factors (OCAF);

> The Mod Rehab FMR (120% of the existing Fair Market Rents) minus the Utility allowance; and

> Comparable market rents

The rent under the extension contract is based on the lowest of the above three figures. HACoLA will complete this analysis for the building and provide the owner with a copy.

For the participant's re-examination process, see Chapter 12 (Re-Examination). For family obligations, see Chapter 15 (Family Obligations). These two rulings apply to the Section 8 Certificate Program and the Housing Choice Voucher Program.

## 22.5   NON-EXPIRED MOD REHAB CONTRACTS

For those Mod Rehab contracts that have not reached their 15-year contract, the annual increases may be granted providing:

> The owner submits a proper 60-day notice, prior to the anniversary date, of their rent increase amount to HACoLA.

> The new rent increase does not exceed the annual adjustment factor and comparables justify the increase.

> The unit has passed the annual inspection.

For the re-examination process for the participant, see Chapter 12 (Re-Examination). On family obligations, see Chapter 15 (Family Obligations).

These rulings apply to the Section 8 Certificate Program and the Housing Choice Voucher Program.

## 22.6    REQUEST TO MOVE

Since the assistance is attached to the unit and not the participant, a participant wishing to relocate and continue their assistance must relocate to another Mod Rehab Unit. The participant must submit their 30-60 day notice to vacate to their owner and mail a copy to the Housing Authority.  Once the office receives the vacate notice, the Housing Authority will confirm receipt of the notice to vacate by sending the participant a confirmation notice along with a set of income verification forms.  The participant must submit their income verifications forms by the due date on the cover letter. Upon receipt of the completed income forms, the representative will contact the participant to schedule an appointment for their issuance. Listings for other vacant Mod Rehab Units may be available.

For those participants who placed themselves on the waiting list for a Housing Choice Voucher and have been contacted by the Applications and Eligibility Department for issuance, the participant must submit their proper 30-60 day notice to their owner and mail a copy to the Housing Authority.

If the participant vacates their unit without the proper 30-60 day written notice to their owner and the Housing Authority, they will be terminated from the program. Keep in mind that under the Mod Rehab program, the owner may file for vacancy loss and if any money is paid on behalf of the participant, they must reimburse the Housing Authority before we can consider any future assistance.

If the owner has submitted a written notice to the participant to vacate their premises, the participant needs to contact their representative immediately.  The representative will advise and direct the participant of their responsibilities.

## 22.7    REFERRALS

When a Mod Rehab unit is ready for new lease inspection, the owner/manager will refer their next applicant off their waiting list to the Mod Rehab unit.  Once the applicant calls the office, the applicant's name and family composition will be requested in order to prepare the income verification packet along with the Criminal Background Check (family members 18 years and older need to sign this form) for the Head of Household to pick-up at the office. The applicant will have 10 calendar days to return the completed income verification forms to the office to determine eligibility.  If the applicant has not submitted all the necessary documents to determine eligibility, a final notice will be mailed out and given a 10 working day due date.  If the final request is not returned by the due date, the owner must refer the next applicant on their waiting list.

The criminal background check is required for family members 18 years and older.  For information on the eligibility process, please see Chapter 2, Section 2.6, on Criminal Background Checks.

**22.8    NEW LEASE PROCESS**

Once the applicant has been determined eligible for the Mod Rehab program, the HACoLA representative will contact the applicant and schedule them for a lease issuance.  Following the issuance of the lease, the representative will contact the owner/manager to schedule a new lease inspection.  Upon passing of the initial inspection, the representative will contact the owner to confirm the effective date of the new lease and the amount of the security deposit that will be collected. See Chapter 10 for information on inspections.

The representative will complete the new lease process by entering all the necessary tenant and owner information into the Memory Lane System and print the new lease.  The new lease will then be mailed to the owner for signatures from the participant and owner.  Upon receipt of the signed lease, then the representative will release the HAP payment to the owner.

**22.9    CLAIMS, MOVE-OUT AND CLOSE-OUT INSPECTIONS**

Please see Chapter 18 (Claims, Move-Out and Close-Out Inspections) for more information on this subject.

# EXHIBIT

# A

# DOCUMENT

# 4

# PAGES

# 1-186

**ADMISSIONS AND CONTINUED OCCUPANCY POLICY [2008] FOR THE CONVENTIONAL PUBLIC HOUSING PROGRAM**







# HOUSING AUTHORITY OF THE
# COUNTY OF LOS ANGELES

12131 TELEGRAPH ROAD
SANTA FE SPRINGS, CA 90670
(562) 347-4663

# ADMINISTRATIVE PLAN
## JULY 1, 2008

*Strengthening Neighborhoods • Supporting Local Economies • Empowering Families • Promoting Individual Achievement*

# Administrative Plan
# Table of Contents

| Section | | Page |
|---|---|---|

➢ Chapter 1: Policies and Objectives    1

1.1   Introduction........................................................................................... 1

1.2   Purpose of the Plan ............................................................................. 1

1.3   Local Objectives .................................................................................. 2

1.4   Jurisdiction .......................................................................................... 2

1.5   Rental Assistance Programs ............................................................... 2

    1.5.1   Set-Aside, Targeted and Special Programs ............................. 3

1.6   Fair Housing and Equal Opportunity Policy......................................... 4

1.7   Operating Reserves ............................................................................ 4

1.8   Service Policy ..................................................................................... 5

    1.8.1   Requests for Reasonable Accommodation ............................... 5

1.9   Family Outreach .................................................................................. 6

1.10   Owner Outreach ................................................................................ 6

1.11   Privacy Rights ................................................................................... 6

1.12   Monitoring Program Performance ..................................................... 7

1.13   Terminology....................................................................................... 7

➢ Chapter 2: Admission Eligibility Factors and Applicant Requirements
    10

2.1   Introduction......................................................................................... 10

2.2   Eligibility Factors and Requirements .................................................. 10

2.3   Family Composition............................................................................. 11

    2.3.1   Stable Relationship................................................................... 12

    2.3.2   Head of Household .................................................................. 12

    2.3.3   Spouse of Head ....................................................................... 12

    2.3.4   Co-Head .................................................................................. 12

        Live-In Aides............................................................................ 12

    2.3.5   12

    2.3.6   Split Households Before Voucher Issuance ............................. 13

    2.3.7   Multiple Families in the Same Household ................................ 14

    2.3.8   Joint Custody of Children ........................................................ 14

2.4   Income Limitations ............................................................................. 14

|      | 2.4.1 | Income Limits for Other Programs ........................................................ 15 |
| 2.5  | Eligibility of Students ............................................................................ 15 |
| 2.6  | Citizenship/Eligible Immigration Status ................................................ 15 |
|      | 2.6.1 | Mixed Families.............................................................................. 16 |
|      | 2.6.2 | No Eligible Members .................................................................... 16 |
| 2.7  | Social Security Number Requirements .................................................. 16 |
| 2.8  | Screening for Drug Abuse and Other Criminal Activity.......................... 16 |
|      | 2.8.1 | Drug Abuse and Criminal History Screening Standards...................... 17 |
|      | 2.8.2 | Criminal Background Checks .............................................................. 19 |
|      | 2.8.3 | Requests for Criminal Records by Owners of Covered Housing for the Purposes of Screening .......................................................................... 19 |
|      | 2.8.4 | Request for Criminal Records by Section 8 Project-Based Owners for the Purposes of Lease Enforcement or Eviction .................................. 20 |
|      | 2.8.5 | Confidentiality of Criminal Records .................................................. 20 |
|      | 2.8.6 | Disclosure of Criminal Records to Family........................................... 20 |
|      | 2.8.7 | Explanations and Terms .................................................................... 20 |
| 2.9  | Other Criteria for Admission ................................................................. 21 |
| 2.10 | Suitability of Family .............................................................................. 22 |
| 2.11 | Denying Admission to Ineligible Families .............................................. 22 |

> Chapter 3: Administration of the Waiting List 23

| 3.1 | Introduction.......................................................................................... 23 |
| 3.2 | How to Register .................................................................................... 23 |
|     | 3.2.1 | Preliminary Registration Waiting List................................................. 23 |
|     | 3.2.2 | Active Waiting List ............................................................................ 23 |
|     | 3.2.3 | Change in Circumstances ................................................................. 23 |
| 3.3 | Applying for Special Programs and Non-Housing Choice Voucher Programs. 24 |
| 3.4 | Special Admissions .............................................................................. 24 |
|     | 3.4.1 | Exceptions for Special Admissions.................................................... 24 |
|     | 3.4.2 | Criminal Background Checks ............................................................. 24 |
| 3.5 | Opening and Closing The Waiting List ................................................... 25 |
|     | 3.5.1 | Opening the Waiting List ................................................................... 25 |
|     | 3.5.2 | Criteria Defining Who May Apply....................................................... 26 |
|     | 3.5.3 | Closing the Waiting List .................................................................... 26 |
| 3.6 | Time of Selection.................................................................................. 26 |
| 3.7 | Cross-Listing of Public Housing and Section 8 Waiting Lists ........................ 26 |

3.8     Removing Applicants from the Waiting List and Purging ................................... 26

3.9     Application Pool ........................................................................................... 27

    ➤   **Chapter 4:** Admission Process        28

4.1     Introduction ................................................................................................. 28

4.2     Application Procedures ................................................................................. 28

    4.2.1   Interview Sessions/Mailings ................................................................ 29

    4.2.2   Request for Information via Mail .......................................................... 29

    4.2.3   Application Interview Process .............................................................. 29

    4.2.4   Secondary Reviews/Credit Reports .................................................... 30

4.3     Local Preferences ........................................................................................ 32

    4.3.1   Verification of Preferences .................................................................. 33

    4.3.2   Final Verification of Preferences ......................................................... 33

    4.3.3   Preference Denial ............................................................................... 33

4.4     Denial of Assistance .................................................................................... 34

4.5     Final Determination and Notification of Eligibility ......................................... 34

    ➤   Chapter 5: Subsidy Standards        35

5.1     Introduction ................................................................................................. 35

5.2     Determination of Voucher Size ..................................................................... 35

    5.2.1   Maximum Unit Occupancy ................................................................... 36

5.3     Occupancy Standards Waiver ...................................................................... 37

5.4     Exceptions for Foster Children ..................................................................... 37

5.5     Flexibility of Unit Size Actually Selected ...................................................... 37

    5.5.1   Calculating Assistance for a Different Unit Size ................................... 38

    ➤   Chapter 6: Determining the Total Tenant Payment and Housing Authority
    Absence Policy        39

6.1     Introduction ................................................................................................. 39

6.2     Income Definitions ....................................................................................... 39

6.3     Income Deductions ...................................................................................... 39

    6.3.1   Childcare Expenses ............................................................................ 40

    6.3.2   Medical Expenses .............................................................................. 40

6.4     Income Inclusions and Exclusions ............................................................... 41

    6.4.1   Income Inclusions .............................................................................. 41

    6.4.2   Income Exclusions ............................................................................. 43

    6.4.3   Earned Income Disallowance .............................................................. 46

|  | 6.4.4 | Earned Income Disallowance Exclusion Time Periods | 47 |
| 6.5 | Family Assets | | 47 |
|  | 6.5.1 | Included Assets | 47 |
|  | 6.5.2 | Excluded Assets | 48 |
| 6.6 | Calculating Income and Family Contribution | | 49 |
|  | 6.6.1 | "Minimum Rent" and Minimum Family Contribution | 49 |
|  | 6.6.2 | Minimum Income | 49 |
|  | 6.6.3 | Averaging Income | 49 |
|  | 6.6.4 | Utility Allowance and Utility Reimbursement Payments | 50 |
|  | 6.6.5 | Reduction in Welfare Assistance | 50 |
| 6.7 | Proration of Assistance for "Mixed" Families | | 51 |
|  | 6.7.1 | Applicability | 51 |
|  | 6.7.2 | Prorated Assistance Calculation | 51 |
| 6.8 | Absence Policy | | 51 |
|  | 6.8.1 | Absence of Entire Family | 52 |
|  | 6.8.2 | Absence of Any Member | 52 |
|  | 6.8.3 | Absence Due to Medical Reasons | 53 |
|  | 6.8.4 | Absence Due to Incarceration | 53 |
|  | 6.8.5 | Foster Care and Absences of Children | 53 |
|  | 6.8.6 | Absence of Adult | 53 |
|  | 6.8.7 | Students | 54 |
|  | 6.8.8 | Visitors | 55 |
|  | 6.8.9 | Reporting Absences to the Housing Authority | 55 |
|  | 6.8.10 | Verification of Absence | 55 |
|  | ➤ Chapter 7: Verification Procedures | 56 |
| 7.1 | Introduction | | 56 |
| 7.2 | Methods of Verification and Time Allowed | | 56 |
|  | 7.2.1 | Up-Front Income Verification (UIV) | 56 |
|  | 7.2.2 | Third-Party Written Verification | 57 |
|  | 7.2.3 | Third-Party Oral Verification | 57 |
|  | 7.2.4 | Review of Documents | 57 |
|  | 7.2.5 | Self-Certification/Self-Declaration | 58 |
| 7.3 | Release of Information | | 58 |
| 7.4 | Computer Matching | | 59 |

|  | 7.4.1 | Data Sharing .................................................................................. | 59 |
| 7.5 | | Items to be Verified ................................................................................ | 59 |
|  | 7.5.1 | Victims of Violence ....................................................................... | 59 |
| 7.6 | | Verification of Income ............................................................................. | 60 |
|  | 7.6.1 | Employment Income ...................................................................... | 60 |
|  | 7.6.2 | Social Security, Pensions, Disability, Supplementary Security Income | 61 |
|  | 7.6.3 | Unemployment Compensation ....................................................... | 61 |
|  | 7.6.4 | Welfare Payments or General Assistance ...................................... | 61 |
|  | 7.6.5 | Alimony or Child Support Payments .............................................. | 62 |
|  | 7.6.6 | Net Income from a Business ......................................................... | 62 |
|  | 7.6.7 | Child Care Business ...................................................................... | 63 |
|  | 7.6.8 | Recurring Gifts .............................................................................. | 63 |
|  | 7.6.9 | Zero-Income Status ....................................................................... | 63 |
|  | 7.6.10 | Full-Time Student Status ............................................................... | 64 |
| 7.7 | | Income from Assets ................................................................................ | 64 |
|  | 7.7.1 | Savings Account Interest Income and Dividends ........................... | 64 |
|  | 7.7.2 | Interest Income from Mortgages or Similar Arrangements ............. | 64 |
|  | 7.7.3 | Net Rental Income from Property Owned by Family ....................... | 65 |
| 7.8 | | Verification of Assets .............................................................................. | 65 |
|  | 7.8.1 | Family Assets ................................................................................ | 65 |
|  | 7.8.2 | Assets Disposed of for Less than Fair Market Value (FMV) ........... | 65 |
| 7.9 | | Verification of Allowable Deductions from Income ................................... | 66 |
|  | 7.9.1 | Childcare Expenses ...................................................................... | 66 |
|  | 7.9.2 | Medical Expenses ......................................................................... | 66 |
|  | 7.9.3 | Assistance to Persons with Disabilities ......................................... | 67 |
| 7.10 | | Verifying Non-Financial Factors .............................................................. | 68 |
|  | 7.10.1 | Verification of Legal Identity ......................................................... | 68 |
|  | 7.10.2 | Verification of Marital Status ......................................................... | 68 |
|  | 7.10.3 | Familial Relationships ................................................................... | 69 |
|  | 7.10.4 | Verification of Permanent Absence of Adult Member ..................... | 69 |
|  | 7.10.5 | Verification of Change in Family Composition ................................ | 70 |
|  | 7.10.6 | Verification of Disability ................................................................ | 70 |
|  | 7.10.7 | Verification of Citizenship/Eligible Immigrant Status ..................... | 70 |
|  | 7.10.8 | Verification of Social Security Numbers ........................................ | 72 |
|  | 7.10.9 | Medical Need for Larger Unit ........................................................ | 73 |

7.10.10  Reasonable Accommodation ................................................................. 73

7.10.11  Secondary Review/Credit Checks ........................................................ 73

➤  Chapter 8: Voucher Issuance and Briefings  76

8.1    Introduction.................................................................................................. 76

8.2    Issuance of Housing Choice Vouchers ...................................................... 76

8.3    Briefing Types and Required Attendance..................................................... 76

    8.3.1    Initial Applicant Briefing ................................................................ 76

    8.3.2    Re-Issuance Briefing ..................................................................... 76

    8.3.3    Owner Briefing ............................................................................... 77

8.4    Information Provided at the Briefing Session ............................................. 77

    8.4.1    Topics Covered in the Briefing Session......................................... 77

    8.4.2    Briefing Packet ............................................................................. 77

8.5    Encouraging Participation in Areas Without Low Income or Minority
       Concentration ............................................................................................. 79

8.6    Security Deposit Requirements .................................................................. 79

8.7    Term of Voucher.......................................................................................... 79

    8.7.1    Expirations ..................................................................................... 80

    8.7.2    Policy on Suspensions (Tolling) .................................................... 80

    8.7.3    Extensions ..................................................................................... 80

    8.7.4    Assistance to Voucher Holders ..................................................... 80

8.8    Voucher Issuance Determination for Split Households .............................. 80

8.9    Remaining Member of Family – Retention of Voucher................................ 81

8.10   Family Voluntarily Relinquishes Housing Choice Voucher.......................... 81

➤  Chapter 9: The New Contract Process Request for Tenancy Approval and
    Contract Execution    83

9.1    Introduction.................................................................................................. 83

9.2    Request for Tenancy Approval .................................................................... 83

    9.2.1    Disapproval of RTA ........................................................................ 83

9.3    Eligible Types of Housing ........................................................................... 84

    9.3.1    Special Housing Types ................................................................... 84

    9.3.2    Ineligible Housing Types ................................................................ 85

9.4    Restrictions On Renting To Relatives ......................................................... 85

9.5    Lease Agreements ...................................................................................... 85

    9.5.1    Separate Agreements..................................................................... 87

9.6    Initial Inspections ........................................................................................ 87

9.7    Rent Limitations.................................................................87

9.8    Rent Reasonableness.........................................................88

9.9    Information to Owners.........................................................88

9.10   Owner Disapproval.............................................................88

9.11   Change in Total Tenant Payment (TTP) Prior to HAP Effective Date ............90

9.12   Contract Execution Process.................................................90

    9.12.1 Determining the Contract Effective Date ................................91

    9.12.2 Prorating First Month's Rent ...........................................91

    9.12.3 Proof Of Ownership ......................................................91

    9.12.4 Establishing Eligibility To Execute HAP Contract and Related Documents ..................................................91

    9.12.5 Payment To The Owner ....................................................92

9.13   Change in Ownership..........................................................92

    ➢   Chapter 10: Housing Quality Standards and Inspections     93

10.1   Introduction....................................................................93

10.2   Types of Inspections .........................................................93

10.3   Housing Quality Standards (HQS) ...........................................93

    10.3.1 Unit Space and Size........................................................94

    10.3.2 Living Room / Sleeping Room ...........................................94

    10.3.3 Sanitary Facilities (Bathroom) .........................................94

    10.3.4 Food Preparation (Kitchen) .............................................95

    10.3.5 Ceilings, Walls, Floors and Building Exterior............................95

    10.3.6 Windows....................................................................96

    10.3.7 Doors and Unit Access ...................................................96

    10.3.8 Thermal Environment .....................................................97

    10.3.9 Electricity .................................................................97

    10.3.10 Smoke Detectors..........................................................97

    10.3.11 Site and Sanitation .......................................................97

    10.3.12 Manufactured Homes (Mobile Homes) HQS Requirements ..............98

    10.3.13 Additional Housing Quality Standards...................................98

    10.3.14 Single Room Occupancy (SRO) HQS Requirements .....................99

    10.3.15 Serious Deficiencies......................................................99

10.4   Lead-Based Paint.............................................................100

    10.4.1 Disclosure ................................................................101

    10.4.2 Lead-Based Paint Visual Assessment....................................101

10.4.3 Stabilization and Clearance .................................................................. 102

10.4.4 Children with Environmental Intervention Blood Lead Levels............. 103

10.5   Inspections Schedule ...................................................................... 103

10.6   New Contract Inspections ................................................................ 103

10.6.1 When HQS Deficiencies Must Be Corrected ...................................... 104

10.7   Annual and Interim Inspections ....................................................... 104

10.7.1 Annual Inspections ........................................................................ 104

10.7.2 Interim Inspections ........................................................................ 104

10.8   Failed Inspections: Determination of Responsibility ......................... 105

10.9   Failed Inspections: When Deficiencies Must Be Corrected............................ 105

10.9.1 Emergency Fail Deficiencies .............................................................. 105

10.9.2 Non-Emergency Fail Deficiencies ...................................................... 106

10.9.3 Non-Emergency Fail Deficiencies Not Requiring Follow-up Inspection 106

10.10 Consequences of Verified Family-Caused Deficiencies................................ 107

10.11 Consequences of Verified Owner-Related Deficiencies................................ 107

10.11.1 Abatement ..................................................................................... 107

10.11.2 Termination of Contract................................................................... 108

10.12 Quality Control Inspections ............................................................ 109

➢ Chapter 11: Setting Payment Standards and Determining Rent Reasonableness       110

11.1   Introduction.................................................................................... 110

11.2   Payment Standards for the Voucher Program ................................... 110

11.2.1 Assisted Families' Rent Burdens ....................................................... 110

11.2.2 Success Rate of Voucher Holders...................................................... 110

11.2.3 Rent Reasonableness Database......................................................... 111

11.2.4 Quality of Units Selected ................................................................. 111

11.2.5 File Documentation.......................................................................... 111

11.3   Rent Reasonableness Determinations.............................................. 111

11.3.1 Appealing a Rent Reasonableness Determination............................. 112

11.3.2 Rent Increases ............................................................................... 112

➢ Chapter 12: Re-examination  114

12.1   Introduction.................................................................................... 114

12.1.1 Procedure ...................................................................................... 114

12.2   Re-Examination Notification to the Family ....................................... 114

12.2.1 Persons with Disabilities .......................................................................114

12.2.2 Requirements to Attend ........................................................................114

12.2.3 Failure to Respond ..............................................................................114

12.2.4 Documents Required from the Family ................................................115

12.2.5 Tenant Rent Increases .........................................................................115

12.2.6 Tenant Rent Decreases ........................................................................115

12.3   Interim Re-Examination ...................................................................................116

12.3.1 Interim Changes in Income .................................................................116

12.4   Special Adjustments ........................................................................................116

12.5   Changes in Family Composition ......................................................................117

12.5.1 Allowable Family Additions ...............................................................117

12.5.2 Decreases in Family Size ....................................................................118

12.6   Continuation of Assistance for "Mixed" Families ...........................................118

          ➤  Chapter 13: Allowable Moves/Portability        119

13.1   Introduction ......................................................................................................119

13.2   Allowable Moves and Restrictions ...................................................................119

13.2.1 Restrictions on Moves ........................................................................119

13.2.2 Allowable Moves for New Applicants .................................................119

13.2.3 Allowable Moves for Current Participants ..........................................120

13.2.4 Restrictions on Moves During the Initial Lease .................................121

13.3   Procedures for Moves for Current Participants ...............................................121

13.4   Outgoing Portability Procedures ......................................................................122

13.4.1 Briefing for Families Wishing to Exercise Portability .........................122

13.4.2 Payment to the Receiving PHA ...........................................................122

13.5   Incoming Portability Procedures ......................................................................122

13.5.1 Policies on Absorption and Administration .........................................123

13.5.2 Income and Total Tenant Payment Review .........................................123

13.5.3 Criminal Background Checks for Incoming Portability .......................124

13.5.4 Terminations ........................................................................................124

13.5.5 Informal Hearings/Reviews .................................................................125

          ➤  Chapter 14: Contract Terminations    126

14.1   Introduction ......................................................................................................126

14.2   Description of Documents ................................................................................126

14.3   Termination of the Lease by the Family: Moves ..............................................126

14.4    Termination of the Lease by the Owner ........................................................ 126

14.4.1 Terminating the Lease During the Initial Term of the Lease.............. 127

14.4.2 Terminating the Lease After the Initial Term of the Lease................. 127

14.4.3 Requests for Criminal Records by Project-Based Section 8 Owners . 127

14.5    Mutual Termination of the Lease.................................................................... 128

14.6    Termination of the HAP Contract by Housing Authority ................................. 128

14.7    HAP Payments and Contract Terminations..................................................... 130

➢   Chapter 15: Family Obligations        131

15.1    Introduction.................................................................................................... 131

15.2    Grounds for Termination ................................................................................ 131

15.2.1 Form of Termination ........................................................................... 131

15.2.2 Mandatory Termination....................................................................... 131

15.2.3 Grounds for Termination of Assistance ............................................... 132

15.2.4 Welfare to Work Program ................................................................... 132

15.2.5 Registered Sex Offenders .................................................................. 133

15.3    Family Obligations......................................................................................... 133

15.3.1 Housing Authority Discretion .............................................................. 135

15.3.2 Enforcing Family Obligations.............................................................. 135

15.3.3 Drug-Related Criminal Activity............................................................ 136

15.3.4 Violent Criminal Activity ..................................................................... 137

15.3.5 Required Evidence ............................................................................. 138

15.3.6 Confidentiality of Criminal Records ..................................................... 138

15.3.7 Disclosure of Criminal Records to Family............................................ 138

15.4    Notice of Termination of Assistance ............................................................... 138

15.5    Procedures for Non-Citizens ......................................................................... 139

15.5.1 False or Incomplete Information (No Eligible Members)...................... 139

15.6    Zero Assistance  (End of Participation) .......................................................... 139

15.7    Option Not to Terminate for Misrepresentation of Income ............................. 140

15.8    Misrepresentation in Collusion with Owner .................................................... 140

15.9    Missed Appointments and Deadlines ............................................................. 140

➢   Chapter 16: Informal REViews/Hearings        142

16.1    Introduction.................................................................................................... 142

16.2    Reasonable Accommodation ......................................................................... 142

16.3    Informal Review Procedures for Applicants .................................................... 142

16.3.1 When an Informal Review is Not Required..................................... 143

16.3.2 Procedure for Review ..................................................................... 143

16.4    Informal Hearing for Participants .................................................................. 144

16.4.1 When an Informal Hearing May Be Requested ........................... 144

16.4.2 Notification....................................................................................... 144

16.4.3 Prior to Hearing .............................................................................. 145

16.4.4 Hearing Process ............................................................................. 146

16.4.5 Hearing Officer ................................................................................ 146

16.4.6 Opening ........................................................................................... 146

16.4.7 Presentations .................................................................................. 147

16.4.8 Rebuttals ......................................................................................... 147

16.4.9 Final Summary ................................................................................ 147

16.4.10 Conclusion of Hearing .................................................................. 147

16.5    When an Informal Hearing Is Not Required ................................................. 147

➢    Chapter 17: Owner or Family Debts to Housing Authority    149

17.1    Introduction.................................................................................................... 149

17.2    Repayment Agreements for Families ........................................................... 149

17.2.1 Late Payments................................................................................. 150

17.2.2 Requests To Move .......................................................................... 150

17.2.3 Guidelines for Repayment Agreements......................................... 150

17.3    Family Debts Owed for Claims ..................................................................... 151

17.4    Family Debts Due to Fraud/Non-Reporting of Information ........................... 151

17.4.1 Family Error/Late Reporting ........................................................... 151

17.4.2 Program Fraud ................................................................................ 151

17.5    Family Debts Paid in Full............................................................................... 151

17.6    Owner Debts to Housing Authority ............................................................... 152

17.6.1 Owner Debts Due to Fraud............................................................. 152

17.7    Writing Off Debts ........................................................................................... 152

➢    Chapter 18: Special Programs    154

18.1    Introduction.................................................................................................... 154

18.2    Housing Assistance Programs ...................................................................... 154

18.2.1 Housing Choice Voucher Programs ............................................... 154

18.2.2 Voluntary Set-Aside Programs For Homeless Families .................... 154

18.2.3 Non-Housing Choice Voucher Special Programs.............................. 155

18.3    Housing Assistance Program Procedures..........................................................156
        18.3.1  Referral Process/Waiting List ...............................................................156
        18.3.2  Eligibility....................................................................................................156
        18.3.3  Verification Procedures ..........................................................................156
        18.3.4  Denial of Participation.............................................................................156
        18.3.5  Criminal Background ...............................................................................157
        18.3.6  Briefing Sessions.....................................................................................157
        18.3.7  Contracts/Tenant Payments ...................................................................157
        18.3.8  Re-Examinations ......................................................................................157
        18.3.9  Terminations .............................................................................................158
        18.3.10 Portability...................................................................................................158
18.4    Family Self-Sufficiency Program .........................................................................158
18.5    FSS Application Process .......................................................................................159
        18.5.1  FSS Eligible Families...............................................................................159
        18.5.2  Denial of Participation.............................................................................159
18.6    FSS Contract of Participation (COP) ....................................................................159
        18.6.1  Compliance With The Lease ..................................................................161
18.7    Individual Training and Service Plan (ITSP)........................................................161
        18.7.1  Needs Assessment...................................................................................161
        18.7.2  The Individual Training and Services Plan (ITSP) ...............................161
18.8    Escrow Accounts...................................................................................................162
        18.8.1  Forfeiting the FSS Escrow Account.......................................................163
18.9    Change in Family Composition ...........................................................................164
18.10   FSS Termination/Cancellation/Portability ..........................................................164
        18.10.1 FSS Termination Due To Portability .......................................................164

        ➤  Chapter 19: Pre-Pay/Preservation Program [24 CFR §886] 165
19.1    Introduction............................................................................................................165
19.2    Terms/Provisions...................................................................................................165

        ➤  Chapter 20: Moderate Rehabilitation Program [24 CFR §882]        168
20.1    Introduction............................................................................................................168
20.2    The Expired 15-Year Contracts ............................................................................168
20.3    Requesting An Extension .....................................................................................168
20.4    Annual Increase For the Expired 15-Year Contracts.........................................169
20.5    Non-Expired Mod Rehab Contracts ....................................................................169

20.6   Request To Move ........................................................................................ 170

20.7   Referrals ..................................................................................................... 170

20.8   New Lease Process ..................................................................................... 171

20.9   Claims, Move-Out and Close-Out Inspections ........................................... 171

    20.9.1 Owner Claims ..................................................................................... 171

    20.9.2 Unpaid Rent........................................................................................ 171

    20.9.3 Vacancy Loss ..................................................................................... 171

    20.9.4 Damage Claims .................................................................................. 172

    20.9.5 Move-Out and Close-Out Inspections ................................................ 173

    20.9.6 Processing Claims............................................................................... 173

    20.9.7 Other Requirements for Claims Processing ....................................... 174

    ➢   Chapter 21:   175

    ➢   project-based vouchers   175

21.1   introduction.................................................................................................. 175

21.2   Level of Assistance ..................................................................................... 175

21.3   Owner proposal selection procedure............................................................ 175

    21.3.1 Selection Criteria ................................................................................ 176

    21.3.2 Requirements For Rehabilitated and Newly Constructed Housing..... 176

    21.3.3 Agreement to Enter Into the HAP Contract ....................................... 176

    21.3.4 Subsidy Layering Review (SLR)......................................................... 177

    21.3.5 Housing Authority – Owned Units....................................................... 177

21.4   housing eligible for assistance .................................................................... 177

21.5   Limits on assistance .................................................................................... 178

    21.5.1 Qualified Supportive Services ............................................................ 178

    21.5.2 Qualifications for Supportive Services................................................ 178

    21.5.3 Supportive Services Monitoring.......................................................... 179

    21.5.4 Failure to Meet Supportive Service Requirements ............................. 179

21.6   Selection of Participants............................................................................... 179

    21.6.1 Waiting List ......................................................................................... 179

    21.6.2 Protection of In-Place Families........................................................... 179

    21.6.3 Local Preferences............................................................................... 180

    21.6.4 Refusal of Assistance ......................................................................... 180

21.7   Information for accepted families ................................................................. 180

21.8   Leasing of contract units ............................................................................. 181

21.9    Vacancies ............................................................................................. 181

21.10  Tenant Screening ................................................................................ 181

21.11  housing assistance payments contract ........................................ 181

    21.11.1  HAP Contract Information ......................................................... 181

    21.11.2  Execution of the HAP Contract ............................................... 182

    21.11.3  Term of the HAP Contract ....................................................... 183

    21.11.4  Amendments to the HAP Contract .......................................... 183

21.12  inspections ......................................................................................... 183

    21.12.1  HQS Violation ........................................................................... 184

21.13  Lease ..................................................................................................... 184

    21.13.1  Changes in the Lease ............................................................... 185

    21.13.2  Absence from the Unit .............................................................. 185

    21.13.3  Owner Termination of Tenancy and Eviction ........................ 185

    21.13.4  Security Deposits ...................................................................... 185

21.14  family occupancy of wrong-size or accessible unit ..................... 186

21.15  Determining rent to owner ............................................................... 186

    21.15.1  Rent to Owner for Certain Tax Credit Units ........................... 186

    21.15.2  Housing Authority – Owned Units .......................................... 187

    21.15.3  Redetermination of Rent to Owner ......................................... 187

    21.15.4  Rent Determination for Projects with Other Subsidies ....... 187

    21.15.5  Rent Control and Other Rent Limitations .............................. 188

21.16  Payment to Owner .............................................................................. 188

    21.16.1  Vacancy Payments ................................................................... 188

    21.16.2  Other Charges and Fees .......................................................... 189

➢

## CHAPTER 1:
## POLICIES AND OBJECTIVES

**1.1**   **INTRODUCTION**

The Los Angeles County Community Development Commission (CDC) was created in 1982 by the County's Board of Supervisors. The CDC aims to build better lives and better neighborhoods, by providing services to improve the quality of life in low- and moderate-income neighborhoods. The CDC manages programs in public and assisted housing, community development, economic development, and housing development and preservation.

The Housing Authority of the County of Los Angeles (Housing Authority) was created in 1938 to manage and develop affordable housing. Since 1938, the Housing Authority has administered federally funded public housing, rental assistance programs, and services and special programs for residents of public and assisted housing.

In an effort to streamline Los Angeles County's housing and community development programs and services, the County Board of Supervisors combined the Housing Authority with the CDC in 1982. The Housing Authority is comprised of two divisions of the CDC. The Housing Management Division manages public housing and related programs and services. The Assisted Housing Division administers rental assistance programs.

**1.2**   **PURPOSE OF THE PLAN**
     **[24 CFR §982.54(a) – §982.54(c)]**

The purpose of the Administrative Plan is to clearly outline the policies and procedures that govern the Housing Authority's administration of rental assistance programs. The plan includes program requirements established by the U.S. Department of Housing and Urban Development (HUD), as well as the discretionary policies established by the Housing Authority.

The policies and procedures in this Administrative Plan comply with applicable local, State, and HUD and other Federal regulations, relevant memos, notices and guidelines, including fair housing and equal opportunity requirements. If applicable regulatory changes conflict with this plan, regulations will have precedence.

The Housing Authority adheres to the Administrative Plan in administering all rental assistance programs. The original plan and any changes must be approved by the Board of Commissioners of the agency (the Los Angeles County Board of Supervisors), and a copy of the plan must be provided to HUD.

As much as possible, revisions and additions are published to coincide with published changes in the Housing Authority's Agency Plan. Interim changes, including Board mandates and administrative updates reflecting changes in law or regulatory requirements, will be made effective by memo from the Executive Director or designee.

Housing Authority of the County of Los Angeles

**1.3  LOCAL OBJECTIVES**
**[24 CFR §982.1(a)]**

The Housing Authority's rental assistance programs are designed to achieve three major objectives:

1. To provide improved living conditions and decent, safe, and sanitary housing for very low-income families while maintaining their rent payments at an affordable level;

2. To provide an incentive to private property owners to rent to lower income families by offering timely assistance payments; and

3. To promote freedom of housing choice and spatial deconcentration of lower income and minority families.

Additionally, the Housing Authority has adopted the following mission statement:

➢ To promote adequate and affordable housing, economic opportunity and a suitable living environment free from discrimination.

**1.4  JURISDICTION**
**[24 CFR §982.51 and 24 CFR §982.4(b)]**

HUD has authorized the Housing Authority to administer rental assistance programs within the corporate boundaries of Los Angeles County.  The Housing Authority's jurisdiction includes:

1. The unincorporated areas of the County, and

2. Participating cities within the County. Participating small cities are defined as cities in the Los Angeles County area that have authorized the Housing Authority to administer rental assistance programs within their city limits.

**1.5  RENTAL ASSISTANCE PROGRAMS**

Section 8 of the Housing and Community Development Act of 1974 established the "Section 8 Program," the first permanent Federal program for rental assistance.  The program authorized a basic certificate program, as well as targeted subprograms.  As rental assistance programs developed, Congress authorized additional Section 8 programs, including a voucher program in 1987.

In 1998, the Quality Housing and Work Responsibility Act (QHWRA) required housing authorities to convert their certificates into vouchers and establish the Housing Choice Voucher Program as the primary rental assistance program.  As a result of this conversion, the Housing Choice Voucher Program now encompasses all Housing Authority rental assistance except for existing certificates under the previously offered Moderate Rehabilitation Program.

● **Moderate Rehabilitation Program**: A certificate-based rental assistance program incorporating financial options for owners doing moderate levels of rehab and upkeep to affordable housing rental units.  Administration involves closing or extending expiring contracts.  Chapter 20 (Moderate Rehabilitation Program) covers the details of this program.

- **Section 8 Pre-Pay/Preservation Program**: A voucher-based rental assistance program that enables existing participants, living in units in which owners have prepaid a HUD-insured mortgage loan, to remain in affordable housing. Chapter 19 (Pre-Pay/Preservation Program) covers the details of this program.

- **Project-Based Voucher Program**: The Housing Authority will utilize Project-Based vouchers to prevent the displacement of families and preserve affordable rents in the case of an unforeseen event.

- **Housing Choice Voucher Program**: The major rental assistance program administered by the Housing Authority.

  - ➢ **Note**: Unless otherwise noted, the procedures in this Administrative Plan are for the general Housing Choice Voucher Program.

As required by HUD regulations, the Housing Authority administers the Family Self-Sufficiency Program as a special program option for participants in the Housing Choice Voucher Program.  See Chapter 18 (Special Programs) for details.

## 1.5.1 Set-Aside, Targeted and Special Programs

The Housing Authority may use the Housing Choice Voucher Program budget to fund set-aside programs, which are detailed in Chapter 18 (Special Programs). All set-aside programs are subject to the availability of funding.  The Executive Director has the discretion to approve allocations beyond the existing program size for all set-aside programs.

  - ➢ **Housing Choice Voucher Homeless Program**: This program targets families throughout Los Angeles County.  All eligible families are referred to the Housing Authority by pre-selected service providers.

  - ➢ **Housing Choice Voucher Long-Term Family Self-Sufficiency Homeless Program**: This program targets homeless families who are eligible for CalWORKs and are employed or have an offer of employment (either subsidized or unsubsidized).

  - ➢ **Housing Choice Voucher Family Unification Set-Aside Program**: This program provides assistance to families who are in imminent danger of losing or who cannot regain custody of their minor children due to lack of adequate housing.

Periodically, the Housing Authority applies for special funding from HUD to administer vouchers to targeted populations, within the Housing Choice Voucher Program.  The Housing Authority administers vouchers through the following targeted programs:

  - ➢ **Housing Choice Voucher Welfare to Work Program**: This program provides assistance to families who are eligible for CalWORKs benefits, are in good standing with the employment/job training program offered by the Los Angeles County Department of Public and Social Services (DPSS) and are in need of housing in order to obtain or retain employment.  See Chapter 18 (Special Programs) for details.

Housing Authority of the County of Los Angeles

> **Housing Choice Voucher Mainstream Program**:  This program assists very-low income, disabled families who need rental assistance.  As authorized by HUD regulations, the Housing Authority administers this program independently and does not rely on joint ventures with community partners.  Eligible families are identified from the regular housing choice voucher waiting list and are admitted on a first come, first served basis.

> Families admitted into a targeted program must meet all regular admission requirements with the exception of the residency requirement. Since the Housing Authority is required to work closely with other County departments that provide services through all of Los Angeles County, families residing outside of the Housing Authority's jurisdiction are allowed to participate in targeted programs.  However, families may be required to move within the Housing Authority's jurisdiction for at least one year.

The Housing Authority also receives non-Housing Choice Voucher Program funding to administer the following special programs.  See Chapter 18 (Special Programs) for details:

> **Shelter Plus Care Program**

> **Housing Opportunities for Persons with AIDS (HOPWA) Program**

**1.6    FAIR HOUSING AND EQUAL OPPORTUNITY POLICY
        [24 CFR §982.53]**

It is the policy of the Housing Authority to comply fully with all Federal, State and local nondiscrimination laws and with the rules and regulations governing fair housing and equal opportunity in housing and employment.

The Housing Authority shall not deny any family or individual the opportunity to apply for or receive assistance under its rental assistance programs on the basis of race, color, sex, religion, creed, national or ethnic origin, age, family status, handicap or disability.

The Housing Authority will provide Federal, State, and local information to voucher holders regarding discrimination, and the recourse available to them if they are victims of discrimination.  Such information will be made available during the family briefing session, and all fair housing information and discriminatory complaint forms will be included in the voucher holder's briefing packet.

Except as otherwise provided in 24 CFR §8.21(c)(1), §8.24(a), §8.25 and §8.31, no individual with disabilities shall be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination because the Housing Authority's facilities are inaccessible to or unusable by persons with disabilities.

**1.7    OPERATING RESERVES**

The Board of Commissioners shall establish the permitted uses of earned administrative fees at the time of the Annual Consolidated Operating Budget approval.  The approval shall consist of the use of administrative fees for the Housing Choice Voucher Program (Section 8) administration.

The Board of Commissioners must approve the expenditure of Section 8 operating reserves in excess of $50,000. The Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $49,999. The Assistant Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $30,000.

## 1.8     SERVICE POLICY
### [24 CFR §8.24]

This policy is applicable to all situations described in this Administrative Plan when a family initiates contact with the Housing Authority, when the Housing Authority initiates contact with a family including when a family applies, and when the Housing Authority schedules or reschedules any kind of appointments.

It is the policy of the Housing Authority to be service-directed in the administration of its rental assistance programs, and to exercise and demonstrate a high level of professionalism while providing housing services to all families.

The Housing Authority's policies and practices are designed to provide assurances that all persons with disabilities will be provided reasonable accommodation so that they may fully access and utilize the housing program and related services. The availability of specific accommodations will be made known by including notices on Housing Authority forms and letters to all families.

### 1.8.1    Requests for Reasonable Accommodation
### [24 CFR §8.28]

The Housing Authority is required to make reasonable adjustments to rules, policies, practices and procedures of its programs, in order to enable a disabled applicant or participant to have an equal opportunity to use and enjoy their unit, including common areas, and to comply with program obligations.

The Housing Authority approves reasonable accommodation requests on a case-by-case basis, upon determination that:

  ➢  The requested accommodation is reasonable (i.e., it does not result in a fundamental alteration in the nature of the program or an undue financial and administrative burden), and

  ➢  There is an identifiable relationship between the requested accommodation and the individual's disability.

All requests for accommodation will be verified with a reliable, knowledgeable professional so that the Housing Authority can properly accommodate the need presented by the disability (see Chapter 7 for Verification of Reasonable Accommodations).

Families requesting a reasonable accommodation will be notified in writing of the decision.

Reasonable accommodation will be made for persons with disabilities that require an advocate or accessible offices. A designee will be allowed to provide information as needed, but only with the permission of the person with the disability.

Housing Authority of the County of Los Angeles

**1.9    FAMILY OUTREACH**

Each time the Housing Authority enters into an Annual Contributions Contract (ACC) with HUD for new Section 8 existing units, it will be publicized in accordance with the specification in the criteria of the Equal Opportunity Housing Plan. The Housing Authority's waiting list will remain open on a continuous basis for the foreseeable future.

The Housing Authority will communicate the status of housing availability to other service providers in the community; advise them of housing eligibility factors and guidelines in order that they can make proper referrals for housing assistance.

Information regarding the program directed at prospective applicants/tenants will be disseminated in accordance with Equal Opportunity Housing Plan and HUD guidelines for fair housing.

**1.10   OWNER OUTREACH**
       **[24 CFR §982.54(d)(5)]**

The Housing Authority encourages owners of decent, safe and sanitary housing units to lease to families participating in its rental assistance programs. The Housing Authority maintains and regularly updates a list of interested landlords and available units for its rental assistance programs. When listings from owners are received, they are compiled by Housing Authority staff and made available through the phone hotline, by mail, or by Internet at www.hacola.org.

Ongoing marketing efforts to recruit suburban owners for participation include, but are not limited to:

1. Brochures for owners;

2. Realty Board presentations;

3. Apartment Owner Association presentations;

4. Community Center presentations; and

5. Presentation to organizations serving the disabled and other similar organizations.

The Housing Authority periodically evaluates the distribution of assisted families to identify areas within the jurisdiction where owner outreach should be targeted. Special outreach efforts will be used in order to encourage participation of those groups who would not normally apply or participate.

**1.11   PRIVACY RIGHTS**
       **[24 CFR §5.212]**

Applicants and participants, including all adults in each household, are required to sign the HUD-9886 Form (Authorization for the Release of Information). This document incorporates the Federal Privacy Act Statement and describes the conditions under which HUD will release family information.

A statement of the Housing Authority's policy on release of information to prospective landlords will be included in the briefing packet that is provided to the family.

The Housing Authority's practices and procedures are designed to safeguard the privacy of applicants and program participants. All applicant and participant files are stored in a secure location that is only to be accessed by authorized staff.

Housing Authority staff will not discuss family information contained in files unless there is a business or legal reason to do so. Inappropriate discussion of family information or improper disclosure of family information will result in disciplinary action.

## 1.12   MONITORING PROGRAM PERFORMANCE
### [24 CFR §985]

In order to ensure quality control, supervisory staff will review the following functions:

1. 10 percent of all work completed by their staff, and

2. 100 percent of work completed by new staff for a minimum of 30 calendar days.

The Housing Authority's Quality Assurance Unit conducts audits of:

1. 5 percent of annual re-examinations/interim re-examinations, and

2. Minimum Housing Quality Standards (HQS) quality control inspections as dictated by Section 8 Management Assessment Program (SEMAP) Indicator #5.

The Housing Authority's Program Enforcement/Investigations Unit uses credit checks, and other similar tools to ensure program integrity. 1,500 random credit reviews are conducted annually for new applicant and existing participant households, including added family members, portability households, zero-income households, staff referrals and fraud inquiries.

## 1.13   TERMINOLOGY
### [24 CFR §982.4(b) and FR-5056-N-01]

"Family" is used interchangeably with "applicant" or "participant" and can refer to a single person family. "Tenant" refers to participants in terms of their relation to landlords.

"Landlord" and "owner" are used interchangeably.

"Domestic Violence" is defined as felony or misdemeanor crimes of violence committed by:

➢ A current or former spouse of the victim;

➢ A person with whom the victim shares a child in common;

➢ A person who is cohabitating with or has cohabitated with the victim as a spouse;

➢ A person similarly situated to a spouse of the victim under local and state domestic or family violence laws;

> ➢  Any other person against an adult or youth victim who is protected from that person's acts under local and state domestic or family violence laws.

"Dating Violence" is defined as violence committed by a person:

> ➢  Who is or has been in a social relationship of a romantic or intimate nature with the victim; and

> ➢  Where the existence of such a relationship shall be determined based on consideration of the following factors:
>
>> o   The length of the relationship;
>>
>> o   Type of relationship; and
>>
>> o   Frequency of interaction between persons involved in the relationship.

"Stalking" is defined:

> ➢  To follow, pursue, or repeatedly commit acts with the intent to kill, injure, harass, or intimidate another person; or

> ➢  To place under surveillance with the intent to kill, injure, harass, or intimidate another person; and

> ➢  In the course of, or as a result of, such following, pursuit, surveillance, or repeatedly committed acts, to place a person in reasonable fear of the death of, or serious bodily injury to, or to cause serious emotional harm to that person, the spouse or intimate partner of that person, or a member of the immediate family of that person.

"Immediate Family Member" is defined to mean, with respect to a person,

> ➢  A spouse, parent, brother or sister, or child of that person, or an individual to whom that person stands in loco parentis; or

> ➢  Any other person living in the household of that person and related to that person by blood or marriage.

"Student" is defined to mean all students enrolled either full-time or part-time at an institution of higher education.

"Independent Student Status" is when the income of the student's parents is not relevant or the student can demonstrate the absence of, or his or her independence from, parents. These criteria include but are not limited to the following:

> ➢  The individual must be of legal contract age under state law;

> ➢  The individual must have established a household separate from parents or legal guardians for at least one year prior to application for assistance, or

> ➢  The individual meets the U.S. Department of Education's definition of an independent student:
>
>> •   Be at least 24 years old by December 31 of the award year for which aid is sought;

- Be an orphan or a ward of the court through the age of 18.

- Be a veteran of the U.S. Armed Forces;

- Have a legal dependents other than a spouse (for example, dependent children or parent);

- Be a graduate or professional student; or,

- Be married.

"Financial Aid" means any assistance that an individual receives:

- Under the Higher Education Act of 1965;

- From private sources;

- From an institute of higher education.

Such financial aid may include federal, state, and local grants and scholarships (athletic and academic), fellowships and student educational financial assistance from parents, guardians, or other persons residing outside of the student family household.

Types of financial aid under the Higher Education Act of 1965 would include: the Pell Grant, the Federal Supplemental Education Opportunity Grant (FSEOG), Academic Achievement Incentive Scholarships, State assistance under the Leveraging Educational Assistance Partnerships Program, the Robert C. Byrd Honors Scholarship Program, and federal Work-Study (FWS) programs.

"Tuition" shall have the meaning given by the institution of higher education in which the student is enrolled.

Housing Authority of the County of Los Angeles

## CHAPTER 2:
## ADMISSION ELIGIBILITY FACTORS AND APPLICANT REQUIREMENTS

**2.1**   **INTRODUCTION**
**[24 CFR §982.54(d)]**

This chapter defines the criteria used by the Housing Authority to determine program eligibility, and the requirements that families and family members must meet in order to receive assistance under the program. This chapter also clarifies the circumstances that may lead to a denial of admission, and the process for notifying families if they are denied admission.

Family members being added to households that are currently receiving assistance are considered new applicants and are subject to the Housing Authority's admission and eligibility requirements.

The intent of these policies is to maintain consistency and objectivity in evaluating the eligibility of families who apply for the programs. The criteria listed in this chapter are the only factors used to review eligibility, to minimize the possibility of bias or discrimination. Selection shall be made without regard to race, color, creed, religion, sex, national origin, familial status, source of income, or disability/handicap.

**2.2**   **ELIGIBILITY FACTORS AND REQUIREMENTS**
**[24 CFR §982.201 and 24 CFR §982.552]**

In accordance with HUD regulations, the Housing Authority has established the following eligibility criteria, which are detailed throughout this chapter. To be eligible for admission, an applicant family must:

1. Meet the definition of a "family;"

2. Be within the appropriate income limits;

3. Be a citizen, or a non-citizen with eligible immigration status [24 CFR §5.508]; and

4. Furnish and verify valid Social Security numbers for all family members age 6 and over [24 CFR §5.216].

The Housing Authority will also deny admission as follows:

1. If applicant fails to meet specified criteria regarding drug abuse and other criminal activity;

2. If applicant fails to submit required consent forms, or any other Housing Authority-required information to verify family eligibility, composition, or income (including birth certificates and valid state identification);

3. If applicant is in violation of other criteria listed in Section 2.8 of this chapter;

4. If the applicant is a member, officer or employee of the Housing Authority who formulates policy or influences decisions with respect to federally funded rental assistance programs or a public official or a member of the local governing body or member of Congress; or

5.  If applicant is a student enrolled in an institution of higher learning and meets all the criteria listed in Section 2.5 of this chapter.

The Housing Authority's procedures regarding notification and informal reviews for applicants who are denied assistance can be found at the end of this chapter.

**2.3   FAMILY COMPOSITION**
   **[24 CFR §982.201(c)]**

The applicant must qualify as a family. The Housing Authority defines a family as a single person or a group of persons as follows.

1.  **An elderly family**:   A family whose head, co-head, spouse, or sole member is a person who is at least 62 years of age. It may include two or more persons who are at least 62 years of age living together, or one or more persons who are at least 62 years of age living with one or more live-in aides.

2.  **A disabled family**:   A family whose head, co-head, spouse, or sole member is a person with disabilities. It may include two or more persons with disabilities living together, or one or more persons with disabilities living with one or more live-in aides.

3.  **The remaining member of a tenant family**: The remaining member of a tenant family will be reassigned another bedroom size voucher, provided there is funding available.

    The remaining member of a tenant family does not include a live-in aide of the former family whose service was necessary to care for the well being of an elderly, disabled or handicapped head of household, co-head, or spouse and whose income was not included for eligibility purposes.

4.  **A group of persons**: Two or more persons sharing residency, who are not categorized as an elderly or disabled family, whose income and resources are available to meet family needs. There must be a relation by blood, marriage or operation of law, or the group must provide evidence of a significant relationship determined to be stable by the Housing Authority.

    The following is to be considered as relation by blood: mother, father, children, cousin, niece, nephew, aunt, uncle, grandfather and grandmother. A group of two could also be a single person who is pregnant or in the process of adopting or securing legal custody of any individual under the age of 18.

5.  **A single person**: A person who lives alone, or intends to live alone, who is not categorized as elderly, disabled, or the remaining member of a tenant family.

A child who is temporarily away from home due to placement in foster care is considered a member of the family.

Housing Authority of the County of Los Angeles

**2.3.1   Stable Relationship**

When the applicant group is not related by blood, marriage, or operation of law, the Housing Authority will require that the applicant group provide evidence of a stable relationship.

The Housing Authority defines a stable relationship as:

1. A relationship that has been in existence for a minimum of 6 months, and

2. The parties provide financial support for each other.

Acceptable documentation of a stable relationship includes lease agreements indicating that the parties have lived together for at least 6 months, utility bills, other joint bills and/or bank account(s) (need to provide for a 6-month period), and, on a case-by-case basis, letters from a social service provider or religious organization confirming the relationship.

**2.3.2   Head of Household**
**[24 CFR §5.504]**

The head of household is considered to be the adult member of the household who is designated by the family or the Housing Authority as head, is wholly or partly responsible for paying the rent, to sign program-related documents, and has the legal capacity to enter into a lease under State/local law.  However, since rental assistance is provided to the entire family, it is expected that every family member will uphold the Housing Authority's rules and regulations.  Emancipated minors who qualify under State law will be recognized as head of household.

**2.3.3   Spouse of Head**

Spouse means the husband or wife of the head of household.  The marriage partner who, in order to dissolve the relationship would have to be divorced. It includes the partner in a common law marriage.  The term "spouse" does not apply to boyfriends, girlfriends, significant others, or co-heads.

**2.3.4   Co-Head**

A co-head is an individual in the household who is equally responsible for the lease with the head of household.  A family may have a spouse or co-head, but not both.  A co-head never qualifies as a dependent.

**2.3.5   Live-In Aides**
**[24 CFR §982.316 and 24 CFR §5.403]**

A family may include a live-in aide if the live-in aide meets the following stipulations.  The live-in aide:

1. Is determined by the Housing Authority to be essential to the care and well being of an elderly person or a person with a disability;

2. Is not obligated for the support of the person(s);

3. Would not be living in the unit except to provide care for the person(s); and

4. Must submit a signed Criminal Background Consent Form.

A live-in aide is different from a family member in the following:

1. An aide's income will not be used to determine eligibility of family;

2. An aide is not subject to citizenship/eligible immigrant requirements;

3. An aide is not considered a remaining member of the tenant family, which means that they are not entitled to retain the voucher if the eligible family member(s) voluntarily leave the program, are terminated from the program, or have a voucher that expires.

Relatives are not automatically excluded from being live-in aides, but they must meet all the stipulations in the live-in aide definition described above to qualify for the income exclusion as a live-in aide.

A relative who does not qualify for income exclusion as a live-in aide may qualify for other exclusions, including if a family receives income from a state agency to offset the cost of services and equipment needed to keep a developmentally disabled family member at home. For a complete list of income exclusions, refer to Section 6.4 (Income Inclusions and Exclusions).

A live-in aide may only reside in the unit with the approval of the Housing Authority. The Housing Authority will require written verification from a reliable, knowledgeable professional, such as a doctor, social worker, or caseworker. The verification provider must certify that a live-in aide is needed for the care of the family member who is elderly, and/or disabled. The verification must include the hours of care that will be provided.

The live-in aide will be subject to a criminal background check and must meet the same standard as an applicant. Please see Section 2.8 (Screening for Drug Abuse and Other Criminal Activity) for more information.

With authorization from the assisted family, the landlord and the Housing Authority, a live-in aide may have a family member live in the assisted unit as long as it does not create overcrowding in the unit. The Housing Authority will not increase the family's subsidy to accommodate the family of a live-in aide.

### 2.3.6  Split Households Before Voucher Issuance

When a family breakup occurs while a family is on the waiting list due to divorce or legal separation, it is the responsibility of the two families to decide which will take the placement on the waiting list. If no decision or court determination is made, the Housing Authority will make the decision, taking into consideration the following:

1. Which family member applied as head of household;

2. Which family member retains the children or any disabled or elderly members;

3. Any restrictions that were in place at the time the family applied;

4. Role of domestic violence or any other infraction; and

5. Recommendation of social service agencies or qualified professionals.

Housing Authority of the County of Los Angeles

**2.3.7** <u>**Multiple Families in the Same Household**</u>

When families consisting of two families living together, (such as a mother and father, and a daughter with her own husband or children), apply together as a family, they will be treated as one-family unit.

**2.3.8** <u>**Joint Custody of Children**</u>

Children who are subject to a joint custody agreement but live with one parent at least 51 percent of the time will be considered members of that household.  If both parents on the waiting list are trying to claim the child, the parent whose address is listed in the school records will be allowed to claim the school-age child as a dependent.

Where court orders exist and provide guidance on custody issues, the Housing Authority will follow the directives outline in the court documents.

**2.4** <u>**INCOME LIMITATIONS**</u>
<u>**[24 CFR §982.201(b) and 24 CFR §5.603(b]**</u>

In order to be eligible for assistance, an applicant must be:

1. An extremely low-income family (a family whose gross annual income does not exceed 30 percent of the HUD-established median income for the Los Angeles-Long Beach Primary Metropolitan Statistical Area); **or**

2. A very low-income family (a family whose gross annual income does not exceed 50 percent of the median income for the Los Angeles-Long Beach Primary Metropolitan Statistical Area).

3. A low-income family (a family whose gross annual income does not exceed 80 percent of the median income for the Los Angeles-Long Beach Primary Metropolitan Statistical Area) who meets at least one of the following criteria:

   i. Is "continuously assisted" (meaning the applicant has been receiving assistance under a program covered by the 1937 Housing Act, i.e. public housing); or

   ii. Is displaced as a result of the prepayment of the mortgage or voluntary termination of an insurance contract on eligible low-income housing; or

   iii. Qualifies for assistance as a non-purchasing family residing in a HOPE 1 or HOPE 2 project; or

   iv. Qualifies for assistance as a non-purchasing family residing in a project subject to a resident homeownership program under 24 CFR §248.101.

As required by HUD regulations, 75 percent of all new admissions will be required to meet the definition of an extremely low-income family.  To achieve the required balance, it may be necessary to skip over an otherwise eligible family.  If this occurs, families that have been skipped over will retain the time and date of application and will be admitted as soon as an appropriate opening becomes available.

Families whose annual incomes exceed the income limit will be denied admission and offered an informal review.

### 2.4.1 Income Limits for Other Programs

Periodically, HUD has provided funding to the Housing Authority for projects involving preservation opt-outs and/or the expiration of a project based Section 8 contract.  HUD provides the income limits applicable to those projects through specific regulation.   The Housing Authority will follow HUD directives in determining admissions for such programs.

### 2.5   ELIGIBILITY OF STUDENTS
### [24 CFR §5.612]

The student rule applies to all individuals enrolled as a full or part-time student at an institution of higher education for the purpose of obtaining a degree, certificate, or other program leading to a recognized educational credential, except for a student who is living with his/her parents who are applying for or receiving section 8 assistance.

No assistance shall be provided to any individual that meets the following criteria:

> - Is enrolled as a student at an institution of higher education, as defined under section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002);

> - Is under 24 years of age;

> - Is not a veteran of the United States military;

> - Is unmarried;

> - Does not have a dependent child;

> - Is not a person with disabilities, as such term is defined in section 3(b)(3)(F) of the United States Housing Act of 1937 and was not receiving assistance under such section 8 as of November 30, 2005; and

> - Is not otherwise individually eligible (determined independent from his or her parents. See section 1.13 Terminology), or has parents, who individually or jointly, are not eligible on the basis of income to receive assistance.

> Unless the student is determined independent from his or her parents, the eligibility of a student seeking assistance will be based on both the student and the parents being determined income eligible for assistance or whether the student's parents, individually or jointly, are income eligible for assistance.  Both the student's income and the parents' income must be separately assessed for income eligibility.

### 2.6   CITIZENSHIP/ELIGIBLE IMMIGRATION STATUS
### [24 CFR §982.201(a) and §982.203(b)(4) and §5.508]

Eligibility for assistance is contingent upon a family's submission of evidence of citizenship or eligible immigration status.  In order to receive assistance, a family member must be a U.S. citizen or eligible immigrant.  Each family member, regardless of age, must submit a signed declaration of U.S. citizenship or eligible

Housing Authority of the County of Los Angeles

immigration status.  The Housing Authority may request verification of the declaration according to verification guidelines detailed in Chapter 7.

The citizenship/eligible immigration status of each member of the family is considered individually before the family's status is defined.

### 2.6.1 Mixed Families
### [24 CFR §5.504]

An applicant family is eligible for assistance as long as at least one member is a citizen or eligible immigrant.  A family that includes eligible and ineligible individuals is called a "mixed family."  Mixed family applicants will be given notice that their assistance will be prorated and that they may request a hearing if they contest this determination.

### 2.6.2 No Eligible Members
### [24 CFR §982.552(b)(4)]

The Housing Authority is required to deny admission if no member of the family is a U.S. citizen or eligible immigrant.  Families will be provided the opportunity to appeal the decision in an informal review.

### 2.7 SOCIAL SECURITY NUMBER REQUIREMENTS
### [24 CFR §5.216(a)]

Applicant families are required to provide verification of Social Security numbers for all family members prior to admission, if they have been issued a number by the Social Security Administration.  This requirement also applies to persons joining the family after the admission to the program.  Children age 5 and under, who have not been assigned a number, are exempt from this requirement.

Failure to furnish verification of Social Security numbers is grounds for denial of admission.

### 2.8 SCREENING FOR DRUG ABUSE AND OTHER CRIMINAL ACTIVITY
### [24 CFR §982.552 – §982.553]

This section describes the guidelines the Housing Authority has established for screening applicants for drug abuse and other criminal activity.  The section includes HUD-required screening standards, as well as discretionary standards allowed by HUD.  The Housing Authority will deny program admission if there is reasonable cause to believe that an applicant family has engaged in activity prohibited by these guidelines.

These guidelines apply to applicant families, and any new members being added to the household of a family currently participating in a rental assistance program administered by the Housing Authority.  The Housing Authority also screens families transferring into its jurisdiction from other housing authorities, as authorized at 24 CFR §982.355(c)(9) and §982.355(c)(10).

**2.8.1** **Drug Abuse and Criminal History Screening Standards**
**[24 CFR §982.552(i) and §982.553(a)]**

The Housing Authority will prohibit program admission to households if any household member is found to have engaged in activities listed in this screening standards section. Applicants convicted of an act listed in this section are ineligible to receive assistance. However, the Housing Authority will consider the household eligible for rental assistance if the household member who committed the criminal act will not be a part of the assisted household; as long as all other admission requirements are met. The family may be required to submit written certification that the ineligible family member(s) will not reside in and/or visit the household.

1. **Applicant(s) previously evicted from federally assisted housing for drug-related criminal activity.**

   The Housing Authority is required to deny admission to the applicant or any household member evicted from public housing, Indian housing, Section 23, or any federally assisted housing program because of a drug-related criminal activity for a 3-year period beginning on the date of such eviction. However, the Housing Authority may waive the 3-year probation period if the person who committed the drug-related crime has successfully completed an approved supervised drug rehabilitation program after the date of the eviction or if the circumstances leading to the eviction no longer exist (i.e. the individual responsible for the original eviction is imprisoned or is deceased).

2. **Applicant(s) convicted for the manufacture of methamphetamine on the premises of federally assisted housing.**

   The Housing Authority is required to deny admission if the applicant or any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

3. **Applicant(s) currently engaging in the illegal use of a drug.**

   The Housing Authority is required to deny admission to an applicant or any household member who the Housing Authority determines is currently engaging in illegal use of a drug.

   The Housing Authority is required to deny admission if the Housing Authority has reasonable cause to believe that there is a pattern of illegal use of a drug by the applicant or any household member and that this pattern may threaten the health, safety, or right to peaceful enjoyment of the premises by others, regardless of whether the household member has been arrested or convicted.

   The Housing Authority may approve admission if the person provides sufficient evidence that they are no longer engaging in illegal drug use and have successfully completed a supervised drug rehabilitation program.

4. **Applicant(s) subject to a lifetime sex offender registration requirement.**

Housing Authority of the County of Los Angeles

The Housing Authority is required to deny admission if the applicant or any household member is subject to lifetime registration as a sex offender under a state registration program, regardless of longevity of conviction or completion of any rehabilitative program.

5. **Applicant(s) with a pattern of alcohol abuse.**

The Housing Authority is required to deny admission if the Housing Authority has reasonable cause to believe that there is a pattern of abuse of alcohol by the applicant or any household member and this pattern may threaten the health, safety, or peaceful enjoyment of the premises.

The Housing Authority may approve admission if the person provides sufficient evidence that they are no longer engaging in the abuse of alcohol and has successfully completed a supervised alcohol rehabilitation program.

6. **Applicant(s) currently engaging in, or who have engaged in criminal activities.**

The Housing Authority shall deny admission if the applicant or any household member has been convicted for **any** of the following activities, for a period of 3 years following the end of a conviction or incarceration (which ever is later), with no further arrest or convictions other than minor traffic violations:

- Drug-related criminal activity;

- Violent criminal activity (convicted perpetrators only);

- Other criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity; and

- Other criminal activity which may threaten the health or safety of the owner or Housing Authority staff, contractor or subcontractors or vendors.

- The Housing Authority may waive the 3-year period for drug-related criminal activity if the person provides sufficient evidence that they are no longer engaging in the illegal use of a controlled substance and have successfully completed a supervised drug rehabilitation program.

7. **Applicant(s) engaging in fraud or bribery associated with any federal housing program.**

The Housing Authority shall deny admission if the applicant or any household member has committed fraud, bribery, or any other corrupt or criminal act in connection with any Federal housing program.   The Housing Authority may make an exception in determining admission if the family member(s) who participated or were culpable for the action do not reside in the assisted unit.

8. **Applicant(s) have not completed parole or probation.**

The Housing Authority shall deny admission if the applicant or any household member has not completed parole or probation, including summary probation.

## 2.8.2 Criminal Background Checks
[24 CFR §982.552 – §982.553, §5.903 – §5.905]

The Housing Authority requests a criminal background check for all applicant household members (including live-in aides) 18 years of age and older.   The criminal background check is used as a factor in screening applicants for criminal activities that would prohibit admission to the Housing Authority's Section 8 rental assistance programs.

All adult members of an applicant household must submit a signed Criminal Background Consent Form [24 CFR §5.903(b)], authorizing the release of criminal conviction records from law enforcement agencies.  Failure to sign the consent form will result in the denial of assistance.

A criminal conviction alone may or may not result in the denial of assistance. Factors such as disclosure, completion of a drug or alcohol rehabilitative treatment program, type and longevity of the conviction may also be taken into consideration.

The Housing Authority is additionally authorized by HUD to obtain access to sex offender registration information, in order to prevent program admission to any household member (including live-in aides and minors) subject to a lifetime sex offender registration under a State sex offender registration program.

## 2.8.3 Requests for Criminal Records by Owners of Covered Housing for the Purposes of Screening
[24 CFR §5.903(d)]

Owners of covered housing may request that the Housing Authority obtain criminal records, on their behalf, for the purpose of screening applicants.  The Housing Authority will charge a fee in order to cover costs associated with the review of criminal records.   These costs could include fees charged to the Housing Authority by the law enforcement agency and the Housing Authority's own related staff and administrative cost.

Owners must submit the following items in order for the Housing Authority to process criminal records.  Owner requests must include:

1.  A copy of a signed consent form from each adult household members, age 18 years and older.  Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social Security number.  This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2.  An owner's criteria or standards for prohibiting admission of drug criminals in accordance with HUD regulations (§ 5.854 of 24 CFR Parts 5 et al.), and for prohibiting admission of other criminals (§ 5.855 of 24 CFR Parts 5 et al.).

Once the Housing Authority obtains criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used

Housing Authority of the County of Los Angeles

as a basis for applicant screening. The Housing Authority will base its determination in accordance with HUD regulations and the owner criteria. If the owner's criteria conflicts with HUD regulations, the regulations will have precedence.

It is important to note that the Housing Authority will not disclose the applicant's criminal conviction record or the content of that record to the owner.

**2.8.4    Request for Criminal Records by Section 8 Project-Based Owners for the Purposes of Lease Enforcement or Eviction**

Section 8 project-based owners may request that the public housing agency in the location of the project obtain criminal conviction records of a household member on behalf of the owner for the purpose of lease enforcement or eviction. The owner's request must include the following:

1. A copy of the consent form, signed by the household member, and

2. The owner's standards for lease enforcement and evicting due to criminal activity by members of a household.

**2.8.5    Confidentiality of Criminal Records
[24 CFR §5.903(g)]**

Criminal records received by the Housing Authority are maintained confidentially, not misused, nor improperly disseminated and kept locked during non-business hours. All criminal records will be destroyed no later than 30 calendar days after a final determination is made.

**2.8.6    Disclosure of Criminal Records to Family**

The applicant or family member requesting to be added to the household will be provided with a copy of the criminal record upon request and an opportunity to dispute the record. Applicants will be provided an opportunity to dispute the record at an informal review. Participants may contest such records at an informal hearing [24 CFR §982.553(d)].

**2.8.7    Explanations and Terms
[24 CFR §5.100]**

The following terms are used to determine eligibility when an applicant or a family member is added to an already assisted household and is undergoing a criminal background check.

- "Covered housing" includes public housing, project-based assistance under Section 8 (including new construction and substantial rehabilitation projects), and tenant-based assistance under Section 8.

- "Drug" means a controlled substance as defined in Section 102 of the Controlled Substance Act (21 U.S.C. 802).

- "Drug-related criminal activity" means the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with the intent to manufacture, sell, distribute or use the drug.

- "Pattern" is defined as the use of a controlled substance or alcohol if there is more than one incident during the previous 12 months. "Incident" includes but is not limited to arrests, convictions, no contest pleas, fines, and city ordinance violations.

- "Premises" is the building or complex or development in which the public or assisted housing dwelling unit is located, including common areas and grounds.

- "Sufficient evidence" may include all or a number of personal certification along with supporting documentation from the following sources 1) probation officer; 2) landlord; 3) neighbors; 4) social service workers; 5) review of verified criminal records.

- "Violent criminal activity" means any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage.  Violent criminal activity also includes activity within the family, such as during domestic disputes.

## 2.9   OTHER CRITERIA FOR ADMISSION
[24 CFR §982.552(c)]

The Housing Authority is authorized to apply the following criteria, in addition to the HUD eligibility criteria, as grounds for denial of admission to the program.

1. The family, or any household member, must not have violated any family obligations during a previous participation in a federally assisted housing program.  The Housing Authority will review situations, on a case-by-case basis, for violations that are more than 5 years old.

2. The family, or any household member, must not have engaged in serious lease violations while a resident of federally assisted housing or within the past 5 years had been evicted from a federally assisted housing program.

3. The family, or any household member, must not be a past participant of any Section 8 or public housing program who has failed to satisfy liability for rent, damages or other amounts to the Housing Authority or another public housing agency, including amounts paid under a HAP contract to an owner for rent, damages, or other amounts owed by the family under the lease.

   - On a case-by-case basis, the Housing Authority may provide the applicant the opportunity to repay any such debt in full as a condition of admissions.  The Housing Authority will not enter into a repayment agreement for this purpose.

4. No family household member may have engaged in or threaten abusive or violent behavior toward Housing Authority personnel.

   - "Abusive or violent behavior" includes verbal as well as physical abuse or violence.  Use of expletives that are generally considered insulting, racial epithets, or other language, written or oral, that is customarily used to insult or intimidate, may be cause for denial of admission.

Housing Authority of the County of Los Angeles

- "Threatening" refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.
- Actual physical abuse or violence will always be cause for denial.

5. The family, or any household member, must not supply false, inaccurate or incomplete information on any application for federal housing programs, including public housing and Section 8. The family may be denied for a period not to exceed 2 years from the date of such a determination by the Housing Authority that information which was provided was false, inaccurate or incomplete, provided that no further cause for denial exists [24 CFR §982.552(c)(2)(i)].

**2.10   SUITABILITY OF FAMILY**
**[24 CFR §982.307(a)(2)]**

The Housing Authority may take into consideration any admission criteria listed in this chapter in order to screen applicants for program eligibility; however, it is the owner's responsibility to screen applicants for family behavior and suitability for tenancy.

The Housing Authority will assist and advise applicants on how to file a compliant if they have been discriminated against by an owner.

**2.11   DENYING ADMISSION TO INELIGIBLE FAMILIES**
**[24 CFR §982.201(f)(1) AND §982.552(A)(2)]**

Denial of assistance for an applicant family may include denying placement on the waiting list; denying or withdrawing a voucher; refusing to enter into a HAP contract or approve a lease; and refusing to process or provide assistance under portability procedures.

Families from the waiting list who are determined to be ineligible will be notified in writing of the reason for denial and given an opportunity to request an informal review if they do not agree with the decision. This policy also applies to incoming families from other housing authorities that have not yet received assistance in the Housing Authority's jurisdiction. Please refer to Chapter 16 for more information on the informal review process.

## CHAPTER 3:
## ADMINISTRATION OF THE WAITING LIST

**3.1    INTRODUCTION**
**[24 CFR §982.54(d)(1)]**

This chapter describes the policies and procedures that govern the initial application, placement and denial of placement on the Housing Authority's waiting list. It is the Housing Authority's objective to ensure that the families are placed on the waiting list in the proper order so that an offer of assistance is not delayed to any family, or made to any family prematurely.

By maintaining an accurate waiting list, the Housing Authority will be able to perform the activities, which ensure that an adequate pool of qualified applicants will be available so that program funds are used in a timely manner.

**3.2    HOW TO REGISTER**

Interested persons may apply online at www.hacola.org, or by calling the Housing Authority at (562) 347-4663 or (800) 731-4663.

**3.2.1   Preliminary Registration Waiting List**
**[24 CFR §982.204(b)]**

All families wishing to receive rental assistance through a Housing Authority rental assistance program are initially placed on the Preliminary Registration Waiting List.  This is essentially an interest list.  Families are placed on the Preliminary Registration Waiting List according to the Housing Authority's admission policies.  Preliminary information regarding the family's address, income, family composition, and disability status is collected.  However, this information is not verified until the family is placed on the Active Waiting List. Applicants receive a confirmation letter that their name has been placed on the Preliminary Registration Waiting List.

**3.2.2   Active Waiting List**

When the Housing Authority determines that there is sufficient funding to issue additional vouchers, a pool of potential new applicants is drawn from the Preliminary Registration Waiting List.  Families move onto the Active Waiting List according to the Housing Authority's admission policies.  Once a family has been placed on the Active Waiting List, they will be asked to complete an application and provide all the necessary income and eligibility forms.   At this point, all information will be confirmed through a third-party.   Families must meet all admissions requirements to be issued a voucher.

**3.2.3   Change in Circumstances**
**[24 CFR §982.204(b)]**

Applicants are required to notify the Housing Authority in writing, within 30 calendar days, when their circumstances change, including any change of address, income or family composition.

Housing Authority of the County of Los Angeles

### 3.3     APPLYING FOR SPECIAL PROGRAMS AND NON-HOUSING CHOICE VOUCHER PROGRAMS

To see a list of special programs, other non-Housing Choice Voucher Programs and the eligibility process, please refer to Chapter 18 (Special Programs).

### 3.4     SPECIAL ADMISSIONS

Applicants admitted under special admissions, rather than from the waiting list, are identified by codes in the automated system and are not maintained on separate lists.

Applicants who are admitted under targeted funding which are not identified as a Special Admission are identified by codes in the automated system and are not maintained on separate waiting lists.

### 3.4.1   Exceptions for Special Admissions
### [24 CFR §982.203]

If HUD awards the Housing Authority program funding that is targeted for specifically named families, the Housing Authority will admit these families under a special admission procedure.  Special admissions families will be admitted outside of the regular waiting list process. They do not have to qualify for any preferences, nor are they required to be on the program waiting list. They are not counted in the limit on non-Federal preference admissions.   The Housing Authority maintains separate records of these admissions.   The following are examples of types of program funding that may be designated by HUD for families living in a specified unit:

1.  A family displaced because of demolition or disposition of a public or Indian housing project;

2.  A family residing in a multifamily rental housing project when HUD sells forecloses or demolishes the project;

3.  For housing covered by the Low Income Housing Preservation and Resident Homeownership Act of 1990;

4.  A family residing in a project covered by a project-based Section 8 HAP contract at or near the end of the contract term; and

5.  A non-purchasing family residing in a HOPE 1 or HOPE 2 project.

### 3.4.2   Criminal Background Checks

Program applicants for all voluntary set-aside programs will require criminal background checks.  Applicants for the Shelter Plus Care program will not be required to undergo criminal background checks. For more specific information on the applicant screening standards used by the Housing Authority when reviewing criminal records, please refer to Section 2.8 (Screening for Drug Abuse and Other Criminal Activity).

**3.5**    **OPENING AND CLOSING THE WAITING LIST**
        **[24 CFR §982.206]**

The Housing Authority has maintained a continuously open waiting list, and for the foreseeable future plans to continue this process indefinitely.   However, should it become necessary to close and then reopen the waiting list, the Housing Authority will comply with the policies outlined in this chapter.

**3.5.1**   **Opening the Waiting List**
        **[24 CFR §982.206(a)]**

When the Housing Authority opens its waiting list, it will give public notice by advertising in the following newspapers, minority publications, and media entities.

- ➢ Los Angeles Times
- ➢ La Opinion
- ➢ The Daily News
- ➢ International Daily News
- ➢ L.A. Sentinel
- ➢ Long Beach Press Telegram
- ➢ Eastern Group Publications
- ➢ The Wave
- ➢ The Daily Breeze

The Housing Authority's public notice will contain:

- ➢ The dates, times, and locations where families may apply;
- ➢ The programs for which applications will be taken;
- ➢ A brief description of the program(s);
- ➢ A statement that public housing residents must submit a separate application if they want to apply to a rental assistance program;
- ➢ Any limitations on who may apply; and
- ➢ The Fair Housing Logo.

The notice will provide potential applicants with information that includes the Housing Authority's telephone number, website address, location address, information on eligibility requirements, and the availability of local preferences, if applicable.   The notice will be made in an accessible format to persons with disabilities if requested.

Additional time for submission of an application after the stated deadline will be given as a reasonable accommodation at the request of a person with a disability.

Housing Authority of the County of Los Angeles

### 3.5.2 Criteria Defining Who May Apply
#### [24 CFR §982.206(b)(1)]

Upon opening the waiting list, the Housing Authority will disclose the criteria defining what families may apply for assistance under a public notice.

### 3.5.3 Closing the Waiting List
#### [24 CFR §982.206(c)]

Should it become necessary to close the waiting list, the Housing Authority will use the same advertising methods described above.

Notification of impending closure will be provided to the public for a minimum of 30 calendar days.

### 3.6 TIME OF SELECTION
#### [24 CFR §982.204(d)]

When funding is available, families will be selected from the waiting list based on the Housing Authority's admission policies.

If the Housing Authority ever has insufficient funds to subsidize the unit size of the family at the top of the waiting list, the Housing Authority will not admit any other applicant until funding is available for the first applicant.

However, families may be skipped over to meet HUD-mandated income targeting requirements [24 CFR §982.201(b)].   See Section 2.4 (Income Limitations) for details.

### 3.7 CROSS-LISTING OF PUBLIC HOUSING AND SECTION 8 WAITING LISTS
#### [24 CFR §982.205(a)]

The Housing Authority does not merge the waiting lists for public housing and Section 8.  However, if the Section 8 waiting list is open when the applicant is placed on the public housing list, the Housing Authority must offer to place the family on the Section 8 waiting list.  If the public housing waiting list is open at the time an applicant applies for Section 8 rental assistance, the Housing Authority must offer to place the family on the public housing waiting list.

### 3.8 REMOVING APPLICANTS FROM THE WAITING LIST AND PURGING
#### [24 CFR §982.204(c) and §982.201(f)(1)]

The Housing Authority is authorized to remove names of applicants who do not respond to requests for information or updates. An applicant who fails to respond to a Housing Authority mailing within the time frame indicated will be removed from the waiting list.   An extension may be considered a reasonable accommodation if requested in advance by a person with a disability.

If a letter is returned by the Post Office, the applicant will be removed without further notice. The envelope and letter will be maintained in the file.

This policy applies to purging, in which a request for current information and confirmation of continued interest is mailed to all applicants, to ensure that the waiting list is current and accurate.

Notices will be made available in accessible format upon the request of a person with a disability.

Applicants who are removed from the waiting list for failure to respond are not entitled to reinstatement on the waiting list, unless:

> The Housing Authority verifies a family/health/work emergency, or

> The applicant failed to respond because of a family member's disability.

Periodically, applicants will call to check their status on the waiting list and learn that they have been cancelled because mail was returned undeliverable.  In extenuating circumstances, such as a long-term illness, or other family emergency, the applicant may be reinstated.  However, the applicant must be able to provide documentation of the circumstances.  Such requests will be reviewed and approved (or denied) on a case-by-case basis by the Applications and Eligibility Unit Supervisor.

**3.9   APPLICATION POOL**

The waiting list will be maintained in accordance with the following guidelines:

1. The application will be a permanent file;

2. Applications equal in preference will be maintained by date and time; and

3. All applicants must meet eligibility requirements outlined in Chapter 2 (Admission Eligibility Factors and Applicant Requirements).

Housing Authority of the County of Los Angeles

<div align="center">

**Chapter 4:**
**ADMISSION PROCESS**

</div>

**4.1     INTRODUCTION**

The policies outlined in this chapter are intended to ensure that all families who express an interest in housing assistance are given an equal opportunity to apply.  The primary purpose of the intake function is to gather information about the family so that an accurate, fair, and timely decision relative to the family's eligibility may be made.  As such, applicants are placed on the waiting list in accordance with this plan.

**4.2     APPLICATION PROCEDURES**
**[24 CFR §982.204(c)]**

Once the applicant is transferred from the Preliminary Registration Waiting List to the Active Waiting List, an application will be mailed to the applicant.  The application is due back within 10 calendar days from the date it was mailed.  If the application is returned undeliverable, the applicant will be cancelled from the waiting list.

Once an application is returned, the information provided by the applicant will be used to determine if the applicant is eligible for a tenant selection preference, and used to help the Housing Authority determine which income forms the applicant must complete.

If an applicant is ineligible based on the information provided on the application, or because they fail to return the documents by the due date, the applicant will be provided written notice of the reason for their disqualification and their right to request an informal review.

The application may capture the following information:

> ➤  Name of adult members and age of all members;
> ➤  Sex and relationship of all members;
> ➤  Street address and phone number;
> ➤  Mailing address;
> ➤  Amount(s) and source(s) of income received by household members;
> ➤  Information regarding disabilities relating to program requirements;
> ➤  Information related to qualification for preference(s);
> ➤  Social Security numbers;
> ➤  Race/ethnicity;
> ➤  Citizenship/eligible immigration status;
> ➤  Convictions for drug-related or violent criminal activity;
> ➤  Request for specific reasonable accommodation(s) needed to fully utilize program and services;

➢ Previous address;

➢ Current and previous landlords' names and addresses;

➢ Emergency contact person and address; and

➢ Program integrity questions regarding previous participation in HUD programs.

Applicants are required to inform the Housing Authority in writing within 30 calendar days of effective date of any changes in family composition, income, and address, as well as any changes in their preference status. Applicants must also comply with requests from the Housing Authority to update information.

### 4.2.1   Interview Sessions/Mailings

The Housing Authority will use both mailing and interview sessions to obtain income, asset and family composition information from applicants.

### 4.2.2   Request for Information via Mail

During times of high activity, the Housing Authority will mail income and asset forms to applicants. Applicants will be given 10 calendar days to complete and return all required forms. If forms are not returned in a timely manner, the applicant will receive a final notice. The final notice will provide an additional 5-day grace period. If the required forms are not returned, as specified, the application will be cancelled. The Housing Authority will provide additional time, with appropriate documentation, as a reasonable accommodation and in special circumstances such as an illness and/or death in the family.

### 4.2.3   Application Interview Process

During times for regular activity (average volume), the Housing Authority utilizes a full application interview to discuss the family's circumstances in greater detail, to clarify information that has been provided by the applicant, and to ensure that the information is complete.

Applicants are given two opportunities to attend an interview session. If the applicant does not respond to the second invitation, the application is cancelled. Housing Authority will allow for a third interview appointment as a reasonable accommodation and in special circumstances such as illness. An applicant may also request that the Housing Authority assign someone to conduct the interview at the applicant's home, as a reasonable accommodation.

All applicants must complete the following requirements [24 CFR §982.551(b)(1)(iii)].

1. At minimum, the <u>head of household must attend the interview</u>. The Housing Authority requests that all adult members of the applicant family attend when possible. This assures that all members receive information regarding their obligations and allows the Housing Authority to obtain signatures on critical documents quicker.

2. All adult members of the applicant family must sign the HUD-9886 Form (Authorization for the Release of Information), and all supplemental forms required by Housing Authority.

3. Citizen declaration forms must be completed for all applicant family members, regardless of age.

4. All adult members of the applicant family must complete and sign a Criminal Background Consent/Acknowledgment Form.

5. Identification information for all members of the applicant family such as birth certificates, valid driver's licenses or State (Department of Motor Vehicles) ID cards, whichever is applicable based on the age of the family member, must be submitted for all members of the household regardless of age.

Information provided by the applicant will be verified, including citizenship status, full-time student status and other factors related to preferences, eligibility and rent calculation.  Verifications must not be older than 60 calendar days old at the time of issuance.

If they are requested, exceptions for any of the above listed items will be reviewed on a case-by-case basis.   Exceptions will be granted based upon hardship. Reasonable accommodations will be made for persons with disabilities. In these cases, a designee will be allowed to provide some information, but only with permission of the person with a disability.

Under both processes, all local preferences claimed on the application while the family is on the waiting list will be verified.  Preference is based on current status, so the qualifications for preference must exist at the time the preference is verified, regardless of the length of time an applicant has been on the waiting list.

### 4.2.4   Secondary Reviews/Credit Reports
### [24 CFR §982.551(b)(1)]

Before issuing vouchers to applicant families, the Housing Authority requests a credit report for a random sample of new applicant families, as detailed in Section 1.12 (Monitoring Program Performance).   Of the randomly selected families, all adults (persons 18 years of age and older) who will reside in the assisted household will have their credit report reviewed by the Housing Authority.   Applicant households claiming that they have zero income will automatically undergo a credit review.

The information contained in the credit report will be used to confirm the information provided by the family.  Specifically, the credit report will be used to confirm:

- **Employment**: A credit report will list any employers that the applicant has listed in any recent credit applications.   If the credit report reveals employment, for any adult household member, within the last 12 months that was not disclosed, the family will be asked to provide additional documents to clear up the discrepancy. Failure to disclose current employment may result in cancellation of the family's application.

- **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit. Common reasons for use of other names include a recent marriage or a divorce. If an alias has not been disclosed to the Housing Authority, the family will be asked to provide additional evidence of the legal identity of adult family members.

- **Current and previous addresses**: A credit report can provide a history of where the family has lived. This is particularly important because the Housing Authority provides a residency preference. If the family has provided one address to the Housing Authority and the credit report indicates a different address, the family will be asked to provide additional proof of residency. This may include a history of utility bills, bank statements, school enrollment records for children, credit card statements or other relevant documents. Failure to provide adequate proof will result in the denial of a residency preference.

- **Credit card and loan payments**: A credit report will usually include a list of the family's financial obligations. Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments. The Housing Authority will review this information to confirm the income and asset information provided by the family. If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, the Housing Authority will ask the family to disclose how they are currently meeting their financial obligations. Accounts that have been charged off or significantly delinquent are not included in this calculation. Failure to provide adequate proof of income will result in termination of the application.

- **Multiple Social Security numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit. If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

A family will not be issued a voucher until all discrepancies between the information provided by the applicant family, and the information contained in the credit report have been cleared by the applicant family.

When discrepancies are found, the family will be contacted by telephone or by mail. In most cases, the family will be allowed a maximum of 10 calendar days to provide the additional documentation. On a case-by-case basis, as a reasonable accommodation, the family may be granted additional time. If additional time is granted, the family will receive a letter confirming the new deadline. No additional extension will be granted thereafter.

When the credit report reveals multiple discrepancies that are not easily communicated over the telephone, the Housing Authority will set up a face-to-face interview with the applicant. The Housing Authority will schedule up to two interview appointments. An additional interview may be scheduled as a reasonable accommodation. Failure to appear at the interview session will result in cancellation of the application.

Housing Authority of the County of Los Angeles

Additionally, failure to provide the necessary information will result in cancellation of the application.

**4.3    LOCAL PREFERENCES**
**[24 CFR §982.207]**

The Housing Authority will apply a system of local preferences in determining admissions for the program.  All preferences will be subject to the availability of funds and all applicants will be required to meet all eligibility requirements.  In accordance with California Health and Safety Code §34322.2, the Housing Authority will give priority to families of veterans and members of the armed forces in each of the categories below.   Local preferences are weighted highest to lowest, in the following order:

1. **Set-Aside, Targeted, and Special Programs :** Families who qualify for Set-Aside, Targeted, or Special Programs administered by the Housing Authority will be admitted before all other eligible applicants or applicants on the waiting list.  Referral may be made by County agencies with a contract or Memorandum of Understanding in place, or by contracted CBO's up to and not to exceed the number of vouchers specified in the contract.

2. Families previously assisted by the Housing Authority whose assistance was terminated due to insufficient funding.

3. Families who live or work in the jurisdiction in the following categories that are subject to the approval by the Executive Director:

   - **Victims of Declared Disasters**: An admissions preference may be given to bona fide victims of declared disasters, whether due to natural calamity (e.g. earthquake), civil disturbance, or other causes recognized by the federal government. Victims must provide documentation to receive an admissions preference. Admissions preference may only be given within the allotted timeframe established by the federal government. If HUD provides specific funding, the Housing Authority will not exceed the allocated amount.

   - **Displacement Due to Government Actions:** Families or individuals who are certified as displaced due to the action of a federal government agency or local government agencies may be given an admissions preference.

   - **Referrals from law enforcement agencies:** The Housing Authority may distribute application forms and may issue a voucher to families or single persons that are referred by law enforcement agencies. The types of referrals that will be considered include, but are not limited to:

     - Victims of domestic violence,

     - Involuntarily displaced to avoid reprisals, or

     - Displaced due to being a victim of a hate crime.

     Law enforcement referrals must be made in writing, on law enforcement agency letterhead, and signed by the requesting officer

and his or her immediate supervisor.  Eligibility, including background checks will be confirmed for all members.

4. **Jurisdictional Preference**: Families who live and/or work in the Housing Authority's jurisdiction will be admitted before families outside of the Housing Authority's jurisdiction.

5. **Date and Time of Registration**: When the family placed their name on the Section 8 Preliminary Registration Waiting List.

### 4.3.1 Verification of Preferences [24 CFR §982.207(e)]

**Residency Preference**: For families who are residing in the Housing Authority's jurisdiction at the time the, or have at least one adult member who works or has been hired to work in the Housing Authority's jurisdiction.

➢ In order to verify that an applicant is a resident, the Housing Authority will require documentation of residency as shown by the following documents: current rent receipts, leases, utility bills, employer or agency records, school records, drivers licenses, state identification or credit reports.

➢ In cases where an adult member of the household works or has been hired to work in the Housing Authority's jurisdiction, a statement from the employer will be required.

**Veteran's Preference**: Acceptable documentation regarding veteran's status will include a DD-214 (discharge documents), proof of receipt of veteran's benefits, or documentation from the Veteran's Administration.

### 4.3.2 Final Verification of Preferences [24 CFR §982.207(e)]

Preference information on applications will be updated as applicants are selected from the waiting list.  At that time, the Housing Authority will obtain necessary verifications of preference at the interview and by third-party verification.

### 4.3.3 Preference Denial

If the Housing Authority denies a preference, the Housing Authority will notify the applicant in writing of the reasons why the preference was denied and offer the applicant an opportunity for an informal review. The applicant must request for an informal review in writing within 15 calendar days from the date of the notification. The request should also provide all information and documents supporting the applicant's request.  If the preference denial is upheld as a result of the informal review, the applicant will be placed on the waiting list without benefit of the preference.  Applicants may exercise other rights if they believe they have been discriminated against.

If the applicant falsifies documents or makes false statements in order to qualify for any preference, or for any other reason, they will be removed from the waiting list.

Housing Authority of the County of Los Angeles

**4.4**   **DENIAL OF ASSISTANCE**
   **[24 CFR §982.204(c)(1) and §982.204(f)(1) §982.552]**

   If an application is denied due to failure to attend the initial and final interviews, or for failure to provide eligibility related information, the applicant family will be notified in writing and offered an opportunity to request an informal review.   If the applicant misses two scheduled meetings, the Housing Authority will cancel the application and remove the applicant's name from the waiting list.

   The Housing Authority may at any time deny program assistance to an applicant family because of actions or failure to act by members of the family such as any member of the family to sign and submit consent forms for obtaining information.

   The Housing Authority will not deny admission of an applicant who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the applicant otherwise qualifies for admission.

**4.5**   **FINAL DETERMINATION AND NOTIFICATION OF ELIGIBILITY**
   **[24 CFR §982.301]**

   If the applicant family is determined to be eligible after all applicable paperwork has been reviewed, they will be invited to attend a briefing session at which time they will receive information regarding their rights and responsibilities and they will be issued a voucher.   See Chapter 8 (Voucher Issuance and Briefings) for more detail information.

## CHAPTER 5:
## SUBSIDY STANDARDS

**5.1**  **INTRODUCTION**
**[24 CFR §982.402(a)]**

Program regulations require that the Housing Authority establish subsidy standards that determine the number of bedrooms needed for families of different sizes and compositions. Such standards must provide for a minimum commitment of subsidy while avoiding overcrowding. The standards in determining the voucher size must be within the minimum unit size requirements of HUD's Housing Quality Standards (HQS).

This chapter lays out the factors used in determining the voucher size issued to a family initially and when there is a move to a new unit, as well as the Housing Authority's procedures for handling changes in family size, selection of unit size that are different from the voucher size and requests for waivers.

**5.2**  **DETERMINATION OF VOUCHER SIZE**
**[24 CFR §982.402]**

Subsidy standards and determination of voucher bedroom size are based upon the number of family members who will reside in the assisted dwelling unit. All standards in this section relate to the number of bedrooms on the voucher, not the family's actual living arrangements.

The unit size on the voucher remains the same as long as the family composition remains the same.

As required by HUD, the Housing Authority's subsidy standards for determining voucher size shall provide for the smallest number of bedrooms needed to house a family without overcrowding. They will be applied consistently for all families of like size and composition, in a manner consistent with fair housing guidelines and HQS.

In accordance with HUD regulations, the unit size designated on the voucher should be assigned using the following Housing Authority subsidy standards, which are based on two persons per bedroom:

| Number of Household Members | Number of Bedrooms |
|:---:|:---:|
| 1-2 | 1- bedroom |
| 3-4 | 2- bedroom |
| 5-6 | 3- bedroom |
| 7-8 | 4- bedroom |
| 9-10 | 5- bedroom |
| 11-12 | 6- bedroom |

Housing Authority of the County of Los Angeles

1. At issuance, the bedroom size assigned should not require more than two persons to occupy the same bedroom. The family may choose and live within a suitable unit in any grouping that is acceptable to the family, including using the living room for sleeping purposes.

2. Every family member is to be counted as a person in determining the family unit size [24 CFR §982.402(a)(4)-(6)]. Under this definition, family members include the unborn child of a pregnant woman; any live-in aides (approved by the Housing Authority to reside in the unit to care for a family member who is disabled or is at least 50 years of age); and a child who is temporarily away from the home because of placement in foster care. A family that consists of a pregnant woman (with no other persons) must be treated as a two-person family.

   **Note**: An approved live-in aide is counted in determining the voucher size. There is no waiver or exception to the subsidy standards unless otherwise specified.

3. An additional bedroom may be assigned if approved under a waiver by the Housing Authority (see Section 5.3 below).

4. If the family decides to move, the Housing Authority will issue a voucher based on the family's current composition.

### 5.2.1   Maximum Unit Occupancy

In cases where an additional person(s) joins the family and the family will continue to occupy the same rental unit, i.e. no move is involved, the Housing Authority may require the family to use the living room for sleeping purposes for no more than one person provided that the unit meets other HQS.

Changes to household composition must be made according to Housing Authority policy detailed in Section 12.5 (Changes in Family Composition).

The maximum occupancy as determined by the Housing Authority is as follows:

| Number of Bedrooms | Maximum Occupancy |
|--------------------|-------------------|
| 1- bedroom | 3 |
| 2- bedroom | 5 |
| 3- bedroom | 7 |
| 4- bedroom | 9 |
| 5- bedroom | 11 |
| 6- bedroom | 13 |

The Housing Authority will not increase the family's voucher size due to additions where the family will continue to occupy the same unit, unless the addition creates an overcrowding situation for the family.

The family may be required to move into a larger size dwelling unit if the Housing Authority determines that the family is overcrowded.

**5.3**   **OCCUPANCY STANDARDS WAIVER**
         **[24 CFR §982.402(b)(8)]**

The standards discussed above should apply to the vast majority of assisted families. However, in some cases, the Housing Authority may grant exceptions to the subsidy standards. Examples of possible exceptions that may be justified include but are not limited to:

1. The health of a family member.

2. A reasonable accommodation to a disability.

Requests based on health related reasons must be verified, in writing, by a doctor or other medical professional. The request must specify the reason for the request and how providing a larger bedroom size would improve or accommodate the medical condition.

A Unit Supervisor who has not been involved in the initial determination will review the request, any prior determination and make a decision based on the specifics of the individual case (on a case-by-case basis). After the decision is made, a letter notifying the applicant or participant of the decision regarding the waiver will be sent by the reviewing supervisor.

To request a larger voucher size than indicated by the subsidy standards for any other reason, the family must submit a written request within 15 calendar days of the Housing Authority's determination of bedroom size. The request must explain the need or justification for a larger bedroom size.

**5.4**   **EXCEPTIONS FOR FOSTER CHILDREN**
         **[24 CFR §982.402(b)(8)]**

Exceptions will be made to accommodate foster children. The Los Angeles County Department of Family and Children Services (DCFS) has very specific housing guidelines that must be met by foster families. In order to assure that foster children are able to remain with designated Section 8 foster families, the Housing Authority will utilize the guidelines published by the Los Angeles County DCFS, or specified in a court order, in situations involving foster children.

**5.5**   **FLEXIBILITY OF UNIT SIZE ACTUALLY SELECTED**
         **[24 CFR §982.402(d)]**

The family may select a dwelling unit with a different size than that listed on the voucher:

- Larger than the voucher size: The Housing Authority shall not prohibit a family from renting an otherwise acceptable unit because it is too large for the family, provided that the rent for the unit is comparable and the family's total rent contribution (rent to the owner plus any applicable utility costs) does not exceed 40 percent of the family's adjusted monthly income (applies only if the gross rent for the unit exceeds the payment standard).

- Smaller than the voucher size: The Housing Authority will allow families to request a waiver to rent an otherwise acceptable unit with fewer bedrooms

Housing Authority of the County of Los Angeles

than the voucher size, if the unit does not exceed maximum unit occupancy requirements.

**5.5.1   Calculating Assistance for a Different Unit Size**

To determine the family's maximum rent subsidy, the Housing Authority uses the payment standard for the voucher size or the selected unit size, whichever is lower [24 CFR §982.402(c)].

The utility allowance used to calculate the gross rent is based on the actual size of the unit the family selects, regardless of the size authorized on the family's voucher [24 CFR § 982.517(d)].

## CHAPTER 6:
## DETERMINING THE TOTAL TENANT PAYMENT AND HOUSING AUTHORITY ABSENCE POLICY

**6.1   INTRODUCTION**

This chapter explains how the Total Tenant Payment (TTP) is calculated at admission and during annual re-examinations.  It covers Housing Authority and HUD standards used to calculate income inclusions and deductions.

This chapter also provides the Housing Authority's definition of absence of household members and explains how the presence or absence of household members can affect the TTP.

The policies outlined in this chapter address those areas, which allow the Housing Authority discretion to define terms and to develop standards in order to assure consistent application of the various factors that relate to the determination of TTP.

**6.2   INCOME DEFINITIONS**

- **Total Tenant Payment (TTP)**: represents the minimum amount a family must contribute toward rent and utilities regardless of the unit selected.. The TTP is the greater of:

  - 30 percent of monthly adjusted income;

  - 10 percent of monthly gross income; or

  - The Housing Authority's minimum rent of $50.

- **Income**: The Housing Authority will include income from all sources, unless otherwise specifically exempted [24 CFR §5.609(c)] through program regulations, for the purposes of calculating the TTP. In accordance with this definition, income from all sources of each member of the household is counted.

- **Annual Income [24 CFR §5.609(a)]**: The gross amount of income anticipated to be received by the family during the 12 months after certification or re-examination. Gross income is the amount of income prior to any HUD allowable expenses or deductions, and does not include income that has been excluded by HUD.  Annual income is used to determine whether or not applicants are within the applicable income limits.

- **Adjusted Income [24 CFR §5.611]**: The annual income minus any HUD allowable deductions.

**6.3   INCOME DEDUCTIONS**
**[24 CFR §5.611(a)]**

The following deductions will be applied in the TTP calculation:

  ➢ **Dependent Allowance**: $480 each for family members (other than the head, co-head, or spouse), who are minors, and for family members who

Housing Authority of the County of Los Angeles

are 18 and older who are full-time students or who are disabled. This allowance does not apply to foster children.

> **Elderly Family or Disabled Family Allowance**: $400 for families whose head, co-head, or spouse is 62 or over or disabled.

> **Childcare Expenses**: Deducted for children under 13, including foster children, when childcare is necessary to allow an adult member to work, search for work, or attend school (see below for details).

> **Allowable Medical Expenses**: Deducted for unreimbursed medical expenses for members of any elderly family or disabled family.

> **Disability Assistance Expenses**: Deducted for persons with disabilities if needed to enable the individual or an adult family member to work.

### 6.3.1   Childcare Expenses
### [24 CFR §5.603(b) and 24 CFR §5.611(a)]

Childcare expenses for children under 13 years of age may be deducted from annual income if they enable an adult to work, search for work, or attend school full time.

In the case of a child attending school, only care during non-school hours can be counted as childcare expenses.

Families will be given a childcare allowance based on the following guidelines:

- **Childcare to Work**: The maximum childcare expense allowed must be less than the amount earned by the person enabled to work. The "person enabled to work" will be the adult member of the household who earns the least amount of income from working.

- **Childcare to Search for Work**: Childcare expenses cannot exceed the current amount of income received.

- **Childcare for School**: The number of hours claimed for childcare may not exceed the number of hours the family member is attending school (including one hour travel time to and from school).

- **Amount of Expense**: The Housing Authority will determine local average costs as a guideline. If the hourly rate materially exceeds the guideline, the Housing Authority may calculate the allowance using the guideline.

### 6.3.2   Medical Expenses
### [24 CFR §5.611(a)(3)(i)]

When it is unclear in the HUD rules as to whether or not to allow an item as a medical expense, IRS Publication 502 will be used as a guide.

The Housing Authority will allow as medical expense the actual out-of-pocket amounts which are owed and anticipated to be paid by the family during the re-examination period.  Expenses from the previous year may be analyzed to determine the amount to anticipate when other verification is not available.

Nonprescription medicines will be counted toward medical expenses for families who qualify if the family furnishes legible receipts.

Acupressure, acupuncture and related herbal medicines, and chiropractic services will be considered allowable medical expenses.

**6.4    INCOME INCLUSIONS AND EXCLUSIONS**

**6.4.1    Income Inclusions
          [24 CFR §5.609(b)]**

The Housing Authority considers the following to be included in the family's annual income, as required by HUD:

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in paragraph (2) of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic payments received from Social Security, annuities, insurance policies, retirement funds, pensions, lotteries, disability or death benefits, and other similar types of periodic receipts, including a lump-sum payment for the delayed start of a periodic payment (but see paragraph (13) under Income Exclusions);

(5) Payments in lieu of earnings, such as unemployment, worker's compensation, and severance pay (but see paragraph (3) under Income Exclusions);

(6) Welfare Assistance.

    a.  Welfare assistance received by the household.

    b.  The amount of reduced welfare income that is disregarded specifically because the family engaged in fraud or failed to comply with an economic self-sufficiency or work activities requirement.

    c.  If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustments by the

welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare income to be included as income shall consist of:

(i) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

(ii) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage;

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from persons not residing in the dwelling;

---

Regular Contributions and Gifts [24 CFR §5.609(b)(7)]

Any contribution or gift received every 3 months or more frequently will be considered a "regular" contribution or gift from the same source. This includes payments made on behalf of the family such as payments for a car, credit card bills, rent and/or utility bills and other cash or non-cash contributions provided on a regular basis. It does not include casual contributions or sporadic gifts.

If the family's expenses exceed its known income, the Housing Authority will question the family about contributions and gifts. If the family indicated that it is able to meet the extra expenses due to gifts or contributions from persons outside the household, the amount provided will be included in the family's TTP.

---

Alimony and Child Support [24 CFR §5.609(b)(7)]

If the amount of child support or alimony received is less than the amount awarded by the court, the Housing Authority must use the amount awarded by the court unless the family can verify that they are not receiving the full amount. Acceptable verification in such cases may include:

1. Verification from the agency responsible for enforcement or collection, and

2. Documentation of child support or alimony collection action filed through a child support enforcement/collection agency, or has filed an enforcement or collection action through an attorney.

It is the family's responsibility to supply a certified copy of the divorce decree.

---

(8) All regular pay, special pay, and allowances of a member of the Armed Forces (whether or not living in the dwelling) who is head of the family, co-head, spouse, or other person whose dependents are residing in the unit (but see paragraph (7) under Income Exclusions).

(9) Any financial assistance, in excess of amounts received for tuition, that an individual received for tuition, that an individual receives under the Higher Education Act of 1965 (20 U.S.C. 1001 *et seq.*), from private sources, or from an institution of higher education (as defined under the Higher Education Act of 1965 (20 U.S.C. 1002)), shall be considered income to that individual, except that financial assistance described in this paragraph is not considered annual income for students who are living with their parents who are applying for or receiving assistance or persons over the age of 23 with dependent children.   For the purpose of determining income, loan proceeds are not considered "financial assistance".

(10) Any part of an athletic scholarship that can be used to cover housing costs must be included in the family's income.

(11) The net amount of Social Security (SS) and Supplemental Security Income (SSI) benefits when there is a payment deduction due to prior overpayments of benefits.

## 6.4.2   Income Exclusions
## [24 CFR §5.609(c)]

The Housing Authority considers the following to be excluded from the family's annual income, as required by HUD:

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually individuals with disabilities, unrelated to the tenant family, who are unable to live alone);

> Benefits received through the Kin GAP program, a California program designed specifically for foster children who have been place in the home of a relative are considered foster care and should be excluded.

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses (but see paragraph (5) under Income Inclusions);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide (as defined by regulation);

(6) Subject to paragraph (9) in Income Inclusions, the full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8) (a) Amounts received under training programs funded by HUD;

   (b) Amounts received by a person with disabilities that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and

benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

(c) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to allow participation in a specific program;

(d) A resident service stipend. This is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the owner, on a part-time basis, that enhances the quality of life in the development. This may include, but is not limited to fire patrol, hall monitoring, lawn maintenance, and resident initiatives coordination and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time; or

(e) Incremental earnings and benefits resulting to any family member from participation in qualifying state or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program.

(9) Temporary, nonrecurring, or sporadic income (including gifts). For example, amounts earned by temporary census employees whose terms of employment do not exceed 180 days (Notice PIH 2000-1).

(10) Reparations payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years or older (excluding the head of household, co-head, and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) Deferred periodic payments of supplemental security income and social security benefits that are received in a lump-sum payment or in prospective monthly payments;

(14) Amounts received by the family in the form of refunds or rebates under state or local law for property taxes paid on the dwelling unit;

(15) Amounts paid by a state agency to a family with a developmentally disabled family member living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; and

(16) Amounts specifically excluded by any other federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under the 1937 Act. A notice will be published in the Federal Register and distributed to PHAs identifying the benefits that qualify for this exclusion. Updates will be distributed when necessary. The following is a list of income sources that qualify for that exclusion:

a) The value of the allotment provided to an eligible household under the Food Stamp Act of 1977 (7 U.S.C. 2017 (b));

b) Payments to Volunteers under the Domestic Volunteer Services Act of 1973 (42 U.S.C. 5044(g), 5058);

c) Payments received under the Alaska Native Claims Settlement Act (43 U.S.C. 1626(c));

d) Income derived from certain submarginal land of the United States that is held in trust for certain Indian tribes (25 U.S.C. 459e);

e) Payments or allowances made under the Department of Health and Human Services' Low-Income Home Energy Assistance Program (42 U.S.C. 8624(f));

f) Payments received under programs funded in whole or in part under the Job Training Partnership Act (29 U.S.C. 1552(b); (effective July 1, 2000, references to Job Training Partnership Act shall be deemed to refer to the corresponding provision of the Workforce Investment Act of 1998 (29 U.S.C. 2931);

g) Income derived from the disposition of funds to the Grand River Band of Ottawa Indians (Pub.L- 94-540, 90 Stat. 2503-04);

h) The first $2000 of per capita shares received from judgment funds awarded by the Indian Claims Commission or the U. S. Claims Court, the interests of individual Indians in trust or restricted lands, including the first $2000 per year of income received by individual Indians from funds derived from interests held in such trust or restricted lands (25 U.S.C. 1407-1408);

i) Amounts of scholarships funded under title IV of the Higher Education Act of 1965, including awards under federal work-study program or under the Bureau of Indian Affairs student assistance programs (20 U.S.C. 1087uu);

j) Payments received from programs funded under Title V of the Older Americans Act of 1985 (42 U.S.C. 3056(f));

k) Payments received on or after January 1, 1989, from the Agent Orange Settlement Fund or any other fund established pursuant to the settlement in *In Re Agent*-product liability litigation, M.D.L. No. 381 (E.D.N.Y.);

l) Payments received under the Maine Indian Claims Settlement Act of 1980 (25 U.S.C. 1721);

m) The value of any child care provided or arranged (or any amount received as payment for such care or reimbursement for costs incurred for such care) under the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858q);

n) Earned income tax credit (EITC) refund payments received on or after January 1, 1991 (26 U.S.C. 32(j));

Housing Authority of the County of Los Angeles

o) Payments by the Indian Claims Commission to the Confederated Tribes and Bands of Yakima Indian Nation or the Apache Tribe of Mescalero Reservation (Pub. L. 95-433);

p) Allowances, earnings and payments to AmeriCorps participants under the National and Community Service Act of 1990 (42 U.S.C. 12637(d));

q) Any allowance paid under the provisions of 38 U.S.C. 1805 to a child suffering from spina bifida who is the child of a Vietnam veteran (38 U.S.C. 1805);

r) Any amount of crime victim compensation (under the Victims of Crime Act) received through crime victim assistance (or payment or reimbursement of the cost of such assistance) as determined under the Victims of Crime Act because of the commission of a crime against the applicant under the Victims of Crime Act (42 U.S.C. 10602); and

s) Allowances, earnings and payments to individuals participating in programs under the Workforce Investment Act of 1998 (29 U.S.C. 2931).

(17) Earned Income Disallowance for persons with disabilities [24CFR5.617]

    (a) Initial 12-Month Exclusion [24CFR5.617(C)(1)]

    (b) Second 12-Month Exclusion and Phase-In [24CFR5.617(C)2)]

    (c) Maximum 4-Year Disallowance [24 CFR 5.617(c)(3)]

(18) The low-income subsidy (extra help) received to assist low-income persons in paying for their Medicare Prescription Drug Plan cost.

(19) The payment amount of Social Security (SS) and Supplemental Security Income (SSI) benefits that are reduced due to prior overpayments.

### 6.4.3   Earned Income Disallowance
### [24 CFR §5.617]

When determining the annual income of a participant family that includes persons with disabilities, the determination must exclude an increase in annual income due to any of the following events:

1. Employment by a family member who is a person with disabilities and who was previously unemployed for one or more years prior to employment.

    ➢ A previously unemployed person is defined as a person who in the 12 months prior to employment has earned no more than would be received for 10 hours of work per week for 50 weeks at the established minimum wage.

2. An increase in income by a family member who is a person with disabilities and whose earnings increase during participation in an economic self-sufficiency program or other job-training program.

    ➢ An economic self-sufficiency program is any program designed to encourage, assist, train, or facilitate the economic independence of HUD-assisted families or to provide work for such families.

3. New employment or increased earnings by a family member who is a person with disabilities and who has received TANF benefits or services within the past 6 months.

   ➢ If TANF is received in the form of monthly monetary maintenance, there is no minimum amount that must be received to be considered a participant in TANF.

   ➢ If TANF is received in the form of one-time payments, wage subsidies and transportation assistance that add up to at least $500 over a 6-month period, they would meet this requirement.

**6.4.4   Earned Income Disallowance Exclusion Time Periods [24 CFR §5.617(c)]**

- **Initial 12-Month Exclusion**: During the initial 12-month exclusion period, the full amount of the increase in income due to employment or increase earnings is excluded.  This exclusion extends for 12 cumulative months and the months do not have to be consecutive.

- **Second 12-Cumulative Months**: During the second 12-month exclusion and phase-in period, the exclusion is reduced to half, or 50 percent, of the increase in income due to employment or increased earnings.  This second 12-month exclusion period begins after the full 12 months of the full exclusion has been used and the months do not have to be consecutive.

- **4-Year Lifetime Limit**: A participant has a total lifetime limit of 48 consecutive months that begins once the initial exclusion is given after the qualifying event.  No exclusion should be given after the lifetime limit has been reached.

**6.5   FAMILY ASSETS [24 CFR §5.603(b)]**

**6.5.1   Included Assets**

(1)   Amounts in savings and checking accounts.

(2)   Stocks, bonds, savings certificates, money market funds and other investment accounts.

(3)   Equity in real property or other capital investments. Equity is the estimated current market value of the asset less the unpaid balance on all loans secured by the assets and reasonable costs (such as broker fees) that would be incurred in selling the assets.

(4)   The cash value of trusts that may be withdrawn by the family.

(5)   IRA, Keogh and similar retirement savings accounts, even though withdrawal would result in a penalty.

(6)   Some contributions to company retirement/pension funds.

| Contributions to company retirement/pension funds are handled as follows: |
|---|

Housing Authority of the County of Los Angeles

> 1. While an individual is employed, include as assets only amounts the family can withdraw without retiring or terminating employment.
>
> 2. After retirement or termination of employment, include any amount the individual elects to receive as a lump sum.

(7)   Assets, which although owned by more than one person, allow unrestricted access by the applicant.

(8)   Lump sum receipts such as inheritances, capital gains, lottery winnings, insurance settlements, and other claims.

> Lump-sum additions to family assets, such as inheritances, insurance payments (including lump-sum payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses, are not included as income but may be included in assets.
>
> Lump-sum payments caused by delays in processing periodic payments (unemployment or welfare assistance) are counted as income. Lump sum payments from Social Security or SSI are excluded from income, but any amount remaining will be considered an asset. Deferred periodic payments which have accumulated due to a dispute will be treated the same as periodic payments which are deferred due to delays in processing.
>
> The family's attorney fees may be deducted from lump-sum payments when computing annual income if the attorney's efforts have recovered a lump-sum compensation, and the recovery paid to the family does not include an additional amount in full satisfaction of the attorney fees.

(9)   Personal property held as an investment such as gems, jewelry, coin collections, antique cars, etc.

(10)  Cash value of life insurance policies.

(11)  Assets disposed of for less than fair market value during the two years preceding certification or re-certification.

> The Housing Authority must count assets disposed of for less than fair market value during the 2 years preceding certification or re-examination. The Housing Authority will count the difference between the market value and the actual payment received in calculating total assets.
>
> Assets disposed of as a result of foreclosure or bankruptcy, separation or divorce are not considered to be assets disposed of for less than fair market value.
>
> The Housing Authority's minimum threshold for counting assets disposed of for less than Fair Market Value is $5,000. If the total value of assets disposed of within a 1-year period is less than $5,000, they will not be considered an asset.

### 6.5.2   Excluded Assets

(1)   Necessary personal property, except as noted in #9 above at Section 6.5.1.

(2)   Interest in Indian trust lands.

(3)   Assets that are part of an active business or farming operation.

> If a household member's main occupation is the business from his/her rental property, the rental property is considered a business asset and therefore excluded.  If a household member's rental property is considered a personal asset and held as an investment, it is considered an included asset.

(4)   Assets not controlled by or accessible to the family and which provide no income for the family.

(5)   Vehicles especially equipped for the disabled.

(6)   Equity in owner-occupied cooperatives and manufactured homes in which the family lives.

## 6.6   CALCULATING INCOME AND FAMILY CONTRIBUTION

### 6.6.1   "Minimum Rent" and Minimum Family Contribution [24 CFR §5.630(a)(2)]

Minimum family contribution in the Housing Authority's rental assistance programs is $50, for all new contracts including moves effective April 5, 2005, and effective at annual re-examinations beginning May 2005.

The Housing Authority will waive the minimum rent requirement in cases where the family documents that they do not currently have any source of income such as in the case of some homeless families.  In such cases, the family will be re-evaluated in 6 months.  All families are required to report changes in income within 30 calendar days.

### 6.6.2   Minimum Income

There is no minimum income requirement.  Families who report zero income may be required to attend an interim re-examination periodically, up to once a quarter, at the Housing Authority's discretion.  A credit review will automatically be requested for families claiming zero income.

### 6.6.3   Averaging Income [24 CFR §982.516(b)(2) and 24 CFR §5.609(d)]

When annual income cannot be anticipated for a full 12 months, the Housing Authority may annualize current income and conduct an interim re-examination if income changes.

If there are bonuses or overtime which the employer cannot anticipate for the next 12 months, bonuses and overtime received the previous year may be used.

Income from the previous year may be analyzed to determine the amount to anticipate when third-party or check-stub verification is not available.

Housing Authority of the County of Los Angeles

If by averaging, an estimate can be made for those families whose income fluctuates from month to month, this estimate will be used so that the housing payment will not change from month to month.

The method used depends on the regularity, source and type of income.

**6.6.4**   **Utility Allowance and Utility Reimbursement Payments**
**[24 CFR §982.517]**

The utility allowance is intended to help defray the cost of utilities not included in the rent and is subtracted from TTP to establish the family's rent to the owner. The allowances are based on rates and average consumption studies, not on a family's actual consumption. The Housing Authority will review the Utility Allowance Schedule on an annual basis and revise it if needed (10 percent increase or decrease).

The approved utility allowance schedule is given to families along with the voucher.  The utility allowance is based on the actual unit size selected.

Where families provide their own range and refrigerator, the Housing Authority will establish an allowance adequate for the family to purchase or rent a range or refrigerator, even if the family already owns either appliance.  Allowances for ranges and refrigerators will be based on the lesser of the cost of leasing or purchasing the appropriate appliance over a 12-month period.

If the utility allowance exceeds the family's TTP, the Housing Authority will provide a utility reimbursement payment for the family each month.  The check will be made out directly to the family's head of household on record.

**6.6.5**   **Reduction in Welfare Assistance**
**[24 CFR §5.615]**

The Housing Authority will impute (count) welfare income not received by the family, if the welfare assistance was reduced specifically because of:

> ➢   Fraud;

> ➢   Failure to participate in an economic self-sufficiency programs; or

> ➢   Noncompliance with a work activities requirement.

Imputed welfare income is the amount that welfare benefits are reduced.

Imputed welfare income is not included in the family's annual income, if the family was not assisted at the time of the welfare sanction.

The Housing Authority will include in the family's annual income the amount of the imputed welfare income plus the total amount of other annual income and the family's rent will not be reduced.

However, the Housing Authority will reduce the rent if the welfare assistance reduction is a result of any of the following:

> ➢   The expiration of a lifetime time limit on receiving benefits;

> ➢   The family has complied with welfare program requirements but cannot obtain employment; or

> The family member has not complied with other welfare agency requirements.

A family's request for rent reduction shall be denied upon the Housing Authority obtaining written verification from the welfare agency stating that the family's benefits have been reduced for fraud or noncompliance.

### 6.6.6 Prior Overpayment of Social Security (SS) and Supplemental Security Income (SSI)

When there is a payment reduction due to prior overpayments, staff will use the net amount of the SS/SSI benefit to calculate projected annual income.

### 6.7 PRORATION OF ASSISTANCE FOR "MIXED" FAMILIES

### 6.7.1 Applicability
[24 CFR §5.520(a)]

Proration of assistance must be offered to any "mixed" applicant or participant family. A "mixed" family is one that includes at least one U.S. citizen or eligible immigrant and any number of ineligible members.

"Mixed" families that were participants on June 19, 1995, and that do not qualify for continued assistance must be offered prorated assistance. Mixed family applicants are entitled to prorated assistance. Families that become mixed after June 19, 1995 by addition of an ineligible member are entitled to prorated assistance.

### 6.7.2 Prorated Assistance Calculation
[24 CFR §5.520(c)]

Prorated assistance is calculated by determining the amount of assistance payable if all family members were eligible and multiplying by the percent of the family members who actually are eligible.

### 6.8 ABSENCE POLICY

The Housing Authority must compute all applicable income of every family member who is on the lease, including those who are temporarily absent.  In addition, the Housing Authority must count the income of the spouse or the head of household if that person is temporarily absent, even if that person is not on the lease.

Income of persons permanently absent will not be counted.  If the head of household or spouse is temporarily absent and in the military, all military pay and allowances (except hazardous duty pay when exposed to hostile fire and any other exceptions to military pay HUD may define) is counted as income.

It is the responsibility of the household to report absences and changes in family composition. The Housing Authority will evaluate absences from the unit using this policy [24 CFR §982.551(i)].

Housing Authority of the County of Los Angeles

### 6.8.1 Absence of Entire Family
### [24 CFR §982.312]

These policy guidelines address situations when the family is absent from the unit, but has not moved out of the unit.  In cases where the family has moved out of the unit, the Housing Authority will terminate assistance in accordance with appropriate termination procedures contained in this plan.

Families are required both to notify the Housing Authority before they move out of a unit and to give the Housing Authority information about any family absence from the unit.

Families must notify the Housing Authority if they are going to be absent from the unit for more than 30 consecutive calendar days.

If the family fails to notify the Housing Authority of an absence of longer than 30 consecutive calendar days, or if the entire family is absent from the unit for more than 60 consecutive calendar days, the unit will be considered to be vacated and the assistance will be terminated.   The Housing Authority at all times shall reserve the right to exercise its judgment regarding extensions on family absence from the unit on a case-by-case basis.  However, HUD regulations require the Housing Authority to terminate assistance if the entire family is absent from the unit for a period of more than 180 consecutive calendar days.

"Absence of entire family" means that no family member is residing in the unit, and the unit has not been vacated.  In order to determine if the family is absent from the unit, the Housing Authority may:

> ➢ Write letters to the family at the unit

> ➢ Telephone the family at the unit

> ➢ Interview the owner

> ➢ Interview neighbors

> ➢ Verify if utilities are in service

> ➢ Conduct an interim HQS Inspection

If the absence which resulted in termination of assistance was due to a person's disability, and the Housing Authority can verify that the person was unable to notify Housing Authority in accordance with the family's responsibilities, and if funding is available, the Housing Authority may reinstate the family as a reasonable accommodation if requested by the family.

### 6.8.2 Absence of Any Member
### [24 CFR §982.312(a)]

Any member of the household will be considered permanently absent if s/he is away from the unit for 180 consecutive calendar days except as otherwise provided in this chapter.

**6.8.3   Absence Due to Medical Reasons**
**[24 CFR §982.312(e)(1)]**

If any family member leaves the household to enter a facility such as a hospital, nursing home, or rehabilitation center, the Housing Authority will seek advice from a reliable qualified source as to the likelihood and timing of their return. If the verification indicates that the family member will return in less than 180 calendar days, the family member will not be considered permanently absent.

If the verification indicates that the family member will be permanently confined to a nursing home, the family member will be considered to be permanently absent, out of the home and removed from the family composition.

If the person who is determined to be permanently absent is the sole member of the household, assistance will be terminated in accordance with the Housing Authority's "Absence of Entire Family" policy.

**6.8.4   Absence Due to Incarceration**
**[24 CFR §982.312(e)(1)]**

If the sole member of the household is incarcerated for more than 30 calendar days, s/he will be considered permanently absent and the Housing Authority will initiate proposed termination procedures to terminate assistance.

Any member of the household, other than the sole member, will be considered permanently absent if s/he is incarcerated for 60 calendar days. Once a family member is removed from the family composition, the family must seek Housing Authority approval prior to allowing the family member to re-join the assisted household. Failure to adhere to this policy can result in termination of assistance.

The Housing Authority will determine if the reason for any family member's incarceration is for drug-related or violent criminal activity and, if appropriate, will pursue termination of assistance for the family if deemed appropriate.

**6.8.5   Foster Care and Absences of Children**
**[24 CFR §982.551(h)(4)]**

If the family includes a child or children temporarily absent from the home due to placement in foster care, the Housing Authority will request information from the appropriate agency to determine when the child/children will be returned to the home.

If the time period is to be greater than 180 calendar days from the date of removal of the child/children, the voucher size may be temporarily reduced. If children are removed from the home permanently, the voucher size will be permanently reduced in accordance with the Housing Authority's subsidy standards.

**6.8.6   Absence of Adult**
**[24 CFR §982.312(e)]**

If neither parent remains in the household and the appropriate agency has determined that another adult is to be brought into the assisted unit to care for

Housing Authority of the County of Los Angeles

the children for an indefinite period, the Housing Authority will treat that adult as a visitor for up to the first 180 calendar days.

If during or by the end of that period, court-awarded custody or legal guardianship has been awarded to the caretaker, the voucher will then be transferred to the caretaker.

If custody or legal guardianship has not been awarded by the court, but the action is in process, the Housing Authority will secure verification from social services staff or the attorney as to the status.

If the appropriate agency cannot confirm the guardianship status of the caretaker, the Housing Authority will review the status at 120-day intervals.

The caretaker will be allowed to remain in the unit, as a visitor, until a determination of custody is made or up to 12 months total.

The Housing Authority will transfer the voucher to the caretaker, in the absence of a court order, if the caretaker has been in the unit for more than 12 months and it is reasonable to expect that custody will be granted.

When the Housing Authority approves a person to reside in the unit as caretaker for the children, this person's income will be counted in the TTP for the family pending a final disposition. The Housing Authority will work with the appropriate service agencies and the owner to provide a smooth transition in these cases.

If a member of the household is subject to a court order that restricts him/her from the home for more than 180 calendar days, the person will be considered permanently absent.

If an adult family member leaves the household for any reason, the family must report the change in family composition to the Housing Authority within 30 calendar days.

The family will be required to notify the Housing Authority in writing within 30 calendar days when a family member leaves the household for any reason or moves out.  The notice must contain a certification by the family as to whether the member is temporarily or permanently absent.  The family member will be determined permanently absent if verification is provided.

If an adult child goes into the military and leaves the household, they will be considered permanently absent.

Time extensions may be granted as a reasonable accommodation upon request by a person with a disability.

### 6.8.7 Students
### [24 CFR §982.312(e)]

Full time students who attend school away from the home and live with the family during school recess will be considered temporarily absent from the household. These family members will continue to be counted for the purpose of determining the family's appropriate voucher size.

6.8.8   **Visitors**
**[24 CFR §982.312(e)]**

Any person not included on the HUD-50058 who has been in the unit more than 30 calendar days, or a total of 60 calendar days in a 12-month period, will be considered to be living in the unit as an unauthorized household member.

Absence of evidence of any other address will be considered verification that the visitor is a family member.

Statements from neighbors and/or the owner will be considered in making the determination.

Use of the unit address as the visitor's current residence for any purpose that is not explicitly temporary shall be construed as permanent residence.

The burden of proof that the individual is a visitor rests on the family. In the absence of such proof, the individual will be considered an unauthorized member of the family and the Housing Authority will terminate assistance since prior approval was not requested for the addition.

In a joint custody arrangement, if the minor is in the household less than 180 calendar days per year, the minor will be considered to be an eligible visitor and not a family member.

6.8.9   **Reporting Absences to the Housing Authority**
**[24 CFR §982.551(h)(3) and §982.551(i)]**

If a family member leaves the household, the family must report this change to the Housing Authority, in writing, within 30 calendar days of the change and certify as to whether the member is temporarily absent or permanently absent. When available to do so, an adult family member who is leaving the household should remove him/herself in writing from the lease and voucher family composition.

The Housing Authority will conduct an interim re-examination for changes, which may affect the TTP in accordance with the interim policy.  See Section 12.5 (Changes in Family Composition) for more information.

6.8.10   **Verification of Absence**

Please refer to Section 7.10.4 (Verification of Permanent Absence of Adult Member).

Housing Authority of the County of Los Angeles

## CHAPTER 7:
## VERIFICATION PROCEDURES

**7.1** **INTRODUCTION**
**[24 CFR §5.240(c), 24 CFR §5.210, 24 CFR §982.551(b)]**

HUD regulations require the Housing Authority to verify factors of eligibility. Applicants and program participants must furnish proof of their statements whenever required by the Housing Authority, and the information they provide must be true and complete. The Housing Authority's verification requirements are designed to maintain program integrity. This chapter explains the Housing Authority's procedures and standards for verification of preferences, income, assets, allowable deductions, family status, and changes in household composition. The Housing Authority will ensure that proper authorization from the family is always obtained before making verification inquiries.

**7.2** **METHODS OF VERIFICATION AND TIME ALLOWED**

The Housing Authority will use five levels of verification methods acceptable to HUD in the following order:

1. Up-Front Income Verification (UIV) will be the first level used, when available.

2. Third-party written verification will be the second level used when UIV is not available, when there is a discrepancy between UIV and the tenant-provided documents or when the family disputes the information found on UIV.

3. Third-party oral verification will be the third level used when written verification is delayed or not possible.

4. Review of documents verification will be used in conjunction with UIV when available or as the fourth level of verification if third-party oral verification is unavailable.

5. Certification/self-declaration verification will be the fifth level used if review of documents cannot be made.

The Housing Authority may allow up to 10 calendar days for the return of third-party verifications before going to the next method.

For applicants, verifications may not be more than 60 calendar days old at the time of voucher issuance [24 CFR §982.201(e)]. For participants, income forms are valid for 120 calendar days.

**7.2.1** **Up-Front Income Verification (UIV)**

The Housing Authority will utilize up-front income verification tools, such as Enterprise Income Verification system, State Systems for the Temporary Assistance of Needy Families (TANF), and Work Number, to verify items including but not limited to Social Security (SS) and Supplemental Security Income (SSI), State Unemployment Insurance, TANF and wages whenever possible.

If there is a difference between UIV verification and family provided documents and the tenant disputes the discrepancy or cannot provide adequate documentation to validate the discrepancy, third-party verification will be required.

In these cases, the Housing Authority shall follow the guidelines below:

➢ The Housing Authority may request written third-party verification from the discrepant income source.

➢ The Housing Authority may review historical income data for patterns of employment, paid benefits, and/or receipt of other income, when the Housing Authority can not readily anticipate income, such as in cases of seasonal employment, unstable working hours, and suspected fraud.

➢ The Housing Authority will analyze all data (UIV data, third-party verification and other documents and information provided by the family) and attempt to resolve the income discrepancy.

➢ The Housing Authority will use the most current information available to calculate the anticipated annual income.

In cases where UIV income data is different than tenant-reported income and the tenant does not dispute the discrepancy and can provide adequate documentation to validate the discrepancy, the Housing Authority will use the most current information available to calculate the anticipated annual income.

## 7.2.2   Third-Party Written Verification

Third-party written verification will be used when UIV is not available or when a participant disputes a discrepancy on the UIV or cannot provide adequate documentation to validate the discrepancy.

Third-party written verification forms will be sent and returned via first class mail. The family will be required to sign an authorization for the information source to release the specified information.

Verifications received electronically directly from the source are considered third party written verifications.

## 7.2.3   Third-Party Oral Verification

Oral third-party verification will be used when written third-party verification is delayed or not possible.  When third-party oral verification is used, staff will be required to document the file, noting with whom they spoke, the date of the conversation, and the facts provided.

## 7.2.4   Review of Documents

The Housing Authority will use documents provided by the family in conjunction with UIV documentation. In the event that UIV or third-party written or oral verification is unavailable, or the information has not been verified by the third party, the Housing Authority will annotate the file accordingly and utilize documents provided by the family as the primary source if the documents provide complete information.

Housing Authority of the County of Los Angeles

All documents will be photocopied and retained in the family file. The Housing Authority will accept the following documents or other documents from the family provided that the document is such that tampering would be easily noted:

- ➢ Printed wage stubs
- ➢ Computer print-outs from the employer
- ➢ Signed letters by source

The Housing Authority will accept computerized printouts delivered by the family from the following agencies or any other required agencies.

- ➢ Social Security Administration
- ➢ Veterans Administration
- ➢ Welfare Assistance
- ➢ Unemployment Compensation Board
- ➢ City or County Courts
- ➢ Child Support Enforcement Agencies

The Housing Authority will accept faxed documents, however a hard copy may be requested for verification.

If third-party verification is received after documents have been accepted as provisional verification, and there is a discrepancy, the Housing Authority may utilize the third-party verification and/or document the reason for not using the third-party verification.

**7.2.5   Self-Certification/Self-Declaration**

When verification cannot be made by third-party verification or review of documents, families will be required to submit a self-certification.

Self-certification means a signed statement/affidavit/certification under penalty of perjury.

**7.3   RELEASE OF INFORMATION**
**[24 CFR §5.230]**

The family will be required to sign specific authorization forms when information is needed that is not covered by the HUD-9886 Form (Authorization for the Release of Information).

Each member requested to consent to the release of information will be provided with a copy of the appropriate forms for their review and signature.

Family refusal to cooperate with the HUD prescribed verification system will result in denial of admission or termination of assistance because it is a family obligation to supply any information requested by the Housing Authority or HUD.

Administrative Plan 2008

**7.4   COMPUTER MATCHING**
**[24 CFR §5.210(a)]**

Where allowed by HUD and/or other State or local agencies, computer matching will be done.

**7.4.1   Data Sharing**
**[State of California Health and Safety Code, §34217]**

The Housing Authority will share applicant and participant information that is necessary to determine eligibility for County welfare department programs or services for which the client has applied or is receiving.

**7.5   ITEMS TO BE VERIFIED**
**[24 CFR §982.551(b)]**

- All income not specifically excluded by the regulations.
- Zero-income status of household.
- Full-time student status including high school students who are age 18 or over.
- Current assets including assets disposed of for less than fair market value in preceding two years.
- Childcare expense where it allows an adult family member to be employed, seek employment or to further his/her education.
- Total medical expenses of all family members in households whose head, co-head, or spouse is elderly or disabled.
- Disability assistance expenses to include only those costs associated with attendant care or auxiliary apparatus, which allow an adult family member to be employed.
- Identity.
- U.S. citizenship/eligible immigrant status.
- Social Security Numbers for all family members 6 years of age or older.
- Preference status, based upon local preferences.
- Displacement status of single applicants who are involuntarily displaced through no fault of their own.
- Familial/marital status when needed for head or spouse definition.
- Disability for determination of preferences, allowances or deductions.
- Enrollment in a Medicare prescription drug plan.
- The amount of Prescription drug benefits received.

**7.5.1   Victims of Violence**

The Housing Authority may request that an applicant/participant certify

Housing Authority of the County of Los Angeles

their statement of being a victim of domestic violence, dating violence, sexual assault, or stalking and that the incident or incidents in question are bona fide incidents of actual or threatened abuse. Certification must be received within fourteen (14) business days after the applicant/participant receives the request for certification. The Housing Authority will accept the following forms of verification:

❑ Certification of Domestic Violence, Dating Violence or Stalking (HUD-50066 Form)

❑ Documentation signed by an employee, agent, or volunteer of a victim service provider, an attorney, or a medical professional, from whom the victim has sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effect of the abuse in which the professional attests under penalty of perjury to the professional's belief that the incident or incidents in question are bona fide incidents of abuse, and that the victim of domestic violence, dating violence, sexual assault, or stalking has signed or attested to the documentation, or

❑ Federal, State, tribal, territorial, or local police record, or

❑ Court record.

**7.6     VERIFICATION OF INCOME**
**[24 CFR §982.516(a)(2)(i)]**

This section defines the methods the Housing Authority will use to verify various types of income.  The Housing Authority may make an exception to obtaining third-party verification when:

1. The use of Up-Front Income Verification (UIV) is unavailable; and

2. Staff has made at least two documented efforts (mail, fax, telephone call, or email) to obtain third-party verification of income and no response is received; or

3. An independent source does not have the capability of sending written third-party verification directly to the Housing Authority or does not facilitate oral third-party verification.

**7.6.1   Employment Income**
**[24 CFR §5.609(a) and (b)(1)]**

Verification forms request the employer to specify the:

➢ Dates of employment

➢ Amount and frequency of pay

➢ Date of the last pay increase

➢ Likelihood of change of employment status and effective date of any known salary increase during the next 12 months

➢ Year-to-date earnings

➢ Estimated income from overtime, tips, bonus pay expected during next 12 months

Acceptable methods of verification include, but are not limited to the following:

1. Up-Front Income Verification (UIV) tools, such as Enterprise Income Verification (EIV) system and Work Number.

2. Employment verification form completed by the employer.

3. Check stubs or earning statements, which indicate the employee's gross pay, frequency of pay or year-to-date earnings.

4. W-2 forms plus income tax return forms.

5. Income tax returns signed by the family may be used for verifying self-employment income, or income from tips and other gratuities.

In cases where there are questions about the validity of information provided by the family, the Housing Authority will require the most recent federal income tax statements.

### 7.6.2   Social Security, Pensions, Disability, Supplementary Security Income [24 CFR §5.609(b)(4)]

Acceptable methods of verification include, but are not limited to the following:

1. Enterprise Income Verification (EIV) system.

2. Benefit verification form completed by agency providing the benefits.

3. Award or benefit notification letters prepared and signed by the providing agency.

4. Computer report electronically obtained or in hard copy.

The Housing Authority may request a complete Social Security Earnings Statement (SSA Form 7004) to resolve discrepancies with Social Security income

### 7.6.3   Unemployment Compensation [24 CFR §5.609(b)(5)]

Acceptable methods of verification include, but are not limited to the following:

1. Enterprise Income Verification (EIV) System.

2. Computer printouts from unemployment office stating payment dates and amounts.

3. Payment stubs.

Unemployment and State Disability Insurance may no longer be verified through the Employment Development Department (EDD) [EDD Letter, 5/23/2006].

### 7.6.4   Welfare Payments or General Assistance [24 CFR §5.609(b)(6)]

Acceptable methods of verification include, but are not limited to the following:

1. LEADER for the Temporary Assistance of Needy Families (TANF)

2. Computer-generated Notice of Action.

Housing Authority of the County of Los Angeles

3.  Housing Authority verification form completed by payment provider.

4.  Written statement from payment provider indicating the amount of grant/payment, start date of payments, and anticipated changes in payment in the next 12 months.

**7.6.5** **Alimony or Child Support Payments**
**[24 CFR §5.609(b)(7)]**

Acceptable methods of verification include, but are not limited to the following:

1.  Computerized official printout of payments made if through a state agency.

2.  Housing Authority verification form completed by payment provider.

3.  A letter from the person paying the support.

4.  Copy of latest check and/or payment stubs from Court Trustee.  The Housing Authority must record the date, amount, and number of the check.

5.  Copy of a separation or settlement agreement or a divorce decree stating amount and type of support and payment schedules.

6.  Family's self-certification of amount received and of the likelihood of support payments being received in the future, or that support payments are not being received.

7.  If payments are irregular, the family must provide:

➤  A copy of the separation or settlement agreement, or a divorce decree stating the amount and type of support and payment schedules.

➤  A statement from the agency responsible for enforcing payments to show that the family has filed for enforcement.

➤  A welfare notice of action showing amounts received by the welfare agency for child support.

➤  A written statement from the District Attorney's office or other appropriate agency certifying that a collection or enforcement action has been filed.

Written or oral third party verification of child support payments may no longer be verified through the County of Los Angeles Child Support Services Department. [See memo, 2/8/2007]

**7.6.6** **Net Income from a Business**
**[24 CFR §5.609(b)(2)]**

In order to verify the net income from a business, the Housing Authority will view IRS and financial documents from prior years and use this information to anticipate the income and expenses for the next 12 months.

Acceptable methods of verification include, but are not limited to the following:

1.  IRS Form 1040, including:

➤  Schedule C (Small Business)

> ➢ Schedule E (Rental Property Income)

> ➢ Schedule F (Farm Income)

2. If accelerated depreciation was used on the tax return or financial statement, an accountant's calculation of depreciation expense, computed using straight-line depreciation rules.

3. Audited or unaudited financial statement(s) of the business.

4. Third-party verification forms for each customer/contract indicating the amounts of income received in a specified time period.

Expenses for rent and utilities will not be allowed for operations or businesses based in the subsidized unit, as these expenses are a required family contribution in the Housing Choice Voucher Program and are calculated based upon the family's income.

### 7.6.7   Child Care Business

If a family is operating a licensed day care business, income and expenses will be verified as with any other business.

If the family is operating a cash and carry operation (which may or may not be licensed), the Housing Authority will require that the family complete a form for each customer which indicates: name of person(s) whose child/children is/are being cared for, phone number, number of hours child is being cared for, method of payment (check/cash), amount paid, and signature of person.

If childcare services were terminated, a third-party verification will be sent to the parent whose child was receiving childcare.

### 7.6.8   Recurring Gifts
### [24 CFR §5.609(b)(7)]

The family must furnish a self-certification containing the following information:

> ➢ The person who provides the gifts

> ➢ The value of the gifts

> ➢ The regularity (dates) of the gifts

> ➢ The purpose of the gifts

### 7.6.9   Zero-Income Status

Families claiming to have no income will automatically undergo a credit review. The information contained in the credit report will be used to confirm the information provided by the family. The Housing Authority will also utilize records provided by the Department of Public Social Services (DPSS).

Moreover, the Housing Authority may check records of other departments in the jurisdiction that have information about income sources of customers.

Housing Authority of the County of Los Angeles

### 7.6.10 Full-Time Student Status
### [24 CFR §5.609(c)(11)]

Only the first $480 of the earned income of full-time students 18 years or older (including those who are temporarily absent), other than head of household, co-head, or spouse, will be counted towards family income.

Verification of full-time student status includes:

1. Written verification from the registrar's office or other school official;

2. School records indicating enrollment for sufficient number of credits to be considered a full-time student by the educational institution; and

3. A copy of final grades.

### 7.7   INCOME FROM ASSETS

Third-party verification will be conducted for assets totaling more than $5,000. The Housing Authority may make an exception to obtaining third-party verification when:

1. The asset or expense to be verified is not a significant amount and would have minimum impact on total payment (TTP) and the Housing Authority is able to verify the asset or expense through review of original documents provided by the tenant; or

2. An independent source does not have the capability of sending written third-party verification directly to the Housing Authority or does not facilitate oral third-party verification; or

3. It is not cost effective or reasonable to obtain third-party verification of assets and expenses.

### 7.7.1   Savings Account Interest Income and Dividends
### [24 CFR §5.609(b)(3)]

Acceptable documents for verification include, but are not limited to the following:

1. Account statements, passbooks, certificates of deposit, or Housing Authority verification forms completed by the financial institution.

2. Broker's statements showing value of stocks or bonds and the earnings credited the family. Earnings can be obtained from current newspaper quotations or oral broker's verification.

3. IRS Form 1099 from the financial institution, provided that the Housing Authority must adjust the information to project earnings expected for the next 12 months.

### 7.7.2   Interest Income from Mortgages or Similar Arrangements
### [24 CFR §5.609(b)(7)]

Acceptable documents for verification include, but are not limited to the following:

1. A letter from an accountant, attorney, real estate broker, the buyer, or a financial institution stating interest due for next 12 months. (A copy of the

check paid by the buyer to the family is not sufficient unless a breakdown of interest and principal is shown.)

2. Amortization schedule showing interest for the 12 months following the effective date of the certification or re-examination.

### 7.7.3  Net Rental Income from Property Owned by Family [24 CFR §5.609(b)(3)]

Acceptable documents for verification include, but are not limited to the following:

1. IRS Form 1040 with Schedule E (Rental Income).

2. Copies of latest rent receipts, leases, or other documentation of rent amounts.

3. Documentation of allowable operating expenses of the property: tax statements, insurance invoices, bills for reasonable maintenance and utilities, and bank statements or amortization schedules showing monthly interest expense.

## 7.8  VERIFICATION OF ASSETS [24 CFR §982.516(a)(2)(ii)]

### 7.8.1  Family Assets

The Housing Authority will determine the current cash value, (the net amount the family would receive if the asset were converted to cash). Acceptable documents for verification include, but are not limited to the following:

1. Verification forms, letters, or documents from a financial institution or broker.

2. Passbooks, checking account statements, certificates of deposit, bonds, or financial statements completed by a financial institution or broker.

3. Quotes from a stockbroker or realty agent as to net amount family would receive if they liquidated securities or real estate.

4. Real estate tax statements if the approximate current market value can be deduced from assessment.

5. Financial statements for business assets.

6. Copies of closing documents showing the selling price and the distribution of the sales proceeds.

7. Appraisals of personal property held as an investment.

### 7.8.2  Assets Disposed of for Less than Fair Market Value (FMV) [24 CFR §5.603(b)(3)]

This includes assets disposed of during 2 years preceding effective date of certification or re-examination:

1. For all certifications and re-examinations, the Housing Authority will obtain the family's certification as to whether any member has disposed

of assets for less than fair market value during the 2 years preceding the effective date of the certification or re-examination.

2. If the family certifies that they have disposed of assets for less than fair market value, verification [or certification] is required that shows:

- All assets disposed of for less than FMV;
- The date they were disposed of;
- The amount the family received; and
- The market value of the assets at the time of disposition. Third-party verification will be obtained wherever possible.

## 7.9 VERIFICATION OF ALLOWABLE DEDUCTIONS FROM INCOME [24 CFR §5.11]

### 7.9.1 Childcare Expenses [24 CFR §5.611(a)(4)]

Acceptable documents for verification include, but are not limited to the following:

1. Written verification from the person who receives the payments is required. If the childcare provider is an individual, s/he must provide a statement of the amount they are charging the family for their services and whether any of the amounts owed have been or will be paid by sources outside the family.
2. Verifications must specify the child care provider's name, address, telephone number, the names of the children cared for, the number of hours the child care occurs, the rate of pay, and the typical yearly amount paid, including school and vacation periods.
3. Family's certification as to whether any of those payments have been or will be paid or reimbursed by outside sources.

### 7.9.2 Medical Expenses [24 CFR §5.611(a)(3)]

Families who claim medical expenses or expenses to assist a person(s) with a disability will be required to submit a certification as to whether or not any expense payments have been, or will be, reimbursed by an outside source.

Acceptable documents for verification include, but are not limited to the following:

1. Written verification by a doctor, hospital or clinic personnel, dentist, pharmacist, of
   - The anticipated medical costs to be incurred by the family and regular payments due on medical bills, and
   - Extent to which those expenses will be reimbursed by insurance or a government agency.
2. Written confirmation by the insurance company or employer of health insurance premiums to be paid by the family.

3.  Written confirmation from the Social Security Administration's written of Medicare premiums to be paid by the family over the next 12 months.  A computer printout will be accepted.

4.  For attendant care:

    -   A reliable, knowledgeable professional's certification that the assistance of an attendant is necessary as a medical expense and a projection of the number of hours the care is needed for calculation purposes.

    -   Attendant's written confirmation of hours of care provided and amount and frequency of payments received from the family or agency (or copies of canceled checks the family used to make those payments) or stubs from the agency providing the services.

5.  Receipts, canceled checks, or pay stubs that verify medical costs and insurance expenses likely to be incurred in the next 12 months.

6.  Copies of payment agreements or most recent invoice that verify payments made on outstanding medical bills that will continue over all or part of the next 12 months.

7.  Receipts or other record of medical expenses incurred during the past 12 months that can be used to anticipate future medical expenses. The Housing Authority may use this approach for general medical expenses such as non-prescription drugs and regular visits to doctors or dentists, but not for one-time, nonrecurring expenses from the previous year.

8.  The Housing Authority will use mileage at the IRS rate, or cab, bus fare, or other public transportation cost for verification of the cost of transportation directly related to medical treatment.

**7.9.3   Assistance to Persons with Disabilities
[24 CFR §5.611(a)(3)(ii)]**

1.  In all cases:

    -   Written certification from a reliable, knowledgeable professional that the person with disabilities requires the services of an attendant and/or the use of auxiliary apparatus to permit him/her to be employed or to function sufficiently independently to enable another family member to be employed.

    -   Family's certification as to whether they receive reimbursement for any of the expenses of disability assistance and the amount of any reimbursement received.

2.  Attendant Care:

    -   Attendant's written certification of amount received from the family, frequency of receipt, and hours of care provided.

    -   Certification of family and attendant and/or copies of canceled checks family used to make payments.

3.  Auxiliary Apparatus:

Housing Authority of the County of Los Angeles

- Receipts for purchases or proof of monthly payments and maintenance expenses for auxiliary apparatus.
- In the case where the person with disabilities is employed, a statement from the employer that the auxiliary apparatus is necessary for employment.

**7.10  VERIFYING NON-FINANCIAL FACTORS [24 CFR §982.551(b)(1)]**

**7.10.1  Verification of Legal Identity**

In order to prevent program abuse, the Housing Authority will require applicants to furnish verification of legal identity for all family members.

The documents listed below will be considered acceptable verification of legal identity for adults. If a document submitted by a family is invalid or otherwise questionable, more than one of these documents may be required.

- ➤ Certificate of Birth, naturalization papers
- ➤ Church issued baptismal certificate
- ➤ Current, valid Driver's license
- ➤ U.S. military discharge (DD 214)
- ➤ U.S. passport
- ➤ Board approved Consulate General identification cards, which are currently Mexico's and Argentina's "Matricula Consular" identification cards
- ➤ Company/agency Identification Card
- ➤ Department of Motor Vehicles Identification Card
- ➤ Hospital records

Documents considered acceptable for the verification of legal identity for minors may be one or more of the following:

- ➤ Certificate of Birth
- ➤ Adoption papers
- ➤ Custody agreement
- ➤ Health and Human Services ID

**7.10.2  Verification of Marital Status**

- Verification of divorce status will be a certified copy of the divorce decree, signed by a Court Officer.
- Verification of a separation may be a copy of court-ordered maintenance or other records.
- Verification of marriage status is a marriage certificate.

### 7.10.3 Familial Relationships

The following verifications may be required if applicable:

- ➢ Verification of relationship:
  - Official identification showing names
  - Birth Certificates
  - Baptismal certificates
- ➢ Verification of guardianship:
  - Court-ordered assignment
- ➢ Verification from social services agency
- ➢ School records
  - Affidavit of parent
- ➢ Evidence of a stable family relationship:
  - Joint bank accounts or other shared financial transactions
  - Leases or other evidence of prior cohabitation
  - Credit reports showing relationship

### 7.10.4 Verification of Permanent Absence of Adult Member

If an adult member who was formerly a member of the household is reported permanently absent by the family, the Housing Authority may require one or more of the following as verification:

1. Husband or wife institutes divorce action.

2. Husband or wife institutes legal separation.

3. Order of protection/restraining order obtained by one family member against another.

4. Proof of another home address, such as utility bills, canceled checks for rent, drivers license, or lease or rental agreement, if available.

5. Statements from other agencies such as social services or a written statement from the owner or manager that the adult family member is no longer living at that location.

6. If the adult family member is incarcerated, a document from the Court or prison should be obtained stating how long they will be incarcerated.

7. A statement by the adult member of the household removing him/herself from the lease and voucher household and providing a forwarding address and effective date of the move.

Housing Authority of the County of Los Angeles

**7.10.5  Verification of Change in Family Composition
[24 CFR §982.516(c)]**

The Housing Authority may verify changes in family composition (either reported or unreported) through letters, telephone calls, utility records, inspections, owners, neighbors, credit data, school or DMV records, and other sources.

**7.10.6  Verification of Disability**

Verification of disability must be receipt of SSI or SSA disability payments under Section 223 of the Social Security Act or 102(7) of the Developmental Disabilities Assistance and Bill of Rights Act (42 U.S.C. 6001(7) or verified by appropriate diagnostician such as physician, psychiatrist, psychologist, therapist, rehabilitation specialist, or licensed social worker, using the HUD language as the verification format.

**7.10.7  Verification of Citizenship/Eligible Immigrant Status
[24 CFR Part 5, Subpart E]**

To be eligible for assistance, individuals must be U.S. citizens, or non-citizens with eligible immigrant status based on the eligible categories specified by regulations.  Individuals who are neither may elect not to contend their status. Each family member must declare their status once.  Assistance cannot be delayed, denied, or terminated while verification of status is pending except that assistance to applicants may be delayed while the Housing Authority hearing is pending.

1. Citizens or Nationals of the United States: Required to sign a declaration under penalty of perjury [24 CFR §5.508(b)(1)].

2. Eligible Immigrants Age 62 and Over: Required to sign a declaration of eligible immigration status and provide proof of age [24 CFR §5.508(b)(2)].

3. All Other Eligible Immigrants: Required to sign a declaration of status and verification consent form, and to provide an acceptable document of eligible immigration as follows:

   - Resident Alien Card (I-551)

   - Alien Registration Receipt Card (I-151) (With receipt for application of I-551)

   - Foreign Passport with I-551 stamp

   - Arrival-Departure Record (I-94) with no annotation accompanied by:

     ▪ A final court decision granting asylum (if no appeal is taken);

     ▪ A letter from an INS or USCIS asylum officer granting asylum (if application is filed on or after 10/1990) or from and INS director granting asylum (application filed before 10/1/90);

     ▪ A court decision granting withholding of deportation; or

- A letter from an asylum officer granting withholding of deportation (if application filed on or after 10/1/90).

- Arrival-Departure Record (I-94) stamped with one of the following:

  - "Admitted as a Refugee Pursuant to Section 207"

  - "Section 208" or "Asylum"

  - "Section 243(h)" or "Deportation stayed by Attorney General"

  - "Paroled Pursuant to Section 221(d)(5) of the INS (or USCIS)"

- Temporary Resident Card (I-688) annotated "Section 245A" or Section "210"

- Employment Authorization Card (I-688B) annotated "Provision of Law 274a. 12(11)" or "Provision of Law 274a.12"

- Employment Authorization Document (I-766) annotated "Provision of Law 274a. 12(11)" or "Provision of Law 274a.12"

- Any official revision of the acceptable documents listed above

- Receipt issued by the United States Citizenship and Immigration Service (USCIS) for issuance of replacement of any of the above documents that shows individual's entitlement has been verified

The document is copied front and back and returned to the family. A birth certificate is not acceptable verification of eligible immigrant status. All documents in connection with U.S. citizenship/eligible immigrant status must be kept 5 years.

Eligible immigrants must have their status verified by USCIS. The Housing Authority verifies the status through the USCIS SAVE system. If this primary verification fails to verify status, the Housing Authority must request within 10 calendar days that the USCIS conduct a manual search [24 CFR §5.512(c)].

4. Ineligible Family Members: Family members who do not claim to be citizens or eligible immigrants must be listed on a statement of ineligible family members signed by the head of household, co-head, or spouse [24 CFR §5.508(e)].

5. Non-Citizen Students on Student Visas: Ineligible, even though they are in the country lawfully. They must provide their student visa but their status will not be verified and they do not sign a declaration but are listed on the statement of ineligible members [24 CFR §5.522].

- **Failure to Provide**: If an applicant or participant family member fails to sign required declarations and consent forms or provide documents, as required, they must be listed as an ineligible member. If the entire family fails to provide and sign as required, the family may be denied or terminated for failure to provide required information [24 CFR §5.508(i)].

- **Time of Verification**: For applicants, verification of U.S. citizenship/eligible immigrant status occurs at the same time as verification of other factors of

Housing Authority of the County of Los Angeles

eligibility for final eligibility determination. For family members added after other members have been verified, the verification occurs at the first interim or annual re-examination after the new member moves in. Once verification has been completed for any covered program, it need not be repeated except that, in the case of port-in families, if the initial public housing agency does not supply the documents, the Housing Authority must conduct the determination [24 CFR §5.508(g)].

- **Extensions of Time to Provide Documents**: Extensions must be given for persons who declare their eligible immigration status but need time to obtain the required documents. The length of the extension shall be based on individual circumstances. The Housing Authority will generally allow up to 30 calendar days to provide the document or a receipt issued by the USCIS for issuance of replacement documents [24 CFR §5.508(h)].

- **Determination of Ineligibility**: After the Housing Authority has made a determination of ineligibility, the family will be notified of the determination and the reasons and informed of the option for prorated assistance (if applicable).

### 7.10.8 Verification of Social Security Numbers [24 CFR §5.216(a)]

Social Security numbers must be provided as a condition of eligibility for all family members, except for children age 5 and under, who have not been assigned a number, and family members who are not eligible to obtain a Social Security number. Social Security numbers will be verified through a Social Security card issued by the Social Security Administration. If a family member cannot produce a Social Security card, only the documents listed below showing his or her Social Security number may be used for verification. The family is also required to certify in writing that the document(s) submitted in lieu of the Social Security card information provided is/are complete and accurate [24 CFR §5.216(f)]:

- A driver's license
- Identification card issued by a Federal, state or local agency
- Identification card issued by a medical insurance company or provider (including Medicare and Medicaid)
- An identification card issued by an employer or trade union
- An identification card issued by a medical insurance company
- Earnings statements or payroll stubs
- Bank statements
- IRS Form 1099
- Benefit award letters from government agencies
- Retirement benefit letter
- Life insurance policies
- Court records such as real estate, tax notices, marriage and divorce, judgment or bankruptcy records

> Verification of benefits or Social Security Number from Social Security Administration

All new family members, except children age 5 and under, who have not been assigned a number, will be required to produce their Social Security card or provide the substitute documentation described above together with their certification that the substitute information provided is complete and accurate. This information is to be provided at the time the change in family composition is reported to the Housing Authority [24 CFR §5.216(a)].

If a family member is able to disclose the Social Security number but cannot meet the documentation requirements, he/she must sign a certification to that effect provided by the Housing Authority. The family member will have an additional 60 calendar days to provide proof of the Social Security number. If they fail to provide this documentation, the family's assistance will be terminated [24 CFR §5.216(g)].

If the family member states they have not been issued a number, the family member will be required to sign a certification to this effect.

### 7.10.9 Medical Need for Larger Unit

A written certification that a larger unit is medically necessary must be obtained from a reliable, knowledgeable medical professional.

### 7.10.10 Reasonable Accommodation

In order to verify the necessity for a reasonable accommodation, the Housing Authority will require the disabled individual, or a third party acting on their behalf, to return the Reasonable Accommodation Request form, or other written documentation, completed by a qualified professional with direct experience with the individual's disability. Qualified professionals may include, but are not limited to:

> A medical doctor

> A psychiatrist

> A social worker

> Other unlicensed care providers

### 7.10.11 Secondary Review/Credit Checks

The Housing Authority uses credit reports obtained from reliable sources to conduct secondary verifications for a random sample of applicants and participants as detailed in Section 1.12 (Monitoring Program Performance).

The methodology used to evaluate the information obtained from the credit report in relation to new applicants is outlined in Chapter 4 (Establishing Preferences and Maintaining the Waiting List).

The secondary review includes a comparison between the information contained in the credit report, for each adult household member, and the information provided by the family to the Housing Authority for eligibility purposes. Specifically, the Housing Authority reviews the credit report to verify:

Housing Authority of the County of Los Angeles

> **Employment**: If the credit report reveals employment during the subsidized period that was not disclosed to the Housing Authority, the family will be required to provide documentation that the employment did not occur or provide information regarding the amount of earnings received during the employment period.

If the family contends that the employment was made up for the purposes of obtaining credit or was erroneously placed on the credit report, the family must supply a letter from the employers listed confirming such information.  On a case-by-case basis, the Housing Authority may accept a certified statement from the family.

If the family failed to disclose employment for a period longer than 6 months, the Housing Authority will propose termination of the family's assistance and seek repayment of any overpayment.  On a case-by-case basis the Housing Authority may counsel the family before proposing termination and seeking repayment of any overpayment.

If the family failed to disclose employment for less than 6 months, the family will be required to attend a counseling interview and re-sign all program documents re-enforcing the family's obligations.  The family will also be required to repay any overpayment amount. A second violation of this nature will result in a proposed termination.

> **Assets**:  The credit report information will be used to verify assets, particularly, large items such as real estate property. If the credit report reveals that the family owns property, the family will be required to provide the appropriate documentation regarding the property.

If all documentation confirms that the family (any family member) owns real estate property that was purposely concealed, the Housing Authority will propose termination of assistance and seek repayment of any overpayment amount.

> **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit.  Common reasons for use of other names include a recent marriage or a divorce.  If an alias has not been disclosed to the Housing Authority, the family will be asked to provide additional evidence of the legal identity of adult family members.

> **Current and Previous Addresses**: For a continuously assisted family, it is assumed that the family's primary residence is the assisted address.  If the credit report indicates the continuous use of an address, other than that of the assisted unit during the subsidized period, the family will be asked to provide documentation that the assisted address is being used as the family's primary residence.  This may include a history of utility bills, bank statements, school enrollment record for children, credit card statements or other relevant documents.  Failure to provide adequate proof may result in termination of assistance.

If the family is not using the subsidized unit as their primary residency and/or is subletting the assisted unit, the file will be referred for proposed termination and the Housing Authority will seek full repayment of any overpayment amount.

➢ **Credit Card and Loan Payments**: A credit report will usually include a list of the family's financial obligations.  Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments.  The Housing Authority will review this information to confirm the income and asset information provided by the family. If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, the Housing Authority will ask the family to disclose how they are currently meeting their financial obligations.   Accounts that have been charged off or significantly delinquent are not included in this calculation.   Failure to provide adequate proof of income will result in the file being referred for proposed termination.   Additionally, the Housing Authority will seek full repayment of any overpayment amount.

➢ **Multiple Social Security Numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit.  If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

Whenever a violation results in a proposed termination, the family is entitled to request an informal hearing. Procedures governing the informal hearing process are outlined in Chapter 16 (Informal Hearings and Complaints).

Housing Authority of the County of Los Angeles

## CHAPTER 8:
## VOUCHER ISSUANCE AND BRIEFINGS

**8.1**  **INTRODUCTION**

This chapter covers the Housing Authority's process for issuing vouchers, including the contents of the briefing that is conducted for families receiving a voucher. It also includes policies on the term of the voucher.

**8.2**  **ISSUANCE OF HOUSING CHOICE VOUCHERS**

When funding is available, the Housing Authority will issue vouchers to applicants whose eligibility has been determined.

The number of vouchers issued must ensure that the Housing Authority stays as close as possible to 100 percent lease-up. The Housing Authority performs a calculation to determine whether applications can be processed, the number of vouchers that can be issued, and to what extent the Housing Authority can over-issue.

The Housing Authority may over-issue vouchers only to the extent necessary to meet leasing goals. All vouchers that are over-issued must be honored. If the Housing Authority finds it is over-leased, it must adjust future issuance of vouchers in order not to exceed the ACC budget limitations for the fiscal year.

**8.3**  **BRIEFING TYPES AND REQUIRED ATTENDANCE**

**8.3.1**  **Initial Applicant Briefing**
**[24 CFR §982.301(a)]**

When the family is initially issued a voucher, the Housing Authority conducts a briefing session, as required by HUD. The briefing session is mandatory.

- Briefing sessions will be conducted in groups or individual meetings.

The Housing Authority will not issue a voucher to a family unless the household representative has attended a briefing and signed the voucher. Applicants who provide prior notice of inability to attend a briefing will automatically be scheduled for the next briefing. Applicants who fail to attend scheduled briefings, without prior notification and approval of the Housing Authority, may be denied admission based on failure to supply information needed for certification. The Housing Authority will conduct individual briefings for families with disabilities at their home, upon request by the family, if required for reasonable accommodation.

Families who attend group briefings and still have the need for individual assistance will be referred to the appropriate staff person.

**8.3.2**  **Re-Issuance Briefing**

A briefing will be held for participants who will be re-issued vouchers to move. This briefing may include incoming and outgoing portable families. Families failing to attend a scheduled briefing twice will be denied a new voucher based on failure to provide required information.

### 8.3.3   Owner Briefing

Briefings are held for owners at least annually.   Invitations are mailed to all owners.  Prospective owners are also welcome.  The purpose of the briefing is to assure successful owner participation in the program.

### 8.4   INFORMATION PROVIDED AT THE BRIEFING SESSION

The Housing Authority's objectives are to assure that families selected to participate are successful in obtaining an acceptable housing unit, and that they have sufficient knowledge to derive maximum benefit from the program and to comply with program requirements.

The purpose of the briefing session is to provide information on the Housing Authority's process for voucher holders who intend to lease a unit.  This will enable families to utilize the program to their advantage, and prepare them to discuss it with potential owners and property manager.

When the family is selected to participate, the briefing session includes information as follows.

### 8.4.1   Topics Covered in the Briefing Session
### [24 CFR §982.301(a)]

The person conducting the briefing will describe how the program works and include information on the following subjects:

- A description of how the program works;

- Family and owner responsibilities;

- Where a family may lease a unit inside and outside the Housing Authority's jurisdiction;

- How portability works for families eligible to exercise portability; and

- Advantages of moving to an area that does not have a high concentration of poor families, for families living in high poverty census tracts in the Housing Authority's jurisdiction.

If the family includes a person with disabilities, the Housing Authority will ensure compliance with 24 CFR §8.6 to ensure effective communication.

### 8.4.2   Briefing Packet
### [24 CFR §982.301(b)]

The Housing Authority provides families with a briefing packet that contains more detailed information about the program.   The packet includes forms and information required by HUD, as well as additional resources.   The person conducting the briefing session will explain the documents in the briefing packet.

1. Instructions: This explains the term of the voucher, the Housing Authority's policies on extensions and suspensions, and how families may request tenancy approval.

Housing Authority of the County of Los Angeles

2. <u>Subsidy Estimation</u>: A worksheet on rent calculations, including a description of the method used to calculate the assistance payment, how the minimum and maximum allowable rent is determined, how the payment standard is determined, and a calculation of the estimated maximum rent to suit the tenant's budget.

3. <u>Utility Allowance Schedule</u>: Utility allowance amounts for rental units, by unit size and utility type, for cities and unincorporated areas within the Housing Authority's jurisdiction.

4. <u>Information on where the family can lease a unit</u>, including portability procedures, a list of area housing authorities, and a form for participants who are requesting to transfer.

5. <u>Form HUD-53641</u>: The HUD-required "tenancy addendum" that must be included in the lease.

6. <u>Request for Tenancy Approval (RTA)</u>: Families request Housing Authority approval of the assisted tenancy with this form.  The RTA includes a statement of Housing Authority policy on providing family information to prospective owners.

7. <u>Subsidy Standards and Requests for Waivers</u>: Explains how the number of bedrooms (unit size) relates to family composition, and when and how exceptions are made in regards to requests for additional bedrooms.

8. <u>A Good Place to Live</u>: HUD's brochure on selecting a unit that complies with HQS.

9. <u>Are You A Victim of Housing Discrimination</u>: HUD's pamphlet on fair housing which contains the complaint form.  The Housing Authority also includes available State and local information on equal opportunity laws.

10. <u>Marketing List of Available Properties</u>:  The Housing Authority has contracted with Socialserve.com to provide an internet-based property listing and search service for owners and participants.  The Housing Authority includes an information sheet on how to access Socialservve.com.

11. <u>Family Obligations</u>: Families sign to acknowledge program obligations, and consequences including termination of assistance for failure to comply.

12. <u>Informal Hearing Information</u>: Includes procedures and explanations of when participant families have the opportunity for an informal hearing, and how to request a hearing.

The packet may also include the following materials:

- <u>Three Way Partnership</u>: Explains the relationship between owners, participants and the Housing Authority.

- <u>Protect Your Family From Lead In Your Home</u>: Federal brochure on the hazards of lead-based paint and resources for additional information.

- <u>Searching for a Rental Home</u>: Guidance on finding a unit and submitting a successful rental application.

- <u>Additional Standards for HQS Inspections</u> and inspections process details.

- <u>Owner materials</u> including information on the New Contracts Process and the Benefits of Participation.

- <u>Owner forms</u> including IRS W-9, Letter of Authorization, Authorization Agreement for Direct Deposit, and a sample Lead-Based Paint Disclosure.

- <u>Request for Voucher Extension form</u>

**8.5    ENCOURAGING PARTICIPATION IN AREAS WITHOUT LOW INCOME OR MINORITY CONCENTRATION**
**[24 CFR §982.301(a)(3)**

At the briefing, families are encouraged to search for housing in non-impacted areas.  The Housing Authority provides assistance to families who wish to do so.

The assistance provided to such families includes:

- Direct contact with owners;

- Counseling with the family;

- Providing information about services in various non-impacted areas;

- Meeting with neighborhood groups to promote understanding;

- Formal or informal discussions with owner groups;

- Formal or informal discussions with social service agencies;

- Meeting with rental referral companies or agencies; and

- Meeting with fair housing groups or agencies.

The Housing Authority will maintain a database of available housing submitted by owners in all neighborhoods within its jurisdiction to ensure greater mobility and housing choice to very low-income households.  The Marketing List will be made available to voucher holders who are actually seeking housing.

**8.6    SECURITY DEPOSIT REQUIREMENTS**
**[24 CFR §982.313]**

Security deposits charged by owners may not exceed those charged to unassisted families (nor the maximum prescribed by State or local law.)

For lease-in-place families, responsibility for first and last month's rent is not considered a security deposit issue.  In these cases, the owner should settle the issue with the family prior to the beginning of assistance.

**8.7    TERM OF VOUCHER**
**[24 CFR §982.301(b)(1)]**

During the briefing session, each family is issued a voucher, which represents a contractual agreement between the Housing Authority and the family, specifying the rights and responsibilities of each party. It does not constitute admission to the program, which occurs when the lease and contract become effective.

Housing Authority of the County of Los Angeles

### 8.7.1 Expirations
### [24 CFR §982.303(a)]

The voucher is valid for a period of 60 calendar days from the date of issuance. The family must submit a Request for Tenancy Approval and lease within the 60 calendar-day period, unless an extension has been granted by the Housing Authority.

If the voucher has expired, and has not been extended by the Housing Authority or expires after an extension, the family will be denied assistance. The family will not be entitled to a review or hearing. If the family is currently assisted, they may remain as a participant in their unit if there is an assisted lease/contract in effect.

### 8.7.2 Policy on Suspensions (Tolling)
### [24 CFR 982.303(c)]

When a Request for Tenancy Approval is received, the Housing Authority will not deduct the number of calendar days required to process the request from the term of the voucher.

### 8.7.3 Extensions
### [24 CFR §982.303(b)]

The Housing Authority may grant extensions to vouchers.

A family may request an extension of the voucher time period. All requests for extensions must be received prior to the expiration date of the voucher.

Extensions may be granted in 30, 60, or 120-day increments, up to a maximum term of 180 calendar days, if necessary for the tenant to locate a unit.

Supervisors may authorize extensions up to a maximum term of 270 calendar days for extenuating circumstances or as a reasonable accommodation. Such matters will be considered on an individual basis and must be supported by verifiable third-party documentation.

### 8.7.4 Assistance to Voucher Holders
### [24 CFR §982.301(b)]

Families who require additional assistance during their search may call the Housing Authority to obtain a Marketing List of available units. Information regarding the Marketing List will be presented at the briefing session.

The Housing Authority will assist families with negotiations with owners and provide other assistance related to the families' search for housing.

### 8.8 VOUCHER ISSUANCE DETERMINATION FOR SPLIT HOUSEHOLDS
### [24 CFR §982.315]

In those instances when a family assisted under the Housing Choice Voucher Program becomes divided into two otherwise eligible families due to divorce, legal separation, or the division of the family, and the new families cannot agree as to which new family unit should continue to receive the assistance, and there

is no determination by a court, the Housing Authority shall consider the following factors to determine which of the families will continue to be assisted:

1. Which of the two new family units has custody of dependent children.

2. Which family member was the head of household when the voucher was initially issued (listed on the initial application).

3. The composition of the new family units, and which unit contains elderly or disabled members.

4. Whether domestic violence was involved in the breakup.

5. Which family members remain in the unit.

6. Recommendations of social service professionals.

Documentation of these factors will be the responsibility of the requesting parties.

If documentation is not provided, the Housing Authority will terminate assistance on the basis of failure to provide information necessary to complete the annual re-examination.

Where the breakup of the family also results in a reduction of the size of the voucher, the family will be required to move to a smaller unit if the current owner is unwilling to accept the rent level of the smaller sized certificate.

**8.9** **REMAINING MEMBER OF FAMILY – RETENTION OF VOUCHER**

To be considered the remaining member of the family, the person must have been previously approved by the Housing Authority to be living in the unit.

A live-in aide, by definition, is not a member of the family and will not be considered a remaining member of the family.

In order for a minor child to continue to receive assistance as a remaining family member:

1. The court has to have awarded emancipated minor status to the minor, or

2. The Housing Authority has to have verified that social services and/or the Juvenile Court has arranged for another adult to be brought into the assisted unit to care for the child/children for an indefinite period.

A reduction in family size may require a reduction in the voucher size.

**8.10** **FAMILY VOLUNTARILY RELINQUISHES HOUSING CHOICE VOUCHER**

The family may voluntarily relinquish their voucher at any time.  In such cases, the Housing Authority will provide the owner of the property with a 30 calendar days notice indicating that rental assistance will terminate based on the family's request. The family will become fully liable for the contract rent after 30 calendar days.

Generally, the Housing Authority will not reinstate a family once a request for voluntary termination has been received.   However, as a reasonable accommodation, the Housing Authority will review requests for reinstatements received within 6 months and make a determination on a case-by-case basis.

Housing Authority of the County of Los Angeles

If a family voluntarily relinquishes their voucher in lieu of facing termination, the Housing Authority will continue to seek to recover any monies that may be due to the Housing Authority as a result of misrepresentation or other breach of program regulations.

## CHAPTER 9:
## THE NEW CONTRACT PROCESS REQUEST FOR TENANCY APPROVAL AND CONTRACT EXECUTION

**9.1**   **INTRODUCTION**
          **[24 CFR §982.302(b) and 24 CFR §982.353(b)]**

After families are issued a voucher, they may search for a unit anywhere within the Housing Authority's jurisdiction, or outside of the Housing Authority's jurisdiction if they qualify for portability. The family must find an eligible unit under the program rules, with an owner who is willing to enter into a Housing Assistance Payments (HAP) contract with the Housing Authority. This chapter defines the types of eligible housing, the Housing Authority's policies which pertain to lease requirements, owner disapproval, and the processing of Requests for Tenancy Approval (RTA).

**9.2**   **REQUEST FOR TENANCY APPROVAL**
          **[24 CFR §982.302(c)]**

The family must submit the RTA and a copy of the proposed lease during the term of the voucher. Both the owner and the voucher holder must sign the RTA.

The Housing Authority will not permit the family to submit more than one RTA at a time.

The RTA will be approved if [24 CFR §982.302(d)]:

1. The unit is an eligible type of housing;
2. The unit passes an inspection (based on HUD's Housing Quality Standards and the Housing Authority's requirements, detailed in Chapter 10);
3. The rent is reasonable;
4. The security deposit amount is approvable;
5. The proposed lease complies with HUD and Housing Authority requirements, and State and local law;
6. The owner is approvable, and there are no conflicts of interest; and
7. All applicable lead-based paint disclosure requirements have been met. See Section 10.4 (Lead-Based Paint) for additional policies.

**9.2.1**   **Disapproval of RTA**
            **[24 CFR §982.302(d)]**

If the Housing Authority determines that the RTA cannot be approved for any reason, the owner and the family will be notified in writing.  The Housing Authority will instruct the owner and family of the steps that are necessary to approve the Request.

The owner will be given 5 calendar days to submit an approvable RTA from the date of disapproval unless the reason for the disapproval is the result of multiple failed inspections (three or more failed HQS inspections).

Housing Authority of the County of Los Angeles

When, for any reason, an RTA is not approved, the Housing Authority will furnish another RTA form to the family along with the notice of disapproval so that the family can continue to search for eligible housing.

The Housing Authority will suspend the term of the voucher while the RTA is being processed. Therefore, the length of time allotted to a family for the purpose of locating another unit will be based on the number of days left on the term of the voucher at the time the RTA was submitted to the Housing Authority [24 CFR §982.303(b)].

**9.3    ELIGIBLE TYPES OF HOUSING
        [24 CFR §982.352]**

The Housing Authority will approve the following types of housing in the voucher program:

- Single-family dwellings, including condos and townhouses.
- Manufactured homes where the family leases the mobile home and the pad [24 CFR §982.620(a)(2)].
- Manufactured homes where the family owns the mobile home and leases the pad [24 CFR §982.620(a)(3)].
- Multifamily dwellings (apartment buildings).
- Units owned but not subsidized by the Housing Authority (HUD-prescribed requirement).

A family can own a rental unit but cannot reside in it while being assisted, except in the cases involving manufactured homes when the family owns the mobile home and leases the pad.  A family may lease in and have an interest in a cooperative housing development.

The Housing Authority may not permit a voucher holder to lease a unit that is receiving project-based Section 8 assistance or any duplicative rental subsidies.

**9.3.1   Special Housing Types
         [24 CFR §982.601]**

The Housing Authority must permit use of all special housing type listed below, if needed as a reasonable accommodation so the program is readily accessible to and usable by persons with disabilities in accordance with 24 CFR Part 8.

- Congregate housing
- Group home
- Shared housing
- Cooperative housing (excluding families that are not cooperative members)
- Homeownership (if homeownership program is available)
- Single Room Occupancy (SRO)

**9.3.2   Ineligible Housing Types**
**[24 CFR §982.352(a)]**

The Housing Authority will not approve:

- A unit occupied by the owner or by any person with an interest in the unit, other than manufactured homes described above.

- Nursing homes or other institutions that provide care.

- School dormitories and institutional housing.

- Structures that have not been properly converted.  Owners will be required to provide finalized permits for all conversion work when the integrity and/or soundness of a structure is in question.

- Converted garages or other structures not intended to be living areas.

- Any other types of housing prohibited by HUD.

**9.4   RESTRICTIONS ON RENTING TO RELATIVES**
**[24 CFR §982.306(d)]**

In accordance with HUD policy, the family will not be allowed to rent a unit from an owner (including a principal or other interested party) who is the spouse, parent, child, grandparent, grandchild, and sister or brother of any member of the family.  This restriction applies to all new contracts entered into after June 16, 1998.

Exceptions may be made to this policy as a reasonable accommodation for persons with a disability.  The Housing Authority will review all such requests on a case-by-case basis.  The family will be required to provide documentation of disability and how the particular unit, owned by the relative, could benefit the disabled person.  Owners must provide the current address of their residence (not a Post Office box).  If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification.  In addition, the Housing Authority may request a copy of the owner's current utility bills and bank statement.

Failure to provide adequate documentation, within the specified time period (2 weeks), will be grounds for denial of such request.

In all cases, the owner of the assisted unit may not reside in the unit with the assisted household at any time during the term of the Housing Assistance Payment (HAP) Contract between the Housing Authority and the owner.

**9.5   LEASE AGREEMENTS**
**[24 CFR §982.308 - §982.309]**

The tenant and the owner must enter a written lease for the unit.  If the owner uses a standard lease form for rental to unassisted tenants in the locality or the premises, the lease must be in such standard form, plus the required HUD Tenancy Addendum, which the Housing Authority will provide to the owner.

Housing Authority of the County of Los Angeles

The Housing Authority will review the lease for compliance with regulations. At minimum, the lease must specify the following information:

- The names of the owner and tenant;

- The address of the unit rented;

- The term of the lease including the initial term and any provisions for renewal;

- The amount of the monthly rent to owner; and

- A specification of which utilities and appliances will be supplied by the owner, and which by the family.

The lease must provide the following are grounds for the owner to terminate tenancy [24 CFR §982.310(c)]:

- Drug- related criminal activity engaged in, on or near the premises by any tenant, household member, or guest, or such activity engaged in on the premises by any other person under the tenant's control. In addition, the lease must provide that the owner may evict a family when the owner determines that a household member is illegally using a drug or when the owner determines that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

- Any of the following types of criminal activity by a covered person:

  ➢ Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);

  ➢ Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; or

  ➢ Any violent criminal activity on or near the premises by a tenant, household member, or guest, or any such activity on the premises by any other person under the tenant's control.

- If a tenant is:

  ➢ Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or

  ➢ Violating a condition of probation or parole imposed under Federal or State law.

When needed, the Housing Authority may require the owner and family to execute a lease rider to include changes to the rent amount, changes to utility responsibilities and/or effective date on the owner's original lease.

The effective date of the lease and the HAP contract will be based on the date the unit passed inspection or the family took possession of the unit, whichever is later. For this purpose, the family is considered to be in possession of the unit

when the family has a key to the unit and the unit is fully available for the family's exclusive use [24 CFR §982.305(b)].

**9.5.1    Separate Agreements**
**[24 CFR §982.510(c)]**

Separate agreements are not necessarily prohibited.  Families and owners will be advised of the prohibition of illegal side payments for additional rent, or for items normally included in the rent of unassisted families, or for items not shown on the approved lease.

Owners and families may execute separate agreements for services (parking space), appliances (other than range and refrigerator) and other items that are not included in the lease if the agreement is in writing and approved by the Housing Authority.

Any appliances, services or other items which are routinely provided to unassisted families as part of the lease (such as air conditioning, dishwasher or garage) or are permanently installed in the unit, cannot be put under separate agreement and must be included in the lease.  For there to be a separate agreement, the family must have the option of not utilizing the service, appliance or other item.

The Housing Authority is not liable for unpaid charges for items covered by separate agreements and nonpayment of these agreements cannot be cause for eviction.

If the family and owner have come to a written agreement on the amount of allowable charges for a specific item, so long as those charges are reasonable and not a substitute for higher rent, they will be allowed.

All agreements for special items or services must be attached to the lease approved by the Housing Authority.  If agreements are entered into at a later date, they must be approved by the Housing Authority and attached to the lease.

**9.6     INITIAL INSPECTIONS**

See Chapter 10 (Housing Quality Standards and Inspections).

**9.7     RENT LIMITATIONS**
**[24 CFR §982.508]**

In accordance with HUD regulations, at the time the family initially receives assistance for a new unit, the family's share of the rent for the unit (includes utilities and the rent to the owner) may not exceed more than 40 percent of the family's adjusted monthly income if the gross rent for the unit exceeds the payment standard.  Although HUD does not place limits on the amount that a family may contribute towards rent (if the family is a continuing family or the gross rent for an initial lease does not exceed the payment standard), the Housing Authority is concerned about affordability.  Therefore, whenever a family is contributing more than 60 percent of their adjusted family income towards rent, the family will be required to attend a Housing Authority affordability counseling session.  Trained staff will review the family's financial situation and review the

family's ability to meet their rental obligation.  If the family discloses that they are concerned about their ability to meet their rental obligation, the Housing Authority will work with the family to help them locate another affordable unit. If the family indicates that they are able to meet all of their current financial obligations, the family will be allowed to proceed with their request to remain in the current contracted unit.   A notation will be made in the family's file.

**9.8**    **RENT REASONABLENESS**
        **[24 CFR §982.507(a)(1)]**

A rent reasonable test will be used to determine if the rent amount request by the owner can be approved.  The Housing Authority's rent reasonableness policy, including appeals process, is covered in Chapter 11 (Setting Payment Standards and Determining Rent Reasonableness).

**9.9**    **INFORMATION TO OWNERS**
        **[24 CFR §982.307(b)]**

The Housing Authority is required to provide prospective owners with the address of the applicant and the names and addresses of the current and previous owner if known.  The Housing Authority will make an exception to this requirement if the family's whereabouts must be protected due to domestic abuse or witness protection.   The Housing Authority will not release any other information regarding the family.

The Housing Authority will inform owners that it is the responsibility of the owner to determine the suitability of prospective tenants.  Owners will be encouraged to screen applicants for rent payment history, eviction history, damage to units, and other factors related to the family's suitability as a tenant [24 CFR §982.307(a)].

Information regarding the Housing Authority's policy on this subject is included in the briefing packet and as an attachment to the Request for Tenancy Approval. This policy will apply uniformly to all families and owners.

In addition to the information listed above, the Housing Authority provides owner workshops at least twice a year.  At the workshops, current and prospective owners are given an overview of the program and information about any significant program changes.   There is also ample time for a question and answer session.

**9.10**    **OWNER DISAPPROVAL**
         **[24 CFR §982.306(a) - §982.306(c)(4)]**

For purposes of this section, "owner" includes a principal or other interested party, and to disapprove an owner means to prevent the participation of an owner in Housing Authority programs.

The Housing Authority is required to disapprove an owner for the following reasons:

➢ HUD has informed the Housing Authority that the owner has been debarred, suspended, or subject to a limited denial of participation under 24 CFR Part 24.

> HUD has informed the Housing Authority that the federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other federal equal opportunity requirements and such action is pending.

> HUD has informed the Housing Authority that a court or administrative agency has determined that the owner violated the Fair Housing Act or other Federal equal opportunity requirements.

> If the owner is the spouse, parent, child, grandparent, grandchild, sister, or brother of any member of the family.

The Housing Authority also maintains the discretion to disapprove an owner for the reasons listed below. The Housing Authority may disapprove an owner for a period of 1 year for the following reasons:

> The owner has violated obligations under a housing assistance payments contract under Section 8 of the 1937 Act (42 U.S.C. 1437f).

> The owner has a history or practice of non-compliance with the HQS for units leased under the tenant-based programs or with applicable housing standards for units leased with project-based Section 8 assistance or leased under any other Federal housing program.

> The owner has a history or practice of renting units that fail to meet State or local housing codes;

> The owner has not obtained a business license for rental property for the assisted unit, where required by local ordinance; or

> The owner has not paid State or local real estate taxes, fines or assessments.

An owner may be disapproved for a period of up to 5 years for the following reasons:

> The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program.

> The owner has a history or practice of failing to terminate tenancy of Section 8-assisted tenants, or tenants assisted under any other federally-assisted housing program, for activity engaged in by the tenant, any member of the household, guest or another person under the control of any member of the household that:

  - Threatens the right to peaceful enjoyment of the premises by other residents;

  - Threatens the health or safety of other residents, of employees of the Housing Authority, or of owner employees or other persons engaged in management of the housing;

  - Threatens the health or safety of, or the right to peaceful enjoyment of their residences, by persons residing in the immediate vicinity of the premises; or commits drug related criminal activity or violent criminal activity.

An owner may be disapproved for a period of up to 10 years for the following reason:

> ➢ The owner has engaged in any drug-related criminal activity or any violent criminal activity.

If an owner disagrees with the Housing Authority's disapproval, the owner may appeal the decision in writing within 10 calendar days from receiving the Housing Authority's decision. A supervisor will review the appeal and prepare a written decision within 30 calendar days after receiving the request. The decision of the supervisor is final.

**9.11    CHANGE IN TOTAL TENANT PAYMENT (TTP) PRIOR TO HAP EFFECTIVE DATE**

When the family reports changes in factors that will affect the Total Tenant Payment (TTP) prior to the effective date of the HAP contract, the information will be verified and the TTP will be recalculated. If the family does not report any change, the Housing Authority need not obtain new verifications before the HAP contract becomes effective, unless the verifications are more than 120 calendar days old.

**9.12    CONTRACT EXECUTION PROCESS**
**[24 CFR §982.305(c)]**

Provided that the unit passes inspection, the Housing Authority will prepare the HAP contract for execution.  The family and the owner will execute the lease agreement, and the owner and the Housing Authority will execute the HAP contract.  Copies of the documents will be furnished to the parties who signed the respective documents.

The Housing Authority makes every effort to execute the HAP contract before the commencement of the lease term.  The HAP contract may not be executed more than 60 calendar days after commencement of the lease term and no payments will be made until the contract is executed.

Verification documents may not be more than 120 days old at the time of the contract effective date.

The following Housing Authority representatives are authorized to execute a contract on behalf of the Housing Authority: Assisted Housing's Division Director, Assistant Director, Managers, Assistant Managers and Supervisors.

Owners must provide the current address of their residence (not a Post Office box).  If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification.

### 9.12.1  Determining the Contract Effective Date

The effective date and the amount of the rental payment is communicated in writing to both the owner and family.

If the owner and the family have entered into a lease and provide a copy of the lease with the RTA, the effective date of the contract will be either:

1.  The date the unit passed inspection (for families residing in the unit prior to the inspection date), or

2.  The date that the Housing Authority authorized the owner to allow the family to take possession of the unit.

The contract effective date will be based on the later of these two dates. If the owner and the family have not executed a lease prior to the HAP contract negotiation process, then the HAP contract will become effective once the lease has been properly executed by both parties.

### 9.12.2  Prorating First Month's Rent

When the effective date of a new contract begins on a day other than the first of the month, the Housing Authority will determine a prorated contract rent amount. For consistency with rental industry standards, prorated amounts will be calculated by using 30 days to establish a daily rate (refer to 3/3/05 memo).

### 9.12.3  Proof Of Ownership

The Housing Authority will use property profile information obtained from a private vendor to confirm ownership of the assisted unit.  If third party information cannot confirm ownership of the unit, the Housing Authority may also request a recorded deed or closing escrow statement to prove ownership.

Owners may also be required to provide a copy of a business rental license if the assisted unit is in a city where one is required.

Any requested information must be provided prior to execution of the HAP contract.  Failure to provide the requested information within a reasonable period of time, generally not more than 30 calendar days, will result in a cancellation of the RTA.

### 9.12.4  Establishing Eligibility To Execute HAP Contract and Related Documents

In cases involving multiple owners, the Housing Authority will accept the signature of a designee on all contracts and related paperwork if all the legal owners have jointly agreed on the person/persons who may act on their behalf.

In cases involving multiple owners, the Housing Authority requires that all persons who have interest in the property sign or provide a letter of authorization, giving one or more parties the right to sign contracts and other program documents.

In cases involving a partnership or corporation, the Housing Authority may request the partnership agreement or incorporation documents to determine who is designated to act on the group's behalf.  In cases involving a trust, the Housing

Authority may request a copy of the trust in order to verify the names of the trustees.

The Housing Authority will not execute a HAP Contract until all proper authorization, from all appropriate parties, has been provided. Failure to provide information needed to establish authority to execute the HAP contract within a reasonable time, generally 30 calendar days, may result in a cancellation of the RTA.

Once the Housing Authority has established proper authorization, the letter of authorization will remain in effect until superseded by another authorization or the HAP contract is terminated. All changes or modification to the instructions provided in the current letter of authorization must be provided in writing.

### 9.12.5 Payment To The Owner [24 CFR §982.311(a)]

Once the HAP Contract is executed, the Housing Authority begins processing payments to the owner. Because the Housing Authority's sole method of payment to owners is direct deposit, new and existing owners must provide the necessary information for enrollment in the Housing Authority's direct deposit program. Payments will be made via direct deposit by the first of each month. Owners must notify the Housing Authority of any missing payments as soon as possible. The Housing Authority will accept report of missing payment both via a telephone call and/or in writing.

### 9.13 CHANGE IN OWNERSHIP

A change in ownership does not require execution of a new contract.

The Housing Authority will process a change of ownership only upon the written request of the previous or new owner and only if accompanied by a copy of the escrow statement or other document showing the transfer of title and the Employee Identification Number or Social Security number of the new owner.

In order to complete a change of ownership, the new owner must complete an Assumptions of Obligations and Benefits contract. This form obligates the new owner to the HAP contract. The Housing Authority will provide this document once a written request for a change is received.

When the assumption contract has been executed, the Housing Authority will send a copy of it, along with a copy of the original HAP contract and lease, to the new owner.

New owners are subject to the Housing Authority's owner disapproval policy as detailed in Section 9.10 of this chapter.

**CHAPTER 10:**
**HOUSING QUALITY STANDARDS AND INSPECTIONS**

**10.1   INTRODUCTION**

This chapter describes the Housing Authority's procedures for implementing Housing Quality Standards (HQS), conducting different inspections, and setting standards for the timeliness of repairs.  It also explains the responsibilities of the owner and family, and the consequences for noncompliance with HQS by the owner and family.

**10.2   TYPES OF INSPECTIONS**
**[24 CFR §982.405]**

The Housing Authority conducts the following inspections, which will be explained in greater detail throughout the chapter:

- **New Contracts Inspection**: A unit must pass this HQS inspection before the Housing Authority enters into a HAP Contract with the owner.

- **Inspections at Other Times as Needed**:

  - ➤ Interim Inspection: HQS inspection conducted upon request of the owner, family or agency.

  - ➤ Emergency Inspection: HQS inspection conducted for life-threatening violations.

  - ➤ Compliance Check/Home Visit Inspections:   An inspection conducted, without notice, to verify compliance with the Section 8 Program.

- **Annual Inspection**: A unit must pass its annual HQS inspection.

- **Quality Control Inspection**: The Housing Authority is required to conduct supervisor quality control HQS inspections.

- **Move-Out Inspection**: For its Moderate Rehabilitation Program, the Housing Authority may conduct a move-out inspection for contracts effective before October 2, 1995, at an owner's request, if a damage claim is to be submitted (see Section 20.9 for details on these inspections).

**10.3   HOUSING QUALITY STANDARDS (HQS)**
**[24 CFR §982.401]**

HQS is the minimum quality standards set forth by HUD for tenant-based programs.   These standards are in place to ensure that assisted housing is decent, safe and sanitary.  All program housing must meet the HQS performance requirements both at commencement of assisted occupancy, and throughout the assisted tenancy.

Efforts will be made at all times to encourage owners to provide housing above the HQS minimum standards.

HQS applies to the building and premises, as well as the unit.  In order for a unit to pass an HQS inspection, the following standards must be met.

Housing Authority of the County of Los Angeles

**10.3.1** **Unit Space and Size**
**[24 CFR §982.401(d)(2)(i)]**

At minimum, a living room, kitchen area, and bathroom must be located in the unit.

**10.3.2** **Living Room / Sleeping Room**
**[24 CFR §982.401(d)(2)(ii)], [24 CFR §982.401(h)(2)(iv)], [24 CFR §982.401(f)]**

- The dwelling unit must have at least one bedroom or living/sleeping room for each two persons. Children of opposite sex, other than very young children, may not be required to occupy the same bedroom or living/sleeping room.

- There must be at least one window in the living room and in each sleeping room.  If the window is designed to be openable, the window must open and close properly, and be large enough to provide emergency egress.

- The living room and each bedroom must have at least two electrical outlets in proper operating condition.  Permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets.

- Bedrooms must also have a built-in closet or wardrobe, be located within the unit (e.g., no garages), and be private (have a closing door separating it from the rest of the unit).  Bedrooms should also be finished in a quality similar to other bedrooms in the home.

- In cases where an owner has modified the rental unit without obtaining the proper city and/or County building permits, the Housing Authority may rely on the legal property description for the purposes of negotiating the rent and determining how many actual sleeping rooms are in the rental unit.

**10.3.3** **Sanitary Facilities (Bathroom)**
**[24 CFR §982.401(b)], [24 CFR §982.401(h)(2)(iii)], [24 CFR §982.401(f)(2)(ii)]**

- The bathroom must be located in a separate private room and contain a working flush toilet.

- Bathroom areas must have one openable window or other adequate exhaust ventilation.

- The unit must have a fixed sink. The bathroom sink may be located separately from other bathroom facilities, but the kitchen sink may not also be used for the bathroom sink.

- The unit must have a shower or tub in proper operating condition, with hot and cold running water.  The shower or tub need not be in the same room with other bathroom facilities, but they must be private.

- All walls in a tub or shower area must be covered with ceramic tile or other material that is impervious to water to prevent water damage and deterioration.

- Sinks and commode water lines must have shut off valves, unless faucets are wall-mounted.  All sinks in the unit must have functioning stoppers.

- The bathroom must have a permanent ceiling or wall light fixture in proper operating condition.

- All bathrooms in the unit must be in proper operating condition.

### 10.3.4 Food Preparation (Kitchen) [24 CFR §982.401(c)], [24 CFR §982.401(f)(2)(ii)]

- The dwelling unit must have suitable space and equipment to store, prepare, and serve foods in a sanitary manner (i.e., kitchen).

- The dwelling unit must have an oven, and a stove or range, and a refrigerator of appropriate size for the family. All of the equipment must be in proper operating condition. The stove and oven must be properly hooked up to the gas, with no hazards present. The refrigerator must be able to maintain a temperature sufficient to keep food from spoiling over a reasonable period of time. The equipment may be supplied by either the owner or the family.

- A microwave oven may be substituted for a tenant-supplied oven and stove or range. A microwave oven may be substituted for an owner-supplied oven and stove or range if the tenant agrees and microwave ovens are furnished instead of an oven and stove or range to both subsidized and unsubsidized tenants in the building or premises.

- The kitchen area must have a permanent ceiling or wall light fixture in proper operating condition, and at least one electrical outlet in proper operating condition.

- The dwelling unit must have a permanently attached kitchen sink in proper operating condition, with a sink trap and hot and cold running water. The sink must have a shut off valve, unless faucets are wall-mounted, and must drain into an approvable public or private system. All sinks in the unit must have functioning stoppers.

- There must be facilities and services for the sanitary disposal of food waste and refuse, including temporary storage facilities where necessary (e.g., garbage cans).

### 10.3.5 Ceilings, Walls, Floors and Building Exterior [24 CFR §982.401(g)]

The unit must be structurally sound. The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment.

Ceilings, walls, floors and fences must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage.

- Wood floors must be sanded to a smooth surface and sealed. Any loose or warped boards must be re-secured and made level. If the boards cannot be leveled, they must be replaced.

Housing Authority of the County of Los Angeles

- The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation.

- In areas where plaster or drywall is sagging, severely cracked, bulging or leaning, or has large holes, it must be repaired or replaced.

- The condition and equipment of interior and exterior stairs, halls, porches, walkways, etc., must not present a danger of tripping and falling. For example, broken or missing steps or loose boards are unacceptable. Stairs with four or more steps must have a secure handrail.

- A porch or balcony at least 30 inches or more from the ground must have secure railings.

- The roof must be structurally sound and weather tight and must not have any serious defects, such as buckling or sagging. Gutters, downspouts and soffits must not show signs of serious decay and must not allow entry of significant air or water into the interior of the structure.

- The chimney must not be seriously leaning or showing evidence of significant disintegration.

- Building foundations must not have any severe structural defects that may create a hazardous condition, including allowing significant entry of ground water.

**10.3.6 Windows**
**[24 CFR §982.401(f)(1)(ii)], [24 CFR §982.401(d)(2(iii)]**

All window sashes must be in good condition, solid, intact, and fit properly in the window frame. Damaged or deteriorated sashes must be replaced.

Windows must be weather-stripped as needed to ensure a weather tight seal.

Windows must not have missing or broken-out panes, or panes that are dangerously loose or have large cracks.

If window security bars or security screens are present on emergency exit windows, they must be equipped with a quick release system. The owner is responsible for ensuring that the family is instructed on the use of the system.

Dwelling unit windows that are accessible from the outside, such as basement, first floor, and fire escape windows, must be lockable (such as window units with sash pins or sash locks, and combination windows with latches).

Windows that are nailed shut are acceptable only if these windows are not needed for ventilation or as an alternate exit in case of fire.

**10.3.7 Doors and Unit Access**
**[24 CFR §982.401(d)(2)(iv)], [24 CFR §982.401(k)]**

All exterior doors must be solid core and weather tight to avoid any air or water infiltration, have no holes, and have all trim intact.

All interior doors must have no holes, have all trim intact, and be openable without the use of a key.

All exterior doors must have dead bolt locks.

The unit must be able to be used and maintained without unauthorized use of other private properties. The building must provide an alternate means of exit in case of fire (such as fire stairs or egress through windows).

### 10.3.8  Thermal Environment
### [24 CFR §982.401(e)]

There must be a safe system for heating the unit, in proper operating condition. The heating unit must be affixed to the unit and be able to provide adequate heat, either directly or indirectly, to each room.  The dwelling unit must not contain unvented room heaters that burn gas, oil, or kerosene. Electric heaters are acceptable.  Portable heaters are not acceptable.  Heating equipment also must not pose other unsafe conditions, such as improper flue connection or installation of equipment.

### 10.3.9  Electricity
### [24 CFR §982.401(f)]

The unit must not contain any electrical hazards, such as exposed electrical connections; broken, noninsulated or frayed wiring; improper types of wiring, connections or insulation, or wires lying in or near standing water or other hazardous locations.

### 10.3.10  Smoke Detectors
### [24 CFR §982.401(n)]

Each assisted unit must be equipped with at least one properly working battery-operated or hard-wired smoke detector on each level of the unit.

Whenever possible, smoke detectors should be installed in a hallway adjacent to a bedroom.

If an assisted unit is occupied by a household with hearing-impaired persons, a permanently installed smoke detector designed for people with hearing-impairments must be located in each bedroom that is occupied by a hearing-impaired person.

### 10.3.11  Site and Sanitation
### [24 CFR §982.401(l)], [24 CFR §982.401(m)]

The site and neighborhood may not be subject to serious adverse environmental conditions, natural or manmade. These can include dangerous walks or steps; instability; flooding, poor drainage, septic tank back-ups or sewage hazards; mudslides; abnormal air pollution, smoke or dust; excessive noise, vibration or vehicular traffic; excessive accumulations of trash; vermin or rodent infestation; or fire hazards.

Adequate covered facilities for the disposal of rubbish must be present at the site, such as covered dumpsters and other covered refuse containers approvable by the local health and sanitation department.

Housing Authority of the County of Los Angeles

The unit and its equipment must be in sanitary condition, and free from vermin and rodent infestation.

**10.3.12**  **Manufactured Homes/Mobile Homes HQS Requirements [24 CFR 982.621]**

In addition to meeting all other HQS requirements, a mobile home must meet the following requirements:

- It must be situated on a site that is stable and free from hazards such as sliding or wind damage.

- Must be appropriately anchored by a tie down device that distributes and transfers the load imposed by the unit to appropriate ground anchors to resist wind overturning and sliding. Alternative types of anchors, beams and foundation bolts are permissible if they meet manufacturer's specifications.

- One operable smoke detector is required.

**10.3.13**  **Additional Housing Quality Standards [24 CFR §982.401(a)(4)]**

The Housing Authority is authorized to enhance HQS, provided that by doing so the Housing Authority does not overly restrict the number of units available for leasing. The enhancements adopted by the Housing Authority are meant to ensure that assisted units are safe in relation to other units rented throughout Los Angeles County.

In addition to the HQS identified by HUD, all assisted units must also be in compliance with the following items derived from California and Los Angeles County Code, in order to pass an HQS inspection.

- **Double Cylinder Locks**: Double-keyed deadbolts, or any other lock requiring special knowledge or a tool to open, are prohibited in a residential unit. All doors that provide an exit from the residence must be openable from the inside without the need of a key or any other special knowledge, effort or tool.

- **Swimming Pools**: Swimming pools in multifamily structures must be enclosed by a gate from 48 inches to 60 inches tall. The gate must be self-closing with a self-closing latch and a protected panel must surround the latch.

- **Hot Water Heater**: Water heaters must have a temperature-pressure relief valve and discharge line (directed toward the floor or outside of the living area) as a safeguard against build up of steam if the water heater malfunctions. Gas or oil-fired water heaters must be vented into a properly installed chimney or flue leading outside. Electric water heaters do not require venting. A gas water heater must have a safety divider or shield if it is located in a bedroom or other living area.

  If the water heater is located in a large apartment building (at least 25 units) and the unit is inaccessible, staff must check inconclusive on the inspection

report. The item may be cleared if the owner or manager can provide documentation to show it has passed a local inspection.

- **Earthquake Straps for Water Heaters**: Must be secured for seismic stability. All water heaters must be braced, anchored or strapped to prevent falling or movement during an earthquake.

**Garages**: Garages, whether attached or detached, must be accessible. Garages are not to be used as a living space.

### 10.3.14  Single Room Occupancy (SRO) HQS Requirements [24 CFR §982.605]

The HQS requirements outline in the above sections apply to SRO housing along with some additional requirements for access, fire safety, sanitary facilities, and space and security. The additional requirements are as follows:

❑ **Access:** Access doors to the SRO unit must have working locks for privacy. The occupant must be able to access the unit without going through any other unit. Each unit must have immediate access to two or more approved means of ext for the building, appropriately marked and leading to a safe and open space at ground level.

❑ **Fire Safety:** All SRO facilities must have a sprinkler system that protects major spaces. "Major spaces" are defined as hallways and common areas. SROs must also have hard-wired smoke detectors.

❑ **Sanitary Facilities:** At least one flush toilet that can be used in privacy, a lavatory basin, a bathtub or shower in proper operating condition must be provided for each six persons (or fewer) residing in the SRO facility. If the SRO units are leased only to men, flush urinals may be substituted for up to one half of the required number of toilets.

Sanitary facilities must be reasonable accessible from a common hall or passageway, and may not be located more than one floor above the SRO unit. They may not be located below grade unless the SRO units are located on that level.

❑ **Space and Security:** A SRO unit must contain at least 110 square feet of floor space, and at lease four square feet of closet space with an unobstructed height of at least five feet, for use by the occupant. If the closet space is less than four square feet, the habitable floor space in the SRO unit must be increased by the amount of the deficiency. Exterior doors and windows accessible from the outside the SRO unit must be lockable.

Because no children live in SRO housing, the housing quality standards applicable to lead-based paint do not apply.

### 10.3.15  Serious Deficiencies

Assisted units must meet <u>all</u> HQS performance requirements in order to pass an inspection. The Housing Authority has compiled the following list of specific conditions that are considered serious deficiencies that may cause a unit to fail an inspection. This list assists inspectors in making a determination regarding

Housing Authority of the County of Los Angeles

the condition of an assisted unit; however, deficiencies are not limited to this list:

1. No TPR/Drainpipe on water heater
2. Clogged toilets/sinks/wash basins/bathtubs
3. Torn carpet or linoleum flooring posing a tripping hazard
4. Stretched carpet when a potential hazard exists
5. Broken mirrors, cabinets, etc.
6. Missing smoke detectors
7. Vermin infestation (fleas, roaches, termites, mice, and rats)
8. Double cylinder locks
9. Exterior/common grounds excessive rubbish/debris accumulation and overgrown grass/weeds
10. Large holes/cracks/uneven concrete in walkway
11. Building with major peeling of wood trim/paint (directly affecting family's unit)
12. Large porcelain chips or peeling paint in bathtubs/sinks/wash basin exposing black surfaces/rust
13. Burner knobs missing on stove
14. Inoperable stove/refrigerator
15. Bathrooms where no windows are present and exhaust fans are missing/inoperable
16. Flammable products stored near water heaters
17. Signs of leaking/water damage on ceiling/roof
18. Broken windows and larger cracks which pose a potential hazard
19. Algae/debris in swimming pool
20. Loose hand rails/guard rails
21. Missing/cracked switch cover plates
22. Closet doors off track
23. Bedroom window security bar release mechanism is inoperable
24. Inoperable window locks

**10.4   LEAD-BASED PAINT**
**[24 CFR §982.401(j)]**

The Housing Authority's rental assistance programs are subject to the requirements of the Lead-Based Paint Poisoning Prevention Act and the Residential Lead-Based Paint Hazard Reduction Act of 1992. Applicable regulations are detailed in 24 CFR §35.

The Housing Authority will be responsible for the collection of LBP disclosure information; conducting Visual Assessment inspections; assuring that Clearance

Examinations are conducted; collect data regarding Elevated Intervention Blood Lead Level (EIBLL) cases, and informing owners of their responsibilities.

**10.4.1 Disclosure**
**[24 CFR §35(Subpart A)]**

Owners of units built before 1978 are required to disclose to lessees all available information about the presence of lead-based paint or lead-based paint hazards and provide any available record or reports pertaining to the presence of lead-based paint or lead-based paint hazards, before the lease is enacted.

Lessees must also receive a copy of the lead hazard information pamphlet, "Protect Your Family From Lead in Your Home."

For all new contracts, the Housing Authority will require owners to certify on the RTA that they have met all applicable lead-based paint disclosure requirements. If applicable, the Housing Authority will require owners to submit a copy of the lead-based paint disclosure statement, and any inspection reports.

The Housing Authority will include a sample lead-based paint disclosure form and a lead hazard information pamphlet in voucher issuance packets for participants. Materials will be made available directly to owners upon request.

For units built before 1978, the Housing Authority will not approve an owner lease without receiving all applicable lead-based paint disclosure information.

**10.4.2 Lead-Based Paint Visual Assessment**
**[24 CFR §35.1215]**

The Housing Authority is required to conduct lead-based paint visual assessments for all units built prior to 1978 that house or will house a child or children under 6 years of age, at the time of the new contract inspection and at annual inspections.

The Housing Authority inspectors conducting lead-based paint visual assessments will be trained according to HUD requirements.

The purpose of the visual assessment is to identify any deteriorated paint. Deteriorated paint is paint that is peeling, chipping, chalking or cracking, or any paint or coating located on an interior or exterior surface or fixture that is otherwise damaged or separated from the substrate. Inspectors will check the condition of painted surfaces. If any deteriorated paint is found in the course of the inspection, the unit will fail the lead-based paint visual assessment. Owners must perform paint stabilization on all deteriorated paint surfaces regardless of the size of the deteriorated surface. If the amount of deteriorated paint is below the de minimis level, the owner must perform paint stabilization, but is not required to perform lead-safe work practices and clearance. The de minimis thresholds are defined as 20 sq. ft. (2 sq. meters) on exterior surfaces; 2 sq. ft. (0.2 sq. meters) in any one interior room or space; or 10% of the total surface area on an interior or exterior type of component with a small surface area (such as window sills, baseboards, and trim).

Housing Authority of the County of Los Angeles

If deteriorated paint exceeds the de minimis thresholds as defined by HUD, the unit will fail the lead-based paint visual assessment and require stabilization and a clearance report

### 10.4.3 Stabilization and Clearance
### [24 CFR §35.1215]

Owners of units that fail the lead-based paint visual assessment above de minimis levels will be required to stabilize deteriorated paint in order for the unit to pass, using lead-safe work practices.

The Housing Authority will send a letter to owners of failed units that provides guidance on stabilizing paint and other required activities. Owners will have 30 calendar days from the letter date to complete the following:

- **Repair the deteriorated paint**. Work must be performed by certified lead workers using lead-safe work practices. The Housing Authority will provide owners with resources and information on meeting these guidelines.

- **Obtain a Clearance Report**. A contractor certified by the Environmental Protection Agency (EPA) must inspect the unit and prepare a Clearance Report summarizing the work completed and the inspection results.

- **Complete the Housing Authority's Lead-Based Paint Owner Certification form**. The owner must certify that all applicable requirements have been met.

- **Submit Clearance Report and Certification to the Housing Authority**. The Housing Authority will accept paperwork by mail, fax, and hand delivery.

The owner is responsible for informing tenants of all lead hazard reduction work and evaluations, in a manner consistent with HUD regulations.

If the unit has been previously certified free of lead-based paint by a certified inspector, the owner may submit a copy of the inspector's report, along with the certification form, to the Housing Authority.

The Housing Authority will review the Clearance Report and certification form for completeness. The Clearance Report must contain all information required by HUD. If the Clearance Report passes, the unit will receive a pass on the visual assessment; no further inspection visit is required.

On new contracts inspections, the passing Clearance Report and valid certification form must be received by the Housing Authority before the Housing Authority can enter into a HAP Contract with the owner. If this does not take place within 30 calendar days, the Housing Authority will cancel the RTA.

For annual inspections, if the owner fails to submit the passing Clearance Report and valid certification form within 30 calendar days, the Housing Assistance Payments (HAP) will be placed on hold (abated) for the unit and the participant will be issued a voucher. The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated. See Section 10.11.1 for details on abatement.

Assisted Housing's Director will review reasonable cause requests for extension. Extension requests must be submitted in writing within the first 30 calendar days

of the failed lead-based paint visual assessment. An extension shall not extend beyond 90 days after the date of notification to the owner of the results of the visual assessment. If an extension is approved, the HAP will not be abated during this extension period. Reasonable cause circumstances include prohibitive weather conditions, financial hardship, and rehabilitation in progress.

**10.4.4  Children with Environmental Intervention Blood Lead Levels
[24 CFR §35.1225]**

On a quarterly basis, the Division will send the Los Angeles County Department of Health Services Childhood Lead Poisoning Prevention (CLPP) Program the addresses of assisted families with children under the age of 6. CLPP Program staff will check the addresses for matches with cases of identified Environmental Intervention Blood Lead Levels (EIBLL). If a match is found, CLPP Program staff will conduct a Risk Assessment of the occupied unit and forward a report to the Division. A Risk Assessment is a comprehensive evaluation for LBP hazards that goes beyond the Visual Assessment component including paint testing, and dust and soil sampling. The Risk Assessment Report identifies lead hazards and appropriate lead hazard reduction methods.

A copy of the Risk Assessment Report must immediately be forwarded to the participating owner once received by the Division. The owner must post a Notice of Lead Hazard Evaluation within 15 calendar days and complete lead hazard reduction and clearance activities as advised in the Report within 30 calendar days. The Housing Authority is not allowed to assist any other participant in the unit until the owner complies with the Report.

If informed about an EIBLL case from a source other than the CLPP Program, the Division must submit the information to the CLPP Program within 5 calendar days. The CLPP Program will conduct a Risk Assessment of the occupied unit if required.

**10.5  INSPECTIONS SCHEDULE**

Inspections are conducted on business days between the hours of 7:00 a.m. and 5:00 p.m. An individual over 18 years of age must be present to allow entry for the inspector.

**10.6  NEW CONTRACT INSPECTIONS
[24 CFR §982.305(b)(2)]**

Under normal circumstances, new contract (initial) inspections are conducted 7 to 10 calendar days following the receipt of a Request for Tenancy Approval. The new contract inspection is conducted in order to:

1. Determine if the unit, including common areas, meets housing quality standards.

2. Document the current condition of the unit. This will serve as the basis to evaluate the future condition of the unit, i.e. excessive wear and tear.

Housing Authority of the County of Los Angeles

### 10.6.1 When HQS Deficiencies Must Be Corrected

If the unit fails the initial inspection, the unit will be scheduled for a follow-up inspection within 10 calendar days. The owner will be given 30 calendar days to correct the deficiencies. The owner can request an inspection sooner if repairs have been made prior to the scheduled follow-up inspection date.

If the time period given by the Housing Authority to correct the deficiencies has lapsed, or the maximum of three failed inspections has occurred, the family must select another unit.

The Housing Authority will not enter into a HAP Contract with the owner until the unit passes the inspection. However, the family may already be in the unit when the new contract inspection is conducted. If the family lives in the unit at the time of the new contract inspection, they are responsible for meeting their HQS obligations. See Section 10.8 for details of the family's HQS obligations.

### 10.7    ANNUAL AND INTERIM INSPECTIONS
### [24 CFR §982.405]

### 10.7.1 Annual Inspections

In order to assure that units meet housing quality standards throughout the assisted tenancy, the Housing Authority conducts inspections at least annually.

As stated in the family obligations, the family must allow the Housing Authority to inspect the unit at reasonable times and after reasonable notice. The Housing Authority will notify the family and/or owner of the date and time of the scheduled inspection appointment in writing at least 10 calendar days prior to the inspection.

**Appointments may be rescheduled for good cause such as, but not limited to, hospitalization, illness or injury.** If the family fails to contact the Housing Authority to reschedule the inspection, or if the family misses two inspection appointments, the Housing Authority will consider the family to be in violation of the Certified Statement of Family Obligation agreement and will initiate termination procedures in accordance with the Housing Authority's policy for proposed termination. On a case by case basis the Housing Authority may counsel the family before proposing termination.

### 10.7.2 Interim Inspections

Interim inspections are conducted at the request of the owner, family, or agency (usually as a result of a violation of HQS or violation of the lease). Interim inspections may be scheduled and conducted at any time of the year.

### 10.7.3 Compliance Check/Home Visit Inspections

Compliance Check/Home Visit Inspections are conducted without prior notice to the family or owner. The purpose of these inspections is to verify compliance with the Section 8 Program. If a Compliance check/Home Visit Inspection occurs, the family has the right to refuse to submit and/or participate in an unannounced Compliance Check/Home Visit Inspection or interview.

**10.8** **FAILED INSPECTIONS: DETERMINATION OF RESPONSIBILITY [24 CFR §982.404(b)]**

If deficiencies cause an assisted unit to fail an inspection, Housing Authority inspectors will determine who is responsible at the time of inspection.

In accordance with family obligations, the following deficiencies are considered the responsibility of the family:

➢ Family-paid utilities not in service;

➢ Failure to provide or maintain family-supplied appliances; and

➢ Damages to the unit or premises caused by a household member or guest beyond normal wear and tear.

- "Normal wear and tear" is defined as items that could be charged against the family's security deposit under state law or court practice.

The owner is responsible for all other HQS violations.  In cases such as vermin infestation, where burden of responsibility is not immediately clear, Housing Authority inspector will determine the responsible party.

HQS deficiencies that cause a unit to fail must be corrected by the owner, unless the family is responsible for the deficiencies.

**10.9** **FAILED INSPECTIONS: WHEN DEFICIENCIES MUST BE CORRECTED [24 CFR §982.404(a)(3)]**

**10.9.1 Emergency Fail Deficiencies**

Items that endanger the family's health or safety are considered emergency fails. These deficiencies must be corrected within 24 hours of inspection. The following deficiencies are considered life-threatening, emergency fails, and will cause a unit to be labeled uninhabitable:

➢ Gas leaks

➢ Major plumbing problems

➢ No running water

➢ No functioning toilet

➢ Unstable roof/structure

In cases where the unit is deemed uninhabitable, the family will be issued a voucher within 24 hours so that they can make arrangements to secure another residence if necessary.

If an emergency fail deficiency is not corrected in the time period required by the Housing Authority, and the owner is responsible, the housing assistance payment will be abated immediately and the contract will be terminated.

If repairs are completed and the family wishes to move back into the unit, a new RTA will need to be submitted for that unit and the New Contract Process will need to be completed again.

Housing Authority of the County of Los Angeles

If the emergency fail deficiency is not corrected in the time period required by the Housing Authority, and the family is responsible, the Housing Authority will terminate the family's assistance for violating family obligations (see Chapter 15: Family Obligations), but will not abate the payment to owner for that month.

**10.9.2  <u>Non-Emergency Fail Deficiencies</u>**

Non-emergency deficiencies that cause a unit to fail the inspection must be corrected within a 30 calendar-day cycle. The family and owner will be notified of the failed items in writing. Within the 30 calendar days from the notification letter, the owner and family must make the appropriate corrections and notify the Housing Authority so that a follow-up inspection can be scheduled.

If the necessary repairs have been completed prior to the next scheduled inspection, the owner or tenant may request an earlier inspection date. Requests for earlier repair dates will be reviewed and accommodated in a case-by-case basis.

For major repairs, the Inspections Housing Unit Supervisor or Housing Supervisor may approve an extension beyond 30 calendar days. However, this extension cannot exceed 60 calendar days.

If the family is not at home for the follow-up inspection appointment, a card will be left at the unit with instructions. A second follow-up inspection will be scheduled automatically and the owner and family will be notified by mail.

If owner-caused deficiencies are not corrected in the time period required by the Housing Authority, housing assistance payments will be abated and the contract may be terminated. If family-caused deficiencies are not corrected in the time period required by the Housing Authority, housing assistance may be terminated. See Sections 10.10 and 10.11 below for more information.

**10.9.3  <u>Non-Emergency Fail Deficiencies Not Requiring Follow-up Inspection</u>**

The following deficiencies will not require a follow-up inspection if cleared by proper owner certification:

- ➢ Inoperable gas wall or floor heater
- ➢ Damaged (not missing) outlet covers
- ➢ Inoperable secondary smoke detectors
- ➢ Presence of vermin/roaches (not infestation)
- ➢ Minor faucet and/or plumbing leaks

These deficiencies must be cleared by a certification signed by owner and participant. Appropriate third-party documentation must also be supplied where appropriate, including a utility receipt, invoice, or Gas Company tag. If the certification is not approved by a supervisor, a follow-up inspection must be performed.

**10.10   CONSEQUENCES OF VERIFIED FAMILY-CAUSED DEFICIENCIES
[24 CFR §982.552(a)]**

The family has a responsibility to maintain the assisted unit in good condition and to notify the owner of needed repairs. If non-emergency violations of HQS are determined to be the responsibility of the family, the Housing Authority will require the family to make any repair(s) or corrections within the 30 calendar-day cycle. Housing assistance will be terminated if an assisted unit continues to fail housing inspections for family-caused deficiencies or the family fails to keep scheduled appointment(s).   See Chapter 15 (Family Obligations) for more information.

Extensions will be granted on a case-by-case basis and must be approved by the Unit Supervisor.

If it has been concluded that all deficiencies are family-caused, the owner's rent will not be abated for such items.

**10.11   CONSEQUENCES OF VERIFIED OWNER-RELATED DEFICIENCIES
[24 CFR §982.404(a), 24 CFR §982.452 and 24 CFR §982.453]**

The owner is responsible for maintaining the unit in accordance with HQS. When it has been determined that an assisted unit fails to meet HQS, the owner of that unit is responsible for completing the necessary repair(s) in the time period specified by the Housing Authority.   If the owner fails to correct deficiencies within the specified time period, the Housing Authority is obligated to withhold (abate) housing assistance payments.

**10.11.1   Abatement
[24 CFR §982.453(b) and 24 CFR §982.404(a)(3)]**

Abatement is defined as withholding Housing Assistance Payments (HAP) to the owner for the period of time the unit is out of compliance with HQS requirements.

HAP will be abated if:

1. **The assisted unit fails the first and second housing inspections due to owner-related deficiencies.**

   If a unit fails the first inspection due to owner-related deficiencies, the notice sent to the owner stating the deficiencies, repairs that need to be made, and the date of the next inspection will also serve as notice that HAP will be abated if the unit fails a second inspection due to owner-related deficiencies.

   If, after the 30-day correction period, the unit then fails the second inspection due to owner-related deficiencies, the Housing Authority will stop payment on the first day of the month following the expiration of the 30-day correction period.

   The owner will be notified of the date of a final inspection.   Under normal circumstances, the Housing Authority will inspect an abated unit within 30 calendar days after the abatement notification has been issued.

Housing Authority of the County of Los Angeles

If the owner makes repairs during the abatement period, HAP payments will resume on the day the Housing Authority's inspector has verified the corrections and the unit passes inspection.

A 30-day calculation standard will be used to reconcile abatement payments. Please refer to memo dated 3/3/05.

No retroactive payments will be made to the owner for the period of time the rent was abated and the unit did not comply with HQS. The notice of abatement states that the family is not responsible for the Housing Authority's portion of rent that is abated. However, the family is responsible to pay its portion of the rent while abatement is in effect.

If an assisted unit fails the third and final housing inspection for owner-caused deficiencies, the Housing Authority will terminate the HAP Contract. The Housing Authority will notify the owner of the termination in writing 30 calendar days before it becomes effective. Abatement will remain in effect until the effective date of the termination.

The Housing Authority is prohibited from implementing rent abatement for family-caused deficiencies. However, abatement will apply if family-caused and owner-related deficiencies exist together.

2. **The Housing Authority has verified that the assisted unit has emergency fail deficiencies, and the owner did not complete the necessary repairs within the required timeframe.**

3. **A unit built before 1978 that houses or will house a child under 6 years of age fails the lead-based paint visual assessment, and the owner fails to submit a complete, passing clearance report and certification within 30 calendar days.** Owners will receive notice by mail if a unit fails the lead-based paint visual assessment. They will have 30 calendar days from the date of the notice to perform clearance and submit passing paperwork. If the owner fails to meet these requirements (see Section 10.4 for more information on lead-based paint), HAP will be abated and the Housing Authority will stop payment on the first day of the month following. The participant will be issued a voucher. The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated.

Families that reside in units that have been abated will be issued a voucher and will have the option to move even if the assisted unit passes inspection at the third and final inspection (this excludes participants of the Moderate Rehabilitation Program).

**10.11.2   Termination of Contract
[24 CFR §982.453(b)]**

When the HAP Contract has been terminated, the family will be required to move in order to continue receiving rental assistance.

RTA submitted for units that have been terminated due to abatement will be reviewed on a case-by-case basis. In cases where the RTA is accepted, the family will be brought in for counseling on their situation.

**10.12   QUALITY CONTROL INSPECTIONS**
**[24 CFR §982.405(b)]**

To ensure efficient program operations, it is essential for management to apply sound quality control practices. The purpose of quality control inspections is to objectively ascertain that each inspector is conducting accurate and complete inspections, and to ensure that there is consistency among inspectors in application of HQS.

Quality control inspections will be performed by a Quality Assurance Representative according to SEMAP Indicator #5 which meets the minimum quality control sample size for the number of units under HAP contract during the last completed Housing Authority fiscal year for SEMAP.

Housing Authority of the County of Los Angeles

**CHAPTER 11:**
**SETTING PAYMENT STANDARDS AND DETERMINING RENT REASONABLENESS**

**11.1   INTRODUCTION**
**[24 CFR §982.503]**

The Housing Authority is responsible for ensuring that the rents charged by owners are reasonable based upon objective comparables in the rental market. When the Housing Authority has determined that the unit meets the minimum HQS, that the lease is approvable, and that the rent is reasonable, it will make timely payments to the owner and notify the owner of the procedures for rent adjustments in the rental assistance programs. This chapter explains the Housing Authority's procedures for setting and adjusting the payment standards and performing rent reasonableness analysis.

**11.2   PAYMENT STANDARDS FOR THE VOUCHER PROGRAM**
**[24 CFR §982.503(b)(1)]**

HUD regulations allow the Housing Authority to set Payment Standards at a level that is between 90 percent to 110 percent of the Fair Market Rent for Los Angeles County.  The Housing Authority must set the payment standard at a level that is high enough to ensure that families are able to afford quality housing while also balancing the need to provide assistance to as many families on the waiting list as possible.

The Housing Authority will review the payment standards at least annually to determine whether an adjustment should be made for some or all unit sizes. The following provides a list of the factors that will be used to evaluate the adequacy of the payment standard and/or be used to make a determination to adjust standards, as appropriate.

**11.2.1   Assisted Families' Rent Burdens**

The Housing Authority will review reports showing the percent of income used for rent by voucher families to determine the extent to which the rent burden is more than 50 percent of income.

If more than 40 percent of program families in the overall program, or for a specific unit size, are contributing in excess of 50 percent of their adjusted monthly income towards rent, the Housing Authority will consider increasing the voucher payment standards. The payment standard will not be raised if:

- The payment is already at the maximum level HUD will allow (110%).

- The Housing Authority would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase.

**11.2.2   Success Rate of Voucher Holders**

The Housing Authority will periodically review the success rate of voucher holders. If 25 percent or more of new admissions and/or families wishing to move are unable to use the vouchers due to current rental rates in Los Angeles

County, the Housing Authority will consider increasing the payment standard for particular unit sizes and/or the entire program, as appropriate.

The payment standard will not be increased if:

- The payment is already at the maximum HUD will allow (110%)
- The Housing Authority would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase

### 11.2.3 Rent Reasonableness Database

The Housing Authority will review the rent information in the rent reasonableness data bank and compare it to the payment standards established for the Housing Choice Voucher Program. If the rent reasonableness review indicated that the payment standards are higher than the average rental unit in Los Angeles County, the payment standard for the specific unit size, or all payment standards, will be lowered to reflect the current market rents.

### 11.2.4 Quality of Units Selected

The Housing Authority will review the quality of units selected by participant families before determining any change to the Payment Standard to ensure that Payment Standard increases are only made when needed to reach the mid-range of the market.

### 11.2.5 File Documentation

A file will be retained in the Housing Authority's Administrative Support Unit for at least 3 years to document the analysis and findings to justify whether or not the Payment Standard was changed.

### 11.3 RENT REASONABLENESS DETERMINATIONS [24 CFR §982.507]

Rent reasonableness determinations are made when units are placed under HAP contract for the first time, when an owner requests a rent increase, and at the HAP contract anniversary if there is a 5 percent decrease in the published fair market rent (FMR) in effect 60 days before the HAP contract anniversary.  The Housing Authority will determine and document on a case-by-case basis that the approved rent [24 CFR §982.507(b) and §982.507 (c)]:

1. Does not exceed rents currently charged on new leases by the same owner for an equivalent unassisted unit in the same building or complex, and

2. Is reasonable in relation to current asking rents and existing rents charged by other owners for comparable units in the unassisted market.

The Housing Authority contracts with an outside agency to provide the Rent Comparable System, *RENTELLECT*.  This system considers a variety of criteria to provide rent comparable information, including:

- Unit location
- Quality

Housing Authority of the County of Los Angeles

> Size

> Type

> Age of the contract unit

> Amenities

> Housing services

> Maintenance; and

> Utilities provided by the landlord.

*RENTELLECT* applies a statistical methodology to calculate a predicted or probable market rent for the unit and a reasonable range of market rent.  In cases where there are insufficient data records in a given area to establish comparables for a given unit, RENTELLECT groups and utilizes similar unit profiles from adjacent census tracts to determine a reasonable market range. The median amount is used, unless an exception is approved by a Division Manager.

### 11.3.1  Appealing a Rent Reasonableness Determination

If the owner of the property disagrees with the rent reasonable determination, the owner may appeal the decision in writing by submitting an appeal that includes a list of comparable rental units that the owner has found to justify their requested rent amount.

Before using a list of rental units submitted by the owner, the Housing Authority would confirm that the units are indeed comparable using the criteria outlined above. If the units are not comparable, the Housing Authority will not use these units in the rent comparability survey and the owner will be notified of the decision.  If it is determined that the list of rental units provided by the owner are comparable the Housing Authority will use the information and redetermine rent reasonableness.

### 11.3.2  Rent Increases
### [24 CFR §982.519]

As stated in the HUD Tenancy Addendum, the owner must notify the Housing Authority at least 60 days before the proposed effective date of any intended rent increase.  The tenant must be notified in writing, and the written notice must be submitted to the Housing Authority.

As authorized by the HAP contract, the Housing Authority will not approve a rent increase if the HAP contract is in abatement for owner-related HQS deficiencies. In accordance with the HUD Tenancy Addendum, the Housing Authority will disapprove requests made during the initial term (first 12 months) of a lease.

The Housing Authority will use the same criteria defined above to determine if a request for a rent increase meets the rent comparability requirement. If the new rent is not rent comparable, the Housing Authority will advise both the owner and the family that the increase cannot be approved.  If a partial rent increase can be approved, the Housing Authority will notify the owner, and process the partial increase upon owner approval.

An owner who disagrees with the determination may exercise any of the following options:

- Appeal the rent comparability determination using the steps outlined above.

- Adjust his/her request for a rent increase.

- Serve the family with a proper termination notice.

Housing Authority of the County of Los Angeles

## CHAPTER 12:
## RE-EXAMINATION

**12.1**   **INTRODUCTION**
          **[24 CFR §982.516(a)]**

To assure that tenancy is restricted to participants meeting the eligibility requirements for continued occupancy and are charged appropriate rents; the eligibility status of each participant is re-examined at least annually, based on the anniversary date of the HAP contract,  per HUD requirements.

The Housing Authority will only change the anniversary date at the time of a new contract, and at other times as necessary, per management approval.

**12.1.1  Procedure**

To maintain program efficiency and integrity, the Housing Authority at its own discretion may conduct re-examination interviews by mail or in-person.   The Housing Authority will attempt to conduct all annual re-examinations interviews through the mail.   Annual re-examinations not completed through the mail process will be conducted in person.

**12.2**   **RE-EXAMINATION NOTIFICATION TO THE FAMILY**

Participating families are advised of the annual re-examination requirement and the importance of reporting income and family composition changes as they occur during the initial re-examination.

**12.2.1  Persons with Disabilities**
          **[24 CFR §8.24(a)]**

Persons with disabilities who are unable to come in to the Housing Authority's office will be granted a reasonable accommodation of conducting the interview at the person's home or by mail, upon verification  that the accommodation requested meets the need presented by the disability.

**12.2.2  Requirements to Attend**

If it is determined that a participant (family) will need to come to the Housing Authority's office then all adult household members 18 years and older will be required to attend the re-examination interview.

**12.2.3  Failure to Respond**

If a family fails to complete or return the required re-examination documents within the specified timeframe, the Housing Authority will schedule the family for a mandatory appointment.  The appointment letter will provide the date and time of the appointment and a list of items that family will need to bring.  Additionally, the appointment letter will serve as a proposed termination notice and will contain the date of termination as well as a specified timeframe to request an informal hearing.

If the family fails to attend the appointment or fails to bring all the required information and has not requested an informal hearing, Housing Assistance Payments will be stopped.

If the family is able to provide documentation of an emergency situation that prevented them from completing the required re-examination documents or attending the mandatory appointment, the Unit Supervisor at his/her own discretion may, on a case-by-case basis reschedule the appointment.

### 12.2.4 Documents Required from the Family

The re-examination documents will include instructions and appropriate forms that need to be submitted to complete the re-examination. The required forms and documentation are the following:

1. Documentation of income for all family members;
2. Documentation of assets;
3. Documentation of medical or child care expenses;
4. Certified statement of family obligations; and
5. Consent for Release of Information (signed by all household members over 18 years of age).

Verification of these documents will be conducted in accordance with Housing Authority procedures and guidelines described in this plan.

### 12.2.5 Tenant Rent Increases

If the tenant rent increases, a 30-day notice of increase in rent is mailed to the family before the anniversary date.

If less than 30 calendar days are remaining before the anniversary date, the new tenant rent will be effective on the first of the month following the 30-day notice. If the Housing Authority was unable to process the re-examination on a timely basis due to the family's failure to provide re-examination documents, then the rent increase will be effective retroactive to the appropriate anniversary date.

If the family causes a delay in the re-examination processing, there will be a retroactive increase in rent to the anniversary date.  In this particular case, the owner will receive a retroactive HAP payment and every effort will be made to recover lost rent from the tenant.

### 12.2.6 Tenant Rent Decreases

If the tenant rent decreases, it will be effective on the anniversary date.

If the family causes a delay so the processing of the re-examination is not completed by the anniversary date, the rent change will be effective on the first day of the month following the completion of the re-examination processing.

Housing Authority of the County of Los Angeles

**12.3    INTERIM RE-EXAMINATION**
**[24 CFR §982.516(b)(3)]**

No TTP adjustments will be affected between dates of periodic re-examination or pre-scheduled re-examinations except as noted below:

Tenants are required to submit information affecting eligibility income at all re-examinations. Additionally, tenants are required to report the following changes in family circumstances:

1. Changes in family composition, including loss or addition of one or more family members through death, divorce, birth, or adoption [24 CFR §982.516(c)], and

2. Changes in family income including increases and decreases for income received by the family.

A family is required to report these changes to the Housing Authority within 30 calendar days after the change has occurred.  The Housing Authority will verify all reported information that will result in an interim reexamination.

The U.S. citizenship/eligible immigrant status of additional family members must be declared and verified as required at the first interim or regular re-examination after moving into the unit.  See Section 7.10.7 (Verification of Citizenship/Eligible Immigration Status) for details.

**12.3.1  Interim Changes in Income**

- **Decreases**: If the information provided results in a decrease in tenant rent, a modification to the HAP Contract is executed to be effective the first of the month following the month in which the required documentation is supplied by the participant.

- **Increases**: If the information provided results in an increase in tenant rent, the Housing Authority may conduct an interim re-examination, or may flag the file and make adjustments at the annual re-examination.  In either case, the tenant will be notified in writing at least 30 calendar days in advance of an increase.

**12.4    SPECIAL ADJUSTMENTS**

If, at the time of re-examination, a family is clearly of low-income, and it is not possible to make an estimate of the family's income for the next 12-month period; A special re-examination will be scheduled to accommodate the family's circumstances.  This includes cases where:

1. A tenant is unemployed and there are no anticipated prospects of employment, or

2. The conditions of employment and/or receipt of income are too unstable to validate usual and normal standards for determination. An interim re-examination will be scheduled for families with zero or unstable income every 3 months.

Families whose past employment has been sporadic or who are on welfare, become employed, then are unemployed, or are self-employed, will not be given

special re-examination.  If such an income pattern has been established and is expected to continue, then a reasonable 12-month estimate of the income may be based upon past income and present rate of income.

Furthermore, special re-examinations must be clearly set for a definite time to assure compliance.

## 12.5   CHANGES IN FAMILY COMPOSITION
### [24 CFR §982.516(c) and 24 CFR §982.551(h)(2)]

The composition of the assisted family residing in the unit must be approved by the Housing Authority.  An interim re-examination will be conducted for any changes in family composition.

The Housing Authority may verify changes in family composition as detailed in Section 7.10.5.

### 12.5.1  Allowable Family Additions
### [24 CFR §982.551(h)(2)]

Allowable family additions are the following:

1. Addition due to birth, adoption or court awarded custody

   ➤ Must be reported to the Housing Authority, in writing, within 30 calendar days of the occurrence.  Families should notify the owner and comply with any lease requirements to obtain owner approval.

2. Other allowable persons:

   ➤ The family must request approval from the owner and the Housing Authority before the person is added.  Anyone who moves into the unit without written owner and Housing Authority approval is considered an unauthorized person.

   • Addition of marriage/or marital type relation (i.e., couples that certify that they intend to live in the same principal residence indefinitely and/ or register in California as domestic partners);

   • Addition of a minor who is a child of the head of household, co-head, spouse or marital-type partner, who have been living elsewhere; and

   • Addition of a Housing Authority-approved live-in aide;

   • Addition of an adult child due to recent discharge from the military.

As part of the approval process, the Housing Authority conducts a criminal background check, and may also conduct a credit review, on all new potential family members, 18 years of age and older.  Criminal records will only be used to screen new household members.  They will not be used for lease enforcement or eviction of residents already receiving tenant-based rental assistance.

If an approved change requires a larger size unit due to overcrowding, the change in voucher size will be made effective immediately (see Chapter 5).  The Housing Authority will determine the assistance, based on funding availability.

Housing Authority of the County of Los Angeles

### 12.5.2 Decreases in Family Size

When a family member leaves the household, the absence must be reported to the Housing Authority, in writing, within 30 calendar days of the occurrence, as detailed in Section 6.8.9 (Reporting Absences to the Housing Authority).  The change in family composition may impact the voucher size, as explained in Chapter 5 (Subsidy Standards).

If a decrease in family size results in a decrease of the voucher size, the Housing Authority may exercise the option to downsize the family's voucher size and require the family to move.

Generally, families will be asked to move if the unit is two bedrooms or larger than the family is eligible to rent.  When this is necessary, the family will be granted 120 calendar days to locate another suitable unit.  Extensions are granted in accordance with the policy outlined in Chapter 8 (Voucher Issuance and Briefings).

However, if the family's Total Tenant Payment unit does not exceed 50 percent of the family's monthly-adjusted income, the family will be allowed to remain in the unit.

### 12.6   CONTINUATION OF ASSISTANCE FOR "MIXED" FAMILIES [24 CFR §5.504(b)]

Families that include at least one citizen or eligible immigrant, and any number of ineligible members, are considered "mixed" families.

"Mixed" families that were participants on or before June 19, 1995, shall continue full assistance if they meet the following criteria:

1. The head of household, co-head, or spouse is a U.S. citizen or has eligible immigrant status, **and**

2. All members of the family other than head, co-head, spouse, parents of head, parents of co-head, parents of spouse, children of head, co-head, or spouse are citizens or eligible immigrants.  The family may change the head of household designation to another adult member of the family to qualify under this provision.

If they do not qualify for continued assistance, the member(s) that cause the family to be ineligible for continued assistance may move, or the family may choose prorated assistance.

## CHAPTER 13:
## ALLOWABLE MOVES/PORTABILITY

**13.1**   **INTRODUCTION**

This chapter defines the procedures, restrictions and limitations for moving, for new applicants and current participants.

As stated in HUD regulations, eligible families participating in the Housing Choice Voucher Program have the right to receive tenant-based voucher assistance anywhere in the United States, in the jurisdiction of a public housing agency (PHA) administering a Housing Choice Voucher program.  This program feature is called "portability."  This chapter includes the Housing Authority's procedures for new applicants and current participants that "port out" of the Housing Authority's jurisdiction.

Additionally, this chapter specifies the Housing Authority's policies for receiving "incoming ports" from other public housing agencies.

The option of portability does not apply to families assisted under the Moderate Rehabilitation Program.

**13.2**   **ALLOWABLE MOVES AND RESTRICTIONS**

**13.2.1**  **Restrictions on Moves**

The Housing Authority may deny families permission to move if:

> ➢   There is insufficient funding for continued assistance;
> ➢   The family has violated a family obligation;
> ➢   The family is in the initial term of the lease (see 13.2.4 for exceptions); or
> ➢   The family owes money to this Housing Authority or another PHA.  See Section 17.2 (Repayment Agreements for Families) for more information on allowable moves for families with repayment agreements.

In the event of insufficient funding, the Housing Authority is approved to deny new and assisted families permission to move if the family chooses to move to a higher cost area.  New or assisted families will not be permitted to move to a different public housing agency's jurisdiction if the new HAP is higher than the current HAP subsidy for a participant, or the estimated HAP for an applicant, unless the receiving PHA chooses to absorb the new or assisted family into their Section 8 program.

**13.2.2**  **Allowable Moves for New Applicants**
          **[24 CFR §982.353]**

A family who lives and/or works in the Housing Authority's jurisdiction at the time they are admitted to the Housing Choice Voucher Program may choose, as their initial housing:

> ➢   To remain in their current unit (this is referred to as leasing-in-place);
> ➢   A unit anywhere within this Housing Authority's jurisdiction; or

Housing Authority of the County of Los Angeles

> ➢ A unit outside of this Housing Authority's jurisdiction.   For more information, see the Outgoing Portability section of this chapter.

A family who does not live or work in this Housing Authority's jurisdiction at the time they are admitted to the Housing Choice Voucher Program must initially locate a unit within this Housing Authority's jurisdiction in order to receive assistance.   The family does not have any right to portability until they have resided in this Housing Authority's jurisdiction for at least 12 months [24 CFR §982.353(c)].

> ➢ Under limited conditions, the Housing Authority may waive this requirement.   Examples of situations that may warrant an exception to this rule include life-threatening situations or as a reasonable accommodation.   However, in all cases both the Housing Authority and the receiving jurisdiction must agree to allow the move.   If the receiving public housing agency does not agree, the Housing Authority will not approve a transfer [24 CFR §982.353(c)(3)].

**13.2.3** **Allowable Moves for Current Participants**
**[24 CFR §982.314]**

A family that initially receives assistance for a unit leased in this Housing Authority's jurisdiction may request to move to another unit and receive continued assistance.   Families in good standing may move with continued assistance if:

1. The assisted lease for the old unit has ended because the Housing Authority has terminated the HAP contract for owner breach [24 CFR §982.314(b)(1)(i)];

2. The lease was terminated by mutual agreement of the owner and the family [24 CFR §982.314(b)(1)(ii)].   The Housing Authority must receive a copy of this notice;

3. The owner has given the family a notice to vacate for reasons other than a lease violation [24 CFR §982.314(b)(2)].   The Housing Authority must receive a copy of this notice; or

4. The family has given proper written notice of lease termination after the initial lease term and in accordance with State law.   This generally requires a 30-day notice; however, the Housing Authority recommends that families provide a 60-day notice in order to ensure a smooth transition to the new unit [24 CFR §982.314(b)(3)].   The Housing Authority must receive a copy of this notice.

A family is considered to be in good standing if they have not violated the terms of the lease, any program regulations and do not owe any money to this Housing Authority or another public housing agency.

Families that are eligible to move with continued assistance may choose to move to a unit that is:

> ➢ **Within this Housing Authority's jurisdiction**.   This type of a move is called a "reserve vacate."   This means that the family is moving from a unit, which could result in a temporary vacancy in the program until

another unit is secured; however, the slot remains reserved for the family until the time they lease another unit.

> ➢ **Outside Housing Authority's jurisdiction**. See the Outgoing Portability section of this chapter for more information.

## 13.2.4  Restrictions on Moves During the Initial Lease
### [24 CFR §982.314(c) and §982.314(e)]

Generally, families will not be permitted to move during the initial lease (12 months), or more than once in any 12-month period except as noted below:

1. **Life-Threatening Situations** (witness to or victim of a crime, victims of domestic violence, dating violence, and stalking; HQS emergency items, natural disaster, unsafe environment, etc.)

2. **Reasonable Accommodation**: A family may request to move to accommodate a disability. The Housing Authority may approve the move as a reasonable accommodation and grant the request to move. However, the owner of the property must agree to release the tenant from the lease.

3. **Mutual Termination**: The family and the owner agree to mutually terminate the contract. If a family requests to terminate a HAP contract based on a mutual termination more than once in a 12-month period, the Housing Authority may review the reason for the mutual termination. If the owner is requesting a mutual termination in lieu of enforcing tenant obligations under the lease, and there is evidence that the family has committed violations of the lease, the Housing Authority may terminate the family for non-compliance with family obligations.

## 13.3  PROCEDURES FOR MOVES FOR CURRENT PARTICIPANTS
### [24 CFR §982.314(d)]

Eligible families who wish to move must first provide the Housing Authority a written notice of their intent to move.  Once the Housing Authority has received the intent to move notice, the family will be issued a new voucher.  If there are no reported changes to the family's income and/or family composition, the Housing Authority will not be required to conduct a reexamination of families whose reexaminations have been completed within the last 12 months.  If there are changes to the family's income and/or family composition, a reexamination will be conducted before a new voucher may be issued.

At the same time the voucher is issued, the family will receive a Request for Tenancy Approval (RTA). The family should begin looking for housing immediately in order to ensure a smooth transition to the new unit.

Requests to move for families wishing to port to another jurisdiction must be submitted in writing.

To initiate the lease termination, the family must send a written notice to the owner and the Housing Authority no less than 30 calendar days before the vacate date. A contract may not be drafted without the proper notice to move.

Housing Authority of the County of Los Angeles

**13.4    OUTGOING PORTABILITY PROCEDURES**
**[24 CFR §982.355(c)]**

Both new applicants and current participant families must first identify the new jurisdiction where they will be moving. Once the Housing Authority has received this information, the Housing Authority will:

1. Notify the receiving public housing agency (PHA) that the family wishes to relocate into its jurisdiction [24 CFR §982.355(c)(3)];

2. Advise the family how to contact and request assistance from the receiving PHA [24 CFR §982.355(c)(2)]; and

3. Provide the following documents and information to the receiving PHA [24 CFR §982.355(c)(4)]:

   • A copy of the family's voucher, with issue and expiration dates, formally acknowledging the family's ability to move under portability.

   • The most recent HUD 50058 form and verifications.

   • The Family Portability form (HUD-52665).

New applicant families will be subject to the income eligibility requirements of the jurisdiction in which they will be <u>receiving</u> assistance [24 CFR §982.353(d)].

**13.4.1  Briefing for Families Wishing to Exercise Portability**

Since families wishing to move to another jurisdiction must understand that the policies and procedures of the receiving PHA prevail, the Housing Authority will provide counseling for those families who express an interest in portability.  This will include a discussion of difference in payment standards, subsidy standards, and income limits, if applicable.

**13.4.2  Payment to the Receiving PHA**
**[24 CFR §982.355(d) and §982.355(e)]**

If the receiving PHA chooses to administer and bill assistance on the Housing Authority's behalf, the Housing Authority will reimburse the receiving PHA for costs associated with administering the voucher, as specified in HUD regulations.

The receiving PHA must submit to the Housing Authority the initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract.

The Housing Authority will ensure that the receiving PHA receives all subsequent monthly payments no later than the fifth working day of each month.

**13.5    INCOMING PORTABILITY PROCEDURES**
**[24 CFR §982.355]**

Eligible participants in the Housing Choice Voucher Program in other public housing agencies may be assisted in the Housing Authority's jurisdiction.

For a family to port in to the Housing Authority's jurisdiction, the Housing Authority must receive, from the initial PHA:

> The Family Portability form (HUD-52665) with Part I completed.

> A copy of the family's voucher with a valid expiration date.

> The most recent HUD 50058 form and required income verifications supporting the form.

### 13.5.1 Policies on Absorption and Administration [24 CFR §982.355(d) and §982.355(e)]

For incoming ports, the Housing Authority may, if funding permits, accept a family with a valid voucher from another jurisdiction and absorb the voucher. The Housing Authority may also exercise the option to administer the initial public housing agency's voucher and bill the initial PHA as authorized in the regulations.

If the Housing Authority chooses to administer, it will submit to the initial PHA an initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract to ensure timely receipt of payment.

All subsequent monthly billing payments are to be received by the Housing Authority no later than the fifth working day of each month.

### 13.5.2 Income and Total Tenant Payment Review [24 CFR §982.355(c)]

The Housing Authority will conduct an initial review of all incoming port families. The Housing Authority will:

> Conduct criminal background and registered sex offender registration checks of family members (see Section 13.5.3 below).

> Verify identifying documents, family income and composition.

> As necessary, the Housing Authority will change the bedroom size of a family's voucher to comply with the Housing Authority's subsidy standards. If this occurs, the family will be notified in writing of the change.

> If family income documents are missing or there has been a change in the family's circumstances, the Housing Authority may re-determine the family's TTP.

> For incoming port families who have not yet leased a unit under the Housing Choice Voucher Program (initial applicants), the Housing Authority must verify that the family meets the Housing Authority's income limits.

If a re-determination is necessary, the Housing Authority will not delay issuing the family a voucher or otherwise delay approval of a unit unless the re-determination reveals that the family is not eligible for assistance in the Housing Authority's jurisdiction. In such cases, the family will be referred to the initial PHA for further assistance [24 CFR §982.355(c)(4)].

In general, all families porting into the Housing Authority's jurisdiction will be issued a Housing Authority voucher. The term of the voucher may not expire

Housing Authority of the County of Los Angeles

before the expiration date noted on the voucher issued by the initial public housing agency. The Housing Authority will determine whether to extend the voucher term, if necessary, based on the Housing Authority's policy for extension. The Housing Authority will notify the initial PHA if such an extension is granted [24 CFR §982.355(c)(6)].

If a family that has ported into the Housing Authority's jurisdiction is unable to locate a unit within the allotted time authorized on the voucher, the Housing Authority will notify the issuing PHA that the voucher did not result in a HAP contract.

Approval of any unit is subject to rent reasonableness and a passed inspection [24 CFR §982.401(a)(3)].

### 13.5.3 Criminal Background Checks for Incoming Portability 24 CFR §982.355(c)(9) – (10) and PIH Notice 2004-12

The Housing Authority will conduct criminal background and sex offender registration checks for all incoming portability families and will not delay issuing the family a voucher but will take subsequent necessary action, including up to termination of a family's assistance (see Section 2.8 for details on screening).

The Housing Authority will take the following steps to minimize the number of terminations for families that are porting into its jurisdiction:

> ➢ At voucher issuance, families be will informed of the Housing Authority's criminal background policies and that they will be going through a background check and offered an opportunity to return to their originating PHA.

> ➢ If it is determined before a contract is effective that a family member is unsuitable due to a criminal background check the family will be given the options of returning to the originating PHA or excluding the culpable family member.

> ➢ If it is determined after a contract is effective that a family member is unsuitable and the Housing Authority is billing the originating PHA, the family will have the option of returning to the originating PHA or exclude the culpable household member.

> ➢ If it is determined after the contract is effective that a family member is unsuitable and the Housing Authority has absorbed the contract, the family will only have the option of excluding the culpable household member and will not be allowed to return to the originating PHA.

The contract will be terminated if it has been absorbed and if the family chooses not to exclude the culpable household member or there are no other adult eligible household members.

### 13.5.4 Terminations

In cases where the Housing Authority is administering a contract on behalf of another PHA, the Housing Authority will notify the initial PHA in writing of any termination of assistance within 30 calendar days of the termination.

### 13.5.5 Informal Hearings/Reviews
### [24 CFR §982.555]

If an informal hearing is required and requested by the family, the Housing Authority will conduct the hearing only if the participant has been assisted within the Housing Authority's jurisdiction. Such hearings will be conducted using the regular hearing procedures included in this plan. Families who have not yet received assistance in the Housing Authority's jurisdiction are eligible for informal reviews, as detailed elsewhere in this administrative plan.

The initial PHA will be responsible for collecting amounts owed to that public housing agency by the family for claims paid and for monitoring repayment. If the initial PHA notifies the Housing Authority that the family is in arrears or the family has refused to sign a Repayment Agreement, the Housing Authority will terminate assistance to the family.

Housing Authority of the County of Los Angeles

## CHAPTER 14:
## CONTRACT TERMINATIONS

**14.1   INTRODUCTION**

The chapter identifies the key documents/contracts that set forth the responsibilities of each party involved in the rental assistance relationship and outlines the policies and procedures under which these contracts can be terminated.

**14.2   DESCRIPTION OF DOCUMENTS**

There are three parties involved in the rental relationship: the assisted family, the owner and the Housing Authority.

The rights and responsibilities of the assisted family are defined in the voucher or certificate and the Certified Statement of Family Obligations. A copy of the voucher or certificate is provided to the family at admission and each time a new voucher is issued. The family signs the Certified Statement of Family Obligations annually.

The relationship between the family and the owner is outlined in the rental lease. Generally, the term of the lease is for one year and then turns into a month-to-month tenancy. Although the Housing Authority is not a part of the lease, HUD regulations allow public housing agencies to act against the family for serious or repeated violations of the lease.

The terms of the relationship between the owner and the Housing Authority are outlined in the Housing Assistance Payments (HAP) contract. The term of the HAP contract is the same as the term of the lease.

**14.3   TERMINATION OF THE LEASE BY THE FAMILY: MOVES
[24 CFR §982.309(c)]**

For continued tenant assistance, the family cannot terminate the lease until after the initial term of the lease except for material breach of the lease by the owner. The lease determines the notice period for termination to the owner. Most leases require, at minimum, a 30-day notification. However, the Housing Authority recommends that families provide a minimum of a 60-day notice in order to allow enough time for a smooth transition of assistance from the old unit to the new unit. To initiate the lease termination, the family must send a written notice to the owner and the Housing Authority no less than 30 calendar days before the vacate date.

**14.4   TERMINATION OF THE LEASE BY THE OWNER**

An owner or manager may bifurcate (separate) a lease in order to evict, remove, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others, without evicting, removing, or terminating assistance, or terminating assistance, or otherwise penalizing the victim of such violence which is also a tenant or lawful occupant.

**14.4.1  Terminating the Lease During the Initial Term of the Lease
[24 CFR §982.310(a)]**

During the term of the lease, the owner may not terminate the tenancy except for good cause, which includes serious or repeated violations of the lease and/or violations of federal, state or local law that imposes obligations on the family in connection with the use of the unit.

Under such conditions, the owner must provide both the family and the Housing Authority with a copy of any notice to move or eviction action.  An eviction action is defined as a notice to vacate, or a complaint, or other initial pleading used under State or local law to commence an eviction action.  Any eviction notice served to a family must specify the grounds for the termination of the tenancy.

An owner may commence termination of a tenancy for good cause by serving a legal notice of termination on the family for the following reasons:

1. Serious or repeated violation of the terms and conditions of the lease [24 CFR §982.310(a)(1)];

2. Violation of federal, state or local law that imposes obligations on the tenant in connection with the occupancy or use of the premises [24 CFR §982.310(a)(2)]; and

3. Other good cause, [24 CFR §982.310(a)(3)] including:

   - Criminal activity by the tenant, any member of the household, a guest or another person under the tenant's control that threatens the health, safety or right to peaceful enjoyment of the premises by the other residents, or persons residing in the immediate vicinity of the premises [24 CFR §982.310(d)];

   - Any drug-related criminal activity on or near the premises; or

   - Tenant disturbance of neighbors, destruction of property, or behavior resulting in damage to the premises.

**14.4.2  Terminating the Lease After the Initial Term of the Lease**

After the initial term of the lease, the owner may terminate the lease for other good cause.  Examples of other good cause include:

   ➢ Business or economic reason for regaining possession of the unit;

   ➢ Owner's desire to repossess the unit for personal or family use or for a purpose other than residential property;

When terminating the lease for business or economic reasons, the owner is required to provide a 90-day notice to both the family and the Housing Authority.

**14.4.3  Requests for Criminal Records by Project-Based Section 8 Owners
[24 CFR §5.903(d)(3)]**

Project-based Section 8 owners (excludes housing choice voucher owners), that have contracts with the Housing Authority, may request that the Housing Authority obtain criminal records, on their behalf, for the purpose of eviction or

lease enforcement.  The Housing Authority will, however, charge a fee in order to cover costs associated with the review of criminal records.

Project-based owners must submit the following items in order for the Housing Authority to process criminal records.  Owner requests must include:

1. A copy of a signed consent form from each adult household members, age 18 years and older.  Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social Security number.  This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2. An owner's criteria or standards for evicting drug criminals in accordance with HUD regulations (§ 5.857 of 24 CFR Parts 5 et al.); or criteria for evicting other criminals (§ 5.858 of 24 CFR Parts 5 et al.); or criteria for lease enforcement.

Once the Housing Authority obtains the criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used as a basis for eviction or lease enforcement.  The Housing Authority will base its determination in accordance with HUD regulations and the owner criteria.

It is important to note that the Housing Authority will not disclose the participant's criminal conviction record, nor the content of that record to the owner unless the owner is proceeding with a judicial eviction process.  In the case of a judicial eviction, the owner must provide the Housing Authority with a certification that the criminal records are necessary to proceed with the eviction.

## 14.5   MUTUAL TERMINATION OF THE LEASE

In cases where the owner and the family agree to terminate the lease, both parties have an obligation to notify the Housing Authority in writing at least 30 calendar days in advance of the vacate date in order that Housing Authority may avoid overpayment to the owner.

## 14.6   TERMINATION OF THE HAP CONTRACT BY HOUSING AUTHORITY [24 CFR §982.453 – §982.454]

The Housing Authority will terminate the HAP contract as follows:

1. When the Housing Authority terminates program assistance for the family.

2. When the owner has breached the HAP contract.

   Any of the following actions will be considered a breach of the HAP contract by the owner:

   ➢ The owner has violated any obligation under the HAP contract for the dwelling unit, including the owner's obligation to maintain the unit according to housing quality standards, including any standards the Housing Authority has adopted in this policy [24 CFR §982.453(a)(1)].

   ➢ The owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.453(a)(2)].

> The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program [24 CFR §982.453(a)(3)].

> The owner has failed to comply with regulations, the mortgage or note, or the regulatory agreement for projects with mortgages insured by HUD or loans made by HUD [24 CFR §982.453(a)(4)].

> The owner has engaged in drug-related criminal activity [24 CFR §982.453(a)(5)].

> The owner has committed any violent criminal activity [24 CFR §982.453(a)(6)].

3. If the family is required to move from a unit which is overcrowded based on the Housing Authority's current subsidy standards [24 CFR §982.403(a)].

4. If funding is no longer available under the ACC [24 CFR §982.454].

> Before terminating HAP contracts on the basis of insufficient funding, the Housing Authority is required to ensure that the determination of insufficient funding is documented.  The Housing Authority will consider funding insufficient if it is determined that the projected year-end subsidy falls short of the authorized budget amount.

> The Housing Authority will determine the number of families that must be terminated, and will present the Board of Commissioners with a recommended method for terminating HAP contracts.  Following Board of Commissioner and HUD notification, the Housing Authority will terminate HAP contracts.

> Contracts of elderly and disabled families will not be subject to termination.

> Terminated families will be placed on the waiting list and will receive a preference for assistance from the waiting list.

The Housing Authority may terminate the HAP contract if the owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.453(a)(2)]. The Housing Authority will consider the following list of factors in determining whether to terminate the HAP contract for a violation of another HAP contract:

> The nature of the breach

> The location of the other units under contract compared to the subject unit

> The impacts on participants in other the units

Additionally, an owner who breaches a HAP contract may be disapproved to participate in Housing Authority programs, as detailed in Section 9.10 (Owner Disapproval). The Housing Authority's rights and remedies against the owner under the HAP contract include recovery of overpayments, abatement or other reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contracts.

Housing Authority of the County of Los Angeles

> Request for reasonable accommodations relating to termination of HAP contracts will be reviewed on a case-by-case basis.

**14.7    HAP PAYMENTS AND CONTRACT TERMINATIONS
[24 CFR §982.311]**

When a HAP contract terminates, the Housing Authority will make payments in accordance with the HAP contract and depending on the reason for the contract termination.

In cases involving a tenant notice to move or a mutual termination, not involving an eviction action, the Housing Authority will pay the owner for the entire last month that the family was in the unit regardless of the actual day of the month that the family moved out. The Housing Authority may also pay HAP on behalf of the family for the new unit in the same month. However, while the Housing Authority can pay a subsidy for two units in a given month under these conditions, the family may only have physical possession of one unit at a time. A family will be considered to have physical possession of a unit if they still have belongings in the unit and the key to the unit. Under such cases, the family will be required to pay the full rent for one of the units in its possession and the family's portion for the other unit [24 CFR §982.311(d)].

In cases involving evictions, the Housing Authority will continue to pay the HAP until the day the family moves out or is evicted [24 CFR §982.311(b)].

In cases involving termination of assistance due to insufficient funding, families will receive a minimum of 30 days notice of termination of assistance.

In cases involving termination of assistance for reasons other than insufficient funding, the Housing Authority will notify the owner and the family of the proposed termination date. If the family does not request a hearing or the hearing is decided in the Housing Authority's favor, the HAP payments will terminate in accordance with the notification. If a family continues to occupy the unit after assistance is terminated, the family is responsible for the total amount of rent due to the owner.

If HAP payments are released to the owner for periods of time beyond the dates set forth above, the owner will be required to return all monies to the Housing Authority within 30 calendar days or within the time specified in any approved repayment agreement. The Housing Authority also reserves the right to deduct any monies from other HAP payments being made to the owner by the Housing Authority. If the owner fails to repay the HAP, the account will be forwarded for further action.

# CHAPTER 15:
# FAMILY OBLIGATIONS

**15.1** **INTRODUCTION**
**[24 CFR §982.552(a)]**

The Housing Authority may terminate assistance for a family because of the family's action or failure to act.  The Housing Authority will provide families with a written description of the family obligations under the program, the grounds under which the Housing Authority can terminate assistance, and the Housing Authority's informal hearing procedures.   This chapter describes when the Housing Authority is required to terminate assistance, and the Housing Authority's policies for the termination of assistance.

**15.2** **GROUNDS FOR TERMINATION**
**[24 CFR §982.552(c)(2)(iv)]**

The Housing Authority will not terminate assistance of a participant who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for assistance.

If termination is based upon behavior resulting from a disability, the Housing Authority will delay the termination in order to determine if there is a reasonable accommodation, pursuant to law, that would cure the grounds for the termination.

**15.2.1** **Form of Termination**

Termination of assistance for a participant may include any or all of the following [24 CFR §982.552(a)(3)]:

1. Refusal to enter into a HAP contract or approve a lease

2. Termination of HAP under an outstanding HAP contract

3. Refusal to process or provide assistance under portability procedures

**15.2.2** **Mandatory Termination**

The Housing Authority must terminate assistance for participants under the following conditions:

1. If any member of the family fails to sign and submit to HUD or Housing Authority required consent forms for obtaining information [24 CFR §982.552(b)(3)].

2. If no member of the family is an U.S. citizen or eligible immigrant [24 CFR §982.552(b)(4)].

3. If 180 calendar days have elapsed since the Housing Authority's last housing assistance payment was made.

4. If any family member fails to meet the eligibility requirements concerning individuals enrolled at an institution of higher education as specified in Section 2.5 [24 CFR §5.612].

Housing Authority of the County of Los Angeles

**15.2.3  Grounds for Termination of Assistance
[24 CFR §982.552(c)(1)]**

The Housing Authority may at any time terminate program assistance to a participant, for any of the following reasons:

1.  The family violates any family obligation under the program as listed in 24 CFR 982.551 [24 CFR §982.552(c)(1)(i)].

2.  Any member of the family has ever engaged in serious lease violations while a resident of federally assisted housing or within the past 5 years has been evicted from a federally assisted housing program [24 CFR §982.552(c)(1)(ii)].

3.  Any family member engages in drug-related or violent criminal activity [24 CFR §982.553(a) and §982.551(k)-(l)].

4.  The family currently owes rent or other amounts to the Housing Authority or to another housing agency in connection with Section 8 or public housing assistance under the 1937 Act [24 CFR §982.552(c)(1)(v)].

5.  The family has not reimbursed the Housing Authority or any housing agency for amounts paid under a HAP contract to an owner for rent, damages to the unit, or other amounts owed by the family under the lease [24 CFR §982.552(c)(1)(vi)].

6.  The family breaches an agreement with any housing agency to pay amounts owed to any housing agency, or amounts paid to an owner by any housing agency [24 CFR §982.552(c)(1)(vii)].

7.  A family participating in the family self-sufficiency (FSS) program fails to comply, without good cause, with the family's FSS contract of participation (COP) [24 CFR §982.552(c)(1)(viii)].

8.  The family has engaged in or threatened abusive or violent behavior toward Housing Authority personnel [24 CFR §982.552(c)(1)(ix)].

    •  "Abusive or violent behavior" includes verbal as well as physical abuse or violence. Use of expletives that are generally considered insulting, racial epithets, or other language, written or oral, that is customarily used to insult or intimidate, may be cause for termination.

    •  "Threatening" refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

    •  Actual physical abuse or violence will always be cause for termination.

**15.2.4  Welfare to Work Program
[24 CFR §982.552(c)(1)(x)]**

Failure to fulfill the obligations and conditions of the Welfare to Work program is grounds for termination of assistance.

Specifically, the Housing Authority will terminate assistance for Welfare-to-Work families if the family fails to comply with GAIN requirements, the FSS Contract of Participation (CoP) and/or other required Family Self-Sufficiency requirements without good cause.

**15.2.5 Registered Sex Offenders**

If it is brought to the attention of the Housing Authority that a current program participant is on the sex offender registration list, the Housing Authority will review on a case-by-case basis.  The Housing Authority will consult with law enforcement and legal counsel and take appropriate actions based on findings.

**15.3   FAMILY OBLIGATIONS**
**[24 CFR §982.551]**

Failure to abide by any of the family obligations is grounds for termination.

1.  The family must supply any information that the Housing Authority or HUD determines is necessary in the administration of the program [24 CFR §982.551(b)]. Information includes any requested certification, release or other documentation.  Requirements include:

    • Submission of required evidence of citizenship or eligible immigration status (as provided by 24 CFR part 5);

    • Disclosure and verification of social security numbers (as provided by 24 CFR part 5);

    • Providing any information requested by the Housing Authority or HUD for use in a regularly scheduled or interim determination of family income and composition, including income, assets, and accurate family composition.

2.  The family must report all changes in family income and composition in writing immediately as they occur.  The owner of the unit and the Housing Authority must approve changes in composition of the assisted family [24 CFR §982.551(b) and §982.551(h)(2)].  The family must:

    • Report the birth, adoption or court-awarded custody of a child;

    • Request Housing Authority approval to add any other family member;

    • Notify the Housing Authority when a family member no longer lives in the unit.

    If the Housing Authority gives approval, a live-in aide or a foster child may live in the unit.  Failure to report changes, making false reports and/or allowing unauthorized people in the unit is cause for termination from the program.

3.  All information supplied by the family must be true and complete [24 CFR §982.551(b)].

4.  Maintain the rental unit [24 CFR §982.551(c)].  The family is responsible for any violation of Housing Quality Standards resulting from:

    • Failure to pay for tenant-paid utilities;

    • Failure to furnish required stove and or refrigerator if to be provided by family; or

    • Damage to the unit or grounds by the family or its guests beyond normal wear and tear.

Housing Authority of the County of Los Angeles

5. The family must allow the Housing Authority to inspect the unit at reasonable times and after reasonable notice [24 CFR §982.551(d)].

6. The family may not commit any serious or repeated violation of the lease [24 CFR §982.551(e)].

7. The family must notify the owner and, at the same time, notify the Housing Authority before the family moves out of the unit or terminates the lease on notice to the owner.   The family must promptly give the Housing Authority a copy of any owner eviction notice [24 CFR §982.551(f) – (g)].

8. The family must use the assisted unit for residence by the family.   The unit must be the family's only residence. The family must not sublease or let the unit [24 CFR §982.551(h)(1), (6)].

9. The family must not assign the lease or transfer the unit.   In cases where there is a change in the head of household, the lease may be transferred to the new Head but only with the consent of the owner of the property and the Housing Authority [24 CFR §982.551(h)(7)].

10. Members of the household may engage in legal profit-making activities in the unit, but only if such activities are incidental to primary use of the unit as a residence by members of the family [24 CFR §982.551(h)(5)].

11. The family must supply any information or certification requested by the Housing Authority to verify that the family is living in the unit, or relating to family absence from the unit, including any Housing Authority-requested information or certification on the purposes of family absences. The family must cooperate with the Housing Authority for this purpose. The family must promptly notify the Housing Authority of absence from the unit [24 CFR §982.551(i)].

12. The family must not own or have any interest in the unit [24 CFR §982.551(j)].

13. The members of the family must not commit fraud, bribery or any other corrupt or criminal act in connection with the programs [24 CFR §982.551(k)].

14. The members of the family may not engage in drug-related criminal activity or violent criminal activity, or other criminal activity that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

15. The members of the family must not abuse alcohol in a way that threatens the health, safety or right to peaceful enjoyment of other residents and persons residing in the immediate vicinity of the premises.

16. An assisted family, or members of the family, may not receive Section 8 tenant-based assistance while receiving another housing subsidy, for the same unit or for a different unit, under any duplicative (as determined by HUD or in accordance with HUD requirements) federal, State or local housing assistance program [24 CFR §982.551(n)].

17. The family must pay only the amount authorized by the Housing Authority on the approved lease.   Any amount paid by the family other than the

authorized amount is considered an illegal side payment and is cause for termination of the housing assistance subsidy.  The Housing Authority may authorize additional payments for other amenities [24 CFR §982.451(b)(4)(ii)].

18. The family must not receive housing choice voucher program housing assistance while residing in a unit owned by a spouse, parent, child, grandparent, grandchild, sister or brother of any member of the family, unless the Housing Authority has determined (and has notified the owner and the family of such determination) that approving rental of the unit, notwithstanding such relationship, would provide reasonable accommodation for a family member who is a person with disabilities (See Section 9.4 for more information).

19. The family must not have a member that has committed a crime that subjects them to a lifetime sex offender registration requirement imposed by any State sex offender registration program reside in the unit.  This is to ensure that no household member or guest is creating or maintaining a threat to the health and safety of other residents or the public.

### 15.3.1 Housing Authority Discretion
[24 CFR §982.552(c)(2)]

In deciding whether to terminate assistance because of action or failure to act by members of the family, the Housing Authority has discretion to consider all of the circumstances in each case, including:

➢ The seriousness of the case,

➢ The extent of participation or culpability of individual family members, and

➢ The length of time since the violation occurred and more recent record of compliance, and the effects of denial or termination of assistance on other family members who were not involved in the action or failure to act.

On a case by case basis the Housing Authority may counsel the family before proposing termination.

The Housing Authority may impose, as a condition of continued assistance for other family members, a requirement that family members who participated in or were culpable for the action or failure will not reside and/or visit in the unit.  The Housing Authority may permit the other members of a family to continue in the program.

### 15.3.2 Enforcing Family Obligations

#### Explanations and Terms

• **HQS Breach**: The inspector will determine if an HQS breach as identified in 24 CFR §982.404(b) is the responsibility of the family.  Families may be given extensions to correct HQS breaches as explained in Chapter 10.

• **Lease Violations**: The following criteria will be used to decide if a serious or repeated violation of the lease will cause a termination of assistance [24 CFR §982.310]:

- If the owner terminates tenancy through court action for serious or repeated violation of the lease.

- If the owner notifies the family of intention to terminate tenancy for serious or repeated lease violations, and the family moves from the unit prior to the completion of court action, and the Housing Authority determines that the cause is a serious or repeated violation of the lease based on available evidence.

- If there are police reports, neighborhood complaints or other third-party information, and the Housing Authority has verified the information. Lack of receipts or other proof of rent payments by the family may also be considered verification of lease violations.

- **Family Member Moves Out**: Families are required to notify the Housing Authority within 30 calendar days if any family member leaves the assisted household [24 CFR §982.551(h)(3)]. When the family notifies the Housing Authority, they must furnish the following information:

  - The date the family member moved out.

  - The new address, if known, of the family member.

  - A statement as to whether the family member is temporarily or permanently absent.

  - Related income, asset or deduction changes resulting from the member moving.

- **Limitation on Profit-making Activity in Unit [24 CFR §982.551(h)(5)]**: If the business activity area results in the inability of the family to use any of the critical living areas, such as a bedroom utilized for a business which is not available for sleeping, it will be considered a violation.

  If the Housing Authority determines that the use of the unit as a business is not incidental to its use as a dwelling unit, it will be considered a violation of family obligations.

- **Interest in Unit [24 CFR §982.551(j)]**: The owner may not reside in the assisted unit, under any circumstances, including as a live-in aide, regardless of whether the owner is a member of the assisted family, unless assistance is being provided for a mobile home and the family owns the mobile home and rents the pad under the Certificate or Housing Choice Voucher Program.

- **Fraud [24 CFR §982.551(k)]**: In each case, the Housing Authority will consider which family members were involved, the circumstances, and any hardship that might be caused to innocent members.

### 15.3.3 Drug-Related Criminal Activity
### [24 CFR §982.553(a)(1) and (b)(1)]

Drug-related criminal activity refers to the illegal manufacture, sale, distribution, use or possession with intent to manufacture, sell, distribute or use a controlled substance [24 CFR §5.100].

Drug-related criminal activity does not include the prior use or possession of a controlled substance if the family member had an addiction to the substance and

has recovered, or is recovering from the addiction and does not currently use or possess the substance and has demonstrated successful completion of a rehabilitation program [24 CFR §982.553(b)].

> ➢ The Housing Authority may propose termination against the family for drug-related criminal activity that occurs on or off the premises of the assisted unit. An arrest or conviction is not required to deny or terminate assistance.

> ➢ Participants may be terminated if they have been arrested, convicted or whose tenancy is being terminated due to drug-related criminal activity or whose activities have created a disturbance in the building or neighborhood.

> ➢ If the family violates the lease for drug-related criminal activity, the Housing Authority will terminate assistance.

In appropriate cases, the Housing Authority may permit the family to continue receiving assistance provided that family members determined to have engaged in the prescribed activities will not reside and/or visit in the unit. If the violating member is a minor, the Housing Authority may consider individual circumstances with the advice of Juvenile Court officials.

### 15.3.4  Violent Criminal Activity
### [24 CFR §982.553(a)(2) and (b)(2)]

Violent criminal activity includes any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force against a person or property, and the activity is being engaged in by any family member. Violent criminal activity also includes activity which occurs within the family, such as during domestic disputes.

> ➢ The Housing Authority may propose termination against the family for violent criminal activity that occurs on or off the premises of the assisted unit. An arrest or conviction is not required to deny or terminate assistance.

> ➢ Participants may be terminated if they have been arrested, convicted or whose tenancy is being terminated due to violent criminal activity or whose activities have created a disturbance in the building or neighborhood.

> ➢ If the family violates the lease for violent criminal activity, the Housing Authority will terminate assistance.

> ➢ Incidents or threats of abuse, or criminal activity related to abuse engaged in by a member or guest of the participant's household, will not be grounds for termination of the victim or threatened victim of the abuse.

In appropriate cases, the Housing Authority may permit the family to continue receiving assistance provided that family members determined to have engaged in the prescribed activities will not reside and/or visit in the unit. If the violating member is a minor, the Housing Authority may consider individual circumstances with the advice of Juvenile Court officials.

Housing Authority of the County of Los Angeles

### 15.3.5 Required Evidence
### [24 CFR §982.553(c)]

In determining whether to terminate assistance based on criminal activity, the Housing Authority may terminate assistance if the preponderance of evidence indicates that a family member has engaged in such activity, regardless of whether the family member has been arrested or convicted.

The Housing Authority may consider arrests, convictions, no contest pleas, fines, city ordinance violations or other credible preponderance of evidence in determining if a violation has occurred.

**Preponderance of evidence**: evidence which is of greater weight or more convincing than the evidence which is offered in opposition to it; that is, evidence which as a whole shows that the fact sought to be proved is more probable than not. The intent is not to prove criminal liability, but to establish that the act(s) occurred. Preponderance of evidence may not be determined by the number of witnesses, but by the greater weight of all evidence.

### 15.3.6 Confidentiality of Criminal Records
### [24 CFR §5.903(g)]

Criminal records received by the Housing Authority shall be maintained confidential, not misused, nor improperly disseminated and kept locked during non-business hours. Also, all criminal records will be destroyed no later than 30 calendar days after a final determination is made.

### 15.3.7 Disclosure of Criminal Records to Family
### [24 CFR §5.903(f) and §982.553(d)]

The applicant or household member requesting to be added to the lease will be provided with a copy of the criminal record upon request and an opportunity to dispute the record. Applicants will be provided with the opportunity to dispute the record at an informal review. Participants may contest such records at an informal hearing.

### 15.4    NOTICE OF TERMINATION OF ASSISTANCE

In any instance where the Housing Authority decides to terminate assistance to the family, the Housing Authority must give the family a written notice that includes:

1. The reason(s) for the proposed termination;
2. The effective date of the proposed termination;
3. Information regarding the family's right to request an Informal Hearing to be held before termination of assistance; and
4. The date by which a request for an informal hearing must be received by the Housing Authority.

A final notice of determination and date of termination will then be sent to the participant if no hearing is requested within the allowable time or if the Informal Hearing confirms the termination.

The Housing Authority will simultaneously provide written notice of the contract termination to the owner so that it will coincide with the termination of assistance. The notice to the owner will not include any details regarding the reason for termination of assistance.

**15.5    PROCEDURES FOR NON-CITIZENS**
         **[24 CFR §982.552(b)(4) and 24 CFR §5.514]**

The Housing Authority is required to terminate assistance for participant families in which no members are U.S. citizens or eligible immigrants. If a family member does not establish citizenship or eligible immigration status as required, the Housing Authority will prorate the assistance, or if there are no eligible family members remaining, the Housing Authority will propose program termination and provide the opportunity for an informal hearing, as explained in Chapter 16.

**15.5.1  False or Incomplete Information (No Eligible Members)**

Families are required to submit evidence and sign declarations of their citizenship or eligible immigration status. If the Housing Authority obtains substantive documentation (such as a permanent resident card or information from another agency) that contradicts a family member's declaration of citizenship, an investigation will be conducted and the individual given an opportunity to present relevant information.

> ➢ If the family (or any member) claimed eligible immigrant status and the USCIS primary and secondary verifications failed to document the status, the family may make an appeal to the USCIS and request a hearing with the Housing Authority either after the USCIS appeal or in lieu of the USCIS appeal.

> ➢ If the family member is unable to verify their citizenship, the Housing Authority may give the individual an opportunity to provide a new declaration as an eligible immigrant or to elect not to contend their status. The Housing Authority will then verify eligible status, and terminate, or prorate as applicable.

> ➢ Assistance may not be terminated while verification of the participant family's eligible immigration status is pending.

After the Housing Authority has made a determination of ineligibility, the family will be notified of the determination and the reasons, and informed of the option for prorated assistance (if applicable) or the proposed termination.

The Housing Authority will terminate assistance for misrepresentations or submission of false information.

**15.6    ZERO ASSISTANCE (END OF PARTICIPATION)**
         **[24 CFR §982.455]**

The Housing Authority is required to automatically terminate the HAP contract 180 calendar days after the last housing assistance payment is made to the owner. A family receiving no assistance may remain in the unit for up to 180 calendar days after the last HAP payment. If the family is still in the unit after 180

Housing Authority of the County of Los Angeles

calendar days, assistance is terminated. If within the 180-day period, an owner rent increase or a decrease in the TTP causes the family to be eligible for a housing assistance payment, the Housing Authority will resume assistance payments for the family.

In order for a family to move to another unit during the 180 calendar days, the rent for the new unit would have to be high enough to necessitate a housing assistance payment.

**15.7    OPTION NOT TO TERMINATE FOR MISREPRESENTATION OF INCOME**

If the family has misrepresented any facts that caused Housing Authority to overpay assistance, the Housing Authority may choose not to terminate and may offer to continue assistance provided that the family agrees to pay the Housing Authority the amount owed and either pays the Housing Authority in full or executes a Repayment Agreement and makes payments in accordance with the agreement.

**15.8    MISREPRESENTATION IN COLLUSION WITH OWNER**

If the family willingly and knowingly commits fraud or is involved in any other illegal scheme with the owner, the Housing Authority will deny or terminate assistance.

**15.9    MISSED APPOINTMENTS AND DEADLINES**
**[24 CFR §982.551]**

It is a family obligation to supply information, documentation, and certifications as needed for the Housing Authority to complete required processes. The Housing Authority schedules appointments and sets deadlines in order to obtain the required information. Failure to supply requested information can result in termination of assistance. Examples of failing to supply requested information can include: failing to sign necessary documents, failing to return documents or returning incomplete or altered documents, failing to complete all information requested on documents, etc.

The obligations also require that the family keep all appointments and allow the Housing Authority to inspect the assisted unit. All scheduled inspections are considered "appointments."

The family will receive information about the requirement to keep appointments, and the number of times that appointments are rescheduled as specified below. Appointments are scheduled and time requirements imposed for the following events and circumstances:

1.  Eligibility for Admissions;

2.  Verification Procedures;

3.  Voucher Issuance and Briefings;

4.  HQS Inspections;

5.  Re-examinations; and

6.  Appeals (Informal Hearing/Reviews).

Examples of good cause for missing appointments or failing to provide information by deadlines are medical and/or family emergencies.  In such cases, the family may be requested to provide verification of such circumstances.

An applicant or participant who fails to keep appointments, or to supply information required by a deadline without notifying the Housing Authority may be sent a notice of termination of assistance for failure to comply with program regulations.

The family may be granted up to two opportunities before they receive a notice of denial or termination for breach of a family obligation.  After issuance of the denial or termination notice, if the family offers to correct the breach within the time allowed to request a review or hearing, the notice may be rescinded after the family corrects the breach, if the family does not have a history of non-compliance.  For families with a history of non-compliance, the Housing Authority may elect to hold the review or hearing.

Housing Authority of the County of Los Angeles

## CHAPTER 16:
## INFORMAL REVIEWS/HEARINGS

**16.1**   **INTRODUCTION**

This chapter covers the Housing Authority's policy and procedures for informal reviews and informal hearings.  This chapter defines the Housing Authority's responsibilities to applicants and participants.

**16.2**   **REASONABLE ACCOMMODATION**

All requests for accommodation will be verified with a reliable, knowledgeable professional so that the Housing Authority can properly accommodate the need presented by the disability.

Requests for accommodation from persons with disabilities will be granted upon verification that they are reasonable, and they meet the need presented by the disability.

Reasonable accommodation will be made for persons with disabilities that require an advocate or accessible offices.  A designee will be allowed to provide information as needed, but only with the permission of the person with the disability.

**16.3**   **INFORMAL REVIEW PROCEDURES FOR APPLICANTS
[24 CFR §982.554(a)]**

Under certain circumstances, the Housing Authority offers informal reviews for applicants.  Applicants are defined as families who are on the Section 8 waiting list and are awaiting the issuance of a voucher or families who have been issued a voucher but have not yet been assisted under a Housing Assistance Payment (HAP) Contract.

When the Housing Authority denies assistance to an applicant, the family is notified in writing.  The notice contains:

➢ The reason(s) for the decision;

➢ The procedure for requesting an informal review if the applicant does not agree with the decision; and

➢ The time limit for requesting a review.

The Housing Authority must provide applicants with the opportunity for an Informal Review of Decisions denying issuance of a voucher or participation in the program.

Applicants who are denied assistance based on ineligible immigration status are entitled to an informal hearing (rather than an informal review).

### 16.3.1 When an Informal Review is Not Required
### [24 CFR §982.554(c)]

Informal reviews are not required for established policies, procedures, and Housing Authority determinations such as:

1. Discretionary administrative determinations by the Housing Authority;
2. General policy issues or class grievances;
3. A determination of the family unit size under the Housing Authority subsidy standards;
4. Refusal to extend or suspend a certificate or voucher;
5. Disapproval of lease;
6. Determination that the unit is not in compliance with HQS; or
7. Determination that the unit is not in accordance with HQS due to family size or composition.

### 16.3.2 Procedure for Review
### [24 CFR §982.554(b)]

Informal Reviews will be conducted via mail. Applicants will be required to submit written objections to the Housing Authority by the close of business day, no later than 15 calendar days from the date of the Housing Authority's notification of "Notice of Cancellation of Application." The informal review will be conducted within 30 calendar days from the date the request is received.

The informal review will not be conducted by the person who made or approved the decision under review, nor a subordinate of such person.  The review may be conducted by:

> ➢ A staff person who is not the person who made the decision or his/her subordinate, or
> ➢ An individual from outside the Housing Authority.

A Notice of the Review decision will be provided in writing to the applicant within 30 calendar days after the review.  It shall include the decision of the review officer, and an explanation of the reasons for the decision.

All requests for a review, supporting documentation, and a copy of the final decision will be retained in the applicant's file.

Requests for accommodations from persons with disabilities will be granted upon verification that the request is reasonable, and they meet the need presented by the disability on a case-by-case basis.

Housing Authority of the County of Los Angeles

**16.4    INFORMAL HEARING FOR PARTICIPANTS
        [24 CFR §982.555]**

**16.4.1  When an Informal Hearing May Be Requested
        [24 CFR §982.555(a)(1)]**

A participant family must be given an opportunity for an informal hearing to consider whether certain Housing Authority decisions are in accordance with the law, HUD regulations and Housing Authority policies.

In the following cases, the Housing Authority must give the participant an opportunity for an informal hearing before the Housing Authority terminates HAP for the family under an existing HAP contract:

1. A determination of the family's annual or adjusted income, and the use of the income to compute the housing assistance payment.

2. A determination of the appropriate utility allowance (if any) for tenant-paid utilities from the Housing Authority utility allowance schedule.

3. A determination of the family unit size under the Housing Authority's subsidy standards.

4. A determination that a certificate program family is residing in a unit with a larger number of bedrooms than appropriate for the family unit size under the Housing Authority's subsidy standards, or a Housing Authority determination to deny the family request for a waiver from the standards.

5. A determination to terminate assistance for a participant family because of the family's action or failure to act.

6. A determination to terminate assistance because the participant family has been absent from the assisted unit for longer than the maximum period permitted under Housing Authority policy and HUD rules.

**16.4.2  Notification
        [24 CFR §982.555(c)]**

- When the matter in question is:

  1. The determination of the family's annual or adjusted income or computation of the housing assistance payment;

  2. Appropriate utility allowance (if any) for tenant-paid utilities; or

  3. Family unit size,

  The Housing Authority must notify the family that they may ask for an explanation of the basis of the Housing Authority's determination. The family must also be notified that if the family does not agree with the explanation, the family may request in writing an informal hearing on the decision.

- When the matter in question is:

  1. Certificate family residing in too large a unit, or the Housing Authority's refusal to issue a waiver to subsidy standards;

  2. Termination due to the family's action or failure to act; or

3. Absence from the assisted unit for longer than the maximum period permitted,

The Housing Authority must give the family prompt written notice that the family may request in writing an informal hearing on the decision.

- When the Housing Authority has made a decision to:

1. Terminate HAP on behalf of a participant under an active contract;

2. Refuse to re-issue a voucher; or

3. Refuse to execute a new contract with a program participant,

The family must be given written notice of the opportunity for an informal hearing before the termination of Housing Assistance Payments.

- The notice must:

  - Contain a brief statement of reasons for the decision;

  - Inform the participant regarding his/her right to an informal hearing;

  - Advise the participant that a request for an informal hearing must be in writing;

  - Advise the participant that the Housing Authority must receive the request within 10 calendar days of the date of the letter; and

  - Explain the basic elements of the informal hearing, i.e., right of the participant to present evidence, question witnesses, to have representation, the Housing Authority designated impartial hearing officer a written decision.

### 16.4.3 Prior to Hearing
### [24 CFR §982.555(e)(2)]

Before the informal hearing, the family may request an appointment to examine any documents in the family's portion of the file that are directly relevant to the hearing. The family must be allowed to copy any such document at the family's expense. If the Housing Authority does not make the document in the family's file available for examination on request of the family, the Housing Authority may not use the document at the hearing.

The Housing Authority may also provide information to participants on relevant documents in the possession of other public agencies in order for the participant to contact the agency and obtain a copy of the document. The Housing Authority may then reference the contents of the document at the hearing through witness testimony.

The Housing Authority requires that the family submit any documents that are directly relevant to the hearing either before or at the time of the hearing. The Housing Authority must be allowed to copy any such documents at the Housing Authority's expense. If the family does not make the document available for examination on request of the Housing Authority, the family may not rely on the document at the hearing.

Housing Authority of the County of Los Angeles

During the course of the hearing, if the family offers to submit evidence, the Hearing Officer is not required to, but may exercise the discretion to allow the family to submit a document within a specified period.

### 16.4.4 Hearing Process
**[24 CFR §982.555(d)]**

When a participant family has timely requested a hearing, the Housing Authority will proceed within 15 calendar days of receipt of the request to notify the participant of the date, time and location of the hearing.

➤ There may be one postponement of the hearing date by the participant. A request to reschedule must be requested before the scheduled date and may not extend beyond the proposed termination date.

➤ Any additional postponements may only be for good cause such as, but not limited to hospitalization, illness or injury. Second postponement requests must be supported by verification of the cause.

### 16.4.5 Hearing Officer
**[24 CFR §982.555(e)(4)]**

The Hearing Officer may be either a Housing Authority employee or an outside third party contracted by the Housing Authority. The Hearing Officer must not have made or approved the decision under review nor be a subordinate of the person who made the decision. The Hearing Officer controls the informal hearing and may:

➤ Control the scope and method of direct and cross examination of witnesses;

➤ Control the admission and determine relevancy of offered evidence;

➤ Question witnesses and set time limitations for any portion of the informal hearing process.

➤ May consider evidence without regard to admissibility under the rules of evidence applicable to judicial proceedings.

The Hearing Officer will audio record the hearing and follow the format set forth below.

### 16.4.6 Opening

The Hearing Officer will convene the informal hearing with both parties and their representatives present. (If the participant is represented, the participant will have provided the Housing Authority written authorization for the representative to do so.)

The Hearing Officer will explain the informal hearing procedures, state the purpose of the hearing, and inform the participant that the hearing will be recorded. The Hearing Officer may request clarification or ask questions of either side or witnesses at anytime during the Informal Hearing. Each person present will introduce himself or herself.

**16.4.7  Presentations**

Each side will have an opportunity to present its case and be allowed to present witnesses and submit relevant evidence as determined by the Informal Hearing Officer.  (Witnesses may be cross-examined at this time.)  The Housing Authority begins the hearing by presenting the Notice of Hearing.  The Housing Authority will then present a copy of the original notification to the participant regarding the matter, followed by the evidence, including testimony of witnesses, which supports the allegations in the notification.

**16.4.8  Rebuttals**

Each side will have an opportunity to present rebuttal to the evidence presented.

**16.4.9  Final Summary**

Each side is then allowed to summarize its arguments.

**16.4.10  Conclusion of Hearing**

The Hearing Officer may continue a hearing if additional information from either party is requested. Otherwise, the Hearing Officer will advise each side that the testimony and evidence will be reviewed, a final decision made and a determination letter issued stating the decision and the reasons for the decision within 10 calendar days.  The decision of the Hearing Officer is final.

The Hearing Officer will use the following principles for the Informal Hearings and decisions:

1. Evidence may be considered without regard to admissibility under the rules of evidence applicable to judicial proceedings.

2. Determinations on the matter being reviewed shall be based on the evidence presented at the hearing.

3. If the issues and differences can properly be resolved at the hearing, the Hearing Officer should attempt to resolve them through mutual consent as long as the resolution is not contrary to applicable law, HUD regulations and/or Housing Authority's policies.

4. The purpose of the hearing is to determine if the original decision made in the case is in accordance with the law, HUD regulations and Housing Authority policies.

5. The Hearing Officer may not make a finding contrary to HUD regulations or requirements, contrary to federal, state or local law or exceeding the authority of the Hearing Officer.

**16.5   WHEN AN INFORMAL HEARING IS NOT REQUIRED [24 CFR §982.555(b)]**

The Housing Authority is not required to provide a participant family an opportunity for an informal hearing for the following:

Housing Authority of the County of Los Angeles

1. To review discretionary administrative determinations by the Housing Authority, or to consider general policy issues or class grievances;

2. To review the Housing Authority's determination that a unit does not comply with HQS, **except** when the breach of HQS was determined to be tenant-caused;

3. To review decision by the Housing Authority to exercise or not exercise any remedy against the owner under an outstanding Contract, including the termination of HAP to the owner;

4. To review the Housing Authority's decision not to approve a family's request for an extension or suspension of the term of the voucher;

5. Determination that the unit is not accordance with HQS due to family size;

6. Establishment of the Housing Authority's schedule of utility allowances for families in the program; or

7. A Housing Authority determination not to approve a unit or lease.

**CHAPTER 17:**
**OWNER OR FAMILY DEBTS TO HOUSING AUTHORITY**

17.1   **INTRODUCTION**
        **[24 CFR §982.163 AND §792]**

This chapter describes the Housing Authority's policies and guidelines for the recovery of debts and the use of repayment agreements.   Before a debt is assessed against a family or owner, the file must contain documentation to support the Housing Authority's claim that the debt is owed.  The file must further contain written documentation of the method of calculation, in a clear format for review by the owner or the family, as appropriate.

When families or owners owe money to the Housing Authority, every effort will be made to collect the debt.  A variety of collection tools to recover debts may be used including, but not limited to:

- ➢  Requests for lump sum payments
- ➢  Repayment agreements
- ➢  Abatements
- ➢  Deductions
- ➢  Collection agencies
- ➢  Credit bureaus
- ➢  Civil suits

17.2   **REPAYMENT AGREEMENTS FOR FAMILIES**
        **[24 CFR §792.103]**

A Repayment Agreement as used in this plan is a document entered into between the Housing Authority and the person who owes a debt to the Housing Authority.   The Repayment Agreement contains an acknowledgment by the person of the debt in a specific amount, the terms of repayment, any special provisions of the agreement, and the remedies available to the Housing Authority upon default of the agreement.

If a repayment agreement is to be entered into, the Housing Authority will usually require that the family pay an initial lump sum (in an amount determined by the Housing Authority) with the remaining balance to be paid in equal payments over a period of time not to exceed 12 months for amounts under $2,400 or 24 months for any amount in excess of $2,400.

In determining the initial lump sum, the Housing Authority will consider the total amount owed, the ability of the person to make the remaining payments and the percentage of the total sum owed.  In most cases, the Housing Authority will require a significant initial lump sum as part of entering into a Repayment Agreement to help ensure full payment to the Housing Authority and to reduce the monthly payment.

Housing Authority of the County of Los Angeles

### 17.2.1 Late Payments

A payment will be considered to be in arrears if the payment has not been received by the close of the business day on which the payment was due.

> If the due date is on a weekend or holiday, the due date will be at the close of the next business day.

If the family's repayment agreement is in arrears, the Housing Authority may do one or more of the following:

> Require the family to pay the entire arrearage plus current month's payment in order avoid loss of assistance;

> Require the family to pay the balance in full in order to avoid losing assistance;

> Pursue civil collection of the balance due; or

> Terminate the housing assistance.

### 17.2.2 Requests To Move

If the family requests a move to another unit and has a repayment agreement in place and the repayment agreement is not in arrears, the family will be required to pay the balance in full prior to the issuance of a voucher.

If the family requests a move to another unit and is in arrears on a repayment agreement unless, they pay the balance in full, the request will be denied.

Under special circumstances, the Housing Authority may make an exception and allow a family to move without paying the entire balance of the debt if the family is current with its payments. The Housing Authority may also allow a family who is in arrears to become current in order to process a move if the move is for one of the following reasons:

> HAP contract is terminated due to owner non-compliance

> A natural disaster

> The unit is uninhabitable or has major HQS deficiencies that are not the result of a family action or inaction.

> A life-threatening situation such as the family is a witness to or a victim of a crime and must move for safety reasons. The family will be required to provide proof in such cases.

The Housing Authority may not agree to a repayment agreement if the family already has a Repayment Agreement in place, or if the family has breached previous Repayment Agreements.

### 17.2.3 Guidelines for Repayment Agreements

The Housing Authority, at its sole discretion, will determine on a case-by-case basis whether or not to offer a family a repayment agreement for monies owed to the Housing Authority.

Repayment Agreements will be executed between the Housing Authority and the head of household or other adult family member.

Monthly payments may be decreased in cases of hardship with the prior notice of the family, verification of hardship, and the approval of a Housing Authority Housing Supervisor.

- **Additional Debt Incurred**: If the family has a Repayment Agreement in place and incurs an additional debt to the Housing Authority:
    - The Housing Authority may choose, at its discretion, to agree to more than one Repayment Agreement at a time with the same family.
    - If a Repayment Agreement is in arrears more than 30 calendar days, any new debts must be paid in full.

## 17.3    FAMILY DEBTS OWED FOR CLAIMS

If a family owes money to the Housing Authority for claims paid to an owner:

> The Housing Authority may require the family to repay the amount in full.

> The Housing Authority may agree to a Repayment Agreement.

## 17.4    FAMILY DEBTS DUE TO FRAUD/NON-REPORTING OF INFORMATION [24 CFR §792.103]

**HUD's Definition of Program Fraud and Abuse**: A single act or pattern of actions that constitutes false statement, omission, or concealment of a substantive fact, made with intent to deceive or mislead, and that results in payment of Housing Choice Voucher Program funds in violation of Housing Choice Voucher Program requirements.

### 17.4.1  Family Error/Late Reporting

Families who owe money to the Housing Authority due to the family's failure to report increases in income or change in allowances or deductions will be required to repay in accordance with the guidelines set forth in 17.2 (Repayment Agreements for Families) of this chapter.

### 17.4.2  Program Fraud

At the Housing Authority's discretion, families who owe money to the Housing Authority due to program fraud may be required to repay in accordance with the guidelines set forth in Section 17.2 (Repayment Agreements for Families) of this chapter.

In addition, the case may be referred to the Inspector General and/or the Housing Authority may refer the case for criminal prosecution.

## 17.5    FAMILY DEBTS PAID IN FULL

If the Housing Authority determines not to enter into a Repayment Agreement, or if the Repayment Agreement is breached and the Housing Authority demands payment of the balance in full, the family must pay the full amount due and owing

in one lump sum.  If the family fails to pay, the Housing Authority may pursue collection through a collection agency or a civil action and may notify credit agencies of the debt.  Whether or not the amount is paid, the Housing Authority does not waive its right to take other action including termination of assistance or referral for criminal prosecution in appropriate cases.

**17.6   OWNER DEBTS TO HOUSING AUTHORITY**

If the Housing Authority determines that the owner has retained Housing Assistance or Claim Payments the owner is not entitled to, the Housing Authority may deduct the amounts owed from future Housing Assistance or Claim Payments owed the owner for any units under contract.

If future Housing Assistance or Claim Payments are insufficient to reclaim the amounts owed, Housing Authority may do one or more of the following:

> ➤ Require the owner to pay the amount in full within 30 calendar days;

> ➤ Agree to a repayment agreement with the owner for the amount owed. Repayment period may not exceed 12 months;

> ➤ Pursue collections through the local court system;

> ➤ Pursue collections through a collection agency; or

> ➤ Restrict the owner from future participation.

**17.6.1 Owner Debts Due to Fraud**

If the landlord has been overpaid because of fraud, misrepresentation or violation of the contract, the Housing Authority may terminate the contract and arrange for restitution to the Housing Authority and/or family as appropriate.

The Housing Authority will make every effort to recover any overpayments made as a result of landlord fraud or abuse.  Possible remedies available to the Housing Authority include: recovering monies owed from payments otherwise due to the owner, setting up a repayment agreement, referring the debt to a collection agency, or pursuing the matter in a civil court.  A determination on the course of action to be taken will be based on the nature of the violation and the amount of the money owed.  Generally, if the owner is cooperative, is willing to pay back all monies owed, and all monies will be repaid within 12 months, the Housing Authority will offer the owner a chance to enter into a Repayment Agreement.  However, in cases where the owner knowingly and willfully violated program rules, the Housing Authority may seek full repayment in one lump sum.

**17.7   WRITING OFF DEBTS**

Debts may be written off if:

> ➤ The debtor's whereabouts are unknown and the debt is more than 3 years old.

> ➤ A determination is made that the debtor is judgment proof.

> ➤ The debtor is deceased and has an insufficient estate.

➢ The debtor is confined to an institution indefinitely or for more than 3 years.

➢ The amount is less than $100 and the debtor cannot be located.

Housing Authority of the County of Los Angeles

## CHAPTER 18:
## SPECIAL PROGRAMS

### 18.1  INTRODUCTION

The Housing Authority periodically has the opportunity to apply for targeted funding for special populations.   The Housing Authority often enters into collaborative agreements with other agencies or County departments to qualify for and/or administer these funds. **Special Program policies and procedures are the same as that of the Housing Choice Voucher program except as otherwise noted.  If there is a conflict between program regulations and the Admin Plan, the program regulations have precedence.**

Currently, The Housing Authority's Special Programs Unit administers the following targeted programs:

➢ Family Unification Set-Aside Program (Family UP);

➢ Welfare-to-Work Program (WtW);

➢ Homeless Set-Aside Program;

➢ Shelter Plus Care Program (S+C);

➢ Housing Opportunities for Persons with AIDS Program (HOPWA); and

➢ The Family Self-Sufficiency Program (FSS).

This chapter provides details on the special programs currently administered by the Housing Authority.  This section is divided into two main parts:

➢ Housing Assistance Programs, and

➢ Family Self-Sufficiency Program.

### 18.2  HOUSING ASSISTANCE PROGRAMS

#### 18.2.1 Housing Choice Voucher Programs

- **Housing Choice Voucher Welfare-to-Work Program (WtW) Program**: This program provides assistance to families who are eligible for CalWORKs benefits, are in good standing with the employment/job training program offered by the Los Angeles County Department of Public and Social Services (DPSS) and are in need of housing in order to obtain or retain employment. Eligible families are identified by DPSS and referred to the Housing Authority for rental assistance.  The Housing Authority may also refer eligible families from the Housing Authority waiting list to DPSS for assistance.

#### 18.2.2 Voluntary Set-Aside Programs For Homeless Families

- **Housing Choice Voucher Homeless Set-Aside Program**: This program targets families throughout Los Angeles County.  All eligible families are referred to the Housing Authority by pre-selected service providers.

- **Housing Choice Voucher Long Term Family Self-Sufficiency Homeless Program**: This program targets homeless families who are eligible for

CalWORKs and are employed or have an offer of employment (either subsidized or unsubsidized). Families assisted under this program will have access to a $1,500 Relocation grant to help meet the cost of moving expenses and have access to Housing Counseling Services. Relocation and Housing Counseling Services are funded by the Los Angeles County Department of Public and Social Services (DPSS). This program is currently inactive until funding from the DPSS is secured.

- **Housing Choice Voucher Family Unification (Family UP) Set-Aside Program**: This program provides assistance to families who are in imminent danger of losing or who cannot regain custody of their minor children due to lack of adequate housing. This program is a collaborative effort between the Housing Authority and the Los Angeles Department of Children and Family Services (DCFS). Eligible families are identified by DCFS through their Family Preservation Unit and referred to the Housing Authority for rental assistance. The Housing Authority may also refer eligible families from the Housing Authority waiting list to DCFS.

These programs are funded from the Housing Authority's regular turnover, i.e. vouchers that are vacated throughout the year because families are terminated from the program or voluntarily leave are used to provide assistance to special needs families.

For each set-aside program, the Housing Authority works with pre-selected supportive services providers who will certify that the family meets the specific criteria for the set-aside program and commits to providing on-going supportive services for a minimum of 6 months in order to ensure that the family is able to live independently.

All families admitted into a set-aside program must be referred by an approved supportive service provider and meet all regular admission requirements with the exception of the residency requirement. For the purpose of the set-aside programs, the Housing Authority will not require that a family qualify for a residential preference since most families are homeless and are unable to provide information about their last known permanent address. However, families must agree to reside in the Housing Authority's jurisdiction for the first year of assistance.

### 18.2.3 Non-Housing Choice Voucher Special Programs

- **Shelter Plus Care (S+C) Program**: This program is designed to link rental assistance to supportive services for homeless individuals with disabilities and/or their families. This program primarily provides assistance to those who have been diagnosed with mental illness, chronic substance abuse problems, or AIDS. Assistance is provided for a term of 5 years or for as long as there is a continuum of funding available for this program.

- **Housing Opportunities for Persons with AIDS (HOPWA)**: This program specifically targets individuals and families afflicted by HIV/AIDS. Assistance under this program is provided for one year. After the one-year term, all HOPWA participants in good standing are allowed to transition to the regular Housing Choice Voucher Program. This program is also administered by the

Housing Authority in other cities in addition to the cities currently within the Housing Authority's jurisdiction.

## 18.3    HOUSING ASSISTANCE PROGRAM PROCEDURES

### 18.3.1  Referral Process/Waiting List

The Housing Authority does not maintain a waiting list for the Housing Choice Voucher Special Programs, Housing Choice Voucher Homeless Set-aside Programs, or Non-Housing Choice Voucher Special Programs. Eligible families are identified to apply for these programs by pre-selected service providers, other agencies or County departments are referred to the Housing Authority.

### 18.3.2  Eligibility

Applicants must meet HUD's eligibility requirements for that specific program to qualify for rental assistance. In order to determine final eligibility, the Housing Authority may verify all information submitted by applicants.

For more specific information on eligibility requirements, please see Chapter 2 (Admission Eligibility Factors and Applicant Requirements).

### 18.3.3  Verification Procedures

Since HUD requires that factors of eligibility must be verified, applicants and program participants are required to provide proof of their statements whenever required by the Housing Authority. Some Special Programs may require additional documents when verifying program eligibility. For example:

> **Homeless Condition Form**: Must be provided for all individuals/families referred through the Shelter Plus Care Program, Homeless Set-Aside Program, Homeless with AIDS program, and HOPWA program.

> **Verification of Disability and/or Diagnosis Form**: Must be provided for all individuals claiming a disability, especially a disability that is cited as a qualifying factor for a particular program (i.e. S+C, HOPWA). Written determinations must be made by a psychiatric or medical professional trained to make such determination.

### 18.3.4  Denial of Participation

If a family previously participated in any special program and violated a family obligation and was terminated, the family may be denied future participation.

Families may be denied participation in the program if they owe the Housing Authority or another housing agency money in connection with the Housing Choice Voucher Program or Public Housing assistance.

Families referred by contracted Community-Based Organizations (CBO's), will be sent a denial letter and referred to the CBO if there are any further questions.

### 18.3.5 Criminal Background

Program applicants for all voluntary set-aside programs and Housing Choice Voucher Special Programs will require criminal background checks. Shelter Plus Care applicants will not be required to undergo the criminal background check.

For more specific information on the applicant screening standards used by the Housing Authority when reviewing criminal records, please see Section 2.8 (Screening for Drug Abuse and Other Criminal Activity).

### 18.3.6 Briefing Sessions

Briefing sessions are conducted for all special programs. Families are issued accordingly:

> ➢ Housing Choice Voucher Special Programs and Homeless Set-aside Programs are issued a Housing Choice Voucher.

> ➢ Shelter Plus Care applicants are issued a participation agreement. This participation agreement allows for termination of assistance if any member of the family violates the terms set forth in the participation agreement.

> ➢ HOPWA applicants are issued certificates.

For more specific information on voucher issuance and briefings, please see Chapter 8 (Voucher Issuance and Briefing).

### 18.3.7 Contracts/Tenant Payments

Housing Choice Voucher Special Programs and Homeless Set-Aside Programs are contracted based on the payment standards, and participants may pay up to 40% of their adjusted monthly income.

Non-Housing Choice Voucher Special Programs are contracted based on the Fair Market Rents published by HUD and tenant rental portions are limited to 30% of the participant's adjusted monthly income.

For more specific information on determining total tenant payment, please refer to Chapter 6. For more specific information on the new contract process, request for tenancy approval and contract execution, please refer to Chapter 9.

### 18.3.8 Re-Examinations

The Housing Authority is required to process annual re-examinations. In cases where a family experiences a change in household composition and/or income between annual re-examinations, the Housing Authority will process an interim re-examination. The family is required to report all changes in household composition and/or income to the Housing Authority within 30 calendar days of occurrence.

For more specific information regarding causes for processing annual/interim re-examinations and the requirements for completing annual/interim re-examinations, please refer to Chapter 12 (Re-Examination).

Housing Authority of the County of Los Angeles

**18.3.9 Terminations**

- **Proposed Terminations**: Community Based Organizations and/or other government units or departments currently contracted by the Housing Authority to provide supportive services may request termination of housing assistance for a program participant who is in violation of program requirements and/or conditions of occupancy.

- **Terminations**: Housing assistance may be terminated if a family violates specific program requirements and/or the family obligation. For more specific information on family obligations, please see Chapter 15 (Family Obligations).

**18.3.10 Portability**

All special programs have different requirements for portability. They are listed as follows:

➤ Housing Choice Voucher Special Programs and Housing Choice Voucher Set-aside Programs must live within the Housing Authority's jurisdiction for at least one year before becoming eligible to port out to another housing authority's jurisdiction.

➤ Shelter Plus Care participants have **no portability rights**. They must continue to live within the Housing Authority's jurisdiction for as long as they continue to participate in this program.

➤ HOPWA participants have no portability rights as long as they continue being assisted under this program. However, after 1 year of HOPWA assistance, eligible participants are converted to the regular Housing Choice Voucher program and become eligible to port out to another housing authority's jurisdiction.

For more specific information on allowable moves and eligibility for portability, please refer to Chapter 13 (Allowable Moves/ Portability).

**18.4 FAMILY SELF-SUFFICIENCY PROGRAM [24 CFR §984.101(a)]**

Family Self-Sufficiency promotes the development of local strategies to enable families to achieve economic independence and self-sufficiency. The program is designed to provide supportive services for families who are residents within the Housing Authority's jurisdiction. Supportive services include but are not limited to childcare, education, transportation, counseling, job preparation, vocational training and home ownership workshops.

Upon becoming employed, FSS participants continue to pay rent in accordance with the Housing Authority's housing choice voucher procedures. Whenever the participant's rent increases, the Housing Authority establishes an interest bearing Escrow Account in their name. If the family successfully completes the contract obligations within 5 years, the family can apply to graduate from the program and receive the accrued portion of their escrow account.

New admissions to the Family Self-Sufficiency program will be limited to the level of available funding.

**18.5    FSS APPLICATION PROCESS**

An application is mailed to the applicant and is due back within 10 calendar days from the date it was mailed. If the application is returned undeliverable, the Housing Authority will make one more attempt to contact the applicant by mail. If the second application is returned undeliverable, the file will be documented as such.   Tenants will not be penalized for not participating in the FSS Program since it is a voluntary program for voucher holders with the exception of the Welfare-To-Work (WTW) participants.

The FSS application process for WTW participants is handled in the same manner as stated in the preceding paragraph, however if the participant fails to return the application, the Housing Authority would propose termination on the grounds of non-compliance with program mandate.

Once an application is returned to the FSS office, eligibility is determined. If accepted, a Contract of Participation (CoP) is developed and an Individual Training and Services Plan (ITSP) is created.  Following the CoP and ITSP being executed, participants are referred to an FSS case manager or to a contracted Community-Based Organization (CBO) to administer the case. If the application is not accepted, the tenant will be notified in writing within 5 calendar days.  This applies to housing choice voucher applications only.   All Welfare-To-Work applications are accepted.

**18.5.1  FSS Eligible Families**
        **[24 CFR §984.103]**

FSS eligible families are housing choice voucher holders and/or residents of County Public Housing.

- "FSS family" or "participating family" means a family that receives assistance under Public Housing or the Housing Choice Voucher Program and elects to participate in the FSS Program and whose designated head of FSS family has signed the Contract of Participation.

- "Head of the FSS family" means the adult member of the FSS family who is the head of household for purposes of determining income eligibility and rent.

**18.5.2  Denial of Participation**
        **[24 CFR §984.302]**

If a family previously participated in the FSS Program but did not meet its obligations and was terminated, the family may be denied future participation.

Families may be denied participation in the program if they owe the Housing Authority or another housing agency money in connection with the Housing Choice Voucher Program or Public Housing assistance.

**18.6    FSS CONTRACT OF PARTICIPATION (COP)**
        **[24 CFR §984.303]**

Upon receipt of the application, the Housing Authority will prepare a Contract of Participation within 5 to 10 calendar days.  The contract will contain the effective

date as well as the expiration date. It will execute the resources and supportive service and outline the starting base for determining the escrow account. In addition, the contract will outline the guidelines for administering and disbursing the escrow funds [24 CFR §984.303(b)(1)].

Each family participating in FSS must execute a Contract of Participation with Housing Authority. The effective date of the contract will be the first of the month after the contract is executed. The limited term is 5 years. The contract may be extended in writing and at the family's request, for up to 2 years for good cause [24 CFR §984.303(c)].

The Housing Authority will only grant an extension in rare circumstances that are beyond the control of the family, and which prevent completion of the training and services plan [24 CFR §984.304(d)].

Termination of employment for nonperformance by the FSS head is not justification for a contract extension.

The Housing Authority may extend the CoP to allow families to meet the interim goal of being welfare-free at least 12 consecutive months prior to the expiration of the contract.

During an extension to the contract, the family continues to have FSS amounts credited to the escrow account.

The Housing Authority may set milestones for employment and other activities leading to self-sufficiency early in the 5-year contract term in accordance with the family's abilities.

The family's obligations may terminate before the end of the 5-year contract term, and the family's participation in FSS and entitlement to the escrow may be less than 5 years.

Three items of information must be entered into the contract to be valid:

➢ Gross Annual Income

➢ The amount of earned income in the gross annual income

➢ Family Rent (TTP or 30 percent of Monthly Adjusted Income for vouchers)

The CoP establishes an agreement between the family and the Housing Authority as to the responsibilities of each party. The contract is to be signed by the head of the FSS family, which is the head of household for purposes of determining eligibility. Copies of the documents will be furnished to the head of household.

The CoP may be modified in the following areas, if the Housing Authority and the family mutually agree [24 CFR §984.303(f)]:

➢ Individual Training and Services Plan

➢ The contract term (extension)

➢ Designation of the FSS head of the family in cases where the FSS head is deceased or becomes unassisted

A change in the designated FSS head must be included as an attachment to the Contract.  It must contain the following:

> Name of new designated FSS head

> The signatures of the new FSS head and a Housing Authority representative

> The date signed

### 18.6.1 Compliance With The Lease
### [24 CFR §984.303(b)(3)]

The Contract provides that the family must comply with the assisted lease. Therefore, noncompliance with County Housing Development lease, or the lease with the owner in the Housing Choice Voucher Program, is grounds for termination of the FSS Contract of Participation.

In the Housing Choice Voucher Program, if the violation of the lease is "serious or repeated," the housing authority may also terminate program assistance.

The following representative(s) is/are authorized to execute a contract on behalf of the Housing Authority: Special Programs Administrator, FSS Coordinator, and FSS Program Specialist.

### 18.7   INDIVIDUAL TRAINING AND SERVICE PLAN (ITSP)
### [24 CFR §984.303(b)(2)]

The contract must contain an ITSP for the FSS head of household. Other adult family members who wish to receive services must also have an individual training and services plan to participate in the FSS program. The resources and services to be provided must be contained in the plan. It must contain the milestones, interim goals and final goal for suitable employment.

### 18.7.1 Needs Assessment

The Housing Authority will perform a needs assessment with the family using various needs assessment tools.  Upon completion of the assessment, FSS will be able to establish the milestones, and short- and long-term goals designated for the head of household on the ITSP and any other participating family members with an executed ITSP.

### 18.7.2 The Individual Training and Services Plan (ITSP)
### [24 CFR §984.303]

Each individual FSS contract must contain an ITSP for the FSS head of household and any participating family member.  The items included on the ITSP will include:

> The resources and services to be provided by the Housing Authority and contracted supportive services provider;

> The individual milestones, interim goals and final goal for suitable employment;

Housing Authority of the County of Los Angeles

> Completion dates for each individual interim goals will be included on or before the contract expiration date;

> A mandatory interim goal for families receiving welfare is that all family members must be free of welfare assistance for 12 consecutive months prior to the expiration of the contract (including extensions) [24 CFR §982.306(b)(2)];

> The requirement for the head of the FSS family to seek and maintain suitable employment throughout the term of the contract; and

> Each ITSP plan must be signed by the participant and a Housing Authority representative.

Any changes to the ITSP must be included as a revision to the original plan. The revision may be based on the following reasons: factors keeping the client from effectively becoming suitably employed, lack of supportive services, and unforeseen circumstances/barriers. The revision must include:

> The item changed;

> Signature of the participant and a Housing Authority representative; and

> The date signed.

## 18.8   ESCROW ACCOUNTS
## [24 CFR §984.305]

The general concept of the escrow account is that FSS families continue to pay rent in accordance with their incomes (even as their incomes increase due to employment income).  As a rule, the amount of the increase in earned income is escrowed.  Because there are other factors that affect the family rent, it will not necessarily be dollar for dollar.  The amount escrowed for the family will depend on whether the family is considered a very low- or low-income family.

- **Disbursing the FSS Escrow Account**: The amount in an FSS account, in excess of any amount owed to the Housing Authority by the FSS family, is paid to the head or designated remaining family member of the FSS family [24 CFR §984.305(c)(1)]:

  - When the contract of participation has been completed; and

  - When, at contract completion, the head of the family certifies that no family member receives Federal or state welfare assistance.

- **Interim Disbursement**: The Housing Authority may, at its sole option, disburse a portion of the funds from the family's escrow account during the contract period for contract-related expenses if the family has fulfilled certain interim goals and needs a portion of the FSS account funds for purposes consistent with contract such as [24 CFR §984.305(c)(2)]:

  - School tuition;

  - Business start-up expenses;

  - Car when public transportation is unavailable or inaccessible to the family; or

- Job training expenses.

The family may use the final disbursement of escrow account funds without restriction.

The Housing Authority cannot restrict a family's use of FSS escrow account funds withdrawn by the family unless the funds are withdrawn to aid in the completion of an interim goal.

> If a family receives an advance payment from their escrow account prior to completing the Contract, the advance payment does not have to be repaid to the Housing Authority if the family drops out of the FSS program, unless the payment was due to fraud or misinformation by the family.

If the family moves outside of the Housing Authority's jurisdiction under the Housing Choice Voucher Program portability procedures, the Housing Authority may transfer the balance of the family's FSS escrow account to another public housing agency [24 CFR §984.306(e)].

### 18.8.1  Forfeiting the FSS Escrow Account [24 CFR §984.305(f)]]

Amounts in the FSS escrow account will be forfeited if:

> The Contract of Participation is terminated;

> The Contract of Participation is completed but the family is receiving welfare assistance when the contract expires, including extensions; or

> The head of the family dies and the remaining members of the family choose not to continue participating in the program, and the contract obligations have not been met.

If families do not pay their rent to the owner, the funds may be forfeited because:

> Compliance with the applicable housing choice voucher or Public Housing lease is a family obligation under the Contract, and

> Nonpayment of rent is grounds for terminating a family's FSS participation and forfeiture of the escrow.

In the housing choice voucher program, FSS account funds forfeited by the family will be treated as program receipts for payment of program expenses under the Housing Authority's Housing Choice Voucher Program budget. Escrow funds may be used by the Housing Authority for HUD-approved expenses; such expenses may include rental assistance payments.

In Public Housing, the forfeited account will be credited to the Housing Authority's operating reserves and counted as other income in the calculation of the PFS operating subsidy eligibility for the next budget year.  The escrow funds may be used by the Housing Authority for HUD-approved expenses such as Public Housing maintenance costs.

Housing Authority of the County of Los Angeles

**18.9    CHANGE IN FAMILY COMPOSITION**

If the head of the FSS family no longer resides with other family members in the assisted unit, the remaining family members of the family will have the right to designate another family member to receive the funds.  The Housing Authority must be consulted and must approve this change.

If a family with two adults splits up, the Housing Authority will determine if the escrow should be paid.  The family may be paid if the family member that continues to reside in a Housing Development and/or retains the rental assistance through the Housing Choice Voucher Program:

> ➢ Is already head of the FSS family, or

> ➢ Was not designated as head of the FSS family but now designates himself or herself to receive the escrow account.

**18.10   FSS TERMINATION/CANCELLATION/PORTABILITY
         [24 CFR §984.303(h)]**

The Housing Authority is responsible for determining whether the family has violated the FSS contract and whether the family's rental assistance should be terminated.

**18.10.1   FSS Termination Due To Portability
           [24 CFR §984.306(f)]**

Where the family is relocating and is not absorbed by the receiving housing authority under the portability regulations, and is participating in the receiving housing authority's FSS Program, the Housing Authority must abide by the termination decision of the receiving housing authority.

If a relocating FSS family is unable to fulfill its obligation under the FSS contract, the Housing Authority or the receiving public housing agency, whoever is party to the FSS Contract of Participation may:

> ➢ Terminate the family from the FSS Program and the family's FSS account will be forfeited, and

> ➢ Terminate the family's rental assistance since the family failed to meet its obligations under the FSS contract.  This is applicable to Welfare-to-Work participants only.

If the family's FSS account is forfeited, the funds in the account will revert to the housing authority maintaining the FSS account for the family and will be treated as program receipts.

## CHAPTER 19:
## PRE-PAY/PRESERVATION PROGRAM
## [24 CFR §886]

### 19.1   INTRODUCTION

The Section 8 Pre-Pay/Preservation Program is a transition program designed to preserve the level of affordable housing and avoid the potential displacement of low and moderate-income families when owners of eligible properties pre-pay their HUD-insured mortgage loan or voluntarily terminate their mortgage insured contract.  Families determined eligible for this program are assisted with special Section 8 Vouchers.  **The Preservation Program policies and procedures are the same as that of the Housing Choice Voucher program except as otherwise noted.  If there is a conflict between program regulations and the Admin Plan, the program regulations have precedence.**

### 19.2   TERMS/PROVISIONS

There are two types of housing conversion actions that the property owners can choose: pre-pay or opt-out.

1.  Pre-pay date is the date the owner officially "pays off" their HUD-insured mortgage.   The property is no longer considered a Project-Based or Affordable Development, and the owner is free to increase rents to market levels.  As early as 60 days after this "pre-payment date," the residents are no longer protected by the subsidy or affordable rents.

2.  Opt-out is where owners elect to discontinue the existing contract with HUD and no longer desire to participate in any subsidy program.  In cases when owners pre-pay either their mortgage loan or opt-out of the Section 8 Housing Assistance, federal law requires that owners provide the tenants with a 1-year notification before the expiration of the Section 8 Contract.  The owners are required to give proper notice of intent to pre-pay or opt-out to HUD, a notice of intent to  pre-pay loan to California Housing Partnership Office, the Participant City, the local Housing Authority, and the Legal Aid Foundation.  These notifications must be sent at least 1 year in advance, along with the notice of intent to increase the rent with a minimum of 60-day notice to the tenants of such a rent increase.

### 19.3   Enhanced Housing Choice Vouchers

The residents of the Project-Based program under the HUD Section 8 Contract are eligible to receive an Enhance Housing Choice Voucher if the participant eligibility screening is approved, including the criminal background check requirement.

The Housing Authority issues a family an enhanced voucher based on the number of bedrooms the family qualifies for under the current subsidy standards, not actual size of the unit the family is occupying.  If the bedroom size of the family's unit exceeds the number of bedrooms the family qualifies for under the current subsidy standards the family is *over-housed*.

Housing Authority of the County of Los Angeles

**19.4    Availability of Appropriate Size Units in the Project**

The over-housed family must move to an appropriate size unit in the project if one is available in order to receive enhanced voucher assistance.  The enhanced voucher housing assistance payment calculation is based on the gross rent of the appropriate size unit.

**19.4.1   No Appropriate Size Units Currently Available in the Project**

If there is no appropriate size unit current available for the family in the project, the Housing Authority executes a HAP contract on behalf of the family for the oversized unit, provided the rent is reasonable and the unit complies with all other program requirements such as the housing quality standards.

The enhanced voucher housing subsidy calculation is based on the gross rent for the oversized unit.  The subsidy calculation will continue to be based on the gross rent (including subsequent rent increases) for the oversized unit until an appropriate size unit in the project becomes available for occupancy for the family.

**19.4.2   Actions when Appropriate Size Units Later Become Available in the Project**

The owner must immediately inform the Housing Authority and the family when an appropriate size unit will become available in the project.   When an appropriate size unit becomes available, the family residing in the oversized unit must move to the appropriate size unit within 60 days to continue to receive enhanced voucher assistance. Extensions may be authorized as a reasonable accommodation.  Such matters will be considered on an individual basis and must be supported by verifiable third-party documentation from a qualified professional with direct experience with the individual's disability.

The family and owner will enter into a new lease and the Housing Authority will execute a new HAP contract with the owner for the appropriate size unit.  The enhanced voucher subsidy calculation is based on the gross rent for the appropriate size unit.

If an over-housed enhanced voucher family refuses to move to the appropriate size unit, staff will calculate the family's housing assistance payment (HAP) for the oversized unit based on the current applicable voucher subsidy formula using the applicable payment standard.  The family will be responsible for any amount of the gross rent not covered by the housing assistance payment.

**19.4.3   Decrease in Family Size or Change in Family Composition**

If, as a result of a decrease in family size or change in family composition, an enhanced voucher family later becomes over-housed, the same policy regarding over-housed enhanced voucher families would apply.  The family would continue to receive enhanced voucher assistance in the oversized unit until such time that

an appropriate size unit becomes available for occupancy by the family in the project.

If an over-housed enhanced voucher family refuses to move to the appropriate size unit, staff will calculate the family's housing assistance payment (HAP) for the oversized unit based on the current applicable voucher subsidy formula using the applicable payment standard.  The family will be responsible for any amount of the gross rent not covered by the housing assistance payment.

If there are more over-housed families than the number of available appropriate size units at any given time, the Housing Authority will require families to move to the appropriate size unit according to the date of their initial lease.  If the family is unable to move due to a disability and a reasonable accommodation has been approved, we will move to the next household by date of their initial lease.

Families who choose to vacate, the enhance voucher becomes regular housing choice voucher and the eligibility requirements policy is the same as for screening regular admissions for the Housing Choice Voucher Program.  Families are also eligible for portability and the minimum rent requirement is no longer applicable.

Housing Authority of the County of Los Angeles

## CHAPTER 20:
## MODERATE REHABILITATION PROGRAM [24 CFR §882]

**20.1   INTRODUCTION**

The Moderate Rehabilitation (Mod Rehab) Program was designed in 1978 to be an expansion of the rental certificate program.  The rental certificate program was initially amended to permit moderate levels of rehabilitation to upgrade and preserve the housing stock.  The rental certificate program required a minimum expenditure of $1,500 in repairs to meet the program housing quality standards.

After the work was completed, owners entered into a 15-year Housing Assistance Contract with the local housing authority. Using this 15-year rental certificate contract, the housing authority helped the owner repay the loan by subsidizing the rents of low-income participants at a higher-than-fair market rate. The contract tied rental subsides to the building not the participant. Although funding is no longer available for new participants, the Assisted Housing Division continues to administer existing contracts under this program. **Mod Rehab policies and procedures are the same as those of the Housing Choice Voucher program except as otherwise noted.  If there is a conflict between program regulations and the Admin Plan, the program regulations have precedence.**

**20.2   THE EXPIRED 15-YEAR CONTRACTS**

To date, many of the 15-year contracts have now expired.  HUD has authorized housing authorities to extend expiring Moderate Rehabilitation Contracts under certain conditions.  These conditions are as follows:

> ➤ The project must have five or more units.  If a building has five or more units, but only one of the units is under Moderate Rehabilitation Program then the unit is covered under the contract.  The building still qualifies for an extension because the requirement is tied to the project not the contract.

> ➤ The owner must be in good standing with the current contract. Examples of non-compliance: on-going non-compliance with the Housing Quality Standard inspections.

**20.3   REQUESTING AN EXTENSION**

The Housing Authority closely monitors the expiration dates for all Moderate Rehabilitation contracts and mails the owners a letter asking owners if they would like to request an extension.  Owners need to reply immediately to this letter if they wish to extend another year.  The extension of the contract is a 1-year extension.  HUD has allowed the Housing Authority to continue to extend the "extension" contract for another year. This has been the practice since 1996. However, there is no guarantee that the contracts will continue to be extended in the future.

If an owner does not wish to extend the Mod Rehab Contract for their building, they are under no obligation to extend the contract.   Rules governing the Moderate Rehabilitation program require that the owners give their tenants 1-

year notice in advance of the expiration of the contract and their intent to opt-out of the program.  The families will receive enhanced vouchers and have the right to remain in the units as long as the units are used for rental housing.  If the family chooses to vacate the Mod Rehab unit, then the family will be given a Housing Choice Voucher.

If an owner does not provide a family with the required notice, the family is protected as if they were under an assisted tenancy until 1 year from the time the owner actually provides the notice.  This means that if the owner elects not to renew the contract and the family chooses to remain in the unit as an unassisted tenant, the owner will be required to accept the family portion of the rent as full payment until he/she has complied with the notification requirement.

## 20.4   ANNUAL INCREASE FOR THE EXPIRED 15-YEAR CONTRACTS

The Housing Authority will mail the owner a letter regarding their upcoming expiration date and advise them of their annual increase that may be granted to them providing that they choose to extend their contract.  The owner must respond immediately for an extension so that the Housing Authority can expedite the process to secure funding for the new coming year.

The methodology used to calculate the rent that an owner may be eligible to receive under the renewal contract is different.  To determine the rent under the extension contract the Housing Authority must compare the following three rent analyses:

> Existing contract rents multiplied by the Operating Cost Adjustment Factors (OCAF);

> The Mod Rehab FMR (120% of the existing Fair Market Rents) minus the Utility allowance; and

> Comparable market rents

The rent under the extension contract is based on the lowest of the above three figures.  The Housing Authority will complete this analysis for the building and provide the owner with a copy.

For the participant's re-examination process, see Chapter 12 (Re-Examination). For family obligations, see Chapter 15 (Family Obligations).  These two rulings apply to the Section 8 Certificate Program and the Housing Choice Voucher Program.

## 20.5   NON-EXPIRED MOD REHAB CONTRACTS

For those Mod Rehab contracts that have not reached their 15-year contract, the annual increases may be granted providing:

> The owner submits a proper 60-day notice, prior to the anniversary date, of their rent increase amount to the Housing Authority.

> The new rent increase does not exceed the annual adjustment factor and comparables justify the increase.

> The unit has passed the annual inspection.

For the re-examination process for the participant, see Chapter 12 (Re-Examination).   On family obligations, see Chapter 15 (Family Obligations). These rulings apply to the Section 8 Certificate Program and the Housing Choice Voucher Program.

## 20.6   REQUEST TO MOVE

Since the assistance is attached to the unit and not the participant, a participant wishing to relocate and continue their assistance must relocate to another Mod Rehab Unit. The participant must submit their 30-60 day notice to vacate to their owner and mail a copy to the Housing Authority.  Once the office receives the vacate notice, the Housing Authority will confirm receipt of the notice to vacate by sending the participant a confirmation notice along with a set of income verification forms.  The participant must submit their income verifications forms by the due date on the cover letter.  Upon receipt of the completed income forms, the representative will contact the participant to schedule an appointment for their issuance.  Listings for other vacant Mod Rehab Units may be available.

For those participants who placed themselves on the waiting list for a Housing Choice Voucher and have been contacted by the Applications and Eligibility Department for issuance, the participant must submit their proper 30-60 day notice to their owner and mail a copy to the Housing Authority.

If the participant vacates their unit without the proper 30-60 day written notice to their owner and the Housing Authority, they will be terminated from the program. Keep in mind that under the Mod Rehab program, the owner may file for vacancy loss and if any money is paid on behalf of the participant, they must reimburse the Housing Authority before we can consider any future assistance.

If the owner has submitted a written notice to the participant to vacate their premises, the participant needs to contact their representative immediately.  The representative will advise and direct the participant of their responsibilities.

## 20.7   REFERRALS
### 24 CFR §882.514

When a Mod Rehab unit is ready for new lease inspection, the owner/manager will refer their next applicant off their waiting list to the Mod Rehab unit.  Once the applicant calls the office, the applicant's name and family composition will be requested in order to prepare the income verification packet along with the Criminal Background Check (family members 18 years and older need to sign this form) for the Head of Household to pick-up at the office. The applicant will have 10 calendar days to return the completed income verification forms to the office to determine eligibility.  If the applicant has not submitted all the necessary documents to determine eligibility, a final notice will be mailed out and given a 10 working day due date.  If the final request is not returned by the due date, the owner must refer the next applicant on their waiting list.

The criminal background check is required for family members 18 years and older.  For information on the eligibility process, please see Chapter 2 (Admission Eligibility Factors and Applicant Requirements).

**20.8    NEW LEASE PROCESS**

Once the applicant has been determined eligible for the Mod Rehab program, the Housing Authority will contact the applicant and schedule them for a lease issuance.  Following the issuance of the lease, the Housing Authority will contact the owner/manager to schedule a new lease inspection.  The unit is subject to lead-based paint requirements specified at 24 CFR §882.404(d).  Chapter 10 (Housing Quality Standards and Inspections) contains details on inspections.

Upon passing of the initial inspection, the Housing Authority will contact the owner to confirm the effective date of the new lease and the amount of the security deposit that will be collected.

The Housing Authority will generate a new lease, which will then be mailed to the owner for signatures from the participant and owner.  Upon receipt of the signed lease, the representative will release the HAP payment to the owner.

**20.9    CLAIMS, MOVE-OUT AND CLOSE-OUT INSPECTIONS**

This section applies to Moderate Rehabilitation Program contracts that were effective before October 2, 1995.

**20.9.1  Owner Claims**

Under the Moderate Rehabilitation Program, owners may make a special claim for damages, unpaid rent, and vacancy loss after the tenant has vacated the unit.  Owner claims for payment for unpaid rent, damages, or vacancy loss will be reviewed for accuracy and completeness and compared with records in the file.  The Housing Authority establishes standards by which to evaluate claims, but the burden of proof rests with the owner.

If vacancy loss is claimed, the Housing Authority will ascertain whether the family gave proper notice of its intent to move. The file will also be reviewed to verify owner compliance at the time the contract was terminated.

The Housing Authority will pay properly filed claims to the owner as a function of the contract, but the tenant is ultimately responsible to reimburse the Housing Authority for claims paid to the owner.

**20.9.2  Unpaid Rent**

Unpaid rent only applies to the tenant's portion of rent while the tenant is in residence under the assisted lease and only until the termination date of the HAP contract.

Separate agreements are not considered a tenant obligation under the lease and the Housing Authority will not reimburse the owner for any claims under these agreements.

**20.9.3  Vacancy Loss**
**24 CFR §882.411**

Vacancy loss under the Mod Rehab Program is paid if the move was in violation of the notice requirements in the lease, or the result of an eviction.

In order to claim vacancy loss, the unit must be available for lease and the landlord must:

1. Notify the Housing Authority within 72 hours upon learning of the vacancy, or prospective vacancy, and

2. Pursue all possible activities to fill the vacancy, including, but not limited to:

   - Contacting applicants on the owner's waiting list, if any;

   - Seeking eligible applicants by listing the unit with the Housing Authority;

   - Advertising the availability of the unit; and

   - Not rejecting potentially eligible applicants except for good cause.

In the event that a unit becomes vacant because of death, the Housing Authority will permit the owner to keep the HAP for the month in which the tenant died, but may pay no further HAP.

If the tenant moves after the date given on their notice of intent to vacate, the landlord may claim vacancy loss by providing acceptable documentation that there was a bona fide prospective tenant to whom the unit could have been rented.

### 20.9.4 Damage Claims

To ensure valid claim processing, the Housing Authority should conduct a thorough move-in inspection noting conditions as well as HQS deficiencies, take pictures of questionable items, and send a report of all items to the owner and tenant.

The owner must be present during the move-out inspection and only damages claimed by the owner are reimbursable.

All claims for damages must be supported by the actual bills for materials and labor and a copy of the canceled checks or other receipts documenting payment. Estimates are accepted at the discretion of the Housing Authority depending upon the nature of the work to be done.

Bills from individuals providing labor must include their name, Social Security number, address and phone number. The owner may not bill himself/herself for labor since that is not considered by the Housing Authority to be an "actual cost". However, the actual cost of the owner's employees' labor, such as the resident manager, to make repairs may be included.

Persons making repairs or replacements must be licensed to do business in Los Angeles County.

Reasonableness of costs will be based on the Means Cost Estimating Guide. Reimbursement for replacement of items such as carpets, drapes, or appliances, are based on depreciation schedules in general use by the Housing Authority.

The Housing Authority may require verification of purchase date, quality, and price of replaced items in order to calculate depreciation.

Claims for unpaid utility bills cannot be approved as part of a claim.

Claims for normal wear and tear, previously existing conditions, routine turnover preparation, and cyclical interior painting are not paid.

The Housing Authority will inspect the unit to verify that repairs were made.

### 20.9.5 Move-Out and Close-Out Inspections

Move-out (vacate) inspections are performed for the Mod Rehab Program after the tenant has vacated the unit. These inspections are performed by Program Specialists/Inspectors to assess the condition of the unit, not to evaluate the HQS.

The owner must notify the Housing Authority of the move-out and request an inspection within 5 calendar days of learning of the move-out, or contract termination, whichever is first, in order to submit a claim for damages.

If the contract was terminated due to owner breach, or the owner was in violation of the contract at the time that it was terminated, there will be no entitlement to claims and therefore no inspection.

The owner and tenant will be notified of the date and time of the inspection. If the owner is not present, the move-out inspection will not be rescheduled.

The Housing Authority will conduct a move-out inspection on the tenant's request.

In the event that the Housing Authority is unable to inspect within 10 calendar days, the owner will be permitted to use date-stamped photographs to substantiate the claim.

### 20.9.6 Processing Claims

Any amount owed by the tenant to the owner for unpaid rent or damages will first be deducted from the maximum security deposit that the owner could have collected under the program rules. If the maximum allowable security deposit is insufficient to reimburse the owner for the unpaid tenant rent or other amounts which the family owes under the lease, the owner may request reimbursement from the Housing Authority up to the limits for each program.

If the owner claims vacancy loss, the security deposit that s/he collected or could have collected will be deducted from the vacancy loss claim.

The Housing Authority reviews claims for unpaid rent, damages, or vacancy loss and makes a preliminary determination of amount payable. The family is informed that a claim is pending (notice sent to last known address). The notification will state the preliminarily determined amount, the type of claim, and describe the procedure for contesting the claim.

1. The Housing Authority will offer the family 10 calendar days to contest the claim. If the family disputes the claim, the Housing Authority will schedule an informal meeting/claim review with the owner and tenant in order to resolve the differences.

Housing Authority of the County of Los Angeles

    2. If the tenant fails to attend the meeting, the Housing Authority will proceed with its original determination; the meeting will not be rescheduled unless there are extenuating circumstances.

    3. At the Claim Review, the amount and type of claim will be discussed with the family. If the family agrees with the amount and type of claim, the family may be offered a Repayment Agreement. If the family does not agree to sign a Repayment Agreement, the Housing Authority will process the account for collection.

    4. If the family demonstrates that the claim, or parts of it, is invalid, the Housing Authority will adjust the amount. The Housing Authority may offer the tenant an opportunity for an Informal Hearing regarding the claim if disputes cannot be resolved.

After a determination has been made, the Housing Authority will notify the family in writing of the decision. If it has been determined that the family owes money, the Housing Authority will pursue collection to repay either in a lump sum or through a payment agreement. The notice will warn the family that their assistance may be terminated and they may be denied future participation in the program if they do not reimburse the Housing Authority as required.

### 20.9.7 Other Requirements for Claims Processing

- The Housing Authority will require proof that the owner has complied with State and local laws applicable to security deposits before making payment on any claim.

- All notices to tenants during the processing of a claim must include proof of mailing or of personal delivery.

- Costs of filing eviction to remove the tenant or any other legal fees, shall not be reimbursed.

- No claims will be paid for a unit that is vacant as the result of the landlord voluntarily moving a family to another unit owned by the same landlord or as a result of a mutual rescission between the landlord and tenant family.

All unpaid rent, damage, and vacancy loss claim forms must be fully complete when they are submitted, and they must be submitted within 30 calendar days of the date the owner learned of the move-out.

## CHAPTER 21:
## PROJECT-BASED VOUCHERS

### 21.1 INTRODUCTION
### [24CFR983. 5]

The Project-Based Voucher (PBV) program is administered by Public Housing Authorities who also administer the tenant-based Housing Choice Voucher program, or Section 8. PBV is assistance that is tied directly to a unit in an approved project, unlike HCV, where assistance is tied to the participant. The policies regarding the Housing Choice Voucher program apply to the PBV program, except where they are specifically altered in this chapter.

In administering the Project-Based Voucher program, the goals of this Housing Authority are to:

> ➤ Attract more affordable developments to the Housing Authority's jurisdiction;

> ➤ Preserve affordable units that might otherwise become market-rate units;

> ➤ Increase affordability of housing for families making below 30% of the area median income; and

> ➤ Further HUD and Housing Authority goals of deconcentration.

The Housing Authority may enter into contracts for Project-Based Vouchers based on the policies outlined in this chapter.

### 21.2 LEVEL OF ASSISTANCE
### [24CFR983.6]

The Housing Authority will appropriate no more than 20% of the Section 8 budget authority for Project-Based Vouchers.

### 21.3 OWNER PROPOSAL SELECTION PROCEDURE
### [24CFR983.51]

The Housing Authority may use one of the following methods to select owner proposals:

1. Request for Proposal (RFP): The Housing Authority may issue a competitive request for PBV proposals. An RFP may not be limited to a single site and may not impose restrictions that practically preclude owner submission of proposals for PBV on different sites.

   The Housing Authority will publish an RFP in at least one newspaper of general circulation, as well as post the RFP on the Housing Authority website. The submission deadline will be included in the RFP and a detailed application and selection criteria will be provided to all interested parties.

2. At the discretion of the Housing Authority, projects may be selected for PBV assistance using proposals for housing developed using federal, state, or local government housing assistance, community development,

or a supportive services program that requires competitive selection of proposals (e.g., HOME, competitively-awarded Low-Income Housing Tax Credit, City of Industry Funds), where the proposal has already been selected in accordance with such program's competitive selection requirements within three years of the Housing Authority's PBV selection date, and the earlier selection proposal did not involve any consideration that the project would receive Housing Authority PBV assistance.

**21.3.1** **Selection Criteria**
**[24CFR983.57]**

The following criteria will be considered when evaluating proposals for Project-Based Voucher assistance:

1. Housing that serves homeless families;

2. Housing that serves disabled families or individuals;

3. Housing that serves elderly families or individuals;

4. Housing that serves families with children, consistent with the needs indicated by HACoLA's waiting list; and/or

5. Other documented needs

6. Housing that promotes deconcentration by:

   ➢ Being located in a census tract where the poverty rate is 20% or less, or if the poverty rate is greater than 20%, if the overall poverty rate has declined over the past five years;

   ➢ Serving very low-income families in mixed-income projects;

   ➢ Other appropriate criteria consistent with regulation.

7. Housing that provides an appropriate level of supportive services to residents;

8. Housing that serves low- to extremely low-income families for the life of the project;

9. Other criteria consistent with regulation.

**21.3.2** **Requirements For Rehabilitated and Newly Constructed Housing**
**[24CFR983.151]**

The following policies do not apply to existing housing. If a project is selected under the rehabilitated or newly constructed category, it cannot be selected under existing housing.

**21.3.3** **Agreement to Enter Into the HAP Contract**
**[24CFR 983.152]**

If a rehabilitated or newly constructed project, as defined by regulation, is selected by the Housing Authority to receive Project-Based Vouchers, the Housing Authority will enter into an Agreement with the owner in the form required by HUD.

In the Agreement the owner agrees to develop the contract units to comply with HQS, and the Housing Authority agrees that, upon timely completion of the development in accordance with the terms of the Agreement, the Housing Authority will enter into a HAP contract with the owner for the contract units.

### 21.3.4  Subsidy Layering Review (SLR)
### [24CFR983.55]

The Housing Authority may only provide assistance in accordance with HUD subsidy layering regulations and other requirements.

When a project has received any form of governmental housing assistance other than the PBV assistance, HUD must first conduct a subsidy layering review to determine if the project is in accordance with regulations before any agreement or contract is executed between the Housing Authority and the owner.

Once HUD has reviewed and approved, the owner must certify in the HAP contract that the project has not received and will not receive any other form of public assistance during the life of the HAP contract other than that disclosed in the subsidy layering review.

### 21.3.5  Housing Authority – Owned Units
### [24CFR983.59]

Units where a direct or indirect interest is held by any officer or employee of the Housing Authority are considered Housing Authority – owned units.  Project-based vouchers may not be used for public housing units.

Selection of a project owned by the Housing Authority must be consistent with the process outlined in section 21.3 of this chapter.

Rent to owner must be determined in accordance with the same requirements for other units, except that the initial contract rent must be determined by an independent entity, approved by HUD, based on an appraisal by a licensed, state-certified appraiser.

A HUD-approved, independent entity must also perform all HQS inspections as required by regulation.

### 21.4  HOUSING ELIGIBLE FOR ASSISTANCE
### [24CFR983.52]

The Housing Authority will consider proposals for existing and newly constructed and rehabilitated housing.

The following types of housing are ineligible under the Project-Based Voucher Program:

> ➢  Shared housing;

> ➢  Units on the grounds of a penal, reformatory, medical, mental, or similar public or private institution;

> ➢  Facilities providing continuous medical or related care, except an assisted-living facility that provides home health care services;

- 177 -

Housing Authority of the County of Los Angeles

> ➢ Units owned by an educational institution that are designated for occupancy by students of the institution;
> ➢ Manufactured homes;
> ➢ Cooperative housing;
> ➢ High-rise elevator project for families with children
> ➢ Transitional housing;
> ➢ Units occupied by owners; and
> ➢ Units occupied by ineligible families.

**21.5  LIMITS ON ASSISTANCE
[24CFR983.56]**

The Housing Authority may only provide Project-Based Voucher assistance to up to 25% of the units in a selected development.

Units excepted from this rule are:

> ➢ Units that house elderly or disabled families; and
> ➢ Families receiving qualified supportive services.

More than 25% of the units in a single-family building (a building with no more than 4 dwelling units) may be assisted with PBV.

**21.5.1  Qualified Supportive Services**

Units occupied by families receiving qualified supportive services are excepted from the 25% cap on PBV assistance within a single development.  Examples of supportive services that qualify for an exception include, but are not limited to:

> ➢ Family Self-Sufficiency (FSS) program;
> ➢ Welfare-to-Work
> ➢ Psychological or medical services
> ➢ Drug or alcohol rehabilitative treatment
> ➢ Job training or placement services
> ➢ Education program where there is a reasonable expectation of leading to self-sufficiency

**21.5.2  Qualifications for Supportive Services**

It is not necessary that the supportive services be provided at or by the project.

At least one member of the family must be receiving the supportive service for the unit to remain excepted from the 25% cap.

Participation in medical- or disability-related services is not required as a condition of living in an excepted unit, other than a drug and alcohol treatment program for current abusers, although such services may be offered.

### 21.5.3 Supportive Services Monitoring

Participant compliance with a supportive service contract will be monitored at least annually.  The Housing Authority will request a status update for the participant's supportive service contract at the anniversary of said contract.  The Housing Authority may request a status update on the supportive service contract more frequently, at its discretion.

Providers of supportive services must provide the Housing Authority any changes to the program within thirty days of when those changes occur.  Providers must also immediately report to the Housing Authority when a family fails to meet the supportive service contract requirements.

### 21.5.4 Failure to Meet Supportive Service Requirements

When a family living in an excepted unit fails to meet the requirements of a supportive service contract, and is living in the excepted unit because of the supportive services received, the Housing Authority will propose termination of the contract.  The family will not be issued a voucher to move.

The owner and participant will be given a sixty-day notice of the proposed termination of the HAP contract.  The owner may at that time terminate the lease and issue an order to vacate by the HAP contract termination date.

If a family fails to meet the requirements of the supportive service contract for good cause, as determined by the Housing Authority, and is qualified to become reinstated in the supportive service program within a reasonable time period, the Housing Authority may counsel the family on its obligations and allow reinstatement of the supportive service contract.

### 21.6    SELECTION OF PARTICIPANTS [24CFR983.251]

The Housing Authority will only provide PBV assistance to families determined eligible, consistent with Chapter Four of this Plan.

### 21.6.1 Waiting List

The Housing Authority will use a separate waiting list to administer the Project-Based Voucher program.  All applicants currently on the tenant-based assistance waiting list will be given an opportunity to place their name on the PBV waiting list, with their original date and time intact.  New applicants will be given the opportunity to place their name on both the tenant-based waiting list and the PBV waiting list.

### 21.6.2 Protection of In-Place Families

Families already residing in units to be placed under contract will be given the opportunity to place their name on the PBV waiting list.  If the family is determined eligible for the PBV program after they have been placed on the waiting list, an absolute preference will be given that family, who will then be referred to the owner for an appropriately-sized unit in the project.  This protection does not apply to families who do not meet eligibility criteria on the proposal selection date.

Case 2:21-cv-08826-AB-AFM  Document 1  Filed 11/09/21  Page 440 of 600  Page ID #:440

Housing Authority of the County of Los Angeles

### 21.6.3 Local Preferences

Applicants on the PBV waiting list are subject to the system of local preferences as outlined in Chapter Four of this Plan.

Disabled families who need the services offered at a particular project may be awarded first preference from the waiting list. This preference is limited to families or individuals who meet the following criteria:

> ➢ Has a disability that significantly interferes with the ability to obtain and maintain themselves in housing;

> ➢ Will not be able to obtain or maintain themselves in housing without appropriate supportive services;

> ➢ For whom such services cannot be provided in a nonsegregated setting.

Disabled families may not be required to accept the supportive services offered nor can a preference be granted for those with a particular disability.

### 21.6.4 Refusal of Assistance

If a family refuses an offer of PBV assistance, the Housing Authority may remove the family from the PBV waiting list. Such refusal will not affect the family's position on the waiting list for tenant-based assistance nor affect any admissions preference for which the family qualifies.

If an owner rejects a family for admission to the owner's PBV units, such rejection will not affect the family's position on the tenant-based waiting list and the family will be returned to their position on the PBV waiting list. If a family is rejected three times by PBV owners, the Housing Authority may remove the family from the PBV waiting list.

### 21.7  INFORMATION FOR ACCEPTED FAMILIES
### [24CFR983.252]

When a family accepts an offer of Project-based assistance, the Housing Authority will provide the family an oral briefing. Attendance at this briefing is mandatory. The briefing will include:

> ➢ A description of how the program works;

> ➢ Family and owner responsibilities.

A briefing packet will be provided, with information regarding:

1. How the Housing Authority determines total tenant payment;

2. Family obligations; and

3. Applicable fair housing information.

- 180 -

**21.8   LEASING OF CONTRACT UNITS**
        **[24CFR983.253]**

Owners must lease contract units only to eligible families, selected and referred by the Housing Authority from the waiting list, during the term of the HAP contract.

Owners must develop written tenant selection procedures consistent with the purpose of improving housing opportunities for very low-income families, related to program eligibility and an applicant's ability to perform lease obligations.

An owner must promptly notify, in writing, any rejected applicant of the grounds for rejection.

Owners must follow the Housing Authority's subsidy standards when leasing units to referred families.

**21.9   VACANCIES**
        **[24CFR983.254]**

The owner must promptly notify the Housing Authority of any current or expected vacancy in a contract unit.   After owner notice, the Housing Authority will promptly refer a sufficient number of families to the owner to fill the vacancy.

If any contract unit has been vacant for at least 120 days since the owner notice of vacancy, the Housing Authority may give notice to the owner amending the HAP contract to reduce the number of contract units by the number of units that have been vacant for that period.

**21.10  TENANT SCREENING**
        **[24CFR983.255]**

The Housing Authority may take into consideration any admission criteria outlined in Chapter Two of this Plan in order to screen applicants for eligibility; however, it is the responsibility of the owner to screen applicants for behavior and suitability for tenancy.

The Housing Authority will provide the owner with the tenant's current and former address, as well as the name and address of the current and/or former landlord, if known.  This policy is consistent with information provided to owners under the Housing Choice Voucher program.

**21.11  HOUSING ASSISTANCE PAYMENTS CONTRACT**

The Housing Authority must enter into a Housing Assistance Payments (HAP) contract with the owner in order to provide housing assistance payments for eligible families.  The Housing Authority will make housing assistance payments to the owner in accordance with the HAP contract, for contract units leased and occupied by eligible families during the term of the HAP contract.

**21.11.1  HAP Contract Information**

The HAP contract must specify:

1.  The total number of contract units by number of bedrooms;

Housing Authority of the County of Los Angeles

2. Project name and full address, including the block and lot number, if known;

3. Information to identify the specific contract units, including;

   ❑ Number of units in each building;

   ❑ Location of each contract unit;

   ❑ Area of each contract unit; and

   ❑ Number of bedrooms and bathrooms in each unit.

4. Services, maintenance and equipment to be supplied by owner without additional charge;

5. Utilities available to the contract unit, specifying which utilities are paid by owner and which are paid by tenant;

6. Assurance of nondiscrimination;

7. The HAP contract term;

8. The number of excepted units (exceed the 25% per building cap) that will be set aside for occupancy by qualifying families;

9. The initial rent to owner.

10. For newly constructed or rehabilitated units, the owner's certification of the units' completion in accordance with the Agreement.

### 21.11.2  Execution of the HAP Contract
### [24CFR983.204, 24CFR983.209]

Before the HAP contract may be executed, the Housing Authority will inspect each contract unit in accordance with section 21.12 of this chapter and Chapter Ten of this Plan.

For existing housing, the HAP contract must be executed promptly after selection of the owner proposal and inspection.

For new construction or rehabilitated housing, the HAP contract is executed after the Housing Authority has inspected the completed units and is satisfied that said units are completed in accordance with the Agreement and the owner has furnished required evidence of completion.

By execution of the HAP contract, the owner certifies:

➢ The owner is and will maintain all contract units in accordance with HQS;

➢ The owner is providing all services, maintenance, equipment and utilities as agreed to under the HAP contract and in the leases with assisted families;

➢ Each contract unit is leased to an eligible family and the lease complies with the HAP contract and HUD requirements;

➢ Members of the assisted family reside in the contract unit and it is their only residence;

➢ The owner is not a relative of any member of the assisted family by blood or operation of law;

➢ The amount of the housing assistance payment is the correct amount due under the HAP contract;

➢ The rent to owner for each contract unit does not exceed the rent due to owner for any comparable, unassisted unit;

➢ The owner will not receive any other payments beyond the tenant rent and housing assistance payments for the contract unit; and

➢ The family does not own or have any interest in the contract unit.

### 21.11.3  Term of the HAP Contract
#### [24CFR983.205]

The Housing Authority may enter into a HAP contract with an owner for an initial term of not less than one year and not more than ten years for each contract unit.

Within one year of the expiration of the HAP contract, the Housing Authority may extend the term of the HAP contract up to five additional years.

The HAP contract may be terminated by the Housing Authority for insufficient funds.  If it is determined there are insufficient funds available to continue to assist all contract units for the full term, the Housing Authority may give notice to the owner for all or any of the contract units, in accordance with HUD instructions.

### 21.11.4  Amendments to the HAP Contract
#### [24CFR983.206]

**Amendment to Substitute Contract Units** – The Housing Authority may amend the HAP contract to substitute a different unit with the same number of bedrooms in the same building for the previously assisted unit.  Prior to the substitution, the Housing Authority will inspect the proposed substitution unit and determine reasonable rent.

**Amendment to Add Contract Units** – At the discretion of the Housing Authority and provided the number of PBV-assisted units in a building will not exceed the 25% cap or the 20% budget authority, a HAP contract may be amended during the three-year period immediately following the execution date of the HAP contract to add additional PBV units to a building.   The anniversary and expiration date for the added units will be the same as for the existing units under the HAP contract.

### 21.12  INSPECTIONS
#### [24CFR983.103]

HQS inspections will be conducted in accordance with Chapter Ten of this Plan.  The Housing Authority may not perform inspections on units where there is a direct or indirect interest by any of its employees or officers.

The Housing Authority will inspect PBV units at the following times:

1. Pre-selection – the Housing Authority will inspect the proposed site before the proposal selection date.  For existing units, units must substantially

comply with HQS before the proposal selection date.  Units must fully comply before the HAP contract may be executed;

2.  Pre-HAP contract;

3.  Turnover – the Housing Authority must inspect a unit before a new family moves in.  The unit must fully comply with HQS before a family may receive assistance in that unit;

4.  Annual – The Housing Authority will conduct inspections on a random sample of at least 20% of contract units in a building annually.  Turnover inspections are not counted toward annual inspections.

   If more than 20% of the annual sample fail the HQS inspections, 100% of the contract units in the building must be inspected.

5.  Other times – the Housing Authority will inspect PBV units at other times as necessary to insure the contract units are in compliance with HQS and that the owner is providing utilities, maintenance and other services in accordance with the HAP contract.

### 21.12.1  HQS Violation
### [24CFR983.207]

The Housing Authority may make no HAP payments to the owner during any period in which the contract unit does not comply with HQS or any other HAP contract requirement.

Remedies for HQS violation include abatement or reduction in HAP payments, reduction of contract units, and termination of the HAP contract.

### 21.13  LEASE
### [24CFR983.256]

Owners must use the same lease for contract units as for unassisted units, with the lease being in accordance with state law.

The lease must include the HUD tenancy addendum.  All provisions in the tenancy addendum must be included in the lease.  Provisions in the addendum shall prevail over provisions in the lease.

The initial term of the lease must be for at least one year.

The lease must specify:

➢  Names of the owner and tenant;

➢  Identifying information of the unit rented;

➢  Term of the lease and any provision for renewal;

➢  The amount of tenant rent to owner;

➢  Specification of services, maintenance, equipment, and utilities to be provided by the owner;

➢  The amount of any charges for food, furniture, or supportive services.

### 21.13.1  Changes in the Lease

If the tenant and owner agree to any changes in the lease, the change must be in writing and must be submitted to the Housing Authority immediately.

The owner must notify the Housing Authority of any proposed change in the lease regarding responsibility for utilities.  Such changes may only be made with approval of the Housing Authority.  If the Housing Authority approves a change in responsibilities for utilities, rent reasonableness must then be redetermined, which will then be used in calculation of rent to owner from the effective date of the change.

### 21.13.2  Absence from the Unit

The Housing Authority's absence policies found in Chapter Six of this Plan will apply to the PBV program.  The lease may specify a maximum period of family absence from the unit that is shorter than that specified by the Housing Authority.

The HAP contract will not be terminated if the family is absent for longer than the maximum period permitted by the Housing Authority.

### 21.13.3  Owner Termination of Tenancy and Eviction

Grounds for owner termination and eviction are the same as outlined in Chapter Fourteen of this Plan, except that an owner may not terminate tenancy after the initial term of the lease for business or economic reasons, or to repossess the unit for personal, family, or nonresidential use.

If an owner refuses to renew the lease without good cause, the family will be issued a tenant-based voucher and the unit will be removed from the HAP contract.

### 21.13.4  Security Deposits
#### [24CFR983.258]

The owner may collect a security deposit from the tenant.  The amount may not exceed that allowed by state and local law or that charged to unassisted units in the same building.

When the tenant moves out, the owner may use the amount of the deposit, in accordance with the lease and state and local law, as reimbursement for any unpaid tenant rent, damage to the unit, or any other amount the tenant owes under the lease.

The owner must give the tenant a written list of all items charged against the security deposit and the amount of each item.  After deducting the amount used to reimburse the owner, the owner must promptly refund the full amount of the balance to the tenant.

If the balance is not sufficient to cover amounts the tenant may owe under the lease, the owner may seek the remainder from the tenant.  The Housing Authority has no liability or responsibility for payment of any amount owed by the family to the owner.

## 21.14  FAMILY OCCUPANCY OF WRONG-SIZE OR ACCESSIBLE UNIT [24CFR983.259]

If the Housing Authority determines that a family is occupying the wrong-size unit, or a unit with accessibility features the family does not require, and is needed by a family that requires the accessibility features, the Housing Authority will offer the family continued assistance in another unit and will notify the family and owner immediately of its offer of continued assistance and determination.

The Housing Authority may offer continued assistance either in another PBV unit or a tenant-based voucher.  If appropriate, the Housing Authority may refer the family to an available public housing unit or other public or private tenant-based assistance (e.g. HOME).

If the family is given a tenant-based voucher, policies under the Housing Choice Voucher program regarding voucher issuance and expiration will apply.  If a family fails to lease a unit with the tenant-based voucher, assistance will be terminated upon expiration of the voucher (and any subsequent extensions granted by the Housing Authority)

Upon determination that the family is occupying a wrong-size unit or an accessible unit that is not required, and continued assistance is offered in the form of a Project-Based voucher, the family will have ninety days in which to move to another unit.  If the family fails to move or refuses the offer of continued assistance in another unit, assistance to the family will be terminated.

## 21.15  DETERMINING RENT TO OWNER [24CFR983.301]

The amount of estimated rent to owner must be included in the Agreement for rehabilitated or newly constructed housing.  The actual rent to owner must be determined at the beginning of the HAP contract term for all types of housing.

The amount of rent to owner is redetermined at the owner's request for a rent increase and when there is a 5% or greater decrease in the published FMR.

Except for certain tax credit units specified below, the amount of rent to owner must not exceed the lowest of:

> ➢ An amount determined by the PHA that does not exceed 110% of the FMR (or any exception payment standard approved by HUD), minus the utility allowance;

> ➢ The reasonable rent; or

> ➢ The rent requested by the owner.

### 21.15.1  Rent to Owner for Certain Tax Credit Units

Rent to owner must be determined differently if the unit receives low-income housing tax credits under the Internal Revenue Code of 1986 and:

1. Is not located in a qualified census tract; and

2. Is located in the same building as comparable tax credit units of the same bedroom size that do not receive any other form of rental assistance; and

3. The tax credit rent exceeds fair market rental or any exception payment standard.

In the case that the unit meets all of the above stated criteria, rent to owner must not exceed the lowest of:

> ➤ The tax credit rent (comparable tax credit units in the same building that do not receive any other form of rental assistance), minus the utility allowance;

> ➤ The reasonable rent; or

> ➤ The rent requested by owner.

When determining the initial rent to owner, the Housing Authority will use the most recently published FMR and utility allowance in effect at the execution of the HAP contract. However, at its discretion, the Housing Authority may use the amounts in effect at any time during the 30-day period immediately before the beginning date of the HAP contract.

### 21.15.2  Housing Authority – Owned Units

For any units in which any officer or employee has a direct or indirect interest, the initial determination of rent to owner and the annual redetermination of rent to owner will be made by an independent entity, approved by HUD.

### 21.15.3  Redetermination of Rent to Owner
### [24CFR983.302]

The Housing Authority will only redetermine rent to the owner when the owner requests an increase at the annual anniversary of the HAP contract or when there is at least a 5% decrease in the published FMR. Notice of rent increase and other limitations on rent adjustments must conform to the above stated policies and section 11.3.3 of this Plan.

If there is a decrease in rent due to a 5% or greater decrease in the published FMR, the rent to owner must be decreased, whether or not the owner requested a rent adjustment.

The notice of rent adjustment from the Housing Authority constitutes an amendment of rent to owner specified in the HAP contract.

Rent reasonableness will be determined by a HUD-approved, independent entity for units owned by the Housing Authority. The entity will provide a copy of the determination to the Housing Authority and the HUD Los Angeles field office.

### 21.15.4  Rent Determination for Projects with Other Subsidies
### [24CFR983.304]

Rents may not exceed rent limits as established by the applicable federal program for units subsidized under the following programs:

1. HOME;

2. Insured or non-insured Section 236 project;

Housing Authority of the County of Los Angeles

    3.  Formerly insured or non-insured Section 236 project that continues to receive Interest Reduction Payment following a decoupling action;

    4.  Section 221(d)(3) below market interest rate (BMIR) project;

    5.  Section 515 project of the Rural Housing Service;

    6.  A project receiving Low-Income Housing Tax Credits;

    7.  Any other type of federally subsidized project specified by HUD.

The Housing Authority may, at its discretion; reduce the initial amount of rent to the owner because of other governmental subsidies.

### 21.15.5  Rent Control and Other Rent Limitations
#### [24CFR983.305]

Rent control and other rent limitations under local, state or federal law will apply.

### 21.16  PAYMENT TO OWNER
#### [24CFR983.351]

The Housing Authority will make HAP payments to the owner in accordance with the HAP contract for the months in which the contracted unit is leased to and occupied by an eligible family.   Except for discretionary vacancy payments described in section 21.16.1 of this chapter, the Housing Authority will not make any payments for any month after the month in which the family moves out of the unit.  In order to continue receiving HAP payments, the owner must comply with all provisions of the HAP contract, including HQS.

### 21.16.1  Vacancy Payments
#### [24CFR983.352]

If a family moves out of a contract unit, the owner may keep the payment for the full calendar month in which the family moves out.  The owner may not keep the payment if the Housing Authority determines that the vacancy is the owner's fault.

The Housing Authority may provide for vacancy payments to the owner not to exceed two months following move out.  The vacancy payment may not exceed the amount of monthly rent under the assisted lease, minus any rent received by the owner, including any available amount from the tenant's security deposit.

Vacancy payments may only cover periods the unit is actually vacant.

The Housing Authority will only make vacancy payments to the owner if:

    ➢  The owner gives prompt, written notice to the Housing Authority certifying that the family vacated the unit, including the date the family moved out, and certifies:

        o  The vacancy is not the fault of the owner and the unit was vacant during the period claimed;

        o  The owner has taken every reasonable step to minimize the likelihood and length of the vacancy.

The owner must then submit a form requesting vacancy payments and provide the amount of the tenant's security deposit with any amount available to reimburse unpaid rent. The form must be accompany receipts substantiating any damages the owner claims from the security deposit. The owner must certify on this form that no other payments were received for the unit during the period vacancy claimed.

### 21.16.2  Other Charges and Fees
###         [24CFR983.354]

The owner may not require the family to pay charges for any meals or supportive services unless the project is an assisted living development, in which case owners may charge tenants, family members, or both for meals and supportive services. These charges may not be included in the rent to owner and may not be used to calculate rent reasonableness. Nonpayment of such charges is grounds for termination under the lease only in an assisted living development.

The owner may not charge tenants or family members extra amounts for items customarily included in the rent in Los Angeles County, or provided at no additional cost for unsubsidized tenants in the premises.

Housing Authority of the County of Los Angeles

## CHAPTER 22:

## LIMITED ENGLISH PROFICIENCY

### 22.1   INTRODUCTION

In accordance with Executive Order 13166, the Housing Authority will provide meaningful access to its programs and activities by persons with Limited English Proficiency (LEP).   This chapter describes how the Housing Authority will undertake reasonable efforts to provide or arrange free language assistance for LEP beneficiaries or potential beneficiaries of the Housing Choice Voucher program and all other programs administered by the Housing Authority.

### 22.2   MEANINGFUL ACCESS; FOUR-FACTOR ANALYSIS

Meaningful access is free language assistance in accordance with federal guidelines.  The Housing Authority will annually assess and update the following four-factor analysis:

1.  The number or proportion of LEP persons eligible to be served or likely to be served by the Housing Authority.
2.  The frequency with which with LEP persons using a particular language come into contact with the Housing Authority.
3.  The nature and importance of the Housing Authority program, activity or service to the person's life.
4.  The Housing Authority's resources and the cost of providing meaningful access.

### 22.3   LANGUAGE ASSISTANCE

A person who does not speak English as their primary language AND who has a limited ability to read, write, speak or understand English may be a Limited English Proficient (LEP) person and may be entitled to language assistance with respect to the programs and activities of the Housing Authority.

Language assistance includes interpretation, which means oral or spoken transfer of a message from one language into another language; and/or translation, which means the written transfer of a message from one language into another language.  The Housing Authority will determine when interpretation and/or translation services are needed and are reasonable based upon the four-factor analysis.

Housing Authority staff will take reasonable steps to provide language assistance to LEP applicants and participants who have difficulty communicating in English. The Housing Authority will provide the language assistance in the LEP individual's preferred language upon request.

The Housing Authority will periodically assess the necessity for language assistance based on the frequency of requests for interpreters and/or translation, as well as the literacy skills of applicants and participants.

## 22.4    TRANSLATION OF DOCUMENTS

The Housing Authority will consider the following factors in determining whether a document requires translation:

    a.  The document meets the threshold of a "vital document". Per the HUD guidance, "vital documents" are those that are critical for ensuring meaningful access by beneficiaries or potential beneficiaries generally and LEP persons specifically.

    b.  The costs and benefits of translating documents for potential LEP groups, the barriers to meaningful translation or interpretation of technical housing information, the likelihood of frequent changes in documents, the existence of multiple dialects within a single language group, the literacy rate in an LEP group and other relevant factors. The Housing Authority will undertake this examination when an eligible LEP group constitutes 5 percent of an eligible group of beneficiaries or potential beneficiaries (for example, 5 percent of households receiving Section 8 assistance) or 1,000 persons, whichever is less.

In consideration of the above, the Housing Authority will begin to identify all vital documents that need to be translated. The Housing Authority will then translate a portion of those documents identified every year as financially feasible.

As opportunities arise, the Housing Authority may work with other local public housing authorities (PHAs) to share the costs of translating common documents.

As HUD continues to translate standard housing documents in multiple languages, the Housing Authority will replace its translated versions with the official HUD versions.

The Housing Authority will consider technological aids such as Internet-based translation services, which may provide helpful, although perhaps not authoritative, translations of written materials.

### 22.4.1  Audiovisual Materials

The Housing Authority will make reasonable efforts to produce multiple translations of audiovisual materials it may use to inform or educate applicants, participants and other client groups.  For example, the Housing Authority provides interpreters at Resident Advisory Board meetings.

### 22.4.2  Formal Interpreters

To provide meaningful access for LEP applicants and participants, the Housing Authority will provide qualified interpreters, including agency bilingual staff and outside vendors, on an as-needed basis.  At important stages that require one-

Housing Authority of the County of Los Angeles

on-one contact, written translation and verbal interpretation services will be provided, consistent with the four-factor analysis.

The Housing Authority may require an interpreter to certify that he/she understood the matter communicated and rendered a competent interpretation.

Qualified interpreters shall be used at the following:

    a. Voucher issuance briefings;

    b. Informal hearings for termination of assistance;

A Housing Authority staff interpreter may not be a subordinate to the person making the decision.

The Housing Authority maintains a list of qualified, bilingual employees who have applied for, and tested for proficiency in languages used by clients. Those employees receive additional compensation for demonstrating non-English language proficiency and can provide limited assistance to Housing Authority staff and LEP clients as part of their regular job duties.

### 22.4.3 Informal Interpreters

Informal interpreters may include the family members, friends, legal guardians, service representatives or advocates of the LEP individual. Housing Authority staff will determine whether it is appropriate to rely on informal interpreters, depending upon the circumstances and subject matter of the communication. However, in many circumstances, informal interpreters, especially children, may not be an appropriate option to provide accurate interpretations. There may be issues of confidentiality, competency or conflict of interest.

A LEP person may use an informal interpreter of his/her own choosing and at his/her expense, either in place of or as a supplement to the free language assistance offered by the Housing Authority. If possible, the Housing Authority will accommodate a LEP individual's request to use an informal interpreter in place of a formal interpreter.

If a LEP individual prefers an informal interpreter, after the Housing Authority has offered free interpreter services, the informal interpreter may interpret. In these cases, the LEP individual and interpreter may be asked to sign a waiver refusing interpreter services.

If a LEP individual wants to use his/her own informal interpreter, the Housing Authority reserves the right to also have a formal interpreter present.

### 22.4.4 Outside Resources

Outside resources may include community volunteers or Housing Choice Voucher participants.

Outside resources may be used for interpreting services at public or informal meetings or events if a timely request has been made.

The Housing Authority will establish and maintain relationships with organizations that assist specific cultural and ethnic groups living in Los Angeles County. To help their clients obtain or keep housing assistance through the Housing Authority, these organizations may provide qualified interpreters for LEP persons.

## 22.5   MONITORING

The Housing Authority will review and revise this LEP policy annually.   The review will include:

a. Reports from the Housing Authority's software system on the number of LEP clients, to the extent that the software and staff data entry can provide such information.  Such reports may be supplemented by staff observations.

b. A determination as to whether 5 percent or 1,000 persons from Housing Authority-administered programs or the waiting list speak a specific language, which triggers consideration of document translation needs as described above.

c. Analysis of staff requests for contract interpreters: number of requests, languages requested, costs, etc.

## 22.6   LEP PLAN DISTRIBUTION AND TRAINING

The LEP Plan will be:

1. Distributed to all Housing Authority staff.

2. Available at the Housing Authority's Administrative Office.

3. Posted on the Housing Authority's website at www.hacola.org.

4. Explained in orientation and training sessions for supervisors and other staff who need to communicate with LEP clients.

Housing Authority of the County of Los Angeles



*We Build Better Lives & Better Neighborhoods*

# EXHIBIT

# A

# DOCUMENT

# 3

# PAGES

# 1-179

**ADMISSIONS AND CONTINUED OCCUPANCY POLICY [2007] FOR THE
CONVENTIONAL PUBLIC HOUSING PROGRAM**



# HOUSING AUTHORITY OF THE
# COUNTY OF LOS ANGELES



# ADMINISTRATIVE PLAN
# JULY 1, 2007



*Strengthening Neighborhoods • Supporting Local Economies • Empowering Families • Promoting Individual Achievement*

# Administrative Plan
## Table of Contents

**Section**                                                                    **Page**

➤ Chapter 1: Policies and Objectives   1

1.1 Introduction ...... 1
1.2 Purpose of the Plan ...... 1
1.3 Local Objectives ...... 2
1.4 Jurisdiction ...... 2
1.5 Rental Assistance Programs ...... 2
  1.5.1 Set-Aside, Targeted and Special Programs ...... 3
1.6 Fair Housing and Equal Opportunity Policy ...... 4
1.7 Operating Reserves ...... 4
1.8 Service Policy ...... 5
  1.8.1 Requests for Reasonable Accommodation ...... 5
1.9 Family Outreach ...... 6
1.10 Owner Outreach ...... 6
1.11 Privacy Rights ...... 6
1.12 Monitoring Program Performance ...... 7
1.13 Terminology ...... 7

➤ Chapter 2: Admission Eligibility Factors and Applicant Requirements   10

2.1 Introduction ...... 10
2.2 Eligibility Factors and Requirements ...... 10
2.3 Family Composition ...... 11
  2.3.1 Stable Relationship ...... 12
  2.3.2 Head of Household ...... 12
  2.3.3 Spouse of Head ...... 12
  2.3.4 Live-In Aides ...... 12
  2.3.5 Split Households Before Voucher Issuance ...... 13
  2.3.6 Multiple Families in the Same Household ...... 13
  2.3.7 Joint Custody of Children ...... 14
2.4 Income Limitations ...... 14
  2.4.1 Income Limits for Other Programs ...... 14
2.5 Eligibility of Students ...... 14

2.6     Citizenship/Eligible Immigration Status .................................................15
        2.6.1   Mixed Families ................................................................................15
        2.6.2   No Eligible Members .......................................................................15
2.7     Social Security Number Requirements ...................................................16
2.8     Screening for Drug Abuse and Other Criminal Activity ..........................16
        2.8.1   Drug Abuse and Criminal History Screening Standards .....................16
        2.8.2   Criminal Background Checks ............................................................18
        2.8.3   Requests for Criminal Records by Owners of Covered Housing for the
                Purposes of Screening .....................................................................19
        2.8.4   Request for Criminal Records by Section 8 Project-Based Owners for
                the Purposes of Lease Enforcement or Eviction ..................................19
        2.8.5   Confidentiality of Criminal Records...................................................20
        2.8.6   Disclosure of Criminal Records to Family ..........................................20
        2.8.7   Explanations and Terms ...................................................................20
2.9     Other Criteria for Admission ..................................................................21
2.10    Suitability of Family ...............................................................................21
2.11    Denying Admission to Ineligible Families ...............................................22

        ➢  Chapter 3: Administration of the Waiting List 23
3.1     Introduction.............................................................................................23
3.2     How to Register .......................................................................................23
        3.2.1   Preliminary Registration Waiting List .................................................23
        3.2.2   Active Waiting List............................................................................23
        3.2.3   Change in Circumstances .................................................................23
3.3     Applying for Special Programs and Non-Housing Choice Voucher Programs .24
3.4     Special Admissions..................................................................................24
        3.4.1   Exceptions for Special Admissions....................................................24
        3.4.2   Criminal Background Checks ............................................................24
3.5     Opening and Closing The Waiting List ...................................................25
        3.5.1   Opening the Waiting List ..................................................................25
        3.5.2   Criteria Defining Who May Apply.......................................................26
        3.5.3   Closing the Waiting List....................................................................26
3.6     Time of Selection ....................................................................................26
3.7     Cross-Listing of Public Housing and Section 8 Waiting Lists...................26
3.8     Removing Applicants from the Waiting List and Purging ........................26
3.9     Application Pool .......................................................................................27

➤ **Chapter 4: Admission Process     28**

| | | |
|---|---|---|
| 4.1 | Introduction | 28 |
| 4.2 | Application Procedures | 28 |
| | 4.2.1   Interview Sessions/Mailings | 29 |
| | 4.2.2   Request for Information via Mail | 29 |
| | 4.2.3   Application Interview Process | 29 |
| | 4.2.4   Secondary Reviews/Credit Reports | 30 |
| 4.3 | Local Preferences | 32 |
| | 4.3.1   Verification of Preferences | 33 |
| | 4.3.2   Final Verification of Preferences | 33 |
| | 4.3.3   Preference Denial | 33 |
| 4.4 | Denial of Assistance | 34 |
| 4.5 | Final Determination and Notification of Eligibility | 34 |

➤ **Chapter 5: Subsidy Standards     35**

| | | |
|---|---|---|
| 5.1 | Introduction | 35 |
| 5.2 | Determination of Voucher Size | 35 |
| | 5.2.1   Maximum Unit Occupancy | 36 |
| 5.3 | Occupancy Standards Waiver | 37 |
| 5.4 | Exceptions for Foster Children | 37 |
| 5.5 | Flexibility of Unit Size Actually Selected | 37 |
| | 5.5.1   Calculating Assistance for a Different Unit Size | 38 |

➤ **Chapter 6: Determining the Total Tenant Payment and Housing Authority Absence Policy     39**

| | | |
|---|---|---|
| 6.1 | Introduction | 39 |
| 6.2 | Income Definitions | 39 |
| 6.3 | Income Deductions | 39 |
| | 6.3.1   Childcare Expenses | 40 |
| | 6.3.2   Medical Expenses | 40 |
| 6.4 | Income Inclusions and Exclusions | 41 |
| | 6.4.1   Income Inclusions | 41 |
| | 6.4.2   Income Exclusions | 43 |
| | 6.4.3   Earned Income Disallowance | 46 |
| | 6.4.4   Earned Income Disallowance Exclusion Time Periods | 47 |
| 6.5 | Family Assets | 47 |

| | | | |
|---|---|---|---|
| | 6.5.1 | Included Assets | 47 |
| | 6.5.2 | Excluded Assets | 48 |
| 6.6 | | Calculating Income and Family Contribution | 49 |
| | 6.6.1 | "Minimum Rent" and Minimum Family Contribution | 49 |
| | 6.6.2 | Minimum Income | 49 |
| | 6.6.3 | Averaging Income | 49 |
| | 6.6.4 | Utility Allowance and Utility Reimbursement Payments | 49 |
| | 6.6.5 | Reduction in Welfare Assistance | 50 |
| 6.7 | | Proration of Assistance for "Mixed" Families | 50 |
| | 6.7.1 | Applicability | 50 |
| | 6.7.2 | Prorated Assistance Calculation | 51 |
| 6.8 | | Absence Policy | 51 |
| | 6.8.1 | Absence of Entire Family | 51 |
| | 6.8.2 | Absence of Any Member | 52 |
| | 6.8.3 | Absence Due to Medical Reasons | 52 |
| | 6.8.4 | Absence Due to Incarceration | 52 |
| | 6.8.5 | Foster Care and Absences of Children | 53 |
| | 6.8.6 | Absence of Adult | 53 |
| | 6.8.7 | Students | 54 |
| | 6.8.8 | Visitors | 54 |
| | 6.8.9 | Reporting Absences to the Housing Authority | 54 |
| | 6.8.10 | Verification of Absence | 55 |
| | ➢ | Chapter 7: Verification Procedures | 56 |
| 7.1 | | Introduction | 56 |
| 7.2 | | Methods of Verification and Time Allowed | 56 |
| | 7.2.1 | Up-Front Income Verification (UIV) | 56 |
| | 7.2.2 | Third-Party Written Verification | 57 |
| | 7.2.3 | Third-Party Oral Verification | 57 |
| | 7.2.4 | Review of Documents | 57 |
| | 7.2.5 | Self-Certification/Self-Declaration | 58 |
| 7.3 | | Release of Information | 58 |
| 7.4 | | Computer Matching | 59 |
| | 7.4.1 | Data Sharing | 59 |
| 7.5 | | Items to be Verified | 59 |

| | 7.5.1 | Victims of Violence | 59 |
| 7.6 | | Verification of Income | 60 |
| | 7.6.1 | Employment Income | 60 |
| | 7.6.2 | Social Security, Pensions, Disability, Supplementary Security Income | 61 |
| | 7.6.3 | Unemployment Compensation | 61 |
| | 7.6.4 | Welfare Payments or General Assistance | 61 |
| | 7.6.5 | Alimony or Child Support Payments | 61 |
| | 7.6.6 | Net Income from a Business | 62 |
| | 7.6.7 | Child Care Business | 63 |
| | 7.6.8 | Recurring Gifts | 63 |
| | 7.6.9 | Zero-Income Status | 63 |
| | 7.6.10 | Full-Time Student Status | 63 |
| 7.7 | | Income from Assets | 64 |
| | 7.7.1 | Savings Account Interest Income and Dividends | 64 |
| | 7.7.2 | Interest Income from Mortgages or Similar Arrangements | 64 |
| | 7.7.3 | Net Rental Income from Property Owned by Family | 64 |
| 7.8 | | Verification of Assets | 65 |
| | 7.8.1 | Family Assets | 65 |
| | 7.8.2 | Assets Disposed of for Less than Fair Market Value (FMV) | 65 |
| 7.9 | | Verification of Allowable Deductions from Income | 66 |
| | 7.9.1 | Childcare Expenses | 66 |
| | 7.9.2 | Medical Expenses | 66 |
| | 7.9.3 | Assistance to Persons with Disabilities | 67 |
| 7.10 | | Verifying Non-Financial Factors | 68 |
| | 7.10.1 | Verification of Legal Identity | 68 |
| | 7.10.2 | Verification of Marital Status | 68 |
| | 7.10.3 | Familial Relationships | 68 |
| | 7.10.4 | Verification of Permanent Absence of Adult Member | 69 |
| | 7.10.5 | Verification of Change in Family Composition | 69 |
| | 7.10.6 | Verification of Disability | 69 |
| | 7.10.7 | Verification of Citizenship/Eligible Immigrant Status | 70 |
| | 7.10.8 | Verification of Social Security Numbers | 72 |
| | 7.10.9 | Medical Need for Larger Unit | 73 |
| | 7.10.10 | Reasonable Accommodation | 73 |
| | 7.10.11 | Secondary Review/Credit Checks | 73 |

&#10148;   Chapter 8: Voucher Issuance and Briefings  76

8.1 Introduction ..................................................................................76

8.2 Issuance of Housing Choice Vouchers ........................................76

8.3 Briefing Types and Required Attendance ......................................76

  8.3.1 Initial Applicant Briefing ..................................................76

  8.3.2 Re-Issuance Briefing ......................................................76

  8.3.3 Owner Briefing ................................................................77

8.4 Information Provided at the Briefing Session ................................77

  8.4.1 Topics Covered in the Briefing Session ..........................77

  8.4.2 Briefing Packet ................................................................77

8.5 Encouraging Participation in Areas Without Low Income or Minority Concentration ..............................................................................79

8.6 Security Deposit Requirements ....................................................79

8.7 Term of Voucher ..........................................................................79

  8.7.1 Expirations ......................................................................80

  8.7.2 Policy on Suspensions (Tolling) ......................................80

  8.7.3 Extensions ......................................................................80

  8.7.4 Assistance to Voucher Holders ......................................80

8.8 Voucher Issuance Determination for Split Households ..................80

8.9 Remaining Member of Family – Retention of Voucher ..................81

8.10 Family Voluntarily Relinquishes Housing Choice Voucher ............81

&#10148;   Chapter 9: The New Contract Process Request for Tenancy Approval and Contract Execution   83

9.1 Introduction ..................................................................................83

9.2 Request for Tenancy Approval ....................................................83

  9.2.1 Disapproval of RTA ........................................................83

9.3 Eligible Types of Housing ............................................................84

  9.3.1 Special Housing Types ....................................................84

  9.3.2 Ineligible Housing Types ..................................................84

9.4 Restrictions On Renting To Relatives ..........................................85

9.5 Lease Agreements ......................................................................85

  9.5.1 Separate Agreements ....................................................87

9.6 Initial Inspections ........................................................................87

9.7 Rent Limitations ..........................................................................87

9.8 Rent Reasonableness ..................................................................88

9.9     Information to Owners.................................................................88
9.10    Owner Disapproval ...................................................................88
9.11    Change in Total Tenant Payment (TTP) Prior to HAP Effective Date .............90
9.12    Contract Execution Process .........................................................90
        9.12.1 Determining the Contract Effective Date...............................90
        9.12.2 Prorating First Month's Rent.............................................91
        9.12.3 Proof Of Ownership........................................................91
        9.12.4 Establishing Eligibility To Execute HAP Contract and Related
               Documents..................................................................91
        9.12.5 Payment To The Owner ..................................................92
9.13    Change in Ownership ................................................................92

        ➢  Chapter 10: Housing Quality Standards and Inspections    93
10.1    Introduction............................................................................93
10.2    Types of Inspections.................................................................93
10.3    Housing Quality Standards (HQS) ................................................93
        10.3.1 Unit Space and Size.......................................................94
        10.3.2 Living Room / Sleeping Room ..........................................94
        10.3.3 Sanitary Facilities (Bathroom) ..........................................94
        10.3.4 Food Preparation (Kitchen) ..............................................95
        10.3.5 Ceilings, Walls, Floors and Building Exterior .......................95
        10.3.6 Windows ......................................................................96
        10.3.7 Doors and Unit Access....................................................96
        10.3.8 Thermal Environment .....................................................97
        10.3.9 Electricity......................................................................97
        10.3.10 Smoke Detectors ..........................................................97
        10.3.11 Site and Sanitation ........................................................97
        10.3.12 Manufactured Homes (Mobile Homes) HQS Requirements .............98
        10.3.13 Additional Housing Quality Standards ...............................98
        10.3.14 Serious Deficiencies......................................................98
10.4    Lead-Based Paint ....................................................................99
        10.4.1 Disclosure ...................................................................100
        10.4.2 Lead-Based Paint Visual Assessment................................100
        10.4.3 Stabilization and Clearance............................................100
        10.4.4 Children with Environmental Intervention Blood Lead Levels ..........101
10.5    Inspections Schedule...............................................................102

10.6    New Contract Inspections .................................................................................. 102

  10.6.1  When HQS Deficiencies Must Be Corrected...................................... 102

10.7    Annual and Interim Inspections .................................................................... 103

  10.7.1  Annual Inspections .............................................................................. 103

  10.7.2  Interim Inspections ............................................................................. 103

10.8    Failed Inspections: Determination of Responsibility ...................................... 103

10.9    Failed Inspections: When Deficiencies Must Be Corrected ........................... 104

  10.9.1  Emergency Fail Deficiencies .............................................................. 104

  10.9.2  Non-Emergency Fail Deficiencies........................................................ 104

  10.9.3  Non-Emergency Fail Deficiencies Not Requiring Follow-up Inspection
    105

10.10   Consequences of Verified Family-Caused Deficiencies ................................. 105

10.11   Consequences of Verified Owner-Related Deficiencies ................................. 106

  10.11.1  Abatement ......................................................................................... 106

  10.11.2  Termination of Contract..................................................................... 107

10.12   Quality Control Inspections ........................................................................... 107

  &#10148;  Chapter 11: Setting Payment Standards and Determining Rent
    Reasonableness        108

11.1    Introduction.................................................................................................... 108

11.2    Payment Standards for the Voucher Program................................................. 108

  11.2.1  Assisted Families' Rent Burdens ......................................................... 108

  11.2.2  Success Rate of Voucher Holders....................................................... 108

  11.2.3  Rent Reasonableness Database ......................................................... 109

  11.2.4  Quality of Units Selected .................................................................... 109

  11.2.5  File Documentation ............................................................................. 109

11.3    Rent Reasonableness Determinations............................................................ 109

  11.3.1  Appealing a Rent Reasonableness Determination .............................. 110

  11.3.2  Rent Increases .................................................................................... 110

  &#10148;  Chapter 12: Re-examination  112

12.1    Introduction.................................................................................................... 112

  12.1.1  Procedure ........................................................................................... 112

12.2    Re-Examination Notification to the Family...................................................... 112

  12.2.1  Persons with Disabilities...................................................................... 112

  12.2.2  Requirements to Attend....................................................................... 112

  12.2.3  Failure to Respond .............................................................................. 112

12.2.4 Documents Required from the Family ............................................... 113

12.2.5 Tenant Rent Increases ........................................................................ 113

12.2.6 Tenant Rent Decreases ....................................................................... 113

12.3 Interim Re-Examination ............................................................................... 114

12.3.1 Interim Changes in Income.................................................................. 114

12.4 Special Adjustments .................................................................................... 114

12.5 Changes in Family Composition ................................................................. 115

12.5.1 Allowable Family Additions................................................................. 115

12.5.2 Decreases in Family Size ..................................................................... 116

12.6 Continuation of Assistance for "Mixed" Families........................................ 116

   ➤ Chapter 13: Allowable Moves/Portability    117

13.1 Introduction ................................................................................................. 117

13.2 Allowable Moves and Restrictions............................................................... 117

13.2.1 Restrictions on Moves ......................................................................... 117

13.2.2 Allowable Moves for New Applicants................................................. 117

13.2.3 Allowable Moves for Current Participants ......................................... 118

13.2.4 Restrictions on Moves During the Initial Lease ................................. 119

13.3 Procedures for Moves for Current Participants............................................ 119

13.4 Outgoing Portability Procedures ................................................................. 120

13.4.1 Briefing for Families Wishing to Exercise Portability ........................ 120

13.4.2 Payment to the Receiving PHA ........................................................... 120

13.5 Incoming Portability Procedures ................................................................. 121

13.5.1 Policies on Absorption and Administration......................................... 121

13.5.2 Income and Total Tenant Payment Review ........................................ 121

13.5.3 Criminal Background Checks for Incoming Portability ....................... 122

13.5.4 Terminations ......................................................................................... 123

13.5.5 Informal Hearings/Reviews.................................................................. 123

   ➤ Chapter 14: Contract Terminations   124

14.1 Introduction.................................................................................................. 124

14.2 Description of Documents............................................................................ 124

14.3 Termination of the Lease by the Family: Moves ......................................... 124

14.4 Termination of the Lease by the Owner ...................................................... 124

14.4.1 Terminating the Lease During the Initial Term of the Lease............... 125

14.4.2 Terminating the Lease After the Initial Term of the Lease.................. 125

14.4.3 Requests for Criminal Records by Project-Based Section 8 Owners . 125

14.5   Mutual Termination of the Lease ................................................................... 126

14.6   Termination of the HAP Contract by Housing Authority ................................... 126

14.7   HAP Payments and Contract Terminations ..................................................... 128

➤   Chapter 15: Family Obligations        129

15.1   Introduction ................................................................................................. 129

15.2   Grounds for Termination ............................................................................... 129

15.2.1 Form of Termination ................................................................................ 129

15.2.2 Mandatory Termination ........................................................................... 129

15.2.3 Grounds for Termination of Assistance ................................................... 130

15.2.4 Welfare to Work Program ........................................................................ 130

15.2.5 Registered Sex Offenders ....................................................................... 131

15.3   Family Obligations ....................................................................................... 131

15.3.1 Housing Authority Discretion .................................................................. 133

15.3.2 Enforcing Family Obligations ................................................................... 133

15.3.3 Drug-Related Criminal Activity ............................................................... 134

15.3.4 Violent Criminal Activity ......................................................................... 135

15.3.5 Required Evidence .................................................................................. 136

15.3.6 Confidentiality of Criminal Records .......................................................... 136

15.3.7 Disclosure of Criminal Records to Family .................................................. 136

15.4   Notice of Termination of Assistance .............................................................. 136

15.5   Procedures for Non-Citizens ........................................................................ 137

15.5.1 False or Incomplete Information (No Eligible Members) ............................. 137

15.6   $0 Assistance Tenants (End of Participation) .................................................. 137

15.7   Option Not to Terminate for Misrepresentation of Income ............................. 138

15.8   Misrepresentation in Collusion with Owner ................................................... 138

15.9   Missed Appointments and Deadlines ............................................................ 138

➤   Chapter 16: Informal Hearings and Complaints        140

16.1   Introduction ................................................................................................. 140

16.2   Reasonable Accommodation ........................................................................ 140

16.3   Applicants – Preference Denials .................................................................... 140

16.4   Informal Review Procedures for Applicants .................................................... 140

16.4.1 When an Informal Review is Not Required ................................................ 141

16.4.2 Procedure for Review .............................................................................. 141

16.5    Informal Hearing for Participants.................................................................142
        16.5.1  When an Informal Hearing May Be Requested...................................142
        16.5.2  Notification ..........................................................................142
        16.5.3  Prior to Hearing .....................................................................143
        16.5.4  Hearing Process ......................................................................144
        16.5.5  Hearing Officer ......................................................................144
        16.5.6  Opening ..............................................................................144
        16.5.7  Presentations ........................................................................145
        16.5.8  Rebuttals ............................................................................145
        16.5.9  Final Summary ........................................................................145
        16.5.10 Conclusion of Hearing ................................................................145
16.6    When an Informal Hearing Is Not Required.......................................................146

        ➤  Chapter 17: Owner or Family Debts to Housing Authority    147
17.1    Introduction.................................................................................147
17.2    Repayment Agreements for Families ............................................................147
        17.2.1  Late Payments ........................................................................148
        17.2.2  Requests To Move .....................................................................148
        17.2.3  Guidelines for Repayment Agreements ..................................................148
17.3    Family Debts Owed for Claims..................................................................149
17.4    Family Debts Due to Fraud/Non-Reporting of Information.........................................149
        17.4.1  Family Error/Late Reporting ..........................................................149
        17.4.2  Program Fraud ........................................................................149
17.5    Family Debts Paid in Full ....................................................................149
17.6    Owner Debts to Housing Authority .............................................................150
        17.6.1  Owner Debts Due to Fraud..............................................................150
17.7    Writing Off Debts ............................................................................150

        ➤  Chapter 18: Special Programs        152
18.1    Introduction.................................................................................152
18.2    Housing Assistance Programs...................................................................152
        18.2.1  Housing Choice Voucher Programs ......................................................152
        18.2.2  Voluntary Set-Aside Programs For Homeless Families ...................................152
        18.2.3  Non-Housing Choice Voucher Special Programs ..........................................153
18.3    Housing Assistance Program Procedures.........................................................154
        18.3.1  Referral Process/Waiting List ........................................................154

18.3.2 Eligibility ........................................................................154

18.3.3 Verification Procedures ...................................................154

18.3.4 Denial of Participation ....................................................154

18.3.5 Criminal Background .......................................................154

18.3.6 Briefing Sessions ...........................................................155

18.3.7 Contracts/Tenant Payments ............................................155

18.3.8 Re-Examinations ............................................................155

18.3.9 Terminations .................................................................155

18.3.10 Portability ...................................................................156

18.4   Family Self-Sufficiency Program .................................................156

18.5   FSS Application Process ............................................................156

18.5.1 FSS Eligible Families .......................................................157

18.5.2 Denial of Participation ....................................................157

18.6   FSS Contract of Participation (COP).............................................157

18.6.1 Compliance With The Lease .............................................159

18.7   Individual Training and Service Plan (ITSP)....................................159

18.7.1 Needs Assessment ..........................................................159

18.7.2 The Individual Training and Services Plan (ITSP) ...............159

18.8   Escrow Accounts ....................................................................160

18.8.1 Forfeiting the FSS Escrow Account ....................................161

18.9   Change in Family Composition ...................................................161

18.10 FSS Termination/Cancellation/Portability ....................................162

18.10.1 FSS Termination Due To Portability ................................162

          ➢ Chapter 19: Pre-Pay/Preservation Program [24 CFR §886] 163

19.1   Introduction...........................................................................163

19.2   Terms/Provisions ....................................................................163

          ➢ Chapter 20: Moderate Rehabilitation Program [24 CFR §882]      165

20.1   Introduction...........................................................................165

20.2   The Expired 15-Year Contracts....................................................165

20.3   Requesting An Extension............................................................165

20.4   Annual Increase For the Expired 15-Year Contracts .......................166

20.5   Non-Expired Mod Rehab Contracts ..............................................166

20.6   Request To Move .....................................................................167

20.7   Referrals................................................................................167

20.8    New Lease Process ........................................................................................ 168

20.9    Claims, Move-Out and Close-Out Inspections ............................................. 168

    20.9.1 Owner Claims.......................................................................................... 168

    20.9.2 Unpaid Rent ............................................................................................ 168

    20.9.3 Vacancy Loss........................................................................................... 168

    20.9.4 Damage Claims........................................................................................ 169

    20.9.5 Move-Out and Close-Out Inspections.................................................... 170

    20.9.6 Processing Claims.................................................................................... 170

    20.9.7 Other Requirements for Claims Processing............................................ 171

    ➢  Chapter 21:    172

    ➢  project-based vouchers        172

21.1    introduction ................................................................................................... 172

21.2    Level of Assistance ....................................................................................... 172

21.3    Owner proposal selection procedure............................................................. 172

    21.3.1 Selection Criteria ..................................................................................... 173

    21.3.2 Requirements For Rehabilitated and Newly Constructed Housing..... 173

    21.3.3 Agreement to Enter Into the HAP Contract ......................................... 173

    21.3.4 Subsidy Layering Review (SLR) ........................................................... 174

    21.3.5 Housing Authority – Owned Units........................................................ 174

21.4    housing eligible for assistance ..................................................................... 174

21.5    Limits on assistance...................................................................................... 175

    21.5.1 Qualified Supportive Services ............................................................... 175

    21.5.2 Qualifications for Supportive Services .................................................. 175

    21.5.3 Supportive Services Monitoring ............................................................ 176

    21.5.4 Failure to Meet Supportive Service Requirements............................... 176

21.6    Selection of Participants ............................................................................... 176

    21.6.1 Waiting List ............................................................................................ 176

    21.6.2 Protection of In-Place Families ............................................................. 176

    21.6.3 Local Preferences ................................................................................... 177

    21.6.4 Refusal of Assistance ............................................................................. 177

21.7    Information for accepted families ................................................................. 177

21.8    Leasing of contract units .............................................................................. 178

21.9    Vacancies....................................................................................................... 178

21.10   Tenant Screening .......................................................................................... 178

21.11  housing assistance payments contract ........................................................178

    21.11.1  HAP Contract Information ......................................................178

    21.11.2  Execution of the HAP Contract..............................................179

    21.11.3  Term of the HAP Contract .....................................................180

    21.11.4  Amendments to the HAP Contract .........................................180

21.12  inspections...............................................................................................180

    21.12.1  HQS Violation .......................................................................181

21.13  Lease........................................................................................................181

    21.13.1  Changes in the Lease ...........................................................182

    21.13.2  Absence from the Unit...........................................................182

    21.13.3  Owner Termination of Tenancy and Eviction .........................182

    21.13.4  Security Deposits .................................................................182

21.14  family occupancy of wrong-size or accessible unit .........................................183

21.15  Determining rent to owner............................................................................183

    21.15.1  Rent to Owner for Certain Tax Credit Units ..........................183

    21.15.2  Housing Authority – Owned Units...........................................184

    21.15.3  Redetermination of Rent to Owner ........................................184

    21.15.4  Rent Determination for Projects with Other Subsidies .....................184

    21.15.5  Rent Control and Other Rent Limitations...........................................185

21.16  Payment to Owner ......................................................................................185

    21.16.1  Vacancy Payments ...............................................................185

    21.16.2  Other Charges and Fees.........................................................186

**CHAPTER 1:**
**POLICIES AND OBJECTIVES**

**1.1    INTRODUCTION**

The Los Angeles County Community Development Commission (CDC) was created in 1982 by the County's Board of Supervisors.  The CDC aims to build better lives and better neighborhoods, by providing services to improve the quality of life in low- and moderate-income neighborhoods.  The CDC manages programs in public and assisted housing, community development, economic development, and housing development and preservation.

The Housing Authority of the County of Los Angeles (Housing Authority) was created in 1938 to manage and develop affordable housing.  Since 1938, the Housing Authority has administered federally funded public housing, rental assistance programs, and services and special programs for residents of public and assisted housing.

In an effort to streamline Los Angeles County's housing and community development programs and services, the County Board of Supervisors combined the Housing Authority with the CDC in 1982.  The Housing Authority is comprised of two divisions of the CDC.  The Housing Management Division manages public housing and related programs and services.   The Assisted Housing Division administers rental assistance programs.

**1.2    PURPOSE OF THE PLAN**
**[24 CFR §982.54(a) – §982.54(c)]**

The purpose of the Administrative Plan is to clearly outline the policies and procedures that govern the Housing Authority's administration of rental assistance programs.  The plan includes program requirements established by the U.S. Department of Housing and Urban Development (HUD), as well as the discretionary policies established by the Housing Authority.

The policies and procedures in this Administrative Plan comply with applicable local, State, and HUD and other Federal regulations, relevant memos, notices and guidelines, including fair housing and equal opportunity requirements.  If applicable regulatory changes conflict with this plan, regulations will have precedence.

The Housing Authority adheres to the Administrative Plan in administering all rental assistance programs.  The original plan and any changes must be approved by the Board of Commissioners of the agency (the Los Angeles County Board of Supervisors), and a copy of the plan must be provided to HUD.

As much as possible, revisions and additions are published to coincide with published changes in the Housing Authority's Agency Plan.  Interim changes, including Board mandates and administrative updates reflecting changes in law or regulatory requirements, will be made effective by memo from the Executive Director or designee.

Housing Authority of the County of Los Angeles

**1.3**  **LOCAL OBJECTIVES**
    **[24 CFR §982.1(a)]**

The Housing Authority's rental assistance programs are designed to achieve three major objectives:

1. To provide improved living conditions and decent, safe, and sanitary housing for very low-income families while maintaining their rent payments at an affordable level;

2. To provide an incentive to private property owners to rent to lower income families by offering timely assistance payments; and

3. To promote freedom of housing choice and spatial deconcentration of lower income and minority families.

Additionally, the Housing Authority has adopted the following mission statement:

➢ To promote adequate and affordable housing, economic opportunity and a suitable living environment free from discrimination.

**1.4**  **JURISDICTION**
    **[24 CFR §982.51 and 24 CFR §982.4(b)]**

HUD has authorized the Housing Authority to administer rental assistance programs within the corporate boundaries of Los Angeles County.  The Housing Authority's jurisdiction includes:

1. The unincorporated areas of the County, and

2. Participating cities within the County. Participating small cities are defined as cities in the Los Angeles County area that have authorized the Housing Authority to administer rental assistance programs within their city limits.

**1.5**  **RENTAL ASSISTANCE PROGRAMS**

Section 8 of the Housing and Community Development Act of 1974 established the "Section 8 Program," the first permanent Federal program for rental assistance.  The program authorized a basic certificate program, as well as targeted subprograms.  As rental assistance programs developed, Congress authorized additional Section 8 programs, including a voucher program in 1987.

In 1998, the Quality Housing and Work Responsibility Act (QHWRA) required housing authorities to convert their certificates into vouchers and establish the Housing Choice Voucher Program as the primary rental assistance program.  As a result of this conversion, the Housing Choice Voucher Program now encompasses all Housing Authority rental assistance except for existing certificates under the previously offered Moderate Rehabilitation Program.

❑ **Moderate Rehabilitation Program**: A certificate-based rental assistance program incorporating financial options for owners doing moderate levels of rehab and upkeep to affordable housing rental units.  Administration involves closing or extending expiring contracts.  Chapter 20 (Moderate Rehabilitation Program) covers the details of this program.

❑ **Section 8 Pre-Pay/Preservation Program**: A voucher-based rental assistance program that enables existing participants, living in units in which owners have prepaid a HUD-insured mortgage loan, to remain in affordable housing. Chapter 19 (Pre-Pay/Preservation Program) covers the details of this program.

❑ **Project-Based Voucher Program**: The Housing Authority will utilize Project-Based vouchers to prevent the displacement of families and preserve affordable rents in the case of an unforeseen event.

❑ **Housing Choice Voucher Program**: The major rental assistance program administered by the Housing Authority.

  ➢ **Note**: Unless otherwise noted, the procedures in this Administrative Plan are for the general Housing Choice Voucher Program.

As required by HUD regulations, the Housing Authority administers the Family Self-Sufficiency Program as a special program option for participants in the Housing Choice Voucher Program.  See Chapter 18 (Special Programs) for details.

### 1.5.1   Set-Aside, Targeted and Special Programs

The Housing Authority may use the Housing Choice Voucher Program budget to fund set-aside programs, which are detailed in Chapter 18 (Special Programs). All set-aside programs are subject to the availability of funding.  The Executive Director has the discretion to approve allocations beyond the existing program size for all set-aside programs.

  ➢ **Housing Choice Voucher Homeless Program**: This program targets families throughout Los Angeles County.  All eligible families are referred to the Housing Authority by pre-selected service providers.

  ➢ **Housing Choice Voucher Long-Term Family Self-Sufficiency Homeless Program**: This program targets homeless families who are eligible for CalWORKs and are employed or have an offer of employment (either subsidized or unsubsidized).

  ➢ **Housing Choice Voucher Family Unification Set-Aside Program**: This program provides assistance to families who are in imminent danger of losing or who cannot regain custody of their minor children due to lack of adequate housing.

Periodically, the Housing Authority applies for special funding from HUD to administer vouchers to targeted populations, within the Housing Choice Voucher Program.  The Housing Authority administers vouchers through the following targeted programs:

  ➢ **Housing Choice Voucher Welfare to Work Program**: This program provides assistance to families who are eligible for CalWORKs benefits, are in good standing with the employment/job training program offered by the Los Angeles County Department of Public and Social Services (DPSS) and are in need of housing in order to obtain or retain employment. See Chapter 18 (Special Programs) for details.

Housing Authority of the County of Los Angeles

> ➤ **Housing Choice Voucher Mainstream Program**: This program assists very-low income, disabled families who need rental assistance.  As authorized by HUD regulations, the Housing Authority administers this program independently and does not rely on joint ventures with community partners.  Eligible families are identified from the regular housing choice voucher waiting list and are admitted on a first come, first served basis.
>
> Families admitted into a targeted program must meet all regular admission requirements with the exception of the residency requirement. Since the Housing Authority is required to work closely with other County departments that provide services through all of Los Angeles County, families residing outside of the Housing Authority's jurisdiction are allowed to participate in targeted programs.  However, families may be required to move within the Housing Authority's jurisdiction for at least one year.

The Housing Authority also receives non-Housing Choice Voucher Program funding to administer the following special programs.  See Chapter 18 (Special Programs) for details:

> ➤ **Shelter Plus Care Program**
> ➤ **Housing Opportunities for Persons with AIDS (HOPWA) Program**

**1.6   FAIR HOUSING AND EQUAL OPPORTUNITY POLICY
      [24 CFR §982.53]**

It is the policy of the Housing Authority to comply fully with all Federal, State and local nondiscrimination laws and with the rules and regulations governing fair housing and equal opportunity in housing and employment.

The Housing Authority shall not deny any family or individual the opportunity to apply for or receive assistance under its rental assistance programs on the basis of race, color, sex, religion, creed, national or ethnic origin, age, family status, handicap or disability.

The Housing Authority will provide Federal, State, and local information to voucher holders regarding discrimination, and the recourse available to them if they are victims of discrimination.  Such information will be made available during the family briefing session, and all fair housing information and discriminatory complaint forms will be included in the voucher holder's briefing packet.

Except as otherwise provided in 24 CFR §8.21(c)(1), §8.24(a), §8.25 and §8.31, no individual with disabilities shall be denied the benefits of, be excluded from participation in, or otherwise be subjected to discrimination because the Housing Authority's facilities are inaccessible to or unusable by persons with disabilities.

**1.7   OPERATING RESERVES**

The Board of Commissioners shall establish the permitted uses of earned administrative fees at the time of the Annual Consolidated Operating Budget approval.  The approval shall consist of the use of administrative fees for the Housing Choice Voucher Program (Section 8) administration.

The Board of Commissioners must approve the expenditure of Section 8 operating reserves in excess of $50,000. The Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $49,999. The Assistant Executive Director may authorize allowable use of Section 8 operating reserve funds not in excess of $30,000.

**1.8     SERVICE POLICY**
         **[24 CFR §8.24]**

This policy is applicable to all situations described in this Administrative Plan when a family initiates contact with the Housing Authority, when the Housing Authority initiates contact with a family including when a family applies, and when the Housing Authority schedules or reschedules any kind of appointments.

It is the policy of the Housing Authority to be service-directed in the administration of its rental assistance programs, and to exercise and demonstrate a high level of professionalism while providing housing services to all families.

The Housing Authority's policies and practices are designed to provide assurances that all persons with disabilities will be provided reasonable accommodation so that they may fully access and utilize the housing program and related services. The availability of specific accommodations will be made known by including notices on Housing Authority forms and letters to all families.

**1.8.1   Requests for Reasonable Accommodation**
         **[24 CFR §8.28]**

The Housing Authority is required to make reasonable adjustments to rules, policies, practices and procedures of its programs, in order to enable a disabled applicant or participant to have an equal opportunity to use and enjoy their unit, including common areas, and to comply with program obligations.

The Housing Authority approves reasonable accommodation requests on a case-by-case basis, upon determination that:

> ➤ The requested accommodation is reasonable (i.e., it does not result in a fundamental alteration in the nature of the program or an undue financial and administrative burden), and

> ➤ There is an identifiable relationship between the requested accommodation and the individual's disability.

All requests for accommodation will be verified with a reliable, knowledgeable professional so that the Housing Authority can properly accommodate the need presented by the disability (see Chapter 7 for Verification of Reasonable Accommodations).

Families requesting a reasonable accommodation will be notified in writing of the decision.

Reasonable accommodation will be made for persons with disabilities that require an advocate or accessible offices. A designee will be allowed to provide information as needed, but only with the permission of the person with the disability.

Housing Authority of the County of Los Angeles

**1.9    FAMILY OUTREACH**

Each time the Housing Authority enters into an Annual Contributions Contract (ACC) with HUD for new Section 8 existing units, it will be publicized in accordance with the specification in the criteria of the Equal Opportunity Housing Plan.  The Housing Authority's waiting list will remain open on a continuous basis for the foreseeable future.

The Housing Authority will communicate the status of housing availability to other service providers in the community, advise them of housing eligibility factors and guidelines in order that they can make proper referrals for housing assistance.

Information regarding the program directed at prospective applicants/tenants will be disseminated in accordance with Equal Opportunity Housing Plan and HUD guidelines for fair housing.

**1.10    OWNER OUTREACH**
        **[24 CFR §982.54(d)(5)]**

The Housing Authority encourages owners of decent, safe and sanitary housing units to lease to families participating in its rental assistance programs.   The Housing Authority maintains and regularly updates a list of interested landlords and available units for its rental assistance programs.  When listings from owners are received, they are compiled by Housing Authority staff and made available through the phone hotline, by mail, or by Internet at www.hacola.org.

Ongoing marketing efforts to recruit suburban owners for participation include, but are not limited to:

1.  Brochures for owners;

2.  Realty Board presentations;

3.  Apartment Owner Association presentations;

4.  Community Center presentations; and

5.  Presentation to organizations serving the disabled and other similar organizations.

The Housing Authority periodically evaluates the distribution of assisted families to identify areas within the jurisdiction where owner outreach should be targeted. Special outreach efforts will be used in order to encourage participation of those groups who would not normally apply or participate.

**1.11    PRIVACY RIGHTS**
        **[24 CFR §5.212]**

Applicants and participants, including all adults in each household, are required to sign the HUD-9886 Form (Authorization for the Release of Information).  This document incorporates the Federal Privacy Act Statement and describes the conditions under which HUD will release family information.

A statement of the Housing Authority's policy on release of information to prospective landlords will be included in the briefing packet that is provided to the family.

The Housing Authority's practices and procedures are designed to safeguard the privacy of applicants and program participants.  All applicant and participant files are stored in a secure location that is only to be accessed by authorized staff.

Housing Authority staff will not discuss family information contained in files unless there is a business or legal reason to do so.  Inappropriate discussion of family information or improper disclosure of family information will result in disciplinary action.

### 1.12   MONITORING PROGRAM PERFORMANCE
### [24 CFR §985]

In order to ensure quality control, supervisory staff will review the following functions:

1. 10 percent of new applicants/contracts, and
2. 100 percent of work completed by new staff for a minimum of 30 calendar days.

The Housing Authority's Quality Assurance Unit conducts audits of:

1. 5 percent of annual re-examinations/interim re-examinations, and
2. Minimum Housing Quality Standards (HQS) quality control inspections as dictated by Section 8 Management Assessment Program (SEMAP) Indicator #5.

The Housing Authority 's Program Integrity/Fraud Prevention Team uses credit checks, and other similar tools to ensure program integrity.  1,500 random credit reviews are conducted annually for new applicant and existing participant households, including added family members, portability households, zero-income households, staff referrals and fraud inquiries.

### 1.13   TERMINOLOGY
### [24 CFR §982.4(b) and FR-5056-N-01]

"Family" is used interchangeably with "applicant" or "participant" and can refer to a single person family. "Tenant" refers to participants in terms of their relation to landlords.

"Landlord" and "owner" are used interchangeably.

"Domestic Violence" is defined as felony or misdemeanor crimes of violence committed by:

➢ A current or former spouse of the victim;

➢ A person with whom the victim shares a child in common;

➢ A person who is cohabitating with or has cohabitated with the victim as a spouse;

➢ A person similarly situated to a spouse of the victim under local and state domestic or family violence laws;

Housing Authority of the County of Los Angeles

> Any other person against an adult or youth victim who is protected from that person's acts under local and state domestic or family violence laws.

"Dating Violence" is defined as violence committed by a person:

> Who is or has been in a social relationship of a romantic or intimate nature with the victim; and

> Where the existence of such a relationship shall be determined based on consideration of the following factors:

  o The length of the relationship;

  o Type of relationship; and

  o Frequency of interaction between persons involved in the relationship.

"Stalking" is defined:

> To follow, pursue, or repeatedly commit acts with the intent to kill, injure, harass, or intimidate another person; or

> To place under surveillance with the intent to kill, injure, harass, or intimidate another person; and

> In the course of, or as a result of, such following, pursuit, surveillance, or repeatedly committed acts, to place a person in reasonable fear of the death of, or serious bodily injury to, or to cause serious emotional harm to that person, the spouse or intimate partner of that person, or a member of the immediate family of that person.

"Immediate Family Member" is defined to mean, with respect to a person,

> A spouse, parent, brother or sister, or child of that person, or an individual to whom that person stands in loco parentis; or

> Any other person living in the household of that person and related to that person by blood or marriage.

"Student" is defined to mean all students enrolled either full-time or part-time at an institution of higher education.

"Independent Student Status" is when the income of the student's parents is not relevant or the student can demonstrate the absence of, or his or her independence from, parents. These criteria include but are not limited to the following:

> The individual must be of legal contract age under state law;

> The individual must have established a household separate from parents or legal guardians for at least one year prior to application for assistance, or

> The individual meets the U.S. Department of Education's definition of an independent student:

  • Be at least 24 years old by December 31 of the award year for which aid is sought;

- Be an orphan or a ward of the court through the age of 18.
- Be a veteran of the U.S. Armed Forces;
- Have a legal dependents other than a spouse (for example, dependent children or parent);
- Be a graduate or professional student; or,
- Be married.

"Financial Aid" means any assistance that an individual receives:

> - Under the Higher Education Act of 1965;
> - From private sources;
> - From an institute of higher education.

Such financial aid may include federal, state, and local grants and scholarships (athletic and academic), fellowships and student educational financial assistance from parents, guardians, or other persons residing outside of the student family household.

Types of financial aid under the Higher Education Act of 1965 would include: the Pell Grant, the Federal Supplemental Education Opportunity Grant (FSEOG), Academic Achievement Incentive Scholarships, State assistance under the Leveraging Educational Assistance Partnerships Program, the Robert C. Byrd Honors Scholarship Program, and federal Work-Study (FWS) programs.

"Tuition" shall have the meaning given by the institution of higher education in which the student is enrolled.

Housing Authority of the County of Los Angeles

**CHAPTER 2:**
**ADMISSION ELIGIBILITY FACTORS AND APPLICANT REQUIREMENTS**

**2.1**   **INTRODUCTION**
**[24 CFR §982.54(d)]**

This chapter defines the criteria used by the Housing Authority to determine program eligibility, and the requirements that families and family members must meet in order to receive assistance under the program. This chapter also clarifies the circumstances that may lead to a denial of admission, and the process for notifying families if they are denied admission.

Family members being added to households that are currently receiving assistance are considered new applicants and are subject to the Housing Authority's admission and eligibility requirements.

The intent of these policies is to maintain consistency and objectivity in evaluating the eligibility of families who apply for the programs. The criteria listed in this chapter are the only factors used to review eligibility, to minimize the possibility of bias or discrimination. Selection shall be made without regard to race, color, creed, religion, sex, national origin, familial status, source of income, or disability/handicap.

**2.2**   **ELIGIBILITY FACTORS AND REQUIREMENTS**
**[24 CFR §982.201 and 24 CFR §982.552]**

In accordance with HUD regulations, the Housing Authority has established the following eligibility criteria, which are detailed throughout this chapter. To be eligible for admission, an applicant family must:

1. Meet the definition of a "family;"

2. Be within the appropriate income limits;

3. Be a citizen, or a non-citizen with eligible immigration status [24 CFR §5.508]; and

4. Furnish and verify valid Social Security numbers for all family members age 6 and over [24 CFR §5.216].

The Housing Authority will also deny admission as follows:

1. If applicant fails to meet specified criteria regarding drug abuse and other criminal activity;

2. If applicant fails to submit required consent forms, or any other Housing Authority-required information to verify family eligibility, composition, or income (including birth certificates and valid state identification);

3. If applicant is in violation of other criteria listed in Section 2.8 of this chapter;

4. If the applicant is a member, officer or employee of the Housing Authority who formulates policy or influences decisions with respect to federally funded rental assistance programs or a public official or a member of the local governing body or member of Congress; or

> 5.  If applicant is a student enrolled in an institution of higher learning and meets all the criteria listed in Section 2.5 of this chapter.

The Housing Authority's procedures regarding notification and informal reviews for applicants who are denied assistance can be found at the end of this chapter.

**2.3   FAMILY COMPOSITION**
**[24 CFR §982.201(c)]**

The applicant must qualify as a family.  The Housing Authority defines a family as a single person or a group of persons as follows.

1.  **An elderly family:**  A family whose head, spouse, or sole member is a person who is at least 62 years of age.  It may include two or more persons who are at least 62 years of age living together, or one or more persons who are at least 62 years of age living with one or more live-in aides.

2.  **A disabled family:**  A family whose head, spouse, or sole member is a person with disabilities.  It may include two or more persons with disabilities living together, or one or more persons with disabilities living with one or more live-in aides.

3.  **The remaining member of a tenant family:**  Includes a pregnant person whose pregnancy was terminated after admission to the program.  However, if the pregnancy is terminated before admission to the program, the individual will no longer constitute a family.  The remaining member of a tenant family will be reassigned another bedroom size voucher, provided there is funding available.  The remaining member of a tenant family does not include a live-in aide of the former family whose service was necessary to care for the well being of an elderly, disabled or handicapped head of household, or spouse and whose income was not included for eligibility purposes.

4.  **A group of persons:**  Two or more persons sharing residency, who are not categorized as an elderly or disabled family, whose income and resources are available to meet family needs.  There must be a relation by blood, marriage or operation of law, or the group must provide evidence of a significant relationship determined to be stable by the Housing Authority.  The following is to be considered as relation by blood: mother, father, children, cousin, niece, nephew, aunt, uncle, grandfather and grandmother.  A group of two could also be a single person who is pregnant or in the process of adopting or securing legal custody of any individual under the age of 18.

5.  **A single person:**  A person who lives alone, or intends to live alone, who is not categorized as elderly, disabled, or the remaining member of a tenant family.

A child who is temporarily away from home due to placement in foster care is considered a member of the family.

Housing Authority of the County of Los Angeles

### 2.3.1  Stable Relationship

When the applicant group is not related by blood, marriage, or operation of law, the Housing Authority will require that the applicant group provide evidence of a stable relationship.

The Housing Authority defines a stable relationship as:

1.  A relationship that has been in existence for a minimum of 6 months, and
2.  The parties provide financial support for each other.

Acceptable documentation of a stable relationship includes lease agreements indicating that the parties have lived together for at least 6 months, utility bills, other joint bills and/or bank account(s) (need to provide for a 6-month period), and, on a case-by-case basis, letters from a social service provider or religious organization confirming the relationship.

### 2.3.2  Head of Household
### [24 CFR §5.504]

The head of household is considered to be the adult designated by the family or the Housing Authority to sign program-related documents. However, since rental assistance is provided to the entire family, it is expected that every family member will uphold the Housing Authority's rules and regulations.  Emancipated minors who qualify under State law will be recognized as head of household.

### 2.3.3  Spouse of Head

Spouse means the husband or wife of the head of household.  The marriage partner who, in order to dissolve the relationship, would have to be divorced. This includes the partner in a common-law marriage.

### 2.3.4  Live-In Aides
### [24 CFR §982.316 and 24 CFR §5.403]

A family may include a live-in aide if the live-in aide meets the following stipulations.  The live-in aide:

1.  Is determined by the Housing Authority to be essential to the care and well being of an elderly person or a person with a disability;
2.  Is not obligated for the support of the person(s);
3.  Would not be living in the unit except to provide care for the person(s); and
4.  Must submit a signed Criminal Background Consent Form.

A live-in aide is different from a family member in the following:

1.  An aide's income will not be used to determine eligibility of family;
2.  An aide is not subject to citizenship/eligible immigrant requirements;
3.  An aide is not considered a remaining member of the tenant family, which means that they are not entitled to retain the voucher if the eligible family

member(s) voluntarily leave the program, are terminated from the program, or have a voucher that expires.

Relatives are not automatically excluded from being live-in aides, but they must meet all the stipulations in the live-in aide definition described above to qualify for the income exclusion as a live-in aide. A relative who does not qualify for an income exclusion as a live-in aide may qualify for other exclusions, including if a family receives income from a state agency to offset the cost of services and equipment needed to keep a developmentally disabled family member at home. For a complete list of income exclusions, refer to Section 6.4 (Income Inclusions and Exclusions).

A live-in aide may only reside in the unit with the approval of the Housing Authority. The Housing Authority will require written verification from a reliable, knowledgeable professional, such as a doctor, social worker, or caseworker. The verification provider must certify that a live-in aide is needed for the care of the family member who is elderly, and/or disabled. The verification must include the hours of care that will be provided.

The live-in aide will be subject to a criminal background check and must meet the same standard as an applicant. Please see Section 2.8 (Screening for Drug Abuse and Other Criminal Activity) for more information.

With authorization from the assisted family, the landlord and the Housing Authority, a live-in aide may have a family member live in the assisted unit as long as it does not create overcrowding in the unit. The Housing Authority will not increase the family's subsidy to accommodate the family of a live-in aide.

### 2.3.5   Split Households Before Voucher Issuance

When a family breakup occurs while a family is on the waiting list due to divorce or legal separation, it is the responsibility of the two families to decide which will take the placement on the waiting list. If no decision or court determination is made, the Housing Authority will make the decision, taking into consideration the following:

1. Which family member applied as head of household;
2. Which family member retains the children or any disabled or elderly members;
3. Any restrictions that were in place at the time the family applied;
4. Role of domestic violence or any other infraction; and
5. Recommendation of social service agencies or qualified professionals.

### 2.3.6   Multiple Families in the Same Household

When families consisting of two families living together, (such as a mother and father, and a daughter with her own husband or children), apply together as a family, they will be treated as one-family unit.

Housing Authority of the County of Los Angeles

**2.3.7** **Joint Custody of Children**

Children who are subject to a joint custody agreement but live with one parent at least 51 percent of the time will be considered members of that household. If both parents on the waiting list are trying to claim the child, the parent whose address is listed in the school records will be allowed to claim the school-age child as a dependent.

Where court orders exist and provide guidance on custody issues, the Housing Authority will follow the directives outline in the court documents.

**2.4** **INCOME LIMITATIONS**
**[24 CFR §982.201(b) and 24 CFR §5.603(b)]**

In order to be eligible for assistance, an applicant must be:

1. An extremely low-income family (a family whose gross annual income does not exceed 30 percent of the HUD-established median income for the Los Angeles-Long Beach Primary Metropolitan Statistical Area); **or**

2. A low-income family (a family whose gross annual income does not exceed 80 percent of the median income for the Los Angeles-Long Beach Primary Metropolitan Statistical Area.

As required by HUD regulations, 75 percent of all new admissions will be required to meet the definition of an extremely low-income family. To achieve the required balance, it may be necessary to skip over an otherwise eligible family. If this occurs, families that have been skipped over will retain the time and date of application and will be admitted as soon as an appropriate opening becomes available.

Families whose annual incomes exceed the income limit will be denied admission and offered an informal review.

**2.4.1** **Income Limits for Other Programs**

Periodically, HUD has provided funding to the Housing Authority for projects involving preservation opt-outs and/or the expiration of a project based Section 8 contract. HUD provides the income limits applicable to those projects through specific regulation. The Housing Authority will follow HUD directives in determining admissions for such programs.

**2.5** **ELIGIBILITY OF STUDENTS**
**[24 CFR §5.612]**

The student rule applies to all individuals enrolled as a full or part-time student at an institution of higher education for the purpose of obtaining a degree, certificate, or other program leading to a recognized educational credential, except for a student who is living with his/her parents who are applying for or receiving section 8 assistance.

No assistance shall be provided to any individual that meets the following criteria:

➤ Is enrolled as a student at an institution of higher education, as defined under section 102 of the Higher Education Act of 1965 (20 U.S.C. 1002);

> Is under 24 years of age;

> Is not a veteran of the United States military;

> Is unmarried;

> Does not have a dependent child;

> Is not a person with disabilities, as such term is defined in section 3(b)(3)(F) of the United States Housing Act of 1937 and was not receiving assistance under such section 8 as of November 30, 2005; and

> Is not otherwise individually eligible (determined independent from his or her parents. See section 1.13 Terminology), or has parents, who individually or jointly, are not eligible on the basis of income to receive assistance.

> Unless the student is determined independent from his or her parents, the eligibility of a student seeking assistance will be based on both the student and the parents being determined income eligible for assistance or whether the student's parents, individually or jointly, are income eligible for assistance. Both the student's income and the parents' income must be separately assessed for income eligibility.

## 2.6    CITIZENSHIP/ELIGIBLE IMMIGRATION STATUS
### [24 CFR §982.201(a) and §982.203(b)(4) and §5.508]

Eligibility for assistance is contingent upon a family's submission of evidence of citizenship or eligible immigration status. In order to receive assistance, a family member must be a U.S. citizen or eligible immigrant. Each family member, regardless of age, must submit a signed declaration of U.S. citizenship or eligible immigration status. The Housing Authority may request verification of the declaration according to verification guidelines detailed in Chapter 7.

The citizenship/eligible immigration status of each member of the family is considered individually before the family's status is defined.

### 2.6.1   Mixed Families
#### [24 CFR §5.504]

An applicant family is eligible for assistance as long as at least one member is a citizen or eligible immigrant. A family that includes eligible and ineligible individuals is called a "mixed family." Mixed family applicants will be given notice that their assistance will be prorated and that they may request a hearing if they contest this determination.

### 2.6.2   No Eligible Members
#### [24 CFR §982.552(b)(4)]

The Housing Authority is required to deny admission if no member of the family is a U.S. citizen or eligible immigrant. Families will be provided the opportunity to appeal the decision in an informal review.

Housing Authority of the County of Los Angeles

**2.7**  **SOCIAL SECURITY NUMBER REQUIREMENTS**
     **[24 CFR §5.216(a)]**

Applicant families are required to provide verification of Social Security numbers for all family members prior to admission, if they have been issued a number by the Social Security Administration.  This requirement also applies to persons joining the family after the admission to the program.  Children age 5 and under, who have not been assigned a number, are exempt from this requirement.

Failure to furnish verification of Social Security numbers is grounds for denial of admission.

**2.8**  **SCREENING FOR DRUG ABUSE AND OTHER CRIMINAL ACTIVITY**
     **[24 CFR §982.552 – §982.553]**

This section describes the guidelines the Housing Authority has established for screening applicants for drug abuse and other criminal activity.  The section includes HUD-required screening standards, as well as discretionary standards allowed by HUD.  The Housing Authority will deny program admission if there is reasonable cause to believe that an applicant family has engaged in activity prohibited by these guidelines.

These guidelines apply to applicant families, and any new members being added to the household of a family currently participating in a rental assistance program administered by the Housing Authority.  The Housing Authority also screens families transferring into its jurisdiction from other housing authorities, as authorized at 24 CFR §982.355(c)(9) and §982.355(c)(10).

**2.8.1**  **Drug Abuse and Criminal History Screening Standards**
      **[24 CFR §982.552(i) and §982.553(a)]**

The Housing Authority will prohibit program admission to households if any household member is found to have engaged in activities listed in this screening standards section.  Applicants convicted of an act listed in this section are ineligible to receive assistance.  However, the Housing Authority will consider the household eligible for rental assistance if the household member who committed the criminal act will not be a part of the assisted household; as long as all other admission requirements are met.  The family may be required to submit written certification that the ineligible family member(s) will not reside in and/or visit the household.

1.  **Applicant(s) previously evicted from federally assisted housing for drug-related criminal activity.**

    The Housing Authority is required to deny admission to the applicant or any household member evicted from public housing, Indian housing, Section 23, or any federally assisted housing program because of a drug-related criminal activity for a 3-year period beginning on the date of such eviction.  However, the Housing Authority may waive the 3-year probation period if the person who committed the drug-related crime has successfully completed an approved supervised drug rehabilitation program after the date of the eviction or if the circumstances leading to

the eviction no longer exist (i.e. the individual responsible for the original eviction is imprisoned or is deceased).

2. **Applicant(s) convicted for the manufacture of methamphetamine on the premises of federally assisted housing.**

   The Housing Authority is required to deny admission if the applicant or any household member has ever been convicted of drug-related criminal activity for manufacture or production of methamphetamine on the premises of federally assisted housing.

3. **Applicant(s) currently engaging in the illegal use of a drug.**

   The Housing Authority is required to deny admission to an applicant or any household member who the Housing Authority determines is currently engaging in illegal use of a drug.

   The Housing Authority is required to deny admission if the Housing Authority has reasonable cause to believe that there is a pattern of illegal use of a drug by the applicant or any household member and that this pattern may threaten the health, safety, or right to peaceful enjoyment of the premises by others, regardless of whether the household member has been arrested or convicted.

   The Housing Authority may approve admission if the person provides sufficient evidence that they are no longer engaging in illegal drug use and have successfully completed a supervised drug rehabilitation program.

4. **Applicant(s) subject to a lifetime sex offender registration requirement.**

   The Housing Authority is required to deny admission if the applicant or any household member is subject to lifetime registration as a sex offender under a state registration program, regardless of longevity of conviction or completion of any rehabilitative program.

5. **Applicant(s) with a pattern of alcohol abuse.**

   The Housing Authority is required to deny admission if the Housing Authority has reasonable cause to believe that there is a pattern of abuse of alcohol by the applicant or any household member and this pattern may threaten the health, safety, or peaceful enjoyment of the premises.

   The Housing Authority may approve admission if the person provides sufficient evidence that they are no longer engaging in the abuse of alcohol and has successfully completed a supervised alcohol rehabilitation program.

6. **Applicant(s) currently engaging in, or who have engaged in criminal activities.**

   The Housing Authority shall deny admission if the applicant or any household member has been convicted for **any** of the following activities, for a period of 3 years following the end of a conviction or incarceration (which ever is later), with no further arrest or convictions other than minor traffic violations:

Housing Authority of the County of Los Angeles

- Drug-related criminal activity;

- Violent criminal activity (convicted perpetrators only);

- Other criminal activity which may threaten the health, safety, or right to peaceful enjoyment of the premises by other residents or persons residing in the immediate vicinity; and

- Other criminal activity which may threaten the health or safety of the owner or Housing Authority staff, contractor or subcontractors or vendors.

- The Housing Authority may waive the 3-year period for drug-related criminal activity if the person provides sufficient evidence that they are no longer engaging in the illegal use of a controlled substance and have successfully completed a supervised drug rehabilitation program.

7. **Applicant(s) engaging in fraud or bribery associated with any federal housing program.**

The Housing Authority shall deny admission if the applicant or any household member has committed fraud, bribery, or any other corrupt or criminal act in connection with any Federal housing program. The Housing Authority may make an exception in determining admission if the family member(s) who participated or were culpable for the action do not reside in the assisted unit.

8. **Applicant(s) have not completed parole or probation.**

The Housing Authority shall deny admission if the applicant or any household member has not completed parole or probation, including summary probation.

### 2.8.2   Criminal Background Checks
### [24 CFR §982.552 – §982.553, §5.903 – §5.905]

The Housing Authority requests a criminal background check for all applicant household members (including live-in aides) 18 years of age and older. The criminal background check is used as a factor in screening applicants for criminal activities that would prohibit admission to the Housing Authority's Section 8 rental assistance programs.

All adult members of an applicant household must submit a signed Criminal Background Consent Form [24 CFR §5.903(b)], authorizing the release of criminal conviction records from law enforcement agencies. Failure to sign the consent form will result in the denial of assistance.

A criminal conviction alone may or may not result in the denial of assistance. Factors such as disclosure, completion of a drug or alcohol rehabilitative treatment program, type and longevity of the conviction may also be taken into consideration.

The Housing Authority is additionally authorized by HUD to obtain access to sex offender registration information, in order to prevent program admission to any

household member (including live-in aides and minors) subject to a lifetime sex offender registration under a State sex offender registration program.

**2.8.3    Requests for Criminal Records by Owners of Covered Housing for the Purposes of Screening**
**[24 CFR §5.903(d)]**

Owners of covered housing may request that the Housing Authority obtain criminal records, on their behalf, for the purpose of screening applicants. The Housing Authority will charge a fee in order to cover costs associated with the review of criminal records.   These costs could include fees charged to the Housing Authority by the law enforcement agency and the Housing Authority's own related staff and administrative cost.

Owners must submit the following items in order for the Housing Authority to process criminal records.  Owner requests must include:

1.   A copy of a signed consent form from each adult household members, age 18 years and older.  Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social Security number.  This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2.   An owner's criteria or standards for prohibiting admission of drug criminals in accordance with HUD regulations (§ 5.854 of 24 CFR Parts 5 et al.), and for prohibiting admission of other criminals (§ 5.855 of 24 CFR Parts 5 et al.).

Once the Housing Authority obtains criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used as a basis for applicant screening.   The Housing Authority will base its determination in accordance with HUD regulations and the owner criteria.  If the owner's criteria conflicts with HUD regulations, the regulations will have precedence.

It is important to note that the Housing Authority will not disclose the applicant's criminal conviction record or the content of that record to the owner.

**2.8.4    Request for Criminal Records by Section 8 Project-Based Owners for the Purposes of Lease Enforcement or Eviction**

Section 8 project-based owners may request that the public housing agency in the location of the project obtain criminal conviction records of a household member on behalf of the owner for the purpose of lease enforcement or eviction. The owner's request must include the following:

1.   A copy of the consent form, signed by the household member, and

2.   The owner's standards for lease enforcement and evicting due to criminal activity by members of a household.

Housing Authority of the County of Los Angeles

**2.8.5   Confidentiality of Criminal Records
[24 CFR §5.903(g)]**

Criminal records received by the Housing Authority are maintained confidentially, not misused, nor improperly disseminated and kept locked during non-business hours.  All criminal records will be destroyed no later than 30 calendar days after a final determination is made.

**2.8.6   Disclosure of Criminal Records to Family**

The applicant or family member requesting to be added to the household will be provided with a copy of the criminal record upon request and an opportunity to dispute the record.  Applicants will be provided an opportunity to dispute the record at an informal review.  Participants may contest such records at an informal hearing [24 CFR §982.553(d)].

**2.8.7   Explanations and Terms
[24 CFR §5.100]**

The following terms are used to determine eligibility when an applicant or a family member is added to an already assisted household and is undergoing a criminal background check.

❑   "Covered housing" includes public housing, project-based assistance under Section 8 (including new construction and substantial rehabilitation projects), and tenant-based assistance under Section 8.

❑   "Drug" means a controlled substance as defined in Section 102 of the Controlled Substance Act (21 U.S.C. 802).

❑   "Drug-related criminal activity" means the illegal manufacture, sale, distribution, or use of a drug, or the possession of a drug with the intent to manufacture, sell, distribute or use the drug.

❑   "Pattern" is defined as the use of a controlled substance or alcohol if there is more than one incident during the previous 12 months.  "Incident" includes but is not limited to arrests, convictions, no contest pleas, fines, and city ordinance violations.

❑   "Premises" is the building or complex or development in which the public or assisted housing dwelling unit is located, including common areas and grounds.

❑   "Sufficient evidence" may include all or a number of personal certification along with supporting documentation from the following sources 1) probation officer; 2) landlord; 3) neighbors; 4) social service workers; 5) review of verified criminal records.

❑   "Violent criminal activity" means any criminal activity that has as one of its elements the use, attempted use, or threatened use of physical force substantial enough to cause, or be reasonably likely to cause, serious bodily injury or property damage.  Violent criminal activity also includes activity within the family, such as during domestic disputes.

**2.9**   **OTHER CRITERIA FOR ADMISSION**
        **[24 CFR §982.552(c)]**

The Housing Authority is authorized to apply the following criteria, in addition to the HUD eligibility criteria, as grounds for denial of admission to the program.

1. The family, or any household member, must not have violated any family obligations during a previous participation in a federally assisted housing program. The Housing Authority will review situations, on a case-by-case basis, for violations that are more than 5 years old.

2. The family, or any household member, must not have engaged in serious lease violations while a resident of federally assisted housing or within the past 5 years been evicted from a federally assisted housing program.

3. The family, or any household member, must not be a past participant of any Section 8 or public housing program who has failed to satisfy liability for rent, damages or other amounts to the Housing Authority or another public housing agency, including amounts paid under a HAP contract to an owner for rent, damages, or other amounts owed by the family under the lease.

   • On a case-by-case basis, the Housing Authority may provide the applicant the opportunity to repay any such debt in full as a condition of admissions. The Housing Authority will not enter into a repayment agreement for this purpose.

4. No family household member may have engaged in or threaten abusive or violent behavior toward Housing Authority personnel.

   • "Abusive or violent behavior" includes verbal as well as physical abuse or violence. Use of expletives that are generally considered insulting, racial epithets, or other language, written or oral, that is customarily used to insult or intimidate, may be cause for denial of admission.

   • "Threatening" refers to oral or written threats or physical gestures that communicate intent to abuse or commit violence.

   • Actual physical abuse or violence will always be cause for denial.

5. The family, or any household member, must not supply false, inaccurate or incomplete information on any application for federal housing programs, including public housing and Section 8. The family may be denied for a period not to exceed 2 years from the date of such a determination by the Housing Authority that information which was provided was false, inaccurate or incomplete, provided that no further cause for denial exists [24 CFR §982.552(c)(2)(i)].

**2.10**   **SUITABILITY OF FAMILY**
         **[24 CFR §982.307(a)(2)]**

The Housing Authority may take into consideration any admission criteria listed in this chapter in order to screen applicants for program eligibility; however, it is the owner's responsibility to screen applicants for family behavior and suitability for tenancy.

Housing Authority of the County of Los Angeles

The Housing Authority will assist and advise applicants on how to file a compliant if they have been discriminated against by an owner.

**2.11   DENYING ADMISSION TO INELIGIBLE FAMILIES
[24 CFR §982.201(f)(1) AND §982.552(A)(2)]**

Denial of assistance for an applicant family may include denying placement on the waiting list; denying or withdrawing a voucher; refusing to enter into a HAP contract or approve a lease; and refusing to process or provide assistance under portability procedures.

Families from the waiting list who are determined to be ineligible will be notified in writing of the reason for denial and given an opportunity to request an informal review if they do not agree with the decision.  This policy also applies to incoming families from other housing authorities that have not yet received assistance in the Housing Authority's jurisdiction.  Please refer to Chapter 16 for more information on the informal review process.

**CHAPTER 3:**
**ADMINISTRATION OF THE WAITING LIST**

**3.1** **INTRODUCTION**
**[24 CFR §982.54(d)(1)]**

This chapter describes the policies and procedures that govern the initial application, placement and denial of placement on the Housing Authority's waiting list. It is the Housing Authority's objective to ensure that the families are placed on the waiting list in the proper order so that an offer of assistance is not delayed to any family, or made to any family prematurely.

By maintaining an accurate waiting list, the Housing Authority will be able to perform the activities, which ensure that an adequate pool of qualified applicants will be available so that program funds are used in a timely manner.

**3.2** **HOW TO REGISTER**

Interested persons may apply online at www.hacola.org, or by calling the Housing Authority's special application telephone number.

**3.2.1** **Preliminary Registration Waiting List**
**[24 CFR §982.204(b)]**

All families wishing to receive rental assistance through a Housing Authority rental assistance program are initially placed on the Preliminary Registration Waiting List. This is essentially an interest list. Families are placed on the Preliminary Registration Waiting List according to the date and time of their registration. Preliminary information regarding the family's address, income, family composition, and disability status is collected. However, this information is not verified until the family is placed on the Active Waiting List. Applicants receive a confirmation letter that their name has been placed on the Preliminary Registration Waiting List.

**3.2.2** **Active Waiting List**

When the Housing Authority determines that there is sufficient funding to issue additional vouchers, a pool of potential new applicants is drawn from the Preliminary Registration Waiting List. Families move onto the Active Waiting List according to the date and time of their registration. Once a family has been placed on the Active Waiting List, they will be asked to complete an application and provide all the necessary income and eligibility forms. At this point, all information will be confirmed through a third-party. Families must meet all admissions requirements to be issued a voucher.

**3.2.3** **Change in Circumstances**
**[24 CFR §982.204(b)]**

Applicants are required to notify the Housing Authority in writing, within 30 calendar days, when their circumstances change, including any change of address, income or family composition.

Housing Authority of the County of Los Angeles

**3.3**    **APPLYING FOR SPECIAL PROGRAMS AND NON-HOUSING CHOICE VOUCHER PROGRAMS**

To see a list of special programs, other non-Housing Choice Voucher Programs and the eligibility process, please refer to Chapter 18 (Special Programs).

**3.4**    **SPECIAL ADMISSIONS**

Applicants admitted under special admissions, rather than from the waiting list, are identified by codes in the automated system and are not maintained on separate lists.

Applicants who are admitted under targeted funding which are not identified as a Special Admission are identified by codes in the automated system and are not maintained on separate waiting lists.

**3.4.1**    **Exceptions for Special Admissions [24 CFR §982.203]**

If HUD awards the Housing Authority program funding that is targeted for specifically named families, the Housing Authority will admit these families under a special admission procedure. Special admissions families will be admitted outside of the regular waiting list process. They do not have to qualify for any preferences, nor are they required to be on the program waiting list. They are not counted in the limit on non-Federal preference admissions. The Housing Authority maintains separate records of these admissions. The following are examples of types of program funding that may be designated by HUD for families living in a specified unit:

1. A family displaced because of demolition or disposition of a public or Indian housing project;

2. A family residing in a multifamily rental housing project when HUD sells forecloses or demolishes the project;

3. For housing covered by the Low Income Housing Preservation and Resident Homeownership Act of 1990;

4. A family residing in a project covered by a project-based Section 8 HAP contract at or near the end of the contract term; and

5. A non-purchasing family residing in a HOPE 1 or HOPE 2 project.

**3.4.2**    **Criminal Background Checks**

Program applicants for all voluntary set-aside programs will require criminal background checks. Applicants for the Shelter Plus Care program will not be required to undergo criminal background checks. For more specific information on the applicant screening standards used by the Housing Authority when reviewing criminal records, please refer to Section 2.8 (Screening for Drug Abuse and Other Criminal Activity).

**3.5   OPENING AND CLOSING THE WAITING LIST
      [24 CFR §982.206]**

The Housing Authority has maintained a continuously open waiting list, and for the foreseeable future plans to continue this process indefinitely.  However, should it become necessary to close and then reopen the waiting list, the Housing Authority will comply with the policies outlined in this chapter.

**3.5.1   Opening the Waiting List
        [24 CFR §982.206(a)]**

When the Housing Authority opens its waiting list, it will give public notice by advertising in the following newspapers, minority publications, and media entities.

- ➤ Los Angeles Times
- ➤ La Opinion
- ➤ The Daily News
- ➤ International Daily News
- ➤ L.A. Sentinel
- ➤ Long Beach Press Telegram
- ➤ Eastern Group Publications
- ➤ The Wave
- ➤ The Daily Breeze

The Housing Authority's public notice will contain:

- ➤ The dates, times, and locations where families may apply;
- ➤ The programs for which applications will be taken;
- ➤ A brief description of the program(s);
- ➤ A statement that public housing residents must submit a separate application if they want to apply to a rental assistance program;
- ➤ Any limitations on who may apply; and
- ➤ The Fair Housing Logo.

The notice will provide potential applicants with information that includes the Housing Authority's telephone number, website address, location address, information on eligibility requirements, and the availability of local preferences, if applicable.  The notice will be made in an accessible format to persons with disabilities if requested.

Additional time for submission of an application after the stated deadline will be given as a reasonable accommodation at the request of a person with a disability.

Housing Authority of the County of Los Angeles

### 3.5.2   Criteria Defining Who May Apply
**[24 CFR §982.206(b)(1)]**

Upon opening the waiting list, the Housing Authority will disclose the criteria defining what families may apply for assistance under a public notice.

If there are sufficient applications from elderly families, disabled families, and displaced singles, applications will not be accepted from other singles.

### 3.5.3   Closing the Waiting List
**[24 CFR §982.206(c)]**

Should it become necessary to close the waiting list, the Housing Authority will use the same advertising methods described above.

Notification of impending closure will be provided to the public for a minimum of 30 calendar days.

### 3.6   TIME OF SELECTION
**[24 CFR §982.204(d)]**

When funding is available, families will be selected from the waiting list based on the date and time of registration.

If the Housing Authority ever has insufficient funds to subsidize the unit size of the family at the top of the waiting list, the Housing Authority will not admit any other applicant until funding is available for the first applicant.

However, families may be skipped over to meet HUD-mandated income targeting requirements [24 CFR §982.201(b)].  See Section 2.4 (Income Limitations) for details.

### 3.7   CROSS-LISTING OF PUBLIC HOUSING AND SECTION 8 WAITING LISTS
**[24 CFR §982.205(a)]**

The Housing Authority does not merge the waiting lists for public housing and Section 8.  However, if the Section 8 waiting list is open when the applicant is placed on the public housing list, the Housing Authority must offer to place the family on the Section 8 waiting list.  If the public housing waiting list is open at the time an applicant applies for Section 8 rental assistance, the Housing Authority must offer to place the family on the public housing waiting list.

### 3.8   REMOVING APPLICANTS FROM THE WAITING LIST AND PURGING
**[24 CFR §982.204(c) and §982.201(f)(1)]**

The Housing Authority is authorized to remove names of applicants who do not respond to requests for information or updates. An applicant who fails to respond to a Housing Authority mailing within the time frame indicated will be removed from the waiting list.  An extension may be considered a reasonable accommodation if requested in advance by a person with a disability.

If a letter is returned by the Post Office, the applicant will be removed without further notice. The envelope and letter will be maintained in the file.

This policy applies to purging, in which a request for current information and confirmation of continued interest is mailed to all applicants, to ensure that the waiting list is current and accurate.

Notices will be made available in accessible format upon the request of a person with a disability.

Applicants who are removed from the waiting list for failure to respond are not entitled to reinstatement on the waiting list, unless:

> ➢ The Housing Authority verifies a family/health/work emergency, or

> ➢ The applicant failed to respond because of a family member's disability.

Periodically, registrants will call to check their status on the waiting list and learn that they have been cancelled because mail was returned undeliverable.   In extenuating circumstances, such as a long-term illness, or other family emergency, the registrant may be reinstated.   However, the registrant must be able to provide documentation of the circumstances.   Such requests will be reviewed and approved (or denied) on a case-by-case basis by the Applications and Eligibility Unit Supervisor.

### 3.9    APPLICATION POOL

The waiting list will be maintained in accordance with the following guidelines:

1. The application will be a permanent file;

2. Applications equal in preference will be maintained by date and time; and

3. All applicants must meet eligibility requirements outlined in Chapter 2 (Admission Eligibility Factors and Applicant Requirements).

Housing Authority of the County of Los Angeles

**Chapter 4:**
**ADMISSION PROCESS**

**4.1    INTRODUCTION**

The policies outlined in this chapter are intended to ensure that all families who express an interest in housing assistance are given an equal opportunity to apply. The primary purpose of the intake function is to gather information about the family so that an accurate, fair, and timely decision relative to the family's eligibility may be made. As such, applicants are placed on the waiting list in accordance with this plan.

**4.2    APPLICATION PROCEDURES**
       **[24 CFR §982.204(c)]**

Once the applicant is transferred from the Preliminary Registration Waiting List to the Active Waiting List, an application will be mailed to the applicant. The application is due back within 10 calendar days from the date it was mailed. If the application is returned undeliverable, the applicant will be cancelled from the waiting list.

Once an application is returned, the information provided by the applicant will be used to determine if the applicant is eligible for a tenant selection preference, and used to help the Housing Authority determine which income forms the applicant must complete.

If an applicant is ineligible based on the information provided on the application, or because they fail to return the documents by the due date, the applicant will be provided written notice of the reason for their disqualification and their right to request an informal review.

The application may capture the following information:

> ➢ Name of adult members and age of all members;
> ➢ Sex and relationship of all members;
> ➢ Street address and phone number;
> ➢ Mailing address;
> ➢ Amount(s) and source(s) of income received by household members;
> ➢ Information regarding disabilities relating to program requirements;
> ➢ Information related to qualification for preference(s);
> ➢ Social Security numbers;
> ➢ Race/ethnicity;
> ➢ Citizenship/eligible immigration status;
> ➢ Convictions for drug-related or violent criminal activity;
> ➢ Request for specific reasonable accommodation(s) needed to fully utilize program and services;

> ➢ Previous address;

> ➢ Current and previous landlords' names and addresses;

> ➢ Emergency contact person and address; and

> ➢ Program integrity questions regarding previous participation in HUD programs.

Applicants are required to inform the Housing Authority in writing within 30 calendar days of effective date of any changes in family composition, income, and address, as well as any changes in their preference status. Applicants must also comply with requests from the Housing Authority to update information.

**4.2.1   Interview Sessions/Mailings**

The Housing Authority will use both mailing and interview sessions to obtain income, asset and family composition information from applicants.

**4.2.2   Request for Information via Mail**

During times of high activity, the Housing Authority will mail income and asset forms to applicants. Applicants will be given 10 calendar days to complete and return all required forms.  If forms are not returned in a timely manner, the applicant will receive a final notice.  The final notice will provide an additional 5-day grace period.  If the required forms are not returned, as specified, the application will be cancelled.  The Housing Authority will provide additional time, with appropriate documentation, as a reasonable accommodation and in special circumstances such as an illness and/or death in the family.

**4.2.3   Application Interview Process**

During times for regular activity (average volume), the Housing Authority utilizes a full application interview to discuss the family's circumstances in greater detail, to clarify information that has been provided by the applicant, and to ensure that the information is complete.

Applicants are given two opportunities to attend an interview session.  If the applicant does not respond to the second invitation, the application is cancelled. Housing Authority will allow for a third interview appointment as a reasonable accommodation and in special circumstances such as illness.  An applicant may also request that the Housing Authority assign someone to conduct the interview at the applicant's home, as a reasonable accommodation.

All applicants must complete the following requirements [24 CFR §982.551(b)(1)(iii)].

1. At minimum, the <u>head of household must attend the interview</u>.  The Housing Authority requests that all adult members of the applicant family attend when possible. This assures that all members receive information regarding their obligations and allows the Housing Authority to obtain signatures on critical documents quicker.

Housing Authority of the County of Los Angeles

2. All adult members of the applicant family must sign the HUD-9886 Form (Authorization for the Release of Information), and all supplemental forms required by Housing Authority.

3. Citizen declaration forms must be completed for all applicant family members, regardless of age.

4. All adult members of the applicant family must complete and sign a Criminal Background Consent/Acknowledgment Form.

5. Identification information for all members of the applicant family such as birth certificates, valid driver's licenses or State (Department of Motor Vehicles) ID cards, whichever is applicable based on the age of the family member, must be submitted for all members of the household regardless of age.

Information provided by the applicant will be verified, including citizenship status, full-time student status and other factors related to preferences, eligibility and rent calculation. Verifications must not be older than 60 calendar days old at the time of issuance.

If they are requested, exceptions for any of the above listed items will be reviewed on a case-by-case basis. Exceptions will be granted based upon hardship. Reasonable accommodations will be made for persons with disabilities. In these cases, a designee will be allowed to provide some information, but only with permission of the person with a disability.

Under both processes, all local preferences claimed on the application while the family is on the waiting list will be verified. Preference is based on current status, so the qualifications for preference must exist at the time the preference is verified, regardless of the length of time an applicant has been on the waiting list.

### 4.2.4 Secondary Reviews/Credit Reports
### [24 CFR §982.551(b)(1)]

Before issuing vouchers to applicant families, the Housing Authority requests a credit report for a random sample of new applicant families, as detailed in Section 1.12 (Monitoring Program Performance). Of the randomly selected families, all adults (persons 18 years of age and older) who will reside in the assisted household will have their credit report reviewed by the Housing Authority. Applicant households claiming that they have zero income will automatically undergo a credit review.

The information contained in the credit report will be used to confirm the information provided by the family. Specifically, the credit report will be used to confirm:

❑ **Employment**: A credit report will list any employers that the applicant has listed in any recent credit applications. If the credit report reveals employment, for any adult household member, within the last 12 months that was not disclosed, the family will be asked to provide additional documents to clear up the discrepancy. Failure to disclose current employment may result in cancellation of the family's application.

❑ **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit.  Common reasons for use of other names include a recent marriage or a divorce.  If an alias has not been disclosed to the Housing Authority, the family will be asked to provide additional evidence of the legal identity of adult family members.

❑ **Current and previous addresses**: A credit report can provide a history of where the family has lived.  This is particularly important because the Housing Authority provides a residency preference.  If the family has provided one address to the Housing Authority and the credit report indicates a different address, the family will be asked to provide additional proof of residency.  This may include a history of utility bills, bank statements, school enrollment records for children, credit card statements or other relevant documents.  Failure to provide adequate proof will result in the denial of a residency preference.

❑ **Credit card and loan payments**: A credit report will usually include a list of the family's financial obligations.  Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments.  The Housing Authority will review this information to confirm the income and asset information provided by the family.  If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, the Housing Authority will ask the family to disclose how they are currently meeting their financial obligations.  Accounts that have been charged off or significantly delinquent are not included in this calculation.  Failure to provide adequate proof of income will result in termination of the application.

❑ **Multiple Social Security numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit. If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

A family will not be issued a voucher until all discrepancies between the information provided by the applicant family, and the information contained in the credit report have been cleared by the applicant family.

When discrepancies are found, the family will be contacted by telephone or by mail.  In most cases, the family will be allowed a maximum of 10 calendar days to provide the additional documentation.  On a case-by-case basis, as a reasonable accommodation, the family may be granted additional time.  If additional time is granted, the family will receive a letter confirming the new deadline.  No additional extension will be granted thereafter.

When the credit report reveals multiple discrepancies that are not easily communicated over the telephone, the Housing Authority will set up a face-to-face interview with the applicant.  The Housing Authority will schedule up to two interview appointments.  An additional interview may be scheduled as a reasonable accommodation. Failure to appear at the interview session will result in cancellation of the application.

Housing Authority of the County of Los Angeles

Additionally, failure to provide the necessary information will result in cancellation of the application.

**4.3**   **LOCAL PREFERENCES**
   **[24 CFR §982.207]**

The Housing Authority will apply a system of local preferences in determining admissions for the program.  All preferences will be subject to the availability of funds and all applicants will be required to meet all eligibility requirements.  In accordance with California Health and Safety Code §34322.2, the Housing Authority will give priority to families of veterans and members of the armed forces in each of the categories below.   Local preferences are weighted highest to lowest, in the following order:

1. **Set-Aside, Targeted, and Special Programs :** Families who qualify for Set-Aside, Targeted, or Special Programs administered by the Housing Authority will be admitted before all other eligible registrants or applicants on the waiting list.  Referral may be made by County agencies with a contract or Memorandum of Understanding in place, or by contracted CBO's up to and not to exceed the number of vouchers specified in the contract.

2. Families previously assisted by the Housing Authority whose assistance was terminated due to insufficient funding.

3. **Jurisdictional Preference:** Families who live and/or work in the Housing Authority's jurisdiction will be admitted before families outside of the Housing Authority's jurisdiction.

4. These preferences are subject to the approval of the Executive Director:

   - **Victims of Declared Disasters:** An admissions preference may be given to bona fide victims of declared disasters, whether due to natural calamity (e.g. earthquake), civil disturbance, or other causes recognized by the federal government. Victims must provide documentation to receive an admissions preference. Admissions preference may only be given within the allotted timeframe established by the federal government. If HUD provides specific funding, the Housing Authority will not exceed the allocated amount.

   - **Displacement Due to Government Actions:** Families or individuals who are certified as displaced due to the action of a federal government agency or local government agencies may be given an admissions preference.

   - **Referrals from law enforcement agencies:** The Housing Authority may distribute application forms and may issue a voucher to families or single persons that are referred by law enforcement agencies. The types of referrals that will be considered include, but are not limited to:

     - Victims of domestic violence,

     - Involuntarily displaced to avoid reprisals, or

     - Displaced due to being a victim of a hate crime.

- 32 -

> Law enforcement referrals must be made in writing, on law enforcement agency letterhead, and signed by the requesting officer and his or her immediate supervisor. Eligibility, including background checks will be confirmed for all members.

5. **Date and Time of Registration**: When the family placed their name on the Section 8 Preliminary Registration Waiting List.

6. **Other preferences**:

   • Elderly and permanently disabled families as defined in Chapter 2, Section 2.3 (Family Composition).

**Treatment of Single Applicants**: All families with children, elderly families, and disabled families will have an admission preference over "Other Singles."

### 4.3.1 Verification of Preferences
### [24 CFR §982.207(e)]

**Residency Preference**: For families who are residing in the Housing Authority's jurisdiction at the time the application is mailed to them, or have at least one adult member who works or has been hired to work in the Housing Authority's jurisdiction.

> ➢ In order to verify that an applicant is a resident, the Housing Authority will require documentation of residency as shown by the following documents: current rent receipts, leases, utility bills, employer or agency records, school records, drivers licenses or credit reports.

> ➢ In cases where the family's head of household or spouse works or has been hired to work in the Housing Authority's jurisdiction, a statement from the employer will be required.

**Veteran's Preference**: Acceptable documentation regarding veteran's status will include a DD-214 (discharge documents), proof of receipt of veteran's benefits, or documentation from the Veteran's Administration.

### 4.3.2 Final Verification of Preferences
### [24 CFR §982.207(e)]

Preference information on applications will be updated as applicants are selected from the waiting list. At that time, the Housing Authority will obtain necessary verifications of preference at the interview and by third-party verification.

### 4.3.3 Preference Denial

If the Housing Authority denies a preference, the Housing Authority will notify the applicant in writing of the reasons why the preference was denied and offer the applicant an opportunity for an informal review. If the preference denial is upheld as a result of the informal review, the applicant will be placed on the waiting list without benefit of the preference. Applicants may exercise other rights if they believe they have been discriminated against.

Housing Authority of the County of Los Angeles

If the applicant falsifies documents or makes false statements in order to qualify for any preference, or for any other reason, they will be removed from the waiting list.

**4.4    DENID OF ASSISTANCE**
**[24 CFR §982.204(c)(1) and §982.204(f)(1) §982.552]**

If an application is denied due to failure to attend the initial and final interviews, or for failure to provide eligibility related information, the applicant family will be notified in writing and offered an opportunity to request an informal review.   If the applicant misses two scheduled meetings, the Housing Authority will cancel the application and remove the applicant's name from the waiting list.

The Housing Authority may at any time deny program assistance to an applicant family because of actions or failure to act by members of the family such as any member of the family to sign and submit consent forms for obtaining information.

The Housing Authority will not deny admission of an applicant who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the applicant otherwise qualifies for admission.

**4.5    FINAL DETERMINATION AND NOTIFICATION OF ELIGIBILITY**
**[24 CFR §982.301]**

If the applicant family is determined to be eligible after all applicable paperwork has been reviewed, they will be invited to attend a briefing session at which time they will receive information regarding their rights and responsibilities and they will be issued a voucher.  See Chapter 8 (Voucher Issuance and Briefings) for more detail information.

## CHAPTER 5:
## SUBSIDY STANDARDS

**5.1**   **INTRODUCTION**
**[24 CFR §982.402(a)]**

Program regulations require that the Housing Authority establish subsidy standards that determine the number of bedrooms needed for families of different sizes and compositions. Such standards must provide for a minimum commitment of subsidy while avoiding overcrowding. The standards in determining the voucher size must be within the minimum unit size requirements of HUD's Housing Quality Standards (HQS).

This chapter lays out the factors used in determining the voucher size issued to a family initially and when there is a move to a new unit, as well as the Housing Authority's procedures for handling changes in family size, selection of unit size that are different from the voucher size and requests for waivers.

**5.2**   **DETERMINATION OF VOUCHER SIZE**
**[24 CFR §982.402]**

Subsidy standards and determination of voucher bedroom size are based upon the number of family members who will reside in the assisted dwelling unit. All standards in this section relate to the number of bedrooms on the voucher, not the family's actual living arrangements.

The unit size on the voucher remains the same as long as the family composition remains the same.

As required by HUD, the Housing Authority's subsidy standards for determining voucher size shall provide for the smallest number of bedrooms needed to house a family without overcrowding. They will be applied consistently for all families of like size and composition, in a manner consistent with fair housing guidelines and HQS.

In accordance with HUD regulations, the unit size designated on the voucher should be assigned using the following Housing Authority subsidy standards, which are based on two persons per bedroom:

| Number of Household Members | Number of Bedrooms |
|:---:|:---:|
| 1-2 | 1- bedroom |
| 3-4 | 2- bedroom |
| 5-6 | 3- bedroom |
| 7-8 | 4- bedroom |
| 9-10 | 5- bedroom |
| 11-12 | 6- bedroom |

Housing Authority of the County of Los Angeles

1. At issuance, the bedroom size assigned should not require more than two persons to occupy the same bedroom. The family may choose and live within a suitable unit in any grouping that is acceptable to the family, including using the living room for sleeping purposes.

2. Every family member is to be counted as a person in determining the family unit size [24 CFR §982.402(a)(4)-(6)]. Under this definition, family members include the unborn child of a pregnant woman; any live-in aides (approved by the Housing Authority to reside in the unit to care for a family member who is disabled or is at least 50 years of age); and a child who is temporarily away from the home because of placement in foster care. A family that consists of a pregnant woman (with no other persons) must be treated as a two-person family.

   **Note**: An approved live-in aide is counted in determining the voucher size. There is no waiver or exception to the subsidy standards unless otherwise specified.

3. An additional bedroom may be assigned if approved under a waiver by the Housing Authority (see Section 5.3 below).

4. If the family decides to move, the Housing Authority will issue a voucher based on the family's current composition.

### 5.2.1  Maximum Unit Occupancy

In cases where an additional person(s) joins the family and the family will continue to occupy the same rental unit, i.e. no move is involved, the Housing Authority may require the family to use the living room for sleeping purposes for no more than one person provided that the unit meets other HQS.

Changes to household composition must be made according to Housing Authority policy detailed in Section 12.5 (Changes in Family Composition).

The maximum occupancy as determined by the Housing Authority is as follows:

| Number of Bedrooms | Maximum Occupancy |
|---|---|
| 1- bedroom | 3 |
| 2- bedroom | 5 |
| 3- bedroom | 7 |
| 4- bedroom | 9 |
| 5- bedroom | 11 |
| 6- bedroom | 13 |

The Housing Authority will not increase the family's voucher size due to additions where the family will continue to occupy the same unit, unless the addition creates an overcrowding situation for the family.

The family may be required to move into a larger size dwelling unit if the Housing Authority determines that the family is overcrowded.

**5.3   OCCUPANCY STANDARDS WAIVER**
**[24 CFR §982.402(b)(8)]**

The standards discussed above should apply to the vast majority of assisted families.  However, in some cases, the Housing Authority may grant exceptions to the subsidy standards.  Examples of possible exceptions that may be justified include but are not limited to:

1. The health of a family member.

2. A reasonable accommodation to a disability.

Requests based on health related reasons must be verified, in writing, by a doctor or other medical professional.  The request must specify the reason for the request and how providing a larger bedroom size would improve or accommodate the medical condition.

A Unit Supervisor who has not been involved in the initial determination will review the request, any prior determination and make a decision based on the specifics of the individual case (on a case-by-case basis). After the decision is made, a letter notifying the applicant or participant of the decision regarding the waiver will be sent by the reviewing supervisor.

To request a larger voucher size than indicated by the subsidy standards for any other reason, the family must submit a written request within 15 calendar days of the Housing Authority's determination of bedroom size.  The request must explain the need or justification for a larger bedroom size.

**5.4   EXCEPTIONS FOR FOSTER CHILDREN**
**[24 CFR §982.402(b)(8)]**

Exceptions will be made to accommodate foster children.  The Los Angeles County Department of Family and Children Services (DCFS) has very specific housing guidelines that must be met by foster families. In order to assure that foster children are able to remain with designated Section 8 foster families, the Housing Authority will utilize the guidelines published by the Los Angeles County DCFS, or specified in a court order, in situations involving foster children.

**5.5   FLEXIBILITY OF UNIT SIZE ACTUALLY SELECTED**
**[24 CFR §982.402(d)]**

The family may select a dwelling unit with a different size than that listed on the voucher:

❑ <u>Larger than the voucher size</u>: The Housing Authority shall not prohibit a family from renting an otherwise acceptable unit because it is too large for the family, provided that the rent for the unit is comparable and the family's total rent contribution (rent to the owner plus any applicable utility costs) does not exceed 40 percent of the family's adjusted monthly income (applies only if the gross rent for the unit exceeds the payment standard).

❑ <u>Smaller than the voucher size</u>: The Housing Authority will allow families to request a waiver to rent an otherwise acceptable unit with fewer bedrooms than the voucher size, if the unit does not exceed maximum unit occupancy requirements.

Housing Authority of the County of Los Angeles

### 5.5.1  Calculating Assistance for a Different Unit Size

To determine the family's maximum rent subsidy, the Housing Authority uses the payment standard for the voucher size or the selected unit size, whichever is lower [24 CFR §982.402(c)].

The utility allowance used to calculate the gross rent is based on the actual size of the unit the family selects, regardless of the size authorized on the family's voucher [24 CFR § 982.517(d)].

## CHAPTER 6:
## DETERMINING THE TOTAL TENANT PAYMENT AND HOUSING AUTHORITY ABSENCE POLICY

**6.1** **INTRODUCTION**

This chapter explains how the Total Tenant Payment (TTP) is calculated at admission and during annual re-examinations. It covers Housing Authority and HUD standards used to calculate income inclusions and deductions.

This chapter also provides the Housing Authority's definition of absence of household members and explains how the presence or absence of household members can affect the TTP.

The policies outlined in this chapter address those areas, which allow the Housing Authority discretion to define terms and to develop standards in order to assure consistent application of the various factors that relate to the determination of TTP.

**6.2** **INCOME DEFINITIONS**

❑ **Total Tenant Payment (TTP):** TTP is calculated for each household based on family income. It is used to determine the tenant contribution toward rent. The TTP is affected by who is included in the family composition. Accurate calculation of annual income and adjusted income ensures that families do not pay more or less for rent than obligated and required by the regulations.

❑ **Income:** The Housing Authority will include income from all sources, unless otherwise specifically exempted [24 CFR §5.609(c)] through program regulations, for the purposes of calculating the TTP. In accordance with this definition, income from all sources of each member of the household is counted.

❑ **Annual Income [24 CFR §5.609(a)]:** The gross amount of income anticipated to be received by the family during the 12 months after certification or re-examination. Gross income is the amount of income prior to any HUD allowable expenses or deductions, and does not include income that has been excluded by HUD. Annual income is used to determine whether or not applicants are within the applicable income limits.

❑ **Adjusted Income [24 CFR §5.611]:** The annual income minus any HUD allowable deductions.

**6.3** **INCOME DEDUCTIONS**
**[24 CFR §5.611(a)]**

The following deductions will be applied in the TTP calculation:

➤ **Dependent Allowance:** $480 each for family members (other than the head or spouse), who are minors, and for family members who are 18 and older who are full-time students or who are disabled. This allowance does not apply to foster children.

Housing Authority of the County of Los Angeles

> **Elderly Family or Disabled Family Allowance**: $400 for families whose head or spouse is 62 or over or disabled.

> **Childcare Expenses**: Deducted for children under 13, including foster children, when childcare is necessary to allow an adult member to work, search for work, or attend school (see below for details).

> **Allowable Medical Expenses**: Deducted for unreimbursed medical expenses for members of any elderly family or disabled family.

> **Attendant Care and Auxiliary Apparatus Expenses**: Deducted for persons with disabilities if needed to enable the individual or an adult family member to work.

### 6.3.1 Childcare Expenses
### [24 CFR §5.603(b) and 24 CFR §5.611(a)]

Childcare expenses for children under 13 years of age may be deducted from annual income if they enable an adult to work, search for work, or attend school full time.

In the case of a child attending school, only care during non-school hours can be counted as childcare expenses.

Families will be given a childcare allowance based on the following guidelines:

❑ **Childcare to Work**: The maximum childcare expense allowed must be less than the amount earned by the person enabled to work. The "person enabled to work" will be the adult member of the household who earns the least amount of income from working.

❑ **Childcare to Search for Work**: Childcare expenses cannot exceed the current amount of income received.

❑ **Childcare for School**: The number of hours claimed for childcare may not exceed the number of hours the family member is attending school (including one hour travel time to and from school).

❑ **Amount of Expense**: The Housing Authority will determine local average costs as a guideline. If the hourly rate materially exceeds the guideline, the Housing Authority may calculate the allowance using the guideline.

### 6.3.2 Medical Expenses
### [24 CFR §5.611(a)(3)(i)]

When it is unclear in the HUD rules as to whether or not to allow an item as a medical expense, IRS Publication 502 will be used as a guide.

The Housing Authority will allow as medical expense the actual out-of-pocket amounts which are owed and anticipated to be paid by the family during the re-examination period.  Expenses from the previous year may be analyzed to determine the amount to anticipate when other verification is not available.

Nonprescription medicines will be counted toward medical expenses for families who qualify if the family furnishes legible receipts.

Acupressure, acupuncture and related herbal medicines, and chiropractic services will be considered allowable medical expenses.

**6.4    INCOME INCLUSIONS AND EXCLUSIONS**

**6.4.1   Income Inclusions**
**[24 CFR §5.609(b)]**

The Housing Authority considers the following to be included in the family's annual income, as required by HUD:

(1) The full amount, before any payroll deductions, of wages and salaries, overtime pay, commissions, fees, tips and bonuses, and other compensation for personal services;

(2) The net income from operation of a business or profession. Expenditures for business expansion or amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation of assets used in a business or profession may be deducted, based on straight line depreciation, as provided in Internal Revenue Service regulations. Any withdrawal of cash or assets from the operation of a business or profession will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested in the operation by the family;

(3) Interest, dividends, and other net income of any kind from real or personal property. Expenditures for amortization of capital indebtedness shall not be used as deductions in determining net income. An allowance for depreciation is permitted only as authorized in paragraph (2) of this section. Any withdrawal of cash or assets from an investment will be included in income, except to the extent the withdrawal is reimbursement of cash or assets invested by the family. Where the family has net family assets in excess of $5,000, annual income shall include the greater of the actual income derived from net family assets or a percentage of the value of such assets based on the current passbook savings rate, as determined by HUD;

(4) The full amount of periodic payments received from Social Security, annuities, insurance policies, retirement funds, pensions, lotteries, disability or death benefits, and other similar types of periodic receipts, including a lump-sum payment for the delayed start of a periodic payment (but see paragraph (13) under Income Exclusions);

(5) Payments in lieu of earnings, such as unemployment, worker's compensation, and severance pay (but see paragraph (3) under Income Exclusions);

(6) Welfare Assistance.

   a.   Welfare assistance received by the household.

   b.   The amount of reduced welfare income that is disregarded specifically because the family engaged in fraud or failed to comply with an economic self-sufficiency or work activities requirement.

   c.   If the welfare assistance payment includes an amount specifically designated for shelter and utilities that is subject to adjustments by the

Housing Authority of the County of Los Angeles

welfare assistance agency in accordance with the actual cost of shelter and utilities, the amount of welfare income to be included as income shall consist of:

(i) The amount of the allowance or grant exclusive of the amount specifically designated for shelter or utilities; plus

(ii) The maximum amount that the welfare assistance agency could in fact allow the family for shelter and utilities. If the family's welfare assistance is ratably reduced from the standard of need by applying a percentage, the amount calculated under this paragraph shall be the amount resulting from one application of the percentage;

(7) Periodic and determinable allowances, such as alimony and child support payments, and regular contributions or gifts received from persons not residing in the dwelling;

---

**Regular Contributions and Gifts [24 CFR §5.609(b)(7)]**

Any contribution or gift received every 3 months or more frequently will be considered a "regular" contribution or gift. This includes payments made on behalf of the family such as payments for a car, credit card bills, rent and/or utility bills and other cash or non-cash contributions provided on a regular basis. It does not include casual contributions or sporadic gifts.

If the family's expenses exceed its known income, the Housing Authority will question the family about contributions and gifts. If the family indicated that it is able to meet the extra expenses due to gifts or contributions from persons outside the household, the amount provided will be included in the family's TTP.

---

**Alimony and Child Support [24 CFR §5.609(b)(7)]**

If the amount of child support or alimony received is less than the amount awarded by the court, the Housing Authority must use the amount awarded by the court unless the family can verify that they are not receiving the full amount. Acceptable verification in such cases may include:

1. Verification from the agency responsible for enforcement or collection, and

2. Documentation of child support or alimony collection action filed through a child support enforcement/collection agency, or has filed an enforcement or collection action through an attorney.

It is the family's responsibility to supply a certified copy of the divorce decree.

---

(8) All regular pay, special pay, and allowances of a member of the Armed Forces (whether or not living in the dwelling) who is head of the family, spouse, or other person whose dependents are residing in the unit (but see paragraph (7) under Income Exclusions).

(9) Any financial assistance, in excess of amounts received for tuition, that an individual received for tuition, that an individual receives under the Higher Education Act of 1965 (20 U.S.C. 1001 *et seq.*), from private sources, or from an institution of higher education (as defined under the Higher Education Act of 1965 (20 U.S.C. 1002)), shall be considered income to that individual, except that financial assistance described in this paragraph is not considered annual income for students who are living with their parents who are applying for or receiving assistance or persons over the age of 23 with dependent children.  For the purpose of determining income, loan proceeds are not considered "financial assistance".

(10) Any part of an athletic scholarship that can be used to cover housing costs must be included in the family's income.

### 6.4.2 Income Exclusions
### [24 CFR §5.609(c)]

The Housing Authority considers the following to be excluded from the family's annual income, as required by HUD:

(1) Income from employment of children (including foster children) under the age of 18 years;

(2) Payments received for the care of foster children or foster adults (usually individuals with disabilities, unrelated to the tenant family, who are unable to live alone);

> Benefits received through the Kin GAP program, a California program designed specifically for foster children who have been place in the home of a relative are considered foster care and should be excluded.

(3) Lump-sum additions to family assets, such as inheritances, insurance payments (including payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses (but see paragraph (5) under Income Inclusions);

(4) Amounts received by the family that are specifically for, or in reimbursement of, the cost of medical expenses for any family member;

(5) Income of a live-in aide (as defined by regulation);

(6) Subject to paragraph (9) in Income Inclusions, the full amount of student financial assistance paid directly to the student or to the educational institution;

(7) The special pay to a family member serving in the Armed Forces who is exposed to hostile fire;

(8) (a) Amounts received under training programs funded by HUD;

   (b) Amounts received by a person with disabilities that are disregarded for a limited time for purposes of Supplemental Security Income eligibility and benefits because they are set aside for use under a Plan to Attain Self-Sufficiency (PASS);

Housing Authority of the County of Los Angeles

    (c) Amounts received by a participant in other publicly assisted programs which are specifically for or in reimbursement of out-of-pocket expenses incurred (special equipment, clothing, transportation, child care, etc.) and which are made solely to allow participation in a specific program;

    (d) A resident service stipend. This is a modest amount (not to exceed $200 per month) received by a resident for performing a service for the owner, on a part-time basis, that enhances the quality of life in the development. This may include, but is not limited to fire patrol, hall monitoring, lawn maintenance, and resident initiatives coordination and serving as a member of the PHA's governing board. No resident may receive more than one such stipend during the same period of time; or

    (e) Incremental earnings and benefits resulting to any family member from participation in qualifying state or local employment training programs (including training programs not affiliated with a local government) and training of a family member as resident management staff. Amounts excluded by this provision must be received under employment training programs with clearly defined goals and objectives, and are excluded only for the period during which the family member participates in the employment training program.

(9) Temporary, nonrecurring, or sporadic income (including gifts). For example, amounts earned by temporary census employees whose terms of employment do not exceed 180 days (Notice PIH 2000-1).

(10) Reparations payments paid by a foreign government pursuant to claims filed under the laws of that government by persons who were persecuted during the Nazi era;

(11) Earnings in excess of $480 for each full-time student 18 years or older (excluding the head of household and spouse);

(12) Adoption assistance payments in excess of $480 per adopted child;

(13) Deferred periodic payments of supplemental security income and social security benefits that are received in a lump-sum payment or in prospective monthly payments;

(14) Amounts received by the family in the form of refunds or rebates under state or local law for property taxes paid on the dwelling unit;

(15) Amounts paid by a state agency to a family with a developmentally disabled family member living at home to offset the cost of services and equipment needed to keep the developmentally disabled family member at home; and

(16) Amounts specifically excluded by any other federal statute from consideration as income for purposes of determining eligibility or benefits under a category of assistance programs that includes assistance under the 1937 Act. A notice will be published in the Federal Register and distributed to PHAs identifying the benefits that qualify for this exclusion. Updates will be distributed when necessary. The following is a list of income sources that qualify for that exclusion:

    a) The value of the allotment provided to an eligible household under the Food Stamp Act of 1977 (7 U.S.C. 2017 (b));

- 44 -

b) Payments to Volunteers under the Domestic Volunteer Services Act of 1973 (42 U.S.C. 5044(g), 5058);

c) Payments received under the Alaska Native Claims Settlement Act (43 U.S.C. 1626(c));

d) Income derived from certain submarginal land of the United States that is held in trust for certain Indian tribes (25 U.S.C. 459e);

e) Payments or allowances made under the Department of Health and Human Services' Low-Income Home Energy Assistance Program (42 U.S.C. 8624(f));

f) Payments received under programs funded in whole or in part under the Job Training Partnership Act (29 U.S.C. 1552(b); (effective July 1, 2000, references to Job Training Partnership Act shall be deemed to refer to the corresponding provision of the Workforce Investment Act of 1998 (29 U.S.C. 2931);

g) Income derived from the disposition of funds to the Grand River Band of Ottawa Indians (Pub.L- 94-540, 90 Stat. 2503-04);

h) The first $2000 of per capita shares received from judgment funds awarded by the Indian Claims Commission or the U. S. Claims Court, the interests of individual Indians in trust or restricted lands, including the first $2000 per year of income received by individual Indians from funds derived from interests held in such trust or restricted lands (25 U.S.C. 1407-1408);

i) Amounts of scholarships funded under title IV of the Higher Education Act of 1965, including awards under federal work-study program or under the Bureau of Indian Affairs student assistance programs (20 U.S.C. 1087uu);

j) Payments received from programs funded under Title V of the Older Americans Act of 1985 (42 U.S.C. 3056(f));

k) Payments received on or after January 1, 1989, from the Agent Orange Settlement Fund or any other fund established pursuant to the settlement in *In Re Agent*-product liability litigation, M.D.L. No. 381 (E.D.N.Y.);

l) Payments received under the Maine Indian Claims Settlement Act of 1980 (25 U.S.C. 1721);

m) The value of any child care provided or arranged (or any amount received as payment for such care or reimbursement for costs incurred for such care) under the Child Care and Development Block Grant Act of 1990 (42 U.S.C. 9858q);

n) Earned income tax credit (EITC) refund payments received on or after January 1, 1991 (26 U.S.C. 32(j));

o) Payments by the Indian Claims Commission to the Confederated Tribes and Bands of Yakima Indian Nation or the Apache Tribe of Mescalero Reservation (Pub. L. 95-433);

Housing Authority of the County of Los Angeles

p) Allowances, earnings and payments to AmeriCorps participants under the National and Community Service Act of 1990 (42 U.S.C. 12637(d));

q) Any allowance paid under the provisions of 38 U.S.C. 1805 to a child suffering from spina bifida who is the child of a Vietnam veteran (38 U.S.C. 1805);

r) Any amount of crime victim compensation (under the Victims of Crime Act) received through crime victim assistance (or payment or reimbursement of the cost of such assistance) as determined under the Victims of Crime Act because of the commission of a crime against the applicant under the Victims of Crime Act (42 U.S.C. 10602); and

s) Allowances, earnings and payments to individuals participating in programs under the Workforce Investment Act of 1998 (29 U.S.C. 2931).

(17) Earned Income Disallowance for persons with disabilities [24CFR5.617]

(a) Initial 12-Month Exclusion [24CFR5.617(C)(1)]

(b) Second 12-Month Exclusion and Phase-In [24CFR5.617(C)2]

(c) Maximum 4-Year Disallowance [24 CFR 5.617(c)(3)]

(18) Medicare Prescription Drug Plan

### 6.4.3 Earned Income Disallowance [24 CFR §5.617]

When determining the annual income of a participant family that includes persons with disabilities, the determination must exclude an increase in annual income due to any of the following events:

1. Employment by a family member who is a person with disabilities and who was previously unemployed for one or more years prior to employment.

   ➢ A previously unemployed person is defined as a person who in the 12 months prior to employment has earned no more than would be received for 10 hours of work per week for 50 weeks at the established minimum wage.

2. An increase in income by a family member who is a person with disabilities and whose earnings increase during participation in an economic self-sufficiency program or other job-training program.

   ➢ An economic self-sufficiency program is any program designed to encourage, assist, train, or facilitate the economic independence of HUD-assisted families or to provide work for such families.

3. New employment or increased earnings by a family member who is a person with disabilities and who has received TANF benefits or services within the past 6 months.

   ➢ If TANF is received in the form of monthly monetary maintenance, there is no minimum amount that must be received to be considered a participant in TANF.

> ➢ If TANF is received in the form of one-time payments, wage subsidies and transportation assistance that add up to at least $500 over a 6-month period, they would meet this requirement.

### 6.4.4 Earned Income Disallowance Exclusion Time Periods [24 CFR §5.617(c)]

❑ **Initial 12-Month Exclusion**: During the initial 12-month exclusion period, the full amount of the increase in income due to employment or increase earnings is excluded.  This exclusion extends for 12 cumulative months and the months do not have to be consecutive.

❑ **Second 12-Cumulative Months**: During the second 12-month exclusion and phase-in period, the exclusion is reduced to half, or 50 percent, of the increase in income due to employment or increased earnings.  This second 12-month exclusion period begins after the full 12 months of the full exclusion has been used and the months do not have to be consecutive.

❑ **4-Year Lifetime Limit**: A participant has a total lifetime limit of 48 consecutive months that begins once the initial exclusion is given after the qualifying event.  No exclusion should be given after the lifetime limit has been reached.

### 6.5 FAMILY ASSETS [24 CFR §5.603(b)]

### 6.5.1 Included Assets

(1)   Amounts in savings and checking accounts.

(2)   Stocks, bonds, savings certificates, money market funds and other investment accounts.

(3)   Equity in real property or other capital investments. Equity is the estimated current market value of the asset less the unpaid balance on all loans secured by the assets and reasonable costs (such as broker fees) that would be incurred in selling the assets.

(4)   The cash value of trusts that may be withdrawn by the family.

(5)   IRA, Keogh and similar retirement savings accounts, even though withdrawal would result in a penalty.

(6)   Some contributions to company retirement/pension funds.

> Contributions to company retirement/pension funds are handled as follows:
>
> 1.   While an individual is employed, include as assets only amounts the family can withdraw without retiring or terminating employment.
>
> 2.   After retirement or termination of employment, include any amount the individual elects to receive as a lump sum.

(7)   Assets, which although owned by more than one person, allow unrestricted access by the applicant.

Housing Authority of the County of Los Angeles

(8)  Lump sum receipts such as inheritances, capital gains, lottery winnings, insurance settlements, and other claims.

> Lump-sum additions to family assets, such as inheritances, insurance payments (including lump-sum payments under health and accident insurance and worker's compensation), capital gains, and settlement for personal or property losses, are not included as income but may be included in assets.
>
> Lump-sum payments caused by delays in processing periodic payments (unemployment or welfare assistance) are counted as income. Lump sum payments from Social Security or SSI are excluded from income, but any amount remaining will be considered an asset. Deferred periodic payments which have accumulated due to a dispute will be treated the same as periodic payments which are deferred due to delays in processing.
>
> The family's attorney fees may be deducted from lump-sum payments when computing annual income if the attorney's efforts have recovered a lump-sum compensation, and the recovery paid to the family does not include an additional amount in full satisfaction of the attorney fees.

(9)  Personal property held as an investment such as gems, jewelry, coin collections, antique cars, etc.

(10) Cash value of life insurance policies.

(11) Assets disposed of for less than fair market value during the two years preceding certification or re-certification.

> The Housing Authority must count assets disposed of for less than fair market value during the 2 years preceding certification or re-examination. The Housing Authority will count the difference between the market value and the actual payment received in calculating total assets.
>
> Assets disposed of as a result of foreclosure or bankruptcy, separation or divorce are not considered to be assets disposed of for less than fair market value.
>
> The Housing Authority's minimum threshold for counting assets disposed of for less than Fair Market Value is $5,000. If the total value of assets disposed of within a 1-year period is less than $5,000, they will not be considered an asset.

### 6.5.2  Excluded Assets

(1)  Necessary personal property, except as noted in #9 above at Section 6.5.1.

(2)  Interest in Indian trust lands.

(3)  Assets that are part of an active business or farming operation.

> If a household member's main occupation is the business from his/her rental property, the rental property is considered a business asset and therefore excluded. If a household member's rental property is considered a personal asset and held as an investment, it is considered an included asset.

(4)   Assets not controlled by or accessible to the family and which provide no income for the family.

(5)   Vehicles especially equipped for the disabled.

(6)   Equity in owner-occupied cooperatives and manufactured homes in which the family lives.

## 6.6   CALCULATING INCOME AND FAMILY CONTRIBUTION

### 6.6.1   "Minimum Rent" and Minimum Family Contribution [24 CFR §5.630(a)(2)]

Minimum family contribution in the Housing Authority's rental assistance programs is $50, for all new contracts including moves effective April 5, 2005, and effective at annual re-examinations beginning May 2005.

The Housing Authority will waive the minimum rent requirement in cases where the family documents that they do not currently have any source of income such as in the case of some homeless families.  In such cases, the family will be re-evaluated in 6 months.  All families are required to report changes in income within 30 calendar days.

### 6.6.2   Minimum Income

There is no minimum income requirement.  Families who report zero income may be required to attend an interim re-examination periodically, up to once a quarter, at the Housing Authority's discretion.  A credit review will automatically be requested for families claiming zero income.

### 6.6.3   Averaging Income [24 CFR §982.516(b)(2) and 24 CFR §5.609(d)]

When annual income cannot be anticipated for a full 12 months, the Housing Authority may annualize current income and conduct an interim re-examination if income changes.

If there are bonuses or overtime which the employer cannot anticipate for the next 12 months, bonuses and overtime received the previous year may be used.

Income from the previous year may be analyzed to determine the amount to anticipate when third-party or check-stub verification is not available.

If by averaging, an estimate can be made for those families whose income fluctuates from month to month, this estimate will be used so that the housing payment will not change from month to month.

The method used depends on the regularity, source and type of income.

### 6.6.4   Utility Allowance and Utility Reimbursement Payments [24 CFR §982.517]

The utility allowance is intended to help defray the cost of utilities not included in the rent and is subtracted from TTP to establish the family's rent to the owner.

Housing Authority of the County of Los Angeles

The allowances are based on rates and average consumption studies, not on a family's actual consumption. The Housing Authority will review the Utility Allowance Schedule on an annual basis and revise it if needed (10 percent increase or decrease).

The approved utility allowance schedule is given to families along with the voucher. The utility allowance is based on the actual unit size selected.

Where families provide their own range and refrigerator, the Housing Authority will establish an allowance adequate for the family to purchase or rent a range or refrigerator, even if the family already owns either appliance. Allowances for ranges and refrigerators will be based on the lesser of the cost of leasing or purchasing the appropriate appliance over a 12-month period.

If the utility allowance exceeds the family's TTP, the Housing Authority will provide a utility reimbursement payment for the family each month. The check will be made out directly to the family's head of household on record.

### 6.6.5   Reduction in Welfare Assistance
[24 CFR §5.615]

Imputed welfare income is the amount that welfare benefits are reduced specifically because of the following:

> ➢ Fraud;

> ➢ Failure to participate in an economic self-sufficiency programs; or

> ➢ Noncompliance with a work activities requirement.

The Housing Authority will include in the family's annual income the amount of the imputed welfare income plus the total amount of other annual income and the family's rent will not be reduced.

However, the Housing Authority will reduce the rent if the welfare assistance reduction is a result of any of the following:

> ➢ The expiration of a lifetime time limit on receiving benefits;

> ➢ The family has complied with welfare program requirements but cannot obtain employment; or

> ➢ The family member has not complied with other welfare agency requirements.

A family's request for rent reduction shall be denied upon the Housing Authority obtaining written verification from the welfare agency stating that the family's benefits have been reduced for fraud or noncompliance.

## 6.7   PRORATION OF ASSISTANCE FOR "MIXED" FAMILIES

### 6.7.1   Applicability
[24 CFR §5.520(a)]

Proration of assistance must be offered to any "mixed" applicant or participant family. A "mixed" family is one that includes at least one U.S. citizen or eligible immigrant and any number of ineligible members.

"Mixed" families that were participants on June 19, 1995, and that do not qualify for continued assistance must be offered prorated assistance. Mixed family applicants are entitled to prorated assistance. Families that become mixed after June 19, 1995 by addition of an ineligible member are entitled to prorated assistance.

### 6.7.2  Prorated Assistance Calculation
### [24 CFR §5.520(c)]

Prorated assistance is calculated by determining the amount of assistance payable if all family members were eligible and multiplying by the percent of the family members who actually are eligible. TTP is the gross rent minus the prorated assistance.

### 6.8  ABSENCE POLICY

The Housing Authority must compute all applicable income of every family member who is on the lease, including those who are temporarily absent. In addition, the Housing Authority must count the income of the spouse or the head of household if that person is temporarily absent, even if that person is not on the lease.

Income of persons permanently absent will not be counted. If the spouse is temporarily absent and in the military, all military pay and allowances (except hazardous duty pay when exposed to hostile fire and any other exceptions to military pay HUD may define) is counted as income.

It is the responsibility of the household to report absences and changes in family composition. The Housing Authority will evaluate absences from the unit using this policy [24 CFR §982.551(i)].

### 6.8.1  Absence of Entire Family
### [24 CFR §982.312]

These policy guidelines address situations when the family is absent from the unit, but has not moved out of the unit. In cases where the family has moved out of the unit, the Housing Authority will terminate assistance in accordance with appropriate termination procedures contained in this plan.

Families are required both to notify the Housing Authority before they move out of a unit and to give the Housing Authority information about any family absence from the unit.

Families must notify the Housing Authority if they are going to be absent from the unit for more than 30 consecutive calendar days.

If the family fails to notify the Housing Authority of an absence of longer than 30 consecutive calendar days, or if the entire family is absent from the unit for more than 60 consecutive calendar days, the unit will be considered to be vacated and the assistance will be terminated. The Housing Authority at all times shall reserve the right to exercise its judgment regarding extensions on family absence from the unit on a case-by-case basis. However, HUD regulations require the Housing Authority to terminate assistance if the entire family is absent from the unit for a period of more than 180 consecutive calendar days.

Housing Authority of the County of Los Angeles

"Absence of entire family" means that no family member is residing in the unit, and the unit has not been vacated.  In order to determine if the family is absent from the unit, the Housing Authority may:

 ➢  Write letters to the family at the unit

 ➢  Telephone the family at the unit

 ➢  Interview the owner

 ➢  Interview neighbors

 ➢  Verify if utilities are in service

 ➢  Conduct an interim HQS Inspection

If the absence which resulted in termination of assistance was due to a person's disability, and the Housing Authority can verify that the person was unable to notify Housing Authority in accordance with the family's responsibilities, and if funding is available, the Housing Authority may reinstate the family as a reasonable accommodation if requested by the family.

**6.8.2**  **Absence of Any Member**
**[24 CFR §982.312(a)]**

Any member of the household will be considered permanently absent if s/he is away from the unit for 180 consecutive calendar days except as otherwise provided in this chapter.

**6.8.3**  **Absence Due to Medical Reasons**
**[24 CFR §982.312(e)(1)]**

If any family member leaves the household to enter a facility such as a hospital, nursing home, or rehabilitation center, the Housing Authority will seek advice from a reliable qualified source as to the likelihood and timing of their return.  If the verification indicates that the family member will return in less than 180 calendar days, the family member will not be considered permanently absent.

If the verification indicates that the family member will be permanently confined to a nursing home, the family member will be considered to be permanently absent, out of the home and removed from the family composition.

If the person who is determined to be permanently absent is the sole member of the household, assistance will be terminated in accordance with the Housing Authority's "Absence of Entire Family" policy.

**6.8.4**  **Absence Due to Incarceration**
**[24 CFR §982.312(e)(1)]**

If the sole member of the household is incarcerated for more than 30 calendar days, s/he will be considered permanently absent and the Housing Authority will initiate proposed termination procedures to terminate assistance.

Any member of the household, other than the sole member, will be considered permanently absent if s/he is incarcerated for 60 calendar days. Once a family member is removed from the family composition, the family must seek Housing

Authority approval prior to allowing the family member to re-join the assisted household. Failure to adhere to this policy can result in termination of assistance.

The Housing Authority will determine if the reason for any family member's incarceration is for drug-related or violent criminal activity and, if appropriate, will pursue termination of assistance for the family if deemed appropriate.

### 6.8.5 Foster Care and Absences of Children [24 CFR §982.551(h)(4)]

If the family includes a child or children temporarily absent from the home due to placement in foster care, the Housing Authority will request information from the appropriate agency to determine when the child/children will be returned to the home.

If the time period is to be greater than 180 calendar days from the date of removal of the child/children, the voucher size may be temporarily reduced. If children are removed from the home permanently, the voucher size will permanently reduced in accordance with the Housing Authority's subsidy standards.

### 6.8.6 Absence of Adult [24 CFR §982.312(e)]

If neither parent remains in the household and the appropriate agency has determined that another adult is to be brought into the assisted unit to care for the children for an indefinite period, the Housing Authority will treat that adult as a visitor for up to the first 180 calendar days.

If during or by the end of that period, court-awarded custody or legal guardianship has been awarded to the caretaker, the voucher will then be transferred to the caretaker.

If custody or legal guardianship has not been awarded by the court, but the action is in process, the Housing Authority will secure verification from social services staff or the attorney as to the status.

If the appropriate agency cannot confirm the guardianship status of the caretaker, the Housing Authority will review the status at 120-day intervals.

The caretaker will be allowed to remain in the unit, as a visitor, until a determination of custody is made or up to 12 months total.

The Housing Authority will transfer the voucher to the caretaker, in the absence of a court order, if the caretaker has been in the unit for more than 12 months and it is reasonable to expect that custody will be granted.

When the Housing Authority approves a person to reside in the unit as caretaker for the children, this person's income will be counted in the TTP for the family pending a final disposition. The Housing Authority will work with the appropriate service agencies and the owner to provide a smooth transition in these cases.

If a member of the household is subject to a court order that restricts him/her from the home for more than 180 calendar days, the person will be considered permanently absent.

Housing Authority of the County of Los Angeles

If an adult family member leaves the household for any reason, the family must report the change in family composition to the Housing Authority within 30 calendar days.

The family will be required to notify the Housing Authority in writing within 30 calendar days when a family member leaves the household for any reason or moves out. The notice must contain a certification by the family as to whether the member is temporarily or permanently absent. The family member will be determined permanently absent if verification is provided.

If an adult child goes into the military and leaves the household, they will be considered permanently absent.

Time extensions may be granted as a reasonable accommodation upon request by a person with a disability.

### 6.8.7   Students
### [24 CFR §982.312(e)]

Full time students who attend school away from the home and live with the family during school recess will be considered temporarily absent from the household. These family members will continue to be counted for the purpose of determining the family's appropriate voucher size.

### 6.8.8   Visitors
### [24 CFR §982.312(e)]

Any person not included on the HUD-50058 who has been in the unit more than 30 calendar days, or a total of 60 calendar days in a 12-month period, will be considered to be living in the unit as an unauthorized household member.

Absence of evidence of any other address will be considered verification that the visitor is a family member.

Statements from neighbors and/or the owner will be considered in making the determination.

Use of the unit address as the visitor's current residence for any purpose that is not explicitly temporary shall be construed as permanent residence.

The burden of proof that the individual is a visitor rests on the family. In the absence of such proof, the individual will be considered an unauthorized member of the family and the Housing Authority will terminate assistance since prior approval was not requested for the addition.

In a joint custody arrangement, if the minor is in the household less than 180 calendar days per year, the minor will be considered to be an eligible visitor and not a family member.

### 6.8.9   Reporting Absences to the Housing Authority
### [24 CFR §982.551(h)(3) and §982.551(i)]

If a family member leaves the household, the family must report this change to the Housing Authority, in writing, within 30 calendar days of the change and certify as to whether the member is temporarily absent or permanently absent.

When available to do so, an adult family member who is leaving the household should remove him/herself in writing from the lease and voucher family composition.

The Housing Authority will conduct an interim re-examination for changes, which may affect the TTP in accordance with the interim policy.  See Section 12.5 (Changes in Family Composition) for more information.

**6.8.10** <u>**Verification of Absence**</u>

Please refer to Section 7.10.4 (Verification of Permanent Absence of Adult Member).

Housing Authority of the County of Los Angeles

## CHAPTER 7:
## VERIFICATION PROCEDURES

**7.1**   **INTRODUCTION**
        **[24 CFR §5.240(c), 24 CFR §5.210, 24 CFR §982.551(b)]**

HUD regulations require the Housing Authority to verify factors of eligibility. Applicants and program participants must furnish proof of their statements whenever required by the Housing Authority, and the information they provide must be true and complete. The Housing Authority's verification requirements are designed to maintain program integrity. This chapter explains the Housing Authority's procedures and standards for verification of preferences, income, assets, allowable deductions, family status, and when there are changes in family members.  The Housing Authority will ensure that proper authorization from the family is always obtained before making verification inquiries.

**7.2**   **METHODS OF VERIFICATION AND TIME ALLOWED**

The Housing Authority will use five levels of verification methods acceptable to HUD in the following order:

1.  Up-Front Income Verification (UIV) will be the first level used, when available.

2.  Third-party written verification will be the second level used when UIV is not available.

3.  Third-party oral verification will be the third level used when written verification is delayed or not possible.

4.  Review of documents verification will be the fourth level used if third-party oral verification is unavailable.

5.  Certification/self-declaration verification will be the fifth level used if review of documents cannot be made.

The Housing Authority may allow up to 10 calendar days for the return of third-party verifications before going to the next method.

For applicants, verifications may not be more than 60 calendar days old from the date of receipt at the time of voucher issuance [24 CFR §982.201(e)].   For participants, income forms are valid for 120 calendar days from date of receipt.

**7.2.1**   **Up-Front Income Verification (UIV)**

The Housing Authority will utilize up-front income verification tools, such as Enterprise Income Verification system, State Systems for the Temporary Assistance of Needy Families (TANF), and Work Number, to verify items including but not limited to Social Security (SS) and Supplemental Security Income (SSI), TANF and wages whenever possible.

If there is a $200 or greater difference between UIV verification and family provided documents, third-party verification will be required.

In cases where UIV income data is not substantially different than tenant-reported income, the Housing Authority will follow the guidelines below:

> ➤ If UIV income data is less than current tenant-provided documentation, the Housing Authority will use tenant-provided documents to calculate anticipated annual income.

> ➤ If UIV income data is more than current tenant-provided documentation, the Housing Authority will use UIV income data to calculate anticipated annual income unless the tenant provides the Housing Authority with documentation of a change in circumstances (i.e. change in employment, reduction in hours, etc.). Upon receipt of acceptable tenant-provided documentation of a change in circumstances, the Housing Authority will use tenant-provided documents to calculate anticipated annual income.

In cases where UIV income data is substantially different than tenant-reported income, the Housing Authority shall follow the guidelines below:

> ➤ The Housing Authority may request written third-party verification from the discrepant income source.

> ➤ The Housing Authority may review historical income data fro patterns of employment, paid benefits, and/or receipt of other income, when the Housing Authority can not readily anticipate income, such as in cases of seasonal employment, unstable working hours, and suspected fraud.

> ➤ The Housing Authority will analyze all data (UIV data, third-party verification and other documents and information provided by the family) and attempt to resolve the income discrepancy.

> ➤ The Housing Authority will use the most current verified income data (and historical income data if appropriate) to calculate anticipated annual income.

## 7.2.2   Third-Party Written Verification

Third-party written verification will be used when up-front income verification is not available. Third-party written verification forms will be sent and returned via first class mail. The family will be required to sign an authorization for the information source to release the specified information.

Verifications received electronically directly from the source are considered third party written verifications.

## 7.2.3   Third-Party Oral Verification

Oral third-party verification will be used when written third-party verification is delayed or not possible. When third-party oral verification is used, staff will be required to document the file, noting with whom they spoke, the date of the conversation, and the facts provided

## 7.2.4   Review of Documents

In the event that third-party written or oral verification is unavailable, or the information has not been verified by the third party, the Housing Authority will annotate the file accordingly and utilize documents provided by the family as the primary source if the documents provide complete information.

Housing Authority of the County of Los Angeles

All documents will be photocopied and retained in the family file. The Housing Authority will accept the following documents or other documents from the family provided that the document is such that tampering would be easily noted:

> ➢ Printed wage stubs
> ➢ Computer print-outs from the employer
> ➢ Signed letters by source

The Housing Authority will accept computerized printouts delivered by the family from the following agencies or any other required agencies.

> ➢ Social Security Administration
> ➢ Veterans Administration
> ➢ Welfare Assistance
> ➢ Unemployment Compensation Board
> ➢ City or County Courts
> ➢ Child Support Enforcement Agencies

The Housing Authority will accept faxed documents, however a hard copy may be requested for verification.

If third-party verification is received after documents have been accepted as provisional verification, and there is a discrepancy, the Housing Authority may utilize the third-party verification and/or document the reason for not using the third-party verification.

### 7.2.5   Self-Certification/Self-Declaration

When verification cannot be made by third-party verification or review of documents, families will be required to submit a self-certification.

Self-certification means a signed statement/affidavit/certification under penalty of perjury.

### 7.3   RELEASE OF INFORMATION
### [24 CFR §5.230]

The family will be required to sign specific authorization forms when information is needed that is not covered by the HUD-9886 Form (Authorization for the Release of Information).

Each member requested to consent to the release of information will be provided with a copy of the appropriate forms for their review and signature.

Family refusal to cooperate with the HUD prescribed verification system will result in denial of admission or termination of assistance because it is a family obligation to supply any information requested by the Housing Authority or HUD.

**7.4**    **COMPUTER MATCHING**
       **[24 CFR §5.210(a)]**

Where allowed by HUD and/or other State or local agencies, computer matching will be done.

**7.4.1**    **Data Sharing**
       **[State of California Health and Safety Code, §34217]**

The Housing Authority will share applicant and participant information that is necessary to determine eligibility for County welfare department programs or services for which the client has applied or is receiving.

**7.5**    **ITEMS TO BE VERIFIED**
       **[24 CFR §982.551(b)]**

- ❏ All income not specifically excluded by the regulations.
- ❏ Zero-income status of household.
- ❏ Full-time student status including high school students who are age 18 or over.
- ❏ Current assets including assets disposed of for less than fair market value in preceding two years.
- ❏ Childcare expense where it allows an adult family member to be employed, seek employment or to further his/her education.
- ❏ Total medical expenses of all family members in households whose head or spouse is elderly or disabled.
- ❏ Disability assistance expenses to include only those costs associated with attendant care or auxiliary apparatus, which allow an adult family member to be employed.
- ❏ Identity.
- ❏ U.S. citizenship/eligible immigrant status.
- ❏ Social Security Numbers for all family members 6 years of age or older.
- ❏ Preference status, based upon local preferences.
- ❏ Displacement status of single applicants who are involuntarily displaced through no fault of their own.
- ❏ Familial/marital status when needed for head or spouse definition.
- ❏ Disability for determination of preferences, allowances or deductions.

**7.5.1**    **Victims of Violence**

The Housing Authority may request that an applicant/participant certify their statement of being a victim of domestic violence, dating violence, sexual assault, or stalking and that the incident or incidents in question are bona fide incidents of actual or threatened abuse.  Certification must be received within fourteen (14) business days after the applicant/participant

Housing Authority of the County of Los Angeles

receives the request for certification. The Housing Authority will accept the following forms of verification:

- ❑ Certification of Domestic Violence, Dating Violence or Stalking (HUD-50066 Form)
- ❑ Documentation signed by an employee, agent, or volunteer of a victim service provider, an attorney, or a medical professional, from whom the victim has sought assistance in addressing domestic violence, dating violence, sexual assault, or stalking, or the effect of the abuse in which the professional attests under penalty of perjury to the professional's belief that the incident or incidents in question are bona fide incidents of abuse, and that the victim of domestic violence, dating violence, sexual assault, or stalking has signed or attested to the documentation, or
  - ❑ Federal, State, tribal, territorial, or local police record, or
  - ❑ Court record.

**7.6**   **VERIFICATION OF INCOME**
**[24 CFR §982.516(a)(2)(i)]**

This section defines the methods the Housing Authority will use to verify various types of income.  The Housing Authority may make an exception to obtaining third-party verification when:

1. Staff has made at least two documented efforts (mail, fax, telephone call, or email) to obtain third-party verification of income and no response is received; or

2. An independent source does not have the capability of sending written third-party verification directly to the Housing Authority or does not facilitate oral third-party verification.

**7.6.1**   **Employment Income**
**[24 CFR §5.609(a) and (b)(1))]**

Verification forms request the employer to specify the:

- ➤ Dates of employment
- ➤ Amount and frequency of pay
- ➤ Date of the last pay increase
- ➤ Likelihood of change of employment status and effective date of any known salary increase during the next 12 months
- ➤ Year-to-date earnings
- ➤ Estimated income from overtime, tips, bonus pay expected during next 12 months

Acceptable methods of verification include, but are not limited to the following:

1. Employment verification form completed by the employer.

2. Check stubs or earning statements, which indicate the employee's gross pay, frequency of pay or year-to-date earnings.

3. W-2 forms plus income tax return forms.

4. Income tax returns signed by the family may be used for verifying self-employment income, or income from tips and other gratuities.

In cases where there are questions about the validity of information provided by the family, the Housing Authority will require the most recent federal income tax statements.

**7.6.2  Social Security, Pensions, Disability, Supplementary Security Income
[24 CFR §5.609(b)(4)]**

Acceptable methods of verification include, but are not limited to the following:

1. Benefit verification form completed by agency providing the benefits.

2. Award or benefit notification letters prepared and signed by the providing agency.

3. Computer report electronically obtained or in hard copy.

**7.6.3  Unemployment Compensation
[24 CFR §5.609(b)(5)]**

Acceptable methods of verification include, but are not limited to the following:

1. Computer printouts from unemployment office stating payment dates and amounts.

2. Payment stubs.

Unemployment and State Disability Insurance may no longer be verified through the Employment Development Department (EDD) [EDD Letter, 5/23/2006].

**7.6.4  Welfare Payments or General Assistance
[24 CFR §5.609(b)(6)]**

Acceptable methods of verification include, but are not limited to the following:

1. Computer-generated Notice of Action.

2. Housing Authority verification form completed by payment provider.

3. Written statement from payment provider indicating the amount of grant/payment, start date of payments, and anticipated changes in payment in the next 12 months.

**7.6.5  Alimony or Child Support Payments
[24 CFR §5.609(b)(7)]**

Acceptable methods of verification include, but are not limited to the following:

1. Computerized official printout of payments made if through a state agency.

2. Housing Authority verification form completed by payment provider.

Housing Authority of the County of Los Angeles

3.  A letter from the person paying the support.

4.  Copy of latest check and/or payment stubs from Court Trustee.   The Housing Authority must record the date, amount, and number of the check.

5.  Copy of a separation or settlement agreement or a divorce decree stating amount and type of support and payment schedules.

6.  Family's self-certification of amount received and of the likelihood of support payments being received in the future, or that support payments are not being received.

7.  If payments are irregular, the family must provide:

➢  A copy of the separation or settlement agreement, or a divorce decree stating the amount and type of support and payment schedules.

➢  A statement from the agency responsible for enforcing payments to show that the family has filed for enforcement.

➢  A welfare notice of action showing amounts received by the welfare agency for child support.

➢  A written statement from the District Attorney's office or other appropriate agency certifying that a collection or enforcement action has been filed.

**7.6.6   Net Income from a Business
[24 CFR §5.609(b)(2)]**

In order to verify the net income from a business, the Housing Authority will view IRS and financial documents from prior years and use this information to anticipate the income and expenses for the next 12 months.

Acceptable methods of verification include, but are not limited to the following:

1.  IRS Form 1040, including:

➢  Schedule C (Small Business)

➢  Schedule E (Rental Property Income)

➢  Schedule F (Farm Income)

2.  If accelerated depreciation was used on the tax return or financial statement, an accountant's calculation of depreciation expense, computed using straight-line depreciation rules.

3.  Audited or unaudited financial statement(s) of the business.

4.  Third-party verification forms for each customer/contract indicating the amounts of income received in a specified time period.

Expenses for rent and utilities will not be allowed for operations or businesses based in the subsidized unit, as these expenses are a required family contribution in the Housing Choice Voucher Program and are calculated based upon the family's income.

### 7.6.7 Child Care Business

If a family is operating a licensed day care business, income and expenses will be verified as with any other business.

If the family is operating a cash and carry operation (which may or may not be licensed), the Housing Authority will require that the family complete a form for each customer which indicates: name of person(s) whose child/children is/are being cared for, phone number, number of hours child is being cared for, method of payment (check/cash), amount paid, and signature of person.

If childcare services were terminated, a third-party verification will be sent to the parent whose child was receiving childcare.

### 7.6.8 Recurring Gifts
### [24 CFR §5.609(b)(7)]

The family must furnish a self-certification containing the following information:

- ➢ The person who provides the gifts
- ➢ The value of the gifts
- ➢ The regularity (dates) of the gifts
- ➢ The purpose of the gifts

### 7.6.9 Zero-Income Status

Families claiming to have no income will automatically undergo a credit review. The information contained in the credit report will be used to confirm the information provided by the family. The Housing Authority will also utilize records provided by the Department of Public Social Services (DPSS).

Moreover, the Housing Authority may check records of other departments in the jurisdiction that have information about income sources of customers.

### 7.6.10 Full-Time Student Status
### [24 CFR §5.609(c)(11)]

Only the first $480 of the earned income of full-time students 18 years or older (including those who are temporarily absent), other than head of household or spouse, will be counted towards family income.

Verification of full-time student status includes:

1. Written verification from the registrar's office or other school official;
2. School records indicating enrollment for sufficient number of credits to be considered a full-time student by the educational institution; and
3. A copy of final grades.

Housing Authority of the County of Los Angeles

**7.7    INCOME FROM ASSETS**

Third-party verification will be conducted for assets totaling more than $5,000. The Housing Authority may make an exception to obtaining third-party verification when:

1. The asset or expense to be verified is not a significant amount and would have minimum impact on total payment (TTP) and the Housing Authority is able to verify the asset or expense through review of original documents provided by the tenant; or

2. An independent source does not have the capability of sending written third-party verification directly to the Housing Authority or does not facilitate oral third-party verification; or

3. It is not cost effective or reasonable to obtain third-party verification of assets and expenses.

**7.7.1    Savings Account Interest Income and Dividends**
**[24 CFR §5.609(b)(3)]**

Acceptable documents for verification include, but are not limited to the following:

1. Account statements, passbooks, certificates of deposit, or Housing Authority verification forms completed by the financial institution.

2. Broker's statements showing value of stocks or bonds and the earnings credited the family. Earnings can be obtained from current newspaper quotations or oral broker's verification.

3. IRS Form 1099 from the financial institution, provided that the Housing Authority must adjust the information to project earnings expected for the next 12 months.

**7.7.2    Interest Income from Mortgages or Similar Arrangements**
**[24 CFR §5.609(b)(7)]**

Acceptable documents for verification include, but are not limited to the following:

1. A letter from an accountant, attorney, real estate broker, the buyer, or a financial institution stating interest due for next 12 months. (A copy of the check paid by the buyer to the family is not sufficient unless a breakdown of interest and principal is shown.)

2. Amortization schedule showing interest for the 12 months following the effective date of the certification or re-examination.

**7.7.3    Net Rental Income from Property Owned by Family**
**[24 CFR §5.609(b)(3)]**

Acceptable documents for verification include, but are not limited to the following:

1. IRS Form 1040 with Schedule E (Rental Income).

2. Copies of latest rent receipts, leases, or other documentation of rent amounts.

3. Documentation of allowable operating expenses of the property: tax statements, insurance invoices, bills for reasonable maintenance and utilities, and bank statements or amortization schedules showing monthly interest expense.

## 7.8   VERIFICATION OF ASSETS
## [24 CFR §982.516(a)(2)(ii)]

### 7.8.1   Family Assets

The Housing Authority will determine the current cash value, (the net amount the family would receive if the asset were converted to cash). Acceptable documents for verification include, but are not limited to the following:

1. Verification forms, letters, or documents from a financial institution or broker.

2. Passbooks, checking account statements, certificates of deposit, bonds, or financial statements completed by a financial institution or broker.

3. Quotes from a stockbroker or realty agent as to net amount family would receive if they liquidated securities or real estate.

4. Real estate tax statements if the approximate current market value can be deduced from assessment.

5. Financial statements for business assets.

6. Copies of closing documents showing the selling price and the distribution of the sales proceeds.

7. Appraisals of personal property held as an investment.

### 7.8.2   Assets Disposed of for Less than Fair Market Value (FMV)
### [24 CFR §5.603(b)(3)]

This includes assets disposed of during 2 years preceding effective date of certification or re-examination:

1. For all certifications and re-examinations, the Housing Authority will obtain the family's certification as to whether any member has disposed of assets for less than fair market value during the 2 years preceding the effective date of the certification or re-examination.

2. If the family certifies that they have disposed of assets for less than fair market value, verification [or certification] is required that shows:

   - All assets disposed of for less than FMV;

   - The date they were disposed of;

   - The amount the family received; and

   - The market value of the assets at the time of disposition. Third-party verification will be obtained wherever possible.

Housing Authority of the County of Los Angeles

**7.9    VERIFICATION OF ALLOWABLE DEDUCTIONS FROM INCOME
[24 CFR §5.11]**

**7.9.1   Childcare Expenses
[24 CFR §5.611(a)(4)]**

Acceptable documents for verification include, but are not limited to the following:

1. Written verification from the person who receives the payments is required. If the childcare provider is an individual, s/he must provide a statement of the amount they are charging the family for their services and whether any of the amounts owed have been or will be paid by sources outside the family.

2. Verifications must specify the child care provider's name, address, telephone number, the names of the children cared for, the number of hours the child care occurs, the rate of pay, and the typical yearly amount paid, including school and vacation periods.

3. Family's certification as to whether any of those payments have been or will be paid or reimbursed by outside sources.

**7.9.2   Medical Expenses
[24 CFR §5.611(a)(3)]**

Families who claim medical expenses or expenses to assist a person(s) with a disability will be required to submit a certification as to whether or not any expense payments have been, or will be, reimbursed by an outside source.

Acceptable documents for verification include, but are not limited to the following:

1. Written verification by a doctor, hospital or clinic personnel, dentist, pharmacist, of
   - The anticipated medical costs to be incurred by the family and regular payments due on medical bills, and
   - Extent to which those expenses will be reimbursed by insurance or a government agency.

2. Written confirmation by the insurance company or employer of health insurance premiums to be paid by the family.

3. Written confirmation from the Social Security Administration's written of Medicare premiums to be paid by the family over the next 12 months. A computer printout will be accepted.

4. For attendant care:
   - A reliable, knowledgeable professional's certification that the assistance of an attendant is necessary as a medical expense and a projection of the number of hours the care is needed for calculation purposes.
   - Attendant's written confirmation of hours of care provided and amount and frequency of payments received from the family or agency (or

copies of canceled checks the family used to make those payments) or stubs from the agency providing the services.

5. Receipts, canceled checks, or pay stubs that verify medical costs and insurance expenses likely to be incurred in the next 12 months.

6. Copies of payment agreements or most recent invoice that verify payments made on outstanding medical bills that will continue over all or part of the next 12 months.

7. Receipts or other record of medical expenses incurred during the past 12 months that can be used to anticipate future medical expenses. The Housing Authority may use this approach for general medical expenses such as non-prescription drugs and regular visits to doctors or dentists, but not for one-time, nonrecurring expenses from the previous year.

8. The Housing Authority will use mileage at the IRS rate, or cab, bus fare, or other public transportation cost for verification of the cost of transportation directly related to medical treatment.

### 7.9.3   Assistance to Persons with Disabilities
#### [24 CFR §5.611(a)(3)(ii)]

1. In all cases:

   • Written certification from a reliable, knowledgeable professional that the person with disabilities requires the services of an attendant and/or the use of auxiliary apparatus to permit him/her to be employed or to function sufficiently independently to enable another family member to be employed.

   • Family's certification as to whether they receive reimbursement for any of the expenses of disability assistance and the amount of any reimbursement received.

2. Attendant Care:

   • Attendant's written certification of amount received from the family, frequency of receipt, and hours of care provided.

   • Certification of family and attendant and/or copies of canceled checks family used to make payments.

3. Auxiliary Apparatus:

   • Receipts for purchases or proof of monthly payments and maintenance expenses for auxiliary apparatus.

   • In the case where the person with disabilities is employed, a statement from the employer that the auxiliary apparatus is necessary for employment.

Housing Authority of the County of Los Angeles

**7.10   VERIFYING NON-FINANCIAL FACTORS
[24 CFR §982.551(b)(1)]**

**7.10.1  Verification of Legal Identity**

In order to prevent program abuse, the Housing Authority will require applicants to furnish verification of legal identity for all family members.

The documents listed below will be considered acceptable verification of legal identity for adults. If a document submitted by a family is invalid or otherwise questionable, more than one of these documents may be required.

> - Certificate of Birth, naturalization papers
> - Church issued baptismal certificate
> - Current, valid Driver's license
> - U.S. military discharge (DD 214)
> - U.S. passport
> - Board approved Consulate General identification cards, which are currently Mexico's and Argentina's "Matricula Consular" identification cards
> - Company/agency Identification Card
> - Department of Motor Vehicles Identification Card
> - Hospital records

Documents considered acceptable for the verification of legal identity for minors may be one or more of the following:

> - Certificate of Birth
> - Adoption papers
> - Custody agreement
> - Health and Human Services ID

**7.10.2  Verification of Marital Status**

> ❑ Verification of divorce status will be a certified copy of the divorce decree, signed by a Court Officer.
> ❑ Verification of a separation may be a copy of court-ordered maintenance or other records.
> ❑ Verification of marriage status is a marriage certificate.

**7.10.3  Familial Relationships**

The following verifications may be required if applicable:

> - Verification of relationship:
>   - Official identification showing names
>   - Birth Certificates

- Baptismal certificates
➤ Verification of guardianship:
  - Court-ordered assignment
➤ Verification from social services agency
➤ School records
  - Affidavit of parent
➤ Evidence of a stable family relationship:
  - Joint bank accounts or other shared financial transactions
  - Leases or other evidence of prior cohabitation
  - Credit reports showing relationship

## 7.10.4 Verification of Permanent Absence of Adult Member

If an adult member who was formerly a member of the household is reported permanently absent by the family, the Housing Authority may require one or more of the following as verification:

1. Husband or wife institutes divorce action.

2. Husband or wife institutes legal separation.

3. Order of protection/restraining order obtained by one family member against another.

4. Proof of another home address, such as utility bills, canceled checks for rent, drivers license, or lease or rental agreement, if available.

5. Statements from other agencies such as social services or a written statement from the owner or manager that the adult family member is no longer living at that location.

6. If the adult family member is incarcerated, a document from the Court or prison should be obtained stating how long they will be incarcerated.

7. A statement by the adult member of the household removing him/herself from the lease and voucher household and providing a forwarding address and effective date of the move.

## 7.10.5 Verification of Change in Family Composition
## [24 CFR §982.516(c)]

The Housing Authority may verify changes in family composition (either reported or unreported) through letters, telephone calls, utility records, inspections, owners, neighbors, credit data, school or DMV records, and other sources.

## 7.10.6 Verification of Disability

Verification of disability must be receipt of SSI or SSA disability payments under Section 223 of the Social Security Act or 102(7) of the Developmental Disabilities Assistance and Bill of Rights Act (42 U.S.C. 6001(7) or verified by appropriate diagnostician such as physician, psychiatrist, psychologist, therapist,

Housing Authority of the County of Los Angeles

rehabilitation specialist, or licensed social worker, using the HUD language as the verification format.

**7.10.7** <u>**Verification of Citizenship/Eligible Immigrant Status**</u>
<u>**[24 CFR Part 5, Subpart E]**</u>

To be eligible for assistance, individuals must be U.S. citizens, or non-citizens with eligible immigrant status based on the eligible categories specified by regulations. Individuals who are neither may elect not to contend their status. Each family member must declare their status once. Assistance cannot be delayed, denied, or terminated while verification of status is pending except that assistance to applicants may be delayed while the Housing Authority hearing is pending.

1. <u>Citizens or Nationals of the United States</u>: Required to sign a declaration under penalty of perjury [24 CFR §5.508(b)(1)].

2. <u>Eligible Immigrants Age 62 and Over</u>: Required to sign a declaration of eligible immigration status and provide proof of age [24 CFR §5.508(b)(2)].

3. <u>All Other Eligible Immigrants</u>: Required to sign a declaration of status and verification consent form, and to provide an acceptable document of eligible immigration as follows:

   - Resident Alien Card (I-551)

   - Alien Registration Receipt Card (I-151) (With receipt for application of I-551)

   - Foreign Passport with I-551 stamp

   - Arrival-Departure Record (I-94) with no annotation accompanied by:

     - A final court decision granting asylum (if no appeal is taken);

     - A letter from an INS or USCIS asylum officer granting asylum (if application is filed on or after 10/1990) or from and INS director granting asylum (application filed before 10/1/90);

     - A court decision granting withholding of deportation; or

     - A letter from an asylum officer granting withholding of deportation (if application filed on or after 10/1/90).

   - Arrival-Departure Record (I-94) stamped with one of the following:

     - "Admitted as a Refugee Pursuant to Section 207"

     - "Section 208" or "Asylum"

     - "Section 243(h)" or "Deportation stayed by Attorney General"

     - "Paroled Pursuant to Section 221(d)(5) of the INS (or USCIS)"

- Temporary Resident Card (I-688) annotated "Section 245A" or Section "210"
- Employment Authorization Card (I-688B) annotated "Provision of Law 274a. 12(11)" or "Provision of Law 274a.12"
- Employment Authorization Document (I-766) annotated "Provision of Law 274a. 12(11)" or "Provision of Law 274a.12"
- Any official revision of the acceptable documents listed above
- Receipt issued by the United States Citizenship and Immigration Service (USCIS) for issuance of replacement of any of the above documents that shows individual's entitlement has been verified

The document is copied front and back and returned to the family. A birth certificate is not acceptable verification of eligible immigrant status. All documents in connection with U.S. citizenship/eligible immigrant status must be kept 5 years.

Eligible immigrants must have their status verified by USCIS. The Housing Authority verifies the status through the USCIS SAVE system. If this primary verification fails to verify status, the Housing Authority must request within 10 calendar days that the USCIS conduct a manual search [24 CFR §5.512(c)].

4. <u>Ineligible Family Members</u>: Family members who do not claim to be citizens or eligible immigrants must be listed on a statement of ineligible family members signed by the head of household or spouse [24 CFR §5.508(e)].

5. <u>Non-Citizen Students on Student Visas</u>: Ineligible, even though they are in the country lawfully. They must provide their student visa but their status will not be verified and they do not sign a declaration but are listed on the statement of ineligible members [24 CFR §5.522].

❑ **Failure to Provide**: If an applicant or participant family member fails to sign required declarations and consent forms or provide documents, as required, they must be listed as an ineligible member. If the entire family fails to provide and sign as required, the family may be denied or terminated for failure to provide required information [24 CFR §5.508(i)].

❑ **Time of Verification**: For applicants, verification of U.S. citizenship/eligible immigrant status occurs at the same time as verification of other factors of eligibility for final eligibility determination. For family members added after other members have been verified, the verification occurs at the first interim or annual re-examination after the new member moves in. Once verification has been completed for any covered program, it need not be repeated except that, in the case of port-in families, if the initial public housing agency does not supply the documents, the Housing Authority must conduct the determination [24 CFR §5.508(g)].

❑ **Extensions of Time to Provide Documents**: Extensions must be given for persons who declare their eligible immigration status but need time to obtain the required documents. The length of the extension shall be based on individual circumstances. The Housing Authority will generally allow up to 30

Housing Authority of the County of Los Angeles

calendar days to provide the document or a receipt issued by the USCIS for issuance of replacement documents [24 CFR §5.508(h)].

❑ **Determination of Ineligibility:** After the Housing Authority has made a determination of ineligibility, the family will be notified of the determination and the reasons and informed of the option for prorated assistance (if applicable).

### 7.10.8 Verification of Social Security Numbers [24 CFR §5.216(a)]

Social Security numbers must be provided as a condition of eligibility for all family members, except for children age 5 and under, who have not been assigned a number, and family members who are not eligible to obtain a Social Security number.  Social Security numbers will be verified through a Social Security card issued by the Social Security Administration.  If a family member cannot produce a Social Security card, only the documents listed below showing his or her Social Security number may be used for verification.   The family is also required to certify in writing that the document(s) submitted in lieu of the Social Security card information provided is/are complete and accurate [24 CFR §5.216(f)]:

➢ A driver's license

➢ Identification card issued by a Federal, state or local agency

➢ Identification card issued by a medical insurance company or provider (including Medicare and Medicaid)

➢ An identification card issued by an employer or trade union

➢ An identification card issued by a medical insurance company

➢ Earnings statements or payroll stubs

➢ Bank statements

➢ IRS Form 1099

➢ Benefit award letters from government agencies

➢ Retirement benefit letter

➢ Life insurance policies

➢ Court records such as real estate, tax notices, marriage and divorce, judgment or bankruptcy records

➢ Verification of benefits or Social Security Number from Social Security Administration

All new family members, except children age 5 and under, who have not been assigned a number, will be required to produce their Social Security card or provide the substitute documentation described above together with their certification that the substitute information provided is complete and accurate. This information is to be provided at the time the change in family composition is reported to the Housing Authority [24 CFR §5.216(a)].

If a family member is able to disclose the Social Security number but cannot meet the documentation requirements, he/she must sign a certification to that

effect provided by the Housing Authority. The family member will have an additional 60 calendar days to provide proof of the Social Security number. If they fail to provide this documentation, the family's assistance will be terminated [24 CFR §5.216(g)].

If the family member states they have not been issued a number, the family member will be required to sign a certification to this effect.

### 7.10.9 Medical Need for Larger Unit

A written certification that a larger unit is medically necessary must be obtained from a reliable, knowledgeable medical professional.

### 7.10.10 Reasonable Accommodation

In order to verify the necessity for a reasonable accommodation, the Housing Authority will require the disabled individual, or a third party acting on their behalf, to return the Reasonable Accommodation Request form, or other written documentation, completed by a qualified professional with direct experience with the individual's disability. Qualified professionals may include, but are not limited to:

➢ A medical doctor

➢ A psychiatrist

➢ A social worker

➢ Other unlicensed care providers

### 7.10.11 Secondary Review/Credit Checks

The Housing Authority uses credit reports obtained from reliable sources to conduct secondary verifications for a random sample of applicants and participants as detailed in Section 1.12 (Monitoring Program Performance).

The methodology used to evaluate the information obtained from the credit report in relation to new applicants is outlined in Chapter 4 (Establishing Preferences and Maintaining the Waiting List).

The secondary review includes a comparison between the information contained in the credit report, for each adult household member, and the information provided by the family to the Housing Authority for eligibility purposes. Specifically, the Housing Authority reviews the credit report to verify:

➢ **Employment**: If the credit report reveals employment during the subsidized period that was not disclosed to the Housing Authority, the family will be required to provide documentation that the employment did not occur or provide information regarding the amount of earnings received during the employment period.

   If the family contends that the employment was made up for the purposes of obtaining credit or was erroneously placed on the credit report, the family must supply a letter from the employers listed confirming such information. On a case-by-case basis, the Housing Authority may accept a certified statement from the family.

Housing Authority of the County of Los Angeles

If the family failed to disclose employment for a period longer than 6 months, the Housing Authority will propose termination of the family's assistance and seek repayment of any overpayment.

If the family failed to disclose employment for less than 6 months, the family will be required to attend a counseling interview and re-sign all program documents re-enforcing the family's obligations. The family will also be required to repay any overpayment amount. A second violation of this nature will result in a proposed termination.

➤ **Assets**: The credit report information will be used to verify assets, particularly, large items such as real estate property. If the credit report reveals that the family owns property, the family will be required to provide the appropriate documentation regarding the property.

If all documentation confirms that the family (any family member) owns real estate property that was purposely concealed, the Housing Authority will propose termination of assistance and seek repayment of any overpayment amount.

➤ **Aliases**: A credit report can provide information on other names that have been used for the purposes of obtaining credit. Common reasons for use of other names include a recent marriage or a divorce. If an alias has not been disclosed to the Housing Authority, the family will be asked to provide additional evidence of the legal identity of adult family members.

➤ **Current and Previous Addresses**: For a continuously assisted family, it is assumed that the family's primary residence is the assisted address. If the credit report indicates the continuous use of an address, other than that of the assisted unit during the subsidized period, the family will be asked to provide documentation that the assisted address is being used as the family's primary residence. This may include a history of utility bills, bank statements, school enrollment record for children, credit card statements or other relevant documents. Failure to provide adequate proof may result in termination of assistance.

If the family is not using the subsidized unit as their primary residency and/or is subletting the assisted unit, the file will be referred for proposed termination and the Housing Authority will seek full repayment of any overpayment amount.

➤ **Credit Card and Loan Payments**: A credit report will usually include a list of the family's financial obligations. Examples of the items that may show up include car loans, mortgage loans, student loans and credit card payments. The Housing Authority will review this information to confirm the income and asset information provided by the family. If the family's current financial obligations (total amount of current monthly payments) exceed the amount of income reported by the family, the Housing Authority will ask the family to disclose how they are currently meeting their financial obligations. Accounts that have been charged off or significantly delinquent are not included in this calculation. Failure to provide adequate proof of income will result in the file being referred for proposed termination. Additionally, the Housing Authority will seek full repayment of any overpayment amount.

➤ **Multiple Social Security Numbers**: A credit report may list multiple Social Security numbers if an adult family member has used different Social Security numbers to obtain credit.  If the credit report information does not match the information provided by an adult member of the family, the family member will be required to obtain written confirmation of the Social Security number that was issued to him/her from the Social Security Administration.

Whenever a violation results in a proposed termination, the family is entitled to request an informal hearing. Procedures governing the informal hearing process are outlined in Chapter 16 (Informal Hearings and Complaints).

Housing Authority of the County of Los Angeles

## CHAPTER 8:
## VOUCHER ISSUANCE AND BRIEFINGS

### 8.1    INTRODUCTION

This chapter covers the Housing Authority's process for issuing vouchers, including the contents of the briefing that is conducted for families receiving a voucher. It also includes policies on the term of the voucher.

### 8.2    ISSUANCE OF HOUSING CHOICE VOUCHERS

When funding is available, the Housing Authority will issue vouchers to applicants whose eligibility has been determined.

The number of vouchers issued must ensure that the Housing Authority stays as close as possible to 100 percent lease-up. The Housing Authority performs a calculation to determine whether applications can be processed, the number of vouchers that can be issued, and to what extent the Housing Authority can over-issue.

The Housing Authority may over-issue vouchers only to the extent necessary to meet leasing goals. All vouchers that are over-issued must be honored. If the Housing Authority finds it is over-leased, it must adjust future issuance of vouchers in order not to exceed the ACC budget limitations for the fiscal year.

### 8.3    BRIEFING TYPES AND REQUIRED ATTENDANCE

#### 8.3.1    Initial Applicant Briefing
#### [24 CFR §982.301(a)]

When the family is initially issued a voucher, the Housing Authority conducts a briefing session, as required by HUD. The briefing session is mandatory.

❑   Briefing sessions will be conducted in groups or individual meetings.

❑   Briefing sessions will be conducted in English.

The Housing Authority will not issue a voucher to a family unless the household representative has attended a briefing and signed the voucher. Applicants who provide prior notice of inability to attend a briefing will automatically be scheduled for the next briefing. Applicants who fail to attend scheduled briefings, without prior notification and approval of the Housing Authority, may be denied admission based on failure to supply information needed for certification. The Housing Authority will conduct individual briefings for families with disabilities at their home, upon request by the family, if required for reasonable accommodation.

Families who attend group briefings and still have the need for individual assistance will be referred to the appropriate staff person.

#### 8.3.2    Re-Issuance Briefing

A briefing will be held for participants who will be re-issued vouchers to move. This briefing may include incoming and outgoing portable families. Families

failing to attend a scheduled briefing twice will be denied a new voucher based on failure to provide required information.

### 8.3.3 Owner Briefing

Briefings are held for owners at least annually. Invitations are mailed to all owners. Prospective owners are also welcome. The purpose of the briefing is to assure successful owner participation in the program.

### 8.4 INFORMATION PROVIDED AT THE BRIEFING SESSION

The Housing Authority's objectives are to assure that families selected to participate are successful in obtaining an acceptable housing unit, and that they have sufficient knowledge to derive maximum benefit from the program and to comply with program requirements.

The purpose of the briefing session is to provide information on the Housing Authority's process for voucher holders who intend to lease a unit. This will enable families to utilize the program to their advantage, and prepare them to discuss it with potential owners and property manager.

When the family is selected to participate, the briefing session includes information as follows.

### 8.4.1 Topics Covered in the Briefing Session [24 CFR §982.301(a)]

The person conducting the briefing will describe how the program works and include information on the following subjects:

❑ A description of how the program works;

❑ Family and owner responsibilities;

❑ Where a family may lease a unit inside and outside the Housing Authority's jurisdiction;

❑ How portability works for families eligible to exercise portability; and

❑ Advantages of moving to an area that does not have a high concentration of poor families, for families living in high poverty census tracts in the Housing Authority's jurisdiction.

If the family includes a person with disabilities, the Housing Authority will ensure compliance with 24 CFR §8.6 to ensure effective communication.

### 8.4.2 Briefing Packet [24 CFR §982.301(b)]

The Housing Authority provides families with a briefing packet that contains more detailed information about the program. The packet includes forms and information required by HUD, as well as additional resources. The person conducting the briefing session will explain the documents in the briefing packet.

Housing Authority of the County of Los Angeles

1. Instructions: This explains the term of the voucher, the Housing Authority's policies on extensions and suspensions, and how families may request tenancy approval.

2. Subsidy Estimation: A worksheet on rent calculations, including a description of the method used to calculate the assistance payment, how the minimum and maximum allowable rent is determined, how the payment standard is determined, and a calculation of the estimated maximum rent to suit the tenant's budget.

3. Utility Allowance Schedule: Utility allowance amounts for rental units, by unit size and utility type, for cities and unincorporated areas within the Housing Authority's jurisdiction.

4. Information on where the family can lease a unit, including portability procedures, a list of area housing authorities, and a form for participants who are requesting to transfer.

5. Form HUD-53641: The HUD-required "tenancy addendum" that must be included in the lease.

6. Request for Tenancy Approval (RTA): Families request Housing Authority approval of the assisted tenancy with this form.  The RTA includes a statement of Housing Authority policy on providing family information to prospective owners.

7. Subsidy Standards and Requests for Waivers: Explains how the number of bedrooms (unit size) relates to family composition, and when and how exceptions are made in regards to requests for additional bedrooms.

8. A Good Place to Live: HUD's brochure on selecting a unit that complies with HQS.

9. Are You A Victim of Housing Discrimination: HUD's pamphlet on fair housing which contains the complaint form.  The Housing Authority also includes available State and local information on equal opportunity laws.

10. Marketing List of Available Properties: Owners or other parties willing to lease to assisted families submit listings of units that are available to rent, which the Housing Authority compiles and distributes.  The list includes any available information on units that are accessible to persons with disabilities.

11. Family Obligations: Families sign to acknowledge program obligations, and consequences including termination of assistance for failure to comply.

12. Informal Hearing Information: Includes procedures and explanations of when participant families have the opportunity for an informal hearing, and how to request a hearing.

The packet may also include the following materials:

❑ Three Way Partnership: Explains the relationship between owners, participants and the Housing Authority.

❑ Protect Your Family From Lead In Your Home: Federal brochure on the hazards of lead-based paint and resources for additional information.

❑ <u>Searching for a Rental Home</u>: Guidance on finding a unit and submitting a successful rental application.

❑ <u>Additional Standards for HQS Inspections</u> and inspections process details.

❑ <u>Owner materials</u> including information on the New Contracts Process and the Benefits of Participation.

❑ <u>Owner forms</u> including IRS W-9, Letter of Authorization, Authorization Agreement for Direct Deposit, and a sample Lead-Based Paint Disclosure.

❑ <u>Request for Voucher Extension form</u>

## 8.5  ENCOURAGING PARTICIPATION IN AREAS WITHOUT LOW INCOME OR MINORITY CONCENTRATION
### [24 CFR §982.301(a)(3)]

At the briefing, families are encouraged to search for housing in non-impacted areas.  The Housing Authority provides assistance to families who wish to do so.

The assistance provided to such families includes:

❑ Direct contact with owners;

❑ Counseling with the family;

❑ Providing information about services in various non-impacted areas;

❑ Meeting with neighborhood groups to promote understanding;

❑ Formal or informal discussions with owner groups;

❑ Formal or informal discussions with social service agencies;

❑ Meeting with rental referral companies or agencies; and

❑ Meeting with fair housing groups or agencies.

The Housing Authority will maintain a database of available housing submitted by owners in all neighborhoods within its jurisdiction to ensure greater mobility and housing choice to very low-income households.  The Marketing List will be made available to voucher holders who are actually seeking housing.

## 8.6  SECURITY DEPOSIT REQUIREMENTS
### [24 CFR §982.313]

Security deposits charged by owners may not exceed those charged to unassisted families (nor the maximum prescribed by State or local law.)

For lease-in-place families, responsibility for first and last month's rent is not considered a security deposit issue.  In these cases, the owner should settle the issue with the family prior to the beginning of assistance.

## 8.7  TERM OF VOUCHER
### [24 CFR §982.301(b)(1)]

During the briefing session, each family is issued a voucher, which represents a contractual agreement between the Housing Authority and the family, specifying

Housing Authority of the County of Los Angeles

the rights and responsibilities of each party. It does not constitute admission to the program, which occurs when the lease and contract become effective.

### 8.7.1   Expirations
[24 CFR §982.303(a)]

The voucher is valid for a period of 60 calendar days from the date of issuance. The family must submit a Request for Tenancy Approval and lease within the 60 calendar-day period, unless an extension has been granted by the Housing Authority.

If the voucher has expired, and has not been extended by the Housing Authority or expires after an extension, the family will be denied assistance. The family will not be entitled to a review or hearing. If the family is currently assisted, they may remain as a participant in their unit if there is an assisted lease/contract in effect.

### 8.7.2   Policy on Suspensions (Tolling)
[24 CFR 982.303(c)]

When a Request for Tenancy Approval is received, the Housing Authority will not deduct the number of calendar days required to process the request from the term of the voucher.

### 8.7.3   Extensions
[24 CFR §982.303(b)]

The Housing Authority may grant extensions to vouchers.

A family may request an extension of the voucher time period. All requests for extensions must be received prior to the expiration date of the voucher.

Extensions may be granted in 30, 60, or 120-day increments, up to a maximum term of 180 calendar days, if necessary for the tenant to locate a unit.

Housing Supervisors may authorize extensions up to a maximum term of 270 calendar days for extenuating circumstances or as a reasonable accommodation. Such matters will be considered on an individual basis and must be supported by verifiable third-party documentation.

### 8.7.4   Assistance to Voucher Holders
[24 CFR §982.301(b)]

Families who require additional assistance during their search may call the Housing Authority to obtain a Marketing List of available units.   Information regarding the Marketing List will be presented at the briefing session.

The Housing Authority will assist families with negotiations with owners and provide other assistance related to the families' search for housing.

### 8.8   VOUCHER ISSUANCE DETERMINATION FOR SPLIT HOUSEHOLDS
[24 CFR §982.315]

In those instances when a family assisted under the Housing Choice Voucher Program becomes divided into two otherwise eligible families due to divorce,

legal separation, or the division of the family, and the new families cannot agree as to which new family unit should continue to receive the assistance, and there is no determination by a court, the Housing Authority shall consider the following factors to determine which of the families will continue to be assisted:

1. Which of the two new family units has custody of dependent children.

2. Which family member was the head of household when the voucher was initially issued (listed on the initial application).

3. The composition of the new family units, and which unit contains elderly or disabled members.

4. Whether domestic violence was involved in the breakup.

5. Which family members remain in the unit.

6. Recommendations of social service professionals.

Documentation of these factors will be the responsibility of the requesting parties.

If documentation is not provided, the Housing Authority will terminate assistance on the basis of failure to provide information necessary to complete the annual re-examination.

Where the breakup of the family also results in a reduction of the size of the voucher, the family will be required to move to a smaller unit if the current owner is unwilling to accept the rent level of the smaller sized certificate.

## 8.9    REMAINING MEMBER OF FAMILY – RETENTION OF VOUCHER

To be considered the remaining member of the family, the person must have been previously approved by the Housing Authority to be living in the unit.

A live-in aide, by definition, is not a member of the family and will not be considered a remaining member of the family.

In order for a minor child to continue to receive assistance as a remaining family member:

1. The court has to have awarded emancipated minor status to the minor, or

2. The Housing Authority has to have verified that social services and/or the Juvenile Court has arranged for another adult to be brought into the assisted unit to care for the child/children for an indefinite period.

A reduction in family size may require a reduction in the voucher size.

## 8.10    FAMILY VOLUNTARILY RELINQUISHES HOUSING CHOICE VOUCHER

The family may voluntarily relinquish their voucher at any time.  In such cases, the Housing Authority will provide the owner of the property with a 30 calendar days notice indicating that rental assistance will terminate based on the family's request. The family will become fully liable for the contract rent after 30 calendar days.

Generally, the Housing Authority will not reinstate a family once a request for voluntary termination has been received.   However, as a reasonable

Housing Authority of the County of Los Angeles

accommodation, the Housing Authority will review requests for reinstatements received within 6 months and make a determination on a case-by-case basis.

If a family voluntarily relinquishes their voucher in lieu of facing termination, the Housing Authority will continue to seek to recover any monies that may be due to the Housing Authority as a result of misrepresentation or other breach of program regulations.

## CHAPTER 9:
## THE NEW CONTRACT PROCESS REQUEST FOR TENANCY APPROVAL AND CONTRACT EXECUTION

**9.1     INTRODUCTION**
**[24 CFR §982.302(b) and 24 CFR §982.353(b)]**

After families are issued a voucher, they may search for a unit anywhere within the Housing Authority's jurisdiction, or outside of the Housing Authority's jurisdiction if they qualify for portability. The family must find an eligible unit under the program rules, with an owner who is willing to enter into a Housing Assistance Payments (HAP) contract with the Housing Authority. This chapter defines the types of eligible housing, the Housing Authority's policies which pertain to lease requirements, owner disapproval, and the processing of Requests for Tenancy Approval (RTA).

**9.2     REQUEST FOR TENANCY APPROVAL**
**[24 CFR §982.302(c)]**

The family must submit the RTA and a copy of the proposed lease during the term of the voucher. Both the owner and the voucher holder must sign the RTA.

The Housing Authority will not permit the family to submit more than one RTA at a time.

The RTA will be approved if [24 CFR §982.302(d)]:

1.  The unit is an eligible type of housing;

2.  The unit passes an inspection (based on HUD's Housing Quality Standards and the Housing Authority's requirements, detailed in Chapter 10);

3.  The rent is reasonable;

4.  The security deposit amount is approvable;

5.  The proposed lease complies with HUD and Housing Authority requirements, and State and local law;

6.  The owner is approvable, and there are no conflicts of interest; and

7.  All applicable lead-based paint disclosure requirements have been met. See Section 10.4 (Lead-Based Paint) for additional policies.

**9.2.1   Disapproval of RTA**
**[24 CFR §982.302(d)]**

If the Housing Authority determines that the RTA cannot be approved for any reason, the owner and the family will be notified in writing.   The Housing Authority will instruct the owner and family of the steps that are necessary to approve the Request.

The owner will be given 5 calendar days to submit an approvable RTA from the date of disapproval unless the reason for the disapproval is the result of multiple failed inspections (three or more failed HQS inspections).

When, for any reason, an RTA is not approved, the Housing Authority will furnish another RTA form to the family along with the notice of disapproval so that the family can continue to search for eligible housing.

The Housing Authority will suspend the term of the voucher while the RTA is being processed. Therefore, the length of time allotted to a family for the purpose of locating another unit will be based on the number of days left on the term of the voucher at the time the RTA was submitted to the Housing Authority [24 CFR §982.303(b)].

9.3   **ELIGIBLE TYPES OF HOUSING**
      **[24 CFR §982.352]**

The Housing Authority will approve the following types of housing in the voucher program:

- ❑ Single-family dwellings, including condos and townhouses.
- ❑ Manufactured homes where the family leases the mobile home and the pad [24 CFR §982.620(a)(2)].
- ❑ Manufactured homes where the family owns the mobile home and leases the pad [24 CFR §982.620(a)(3)].
- ❑ Multifamily dwellings (apartment buildings).
- ❑ Units owned but not subsidized by the Housing Authority (HUD-prescribed requirement).

A family can own a rental unit but cannot reside in it while being assisted, except in the cases involving manufactured homes when the family owns the mobile home and leases the pad. A family may lease in and have an interest in a cooperative housing development.

The Housing Authority may not permit a voucher holder to lease a unit which is receiving project-based Section 8 assistance or any duplicative rental subsidies.

9.3.1   **Special Housing Types**
        **[24 CFR §982.601]**

The Housing Authority must permit use of all special housing type listed below, if needed as a reasonable accommodation so the program is readily accessible to and usable by persons with disabilities in accordance with 24 CFR Part 8.

- ❑ Congregate housing
- ❑ Group home
- ❑ Shared housing
- ❑ Cooperative housing (excluding families that are not cooperative members
- ❑ Homeownership

9.3.2   **Ineligible Housing Types**
        **[24 CFR §982.352(a)]**

The Housing Authority will not approve:

- ❏ A unit occupied by the owner or by any person with an interest in the unit, other than manufactured homes described above.
- ❏ Nursing homes or other institutions that provide care.
- ❏ School dormitories and institutional housing.
- ❏ Structures that have not been properly converted. Owners will be required to provide finalized permits for all conversion work when the integrity and/or soundness of a structure is in question.
- ❏ Converted garages or other structures not intended to be living areas.
- ❏ Any other types of housing prohibited by HUD.

## 9.4    RESTRICTIONS ON RENTING TO RELATIVES
### [24 CFR §982.306(d)]

In accordance with HUD policy, the family will not be allowed to rent a unit from an owner (including a principal or other interested party) who is the spouse, parent, child, grandparent, grandchild, and sister or brother of any member of the family. This restriction applies to all new contracts entered into after June 16, 1998.

Exceptions may be made to this policy as a reasonable accommodation for persons with a disability. The Housing Authority will review all such requests on a case-by-case basis. The family will be required to provide documentation of disability and how the particular unit, owned by the relative, could benefit the disabled person. Owners must provide the current address of their residence (not a Post Office box). If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification. In addition, the Housing Authority may request a copy of the owner's current utility bills and bank statement.

Failure to provide adequate documentation, within the specified time period (2 weeks), will be grounds for denial of such request.

In all cases, the owner of the assisted unit may not reside in the unit with the assisted household at any time during the term of the Housing Assistance Payment (HAP) Contract between the Housing Authority and the owner.

## 9.5    LEASE AGREEMENTS
### [24 CFR §982.308 - §982.309]

The tenant and the owner must enter a written lease for the unit. If the owner uses a standard lease form for rental to unassisted tenants in the locality or the premises, the lease must be in such standard form, plus the required HUD Tenancy Addendum, which the Housing Authority will provide to the owner.

The Housing Authority will review the lease for compliance with regulations. At minimum, the lease must specify the following information:

- ❏ The names of the owner and tenant;

Housing Authority of the County of Los Angeles

- ❑ The address of the unit rented;
- ❑ The term of the lease including the initial term and any provisions for renewal;
- ❑ The amount of the monthly rent to owner; and
- ❑ A specification of which utilities and appliances will be supplied by the owner, and which by the family.

The lease must provide the following are grounds for the owner to terminate tenancy [24 CFR §982.310(c)]:

- ❑ Drug- related criminal activity engaged in, on or near the premises by any tenant, household member, or guest, or such activity engaged in on the premises by any other person under the tenant's control. In addition, the lease must provide that the owner may evict a family when the owner determines that a household member is illegally using a drug or when the owner determines that a pattern of illegal use of a drug interferes with the health, safety, or right to peaceful enjoyment of the premises by other residents.

- ❑ Any of the following types of criminal activity by a covered person:
  - ➤ Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other residents (including property management staff residing on the premises);
  - ➤ Any criminal activity that threatens the health, safety, or right to peaceful enjoyment of their residences by persons residing in the immediate vicinity of the premises; or
  - ➤ Any violent criminal activity on or near the premises by a tenant, household member, or guest, or any such activity on the premises by any other person under the tenant's control.

- ❑ If a tenant is:
  - ➤ Fleeing to avoid prosecution, or custody or confinement after conviction, for a crime, or attempt to commit a crime, that is a felony under the laws of the place from which the individual flees, or
  - ➤ Violating a condition of probation or parole imposed under Federal or State law.

If the owner does not have a standard lease form, the owner may request a sample lease.

When needed, the Housing Authority may require the owner and family to execute a lease rider that changes the rent amount and/or effective date on the owner's original lease.

The effective date of the lease and the HAP contract will be based on the date the unit passed inspection or the family took possession of the unit, whichever is later. For this purpose, the family is considered to be in possession of the unit when the family has a key to the unit and the unit is fully available for the family's exclusive use [24 CFR §982.305(b)].

**9.5.1   Separate Agreements
         [24 CFR §982.510(c)]**

Separate agreements are not necessarily prohibited.  Families and owners will
be advised of the prohibition of illegal side payments for additional rent, or for
items normally included in the rent of unassisted families, or for items not shown
on the approved lease.

Owners and families may execute separate agreements for services (parking
space), appliances (other than range and refrigerator) and other items that are
not included in the lease if the agreement is in writing and approved by the
Housing Authority.

Any appliances, services or other items which are routinely provided to
unassisted families as part of the lease (such as air conditioning, dishwasher or
garage) or are permanently installed in the unit, cannot be put under separate
agreement and must be included in the lease.  For there to be a separate
agreement, the family must have the option of not utilizing the service, appliance
or other item.

The Housing Authority is not liable for unpaid charges for items covered by
separate agreements and nonpayment of these agreements cannot be cause for
eviction.

If the family and owner have come to a written agreement on the amount of
allowable charges for a specific item, so long as those charges are reasonable
and not a substitute for higher rent, they will be allowed.

All agreements for special items or services must be attached to the lease
approved by the Housing Authority.  If agreements are entered into at a later
date, they must be approved by the Housing Authority and attached to the lease.

**9.6   INITIAL INSPECTIONS**

See Chapter 10 (Housing Quality Standards and Inspections).

**9.7   RENT LIMITATIONS
        [24 CFR §982.508]**

In accordance with HUD regulations, at the time the family initially receives
assistance for a new unit, the family's share of the rent for the unit (includes
utilities and the rent to the owner) may not exceed more than 40 percent of the
family's adjusted monthly income if the gross rent for the unit exceeds the
payment standard.

If the gross rent (rent plus utilities) does not exceed the payment standard, the
family may contribute more than 40 percent of their monthly income towards rent.

Although HUD does not place limits on the amount that a family may contribute
towards rent (if the family is a continuing family or the gross rent for an initial
lease does not exceed the payment standard), the Housing Authority is
concerned about affordability.  Therefore, whenever a family is contributing more
than 60 percent of their adjusted family income towards rent, the family will be
required to attend a Housing Authority affordability counseling session.  Trained

Housing Authority of the County of Los Angeles

staff will review the family's financial situation and review the family's ability to meet their rental obligation. If the family discloses that they are concerned about their ability to meet their rental obligation, the Housing Authority will work with the family to help them locate another affordable unit. If the family indicates that they are able to meet all of their current financial obligations, the family will be allowed to proceed with their request to move into the unit. A notation will be made in the family's file.

**9.8     RENT REASONABLENESS**
        **[24 CFR §982.507(a)(1)]**

A rent reasonable test will be used to determine if the rent amount request by the owner can be approved. The Housing Authority's rent reasonableness policy, including appeals process, is covered in Chapter 11 (Setting Payment Standards and Determining Rent Reasonableness).

**9.9     INFORMATION TO OWNERS**
        **[24 CFR §982.307(b)]**

The Housing Authority is required to provide prospective owners with the address of the applicant and the names and addresses of the current and previous owner if known. The Housing Authority will make an exception to this requirement if the family's whereabouts must be protected due to domestic abuse or witness protection. The Housing Authority will not release any other information regarding the family.

The Housing Authority will inform owners that it is the responsibility of the owner to determine the suitability of prospective tenants. Owners will be encouraged to screen applicants for rent payment history, eviction history, damage to units, and other factors related to the family's suitability as a tenant [24 CFR §982.307(a)].

Information regarding the Housing Authority's policy on this subject is included in the briefing packet and as an attachment to the Request for Tenancy Approval. This policy will apply uniformly to all families and owners.

In addition to the information listed above, the Housing Authority provides owner workshops at least twice a year. At the workshops, current and prospective owners are given an overview of the program and information about any significant program changes. There is also ample time for a question and answer session.

**9.10    OWNER DISAPPROVAL**
        **[24 CFR §982.306(a) - §982.306(c)(4)]**

For purposes of this section, "owner" includes a principal or other interested party, and to disapprove an owner means to prevent the participation of an owner in Housing Authority programs.

The Housing Authority is required to disapprove an owner for the following reasons:

➢ HUD has informed the Housing Authority that the owner has been debarred, suspended, or subject to a limited denial of participation under 24 CFR Part 24.

➢ HUD has informed the Housing Authority that the federal government has instituted an administrative or judicial action against the owner for violation of the Fair Housing Act or other federal equal opportunity requirements and such action is pending.

➢ HUD has informed the Housing Authority that a court or administrative agency has determined that the owner violated the Fair Housing Act or other Federal equal opportunity requirements.

➢ If the owner is the spouse, parent, child, grandparent, grandchild, sister, or brother of any member of the family.

The Housing Authority also maintains the discretion to disapprove an owner for the reasons listed below. The Housing Authority may disapprove an owner for a period of 1 year for the following reasons:

➢ The owner has violated obligations under a housing assistance payments contract under Section 8 of the 1937 Act (42 U.S.C. 1437f).

➢ The owner has a history or practice of non-compliance with the HQS for units leased under the tenant-based programs or with applicable housing standards for units leased with project-based Section 8 assistance or leased under any other Federal housing program.

➢ The owner has a history or practice of renting units that fail to meet State or local housing codes;

➢ The owner has not obtained a business license for rental property for the assisted unit, where required by local ordinance; or

➢ The owner has not paid State or local real estate taxes, fines or assessments.

An owner may be disapproved for a period of up to 5 years for the following reasons:

➢ The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any Federal housing program.

➢ The owner has a history or practice of failing to terminate tenancy of Section 8-assisted tenants, or tenants assisted under any other federally-assisted housing program, for activity engaged in by the tenant, any member of the household, guest or another person under the control of any member of the household that:

- Threatens the right to peaceful enjoyment of the premises by other residents;

- Threatens the health or safety of other residents, of employees of the Housing Authority, or of owner employees or other persons engaged in management of the housing;

- Threatens the health or safety of, or the right to peaceful enjoyment of their residences, by persons residing in the immediate vicinity of the

Housing Authority of the County of Los Angeles

premises; or commits drug related criminal activity or violent criminal activity.

An owner may be disapproved for a period of up to 10 years for the following reason:

➢ The owner has engaged in any drug-related criminal activity or any violent criminal activity.

If an owner disagrees with the Housing Authority's disapproval, the owner may appeal the decision in writing within 10 calendar days from receiving the Housing Authority's decision. A supervisor will review the appeal and prepare a written decision within 30 calendar days after receiving the request. The decision of the supervisor is final.

## 9.11   CHANGE IN TOTAL TENANT PAYMENT (TTP) PRIOR TO HAP EFFECTIVE DATE

When the family reports changes in factors that will affect the Total Tenant Payment (TTP) prior to the effective date of the HAP contract, the information will be verified and the TTP will be recalculated. If the family does not report any change, the Housing Authority need not obtain new verifications before signing the HAP contract, even if verifications are more than 60 calendar days old.

## 9.12   CONTRACT EXECUTION PROCESS
### [24 CFR §982.305(c)]

Provided that the unit passes inspection, the Housing Authority will prepare the HAP contract for execution.  The family and the owner will execute the lease agreement, and the owner and the Housing Authority will execute the HAP contract. Copies of the documents will be furnished to the parties who signed the respective documents.

The Housing Authority makes every effort to execute the HAP contract before the commencement of the lease term.  The HAP contract may not be executed more than 60 calendar days after commencement of the lease term and no payments will be made until the contract is executed.

The following Housing Authority representatives are authorized to execute a contract on behalf of the Housing Authority: Assisted Housing's Division Director, Assistant Director, Assistant Managers and Housing Supervisors.

Owners must provide the current address of their residence (not a Post Office box).  If families lease properties owned by relatives, the owner's current address will be compared to the subsidized unit's address.

Owners must provide an Employer Identification Number or Social Security number, and may also be required to provide a copy of their driver's license or other photo identification.

### 9.12.1  Determining the Contract Effective Date

The effective date and the amount of the rental payment is communicated in writing to both the owner and family.

If the owner and the family have entered into a lease and provide a copy of the lease with the RTA, the effective date of the contract will be either:

1. The date the unit passed inspection (for families residing in the unit prior to the inspection date), or

2. The date that the Housing Authority authorized the owner to allow the family to take possession of the unit.

The contract effective date will be based on the later of these two dates. If the owner and the family have not executed a lease prior to the HAP contract negotiation process, then the HAP contract will become effective once the lease has been properly executed by both parties.

## 9.12.2  Prorating First Month's Rent

When the effective date of a new contract begins on a day other than the first of the month, the Housing Authority will determine a prorated contract rent amount. For consistency with rental industry standards, prorated amounts will be calculated by using 30 days to establish a daily rate (refer to 3/3/05 memo).

## 9.12.3  Proof Of Ownership

The Housing Authority will use property profile information obtained from a private vendor to confirm ownership of the assisted unit. If third party information cannot confirm ownership of the unit, the Housing Authority may also request a recorded deed or closing escrow statement to prove ownership.

Owners may also be required to provide a copy of a business rental license if the assisted unit is in a city where one is required.

Any requested information must be provided prior to execution of the HAP contract. Failure to provide the requested information within a reasonable period of time, generally not more than 30 calendar days, will result in a cancellation of the RTA.

## 9.12.4  Establishing Eligibility To Execute HAP Contract and Related Documents

In cases involving multiple owners, the Housing Authority will accept the signature of a designee on all contracts and related paperwork if all the legal owners have jointly agreed on the person/persons who may act on their behalf.

To establish signature and/or payment authority, the Housing Authority requires that all persons who have interest in the property sign or provide a letter of authorization, giving one or more parties the right to sign contracts, other program documents and/or receive payments on behalf of the owners.

In cases involving a partnership or corporation, the Housing Authority may request the partnership agreement or incorporation documents to determine who is designated to act on the group's behalf.

The Housing Authority will not execute a HAP Contract until all proper authorization, from all appropriate parties, has been provided. Failure to provide information needed to establish authority to execute the HAP contract within a

reasonable time, generally 30 calendar days, may result in a cancellation of the RTA.

Once the Housing Authority has established proper authorization, the letter of authorization will remain in effect until superseded by another authorization or the HAP contract is terminated. All changes or modification to the instructions provided in the current letter of authorization must be provided in writing.

### 9.12.5 Payment To The Owner
### [24 CFR §982.311(a)]

Once the HAP Contract is executed, the Housing Authority begins processing payments to the owner.  Because the Housing Authority's sole method of payment to owners is direct deposit, new and existing owners must provide the necessary information for enrollment in the Housing Authority's direct deposit program.  Payments will be made via direct deposit by the first of each month.  Owners must notify the Housing Authority of any missing payments as soon as possible.  The Housing Authority will accept report of missing payment both via a telephone call and/or in writing.

### 9.13   CHANGE IN OWNERSHIP

A change in ownership does not require execution of a new contract.

The Housing Authority will process a change of ownership only upon the written request of the previous or new owner and only if accompanied by a copy of the escrow statement or other document showing the transfer of title and the Employee Identification Number or Social Security number of the new owner.

In order to complete a change of ownership, the new owner must complete an Assumptions of Obligations and Benefits contract.  This form obligates the new owner to the HAP contract.  The Housing Authority will provide this document once a written request for a change is received.

When the assumption contract has been executed, the Housing Authority will send a copy of it, along with a copy of the original HAP contract and lease, to the new owner.

New owners are subject to the Housing Authority's owner disapproval policy as detailed in Section 9.10 of this chapter.

## CHAPTER 10:
## HOUSING QUALITY STANDARDS AND INSPECTIONS

**10.1    INTRODUCTION**

This chapter describes the Housing Authority's procedures for implementing Housing Quality Standards (HQS), conducting different inspections, and setting standards for the timeliness of repairs.  It also explains the responsibilities of the owner and family, and the consequences for noncompliance with HQS by the owner and family.

**10.2    TYPES OF INSPECTIONS**
         **[24 CFR §982.405]**

The Housing Authority conducts the following inspections, which will be explained in greater detail throughout the chapter:

❑   **New Contracts Inspection**: A unit must pass this HQS inspection before the Housing Authority enters into a HAP Contract with the owner.

❑   **Inspections at Other Times as Needed**:

  ➢  Interim Inspection: HQS inspection conducted upon request of the owner, family or agency.

  ➢  Emergency Inspection: HQS inspection conducted for life-threatening violations.

  ➢  Compliance Check/Home Visit Inspections:   An inspection conducted, without notice, to verify compliance with the Section 8 Program.

❑   **Annual Inspection**: A unit must pass its annual HQS inspection.

❑   **Quality Control Inspection**: The Housing Authority is required to conduct supervisor quality control HQS inspections.

❑   **Move-Out Inspection**: For its Moderate Rehabilitation Program, the Housing Authority may conduct a move-out inspection for contracts effective before October 2, 1995, at an owner's request, if a damage claim is to be submitted (see Section 20.9 for details on these inspections).

**10.3    HOUSING QUALITY STANDARDS (HQS)**
         **[24 CFR §982.401]**

HQS is the minimum quality standards set forth by HUD for tenant-based programs.  These standards are in place to ensure that assisted housing is decent, safe and sanitary.  All program housing must meet the HQS performance requirements both at commencement of assisted occupancy, and throughout the assisted tenancy.

Efforts will be made at all times to encourage owners to provide housing above the HQS minimum standards.

HQS applies to the building and premises, as well as the unit.  In order for a unit to pass an HQS inspection, the following standards must be met.

Housing Authority of the County of Los Angeles

### 10.3.1 Unit Space and Size
### [24 CFR §982.401(d)(2)(i)]

At minimum, a living room, kitchen area, and bathroom must be located in the unit.

### 10.3.2 Living Room / Sleeping Room
### [24 CFR §982.401(d)(2)(ii)], [24 CFR §982.401(h)(2)(iv)], [24 CFR §982.401(f)]

❑ The dwelling unit must have at least one bedroom or living/sleeping room for each two persons. Children of opposite sex, other than very young children, may not be required to occupy the same bedroom or living/sleeping room.

❑ There must be at least one window in the living room and in each sleeping room. If the window is designed to be openable, the window must open and close properly, and be large enough to provide emergency egress.

❑ The living room and each bedroom must have at least two electrical outlets in proper operating condition. Permanent overhead or wall-mounted light fixtures may count as one of the required electrical outlets.

❑ Bedrooms must also have a built-in closet or wardrobe, be located within the unit (e.g., no garages), and be private (have a closing door separating it from the rest of the unit). Bedrooms should also be finished in a quality similar to other bedrooms in the home.

❑ In cases where an owner has modified the rental unit without obtaining the proper city and/or County building permits, the Housing Authority may rely on the legal property description for the purposes of negotiating the rent and determining how many actual sleeping rooms are in the rental unit.

### 10.3.3 Sanitary Facilities (Bathroom)
### [24 CFR §982.401(b)], [24 CFR §982.401(h)(2)(iii)], [24 CFR §982.401(f)(2)(ii)]

❑ The bathroom must be located in a separate private room and contain a working flush toilet.

❑ Bathroom areas must have one openable window or other adequate exhaust ventilation.

❑ The unit must have a fixed sink. The bathroom sink may be located separately from other bathroom facilities, but the kitchen sink may not also be used for the bathroom sink.

❑ The unit must have a shower or tub in proper operating condition, with hot and cold running water. The shower or tub need not be in the same room with other bathroom facilities, but they must be private.

❑ All walls in a tub or shower area must be covered with ceramic tile or other material that is impervious to water to prevent water damage and deterioration.

❑ Sinks and commode water lines must have shut off valves, unless faucets are wall-mounted. All sinks in the unit must have functioning stoppers.

❑ The bathroom must have a permanent ceiling or wall light fixture in proper operating condition.

❑  All bathrooms in the unit must be in proper operating condition.

**10.3.4  Food Preparation (Kitchen)**
**[24 CFR §982.401(c)], [24 CFR §982.401(f)(2)(ii)]**

❑  The dwelling unit must have suitable space and equipment to store, prepare, and serve foods in a sanitary manner (i.e., kitchen).

❑  The dwelling unit must have an oven, and a stove or range, and a refrigerator of appropriate size for the family. All of the equipment must be in proper operating condition. The stove and oven must be properly hooked up to the gas, with no hazards present. The refrigerator must be able to maintain a temperature sufficient to keep food from spoiling over a reasonable period of time. The equipment may be supplied by either the owner or the family.

❑  A microwave oven may be substituted for a tenant-supplied oven and stove or range. A microwave oven may be substituted for an owner-supplied oven and stove or range if the tenant agrees and microwave ovens are furnished instead of an oven and stove or range to both subsidized and unsubsidized tenants in the building or premises.

❑  The kitchen area must have a permanent ceiling or wall light fixture in proper operating condition, and at least one electrical outlet in proper operating condition.

❑  The dwelling unit must have a permanently attached kitchen sink in proper operating condition, with a sink trap and hot and cold running water. The sink must have a shut off valve, unless faucets are wall-mounted, and must drain into an approvable public or private system. All sinks in the unit must have functioning stoppers.

❑  There must be facilities and services for the sanitary disposal of food waste and refuse, including temporary storage facilities where necessary (e.g., garbage cans).

**10.3.5  Ceilings, Walls, Floors and Building Exterior**
**[24 CFR §982.401(g)]**

The unit must be structurally sound. The structure must not present any threat to the health and safety of the occupants and must protect the occupants from the environment.

Ceilings, walls, floors and fences must not have any serious defects such as severe bulging or leaning, large holes, loose surface materials, severe buckling, missing parts, or other serious damage.

❑  Wood floors must be sanded to a smooth surface and sealed. Any loose or warped boards must be re-secured and made level. If the boards cannot be leveled, they must be replaced.

❑  The exterior wall structure and surface must not have any serious defects such as serious leaning, buckling, sagging, large holes, or defects that may result in air infiltration or vermin infestation.

❑  In areas where plaster or drywall is sagging, severely cracked, bulging or leaning, or has large holes, it must be repaired or replaced.

Housing Authority of the County of Los Angeles

- ❏ The condition and equipment of interior and exterior stairs, halls, porches, walkways, etc., must not present a danger of tripping and falling. For example, broken or missing steps or loose boards are unacceptable. Stairs with four or more steps must have a secure handrail.

- ❏ A porch or balcony at least 30 inches or more from the ground must have secure railings.

- ❏ The roof must be structurally sound and weather tight and must not have any serious defects, such as buckling or sagging. Gutters, downspouts and soffits must not show signs of serious decay and must not allow entry of significant air or water into the interior of the structure.

- ❏ The chimney must not be seriously leaning or showing evidence of significant disintegration.

- ❏ Building foundations must not have any severe structural defects that may create a hazardous condition, including allowing significant entry of ground water.

### 10.3.6 Windows
### [24 CFR §982.401(f)(1)(ii)], [24 CFR §982.401(d)(2(iii)]

All window sashes must be in good condition, solid, intact, and fit properly in the window frame. Damaged or deteriorated sashes must be replaced.

Windows must be weather-stripped as needed to ensure a weather tight seal.

Windows must not have missing or broken-out panes, or panes that are dangerously loose or have large cracks.

If window security bars or security screens are present on emergency exit windows, they must be equipped with a quick release system. The owner is responsible for ensuring that the family is instructed on the use of the system.

Dwelling unit windows that are accessible from the outside, such as basement, first floor, and fire escape windows, must be lockable (such as window units with sash pins or sash locks, and combination windows with latches).

Windows that are nailed shut are acceptable only if these windows are not needed for ventilation or as an alternate exit in case of fire.

### 10.3.7 Doors and Unit Access
### [24 CFR §982.401(d)(2)(iv)], [24 CFR §982.401(k)]

All exterior doors must be solid core and weather tight to avoid any air or water infiltration, have no holes, and have all trim intact.

All interior doors must have no holes, have all trim intact, and be openable without the use of a key.

All exterior doors must have dead bolt locks.

The unit must be able to be used and maintained without unauthorized use of other private properties. The building must provide an alternate means of exit in case of fire (such as fire stairs or egress through windows).

**10.3.8  Thermal Environment**
       **[24 CFR §982.401(e)]**

There must be a safe system for heating the unit, in proper operating condition. The heating unit must be affixed to the unit and be able to provide adequate heat, either directly or indirectly, to each room.  The dwelling unit must not contain unvented room heaters that burn gas, oil, or kerosene. Electric heaters are acceptable.  Portable heaters are not acceptable.  Heating equipment also must not pose other unsafe conditions, such as improper flue connection or installation of equipment.

**10.3.9  Electricity**
       **[24 CFR §982.401(f)]**

The unit must not contain any electrical hazards, such as exposed electrical connections; broken, noninsulated or frayed wiring; improper types of wiring, connections or insulation, or wires lying in or near standing water or other hazardous locations.

**10.3.10  Smoke Detectors**
        **[24 CFR §982.401(n)]**

Each assisted unit must be equipped with at least one properly working battery-operated or hard-wired smoke detector on each level of the unit.

Whenever possible, smoke detectors should be installed in a hallway adjacent to a bedroom.

If an assisted unit is occupied by a household with hearing-impaired persons, a permanently installed smoke detector designed for people with hearing-impairments must be located in each bedroom that is occupied by a hearing-impaired person.

**10.3.11  Site and Sanitation**
        **[24 CFR §982.401(l)], [24 CFR §982.401(m)]**

The site and neighborhood may not be subject to serious adverse environmental conditions, natural or manmade.  These can include dangerous walks or steps; instability; flooding, poor drainage, septic tank back-ups or sewage hazards; mudslides; abnormal air pollution, smoke or dust; excessive noise, vibration or vehicular traffic; excessive accumulations of trash; vermin or rodent infestation; or fire hazards.

Adequate covered facilities for the disposal of rubbish must be present at the site, such as covered dumpsters and other covered refuse containers approvable by the local health and sanitation department.

The unit and its equipment must be in sanitary condition, and free from vermin and rodent infestation.

Housing Authority of the County of Los Angeles

**10.3.12** **Manufactured Homes (Mobile Homes) HQS Requirements**
**[24 CFR 982.621]**

In addition to meeting all other HQS requirements, a mobile home must meet the following requirements:

❏ It must be situated on a site that is stable and free from hazards such as sliding or wind damage.

❏ Must be appropriately anchored by a tie down device that distributes and transfers the load imposed by the unit to appropriate ground anchors to resist wind overturning and sliding. Alternative types of anchors, beams and foundation bolts are permissible if they meet manufacturer's specifications.

❏ One operable smoke detector is required.

**10.3.13** **Additional Housing Quality Standards**
**[24 CFR §982.401(a)(4)]**

The Housing Authority is authorized to enhance HQS, provided that by doing so the Housing Authority does not overly restrict the number of units available for leasing. The enhancements adopted by the Housing Authority are meant to ensure that assisted units are safe in relation to other units rented throughout Los Angeles County.

In addition to the HQS identified by HUD, all assisted units must also be in compliance with the following items derived from California and Los Angeles County Code, in order to pass an HQS inspection.

❏ **Double Cylinder Locks**: Double-keyed deadbolts, or any other lock requiring special knowledge or a tool to open, are prohibited in a residential unit. All doors that provide an exit from the residence must be openable from the inside without the need of a key or any other special knowledge, effort or tool.

❏ **Swimming Pools**: Swimming pools in multifamily structures must be enclosed by a gate from 48 inches to 60 inches tall. The gate must be self-closing with a self-closing latch and a protected panel must surround the latch.

❏ **Hot Water Heater**: TPR and drainpipe 6 inches above the floor must be present. PVC type drainpipes are not acceptable.

❏ **Earthquake Straps for Water Heaters**: Must be secured for seismic stability.

❏ **Garages**: Garages, whether attached or detached, must be accessible. Garages are not to be used as a living space.

**10.3.14** **Serious Deficiencies**

Assisted units must meet all HQS performance requirements in order to pass an inspection. The Housing Authority has compiled the following list of specific conditions that are considered serious deficiencies that may cause a unit to fail an inspection. This list assists inspectors in making a determination regarding

the condition of an assisted unit; however, deficiencies are not limited to this list:

1. No TPR/Drainpipe on water heater
2. Clogged toilets/sinks/wash basins/bathtubs
3. Torn carpet or linoleum flooring posing a tripping hazard
4. Stretched carpet when a potential hazard exists
5. Broken mirrors, cabinets, etc.
6. Missing smoke detectors
7. Vermin infestation (fleas, roaches, termites, mice, and rats)
8. Double cylinder locks
9. Exterior/common grounds excessive rubbish/debris accumulation and overgrown grass/weeds
10. Large holes/cracks/uneven concrete in walkway
11. Building with major peeling of wood trim/paint (directly affecting family's unit)
12. Large porcelain chips or peeling paint in bathtubs/sinks/wash basin exposing black surfaces/rust
13. Burner knobs missing on stove
14. Inoperable stove/refrigerator
15. Bathrooms where no windows are present and exhaust fans are missing/inoperable
16. Flammable products stored near water heaters
17. Signs of leaking/water damage on ceiling/roof
18. Broken windows and larger cracks which pose a potential hazard
19. Algae/debris in swimming pool
20. Loose hand rails/guard rails
21. Missing/cracked switch cover plates
22. Closet doors off track
23. Bedroom window security bar release mechanism is inoperable
24. Inoperable window locks

## 10.4   LEAD-BASED PAINT
### [24 CFR §982.401(j)]

The Housing Authority's rental assistance programs are subject to the requirements of the Lead-Based Paint Poisoning Prevention Act and the Residential Lead-Based Paint Hazard Reduction Act of 1992.  Applicable regulations are detailed in 24 CFR §35.

The Housing Authority will be responsible for the collection of LBP disclosure information; conducting Visual Assessment inspections; assuring that Clearance

Housing Authority of the County of Los Angeles

Examinations are conducted; collect data regarding Elevated Intervention Blood Lead Level (EIBLL) cases, and informing owners of their responsibilities.

**10.4.1 Disclosure**
**[24 CFR §35(Subpart A)]**

Owners of units built before 1978 are required to disclose to lessees all available information about the presence of lead-based paint or lead-based paint hazards and provide any available record or reports pertaining to the presence of lead-based paint or lead-based paint hazards, before the lease is enacted.

Lessees must also receive a copy of the lead hazard information pamphlet, "Protect Your Family From Lead in Your Home."

For all new contracts, the Housing Authority will require owners to certify on the RTA that they have met all applicable lead-based paint disclosure requirements. If applicable, the Housing Authority will require owners to submit a copy of the lead-based paint disclosure statement, and any inspection reports.

The Housing Authority will include a sample lead-based paint disclosure form and a lead hazard information pamphlet in voucher issuance packets for participants. Materials will be made available directly to owners upon request.

For units built before 1978, the Housing Authority will not approve an owner lease without receiving all applicable lead-based paint disclosure information.

**10.4.2 Lead-Based Paint Visual Assessment**
**[24 CFR §35.1215]**

The Housing Authority is required to conduct lead-based paint visual assessments for all units built prior to 1978 that house or will house a child or children under 6 years of age, at the time of the new contract inspection and at annual inspections.

The Housing Authority inspectors conducting lead-based paint visual assessments will be trained according to HUD requirements.

The purpose of the visual assessment is to identify any deteriorated paint. Deteriorated paint is paint that is peeling, chipping, chalking or cracking, or any paint or coating located on an interior or exterior surface or fixture that is otherwise damaged or separated from the substrate. Inspectors will check the condition of painted surfaces. If deteriorated paint exceeds the de minimis thresholds as defined by HUD, the unit will fail the lead-based paint visual assessment. The de minimis thresholds are defined as 20 sq. ft. (2 sq. meters) on exterior surfaces; 2 sq. ft. (0.2 sq. meters) in any one interior room or space; or 10% of the total surface area on an interior or exterior type of component with a small surface area (such as window sills, baseboards, and trim).

**10.4.3 Stabilization and Clearance**
**[24 CFR §35.1215]**

Owners of units that fail the lead-based paint visual assessment will be required to stabilize deteriorated paint in order for the unit to pass.

The Housing Authority will send a letter to owners of failed units that provides guidance on stabilizing paint and other required activities. Owners will have 30 calendar days from the letter date to complete the following:

❑ **Repair the deteriorated paint**. Work must be performed by certified lead workers using lead-safe work practices. The Housing Authority will provide owners with resources and information on meeting these guidelines.

❑ **Obtain a Clearance Report**. A contractor certified by the Environmental Protection Agency (EPA) must inspect the unit and prepare a Clearance Report summarizing the work completed and the inspection results.

❑ **Complete the Housing Authority's Lead-Based Paint Owner Certification form**. The owner must certify that all applicable requirements have been met.

❑ **Submit Clearance Report and Certification to the Housing Authority**. The Housing Authority will accept paperwork by mail, fax, and hand delivery.

The owner is responsible for informing tenants of all lead hazard reduction work and evaluations, in a manner consistent with HUD regulations.

If the unit has been previously certified free of lead-based paint by a certified inspector, the owner may submit a copy of the inspector's report, along with the certification form, to the Housing Authority.

The Housing Authority will review the Clearance Report and certification form for completeness. The Clearance Report must contain all information required by HUD. If the Clearance Report passes, the unit will receive a pass on the visual assessment; no further inspection visit is required.

On new contracts inspections, the passing Clearance Report and valid certification form must be received by the Housing Authority before the Housing Authority can enter into a HAP Contract with the owner. If this does not take place within 30 calendar days, the Housing Authority will cancel the RTA.

For annual inspections, if the owner fails to submit the passing Clearance Report and valid certification form within 30 calendar days, the Housing Assistance Payments (HAP) will be placed on hold (abated) for the unit and the participant will be issued a voucher. The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated. See Section 10.11.1 for details on abatement.

Assisted Housing's Director will review reasonable cause requests for extension. Extension requests must be submitted in writing within the first 30 calendar days of the failed lead-based paint visual assessment. An extension shall not extend beyond 90 days after the date of notification to the owner of the results of the visual assessment. If an extension is approved, the HAP will not be abated during this extension period. Reasonable cause circumstances include prohibitive weather conditions, financial hardship, and rehabilitation in progress.

### 10.4.4  Children with Environmental Intervention Blood Lead Levels [24 CFR §35.1225]

On a quarterly basis, the Division will send the Los Angeles County Department of Health Services Childhood Lead Poisoning Prevention (CLPP) Program the

Housing Authority of the County of Los Angeles

addresses of assisted families with children under the age of 6.  CLPP Program staff will check the addresses for matches with cases of identified Environmental Intervention Blood Lead Levels (EIBLL).  If a match is found, CLPP Program staff will conduct a Risk Assessment of the occupied unit and forward a report to the Division.  A Risk Assessment is a comprehensive evaluation for LBP hazards that goes beyond the Visual Assessment component including paint testing, and dust and soil sampling.  The Risk Assessment Report identifies lead hazards and appropriate lead hazard reduction methods.

A copy of the Risk Assessment Report must immediately be forwarded to the participating owner once received by the Division.  The owner must post a Notice of Lead Hazard Evaluation within 15 calendar days and complete lead hazard reduction and clearance activities as advised in the Report within 30 calendar days.  The Housing Authority is not allowed to assist any other participant in the unit until the owner complies with the Report.

If informed about an EIBLL case from a source other than the CLPP Program, the Division must submit the information to the CLPP Program within 5 calendar days.  The CLPP Program will conduct a Risk Assessment of the occupied unit if required.

## 10.5   INSPECTIONS SCHEDULE

Inspections are conducted on business days between the hours of 7:00 a.m. and 5:00 p.m.  An individual over 18 years of age must be present to allow entry for the inspector.

## 10.6   NEW CONTRACT INSPECTIONS
### [24 CFR §982.305(b)(2)]

Under normal circumstances, new contract (initial) inspections are conducted 7 to 10 calendar days following the receipt of a Request for Tenancy Approval.  The new contract inspection is conducted in order to:

1. Determine if the unit, including common areas, meets housing quality standards.

2. Document the current condition of the unit.  This will serve as the basis to evaluate the future condition of the unit, i.e. excessive wear and tear.

### 10.6.1   When HQS Deficiencies Must Be Corrected

If the unit fails the initial inspection, the unit will be scheduled for a follow-up inspection within 10 calendar days.  The owner will be given 30 calendar days to correct the deficiencies.  The owner can request an inspection sooner if repairs have been made prior to the scheduled follow-up inspection date.

If the time period given by the Housing Authority to correct the deficiencies has lapsed, or the maximum of three failed inspections has occurred, the family must select another unit.

The Housing Authority will not enter into a HAP Contract with the owner until the unit passes the inspection.  However, the family may already be in the unit when the new contract inspection is conducted.  If the family lives in the unit at the time

of the new contract inspection, they are responsible for meeting their HQS obligations. See Section 10.8 for details of the family's HQS obligations.

**10.7   ANNUAL AND INTERIM INSPECTIONS**
        **[24 CFR §982.405]**

**10.7.1  Annual Inspections**

In order to assure that units meet housing quality standards throughout the assisted tenancy, the Housing Authority conducts inspections at least annually.

As stated in the family obligations, the family must allow the Housing Authority to inspect the unit at reasonable times and after reasonable notice. The Housing Authority will notify the family and/or owner of the date and time of the scheduled inspection appointment in writing at least 10 calendar days prior to the inspection.

**Appointments may be rescheduled for emergency situations.** If the family fails to contact the Housing Authority to reschedule the inspection, or if the family misses two inspection appointments, the Housing Authority will consider the family to be in violation of the Certified Statement of Family Obligation agreement and will initiate termination procedures in accordance with the Housing Authority's policy for proposed termination.

**10.7.2  Interim Inspections**

Interim inspections are conducted at the request of the owner, family, or agency (usually as a result of a violation of HQS or violation of the lease). Interim inspections may be scheduled and conducted at any time of the year.

**10.7.3  Compliance Check/Home Visit Inspections**

Compliance Check/Home Visit Inspections are conducted without prior notice to the family or owner. The purpose of these inspections is to verify compliance with the Section 8 Program. If a Compliance check/Home Visit Inspection occurs, the family has the right to refuse to submit and/or participate in an unannounced Compliance Check/Home Visit Inspection or interview.

**10.8   FAILED INSPECTIONS: DETERMINATION OF RESPONSIBILITY**
        **[24 CFR §982.404(b)]**

If deficiencies cause an assisted unit to fail an inspection, Housing Authority inspectors will determine who is responsible at the time of inspection.

In accordance with family obligations, the following deficiencies are considered the responsibility of the family:

> ➤ Family-paid utilities not in service;

> ➤ Failure to provide or maintain family-supplied appliances; and

> ➤ Damages to the unit or premises caused by a household member or guest beyond normal wear and tear.

Housing Authority of the County of Los Angeles

- "Normal wear and tear" is defined as items that could be charged against the family's security deposit under state law or court practice.

The owner is responsible for all other HQS violations. In cases such as vermin infestation, where burden of responsibility is not immediately clear, Housing Authority inspector will determine the responsible party.

HQS deficiencies that cause a unit to fail must be corrected by the owner, unless the family is responsible for the deficiencies.

## 10.9   FAILED INSPECTIONS: WHEN DEFICIENCIES MUST BE CORRECTED [24 CFR §982.404(a)(3)]

### 10.9.1   Emergency Fail Deficiencies

Items that endanger the family's health or safety are considered emergency fails. These deficiencies must be corrected within 24 hours of inspection. The following deficiencies are considered life-threatening, emergency fails, and will cause a unit to be labeled uninhabitable:

- ➤ Gas leaks
- ➤ Major plumbing problems
- ➤ Utilities not in service
- ➤ No running water
- ➤ No functioning toilet
- ➤ Unstable roof/structure

In cases where the unit is deemed uninhabitable, the family will be issued a voucher within 24 hours so that they can make arrangements to secure another residence if necessary.

If an emergency fail deficiency is not corrected in the time period required by the Housing Authority, and the owner is responsible, the housing assistance payment will be abated immediately and the contract will be terminated.

If repairs are completed and the family wishes to move back into the unit, a new RTA will need to be submitted for that unit and the New Contract Process will need to be completed again.

If the emergency fail deficiency is not corrected in the time period required by the Housing Authority, and the family is responsible, the Housing Authority will terminate the family's assistance for violating family obligations (see Chapter 15: Family Obligations), but will not abate the payment to owner for that month.

### 10.9.2   Non-Emergency Fail Deficiencies

Non-emergency deficiencies that cause a unit to fail the inspection must be corrected within a 30 calendar-day cycle. The family and owner will be notified of the failed items in writing. Within the 30 calendar days from the notification letter, the owner and family must make the appropriate corrections and notify the Housing Authority so that a follow-up inspection can be scheduled.

If the necessary repairs have been completed prior to the next scheduled inspection, the owner or tenant may request an earlier inspection date. Requests for earlier repair dates will be reviewed and accommodated in a case-by-case basis.

For major repairs, the Inspections Housing Unit Supervisor or Housing Supervisor may approve an extension beyond 30 calendar days. However, this extension cannot exceed 60 calendar days.

If the family is not at home for the follow-up inspection appointment, a card will be left at the unit with instructions. A second follow-up inspection will be scheduled automatically and the owner and family will be notified by mail.

If owner-caused deficiencies are not corrected in the time period required by the Housing Authority, housing assistance payments will be abated and the contract may be terminated. If family-caused deficiencies are not corrected in the time period required by the Housing Authority, housing assistance may be terminated. See Sections 10.10 and 10.11 below for more information.

### 10.9.3 Non-Emergency Fail Deficiencies Not Requiring Follow-up Inspection

The following deficiencies will not require a follow-up inspection if cleared by proper owner certification:

- ➢ Inoperable gas wall or floor heater
- ➢ Damaged (not missing) outlet covers
- ➢ Inoperable secondary smoke detectors
- ➢ Presence of vermin/roaches (not infestation)
- ➢ Minor faucet and/or plumbing leaks

These deficiencies must be cleared by a certification signed by owner and participant. Appropriate third-party documentation must also be supplied where appropriate, including a utility receipt, invoice, or Gas Company tag. If the certification is not approved by a supervisor, a follow-up inspection must be performed.

### 10.10 CONSEQUENCES OF VERIFIED FAMILY-CAUSED DEFICIENCIES [24 CFR §982.552(a)]

The family has a responsibility to maintain the assisted unit in good condition and to notify the owner of needed repairs. If non-emergency violations of HQS are determined to be the responsibility of the family, the Housing Authority will require the family to make any repair(s) or corrections within the 30 calendar-day cycle. Housing assistance will be terminated if an assisted unit continues to fail housing inspections for family-caused deficiencies or the family fails to keep scheduled appointment(s). See Chapter 15 (Family Obligations) for more information.

Extensions will be granted on a case-by-case basis and must be approved by the Unit Supervisor.

If it has been concluded that all deficiencies are family-caused, the owner's rent will not be abated for such items.

**10.11   CONSEQUENCES OF VERIFIED OWNER-RELATED DEFICIENCIES
[24 CFR §982.404(a), 24 CFR §982.452 and 24 CFR §982.453]**

The owner is responsible for maintaining the unit in accordance with HQS. When it has been determined that an assisted unit fails to meet HQS, the owner of that unit is responsible for completing the necessary repair(s) in the time period specified by the Housing Authority. If the owner fails to correct deficiencies within the specified time period, the Housing Authority is obligated to withhold (abate) housing assistance payments.

**10.11.1   Abatement
[24 CFR §982.453(b) and 24 CFR §982.404(a)(3)]**

Abatement is defined as withholding Housing Assistance Payments (HAP) to the owner for the period of time the unit is out of compliance with HQS requirements.

HAP will be abated if:

1.  **The assisted unit fails the first and second housing inspections due to owner-related deficiencies.**

    If a unit fails the first inspection due to owner-related deficiencies, the notice sent to the owner stating the deficiencies, repairs that need to be made, and the date of the next inspection will also serve as notice that HAP will be abated if the unit fails a second inspection due to owner-related deficiencies.

    If, after the 30-day correction period, the unit then fails the second inspection due to owner-related deficiencies, the Housing Authority will stop payment on the first day of the month following the expiration of the 30-day correction period.

    The owner will be notified of the date of a final inspection. Under normal circumstances, the Housing Authority will inspect an abated unit within 30 calendar days after the abatement notification has been issued.

    If the owner makes repairs during the abatement period, HAP payments will resume on the day the Housing Authority's inspector has verified the corrections and the unit passes inspection.

    A 30-day calculation standard will be used to reconcile abatement payments. Please refer to memo dated 3/3/05.

    No retroactive payments will be made to the owner for the period of time the rent was abated and the unit did not comply with HQS. The notice of abatement states that the family is not responsible for the Housing Authority's portion of rent that is abated. However, the family is responsible to pay its portion of the rent while abatement is in effect.

    If an assisted unit fails the third and final housing inspection for owner-caused deficiencies, the Housing Authority will terminate the HAP Contract.

The Housing Authority will notify the owner of the termination in writing 30 calendar days before it becomes effective. Abatement will remain in effect until the effective date of the termination.

The Housing Authority is prohibited from implementing rent abatement for family-caused deficiencies. However, abatement will apply if family-caused and owner-related deficiencies exist together.

2. **The Housing Authority has verified that the assisted unit has emergency fail deficiencies, and the owner did not complete the necessary repairs within the required timeframe.**

3. **A unit built before 1978 that houses or will house a child under 6 years of age fails the lead-based paint visual assessment, and the owner fails to submit a complete, passing clearance report and certification within 30 calendar days.** Owners will receive notice by mail if a unit fails the lead-based paint visual assessment. They will have 30 calendar days from the date of the notice to perform clearance and submit passing paperwork. If the owner fails to meet these requirements (see Section 10.4 for more information on lead-based paint), HAP will be abated and the Housing Authority will stop payment on the first day of the month following. The participant will be issued a voucher. The owner will have an additional 60 calendar days to obtain and submit a valid Clearance Report before the HAP Contract is terminated.

Families that reside in units that have been abated will be issued a voucher and will have the option to move even if the assisted unit passes inspection at the third and final inspection (this excludes participants of the Moderate Rehabilitation Program).

### 10.11.2 Termination of Contract
[24 CFR §982.453(b)]

When the HAP Contract has been terminated, the family will be required to move in order to continue receiving rental assistance.

RTA submitted for units that have been terminated due to abatement will be reviewed on a case-by-case basis. In cases where the RTA is accepted, the family will be brought in for counseling on their situation.

### 10.12 QUALITY CONTROL INSPECTIONS
[24 CFR §982.405(b)]

To ensure efficient program operations, it is essential for management to apply sound quality control practices. The purpose of quality control inspections is to objectively ascertain that each inspector is conducting accurate and complete inspections, and to ensure that there is consistency among inspectors in application of HQS.

Quality control inspections will be performed by a Quality Assurance Representative according to SEMAP Indicator #5 which meets the minimum quality control sample size for the number of units under HAP contract during the last completed Housing Authority fiscal year for SEMAP.

Housing Authority of the County of Los Angeles

## CHAPTER 11:
## SETTING PAYMENT STANDARDS AND DETERMINING RENT REASONABLENESS

**11.1** **INTRODUCTION**
**[24 CFR §982.503]**

The Housing Authority is responsible for ensuring that the rents charged by owners are reasonable based upon objective comparables in the rental market. When the Housing Authority has determined that the unit meets the minimum HQS, that the lease is approvable, and that the rent is reasonable, it will make timely payments to the owner and notify the owner of the procedures for rent adjustments in the rental assistance programs. This chapter explains the Housing Authority's procedures for setting and adjusting the payment standards and performing rent reasonableness analysis.

**11.2** **PAYMENT STANDARDS FOR THE VOUCHER PROGRAM**
**[24 CFR §982.503(b)(1)]**

HUD regulations allow the Housing Authority to set Payment Standards at a level that is between 90 percent to 110 percent of the Fair Market Rent for Los Angeles County. The Housing Authority must set the payment standard at a level that is high enough to ensure that families are able to afford quality housing while also balancing the need to provide assistance to as many families on the waiting list as possible.

The Housing Authority will review the payment standards at least annually to determine whether an adjustment should be made for some or all unit sizes. The following provides a list of the factors that will be used to evaluate the adequacy of the payment standard and/or be used to make a determination to adjust standards, as appropriate.

**11.2.1** **Assisted Families' Rent Burdens**

The Housing Authority will review reports showing the percent of income used for rent by voucher families to determine the extent to which the rent burden is more than 50 percent of income.

If more than 40 percent of program families in the overall program, or for a specific unit size, are contributing in excess of 50 percent of their adjusted monthly income towards rent, the Housing Authority will consider increasing the voucher payment standards. The payment standard will not be raised if:

❑ The payment is already at the maximum level HUD will allow (110%).

❑ The Housing Authority would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase.

**11.2.2** **Success Rate of Voucher Holders**

The Housing Authority will periodically review the success rate of voucher holders. If 25 percent or more of new admissions and/or families wishing to move are unable to use the vouchers due to current rental rates in Los Angeles

County, the Housing Authority will consider increasing the payment standard for particular unit sizes and/or the entire program, as appropriate.

The payment standard will not be increased if:

❑  The payment is already at the maximum HUD will allow (110%)

❑  The Housing Authority would have to reduce the number of new admissions by 20 percent or more for the upcoming year in order to fund the increase

### 11.2.3  Rent Reasonableness Database

The Housing Authority will review the rent information in the rent reasonableness data bank and compare it to the payment standards established for the Housing Choice Voucher Program. If the rent reasonableness review indicated that the payment standards are higher than the average rental unit in Los Angeles County, the payment standard for the specific unit size, or all payment standards, will be lowered to reflect the current market rents.

### 11.2.4  Quality of Units Selected

The Housing Authority will review the quality of units selected by participant families before determining any change to the Payment Standard to ensure that Payment Standard increases are only made when needed to reach the mid-range of the market.

### 11.2.5  File Documentation

A file will be retained in the Housing Authority's Administrative Support Unit for at least 3 years to document the analysis and findings to justify whether or not the Payment Standard was changed.

### 11.3  RENT REASONABLENESS DETERMINATIONS [24 CFR §982.507]

Rent reasonableness determinations are made when units are placed under HAP contract for the first time and when an owner requests a rent increase.  The Housing Authority will determine and document on a case-by-case basis that the approved rent [24 CFR §982.507(b) and §982.507 (c)]:

1.  Does not exceed rents currently charged on new leases by the same owner for an equivalent assisted or unassisted unit in the same building or complex, and

2.  Is reasonable in relation to rents currently charged by other owners for comparable units in the unassisted market.

The Housing Authority contracts with an outside agency to provide the Rent Comparable System, *RENTELLECT*.  This system considers a variety of criteria to provide rent comparable information, including:

➢  Unit location

➢  Quality

➢  Size

Housing Authority of the County of Los Angeles

      ➢  Type
      ➢  Age of the contract unit
      ➢  Amenities
      ➢  Housing services
      ➢  Maintenance; and
      ➢  Utilities provided by the landlord.

*RENTELLECT* applies a statistical methodology to calculate a predicted or probable market rent for the unit and a reasonable range of market rent. The median amount is used, unless an exception is approved by a Division Manager.

### 11.3.1 Appealing a Rent Reasonableness Determination

If the owner of the property disagrees with the rent reasonable determination, the owner may appeal the decision in writing by submitting an appeal that includes a list of comparable rental units that the owner has found to justify their requested rent amount.

Before using a list of rental units submitted by the owner, the Housing Authority would confirm that the units are indeed comparable using the criteria outlined above. If the units are not comparable, the Housing Authority will not use these units in the rent comparability survey and the owner will be notified of the decision.

At the owner's request, the Housing Authority will release information on the unit addresses used in the rent comparability survey. If the owner finds that the information used by the Housing Authority is incorrect, the Housing Authority will re-verify the rental comparables used and re-determine the rent comparability for the unit.

### 11.3.2 Rent Increases
### [24 CFR §982.519]

As stated in the HUD Tenancy Addendum, the owner must notify the Housing Authority at least 60 days before the proposed effective date of any intended rent increase. The tenant must be notified in writing, and the written notice must be submitted to the Housing Authority.

As authorized by the HAP contract, the Housing Authority will not approve a rent increase if the HAP contract is in abatement for owner-related HQS deficiencies. In accordance with the HUD Tenancy Addendum, the Housing Authority will disapprove requests made during the initial term (first 12 months) of a lease.

The Housing Authority will use the same criteria defined above to determine if a request for a rent increase meets the rent comparability requirement. If the new rent is not rent comparable, the Housing Authority will advise both the owner and the family that the increase cannot be approved. If a partial rent increase can be approved, the Housing Authority will notify the owner, and process the partial increase upon owner approval.

An owner who disagrees with the determination may exercise any of the following options:

- ❏ Appeal the rent comparability determination using the steps outlined above.
- ❏ Adjust his/her request for a rent increase.
- ❏ Serve the family with a proper termination notice.

Housing Authority of the County of Los Angeles

**CHAPTER 12:**
**RE-EXAMINATION**

**12.1   INTRODUCTION**
        **[24 CFR §982.516(a)]**

To assure that tenancy is restricted to participants meeting the eligibility requirements for continued occupancy and are charged appropriate rents; the eligibility status of each participant is re-examined on an annual basis per HUD requirements.

When families move to another dwelling unit, a re-examination is completed and the anniversary date changed.

**12.1.1   Procedure**

To maintain program efficiency and integrity, the Housing Authority at its own discretion may conduct re-examination interviews by mail or in-person. The Housing Authority will attempt to conduct all annual re-examinations interviews through the mail. Annual re-examinations not completed through the mail process will be conducted in person.

**12.2   RE-EXAMINATION NOTIFICATION TO THE FAMILY**

Participating families are advised of the annual re-examination requirement and the importance of reporting income and family composition changes as they occur during the initial re-examination.

**12.2.1   Persons with Disabilities**
          **[24 CFR §8.24(a)]**

Persons with disabilities who are unable to come in to the Housing Authority's office will be granted a reasonable accommodation of conducting the interview at the person's home or by mail, upon verification  that the accommodation requested meets the need presented by the disability.

**12.2.2   Requirements to Attend**

If it is determined that a participant (family) will need to come to the Housing Authority's office then all adult household members 18 years and older will be required to attend the re-examination interview.

**12.2.3   Failure to Respond**

If a family fails to complete or return the required re-examination documents within the specified timeframe, the Housing Authority will schedule the family for a mandatory appointment. The appointment letter will provide the date and time of the appointment and a list of items that family will need to bring. Additionally, the appointment letter will serve as a proposed termination notice and will contain the date of termination as well as a specified timeframe to request an informal hearing.

If the family fails to attend the appointment or fails to bring all the required information and has not requested an informal hearing, Housing Assistance Payments will be stopped.

If the family is able to provide documentation of an emergency situation that prevented them from completing the required re-examination documents or attending the mandatory appointment, the Unit Supervisor at his/her own discretion may, on a case-by-case basis reschedule the appointment.

### 12.2.4  Documents Required from the Family

The re-examination documents will include instructions and appropriate forms that need to be submitted to complete the re-examination. The required forms and documentation are the following:

1. Documentation of income for all family members;

2. Documentation of assets;

3. Documentation of medical or child care expenses;

4. Certified statement of family obligations; and

5. Consent for Release of Information (signed by all household members over 18 years of age).

Verification of these documents will be conducted in accordance with Housing Authority procedures and guidelines described in this plan.

### 12.2.5  Tenant Rent Increases

If the tenant rent increases, a 30-day notice of increase in rent is mailed to the family before the anniversary date.

If less than 30 calendar days are remaining before the anniversary date, the new tenant rent will be effective on the first of the month following the 30-day notice. If the Housing Authority was unable to process the re-examination on a timely basis due to the family's failure to provide re-examination documents, then the rent increase will be effective retroactive to the appropriate anniversary date.

If the family causes a delay in the re-examination processing, there will be a retroactive increase in rent to the anniversary date.  In this particular case, the owner will receive a retroactive HAP payment and every effort will be made to recover lost rent from the tenant.

### 12.2.6  Tenant Rent Decreases

If the tenant rent decreases, it will be effective on the anniversary date.

If the family causes a delay so the processing of the re-examination is not completed by the anniversary date, the rent change will be effective on the first day of the month following the completion of the re-examination processing.

Housing Authority of the County of Los Angeles

**12.3    INTERIM RE-EXAMINATION
[24 CFR §982.516(b)(3)]**

No TTP adjustments will be affected between dates of periodic re-examination or pre-scheduled re-examinations except as noted below:

Tenants are required to submit information affecting eligibility income at all re-examinations. Additionally, tenants are required to report the following changes in family circumstances:

1. Changes in family composition, including loss or addition of one or more family members through death, divorce, birth, or adoption [24 CFR §982.516(c)], and

2. Changes in family income including increases and decreases for income received by the family.

A family is required to report these changes to the Housing Authority within 30 calendar days after the change has occurred.  Once notified, the changes that affect the eligibility income will be verified.

The U.S. citizenship/eligible immigrant status of additional family members must be declared and verified as required at the first interim or regular re-examination after moving into the unit.  See Section 7.10.7 (Verification of Citizenship/Eligible Immigration Status) for details.

**12.3.1  Interim Changes in Income**

❑ **Decreases**: If the information provided results in a decrease in tenant rent, a modification to the HAP Contract is executed to be effective the first of the month following the month in which the required documentation is supplied by the participant.

❑ **Increases**: If the information provided results in an increase in tenant rent, the Housing Authority may conduct an interim re-examination, or may flag the file and make adjustments at the annual re-examination.  In either case, the tenant will be notified in writing at least 30 calendar days in advance of an increase.

**12.4    SPECIAL ADJUSTMENTS**

If, at the time of re-examination, a family is clearly of low-income, and it is not possible to make an estimate of the family's income for the next 12-month period; A special re-examination will be scheduled to accommodate the family's circumstances.  This includes cases where:

1. A tenant is unemployed and there are no anticipated prospects of employment, or

2. The conditions of employment and/or receipt of income are too unstable to validate usual and normal standards for determination. An interim re-examination will be scheduled for families with zero or unstable income every 3 months.

Families whose past employment has been sporadic or who are on welfare, become employed, then are unemployed, or are self-employed, will not be given

special re-examination. If such an income pattern has been established and is expected to continue, then a reasonable 12-month estimate of the income may be based upon past income and present rate of income.

Furthermore, special re-examinations must be clearly set for a definite time to assure compliance.

## 12.5 CHANGES IN FAMILY COMPOSITION
### [24 CFR §982.516(c) and 24 CFR §982.551(h)(2)]

The composition of the assisted family residing in the unit must be approved by the Housing Authority. An interim re-examination will be conducted for any changes in family composition.

The Housing Authority may verify changes in family composition as detailed in Section 7.10.5.

### 12.5.1 Allowable Family Additions
#### [24 CFR §982.551(h)(2)]

Allowable family additions are the following:

1. Addition due to birth, adoption or court awarded custody

   ➢ Must be reported to the Housing Authority, in writing, within 30 calendar days of the occurrence. Families should notify the owner and comply with any lease requirements to obtain owner approval.

2. Other allowable persons:

   ➢ The family must request approval from the owner and the Housing Authority before the person is added. Anyone who moves into the unit without written owner and Housing Authority approval is considered an unauthorized person.

   • Addition of marriage/or marital type relation (i.e., couples that certify that they intend to live in the same principal residence indefinitely and/ or register in California as domestic partners);

   • Addition of a minor who is a child of the head of household, spouse or marital-type partner, who have been living elsewhere; and

   • Addition of a Housing Authority-approved live-in attendant;

   • Addition of an adult child due to recent discharge from the military.

As part of the approval process, the Housing Authority conducts a criminal background check, and may also conduct a credit review, on all new potential family members, 18 years of age and older. Criminal records will only be used to screen new household members. They will not be used for lease enforcement or eviction of residents already receiving tenant-based rental assistance.

If an approved change requires a larger size unit due to overcrowding, the change in voucher size will be made effective immediately (see Chapter 5). The Housing Authority will determine the assistance, based on funding availability.

Housing Authority of the County of Los Angeles

### 12.5.2  Decreases in Family Size

When a family member leaves the household, the absence must be reported to the Housing Authority, in writing, within 30 calendar days of the occurrence, as detailed in Section 6.8.9 (Reporting Absences to the Housing Authority).  The change in family composition may impact the voucher size, as explained in Chapter 5 (Subsidy Standards).

If a decrease in family size results in a decrease of the voucher size, the Housing Authority may exercise the option to downsize the family's voucher size and require the family to move.

Generally, families will be asked to move if the unit is two bedrooms or larger than the family is eligible to rent.  When this is necessary, the family will be granted 120 calendar days to locate another suitable unit.  Extensions are granted in accordance with the policy outlined in Chapter 8 (Voucher Issuance and Briefings).

However, if the family's Total Tenant Payment unit does not exceed 50 percent of the family's monthly-adjusted income, the family will be allowed to remain in the unit.

### 12.6  CONTINUATION OF ASSISTANCE FOR "MIXED" FAMILIES [24 CFR §5.504(b)]

Families that include at least one citizen or eligible immigrant, and any number of ineligible members, are considered "mixed" families.

"Mixed" families that were participants on or before June 19, 1995, shall continue full assistance if they meet the following criteria:

1. The head of household or spouse is a U.S. citizen or has eligible immigrant status, **and**

2. All members of the family other than head, spouse, parents of head, parents of spouse, children of head or spouse are citizens or eligible immigrants.  The family may change the head of household designation to another adult member of the family to qualify under this provision.

If they do not qualify for continued assistance, the member(s) that cause the family to be ineligible for continued assistance may move, or the family may choose prorated assistance.

**CHAPTER 13:**
**ALLOWABLE MOVES/PORTABILITY**

**13.1    INTRODUCTION**

This chapter defines the procedures, restrictions and limitations for moving, for new applicants and current participants.

As stated in HUD regulations, eligible families participating in the Housing Choice Voucher Program have the right to receive tenant-based voucher assistance anywhere in the United States, in the jurisdiction of a public housing agency (PHA) administering a Housing Choice Voucher program. This program feature is called "portability." This chapter includes the Housing Authority's procedures for new applicants and current participants that "port out" of the Housing Authority's jurisdiction.

Additionally, this chapter specifies the Housing Authority's policies for receiving "incoming ports" from other public housing agencies.

The option of portability does not apply to families assisted under the Moderate Rehabilitation Program.

**13.2    ALLOWABLE MOVES AND RESTRICTIONS**

**13.2.1  Restrictions on Moves**

The Housing Authority may deny families permission to move if:

> ➤ There is insufficient funding for continued assistance;
> ➤ The family has violated a family obligation;
> ➤ The family is in the initial term of the lease (see 13.2.4 for exceptions); or
> ➤ The family owes money to this Housing Authority or another PHA. See Section 17.2 (Repayment Agreements for Families) for more information on allowable moves for families with repayment agreements.

In the event of insufficient funding, the Housing Authority is approved to deny new and assisted families permission to move if the family chooses to move to a higher cost area. New or assisted families will not be permitted to move to a different public housing agency's jurisdiction if the new HAP is higher than the current HAP subsidy for a participant, or the estimated HAP for an applicant, unless the receiving PHA chooses to absorb the new or assisted family into their Section 8 program.

**13.2.2  Allowable Moves for New Applicants**
**[24 CFR §982.353]**

A family who lives and/or works in the Housing Authority's jurisdiction at the time they are admitted to the Housing Choice Voucher Program may choose, as their initial housing:

> ➤ To remain in their current unit (this is referred to as leasing-in-place);
> ➤ A unit anywhere within this Housing Authority's jurisdiction; or

Housing Authority of the County of Los Angeles

> ➤ A unit outside of this Housing Authority's jurisdiction.   For more information, see the Outgoing Portability section of this chapter.

A family who does not live or work in this Housing Authority's jurisdiction at the time they are admitted to the Housing Choice Voucher Program must initially locate a unit within this Housing Authority's jurisdiction in order to receive assistance.   The family does not have any right to portability until they have resided in this Housing Authority's jurisdiction for at least 12 months [24 CFR §982.353(c)].

> ➤ Under limited conditions, the Housing Authority may waive this requirement.   Examples of situations that may warrant an exception to this rule include life-threatening situations or as a reasonable accommodation.   However, in all cases both the Housing Authority and the receiving jurisdiction must agree to allow the move.   If the receiving public housing agency does not agree, the Housing Authority will not approve a transfer [24 CFR §982.353(c)(3)].

**13.2.3   Allowable Moves for Current Participants**
**[24 CFR §982.314]**

A family that initially receives assistance for a unit leased in this Housing Authority's jurisdiction may request to move to another unit and receive continued assistance.   Families in good standing may move with continued assistance if:

1. The assisted lease for the old unit has ended because the Housing Authority has terminated the HAP contract for owner breach [24 CFR §982.314(b)(1)(i)];

2. The lease was terminated by mutual agreement of the owner and the family [24 CFR §982.314(b)(1)(ii)].   The Housing Authority must receive a copy of this notice;

3. The owner has given the family a notice to vacate for reasons other than a lease violation [24 CFR §982.314(b)(2)].   The Housing Authority must receive a copy of this notice; or

4. The family has given proper written notice of lease termination after the initial lease term and in accordance with State law.   This generally requires a 30-day notice; however, the Housing Authority recommends that families provide a 60-day notice in order to ensure a smooth transition to the new unit [24 CFR §982.314(b)(3)].   The Housing Authority must receive a copy of this notice.

A family is considered to be in good standing if they have not violated the terms of the lease, any program regulations and do not owe any money to this Housing Authority or another public housing agency.

Families that are eligible to move with continued assistance may choose to move to a unit that is:

> ➤ **Within this Housing Authority's jurisdiction**.   This type of a move is called a "reserve vacate."   This means that the family is moving from a unit, which could result in a temporary vacancy in the program until

another unit is secured; however, the slot remains reserved for the family until the time they lease another unit.

> **Outside Housing Authority's jurisdiction**. See the Outgoing Portability section of this chapter for more information.

### 13.2.4 Restrictions on Moves During the Initial Lease [24 CFR §982.314(c) and §982.314(e)]

Generally, families will not be permitted to move during the initial lease (12 months), or more than once in any 12-month period except as noted below:

1. **Life-Threatening Situations** (witness to or victim of a crime, victims of domestic violence, dating violence, and stalking; HQS emergency items, natural disaster, unsafe environment, etc.)

2. **Reasonable Accommodation**: A family may request to move to accommodate a disability. The Housing Authority may approve the move as a reasonable accommodation and grant the request to move. However, the owner of the property must agree to release the tenant from the lease.

3. **Mutual Termination**: The family and the owner agree to mutually terminate the contract. If a family requests to terminate a HAP contract based on a mutual termination more than once in a 12-month period, the Housing Authority may review the reason for the mutual termination. If the owner is requesting a mutual termination in lieu of enforcing tenant obligations under the lease, and there is evidence that the family has committed violations of the lease, the Housing Authority may terminate the family for non-compliance with family obligations.

## 13.3   PROCEDURES FOR MOVES FOR CURRENT PARTICIPANTS [24 CFR §982.314(d)]

Eligible families who wish to move must first provide the Housing Authority and the property owner with proper written notice. Once the Housing Authority has received the notice, the family may be issued a new voucher if there are no reported changes to the family's income or family composition. If there are changes to the family's income or family composition, a reexamination will be conducted before a new voucher may be issued.

At the same time the voucher is issued, the family will receive a Request for Tenancy Approval (RTA). The family should begin looking for housing immediately in order to ensure a smooth transition to the new unit.

> Requests to move for families wishing to port to another jurisdiction must be submitted in writing.

Families in the Housing Authority's jurisdiction that are unable to locate a new unit by the time they are supposed to vacate the old unit are responsible for contacting the owner and negotiating to stay in the current unit longer. In order for an extension to be approved by the Housing Authority, both parties must sign and complete the required contract extension form, indicating the revised effective expiration date, and submit it to the Housing Authority before the

contract is set to expire.  Once the request has been received, the Housing Authority will release payments to the owner as appropriate.  If the owner does not agree to extend the notice, the family may be required to seek alternative housing, at their own expense, in the interim.

## 13.4   OUTGOING PORTABILITY PROCEDURES
[24 CFR §982.355(c)]

Both new applicants and current participant families must first identify the new jurisdiction where they will be moving. Once the Housing Authority has received this information, the Housing Authority will:

1. Notify the receiving public housing agency (PHA) that the family wishes to relocate into its jurisdiction [24 CFR §982.355(c)(3)];

2. Advise the family how to contact and request assistance from the receiving PHA [24 CFR §982.355(c)(2)]; and

3. Provide the following documents and information to the receiving PHA [24 CFR §982.355(c)(4)]:

   - A copy of the family's voucher, with issue and expiration dates, formally acknowledging the family's ability to move under portability.

   - The most recent HUD 50058 form and verifications.

   - The Family Portability form (HUD-52665).

New applicant families will be subject to the income eligibility requirements of the jurisdiction in which they will be <u>receiving</u> assistance [24 CFR §982.353(d)].

### 13.4.1   Briefing for Families Wishing to Exercise Portability

Since families wishing to move to another jurisdiction must understand that the policies and procedures of the receiving PHA prevail, the Housing Authority will provide counseling for those families who express an interest in portability.  This will include a discussion of difference in payment standards, subsidy standards, and income limits, if applicable.

### 13.4.2   Payment to the Receiving PHA
[24 CFR §982.355(d) and §982.355(e)]

If the receiving PHA chooses to administer and bill assistance on the Housing Authority's behalf, the Housing Authority will reimburse the receiving PHA for costs associated with administering the voucher, as specified in HUD regulations.

The receiving PHA must submit to the Housing Authority the initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract.

The Housing Authority will ensure that the receiving PHA receives all subsequent monthly payments no later than the fifth working day of each month.

**13.5     INCOMING PORTABILITY PROCEDURES**
        **[24 CFR §982.355]**

Eligible participants in the Housing Choice Voucher Program in other public housing agencies may be assisted in the Housing Authority's jurisdiction.

For a family to port in to the Housing Authority's jurisdiction, the Housing Authority must receive, from the initial PHA:

> ➢ The Family Portability form (HUD-52665) with Part I completed.

> ➢ A copy of the family's voucher with a valid expiration date.

> ➢ The most recent HUD 50058 form and required income verifications supporting the form.

**13.5.1  Policies on Absorption and Administration**
        **[24 CFR §982.355(d) and §982.355(e)]**

For incoming ports, the Housing Authority may, if funding permits, accept a family with a valid voucher from another jurisdiction and absorb the voucher.  The Housing Authority may also exercise the option to administer the initial public housing agency's voucher and bill the initial PHA as authorized in the regulations.

If the Housing Authority chooses to administer, it will submit to the initial PHA an initial billing no later than 60 days following the expiration date of the family voucher issued or within 10 days of an executed contract to ensure timely receipt of payment.

All subsequent monthly billing payments are to be received by the Housing Authority no later than the fifth working day of each month.

**13.5.2  Income and Total Tenant Payment Review**
        **[24 CFR §982.355(c)]**

The Housing Authority will conduct an initial review of all incoming port families. The Housing Authority will:

> ➢ Conduct criminal background and registered sex offender registration checks of family members (see Section 13.5.3 below).

> ➢ Verify identifying documents, family income and composition.

> ➢ As necessary, the Housing Authority will change the bedroom size of a family's voucher to comply with the Housing Authority's subsidy standards.  If this occurs, the family will be notified in writing of the change.

> ➢ If family income documents are missing or there has been a change in the family's circumstances, the Housing Authority may re-determine the family's TTP.

> ➢ For incoming port families who have not yet leased a unit under the Housing Choice Voucher Program (initial applicants), the Housing Authority must verify that the family meets the Housing Authority's income limits.

Housing Authority of the County of Los Angeles

If a re-determination is necessary, the Housing Authority will not delay issuing the family a voucher or otherwise delay approval of a unit unless the re-determination reveals that the family is not eligible for assistance in the Housing Authority's jurisdiction. In such cases, the family will be referred to the initial PHA for further assistance [24 CFR §982.355(c)(4)].

In general, all families porting into the Housing Authority's jurisdiction will be issued a Housing Authority voucher.  The term of the voucher may not expire before the expiration date noted on the voucher issued by the initial public housing agency.  The Housing Authority will determine whether to extend the voucher term, if necessary, based on the Housing Authority's policy for extension.  The Housing Authority will notify the initial PHA if such an extension is granted [24 CFR §982.355(c)(6)].

If a family that has ported into the Housing Authority's jurisdiction is unable to locate a unit within the allotted time authorized on the voucher, the Housing Authority will notify the issuing PHA that the voucher did not result in a HAP contract.

Approval of any unit is subject to rent reasonableness and a passed inspection [24 CFR §982.401(a)(3)].

### 13.5.3 Criminal Background Checks for Incoming Portability
### 24 CFR §982.355(c)(9) – (10) and PIH Notice 2004-12

The Housing Authority will conduct criminal background and sex offender registration checks for all incoming portability families and will not delay issuing the family a voucher but will take subsequent necessary action, including up to termination of a family's assistance (see Section 2.8 for details on screening).

The Housing Authority will take the following steps to minimize the number of terminations for families that are porting into its jurisdiction:

> ➢ At voucher issuance, families be will informed of the Housing Authority's criminal background policies and that they will be going through a background check and offered an opportunity to return to their originating PHA.

> ➢ If it is determined before a contract is effective that a family member is unsuitable due to a criminal background check the family will be given the options of returning to the originating household or excluding the culpable family member.

> ➢ If it is determined after a contract is effective that a family member is unsuitable and the Housing Authority is billing the originating PHA, the family will have the option of returning to the originating PHA or exclude the culpable household member.

> ➢ If it is determined after the contract is effective that a family member is unsuitable and the Housing Authority has absorbed the contract, the family will only have the option of excluding the culpable household member and will not be allowed to return to the originating household.

The contract will be terminated if it has been absorbed and if the family chooses not to exclude the culpable household member or there are no other adult eligible household members.

### 13.5.4 Terminations

In cases where the Housing Authority is administering a contract on behalf of another PHA, the Housing Authority will notify the initial PHA in writing of any termination of assistance within 30 calendar days of the termination.

### 13.5.5 Informal Hearings/Reviews
### [24 CFR §982.555]

If an informal hearing is required and requested by the family, the Housing Authority will conduct the hearing only if the participant has been assisted within the Housing Authority's jurisdiction. Such hearings will be conducted using the regular hearing procedures included in this plan. Families who have not yet received assistance in the Housing Authority's jurisdiction are eligible for informal reviews, as detailed elsewhere in this administrative plan.

The initial PHA will be responsible for collecting amounts owed to that public housing agency by the family for claims paid and for monitoring repayment. If the initial PHA notifies the Housing Authority that the family is in arrears or the family has refused to sign a Repayment Agreement, the Housing Authority will terminate assistance to the family.

Housing Authority of the County of Los Angeles

<div align="center">

**CHAPTER 14:**
**CONTRACT TERMINATIONS**

</div>

**14.1   INTRODUCTION**

The chapter identifies the key documents/contracts that set forth the responsibilities of each party involved in the rental assistance relationship and outlines the policies and procedures under which these contracts can be terminated.

**14.2   DESCRIPTION OF DOCUMENTS**

There are three parties involved in the rental relationship: the assisted family, the owner and the Housing Authority.

The rights and responsibilities of the assisted family are defined in the voucher or certificate and the Certified Statement of Family Obligations. A copy of the voucher or certificate is provided to the family at admission and each time a new voucher is issued. The family signs the Certified Statement of Family Obligations annually.

The relationship between the family and the owner is outlined in the rental lease. Generally, the term of the lease is for one year and then turns into a month-to-month tenancy. Although the Housing Authority is not a part of the lease, HUD regulations allow public housing agencies to act against the family for serious or repeated violations of the lease.

The terms of the relationship between the owner and the Housing Authority are outlined in the Housing Assistance Payments (HAP) contract. The term of the HAP contract is the same as the term of the lease.

**14.3   TERMINATION OF THE LEASE BY THE FAMILY: MOVES**
**[24 CFR §982.309(c)]**

For continued tenant assistance, the family cannot terminate the lease until after the initial term of the lease except for material breach of the lease by the owner. The lease determines the notice period for termination to the owner. Most leases require, at minimum, a 30-day notification. However, the Housing Authority recommends that families provide a minimum of a 60-day notice in order to allow enough time for a smooth transition of assistance from the old unit to the new unit. To initiate the lease termination, the family must send a written notice to the owner and the Housing Authority no less than 30 calendar days before the vacate date.

**14.4   TERMINATION OF THE LEASE BY THE OWNER**

An owner or manager may bifurcate (separate) a lease in order to evict, remove, or terminate assistance to any individual who is a tenant or lawful occupant and who engages in criminal acts of physical violence against family members or others, without evicting, removing, or terminating assistance, or terminating assistance, or otherwise penalizing the victim of such violence which is also a tenant or lawful occupant.

### 14.4.1 Terminating the Lease During the Initial Term of the Lease [24 CFR §982.310(a)]

During the term of the lease, the owner may not terminate the tenancy except for good cause, which includes serious or repeated violations of the lease and/or violations of federal, state or local law that imposes obligations on the family in connection with the use of the unit.

Under such conditions, the owner must provide both the family and the Housing Authority with a copy of any notice to move or eviction action. An eviction action is defined as a notice to vacate, or a complaint, or other initial pleading used under State or local law to commence an eviction action. Any eviction notice served to a family must specify the grounds for the termination of the tenancy.

An owner may commence termination of a tenancy for good cause by serving a legal notice of termination on the family for the following reasons:

1. Serious or repeated violation of the terms and conditions of the lease [24 CFR §982.310(a)(1)];

2. Violation of federal, state or local law that imposes obligations on the tenant in connection with the occupancy or use of the premises [24 CFR §982.310(a)(2)]; and

3. Other good cause, [24 CFR §982.310(a)(3)] including:

   - Criminal activity by the tenant, any member of the household, a guest or another person under the tenant's control that threatens the health, safety or right to peaceful enjoyment of the premises by the other residents, or persons residing in the immediate vicinity of the premises [24 CFR §982.310(d)];

   - Any drug-related criminal activity on or near the premises; or

   - Tenant disturbance of neighbors, destruction of property, or behavior resulting in damage to the premises.

### 14.4.2 Terminating the Lease After the Initial Term of the Lease

After the initial term of the lease, the owner may terminate the lease for other good cause. Examples of other good cause include:

➢ Business or economic reason for regaining possession of the unit;

➢ Owner's desire to repossess the unit for personal or family use or for a purpose other than residential property;

When terminating the lease for business or economic reasons, the owner is required to provide a 90-day notice to both the family and the Housing Authority.

### 14.4.3 Requests for Criminal Records by Project-Based Section 8 Owners [24 CFR §5.903(d)(3)]

Project-based Section 8 owners (excludes housing choice voucher owners), that have contracts with the Housing Authority, may request that the Housing Authority obtain criminal records, on their behalf, for the purpose of eviction or

lease enforcement. The Housing Authority will, however, charge a fee in order to cover costs associated with the review of criminal records.

Project-based owners must submit the following items in order for the Housing Authority to process criminal records. Owner requests must include:

1. A copy of a signed consent form from each adult household members, age 18 years and older. Included in the consent form must be a legible name, the date of birth, a California Identification Number, and a Social Security number. This information will be used for the sole purpose of distinguishing persons with similar names or birth dates.

2. An owner's criteria or standards for evicting drug criminals in accordance with HUD regulations (§ 5.857 of 24 CFR Parts 5 et al.); or criteria for evicting other criminals (§ 5.858 of 24 CFR Parts 5 et al.); or criteria for lease enforcement.

Once the Housing Authority obtains the criminal records, a determination will be made as to whether a criminal act, as shown by a criminal record, can be used as a basis for eviction or lease enforcement. The Housing Authority will base its determination in accordance with HUD regulations and the owner criteria.

It is important to note that the Housing Authority will not disclose the participant's criminal conviction record, nor the content of that record to the owner unless the owner is proceeding with a judicial eviction process. In the case of a judicial eviction, the owner must provide the Housing Authority with a certification that the criminal records are necessary to proceed with the eviction.

## 14.5   MUTUAL TERMINATION OF THE LEASE

In cases where the owner and the family agree to terminate the lease, both parties have an obligation to notify the Housing Authority in writing at least 30 calendar days in advance of the vacate date in order that Housing Authority may avoid overpayment to the owner. If the family has properly notified the Housing Authority and is in good standing, they will be scheduled for an issuance session where they will receive a voucher and all the necessary documents to search for a new unit.

## 14.6   TERMINATION OF THE HAP CONTRACT BY HOUSING AUTHORITY [24 CFR §982.453 – §982.454]

The Housing Authority will terminate the HAP contract as follows:

1. When the Housing Authority terminates program assistance for the family.

2. When the owner has breached the HAP contract.

   Any of the following actions will be considered a breach of the HAP contract by the owner:

   ➢ The owner has violated any obligation under the HAP contract for the dwelling unit, including the owner's obligation to maintain the unit according to housing quality standards, including any standards the Housing Authority has adopted in this policy [24 CFR §982.453(a)(1)].

> The owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.453(a)(2)].

> The owner has committed fraud, bribery or any other corrupt or criminal act in connection with any federal housing program [24 CFR §982.453(a)(3)].

> The owner has failed to comply with regulations, the mortgage or note, or the regulatory agreement for projects with mortgages insured by HUD or loans made by HUD [24 CFR §982.453(a)(4)].

> The owner has engaged in drug-related criminal activity [24 CFR §982.453(a)(5)].

> The owner has committed any violent criminal activity [24 CFR §982.453(a)(6)].

3. If the family is required to move from a unit which is overcrowded based on the Housing Authority's current subsidy standards [24 CFR §982.403(a)].

4. If funding is no longer available under the ACC [24 CFR §982.454].

> Before terminating HAP contracts on the basis of insufficient funding, the Housing Authority is required to ensure that the determination of insufficient funding is documented. The Housing Authority will consider funding insufficient if it is determined that the projected year-end subsidy falls short of the authorized budget amount.

> The Housing Authority will determine the number of families that must be terminated, and will present the Board of Commissioners with a recommended method for terminating HAP contracts. Following Board of Commissioner and HUD notification, the Housing Authority will terminate HAP contracts.

> Contracts of elderly and disabled families will not be subject to termination.

> Terminated families will be placed on the waiting list and will receive a preference for assistance from the waiting list.

The Housing Authority may terminate the HAP contract if the owner has violated any obligation under any other HAP contract under Section 8 of the 1937 Act (42 U.S.C. 1437f) [24 CFR §982.453(a)(2)]. The Housing Authority will consider the following list of factors in determining whether to terminate the HAP contract for a violation of another HAP contract:

> The nature of the breach

> The location of the other units under contract compared to the subject unit

> The impacts on participants in other the units

Additionally, an owner who breaches a HAP contract may be disapproved to participate in Housing Authority programs, as detailed in Section 9.10 (Owner Disapproval). The Housing Authority's rights and remedies against the owner under the HAP contract include recovery of overpayments, abatement or other

Housing Authority of the County of Los Angeles

reduction of housing assistance payments, termination of housing assistance payments, and termination of the HAP contracts.

Request for reasonable accommodations relating to termination of HAP contracts will be reviewed on a case-by-case basis.

**14.7** **HAP PAYMENTS AND CONTRACT TERMINATIONS**
**[24 CFR §982.311]**

When a HAP contract terminates, the Housing Authority will make payments in accordance with the HAP contract and depending on the reason for the contract termination.

In cases involving a tenant notice to move or a mutual termination, not involving an eviction action, the Housing Authority will pay the owner for the entire last month that the family was in the unit regardless of the actual day of the month that the family moved out. The Housing Authority may also pay a HAP on behalf of the family for the new unit in the same month. However, while the Housing Authority can pay a subsidy for two units in a given month under these conditions, the family may only have physical possession of one unit at a time. A family will be considered to have physical possession of a unit if they still have belongings in the unit and the key to the unit. Under such cases, the family will be required to pay the full rent for one of the units in its possession and the family's portion for the other unit [24 CFR §982.311(d)].

In cases involving evictions, the Housing Authority will continue to pay the HAP until the day the family moves out or is evicted [24 CFR §982.311(b)].

In cases involving termination of assistance due to insufficient funding, families will receive a minimum of 30 days notice of termination of assistance.

In cases involving termination of assistance for reasons other than insufficient funding, the Housing Authority will notify the owner and the family of the proposed termination date. If the family does not request a hearing or the hearing is decided in the Housing Authority's favor, the HAP payments will terminate in accordance with the notification. If a family continues to occupy the unit after assistance is terminated, the family is responsible for the total amount of rent due to the owner.

If HAP payments are released to the owner for periods of time beyond the dates set forth above, the owner will be required to return all monies to the Housing Authority within 30 calendar days or within the time specified in any approved repayment agreement. The Housing Authority also reserves the right to deduct any monies from other HAP payments being made to the owner by the Housing Authority. If the owner fails to repay the HAP, the account will be forwarded for further action.

## CHAPTER 15:
## FAMILY OBLIGATIONS

**15.1**   **INTRODUCTION**
**[24 CFR §982.552(a)]**

The Housing Authority may terminate assistance for a family because of the family's action or failure to act. The Housing Authority will provide families with a written description of the family obligations under the program, the grounds under which the Housing Authority can terminate assistance, and the Housing Authority's informal hearing procedures.   This chapter describes when the Housing Authority is required to terminate assistance, and the Housing Authority's policies for the termination of assistance.

**15.2**   **GROUNDS FOR TERMINATION**
**[24 CFR §982.552(c)(2)(iv)]**

The Housing Authority will not terminate assistance of a participant who is or has been a victim of domestic violence, dating violence, sexual assault, or stalking, if the participant otherwise qualifies for assistance.

If termination is based upon behavior resulting from a disability, the Housing Authority will delay the termination in order to determine if there is a reasonable accommodation, pursuant to law, that would cure the grounds for the termination.

**15.2.1 Form of Termination**

Termination of assistance for a participant may include any or all of the following [24 CFR §982.552(a)(3)]:

1. Refusal to enter into a HAP contract or approve a lease

2. Termination of HAP under an outstanding HAP contract

3. Refusal to process or provide assistance under portability procedures

**15.2.2 Mandatory Termination**

The Housing Authority must terminate assistance for participants under the following conditions:

1. If any member of the family fails to sign and submit to HUD or Housing Authority required consent forms for obtaining information [24 CFR §982.552(b)(3)].

2. If no member of the family is an U.S. citizen or eligible immigrant [24 CFR §982.552(b)(4)].

3. If 180 calendar days have elapsed since the Housing Authority's last housing assistance payment was made.

4. If any family member fails to meet the eligibility requirements concerning individuals enrolled at an institution of higher education as specified in Section 2.5 [24 CFR §5.612].